James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| THE GYMBOREE CORPORATION, *et al.*,[1] | ) | Case No. 17-32986 (___) |
| Debtors. | ) | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion (this "Motion"):

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588). The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

## **Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), (a) authorizing the Debtors to (i) pay all prepetition and postpetition wages, salaries, other compensation, and reimbursable expenses on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within 35 days of the commencement of these chapter 11 cases to consider approval of this Motion on a final basis.

## **Jurisdiction, Venue, and Procedural Background**

2. The United States Bankruptcy Court for the Eastern District of Virginia (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984. The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. The bases for the relief requested herein are sections 105(a), 362(d), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and Rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Rules").

4. On June 11, 2017 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of James A. Mesterharm, Chief Restructuring Officer of The Gymboree Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this Motion.

**The Debtors' Workforce**

5. The Debtors employ over 11,000 individuals on a full- and part-time basis (the "Employees"). Approximately 10,500 Employees are paid on an hourly basis, and approximately 500 Employees earn a salary. The Employees are not represented by a collective bargaining unit. In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors, as well as temporary workers, to complete discrete projects (the "Temporary Staff") sourced regularly from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short- and long-term basis. At this time, the Debtors retain approximately 250 Temporary Staff. The Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

6. The Debtors' Employees and Temporary Staff perform a wide variety of functions critical to the Debtors' operations at the Debtors' home office, Dixon distribution center, and regional stores. Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced. The remainder of these individuals provide services necessary to continue the Debtors' store-level operations. Without the continued, uninterrupted services of their Employees and Temporary Staff, the Debtors' reorganization efforts will be threatened.

**Employee Compensation and Benefits Programs**

7. The Debtors maintain the following compensation and benefits programs and pay various administrative fees and premiums in connection therewith (each as defined herein, and together, the "Employee Compensation and Benefits Programs"):

- Employee Compensation;
- Temporary Staff Compensation;
- Deductions and Payroll Taxes;
- Non-Insider Employee Incentive Programs;
- Health and Welfare Programs; and
- Paid Leave and Unpaid Leave.

8. The vast majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to pay their daily living expenses and support their families. Thus, Employees will face significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business. Consequently, the relief requested is necessary and appropriate.

**I. Compensation and Withholding Obligations.**

**A. ADP Processing.**

9. The Debtors retain ADP Processing to administer payroll and several other employee related benefits. In the 12 months before the Petition Date, the Debtors paid administration fees to ADP Processing in the amount of approximately $235,000. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to ADP Processing on account of administration fees is approximately $70,000.

**B. Unpaid Wages.**

10. The Debtors pay Employees' wages, salaries, and other compensation (excluding reimbursable expenses, and paid leave) on a bi-weekly basis (collectively, the "Employee Compensation"). Because Employees are generally paid one week in arrears, certain Employees will be owed accrued but unpaid Employee Compensation as of the Petition Date. Employee Compensation may also be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe they should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees. In the 12 months before the Petition Date, the Debtors spent an average of approximately $17.9 million per month on Employee Compensation.

11. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees is approximately $8.75 million on account of accrued Employee Compensation earned before the Petition Date. The Debtors do not believe any Employee is owed Employee Compensation in excess of $12,850.

**C. Temporary Staff Compensation.**

12. The Debtors make payments to Staffing Agencies on account of Temporary Staff (the "Temporary Staff Compensation"), for the performance of certain services critical to the Debtors' operations, including, among other things, administrative functions, like information technology and maintenance services, and operational functions related to the Debtors' retail businesses. The Debtors' Employees rely on the support of Temporary Staff to complete discrete projects in furtherance of the Debtors' businesses and to fill short-term, sometimes seasonal positions that are not economically feasible to employ on a full- or part-time basis.

The Debtors believe the authority to continue paying the Staffing Agencies is critical to minimize disruption of the Debtors' continued business operations.

13. In the 12 months before the Petition Date, the Debtors spent approximately $7.7 million on Temporary Staff and staffing agencies in the aggregate. As of the Petition Date, the Debtors estimate that Temporary Staff are owed an aggregate of approximately $650,000 on account of accrued services rendered prior to the Petition Date. The Debtors do not believe they owe any Temporary Staff amounts in excess of $12,850.

**D. Withholding Obligations.**

14. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks, including, without limitation, garnishments, levies, child support and related fees, and pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (as defined below), including payments pursuant to any supplemental Employee-elected, voluntary insurance programs provided by Unum Group ("Unum") (collectively, the "Deductions"). Some of the Deductions are forwarded to various third-party recipients. In the 12 months before the Petition Date, average monthly Deductions were approximately $1 million.

15. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, local income taxes, and Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or

local taxing authority within a few days of when Employees' payroll checks are disbursed. In the 12 months before the Petition Date, average monthly Payroll Taxes were approximately $5.5 million.

16. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $3,000,000.

**E. Reimbursable Expenses.**

17. The Debtors reimburse certain Employees and members of the board of directors for certain expenses incurred in the scope of their duties (the "Reimbursable Expenses"). Reimbursable Expenses typically include expenses associated with transportation, lodging, and meals incurred in connection with business travel and certain other work-related expenses.

18. Certain Reimbursable Expenses are incurred through the use of personal funds, and the Employee or director may be held personally liable for any unpaid obligations. The Debtors' inability to reimburse such expenses would impose hardship on such individuals where the obligations were incurred for the Debtors' benefit.

19. In addition, in the ordinary course, Employees submit certain other Reimbursable Expenses to a third-party provider for reimbursement, which provider reimburses the applicable Employee and is then paid by the Debtors. For example, the Debtors pay Runzheimer International Ltd. for mileage reimbursements due to Employees. The use of these third-parties to administer certain Reimbursable Expense programs greatly reduces the administrative burden that would otherwise fall on the Debtors. By this Motion, the Debtors request authority to pay any fees or costs due to such third-party providers.

20. The Debtors also provide certain employees at their home office, in the field, and at the distribution center with corporate credit cards (the "Corporate Credit Cards").

The Corporate Credit Cards are primarily utilized to pay for certain work-related expenses, such as work-related travel. Given the importance of Employees' ability to use the Corporate Credit Cards for reimbursement, the Debtors request authority to continue utilizing and making payments on account of the Corporate Credit Cards in the ordinary course of business.

21. In the 12 months before the Petition Date, the Debtors spent approximately $3,100,000 on account of Reimbursable Expenses and the Corporate Credit Cards. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Reimbursable Expenses and expenses on account of the Corporate Credit Cards is approximately $325,000.

## II. Non-Insider Employee Incentive Programs.

22. The Debtors maintain a number of incentive programs to drive performance among their Employees, including the Store Management Bonus Program, the District Managers Bonus Program, the Regional Managers Bonus Program, the 2017 Annual Bonus Program, and the 2017 Management Annual Bonus Program, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Non-Insider Employee Incentive Programs").[2]

### A. Performance Incentive Programs.

23. Certain non-insider Employees are eligible to participate in various performance-based incentive programs, including the Store Management Bonus Program, the District Managers Bonus Program, the Regional Managers Bonus Program, the 2017 Annual Bonus Program, and the 2017 Management Annual Bonus Program (together, the "Performance

[2] The relief sought under this Motion with respect to the Non-Insider Employee Incentive Programs does not include the payment of any obligation to an "insider" (as that term is defined in section 101(31) of the Bankruptcy Code, the "Insiders"). The Debtors will seek separate authority with respect to such parties and reserve all rights with respect to the "insider" status of such parties.

Incentive Programs"). Awards under the Performance Incentive Programs are distributed entirely at the discretion of the Company and are calculated and paid in cash, up to the maximum incentive payment for each Employee, based on the specific performance metrics under the applicable program, as further described below.

**1. Store Management Bonus Program.**

24. Various levels of management in each store have the opportunity to earn bonuses up to a certain amount annually, depending on the Employee's specific title under the store management bonus plan (the "Store Management Bonus Program"). Bonuses thereunder are awarded monthly, based on whether or not the Employee's specific store met or exceeded that store's performance goals.

25. To be eligible to receive any bonus under the Store Management Bonus Program, the Employee must work an average of 10 hours per week during the bonus fiscal month and must be employed on the date the bonus is paid. Such bonuses are taxed and paid approximately 6 weeks after the end of the fiscal month.

**2. District Managers Bonus Program.**

26. Employees in the role of District Manager ("District Manager") are eligible to receive bonus awards under the District Managers Bonus Program (the "District Managers Bonus Program"). District Managers are eligible to earn a quarterly bonus, provided that they meet certain quarterly sales and payroll performance metrics.

27. To be eligible to receive any bonus, District Managers must be permanent employees and must be employed on the date the bonus is paid. Such bonuses are taxed and paid approximately 6 weeks after the end of the fiscal quarter.

**3. Regional Managers Bonus Program.**

28. Employees in the role of Regional Manager ("Regional Manager") are eligible to receive bonus awards under the Regional Managers Bonus Program (the "Regional Managers Bonus Program"). The Regional Managers Bonus Program is divided into two parts. Regional Managers are eligible to earn a quarterly bonus of a percentage of their annual salary, provided that they meet certain quarterly sales and payroll performance metrics.

29. Regional Managers are also eligible for an additional bonus of another predetermined percentage of their annual salary if the Company meets or exceeds certain sales and performance objectives. This additional bonus award opportunity includes a guaranteed payment, paid out in two equal installments, with the first installment paid in August, and the second installment paid in March.

30. To be eligible to receive any bonus under the Regional Managers Bonus Program, Regional Managers must be permanent employees and must be employed on the date the bonus is paid. Such bonuses are taxed and paid approximately 6 weeks after the end of the fiscal quarter.

**4. 2017 Annual Bonus Program.**

31. All permanent, non-insider Employees employed in the home office and certain permanent, non-insider Employees employed at the Dixon distribution center (other than certain employees excluded from participation by the Board of Directors of the Company or by participation in the 2017 Management Annual Bonus Program) are eligible to participate in the 2017 Annual Bonus Program (the "2017 Annual Bonus Program"). Temporary Staff are not eligible to participate in the 2017 Annual Bonus Program. Participating Employees are not eligible for bonuses under any of the Company's other bonus programs covering the same bonus period as the 2017 Annual Bonus Program.

32. The bonus period is divided into two halves, the first half and the second half. Whether bonuses under the 2017 Annual Bonus Program are earned is determined by the Company's annual earnings expectations and targets. The Company has sole discretion to determine whether the applicable award thresholds have been met for the first and second semi-annual periods. If the Company does not meet expectations in the first semi-annual period, or an Employee's payout is less than the maximum payout for the first semi-annual period, the difference may be made up if the Company meets or exceeds its goals for the second semi-annual period.

33. Bonuses under the 2017 Annual Bonus Program are paid out in August (for the first semi-annual period) and March (for the second semi-annual period).

**5. 2017 Management Annual Bonus Program.**

34. The 2017 Management Annual Bonus Program operates much like the 2017 Annual Bonus Program, but Employees participating under the 2017 Management Annual Bonus Program are guaranteed certain payout amounts under the 2017 Annual Bonus Program.

35. All permanent, non-insider Employees employed, in each case, as a Director, Senior Director, or Vice President (other than certain employees excluded from participation by the Board of Directors of the Company) (collectively, the "Management Employees") are eligible to participate in the 2017 Management Annual Bonus Program (the "2017 Management Annual Bonus Program"). Temporary Staff are not eligible to participate in the 2017 Management Annual Bonus Program. Management Employees are not eligible for bonuses under any of the Company's other bonus programs covering the same bonus period as the 2017 Management Annual Bonus Program.

36. The bonus period is divided into two halves, the first half and the second half. Whether bonuses under the 2017 Management Annual Bonus Program are earned is determined

by the Company's annual earnings expectations and targets. The Company has sole discretion to determine whether the applicable award thresholds have been met for the first and second semi-annual periods. If the Company does not meet expectations in the first semi-annual period, or an Employee's payout is less than the maximum payout for the first semi-annual period, the difference may be made up if the Company meets or exceeds its goals for the second semi-annual period.

37. Eligible Employees are guaranteed a minimum retention bonus payout for each of the first and second semi-annual periods. Bonuses under the 2017 Management Annual Bonus Program are paid out in August (for the first semi-annual period) and March (for the second semi-annual period).

38. The Debtors believe the Performance Incentive Programs are integral to the operation of the Debtors' business. In particular, the Performance Incentive Programs align Employees' interests with those of the Debtors generally by linking payments under the Performance Incentive Programs to performance and overall efficiency of the Debtors' operations.

39. The Debtors do not currently have any obligations to any Employees outstanding on account of the Performance Incentive Programs. The Debtors expect the total amount payable to non-Insider Employees under the Performance Incentive Programs during the pendency of the case will be approximately $1.85 million.

**B. Referral Incentive Program.**

40. The Debtors provide cash incentives to current non-Insider Employees who refer candidates to fill identified vacant employment positions (the "<u>Referral Incentive Program</u>"). Under the Referral Incentive Program, a referring Employee receives an incentive payment once a referred candidate has completed 90 days of employment with the Debtors. The Referral

Incentive Program is in place at both the corporate and the store level, with eligible store-level referral bonuses being paid for referrals primarily at the district manager level and above. In the 12 months before the Petition Date, the Debtors paid approximately $35,000 on account of the Referral Incentive Program. As of the Petition Date, the Debtors do not have any outstanding obligations on account the Referral Incentive Program.

**C. Values Award Program.**

41. The Debtors provide cash payments to Employees in recognition of their service (the "Values Award Program"). Payments under the Values Award Program are made during February of each year and eligible Employees receive approximately $500 for their service to the Debtors. Values Award Program payments are available to district managers and above. In the 12 months before the Petition Date, the Debtors paid approximately $13,000 under the Values Award Program. As of the Petition Date, the Debtors estimate that there are no outstanding obligations on account of the Values Award Program.

**III. Employee Benefit Programs.**

**A. Health and Welfare Programs.**

42. The Debtors offer a number of health and welfare benefits programs to eligible current and former Employees, including the Health Insurance Programs, the Life and AD&D Insurance, the Disability Benefits, the Workers' Compensation Program, the 401(k) Plan, and the Assistance Programs, and pay certain administrative fees to third-party providers associated with such programs (each as defined herein, and collectively, the "Health and Welfare Programs").

**6. Health Insurance Programs.**

43. Employees are offered the opportunity to participate in or are otherwise provided a number of health benefit plans, including the Medical Plans, the Stop-Loss Insurance, the Wellness Program, the HSA, the FSA, and the Vision Plans (each as defined herein, and

collectively, the "Health Insurance Programs"). The Debtors also subsidize or continue to provide certain benefits to certain former Employees after their termination, retirement, or disability leave, including (without limitation) benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

44. The Debtors offer medical and prescription drug benefit programs (the "Medical Plans") to current and certain former Employees, which are administered by Blue Shield of CA Network ("Blue Shield"), Kaiser Permanente ("Kaiser"), Hawaii Medical Services Association ("HMSA"), and CoreTrust CVS/Caremark ("CoreTrust"). The coverage in the Medical Plans differs depending on the level of coverage Employees or former Employees elect to receive. Monthly health care premiums differ depending on the Medical Plan in which the Employee or former Employee is enrolled and whether the Employee or former Employee has dependents covered by the applicable plan. While the Medical Plans are self-insured, the Debtors maintain a stop-loss insurance policy with Blue Shield to cover catastrophic medical claims (the "Stop-Loss Insurance"). The total cost of the Medical Plans, including the Stop-Loss Insurance, is approximately $400,000 per month. The Debtors also spend approximately $830,000 per month on average on medical claims asserted under the Medical Plans.

45. Employees who participate in certain of the Medical Plans may contribute a portion of their compensation into a health savings account (the "HSA"), administered by Bank of America, which may be used for incidental medical expenses. Participating Employees can make before-tax contributions to the HSA through payroll deductions to cover reimbursements under the program up to the maximum amount permitted by the IRS. Additionally, the Debtors provide a one-time contribution to each participating Employee's HSA in the amount of $500 per Employee for Employees enrolled in employee-only coverage or $1,000 per Employee for

Employees enrolled in employee-plus-one or family coverage. Currently, approximately 400 Employees and 200 former Employees use the HSA. The Debtors pay a monthly administration fee of approximately $1,700 to Bank of America on account of the HSA.

46. The Debtors also provide Employees who participate in certain of the Medical Plans with access to a flexible spending account (the "FSA"), administered by ADP Benefit Services, which can be used to cover incidental medical costs and dependent child care. Currently, approximately 124 Employees use the FSA for medical costs and 45 Employees use the FSA for dependent child care. The Debtors do not make any contributions to any Employee's FSA.

47. The Debtors also provide vision insurance through Vision Service Plan and Hawaii Medical Services Association (together, the "Vision Plan"). The Vision Plan is fully insured. The total cost of the Vision Plan is approximately $15,000 each month, which is funded entirely by Employee contributions and former Employee contributions.

48. The Debtors also provide dental insurance through Delta Dental of California and Hawaii Medical Services Association (together, the "Dental Plan"). The Dental Plan is fully insured. The total cost of the Dental Plan is approximately $30,000 each month, which is funded entirely by Employee contributions and former Employee contributions. The Debtors also spend approximately $67,000 per month on average on claims asserted under the Dental Plan.

49. Additionally, the Debtors work with certain vendors to assist in the administration, advisement, and management of the Medical Plans, including USI Insurance Services ("USI"), Delta Health Systems ("Delta Health"), Wellness Corporate Solutions ("Wellness Corporate Solutions"), Guidespark ("Guidespark"), Health E(FX) ("Health E(FX)"), Navia Benefit Solutions ("Navia"), Doctor on Demand ("DoD"), Quantum Care Coordination

("Quantum"), and Univers ("Univers") (collectively, the "Health Care Vendors"). The Debtors spend approximately $180,000 per month on average on account of the Health Care Vendors.

50. The Debtors spend approximately $1.5 million per month on average on the Health Insurance Programs. Of this amount, certain vendors under the Health Insurance Programs are paid in arrears, and certain are paid in advance on a monthly, quarterly, or annual basis. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations under the Health Insurance Programs and administration fees thereto is approximately $200,000.

51. Additionally, the Debtors are obligated to make quarterly payments to Navia SF HRA City Option Funding on account of San Francisco city and county required medical coverage (the "Required Coverage") for Employees who decline Company provided coverage. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations on account of the Required Coverage is $89,000.

**7. Insurance, Disability, and Workers' Compensation Programs.**

**a. Life and AD&D Insurance Programs.**

52. The Debtors provide life (the "Basic Life Insurance") and accidental death and dismemberment insurance coverage (the "Basic AD&D Insurance") to current and certain former Employees through Symetra Insurance ("Symetra"), which each provide maximum coverage of $500,000 in the event of an Employee's death or dismemberment. Current and certain former Employees may also purchase voluntary life insurance (the "Voluntary Life Insurance") and voluntary accidental death and dismemberment insurance (the "Voluntary AD&D Insurance" and, together with the Basic Life Insurance, the Basic AD&D Insurance, and the Voluntary Life Insurance, the "Life and AD&D Insurance") covering themselves and their spouses and children, through Symetra and Unum. Employees are eligible for company sponsored Life and AD&D

Insurance upon completion of a benefit eligibility waiting period, on the first of the month following two months of continuous employment. The Debtors are fully insured through the Life and AD&D Insurance.

**b. Disability Benefits.**

53. The Debtors provide Employees with short- and long-term disability benefits (the "Disability Benefits"). Employees are eligible for Disability Benefits upon completion of a benefit eligibility waiting period. Under the short-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their base wages in the event of a short-term medical disability due to an illness, injury, or pregnancy related condition (the "Short-Term Disability Benefits"). Under the long-term disability benefits program, Employees are entitled to, among other things, continuation of 60 percent of their wages, up to a monthly limit of $17,500, in the event of a long-term medical disability due to illness or injury (the "Long-Term Disability Benefits" and, together with the Short-Term Disability Benefits, the "Disability Benefits").

54. Employees' Short-Term Disability Benefits begin after an Employee is continuously disabled for 15 days and continue for up to a maximum of 11 weeks. The Long-Term Disability Benefits begin after a 90 calendar day waiting period, pending approval by Symetra, and continue until the Employee meets the normal retirement age as defined by the Social Security Administration. Both the Short-Term Disability Benefits and the Long-Term Disability Benefits are fully insured and administered through Symetra.

55. In the 12 months before the Petition Date, the Debtors paid an average of approximately $120,000 per month in administrative fees and premiums with respect to the Life and AD&D Insurance and Disability Benefits. As of the Petition Date, the Debtors estimate that

the amount of accrued but unpaid obligations on account of the Life and AD&D Insurance and Disability Benefits is approximately $120,000.

**c. Workers' Compensation Program.**

56. The Debtors maintain workers' compensation insurance for Employees at the levels required by laws in the states in which the Debtors operate (collectively, the "Workers' Compensation Coverage"). All Employees participate in the Debtors' Workers' Compensation Coverage, which is fully insured. The Debtors maintain coverage for the Workers' Compensation Coverage through Chubb ("Chubb"), Wyoming Department of Workforce Services ("Wyoming"), Washington Department of Labor and Industries ("Washington"), Ohio Bureau of Workers Compensation ("Ohio"), and North Dakota Workforce Safety & Insurance ("WSI" and, together with the foregoing, the "Workers' Compensation Vendors"). The Debtors pay approximately $1.1 million annually to the Workers' Compensation Vendors for maintaining the Workers' Compensation Coverage.

57. The Debtors also pay Gallagher Bassett ("Gallagher Bassett"), MedCor ("MedCor"), Lockton ("Lockton"), and Jordan Actuary ("Jordan Actuary") for services associated with the Workers' Compensation Coverage, such as claims triage and intake.

58. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Coverage without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[3] There are currently 130 open claims under the Workers' Compensation Coverage, of which all are covered by the Chubb policy. As

[3] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.

of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid amounts on account of the Workers' Compensation Coverage is approximately $3,200,000.

59. The Debtors also attempt to negotiate general releases in exchange for the settlement of some Employee claims (the "Employment Claims Settlements"). As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid fees on account of the Employment Claims Settlements is approximately $10,000.

**8. Retirement Plans.**

60. The Debtors offer all their Employees the opportunity to participate in a 401(k) Plan (the "401(k) Plan"). Employees age 21 or over become eligible for the 401(k) Plan on the first of the month following six months of continuous employment. The 401(k) Plan generally provides for pre-tax salary deductions of compensation up to limits set by the Internal Revenue Code. Each Employee's 401(k) contributions are deducted automatically from each paycheck. The Debtors match the Employees' 401(k) Plan contributions dollar-for-dollar in an amount up to 100 percent of the Employees' first 4 percent of eligible compensation, plus certain discretionary contributions (the "401(k) Contributions"). Under the 401(k) Plan, the Debtors also make disbursements on account of payroll deductions for repayment of loans that Employees previously drew from their individual 401(k) accounts (the "401(k) Participant Loan Payments").

61. In the 12 months before the Petition Date, the Debtors' monthly payments and disbursements on account of 401(k) Contributions and 401(k) Participant Loan Payments averaged approximately $200,000. As of the Petition Date, the Debtors estimate that they owe approximately $100,000 on account of the 401(k) Plan.

62. The 401(k) Plan is administered by Fidelity Investments (as trustee) and NWK Group (as record keeper). Fees for the 401(k) Plan owed to Fidelity Investments and NWK

Group, as trustee and record keeper, respectively, are paid out of the plan itself. Accordingly, as of the Petition Date, the Debtors estimate there are no outstanding amounts due on account of the 401(k) Plan.

**9. Assistance Programs.**

63. The Debtors provide the Employees with a confidential counseling and referral service (the "Employee Assistance Program"). The Employee Assistance Program pairs Employees with masters and doctoral level clinicians, Certified Public Accountants and Certified Financial Planners, and attorneys. The Employee Assistance Program is administered by ComPsych Corporation ("ComPsych"). Payments on account of the Employee Assistance Program are paid together with the Symetra monthly payments under Life and AD&D Insurance.

64. Full-time Employees and part-time Employees working a minimum of 20 hours per week are eligible for the Debtors' educational assistance program, under which the Debtors reimburse eligible expenses for tuition, fees, books, supplies, and coursework relevant to an Employee's current occupation from certain accredited and preferred higher education institutions (the "Educational Assistance Program"). The Educational Assistance Program provides reimbursements to full-time Employees for up to $2,500 per calendar year upon successful completion of a course. After the initial $2,500 is met, full-time Employees will receive reimbursement for 50 percent of the remaining tuition, standard textbook and compulsory fee expenses, up to the maximum nontaxable reimbursement limit established by the IRS per calendar year. Part-time Employees who work at least 20 hours per week will receive up to $1,000 reimbursement per calendar year. Employees who participate in the Educational Assistance Program are expected to remain with the Debtors for 12 months after receipt of their last reimbursement. In the 12 months before the Petition Date, the Debtors paid approximately $65,000 on account of the Educational Assistance Program.

65. In the ordinary course of business, the Debtors reimburse Employees for expenses associated with the adoption of a child under the age of 18, or an individual over 18 who is physically or mentally incapable of caring for themselves (the "Adoption Assistance Plan"). Under the Adoption Assistance Plan, full-time Employees who have been employed for at least one full year are eligible to receive up to $2,500 reimbursement per calendar year for eligible adoption expenses, with no lifetime maximum. In the 12 months before the Petition Date, the Debtors did not pay any fees on account of the Adoption Assistance Plan.

**10. Commuter Programs.**

66. Eligible Employees may choose to defer a dollar amount for qualified parking expenses (the "Parking Program") up to the IRS maximum, which for 2016 was $255 per month. Qualified parking is defined as parking that is on or near the Employee's workplace or parking that is on or near mass transit or vanpool used by the Employee for commuting to work. Employees may choose to have monthly payments mailed directly to a parking provider, checks for parking mailed to their homes, cash reimbursement through ADP Processing, or purchase a prepaid Commuter Check Card Prepaid MasterCard that may be used as a credit or debit card to pay for parking expenses.

67. Eligible Employees may also choose to defer a dollar amount for qualified mass transit expenses (the "Transit Program" and together with the Parking Program, the "Commuter Programs") up to the IRS maximum, which for 2016 was $255 per month. Any amount over the IRS maximum is paid post-tax by credit card at the time of purchase. Employees may choose to have monthly transit passes from their transit providers mailed to their homes, vouchers mailed to their homes, or receive a Commuter Check Card Prepaid MasterCard that may be used as a credit or debit card to pay for transit expenses. Fees on account of the Commuter Programs are taken directly from the Employee's paycheck and are processed by ADP Processing.

**B. Paid and Unpaid Leave.**

68. The Debtors provide paid leave in the form of FTO (as defined below), Sabbatical Leave (as defined below), and certain other statutory Paid Leave (together, the "Paid Leave"); the Debtors also provide Unpaid Leave in certain situations (as defined below).

69. In the ordinary course of business, the Debtors provide flexible time off ("FTO") to the Employees as a Paid Leave benefit and which may be used for any reason. FTO accrues at a specified rate up to a maximum amount based on the Employee's level, area of employment, years of service and date of hire.

70. The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unused FTO, except as provided under applicable nonbankruptcy law, is approximately $6.2 million. This amount, however, is not a current cash payment obligation.

71. In addition, the Debtors provide certain other forms of Paid Leave and Unpaid Leave, including:

- paid holidays throughout the year, during which Employees are not required to work and are paid their base rate of pay (the "Holidays");
- leave under the Family and Medical Leave Act (the "FMLA") for: (a) birth, adoption, or foster care, (b) family care, (c) medical emergencies, (d) military exigencies, and (e) military caregiving needs (the "FMLA Leave");
- maternity leave (the "Maternity Leave") for all expecting female Employees;
- one paid leave of absence upon request during the course of their career (the "Sabbatical Leave") for full-time Employees in the home office and distribution center and all District Managers and Regional Managers who have been employed for seven years to: (i) enhance their education and development through advanced study related to their current position or logical career path at an accredited school; (ii) support schools in their community by working on special projects, supporting teachers and administrators, or other programs supporting the learning environment at the school; or (iii) give back to their community by assisting any 501(3)c

charity to develop programs, help with fundraising activities or other special projects; and

- other paid and unpaid leaves of absence for personal reasons, many of which are required by law, including statutory sick leave, missed work time in the ordinary course of business for bereavement leave, jury or court attendance, or time spent voting (the "Other Paid Leave") and unpaid leaves of absence for family medical leaves and military leaves (the "Unpaid Leave").

These other forms of Paid Leave and Unpaid Leave do not involve incremental cash outlays beyond standard payroll obligations.

72. The Debtors believe that the continuation of the Paid Leave and Unpaid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which all Employees have come to depend. The Debtors anticipate that their Employees will utilize any accrued Paid Leave in the ordinary course of business, which will not create any material cash flow requirements beyond the Debtors' normal payroll obligations.

**C. Severance.**

73. In the ordinary course of business, the Debtors have sometimes provided, on an informal and discretionary basis, severance benefits to certain non-Insider Employees in the event of a termination by the Debtors that is not for "cause," or by reason of death or disability (the "Non-Insider Severance Payments"). Employees have sometimes received, upon termination and on a discretionary basis, up to one week of base pay for each year of service if the Employee is at the store level, up to two weeks of base pay for each year of service if the Employee is at the corporate level, and 52 weeks of base pay and certain continued benefits if the Employee is eligible under the management severance plan (the "Non-Insider Severance Benefits"). Base pay is an Employee's regular weekly or hourly rate of pay and does not include overtime, incentive compensation, or any other type of compensation.

74. The Debtors' ability to pay and provide discretionary severance amounts and other benefits has been critical to maintaining Employee morale and loyalty. Increased instability in the Debtors' workforce will only undermine the Debtors' ability to strengthen their financial and operational foundation, to generate growth, and to be positioned for long-term success. As a condition to receiving any Non-Insider Severance Payments or any Non-Insider Severance Benefits, the Debtors typically require that each Employee execute a release agreement, whereby the Employee releases any claims held against the Debtors. The Debtors believe that the Non-Insider Severance Payments and the Non-Insider Severance Benefits will help reduce the time and expense that could arise in the absence of the Non-Insider Severance Payments and the Non-Insider Severance Benefits to defend the assertion of claims by any severed Employees.

75. In the 12 months before the Petition Date, the Debtors spent approximately $325,000 on account of the Non-Insider Severance Payments. Prior to the Petition Date, the Debtors underwent reductions in force to adjust their operations to an unfavorable business environment. As a result, as of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid obligations under the Non-Insider Severance Payments is approximately $130,000.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits Programs.

#### A. Certain Employee Compensation and Benefits Programs Are Entitled to Priority Treatment.

76. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits Programs owed to the Employees to priority treatment, to the extent such payments do not exceed $12,850 for each individual as provided for under

sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus, granting the relief requested herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits Programs at this time enhances value for the benefit of all interested parties.

**B. Payment of Certain Employee Compensation and Benefits Programs Is Required by Law.**

77. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes). Because the

Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the Court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business. *See In re Dameron*, 155 F.3d 718, 721 (4th Cir. 1998). The Debtors therefore request that the Court recognize that the Withholding Obligations are not property of the Debtors' estates and, regardless of whether the Debtors collected the amounts prior to the Petition Date, authorize the Debtors to transmit such monies to the proper parties in the ordinary course of business.

78. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring. The Debtors therefore request that the Court authorize the Debtors to maintain the Workers' Compensation Program.

## II. Payment of the Employee Compensation and Benefits Programs Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

79. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363(b) of the Bankruptcy Code, courts require only that the debtor "show that a sound business purpose" justifies the proposed use of property. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983) (requiring a "good business reason" to approve a sale pursuant to section 363(b)); *In re W.A. Mallory Co.*, 214 B.R. 834, 836 (Bankr. E.D. Va. 1997) ("This Court follows the 'sound business purpose' test when examining § 363(b) sales.") (citing *In re WBQ*

*P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995)). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."). Thus, if a transaction satisfies the business judgment rule, it should be approved under section 363(b) of the Bankruptcy Code.

80. Furthermore, section 105(a) of the Bankruptcy Code further provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The "doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re United Am., Inc.*, 327 B.R. 776, 781 (Bankr. E.D. Va. 2005) (acknowledging the doctrine of necessity "is a necessary deviation because otherwise there will be no reorganization and no creditor will have an opportunity to recoup any part of its pre-petition claim"); *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105(a)] the court can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor."); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R.

189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

81. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.),* 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

82. Payment of the Employee Compensation and Benefits Programs is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits Programs. Additionally, continuing ordinary course benefits will help maintain Employee morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

83. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' businesses, and the Debtors believe that absent the payment of the Employee

Compensation and Benefits Programs owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

84. Courts in this and other districts have granted similar relief to that requested in this Motion in previous chapter 11 cases. *See, e.g.*, *In re Penn Virginia Corporation*, No. 16-32395 (KLP) (Bankr. E.D. Va. June 9, 2016); *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. Aug. 5, 2015); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. June 4, 2015); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. May 8, 2014); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 17, 2012); *In re Bear Island Paper Co., L.L.C.*, No. 10-31202 (DOT) (Bankr. E.D. Va. Mar. 25, 2010); *In re Movie Gallery, Inc.*, No. 10-30696 (DOT) (Bankr. E.D. Va. Feb. 3, 2010).[4] Accordingly, the Debtors respectfully request that the Court authorize the Debtors to pay and

---

4 Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

continue the Employee Compensation and Benefits Programs in the ordinary course of business and consistent with past practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

85. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

86. Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

## IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

87. The Debtors have sufficient funds to pay the amounts described in this Motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations, debtor-in-possession financing, and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits Programs, as applicable. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all

applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this Motion.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

88. Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." For the reasons discussed above, authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs (as defined below) in the ordinary course of business, (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, as well as granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases. Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

89. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Waiver of Memorandum of Points and Authorities**

90. The Debtors respectfully request that this Court treat this Motion as a written memorandum of points and authorities or waive any requirement that this Motion be accompanied by a written memorandum of points and authorities as described in Local Bankruptcy Rule 9013-1(G).

**Reservation of Rights**

91. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim; (c) a promise or requirement to pay any particular claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

92. The Debtors will provide notice of this Motion via first class mail and email (where available) to: (a) the Debtors, The Gymboree Corporation, 71 Stevenson Street, Suite 2200, San Francisco, California 94105, Attn: Kimberly H. MacMillan; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Anup

Sathy, P.C. and Steven N. Serajeddini and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. and Matthew C. Fagen; (c) proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia 23219, Attn: Michael A. Condyles, Peter J. Barrett and Jeremy S. Williams; (d) the Office of the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, Virginia 23219, Attn: Robert B. Van Arsdale, Esq., and 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201, Attn: Hugh M. Bernstein; (e) counsel to the official committee of unsecured creditors (if any) appointed in these chapter 11 cases; (f) counsel to the DIP Term Loan Agent, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005-1413, Attn: Dennis F. Dunne and Evan R. Fleck, and McGuireWoods LLP, 800 E. Canal Street, Richmond, Virginia 23219, Attn: Dion W. Hayes and Sarah B. Boehm; (g) counsel to the DIP ABL Administrative Agent, Morgan, Lewis & Bockius LLP, One Federal St., Boston, Massachusetts 02110, Attn: Julia Frost-Davies and Amelia C. Joiner and Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown; (h) counsel to the DIP ABL Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110, Attn: Kevin J. Simard and Jennifer C. Fenn and Whiteford Taylor Preston, LLP, 3190 Fairview Park Drive, Suite 800, Falls Church, Virginia 22042-4510, Attn: Christopher A. Jones; (i) the indenture trustee for the Debtors' senior unsecured notes, Deutsche Bank Trust Company Americas, Trust and Securities Services, 100 Plaza One, 6th Floor, MS: JCY03-0699, Jersey City, New Jersey 07311, Attn: Rodney Gaughan; (j) counsel to Bain Capital Private Equity LP, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Matt Barr and Robert Lemons; (k) counsel to the ad hoc group of senior unsecured noteholders, Akin Gump Strauss Hauer & Feld LLP, One

Bryant Park, Bank of America Tower, New York, New York 10036-6745, Attn: Daniel H. Golden and Jason P. Rubin, and Robert S. Strauss Building, 1333 New Hampshire Avenue, N.W., Washington, DC 20036-1564, Attn: James Savin; and (l) any party that has requested notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

93. No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Order and the Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: June 12, 2017
Richmond, Virginia

/s/ *Michael A. Condyles*
Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192
Email: Michael.Condyles@KutakRock.com
Peter.Barrett@KutakRock.com
Jeremy.Williams@KutakRock.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: james.sprayregen@kirkland.com
anup.sathy@kirkland.com
steven.serajeddini@kirkland.com

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: joshua.sussberg@kirkland.com
matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# <u>Exhibit A</u>

**Proposed Interim Order**

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| THE GYMBOREE CORPORATION, *et al.*,[1] | ) | Case No. 17-32986 (___) |
| Debtors. | ) | (Joint Administration Requested) |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order"):

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588). The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

(i) authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto, (ii) granting related relief, and (iii) scheduling a final hearing to consider approval of the Motion on a final basis, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on an interim basis as set forth herein.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

2. The final hearing (the "Final Hearing") on the Motion shall be held on __________, 2017, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of a final order on the Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time on __________, 2017, and served on the following parties: (a) the Debtors, The Gymboree Corporation, 71 Stevenson Street, Suite 2200, San Francisco, California 94105, Attn: Kimberly H. MacMillan; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn: Anup Sathy, P.C. and Steven N. Serajeddini and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn: Joshua A. Sussberg, P.C. and Matthew C. Fagen; (c) proposed co-counsel to the Debtors, Kutak Rock LLP, 901 East Byrd Street, Suite 1000, Richmond, Virginia 23219, Attn: Michael A. Condyles, Peter J. Barrett and Jeremy S. Williams; (d) the Office of the United States Trustee for the Eastern District of Virginia, 701 East Broad Street, Suite 4304, Richmond, Virginia 23219, Attn: Robert B. Van Arsdale, Esq., and 101 West Lombard Street, Suite 2625, Baltimore, Maryland 21201, Attn: Hugh M. Bernstein; (e) counsel to the official committee of unsecured creditors (if any) appointed in these chapter 11 cases; (f) counsel to the DIP Term Loan Agent, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, New York 10005-1413, Attn: Dennis F. Dunne and Evan R. Fleck, and McGuireWoods LLP, 800 E. Canal Street, Richmond, Virginia 23219, Attn: Dion W. Hayes and Sarah B. Boehm; (g) counsel to the DIP ABL Administrative Agent, Morgan, Lewis & Bockius LLP, One Federal St., Boston, Massachusetts 02110, Attn: Julia Frost-Davies and Amelia C. Joiner and Hunton & Williams LLP, Riverfront Plaza, East Tower, 951 East Byrd Street, Richmond, Virginia 23219, Attn: Tyler P. Brown; (h) counsel to the DIP ABL Term Agent, Choate, Hall & Stewart LLP, Two International Place, Boston, Massachusetts 02110, Attn: Kevin J. Simard and Jennifer C. Fenn and Whiteford Taylor Preston,

LLP, 3190 Fairview Park Drive, Suite 800, Falls Church, Virginia 22042-4510, Attn: Christopher A. Jones; (i) the indenture trustee for the Debtors' senior unsecured notes, Deutsche Bank Trust Company Americas, Trust and Securities Services, 100 Plaza One, 6th Floor, MS: JCY03-0699, Jersey City, New Jersey 07311, Attn: Rodney Gaughan; (j) counsel to Bain Capital Private Equity LP, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Matt Barr and Robert Lemons; and (k) counsel to the ad hoc group of senior unsecured noteholders, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, Bank of America Tower, New York, New York 10036-6745, Attn: Daniel H. Golden and Jason P. Rubin, and Robert S. Strauss Building, 1333 New Hampshire Avenue, N.W., Washington, DC 20036-1564, Attn: James Savin (collectively, the "Notice Parties").

3. Subject to: (x) any order approving the Debtors' use of cash collateral and/or any postpetition financing facilities (the "DIP Order"), the documentation in respect of any such postpetition financing facilities and/or use of cash collateral (the "DIP Documents"), and the budget governing any such postpetition financing and/or use of cash collateral (the "DIP Budget"); and (y) any and all claims, liens, security interests, and priorities granted in connection with such postpetition financing facilities and/or use of cash collateral (the "DIP Claims"), the Debtors are authorized to: (a) continue and discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits Programs in the ordinary course of business; *provided*, that pending entry of the Final Order, the Debtors are not authorized to honor obligations under the Non-Insider Employee Incentive Programs or pay any Non-Insider Severance Payments; *provided, further*, that Employees shall not be entitled to

receive payment of any travel savings incentives; *provided, further*, that pending entry of the Final Order, the Debtors shall not honor any Employee Compensation and Benefits Programs obligations that exceed the priority amounts set forth in sections 507(a)(4) or 507(a)(5) of the Bankruptcy Code.

4. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

5. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Program.

6. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Interim Order, without any duty of further inquiry and without liability for following the Debtors' instructions.

7. Notwithstanding the relief granted in this Interim Order and any actions taken pursuant to such relief, nothing in this Interim Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other

party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Interim Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

8. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

9. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b)

10. The requirement under Local Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

11. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

12. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order are immediately effective and enforceable upon its entry.

13. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Interim Order in accordance with the Motion.

14. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Interim Order.

Dated: __________, 2017
Richmond, Virginia

_____________________________________
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

/s/ *Michael A. Condyles*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Michael A. Condyles*

# Exhibit B

## Proposed Final Order

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| THE GYMBOREE CORPORATION, *et al.*,[1] | ) | Case No. 17-32986 (___) |
| Debtors. | ) | (Joint Administration Requested) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of a final order (this "Final Order"):

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588). The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

(i) authorizing the Debtors to (a) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits Programs in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits Programs, including payment of prepetition obligations related thereto and (ii) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated July 10, 1984; and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1. The Motion is granted on a final basis as set forth herein.

2. Subject to: (x) any order approving the Debtors' use of cash collateral and/or any postpetition financing facilities (the "DIP Order"), the documentation in respect of any such postpetition financing facilities and/or use of cash collateral (the "DIP Documents"), and the

budget governing any such postpetition financing and/or use of cash collateral (the "DIP Budget"); and (y) any and all claims, liens, security interests, and priorities granted in connection with such postpetition financing facilities and/or use of cash collateral (the "DIP Claims"), the Debtors are authorized to: (a) continue and discontinue the Employee Compensation and Benefits Programs in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law; and (b) pay and honor prepetition amounts outstanding under or related to the Employee Compensation and Benefits Programs in the ordinary course of business; *provided*, that Employees shall not be entitled to receive payment of any travel savings incentives.

3. Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Program in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Program and pay all prepetition amounts relating thereto in the ordinary course of business. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

4. Nothing herein shall be deemed to authorize the payment of any amounts which violates or implicates section 503(c) of the Bankruptcy Code; *provided*, that nothing herein shall prejudice the Debtors' ability to seek approval of relief pursuant to section 503(c) of the Bankruptcy Code at a later time.

5. Nothing contained herein is intended or should be construed to create an administrative priority claim on account of any obligations owed under any Employee Compensation and Benefits Program.

6. The banks and financial institutions on which checks were drawn or electronic payment requests made in payment of the prepetition obligations approved herein are authorized to receive, process, honor, and pay all such checks and electronic payment requests when presented for payment, and all such banks and financial institutions are authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved by this Final Order without any duty of further inquiry and without liability for following the Debtors' instructions.

7. Notwithstanding the relief granted in this Final Order and any actions taken pursuant to such relief, nothing in this Final Order shall be deemed: (a) an admission as to the validity of any prepetition claim against a Debtor entity; (b) a waiver of the Debtors' or any other party in interest's right to dispute any prepetition claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Final Order or the Motion; (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

8. The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests that are dishonored as a consequence of these chapter 11 cases with respect to prepetition amounts owed in connection with the relief granted herein.

9. The requirement under Local Rule 9013-1(G) to file a memorandum of law in connection with the Motion is waived.

10. Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

11. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Final Order are immediately effective and enforceable upon its entry.

12. The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Final Order in accordance with the Motion.

13. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Final Order

Dated: ___________, 2017
Richmond, Virginia

______________________________________
UNITED STATES BANKRUPTCY JUDGE

WE ASK FOR THIS:

/s/ *Michael A. Condyles*

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone: (804) 644-1700
Facsimile: (804) 783-6192

- and -

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

- and -

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**CERTIFICATION OF ENDORSEMENT**
**UNDER LOCAL BANKRUPTCY RULE 9022-1(C)**

Pursuant to Local Bankruptcy Rule 9022-1(C), I hereby certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

/s/ *Michael A. Condyles*