James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GYMBOREE CORPORATION, *et al.*,[1] | ) | Case No. 17-32986 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

### DECLARATION OF JAMES A. MESTERHARM, CHIEF RESTRUCTURING OFFICER OF THE GYMBOREE CORPORATION, IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, James A. Mesterharm, hereby declare under penalty of perjury:

1.        I am a Managing Director at AlixPartners LLP ("AlixPartners") and have served

as the Chief Restructuring Officer for The Gymboree Corporation (together with the other

above-captioned debtors and debtors in possession, the "Debtors," and, together with their

---

[1]        The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588).  The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

non-Debtor affiliates, "Gymboree") since May 30, 2017.[2]  AlixPartners has served as financial and restructuring advisor to the Debtors since March 2017.

2.      I have been a full time restructuring advisor for over 23 years.  I received a B.S. in Accounting and Management in 1990 from Purdue University and a Masters of Business Administration in Finance and Organizational Behavior in 1998 from Northwestern University's Kellogg School of Graduate Management, where I have been a guest lecturer on restructuring topics.  I am a Certified Public Accountant and a Fellow of the American College of Bankruptcy.  I have been employed by AlixPartners since September 1996.  AlixPartners is a global independent restructuring consulting firm that has a wealth of experience in providing restructuring advisory services, and has assisted, advised, and provided strategic advice to debtors, creditors, bondholders, investors, and other entities in numerous chapter 11 cases of similar size and complexity to these chapter 11 cases.  Since its inception in 1981, AlixPartners, its predecessor entities, and its affiliate, AP Services, LLC, have provided restructuring or crisis management services in numerous large cases.  Some notable, publicly-disclosed restructuring assignments that I have personally led include Linn Energy, Inc., Paragon Offshore PLC, Walter Energy, Inc., Nautilus Holdings Ltd., Eastman Kodak Company, General Growth Properties, Hilex-Poly, Silicon Graphics Inc., Parmalat USA, Safety-Kleen Corporation, and Zenith Electronics Corporation.

3.      Each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of Virginia (the "Court") on June 11,

---

[2]      I also serve as the Chief Restructuring Officer of each of the other above-referenced debtors and debtors in possession (together with the The Gymboree Corporation, the "Debtors," and, together with their non-Debtor affiliates, "Gymboree").  Debtor Gym-Card, LLC is domiciled in the state of Virginia, which serves as a proper basis for venue in these chapter 11 cases.

2017.  To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "First Day Motions").

4.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed today.

5.      Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, input by the Debtors' management team and advisors, including the AlixPartners team working under my supervision, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge.  I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth herein.

### Preliminary Statement

6.      Amidst the challenges facing many in the retail industry, the Debtors commence these chapter 11 cases with a comprehensive pre-negotiated restructuring in hand, together with key creditor support.  After more than four months of diligence and arms' length negotiations with certain secured term loan lenders (the "Consenting Term Loan Lenders"), the Debtors have reached agreement with approximately 66%[3] of lenders holding Gymboree's $788.8 million secured term loan to fund and support an expedited restructuring that will ensure a viable enterprise and maximize stakeholder recoveries.  The key terms of the prenegotiated restructuring contemplate a reduction of approximately $1 billion in indebtedness, an infusion of

---

[3]    Exclusive of the $20 million Li & Fung Term Loan, as described and defined below.

up to $115 million in new money (through both a term loan debtor-in-possession financing facility and a fully backstopped rights offering), and a rationalization of the Debtors' retail footprint.  As contemplated in the Restructuring Support Agreement, dated as of June 11, 2017 (a copy of which is attached hereto as **Exhibit A**), the Debtors intend to move swiftly through these cases and obtain confirmation of a chapter 11 plan by September 24, 2017.

7.    Gymboree was founded in San Francisco, California in 1976 as the first program to promote child growth and learning through playtime with parents.  Following its inception, Gymboree specialized in creating activities to help develop the cognitive, physical, and social skills of children as they play.  In 1986, Gymboree launched its first retail store in California to provide children's apparel to complement Gymboree's existing development programs.  Over the course of the next three decades, Gymboree expanded its domestic and international presence to approximately 1,300 specialty retail stores operating under three brands:  Gymboree; Janie & Jack (a higher-end offering launched in 2002); and Crazy 8 (a value-oriented line launched in 2007). Gymboree's product and price diversification allowed it to maximize market exposure and create consumer loyalty in several different consumer segments.

8.    Unfortunately, the Debtors, like many other apparel and retail companies, have recently fallen victim to adverse macro-trends, including the general shift away from brick-and-mortar stores to online retail channels.  More specifically, retail companies like Gymboree, with a substantial brick-and-mortar presence, bear higher expenses than web-based retailers and are heavily dependent on store traffic, which has decreased significantly as consumers increasingly shop online rather than in malls or shopping centers.  In addition to competing against online retailers, the Debtors have struggled against other established brick-and-mortar retailers, such as Children's Place and the Gap, who have less leveraged capital

structures.  With less debt to service, these competitors are able to offer lower prices than the Debtors and still bear the high operating expenses associated with brick-and-mortar retail.

9.      These developments, compounded with an underdeveloped online presence and wholesale platform, have adversely impacted the Debtors' sales and operations, with EBITDA declining by 24% over the last year, from approximately $94 million in 2015 to approximately $71 million in 2016.  These declines have directly—and negatively—impacted liquidity. Moreover, the Debtors are facing looming debt maturities, beginning in December 2017.

10.      To protect the inherent value in its businesses and to address the existing macro-economic challenges, Gymboree has been proactive in developing strategies to maintain its market position and improve performance in the challenging retail climate.  In particular, Gymboree is implementing real estate rationalization measures and other operational efficiency initiatives and developing its wholesale business and online sales presence.

11.      And unlike many retailers with challenged business models that have been unable to continue operations as a going concern, Gymboree has negotiated a comprehensive reorganization to preserve its existing and highly relevant operations, aided by a deeply-loyal customer base.  With debtor-in-possession financing, a prenegotiated plan structure, and key creditor support in place, the Debtors intend to move expeditiously through these cases and emerge as a stronger, better-capitalized business positioned to thrive for years to come.

12.      To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into five sections.  The *first* section provides background

information on the Debtors' corporate history and operations.[4]   The **second** section offers

detailed information on the Debtors' prepetition capital structure.   The **third** section describes the

circumstances leading to the filing of these chapter 11 cases.   The **fourth** section describes the

Debtors' proposed debtor-in-possession financing and Restructuring Support Agreement.   The

**fifth** section summarizes the relief requested in, and the legal and factual basis supporting, the

First Day Motions.

**Discussion**

## I.    History.

13.    For over 30 years, Gymboree has operated stores selling high-quality clothes and

accessories designed to provide children with maximum comfort and style, making "clothes for

every kid and every moment of childhood."[5]   In 1986, Gymboree opened its first retail store in

California.    Gymboree's store count had expanded to 435 by 1997 when it launched

Gymboree.com, its first platform for inbound marketing.    Gymboree continued to grow

throughout the 2000s, including strong sales continued through the post-recession period.

14.    In October 2010, Gymboree was acquired by Bain Capital Private Equity, LP and

certain of its affiliated investment funds or investment vehicles managed or advised by it

(collectively, the "Sponsor") for approximately $1.8 billion, including approximately $524

million in equity, following a competitive bidding process.  Post-acquisition, Gymboree initiated

a global expansion of its brands into China, South Korea, Australia, and parts of Latin America

to increase its global footprint and overtake its major competitors Carter's, Children's Place

Retail Stores ("Children's Place") and The Gap's Old Navy, GapKids and babyGap (collectively,

---

[4]    Many of the financial figures presented in this declaration are unaudited and potentially subject to change, but
reflect the Debtors' most recent review of their business.   The Debtors reserve all rights to revise and
supplement the figures presented herein.

[5]    Gymboree:  http://www.gymboree.com/shop/about-gymboree.

"Gap").  After many years of success and growth, Gymboree expanded to approximately 1,300 company-operated stores and outlets in the U.S. and abroad, supported by approximately 11,000 full and part-time employees enterprise-wide.  A corporate organizational chart is attached hereto as **Exhibit A**.

15.     As of late, however, the Debtors have felt the pain associated with evolving customer preferences and the rapid decline of brick-and-mortar retail which, combined with an inability to achieve anticipated domestic and international growth and a highly leveraged balance sheet, has led to recent losses and impairment of liquidity.

16.     In the face of these headwinds, the Debtors are implementing key initiatives to regain their competitive edge, including implementing real estate rationalization measures and other operational efficiency initiatives and developing their wholesale business and online sales presence.  These measures, coupled with Gymboree's anticipated deleveraging, are targeted to enable Gymboree to return to financial and operational success.

**A.  Business Operations.**

17.     The Debtors specialize in fashion-forward children's apparel and accessories that are comfortable and flexible for children during active play.  The Debtors maintain control over their proprietary brands by designing, sourcing, marketing, and selling their own merchandise in-house, with dedicated design and merchandising teams for each of their three brands.  The Debtors outsource certain operational functions such as customer service, credit card processing and store communications to various third-party service providers, allowing the Debtors to focus primarily on product strategy, development, and logistics.

18.     Gymboree's operations are seasonal in nature, with sales from retail operations peaking during the quarter ending in January, primarily on account of the holiday season in

November and December.  During fiscal 2015, 2014, and 2013, the fourth quarter accounted for approximately 32%, 31%, and 28%, respectively, of net sales from retail operations.

### 1.    The Debtors' Brick-and-Mortar Model.

19.    The Debtors operate in all fifty states, as well as in Canada and Puerto Rico.  The Debtors also have franchise stores across several international markets, including the Middle East, Asia Pacific, and Latin America.  As of January 2017, the Debtors operated approximately 1,300 stores world-wide.[6]  All of the Debtors' domestic and Canadian stores are identified on the map below.



20.    The Debtors lease space for their domestic stores in a variety of different locations such as regional malls, lifestyle centers, outlet centers, strip centers, and street level shops.  Approximately 35% of their domestic real estate space is concentrated with Simon Property Group, Inc. and GGP Inc. (previously General Growth Properties, Inc.), with the remainder of the Debtors' leasing arrangements spread out among a variety of other landlord entities.

---

[6]    For the avoidance of doubt, there are no Gymboree insolvency proceedings pending outside the United States.

21.     The Debtors use an operations model that organizes their retail stores into eight regions and 94 districts for purposes of management oversight.  Stores are organized by brand to allow managers to focus more effectively on brand-specific activities, resulting in improved execution of sales growth and customer outreach.  Initiatives are currently underway to help improve in-store efficiency and productivity metrics.  The Debtors have recently employed new technologies to improve operational efficiency, including employee iPads, store email, and store analytics applications.

### 2.      The Debtors' Product Offerings.

22.     The Debtors provide three different product lines to consumers, each with a distinct brand identity and targeted product offering.

**GYMBOREE**

23.     Launched in 1986, the Gymboree line provides customers with coordinated style and value designed for everyday wear for kids, ages 0 to 14, with products retailing from $15 to $45.  The Gymboree line is available for purchase internationally across 586 stores, 174 outlets, and 48 franchised stores, accounting for approximately 61% of the Debtors' revenue in 2016. The Gymboree line competes with other specialty retailers, including Macy's, The Gap, Children's Place, Carters, and TJMaxx.



24.    Launched in 2002, the Janie and Jack line offers dressy to dressed-up casual playwear with distinct quality, design, and detail.  The classically modern and timeless collections are sold in a boutique-like environment.  Janie and Jack is the Debtors' highest-end brand offering, with designs retailing from $24 to $250.  Janie and Jack operates 104 stores, 45 outlets, and two franchised stores, accounting for 17% of the Debtors' revenue in 2016.  Janie and Jack is comparable to other high-end retailers, such as Nordstrom, Ralph Lauren, and J. Crew, and has a target demographic of families with one to two kids and a median household income of $125,000, who value unique details in children's clothing and are willing to spend more for quality and design.  To complement the quality of the clothes and premium price points, the stores train their employees to provide suggestions regarding the apparel options that will best suit a particular customer's needs, thereby providing a personalized customer service experience.  Customers may also purchase the Janie and Jack brand offering through the Janie and Jack online platform.



25.     Crazy 8, the newest addition to the Gymboree family of brands, provides apparel at a price point 20-30% less than the Gymboree line.  Launched in 2007, the Crazy 8 brand provides versatile fashion for the value-oriented consumer, with apparel and accessories retailing from $2 to $25.  With a design aesthetic featuring bright colors and bold patterns, Crazy 8 celebrates individual style and encourages kids to "be bold and be themselves."[7]  Crazy 8 maintains 368 stores, 14 outlets, and three franchised stores, accounting for 22% of Gymboree's revenue in 2016.  The target demographic is busy families with more than three kids and a median household income of $75,000, who take a practical approach to shopping, valuing style and price.  Crazy 8 targets customers who shop at other comparable retailers, including the Children's Place, Target, Kohl's, and Old Navy.  Like Gymboree and Janie and Jack, Crazy 8 also maintains a dedicated online store.

26.     In 2016, the Debtors began wholesaling (*i.e.*, selling inventory in bulk quantities) their Gymboree and Crazy 8 lines to larger merchants, such as T.J. Maxx and Amazon.  The benefits of wholesaling include increased access to a broader base of customers who would not normally purchase Gymboree or Crazy 8 apparel, including in geographic markets where the wholesaler serves as a community's one-stop-shop for all needs and services.

### 3.      The Debtors' Design and Marketing Processes.

27.     The Debtors maintain control over each of their three proprietary brands by designing and merchandising in-house to drive sales, margin, and traffic.  Merchant leaders collaborate to ensure compatibility of product offerings across brands, while maintaining each brand's unique identity and core tenets.  The design and merchandising process operates on a ten-month design-to-store cycle to allow management to create and source the best quality at the

---

[7]     Gymboree:  http://www.gymboree.com/shop/about-gymboree.

lowest cost, while also providing ample time for development and execution of product strategy,

concept, costs, product review, inventory strategy, and logistics, among others.

28.     Additionally, the Debtors operate a multi-faceted marketing and advertising

strategy to reach the target audience for each brand.  Over the past decade, the Debtors have

expanded from in-store only marketing to direct mail, partnerships, print, digital, and social

platforms.  The Debtors' current marketing strategy marks a shift toward an integrated, more

advanced advertising structure, which taps into online prospecting to supplement grassroots,

social networking and blogger outreach programs, while continuing to capitalize on the Debtors'

historical marketing strategies.  Further, the Debtors utilize their customer database to launch

targeted campaigns on Facebook, Instagram, and Google.  The Debtors anticipate a significant

platform upgrade in the third quarter of 2017 which will, among other things, allow for greater

consumer insight and customer targeting.

**4.     The Debtors' Sourcing and Procurement Procedures.**

29.     The Debtors utilize an international sourcing and production protocol that relies

heavily on foreign suppliers.  Substantially all of the Debtors' retail products are manufactured

overseas, where the Debtors work with a diverse set of suppliers comprised of over 100 vendors

and 166 factories to manufacture apparel in accordance with their specifications.  Most of the

Company's suppliers are located in China, Vietnam, Bangladesh, Indonesia, and India.  The

Debtors do not maintain long-term contracts with suppliers and typically transact business on an

order-by-order basis.

30.     Approximately 93% of the Debtors' products are sourced through LF Centennial

Pte. Ltd. and certain of its affiliates ("Li & Fung"), Gymboree's longstanding sourcing agent.

Specifically, pursuant to that certain Buying Agent Agreement (the "BAA"), dated February 28,

2015, Li & Fung helps the Debtors negotiate prices and purchase order terms with foreign

vendors in Asia, communicate with foreign vendors to ensure timely production, and comply with various foreign laws and regulations, among other things. This sourcing structure has reduced the average unit cost of production by 6%, while at the same time maintaining rigorous standards for quality, on-time delivery, and cost structure. The Debtors routinely evaluate new vendors within the Li & Fung network to ensure competitive pricing and have significantly shifted their sourcing portfolio since 2011 to vertically-integrated factories in Vietnam, Bangladesh, and India.

31.     The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to their brick-and-mortar locations. Manufacturers generally manufacture and ship inventory and other goods to the Debtors "freight on board" ("FOB"). Under an FOB arrangement, the Debtors pay freight forwarders to transport merchandise and other goods from Asia to the United States. Typically, the supply of retail inventory flows in accordance with the below graphic, with title transferring to the Debtors at the foreign port when merchandise and goods are loaded for shipment to the United States.



32.     The Debtors maintain one distribution center and warehouse located in Dixon, California. Inventory is shipped from the distribution center to retail stores or to customers to fulfill online orders.[8]

---

[8]     On May 5, 2015, Gymboree sold its distribution center in Dixon, California for net proceeds of $25.9 million, and entered into a leaseback of the property from the purchaser for a period of 15 years. Approximately $10.9 million of the proceeds from the sale were restricted to fund capital expenditures or reduce Gymboree's liability under the Term Loan Facility (as defined below).

B.      **Prepetition Transactions.**

1.      **Take Private.**

33.      On October 11, 2010, Gymboree entered into an agreement and plan of merger (the "Merger Agreement") with Giraffe Holding, Inc. ("Parent"), a Delaware corporation and Giraffe Acquisition Corporation ("Acquisition Sub"), a Delaware corporation and indirect wholly-owned subsidiary of Parent controlled by investment funds sponsored by the Sponsor. Pursuant to the Merger Agreement, Acquisition Sub commenced a tender offer on October 25, 2010 to acquire all outstanding shares of The Gymboree Corporation at a price of $65.40 per share, or $1.76 billion.  The purchase price represented a 23.5% premium to Gymboree's closing stock price on October 8, 2010, the last full trading day before the announcement of the Merger Agreement.

34.      On November 23, 2010, Acquisition Sub was merged with and into The Gymboree Corporation in accordance with the Merger Agreement, with The Gymboree Corporation continuing as the surviving entity and a wholly owned subsidiary of Parent (the "Acquisition").  As a result of the Acquisition, investment funds sponsored by the Sponsor indirectly owned a controlling interest in Parent, effectively acquiring Gymboree.

35.      Gymboree's Board of Directors (the "Board") appointed a special committee of independent directors of the Board (the "2010 Special Committee") to review the Acquisition. The 2010 Special Committee was advised by Goldman, Sachs & Co. as its exclusive financial advisor and Skadden, Arps, Slate, Meagher & Flom LLP as its counsel.  Both Goldman, Sachs & Co. and Peter J. Solomon Company provided fairness opinions to the 2010 Special Committee and agreed that the Acquisition was a fair and equitable transaction.  Following the 2010 Special Committee's recommendation that the tender offer and the Acquisition were advisable, fair to,

and in the best interests of the stockholders of the Company, the Board unanimously approved the Acquisition and the other transactions completed by the Merger Agreement.

### 2.     Sale of Gymboree Play & Music.

36.     Until July 15, 2016, Gymboree, through its then-subsidiary Gymboree Play Programs, Inc. ("GPPI"), offered directed parent-child developmental play programs ("Gymboree Play & Music") at certain locations in the United States and other countries. Gymboree owned and operated six corporate Gymboree Play & Music centers and franchised more than 150 centers in the United States.  For international sites, Gymboree contracted with master-franchisees in the applicable territories that operated and subfranchised the Gymboree Play & Music centers.  In China, the largest international Gymboree Play & Music market, Gymboree (Tianjin) Educational Information Consultation Co. Ltd. ("Gymboree Tianjin") was the master franchisee.  Gymboree Tianjin and Gymboree (China) Commercial and Trading Co. Ltd. ("Gymboree China"), the operator of Gymboree retail stores in China, was indirectly controlled by investment funds sponsored by the Sponsor.  Gymboree had no ownership interest in Gymboree Tianjin or Gymboree China.

37.     On July 15, 2016, Gymboree closed a transaction (the "Play & Music Transaction") to sell all the equity of GPPI, together with assignments and licenses to certain intellectual property used in connection with the Gymboree Play & Music business to Zeavion, a Singapore-based investment group.  Upon closing of the Play & Music Transaction, Zeavion acquired the entire Gymboree Play & Music enterprise, including its central operations and centers in North America.

38.     As consideration for the Play & Music Transaction, Gymboree received $128.1 million in cash, approximately $109 million of which was restricted for purposes of paying down outstanding obligations under the term loan credit agreement and capital expenditures.

Gymboree has used the proceeds of the sale to delever its balance sheet, invest in its online offerings, store network, and supply chain infrastructure. As of the Petition Date, the remaining balance of the restricted cash attributable to the Play & Music Transaction was approximately $13.6 million.

39.     Concurrent with the sale of Gymboree Play & Music, non-Debtor Gymboree Investment Holdings L.P. sold Gymboree Tianjin and Gymboree China to Zeavion (the "Zeavion Transaction" and together with the Play& Music Transaction, the "Transactions").

40.     The Board appointed a special committee of independent directors of the Board (the "2016 Special Committee") to review the Transactions. The 2016 Special Committee met frequently throughout the sale process to review and discuss the draft sale agreements and the status of negotiations related to the Transactions. The 2016 Special Committee's financial advisor, Houlihan Lokey, issued a fairness opinion with respect to the Transactions. Based on these findings, the Special Committee determined that the Transactions were fair and in the best interests of Gymboree, and recommended that the Board approve the Transactions. The Board unanimously approved the Transactions.

## C.     The Debtors' Opportunities for Growth.

41.     The Debtors are laser-focused on continuing to improve existing operations and have started to capitalize on certain previously underdeveloped areas of growth that will help facilitate long term success, including omnichannel and wholesale initiatives. The Debtors plan to continue developing these business strategies to diversify the means by which consumers gain access to sales channels.

### 1.     Wholesale Development.

42.     In 2016, the Debtors made an initial entry into the wholesale channel with the Gymboree and Crazy 8 brands, and continue to work with three online retailers and three

"big-box" retailers.  As a result of the Debtors' wholesale efforts, the Debtors generated $5.1 million of sales and $1.5 million in gross margin in 2016.  The wholesale channel represents an attractive opportunity for the Debtors, with significant potential.  While still in the early stages, the Debtors intend to aggressively pursue wholesale opportunities, including improving current wholesale relationships with expanded brand offerings.

### 2.    Web Platform.

43.    The Debtors currently have a sizeable web business, with dedicated online stores for each of the Gymboree, Janie and Jack, and Crazy 8 brands.  In 2016, web sales comprised 21% of all Gymboree revenue.  Despite the Debtors' significant web business across brands, its web platforms are dated and unsupported, limiting omnichannel growth.  The current web platform is in need of additional investment to improve performance of its web commerce infrastructure.  As a result, the Debtors have undertaken significant efforts to create a seamless customer experience across brands and platforms, including online, brick-and-mortar stores, telephone, and mobile device.  With a dedicated team of e-commerce and digital design professionals with deep and relevant experience in mobile shopping, digital marketing, and web design, the Debtors have been focused not only on modernizing the current web platform, but also on developing a coherent multichannel sales approach that provides customers with an integrated shopping experience across brands.

### 3.    Omnichannel Growth.

44.    The Debtors' omnichannel capabilities are currently lacking relative to their peer retailers.  The Debtors have taken steps to introduce an upgraded omnichannel platform that will: (a) upgrade web platforms for all three brands; (b) provide new and up-to-date customer relationship management ("CRM") capabilities with expanded loyalty programs that will enable an enhanced and customized consumer experience; (c) upgrade point-of-sale software to improve

the customer checkout experience; (d) enable full cross-shop and pickup/delivery capabilities allowing customers to buy online and pickup in stores; and (e) ensure compliance with payment-card industry standards.  The new platform is expected to address existing challenges facing the Debtors' web platform and to produce $15 million in additional annual revenue on account of increased consumer conversion.  In addition, the upgraded omnichannel platform will result in enhancements for cross-channel inventory management, enhanced in-store experiences, and new web extensions, which collectively are anticipated to provide an additional benefit of $22.5 million in annual revenue.

### 4. Sourcing Practices.

45.     The Debtors continue to shift sourcing to lower-cost countries to ensure continued competitive pricing.  In doing so, the Debtors have shortened production timelines and increased efficiency without sacrificing product quality.  These practices have provided approximately $11 million in annual savings.  The Debtors continue to advance other cost-cutting efforts, including reducing inventory to avoid carry-over and increasing marketing efforts to levels consistent with their peers.

### 5. Real Estate Rationalization.

46.     The Debtors plan to capitalize on the opportunity to realign their store footprint by closing unprofitable and marginally profitable stores.  Approximately two-thirds of the Debtors' brick-and-mortar store base generates 97% of the EBITDA derived from all stores.  In April 2017, the Debtors hired A&G Realty Partners, LLC ("A&G") to help address this disparity between productive and non-productive stores and rationalize the Debtors' store footprint.  With the assistance of the A&G, the Debtors anticipate that they will reduce their global footprint by more than 375 stores, which will free up net working capital for substantial shifts to web commerce and allow for more efficient operations and inventory management.

## II.    The Debtors' Prepetition Capital Structure.

47.    As of the Petition Date, the Debtors have approximately $1.1 billion in total funded debt obligations, consisting of approximately $81.0 million under the senior secured asset-based revolving credit facility (the "ABL Revolver"); $47.5 million outstanding under Gymboree's asset-based term loan (the "ABL Term Loan" and, together with the ABL Revolver, the "ABL Facility"); $788.8 million in aggregate principal amount outstanding under the Debtors' senior secured term loan (the "Term Loan Facility"); and $171.0 million in aggregate principal amount of 9.125% unsecured senior notes due 2018 (the "Unsecured Notes").

48.    The following table depicts the Debtors' prepetition capital structure:

| Funded Debt | Maturity | Outstanding Principal Amount |
|---|---|---|
| ABL Revolver | December 2017 | $81.0 million |
| ABL Term Loan | December 2017 | $47.5 million |
| Term Loan Facility | February 2018 | $788.8 million |
| Unsecured Notes | December 2018 | $171.0 million |
| Total Funded Debt: | $1,088.3 million | |

## A.    ABL Facility.

49.    The Gymboree Corporation, as lead borrower, the other borrowers party thereto, the guarantors party thereto (the "ABL Guarantors"), the revolving lenders party thereto (the "ABL Revolving Lenders"), the term lenders party thereto (the "ABL Term Lenders" and, together with the ABL Revolving Lenders, the "ABL Lenders"), Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "ABL Administrative Agent"), and Pathlight Capital LLC, as ABL term loan agent (in such capacity, the "ABL Term Agent" and, together with the ABL Administrative Agent, the "ABL Agents"), are parties to that certain Amended and Restated Credit Agreement, dated as of March 30, 2012 (as amended, restated,

supplemented, or otherwise modified from time to time, the "ABL Credit Agreement").[9]  The

ABL Credit Agreement provides for a senior secured revolving credit facility, with a maximum

availability of $225 million, and a senior secured term loan of $50 million, subject to a

borrowing base.  As of the Petition Date, the aggregate borrowing base (*i.e.*, the effective

maximum availability) was approximately $172.2 million.  Each ABL Guarantor has guaranteed

all obligations under the ABL Facility.  The obligations under the ABL Facility are secured,

subject to certain exceptions, by a first priority lien on certain of the Debtors' assets, including,

without limitation, accounts receivable, inventory, cash and cash equivalents and a second

priority lien on the Debtors' capital stock and other personal property, including the Debtors'

intellectual property and investment contracts.  As of the Petition Date, approximately

$81.0 million in borrowings and approximately $49.3 million of letters of credit are outstanding

under the ABL Revolver Facility.  Approximately $47.5 million are outstanding under the ABL

Term Loan.

**B. Term Loan.**

50.    On February 11, 2011, The Gymboree Corporation, as borrower, entered into that

certain Amended and Restated Credit Agreement (as amended from time to time, the "Term

Loan Credit Agreement"), with the other Debtor guarantors, Credit Suisse AG, Cayman Islands

Branch, as administrative and collateral agent (the "Term Loan Agent"), and the lender parties

thereto (the "Term Loan Lenders").  The Term Loan Facility matures in February 2018.  Term

Loan Facility obligations are secured by a first priority lien on the Debtors' capital stock,

intellectual property, and investment contracts and a second priority lien on all of the Debtors'

other personal property, including accounts receivable, inventory, cash and cash equivalents.  As

---

[9]    The guarantors under the ABL Revolver Facility are Gymboree's domestic subsidiaries and Giraffe
Intermediate B. Inc. (collectively, the "ABL Guarantors").

of the Petition Date, approximately $790 million in aggregate principal amount remained outstanding under the Term Loan.

### C.  Unsecured Notes.

51.    In connection with the Acquisition, Gymboree issued $400 million aggregate principal amount of 9.125% Unsecured Notes under the Indenture, dated November 23, 2010, with Gymboree as issuer, Deutsche Bank Trust Company Americas as indenture trustee, and certain of the Debtors as guarantors (the "Indenture").  As of the Petition Date, $171.0 million in aggregate principal amount of Unsecured Notes remains outstanding.

52.    Since 2012, Gymboree has repurchased Unsecured Notes with an aggregate total principal amount of approximately $229 million for approximately $113.5 million in cash through privately negotiated transactions, open market transactions, and a cash tender offer.  As a result, Gymboree recorded gains of approximately $108.5 million on account of the extinguishment of debt, net of approximately $6.9 million in charges related to the write-off of deferred financing costs associated with such debt.

53.    The Unsecured Notes are due in December 2018 and require semiannual coupon payments on June 1 and December 1.  The Debtors did not pay the coupon payment due on June 1, 2017.

### III.    Circumstances Leading Up to the Restructuring and Prepetition Restructuring Efforts.

54.    A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These factors include the general downturn in the retail industry and the marked shift away from brick-and-mortar retail to online channels, the combination of which has made it increasingly difficult for Debtors to maintain their cost and capital structure as sales have remained depressed, impairing the Debtors' liquidity.

### A.      Challenging Operating Environment.

55.      The Debtors, like many other apparel and retail companies, have faced a challenging commercial environment as of late brought on by a shift away from traditional shopping at brick-and-mortar stores.  Given the Debtors' substantial brick-and-mortar presence and associated expenses, the Debtors' businesses have been heavily dependent on store traffic and resulting sales conversions to meet sales and profitability targets.  However, the apparel retail industry has made a permanent shift towards a more online-centric platform, in which retailers are selling more of their products via company websites or through larger retailers such as Amazon.  This has contributed to the Debtors' negative or declining same store sales trends since the second quarter of 2016, with accelerating declines throughout 2016 and into 2017.  Gymboree-operated stores in the United States have been hit particularly hard, with same store sales down 12% in both the third and fourth quarter of 2016.

56.      The Debtors' brick-and-mortar struggles have been compounded by their underdeveloped online presence and wholesale platform.  Although online sales account for an increasing proportion of retail spending in general, the Debtors' online sales remain stagnant, comprising less than a quarter of their total sales.  In addition, the Debtors' wholesale platform, which facilitates the sale of large quantities of merchandise to bulk retailers such as T.J. Maxx and Costco, while promising, is still in its initial stages.  With more modern and customer-focused online and e-commerce models, the Debtors' competitors, along with competing wholesale channels, continue to place downward pressure on the Debtors' revenue.

57.      The Debtors' sales have also declined due to increasing competition, both with other competitors and between the Debtors' three lines.  Most competitors in the children's apparel space, such as Children's Place and the Gap, are not as leveraged as the Debtors.  As a

result, these competitors can engage in price wars with Gymboree and run promotions and sales for longer periods of time.

### B.    Supply Chain Challenges.

58.    As a result of the global nature of their operations, the Debtors regularly transact business with entities located outside of the United States.  For example, the Debtors purchase goods and materials and obtain services from merchant vendors located in China, Vietnam, Indonesia, Cambodia, and India.  All of the merchant vendors supply goods that are crucial to the Debtors' ongoing operations.  Importantly, the Debtors' business operations depend on the timely and uninterrupted flow of inventory through their supply chain.  At any given time, the Debtors are engaged with such vendors to:  (i) produce goods in accordance with current purchase orders; (ii) ship merchandise to stock the Debtors' retail stores, distribution centers, and fulfill online orders; and (iii) negotiate the terms of future purchase orders.  Historically, the Debtors have enjoyed favorable trade terms, including payment terms of as many as 75 days from the date of shipment, with many merchant vendors funding out-of-pocket fabric and production costs necessary to manufacture goods.

59.    As the Debtors' liquidity has tightened, their supply chain vendors have unsurprisingly begun to put pressure on the supply chain cost structure.  Since January 2017, when media coverage broke out regarding certain leadership changes and Gymboree's looming debt overhang, numerous vendors have demanded revised trade terms, including prepayments or cash on delivery and have discontinued ordinary course extensions of credit to the Debtors. Several vendors have threatened to suspend shipping inventory until the Debtors pay upfront. This shift in payment terms both strained the Debtors' liquidity and put the delivery of the Debtors' winter 2017 purchase orders at material risk, jeopardizing the Debtors' ability to fully capitalize on customer demand during the peak holiday selling season.

60.     In light of these threats, Gymboree entered into a letter agreement with Li & Fung (the "Li & Fung Letter Agreement") on April 21, 2017, pursuant to which Gymboree agreed to (a) provide a $10 million standby letter of credit for the benefit of Li & Fung (the "Li & Fung Letter of Credit") and (b) issue to Li & Fung a $20 million incremental term loan under the Term Loan Credit Agreement (the "Li & Fung Term Loan").  As consideration, Li & Fung agreed to, among other things, provide extensions of credit to vendors in Bangladesh with respect to the Debtors' current and future purchase orders in the ordinary course, actively promote and support positive messaging to vendors to maintain current trade terms, and forbear from exercising any remedies against the Debtors.

61.     In accordance with the Li & Fung Letter Agreement, on April 21, 2017, Gymboree, as borrower, the guarantors party thereto, Li & Fung, the Term Loan Agent, and the Term Loan Lenders party thereto, entered into the Waiver and Amendment No. 2 to Amended and Restated Credit Agreement (the "Term Loan Second Amendment"), pursuant to which the Debtors amended the Term Loan Credit Agreement to issue the Li & Fung Term Loan.

62.     On May 24, 2017, the Debtors and Li & Fung amended the BAA (the "BAA Amendment").  Pursuant to the BAA Amendment, the Debtors agreed to provide Li & Fung with up to $15 million in cash to deliver partial payments to certain vendors to assure timely delivery of Winter 2017 purchase orders.  As a result, the Debtors were able to secure Li & Fung's continued services and the commitment of various vendors to honor existing trade terms with respect to Winter 2017 purchase orders and ensure runway to negotiate Gymboree's comprehensive restructuring.[10]

---

[10]   Without access to the restricted cash, the Debtors would have been unable to amend the BAA, and vendors would have tightened trade terms, likely resulting in delayed or cancelled shipments, lost vendors relationships, and misaligned inventory.  These supply chain challenges would have placed increased pressure on the Debtors liquidity position, including by reducing the borrowing base under the ABL Facility.

63.     As is typical in the apparel industry, the Debtors' inventory represents a substantial portion of the ABL Facility borrowing base.  Thus, the aforementioned delay in vendors' shipment of new inventory to the Debtors limits the Debtors' ability to borrow under the ABL Facility which, in a vicious cycle, further limits the Debtors' ability to secure fresh inventory.

64.     A critical component of the Debtors' proposed debtor-in-possession financing (the "Proposed DIP Financing"), described in greater detail below, is securing adequate liquidity for the Debtors to obtain fresh inventory and support the continuation of trade support.

### C.     Prepetition Waiver/Amendment.

65.     On May 12, 2017, the ABL Agents and the ABL Lenders received notice that the Debtors had failed to comply with a requirement of the ABL Credit Agreement that Gymboree and its Restricted Subsidiaries (as defined in the ABL Credit Agreement) maintain, at all times, Combined Availability (as defined in the ABL Credit Agreement) in excess of the greater of (a) $17,500,000 and (b) ten percent of the term loan borrowing base under the ABL Credit Agreement, which constituted an event of default under the ABL Credit Agreement (the "Specified Event of Default").  Gymboree engaged in arm's length negotiations with the ABL Agents and the ABL Lenders and entered into that certain Waiver to Amended and Restated Credit Agreement, with the ABL Guarantors, the ABL Lenders, and the ABL Agents, dated as of May 22, 2017, pursuant to which the ABL Agents and the ABL Lenders agreed to waive the Specified Event of Default, allowing the Debtors to remain in compliance with the ABL Credit Agreement.  In exchange, the Debtors agreed to weekly status calls with the ABL Agents to discuss financial operations and performance, provide weekly borrowing base certificates, cooperate with the ABL Administrative Agent to establish cash management

arrangements, and authorize the retention of Berkeley Research Group, LLC as a consultant and financial advisor to the ABL Administrative Agent.

66.    On May 12, 2017, the Debtors, the Term Loan Agent, and the Term Loan Lenders again amended the Term Loan Credit Agreement ("the "Restricted Cash Amendment") to provide the Debtors with access to $40 million in cash that was restricted under the Term Loan Credit Agreement to fund the Debtors' working capital needs before the Petition Date.

### D.    Management Changes

67.    On March 14, 2017, Mark Breitbard, who had been the Chief Executive Officer of Gymboree since January 8, 2013, formally announced his resignation, effective April 3, 2017. The Debtors appointed long-time director Mark Weikel as interim Chief Executive Officer, effective April 3, 2017, and continued their nationwide search to identify a permanent Chief Executive Officer.

68.    On May 22, 2017, the Debtors appointed Daniel J. Griesemer as Chief Executive Officer.  On the date hereof, Andy North, who had been Chief Financial Officer of Gymboree since November 17, 2014, formally announced his resignation, effective immediately.  The Debtors appointed Liyuan Woo, Director at AlixPartners, as interim Chief Financial Officer, effective immediately, and have initiated a nationwide search to identify a permanent Chief Financial Officer.

### E.    Exploration of Strategic Alternatives.

69.    Recognizing the need to explore restructuring alternatives, in January 2017, the Debtors retained Kirkland & Ellis LLP, as legal advisor, and Lazard Freres & Co. LLC ("Lazard"), as investment banker.  In March 2017, the Debtors retained AlixPartners, as restructuring and financial advisor.  Together, the Debtors and their advisors analyzed the Debtors' capital structure and potential sources of liquidity and runway to facilitate the

operational changes necessary to reduce the burdensome operational costs associated with their brick and mortar footprint, including various restructuring and recapitalization options.

70.    Shortly after beginning to explore restructuring alternatives, the Debtors commenced a detailed review of their entire real estate portfolio to identify underperforming stores as part of an overall strategy to reduce and optimize their existing store footprint.  In April 2017, the Debtors engaged A&G to help develop the Debtors' go-forward real estate strategy and assist with restructuring and renegotiating the Debtors' current real estate leases.  As part of the restructuring, the Debtors plan to exit or renegotiate leases across their portfolio.  Indeed, in the weeks preceding the Petition Date, the Debtors conducted a store-by-store performance analysis to, among other things, identify certain unprofitable stores to close and wind down.  In connection with these efforts, and after an extensive review and selection process, the Debtors engaged Tiger Capital Group, LLC and Great American Group, LLC to liquidate the inventory in the closing stores and otherwise prepare the stores for turnover to the applicable landlords.

**IV.    The Restructuring Support Agreement, Chapter 11 Plan, and Proposed DIP Financing.**

    **A.    Restructuring Support Agreement**

71.    Beginning in March 2017, the Debtors commenced comprehensive restructuring negotiations with the Consenting Term Loan Lenders and the Term Loan Agent's advisors, Milbank, Tweed, Hadley & McCloy LLP and Rothschild & Co. (the "Term Loan Agent Advisors").  The Debtors were also approached by, and engaged in conversations over the last several months with, advisors to a group of Unsecured Noteholders.  The Debtors have facilitated the diligence of both creditor groups' advisors for the last several months.

72.    In May 2017, the Consenting Term Loan Lenders signed nondisclosure agreements with the Debtors and were given access to certain of the Debtors' confidential

information to negotiate a restructuring transaction.  Since the Consenting Term Loan Lenders became restricted, the Debtors and their advisors have engaged in a number of substantive meetings and telephone conferences with the Consenting Term Loan Lenders and the Term Loan Agent Advisors regarding comprehensive restructuring alternatives that would strengthen the Debtors' balance sheet and provide necessary liquidity.  After extensive negotiations, the Debtors and the Consenting Term Loan Lenders entered into the Restructuring Support Agreement on June 11, 2017.

73.    The Restructuring Support Agreement contemplates a comprehensive reorganization, through a chapter 11 plan, that will result in a substantial deleveraging of the Debtors' balance sheet by approximately $1 billion.  The key terms of the restructuring are as follows:

- a $105 million debtor-in-possession term loan credit facility, including $35 million in new money debtor-in-possession term loans and the roll-up of $70 million of term loans under the existing term loan facility into amounts outstanding under the debtor-in-possession term loan credit facility (the "DIP Term Loan Facility");

- a $273.5 million debtor-in-possession revolving credit facility pursuant to which all amounts outstanding under the ABL Facility will be rolled-up into a postpetition ABL credit facility on terms similar to those under the ABL Facility (the "DIP ABL Facility"); and

- up to $80 million in new equity capital by way of a rights offering (the "Rights Offering")  fully-backstopped, by the Consenting Term Loan Lenders, to allow the Company to emerge from chapter 11 with sufficient liquidity to fund the business.

- All Term Loan Lenders will be afforded the opportunity to participate in the DIP Term Loan Facility and Rights Offering.

The restructuring transactions contemplate pro forma equity ownership as follows:[11]

---

[11]    The size of the Rights Offering is dependent on the Debtors' projected post-emergence liquidity need.  The pro forma equity ownership shown below assumes a $80 million Rights Offering.

- Term Loan Lenders who contribute their pro rata share of the $35 million new money DIP Term Loan Facility and their pro rata share of the up to $80 million Rights Offering will obtain the benefit of the $70 million DIP Term Loan Facility roll-up and ultimately share pro rata in 89.6% of the newly-issued common shares (the "New Gymboree Common Shares"), with an additional 2.4% of the New Gymboree Common Shares distributed to the Consenting Term Loan Lenders who have agreed to backstop the Rights Offering.

- Non-participating Term Loan Lenders will receive their pro rata share of 8% of the New Gymboree Common Shares.

- Up to 10% of New Gymboree Common Shares (on a fully diluted basis) shall be reserved for issuance in connection with a management incentive plan.

74.    To effectuate this comprehensive restructuring, and ensure the Debtors' emergence from chapter 11, it is imperative that the Debtors meet the following key dates and milestones:

- **5 days after Petition Date:** File the Plan, Disclosure Statement and Solicitation Materials, motion for entry of an order approving the Disclosure Statement and Solicitation Materials, and motion for entry of an order approving entry into the Backstop Commitment Agreement.

- **35 days after Petition Date:** Obtain entry of a Final Order approving the Proposed DIP Financing.

- **35 days after Petition Date:** Obtain entry of an Order approving entry into the Backstop Commitment Agreement.

- **35 days after Petition Date:** Obtain one or more proposals for the Exit Term Loan Facility, the Exit ABL Term Loan Replacement Facility, and Exit ABL Revolving Facility.

- **55 days after Petition Date:** Obtain entry of Order approving the Disclosure Statement and Solicitation Materials (the "Disclosure Statement Order").

- **75 days after Petition Date:** Obtain written commitments for the Exit Term Loan Facility, the Exit ABL Term Loan Replacement Facility, and Exit ABL Revolving Facility.

- **105 days after Petition Date:** Obtain entry of Confirmation Order.[12]

---

[12]    Under the proposed DIP ABL Credit Facility, the Debtors must commence a parallel sale process if they do not obtain entry of the Confirmation Order within 95 days of the Petition Date.

- **110 days after Petition Date:** Occurrence of the Effective Date.

75. Preserving Gymboree's tax attributes, including approximately $18.3 million of state net operating losses ("NOLs") as of January 31, 2017, expected additional federal and state NOLs in the current year, and certain other attributes, is critical to any restructuring and was a component of the discussions with the Consenting Term Loan Lenders. In particular, there is a significant built in loss in the stock of The Gymboree Corp., which the Debtors plan to utilize to offset gains expected to be triggered by the restructuring. Critically, pursuant to the Restructuring Support Agreement, the Sponsor has agreed to: (i) cooperate in structuring and reporting the restructuring transaction in a way that allows the Debtors to use these tax attributes; (ii) not take any action that would jeopardize such attributes; and (iii) forego any claims for compensation for the use of such attributes. The Restructuring Support Agreement also includes mutual releases between the Sponsor and the Consenting Term Loan Lenders. As a result, the Debtors, the Consenting Term Loan Lenders, and the Sponsor are able to ensure that the valuable tax attributes are preserved and can be utilized by Gymboree.

76. Gymboree maintains a broad "fiduciary out" under the Restructuring Support Agreement. Specifically, Section 17 of the Restructuring Support Agreement provides, in part, that nothing will require Gymboree "to take or refrain from taking any action (including, without limitation, terminating [the Restructuring Support Agreement] under Section 11), to the extent [Gymboree] determines . . . that taking, or refraining from taking, such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law."

77. On May 18, 2017, The Gymboree Corporation formed a special committee (the "Special Committee") to explore strategic alternatives and/or financial alternatives and Transactions (as defined in the May 18, 2017 resolutions) in connection with the Board's consideration of such Transactions. The Special Committee consists of independent director

Steven Winograd, who was also appointed to the Board on May 18, 2017.  Mr. Winograd has

experience serving on boards of directors, including as an independent director, having served

on, among others, the board of Caesars Entertainment Operating Company since June 2014, and

the board of Linn Acquisition Company LLC on behalf of Berry Petroleum Company LLC

during 2016-2017.  During over 33 years as an investment banker, Mr. Winograd has completed

numerous transactions for a wide variety of public and private companies including mergers and

acquisitions, debt and equity financings, and restructurings.  Mr. Winograd received a BA from

Wesleyan University and an MBA from the Columbia University Graduate School of Business.

Mr. Winograd and the Special Committee, have directed Gymboree to engage the law firm of

Munger, Tolles & Olson LLP as directed by Mr. Winograd and the Special Committee, in

connection with the matters delegated to the Special Committee.

### B.      Proposed DIP Financing

78.      To fund the administration of these chapter 11 cases, the ABL Lenders and the

Consenting Term Loan Lenders have agreed to provide the Proposed DIP Financing in the form

of a postpetition ABL facility (the "<u>DIP ABL Credit Facility</u>") and postpetition term loan facility

(the "<u>DIP Term Loan Facility</u>").  Pursuant to the terms of the DIP ABL Credit Facility, upon

entry of the interim order approving the Proposed DIP Financing, all amounts outstanding under

the ABL Facility, including the ABL Term Loan and ABL Revolver, will convert into

obligations under the DIP ABL Credit Facility, to fund the Debtors' working capital needs

during the pendency of these chapter 11 cases.

79.      In addition, the Consenting Term Loan Lenders committed to backstop a $105

million debtor-in-possession financing facility required to support the Debtors' estates during

these cases, consisting of $35 million in new money loans and, immediately upon entry of the

interim order, the conversion of $70 million of the outstanding prepetition owing to the DIP Term Loan Facility lenders into postpetition DIP Term Loans.

80.    Both revolving and term loan portions of the Proposed DIP Financing are critical to the Debtors' ability to operate smoothly postpetition.  I have analyzed the Debtors' cash flow needs.  Without the revolving and term loan portions of the Proposed DIP Financing, the Debtors could not continue operating for more than two weeks postpetition.   The Proposed DIP Financing provides liquidity that is essential to fund the administrative cost of these chapter 11 cases and, critically, to pay manufacturers and other participants in the Debtors' supply chain to ensure the continuing and uninterrupted flow of inventory to the Debtors' stores and wholesale customers that is the lifeblood of the Debtors' business.[13]  Without access to the Proposed DIP Financing, the Debtors likely would need to liquidate in the near term, to the serious detriment of their stakeholders.

81.    Based on my knowledge and extensive discussions with the Debtors' management team and advisors, including a team from AlixPartners acting under my supervision, I believe that the Proposed DIP Financing gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of these chapter 11 cases as the Debtors seek to implement the restructuring contemplated by the Plan.  Finally, based on extensive discussions with the Debtors' advisors, including Lazard, I understand that the Proposed DIP Financing is on the most favorable terms available, presents the best—and likely only—option for the Debtors to reorganize their businesses as a going-concern, was negotiated in good faith and at arm's length,

---

[13]    Further, given the significance in the Debtors' supply chain of foreign vendors who have expressed increasing concerns about payment by the Debtors, I expect that an interruption in payment of foreign vendors would cause additional vendors to modify payment terms (*e.g.*, requiring  payments up front), further exacerbating the Debtors' need for cash and impairing their business.

and will allow the Debtors to maximize the value of their estates for the benefit of all parties in interest.

      **V.**      **Evidentiary Support for First Day Motions.**[14]

      82.      In April 2017, the Debtors retained AlixPartners to assist in the process of preparing for a potential chapter 11 filing.  Since AlixPartners' retention, I have overseen the team of AlixPartners professionals that has been helping the Debtors: (a) finalize the terms of the Restructuring Support Agreement, the Plan, and the Proposed DIP Financing; (b) compile the diligence necessary to draft the First Day Motions; (c) manage liquidity; (d) and otherwise prepare for these chapter 11 cases.

      83.      Contemporaneously herewith, the Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.

      84.      I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion:  (i) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value; (ii) constitutes a critical element in achieving a successful reorganization of the Debtors; and (iii) best serves the Debtors' estates and creditors' interests.  The facts set forth in each First Day Motion are incorporated herein by reference.

---

[14]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Motions.

A.   ***Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "<u>Joint Administration Motion</u>").**

85.     Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to Gymboree without harming the substantive rights of any party in interest.

86.     Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of eight independent chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

B.   ***Debtors' Motion For Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief* (the "<u>Case Management Procedures Motion</u>").**

87.     Pursuant to the Case Management Procedures Motion, the Debtors request entry of an order establishing certain noticing, case management, and administrative procedures including, among other things:  (a) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2)–(6) will be served only to individuals and entities identified on a shortened mailing list and those creditors who, in accordance with Local Bankruptcy Rules 2002-1 and 9013-1(M), file with the Court a request that they receive such notice pursuant to Bankruptcy Rule 2002; (b)

allowing electronic service of all documents (except complaints and summonses) for the 2002 List (as defined in the Case Management Procedures); and (c) directing that all matters be heard at periodic omnibus hearings to be scheduled in advance by the Court.

88.     Given the thousands of potential creditors who may file requests for service of filings and considering the numerous motions and applications to be filed in these chapter 11 cases, approval of the Case Management Procedures will provide significant administrative convenience and cost savings by reducing the need for emergency hearings and requests for expedited relief, and will foster consensual resolution of important matters.  Furthermore, the Debtors' use of electronic service to the 2002 List will undoubtedly reduce the administrative and financial burden of providing notice to the Debtors' creditors and other parties in interest.

89.     The establishment of the Case Management Procedures will also promote the efficient and orderly administration of these chapter 11 cases.  Authorizing the Debtors to serve their documents on a limited mailing matrix will ease the administrative and economic burdens on the Court and the Debtors' estates.  Authorizing electronic service in these chapter 11 cases for the 2002 List will also allow for efficient and effective service at a significantly reduced cost to the Debtors' estates and other serving parties.  Early notice of Omnibus Hearings to all parties in interest will enable these parties to plan efficiently for the use of hearing time, will avoid the need for numerous hearings within each month, and will lessen the burden on the Court and on the Debtors' estates.  Additionally, parties in interest will still have the opportunity to bring true emergency matters before the Court on an expedited basis pursuant to the Local Bankruptcy Rules and the Case Management Procedures.

**C.**     ***Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs, (II) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Mailing Matrix for Each Debtor, (III) Authorizing the Debtors to File a Consolidated List of the Debtors'***

*50 Largest Unsecured Creditors, and (IV) Granting Related Relief
(the "__Creditor Matrix, SOFAs, and Schedules Motion__").*

90.     Pursuant to the Creditor Matrix, SOFAs, and Schedules Motion, the Debtors seek

entry of an order: (a) extending the deadline by which the Debtors must file their schedules of

assets and liabilities, schedules of current income and expenditures, schedules of executory

contracts and unexpired leases, and statements of financial affairs (collectively, the "__Schedules__

__and Statements__") by thirty (30) days, for a total of forty-four (44) days from the Petition Date

without prejudice to the Debtors' ability to request additional extensions for cause shown;

(b) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate

mailing matrix for each Debtor; and (c) authorizing the Debtors to file a consolidated list of the

Debtors' 50 largest unsecured creditors.

### 1.      Schedules and Statements Extension.

91.     To prepare the Schedules and Statements, the Debtors must compile information

from books, records, and documents relating to creditor claims, as well as the Debtors' many

contracts.   This information is voluminous and located in numerous places throughout the

Debtors' organization.  Collecting the necessary information requires an enormous expenditure

of time and effort on the part of the Debtors, their employees, and their professional advisors in

the near term, when these resources would be best used to improve the Debtors' business

operations.

92.     Although the Debtors, with the assistance of their professional advisors, are

mobilizing their employees to work diligently and expeditiously on preparing the Schedules and

Statements, resources are strained and limited.  Given the amount of work entailed in completing

the Schedules and Statements and the competing demands on the Debtors' employees and

professionals to assist in efforts to stabilize business operations during the initial postpetition

period, the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.

93.     The Debtors therefore request that the Court extend the 14-day period for an additional 30 days, without prejudice to the Debtors' right to request further extensions, for cause shown.  This will allow time for the Debtors to receive a greater number of invoices related to the prepetition period, which will improve the accuracy of the Schedules and Statements and reduce the time spent on claims administration in these chapter 11 cases.

### 2.      Consolidated Creditor Matrix.

94.     Although a list of creditors usually is filed on a debtor-by-debtor basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may file a consolidated creditor matrix.  Here, compiling separate top creditor lists for each individual Debtor would consume an excessive amount of the Debtors' time and resources, and filing a consolidated list would more appropriately reflect the liabilities against the Debtors' operations on an enterprise level.

### 3.      Consolidated List of 50 Largest Creditors.

95.     The Debtors request authority to file a single, consolidated list of their 50 largest general unsecured creditors.  This will help alleviate administrative burdens, costs, and the possibility of duplicative service, and will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

96.     Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Creditor Matrix, SOFAs, and Schedules Motion.

**D.**     ***Debtors' Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Prime Clerk LLC as Claims and Noticing Agent, Effective***

**Nunc Pro Tunc *To The Petition Date and (II) Granting Related Relief* (the "Claims and Noticing Agent Application").**

97.    Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Prime Clerk LLC as Claims and Noticing Agent in the Debtors' chapter 11 cases effective *nunc pro tunc* to the Petition Date to, among other tasks, assume full responsibility for the distribution of notices and the maintenance, processing and docketing of proofs of claim filed in the Debtors' chapter 11 cases pursuant to the provisions of the Engagement Agreement.

98.    Based on my discussions with Gymboree's advisors, I believe that the Debtors' selection of Prime Clerk LLC to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Prime Clerk LLC's rates are competitive and reasonable given the quality of services and expertise.

99.    The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of noticing, and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims and Noticing Agent Application.

E.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status to the Postpetition Lenders, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").**

100.    The Debtors seek entry of interim and final orders authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis consisting of a senior secured superpriority credit facility and a new money multiple draw term loan facility.  The Debtors are entering chapter 11 with limited cash on hand, and the Debtors require immediate access to the liquidity provided by the DIP Facilities to operate their businesses postpetition.

101.    After a series of significant, arms'-length and good faith negotiations, a subset of the Prepetition Term Loan Lenders agreed to fund $105 million in postpetition financing required to support the Debtors' estates during these cases, including a commitment for $35 million in new money and the conversion of $70 million of outstanding Prepetition Term Loans owing to the DIP Term Loan Lenders into DIP Term Loans upon entry of the Interim Order. The Debtors also seek to convert the Prepetition ABL Obligations into DIP ABL Obligations upon entry of the Interim Order, and to draw on the DIP ABL Credit Facility to fund their working capital needs during the pendency of these chapter 11 cases.

102.    In light of the Debtors' liquidity constraints, and contemporaneously with negotiating the DIP Facilities with the Debtors' existing debtholders, the Debtors, with the assistance of their advisors, actively solicited proposals for alternative debtor-in-possession financing.  Ultimately, no third-party offered a viable alternative financing proposal that would allow the Debtors to continue to operate their businesses as a going concern.

103.    Without the funding provided by the DIP Facilities, including the new money term loans, during the interim period, the Debtors' access to the cash needed to operate the business would evaporate and trade creditors would likely cease extending credit, creating a vicious cycle.  Accordingly, absent immediate access to the DIP Facilities, the Debtors may have to liquidate in short order, which would be value-destructive.

104.   I believe the requested relief is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the liquidity that would be provided through their proposed interim borrowings, on the terms and conditions set forth in the DIP Documents and the Interim and Final Orders.

**F.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief* ("<u>Cash Management Motion</u>").**

105.   Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to:  (a) continue to operate their Cash Management System; (b) honor any prepetition obligations related thereto; (c) maintain existing Business Forms in the ordinary course of business; and (d) continue to perform the Intercompany Transactions consistent with historical practice.

106.   In the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "<u>Cash Management System</u>").  The Cash Management System is typical of multi-store retail operations and comparable to the centralized cash management systems used by other similarly sized retail companies to manage the cash flow of operating units in a cost-effective, efficient manner.  The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions (as defined below).  The Debtors' corporate accounting, cash forecasting, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

107.    The Cash Management System is comprised of approximately 85 Bank Accounts, which are held at 23 Cash Management Banks, operated by the Debtors.  The Cash Management System consists of:[15]

- 24 primary Bank Accounts (collectively, the "Primary Accounts"), maintained by Bank of America, N.A. ("Bank of America"); and

- 61 Bank Accounts located at various other institutions throughout the United States.[16]

108.    Historically, the Debtors estimate that they pay approximately $150,000 in Bank Fees each month, depending on transaction volume.  The Debtors estimate that approximately $180,000 in prepetition Bank Fees remains outstanding as of the Petition Date.  The Debtors estimate that cash collections average approximately $85 million per month, including store cash receipts, credit card receipts, partner shop payments, and e-commerce sales.  In addition, the Debtors estimate that total disbursements will range between $85 million and $120 million per month during these chapter 11 cases.

109.    Of the 23 Cash Management Banks, 10 are designated as authorized depositories under the U.S. Trustee Guidelines.  In addition, the Primary Accounts reside at Bank of America, which is an authorized depository.  13 Bank Accounts are held at Cash Management Banks that are not Authorized Depositories under the U.S. Trustee Guidelines.  All of the Bank Accounts held by these Cash Management Banks are Store Level Accounts, which, as noted above, receive deposits from stores throughout the week and are regularly deposited daily into one of the

---

[15]    The Cash Management System also includes 10 foreign Bank Accounts, maintained by Toronto Dominion Bank ("TD Bank") and Westpac Banking Corporation ("Westpac") for the non-Debtor Canadian and Australian accounts, respectively.  The Debtors are not funding Puerto Rican or Canadian operations.

[16]    There are currently 53 inactive Store Level Accounts as a result of recent consolidation.

Primary Accounts.  The Primary Accounts can only receive deposits: their ability to disburse is disabled.  Indeed, the banks at which the Store Level Accounts are maintained are typically the only bank located nearby these stores, and if the Debtors are not permitted to maintain these Store Level Accounts, the 270 stores that make daily deposits into such accounts will likely have to submit their required daily deposits by other means, creating additional operational and administrative burdens and expenses to the detriment of the Debtors' business and their estate.

110.    As part of the Cash Management System, the Debtors utilize a number of preprinted Business Forms.  The U.S. Trustee Guidelines require that the Cash Management Banks print "Debtor in Possession" and the bankruptcy case number on checks issued after the Petition Date.  To minimize the burden on their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all Business Forms in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession.  If the Debtors exhaust their existing supply of checks during these chapter 11 cases, the Debtors will print or order checks with the designation "Debtor in Possession" and the corresponding bankruptcy case number.

111.    In the ordinary course of business, the Debtors engage in routine business relationships with each other resulting in intercompany receivables and payables.  Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to non-Debtor affiliates.  Payments from the subsidiaries are generally paid into the Collection Account.  The Intercompany Claims are reflected as journal entry receivables and payables, as applicable, in the respective Debtors' accounting systems.

112.    The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to track postpetition intercompany transfers.  Discontinuing the Intercompany Transactions would unnecessarily disrupt the Cash Management System and the Debtors' operations to the detriment of the Debtors and their creditors and other stakeholders.  The Debtors seek the authority to continue the Intercompany Transactions in the ordinary course of business, in a manner consistent with prepetition practice.

113.    I believe that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' businesses.  Therefore, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

**G.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "<u>Wages Motion</u>").**

114.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to (a) pay all prepetition and postpetition wages, salaries, other compensation, and reimbursable expenses on account of the Employee Compensation and Benefits Programs in the ordinary course of business and (b) continue to administer the Employee Compensation and Benefits Programs.

115.    The Debtors employ over 11,000 individuals on a full- and part-time basis (the "<u>Employees</u>").  Approximately 10,500 Employees are paid on an hourly basis, and approximately 500 Employees earn a salary.  The Employees are not represented by a collective

bargaining unit.  In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors, as well as temporary workers, to complete discrete projects (the "Temporary Staff") sourced periodically from various staffing agencies (the "Staffing Agencies") to fulfill certain duties on a short-term basis.  At this time, the Debtors retain approximately 250 Temporary Staff.  The Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

116.    The Debtors' Employees and Temporary Workers perform a wide variety of functions critical to the Debtors' operations at the Debtors' home office, Dixon distribution center, and regional stores.  Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced.  The remainder of these individuals provide work necessary to continue the Debtors' store-level operations. Without the continued, uninterrupted services of their Employees and Temporary Workers, the Debtors' reorganization efforts will be threatened.

117.    The vast majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to pay their daily living expenses and support their families. Thus, Employees will be exposed to significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business.  Consequently, I believe that the relief requested is necessary and appropriate.

118.    The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.  The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, and other compensation; expense reimbursement, including, Commuter Programs and tuition reimbursement; payroll services, federal and state

withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, and 401(k) contributions); health insurance, including, medical, dental, vision, and disability; retirement benefits; workers' compensation benefits; paid time off, other paid leave, unpaid leave; life and accidental death and dismemberment insurance; short- and long-term disability coverage; employee assistance; severance; and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

119.    Pursuant to the Wages Motion, the Debtors also seek authority to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the pre-existing bonus programs, described more fully in the Wages Motion.  The Debtors believe the Non-Insiders Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.  I understand that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested in the Wages Motion.  I understand that no Employees are owed Employee Compensation in excess of $12,850.

120.    I believe that the Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience significant employee turnover and instability at this critical time in these chapter 11 cases.  Additionally, believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities.

121.    I understand that a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts.  I therefore believe that payment of certain prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of the Employees as the Debtors seek to operate their business in these chapter 11 cases.  Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

**H.**    ***Debtors' Motion for Entry of Interim and Final  Orders (I) Authorizing the Debtors to (A) Continue and Renew Their Liability, Property, Casualty, and Other Insurance Policies and Honor All Obligations In Respect Thereof; (B) Continue and Renew Their Prepetition Insurance Premium Financing Agreements; and (C) Continue the Surety Bond Programs and (II) Granting Related Relief* (the "<u>Insurance Motion</u>").**

122.    Pursuant to the Insurance Motion, the Debtors seek entry of an order authorizing the Debtors to:  (a) continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto in the ordinary course of business and renew, supplement, or purchase insurance coverage in the Debtors' discretion on a postpetition basis, (b) continue performance under prepetition insurance premium financing agreements and renew, supplement, or enter into insurance premium financing agreements in the Debtors' discretion on a postpetition basis, and (c) continue and renew their surety bond program on an uninterrupted basis.

123.    In the ordinary course of business, the Debtors maintain approximately 20 Insurance Policies that are administered by various third-party insurance carriers.  These Insurance Policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, workers' compensation, umbrella coverage, excess liability,

pollution liability, executive protection, commercial crime, special risk, cyber liability, cargo and marine cargo liability, foreign voluntary compensation, employers' liability, and directors' and officers' liability.   The aggregate annual premium on account of the Insurance Policies is approximately $3.5 million.   In addition, the Debtors' contract with Gallagher Basset, a third-party claims administrator, for assistance in managing the portfolio of general liability claims asserted against the Debtors.   The Debtors estimate that, as of the petition date, approximately $65,000 is outstanding on account of prepetition obligations to Gallagher Basset, all of which will become payable within the first 21 days of these chapter 11 cases.

124.   The Debtors obtain the majority of their Insurance Policies through their insurance broker, Marsh USA, Inc ("Marsh").   Marsh is the broker of record with respect to the Debtors' fiduciary, commercial and special crime, and directors' and officers' insurance policies. As of the Petition Date, the Debtors do not believe that they owe any amounts to Marsh on account of fees or any other prepetition obligations.

125.   The vast majority of the Insurance Policies are financed through the Premium Financing Agreements.   As of the Petition Date, the Debtors estimate that approximately $33,000 is outstanding on account of the Premium Financing Agreements, all of which will come due during the first 21 days of these chapter 11 cases. The Debtors seek authority, on an interim basis, subject to entry of the Final Order, to pay such amounts as they come due.

126.   The Debtors also maintain a Surety Bond Program in the ordinary course of business to fulfill obligations to certain third parties, often governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations.   These obligations include United States Customs and Excise Taxes and Use Taxes in the Commonwealth of Puerto Rico.   The Debtors contract with Avalon Risk Management

("Avalon") and Lexon Insurance Company ("Lexon") to provide the requisite surety bonds, which total approximately $11.7 million.   As of the Petition Date, the Debtors do not believe that they owe any amounts on account of annual premiums, which total approximately $65,000, or any other prepetition obligations.  Out of an abundance of caution, however, the Debtors seek authority to honor any amounts owed to Avalon and Lexon to ensure the Surety Bond Program remains uninterrupted.

127.    Continuation and renewal of the Insurance Policies and Surety Bond Program is essential to preserving the value of the Debtors' business, properties, and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

I.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion").**

128.    Pursuant to the Taxes Motion, the Debtors seek the authority for the Debtors to make payment and remittance of taxes and fees that accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases.  The Debtors also request that the Court authorize and direct applicable financial institutions, when the Debtors in their sole discretion so request, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the taxes and fees.

129.    In the ordinary course of business, the Debtors collect, withhold, and incur sales and use taxes, income taxes, franchise taxes, property taxes, and miscellaneous taxes and fees as

more fully described in the Taxes Motion, and occasionally are the subject of audit investigations on account of prior year tax returns.  The Debtors estimate that approximately $13.2 million in taxes and fees relating to the prepetition period are due and payable or will become due and payable after the Petition Date.  Payment of the taxes and fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay prepetition taxes and fees may cause the authorities to take precipitous action, including, but not limited to, conducting audits, filing liens, preventing the Debtors from doing business in certain jurisdictions, seeking to lift the automatic stay, or pursuing payment of the taxes and fees from the Debtors' officers and directors, all of which would greatly disrupt the Debtors' operations and ability to focus on their reorganization efforts.

130.    I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Taxes Motion.

**J.** *Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief* **(the "Utilities Motion").**

131.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders:  (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; and (c) approving the Debtors' proposed procedures for resolving Additional Assurance Requests.

132.    In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste

management (including sewer and trash), internet, cable, and other similar services from a number of third-party utility companies or brokers. On average, the Debtors pay approximately $1.8 million each month for third-party Utility Services, calculated as a historical average payment for the twelve-month period ended April 30, 2017.  Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $1.8 million.  The Debtors have provided certain of the Utility Companies with cash deposits, escrow agreements, or letters of credit, and estimate that the amount currently held as deposits or prepayments with respect to the Utility Companies is approximately $314,680.  To provide additional assurance of payment, the Debtors propose to deposit $830,324 into a segregated account, which is an amount sufficient to cover one half of the Debtors' average monthly cost of Utility Services, calculated as a historical average payment for the twelve-month period ended April 30, 2017, less the amount of Prepetition Deposits held by the Utility Companies.  The Adequate Assurance Deposit will be held by the Debtors, and the Debtors' creditors will have no lien on any Adequate Assurance Deposit to the extent not returned to the Debtors pursuant to the terms set forth in the Order or the Adequate Assurance Account.

133.    The Debtors also request approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Companies to request additional adequate assurance where they believe it is required, and ensure that all key stakeholder groups obtain notice of such request before it is honored.

134.    In addition, the Debtors seek authority to continue honoring in the ordinary course of business certain non-technical utility-related obligations that are paid directly to their Landlords.

135.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, because the Debtors operate a customer-facing retail enterprise and the Debtors' business depends upon having an ability to maintain open and active stores, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue its operations.  I believe this disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

**K.**    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Lien Claimants, Import and Export Claimants, and 503(b)(9) Claimants, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "<u>Lien Claimants Motion</u>").**

136.    Pursuant to the Lien Claimants Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay in the ordinary course all prepetition and postpetition amounts owing on account of (i) certain shippers, warehousemen, and other non-merchant lienholders, (ii) certain import and export claimants, and (iii) certain Bankruptcy Code section 503(b)(9) claimants; and (b) confirming the administrative expense priority status of Outstanding Orders.

### 1.    Lien Claimants

137.    The Debtors' business depends on the uninterrupted flow of inventory and other goods through its supply chain and distribution network, including the purchase, importation, storage, and shipment of the Debtors' Merchandise.  Generally, the Debtors design the Merchandise in-house and contract with various Foreign Vendors, to produce and manufacture

the Merchandise in accordance with the Debtors' design specifications.  Depending on the nature

of the Debtors' arrangement with a given manufacturer, either the manufacturers or the Debtors,

through freight forwarders, ship the Merchandise to the Debtors' warehouse and distribution

center located in Dixon, California, which is leased from the Warehousemen.  Additionally, the

flow of Merchandise from the Debtors' manufacturers to the Warehousemen, and ultimately to

(a) stock the Debtors' domestic brick and mortar stores, (b) fulfill online orders, or (c) fulfill

orders of the Debtors' wholesalers (both domestic and foreign) and foreign franchisees, depends

on the services provided by the Shippers.

138.    Additionally, the Debtors employ various general contractors and vendors to

assist with remodels and on-site construction and repairs at the corporate headquarters and the

retail stores (the "Non-Merchant Lienholders" and, together with the Shippers and

Warehousemen, the "Lien Claimants").  In particular, the Non-Merchant Lienholders provide

renovation and repair services for the Debtors' new corporate headquarters as well as ongoing

store remodels or deliver various furniture and fixtures for installation in the Debtors' new

corporate headquarters as well as individual retail stores.  The Non-Merchant Lienholders are not

under contract, but rather perform work and related services on an order by order basis.

139.    Under certain non-bankruptcy laws, the Lien Claimants may be able to assert

liens on the goods in their possession to secure payment of the charges or expenses incurred in

connection with the Lien Charges.[17]  Accordingly, in the event the Lien Charges remain unpaid,

the Lien Claimants are likely to attempt to assert such possessory liens, and may refuse to deliver

or release goods in their possession until their claims are satisfied and their liens redeemed.  The

---

[17]    For example, section 7-307 of the Uniform Commercial Code provides, in pertinent part, that "[a] carrier has a
lien on the goods covered by a bill of lading or on the proceeds thereof in its possession for charges after the
date of the carrier's receipt of the goods for storage or transportation, including demurrage and terminal
charges, and for expenses necessary for preservation of the goods incident to their transportation or reasonably
incurred in their sale pursuant to law." *See* U.C.C. § 7-307(a) (2003).

Lien Claimants' retention of the Debtors' goods and supplies would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases. The cost of such disruption to the Debtors' estates would likely be greater than the applicable Lien Charges. Further, pursuant to section 363(e) of the Bankruptcy Code, the Lien Claimants may be entitled to adequate protection of any valid possessory lien, which would drain estate assets.

140. Collectively, the Debtors estimate approximately $5.5 million of third-party shipping, storage, and other charges (collectively, the "Lien Charges") are due and owing as of the Petition Date, of which approximately $4.6 million may become due and owing during the interim period.

### 2. The Import Claimants

141. In the ordinary course of their businesses, the Debtors import inventory and related materials (collectively, the "Imported Goods") from the Foreign Vendors. In the ordinary course, the Debtors also export inventory (collectively, the "Exported Goods") to foreign countries, including inventory to be sold in the Debtors' stores located in Canada and Puerto Rico. Timely receipt or transmittal, as applicable, of the Imported Goods and Exported Goods is critical to both the Debtors' domestic and foreign business operations.

142. The Debtors seek authority to pay any and all necessary and appropriate Import/Export Charges incurred on account of prepetition transactions. Absent such payment, parties to whom the Debtors owe Import/Export Charges may interfere with the transportation of the Imported Goods or Exported Goods. The Debtors pay approximately $65.3 million annually on account of Import/Export Charges. The Debtors estimate that approximately $6.9 million in Import/Export Charges for goods currently in transit is outstanding as of the Petition Date, of which the entirety may become due and owing during the interim period. For the foregoing

reasons, I believe that payment of the Import/Export Charges is necessary to preserve and enhance the value of the Debtors' business for the benefit of all parties in interest.

### 3.     The 503(b)(9) Claimants

143.     The Debtors may have received certain inventory, goods, or materials from various foreign and domestic vendors (collectively, the "503(b)(9) Claimants") within the 20-day period immediately preceding the Petition Date.   Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts, but are instead maintained on an order-by-order basis.   As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.   Such refusal could negatively affect the Debtors' estates as the Debtors' business is dependent on the steady flow of inventory to stock their stores.

144.     The Debtors believe that as of the Petition Date, they owe approximately $21.7 million on account of goods delivered within the 20 days immediately preceding the Petition Date, of which approximately $6.3 million may become due and owing during the interim period, and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

**L.     *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Critical Vendors and (II) Granting Related Relief* (the "Critical Vendors Motion").**

145.     Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders:  (a) authorizing, but not directing, the Debtors to pay, in the ordinary course of business, all undisputed, liquidated, prepetition amounts owing on account of claims held by Critical Vendors; and (b) granting related relief.

146.     In the ordinary course of business, the Debtors obtain materials and services from a limited number of highly specialized Service Vendors, Operating and Retail Providers, and Marketing Support Vendors, and other businesses that would likely be impossible to replace or

the loss of which would result in substantially higher costs for the Debtors at this early, critical juncture in these chapter 11 cases. The Debtors rely on timely and frequent delivery of these critical goods and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, employees, customer base, and market share. Further, the Debtors currently enjoy favorable trade terms with many of their Critical Vendors. Loss of trade terms (whether on account of demands for cash in advance, cash on delivery, or otherwise) would materially impair the value of the Debtors' estates.

147.    With the assistance of their advisors, the Debtors have spent time reviewing and analyzing their books and records, consulting with management and the Debtors' personnel responsible for operations and purchasing, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify certain critical business relationships and/or suppliers of goods and services—the loss of which would materially impair the going-concern viability of the Debtors' business. At this time, the Debtors estimate that the Critical Vendors may hold claims in excess of $2.9 million that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code, of which approximately $1.3 million will become due and owing during the interim period.

148.    I believe that the relief requested in the Critical Vendors Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise while also providing the Debtors with flexibility to engage in settlement discussions with such parties regarding the validity, amount, and extent of their claims. I believe that the harm attendant to severing ties with the Critical Vendors would likely far outweigh the cost of payment of the Critical Vendor Claims.

Therefore, I believe that the relief requested in the Critical Vendors Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Motion.

**M.** ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Foreign Vendors and (II) Granting Related Relief*** **(the "<u>Foreign Vendors Motion</u>").**

149.    Pursuant to the Foreign Vendors Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to pay, in the ordinary course of business, all Foreign Vendor Claims held by Foreign Vendors located outside the United States, that are essential to the Debtors' ongoing business operations.

150.    As a result of the global nature of their operations, the Debtors regularly transact business with entities located outside of the United States.  Many of these Foreign Vendors supply goods, materials, or services to the Debtors that are crucial to the Debtors' ongoing operations.  I believe that if the Debtors are unable to honor the payment terms for goods that shipped prior to the Petition Date, but will not become due and owing until after the Petition Date, the Foreign Vendors are unlikely to complete production on open purchase orders or accept new purchase orders in the future.  Without timely deliveries from their foreign suppliers, the provision of services, and the cooperation of all the Foreign Vendors, the Debtors' operations could suffer from a lack of inventory or other products and services to the detriment of the Debtors and their stakeholders, as nearly all of the Debtors' products are manufactured according to detailed specifications that are typically ordered six months in advance of the time when the Debtors ultimately receive the products.

151.    More fundamentally, the Foreign Vendors could simply refuse to do business with the Debtors.  Because all of the Foreign Vendors have no (or *de minimis*) assets or operations in the United States that would be subject to the jurisdiction of this Court, the Debtors have no

workable enforcement mechanism against these parties.  I believe that the cumulative impact of the Foreign Vendors' breach of their contracts with the Debtors could have an adverse effect on the Debtors' operations and their ability to reorganize.

152.    Lastly, if the Foreign Vendor Claims are not paid, the Foreign Vendors may take precipitous action against the Debtors based upon an erroneous belief that they are not subject to the automatic stay provisions of section 362(a) of the Bankruptcy Code. Although the automatic stay applies to protect the Debtors' assets wherever they are located in the world, attempting to enforce the Bankruptcy Code in foreign countries is often challenging and will consume meaningful estate personnel and resources.

153.    In light of these consequences, the Debtors have concluded that payment of the Foreign Vendor Claims is essential to avoid disruptions to the Debtors' operations.  The Debtors estimate that as of the Petition Date, approximately $75.2 million is accrued and outstanding on account of Foreign Vendor Claims, of which approximately $38.7 million may come due on an interim basis.

**N.    *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "Customer Programs Motion").**

154.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to maintain and administer their Customer Programs and honor certain prepetition obligations related thereto.

155.    The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their "brand."  These programs include refund and exchange programs,

loyalty programs, referral programs, gift card and certificate programs, and other sale promotions. Accordingly, maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

156.    The Debtors estimate that, of their prepetition obligations under the Customer Programs, approximately $26.3 million constitutes accrued credits, adjustments, discounts, or other similar obligations owing to their customers, the vast majority of which **do not** entail the expenditure of cash.

157.    I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates. In contrast, if the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating certain customer constituencies (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for reorganization and/or maximizing the value of their estate.

158.    I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases.

O.    ***Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing The Debtors To Assume The Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief* (the "<u>Store Closing Motion</u>").**

159.    Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors to (a) assume the Consulting Agreement, and (b) close stores

in accordance with the terms of the Sale Guidelines with such sales to be free and clear of all liens, claims and encumbrances, and (ii) approving procedures to wind-up any Additional Closing Stores pursuant to the Sale.

160.    Recognizing the need to right-size their store footprint to align with industry conditions, the Debtors' management team and advisors, including Lazard Frères & Co. LLC and A&G Realty Partners, LLC, undertook an extensive analysis of the Debtors' existing store footprint, and whether and how many stores the Debtors should close in connection with their broader financial and operational restructuring initiatives.  The Debtors' management team and advisors ultimately determined that it is appropriate to close and wind down (the "Store Closings") up to 450 unprofitable brick-and-mortar store locations (contingent on lease negotiations with the Debtors' landlords) based off factors such as historical store profitability, recent sales trends, the geographic market in which the store is located, the potential to realize negotiated rent reductions with applicable landlords, and specific circumstances related to a store's performance.

161.    I believe that the Store Closings and the Sales provide the best and most efficient means of selling the Store Closure Assets to maximize the value to their estates.  Delay in consummating the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons.  The Stores fail to generate positive cash flow and therefore are a drain on liquidity.  Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sales of the Store Closure Assets and the termination of operations at the Stores.  Further, the swift and orderly commencement of the Sale will allow the Debtors to timely reject the applicable Store leases, and therefore avoid the accrual of unnecessary administrative expenses for rent payment.  Delaying the Store Closings may cause the Debtors to

pay postpetition rent at many of these stores, at a possible cost to the estate of approximately $3.0 to $3.8 million per month.

162.    Furthermore, I believe that assumption of the Consulting Agreement will allow the Debtors to utilize the experience and resources of the Consultant in performing large-scale liquidations in a format that allows the Debtors to retain control over the sale process and which will provide the maximum benefit to the estates.  Indeed, the Debtors estimate that the proceeds from the Sales will be approximately $65 million to $85 million.

*[Remainder of Page Left Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  June 12, 2017                          /s/ *James A. Mesterharm*
                                              James A. Mesterharm
                                              Chief Restructuring Officer

## Exhibit A

**Restructuring Support Agreement**

*EXECUTION COPY*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

# RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (including all exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**")[1] is made and entered into as of June 11, 2017, by and among the following parties (each of the foregoing described in sub-clauses (i), (ii), and (iii), a "**Party**" and, collectively, the "**Parties**"):

    i.    The Gymboree Corporation ("**Gymboree**") and its undersigned direct and indirect subsidiaries and Giraffe Intermediate B, Inc. (collectively, the "**Debtors**");

    ii.    Bain Capital Private Equity, LP on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its Affiliates that directly or indirectly hold interests in the Debtors (collectively, the "**Sponsor**"); and

    iii.    the lenders party to that certain Amended and Restated Credit Agreement, dated as of February 11, 2011 (as amended, restated, modified, or supplemented from time to time, the "**Term Loan Credit Agreement**"), by and among Gymboree, as borrower, certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (solely in such capacities, the "**Term Loan Agent**") that are or may become in accordance with Section 6 of this Agreement (collectively, the "**Consenting Creditors**").

## RECITALS

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding the restructuring and recapitalization of the Debtors, including with respect to the Debtors' respective obligations under the Term Loan Agreement;

**WHEREAS**, the Parties desire to effectuate a restructuring and recapitalization of the Debtors as set forth in the Restructuring Term Sheet through the confirmation and consummation of a prenegotiated chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Plan**") and certain related

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "**Restructuring Term Sheet**"), subject to Section 2 hereof.

transactions, all of which shall be on the terms and conditions described in this Agreement (such transactions, the "**Restructuring Transactions**");

       **WHEREAS**, to facilitate the consummation of the Restructuring Transactions, the Debtors intend to commence voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**") and promptly file the Plan and a related disclosure statement (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Disclosure Statement**") prior to soliciting votes on the Plan in accordance with section 1125 of the Bankruptcy Code;

       **WHEREAS**, certain Consenting Creditors have agreed to provide the Debtors with a $105 million debtor-in-possession financing facility ("**DIP Term Loan Financing**") consisting of (a) up to $35 million in new money delayed draw term loans") to fund the Chapter 11 Cases and (b) $70 million of term loans to refinance amounts due and owing under the Term Loan Credit Agreement, substantially on the terms set forth in the Debtor-in-Possession Credit Agreement, dated as of June 11, 2017 and entered into concurrently herewith (the "**DIP Term Loan Agreement**"), and subject to entry of the DIP Orders (as defined below);

       **WHEREAS**, certain Consenting Creditors have agreed to fund up to $80 million in two new money rights offerings (the "**Rights Offerings**") in connection with the Restructuring Transactions pursuant to that certain Backstop Commitment Agreement, dated as of June 11, 2017 and entered into concurrently herewith (the "**Backstop Commitment Agreement**") and in accordance with the rights offering procedures attached to the Backstop Commitment Agreement (the "**Rights Offering Procedures**"); and

       **WHEREAS**, the following sets forth the agreement among the Parties concerning their respective rights and obligations in respect of the Restructuring Transactions.

       **NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**   *Agreement Effective Date*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m. (prevailing Eastern Time), on the date on which: (a)(i) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Term Loan Agent; and (ii) holders of at least 66% of the aggregate principal amount of all claims outstanding under the Term Loan Credit Agreement (any such claims, the "**Term Loan Claims**") (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code and excluding the 2017 Incremental Term Loan (as defined in the Term Loan Credit Agreement)) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (b) the Sponsor shall have executed and delivered counterpart signatures of this Agreement to the Debtors; and (c) the Debtors have given notice to counsel to the Term Loan Agent and the Sponsor in accordance with

Section 18.09 hereof that each of the foregoing conditions set forth in this Section 1, in each case, has been satisfied and this Agreement is effective (such date, the "**Agreement Effective Date**").

**Section 2.**    *Exhibits and Schedules Incorporated by Reference.* Each of the exhibits hereto (including the Restructuring Term Sheet) and any schedules to such exhibits (collectively, the "**Exhibits and Schedules**")) is expressly incorporated herein and made a part of this Agreement, and as used in this Agreement, all references to this Agreement shall include the Exhibits and Schedules. In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

**Section 3.**    *Definitive Documentation.*

(a)    The definitive documents and agreements governing the Restructuring Transactions (collectively, the "**Restructuring Documents**") shall consist of this Agreement and each of the following documents:

(i)    the Plan (and all exhibits thereto);

(ii)    the Confirmation Order and pleadings in support of entry of the Confirmation Order;

(iii)    the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(iv)    all other documents that are contained in any supplements filed in connection with the Plan (collectively, the "**Plan Supplement**");

(v)    (A) the interim order or orders authorizing the use of cash collateral and debtor-in-possession financing (each, an "**Interim DIP Order**") and (B) the final order or orders authorizing the use of cash collateral and debtor-in-possession financing (each, a "**Final DIP Order**" and together with the Interim DIP Order, collectively, the "**DIP Orders**");

(vi)    the DIP Term Loan Credit Agreement, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "**DIP Term Documents**");

(vii)    the post-petition debtor-in-possession credit agreement (together with the DIP Term Loan Credit Agreement, the "**DIP Credit Agreements**") for the $273.5 revolving debtor-in-possession financing facility (the "**DIP ABL Facility**" and the financing associated therewith, the "**DIP ABL Financing**") to be entered into in accordance with the DIP Orders by the Debtors, Bank of America, N.A., as Administrative Agent, and the lenders party thereto, including any amendments, modifications, supplements thereto, and together with any related

notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "**DIP ABL Documents**");

(viii)    the credit agreements for the Exit Credit Facilities, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith;

(ix)    any documents relating to corporate governance matters; and

(x)    an order or orders of the Bankruptcy Court approving the Debtors' assumption of, and performance under, the Backstop Commitment Agreement (the "**BCA Approval Order**");

(b) Certain of the Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and shall otherwise be in form and substance acceptable to each of the Debtors and the Required Consenting Creditors. As used herein and the Restructuring Term Sheet: (i) the term "**Required Consenting Creditors**" means, at any relevant time, (a) if the Initial Consenting Creditors (as defined below) then collectively hold at least 40.0% of the principal amount of all outstanding Term Loan Claims at such time, the Majority Initial Consenting Creditors (as defined below) and (b) if the Initial Consenting Creditors then collectively hold less than 40.0% of the principal amount of all outstanding Term Loan Claims at such time, Consenting Creditors then collectively holding greater than 50.0% by principal amount outstanding of the Term Loan Claims held by all Consenting Creditors at such time; (ii) the term "**Initial Consenting Creditor**" means any Consenting Creditor that became a Party to this Agreement on June 11, 2017; and (iii) the term "**Majority Initial Consenting Creditors**" means, at any relevant time, Initial Consenting Creditors then collectively holding at least 50.0% by principal amount outstanding of Term Loan Claims held by all Initial Consenting Creditors at such time.

**Section 4.**    *Milestones*.    As provided in and subject to Section 5.03, the Debtors shall implement the Restructuring Transactions in accordance with the milestones set forth in the Restructuring Term Sheet (the "**Milestones**"). Each Milestone may only be extended with the express prior written consent of the Required Consenting Creditors, not to be unreasonably withheld.

**Section 5.**    ***Commitments Regarding the Restructuring Transactions***.

5.01.    Commitment of the Consenting Creditors.

(a)    From the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Consenting Creditors, each of the Consenting Creditors agrees (on a several but not joint basis) to:

(i)      to the extent permitted to vote to accept or reject the Plan (and subject to the actual receipt by such Consenting Creditor of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code), vote each of its claims against the Debtors (including each of its Term Loan Claims and any other claims against the Debtors (such claims, together with any claims the Sponsor may have against the Debtors, the "**Debtor Claims**")) and any interests in the Debtors (such interests, together with any interests the Sponsor may have in the Debtors, the "**Debtor Interests**" and collectively with the Debtor Claims, the "**Debtor Claims/Interests**") to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis;

(ii)     negotiate in good faith the Restructuring Documents and use reasonable best efforts to take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement;

(iii)    use reasonable best efforts to support and take all actions necessary or appropriate to facilitate the solicitation, confirmation and consummation of the Plan and the Restructuring Transactions;

(iv)    consent to and use reasonable best efforts to support the release, discharge, exculpation, and injunction provisions contained in the Plan (and not "opt out" of such provisions in the Plan);

(v)     not object to or join in any objection to, and use reasonable best efforts to support approval of, the BCA Approval Order, the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order;

(vi)    not change or withdraw (or cause to be changed or withdrawn) any vote(s) to accept the Plan; *provided, however*, that if a Termination Date occurs before consummation of the Restructuring Transactions, all votes tendered by such Consenting Creditors to accept the Plan shall be immediately revoked and deemed void *ab initio* in accordance with Section 11;

(vii)   fully subscribe to its ratable portion of the Rights Offerings on account of its Term Loan Claims; and

(viii)  not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, or otherwise take any action which would, or which would reasonably be expected to, breach or be inconsistent with this Agreement, (B) propose, file, support, or vote for any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership sale of assets, financing (debt or equity), restructuring of the Debtors, other than the Restructuring Transactions (each, an "**Alternative Transaction**"), or (C) support, encourage or direct any other person or entity to take any action contemplated in (A) and (B) of this Section 5.01(a)(viii).

(b)    Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Consenting Creditor nor the acceptance of the Plan by any Consenting Creditor shall: (i) be construed to prohibit any Consenting Creditor from contesting whether any

matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the other Restructuring Documents, or exercising any rights (including any consent and approval rights contemplated under this Agreement or the other Restructuring Documents) or remedies specifically reserved herein or therein; (ii) be construed to prohibit or limit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Effective Period, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; *provided*, that any delay or other impact on consummation of the Restructuring Transactions contemplated by the Plan caused by a Consenting Creditor's opposition to (x) any relief that is inconsistent with such Restructuring Transactions, (y) a motion by the Debtors to enter into a material executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior written consent of the Required Consenting Creditors, not to be unreasonably withheld, or (z) any relief that is adverse to the interests of the Consenting Creditors sought by the Debtors (or any other party), shall not constitute a violation of this Agreement; or (iii) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

5.02.    Commitment of the Sponsor.

(a)    From the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Sponsor, the Sponsor agrees to:

(i)    to the extent permitted to vote to accept or reject the Plan (and subject to the actual receipt by the Sponsor of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code), vote each of its Debtor Claims/Interests to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis;

(ii)    use reasonable best efforts to support and take all actions necessary or appropriate to facilitate the solicitation, confirmation and consummation of the Plan and the Restructuring Transactions;

(iii)    consent to and use reasonable best efforts to support the release, discharge, exculpation, and injunction provisions contained in the Plan (and not "opt out" of such provisions in the Plan);

(iv)    not object to or join in any objection to, and use reasonable best efforts to support approval of, the BCA Approval Order, the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order;

(v)    not change or withdraw (or cause to be changed or withdrawn) any vote(s) to accept the Plan;

(vi)    not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, or otherwise take any action which would, or which would reasonably be expected

6

to, breach or be inconsistent with this Agreement, (B) propose, file, support, or vote for any Alternative Transaction, or (C) support, encourage or direct any other person or entity to take any action contemplated in (A) and (B) of this Section 5.02(a)(vi);

(vii)    not pledge, encumber, assign, sell or otherwise transfer, including by the utilization of a worthless stock deduction, offer or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Debtors to the extent it will impair any Debtor's tax attributes;

(viii)    not assert any claims of any kind or priority against the Debtors in the Chapter 11 Cases (provided, that the Sponsor and each Sponsor Released Party (as defined herein) shall have the right to file a proof of claim in the Chapter 11 Cases in compliance with the bar date to preserve its right to assert its claims if this Agreement terminates in accordance with its terms);

(ix)    not take any action, or cause any Non-Debtor or Debtor to take any action, that would generate taxable income for the Debtors or any Non-Debtor outside the ordinary course of business of the Debtors, or cause any Non-Debtor or Debtor to cease to be a member of an existing Gymboree Consolidated Group; and

(x)    cooperate (and cause any Non-Debtors over which it has control to cooperate) with the Debtors and the Reorganized Debtors in connection with any Gymboree Consolidated Group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Plan Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld); *provided*, that reasonable expenses incurred by the Non-Debtors at the request of the Reorganized Debtors in connection with this sentence shall be borne by the Reorganized Debtors.

(b)    Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by the Sponsor nor the acceptance of the Plan by the Sponsor shall: (i) be construed to prohibit the Sponsor from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the other Restructuring Documents, or exercising any rights (including any consent and approval rights contemplated under this Agreement or the other Restructuring Documents) or remedies specifically reserved herein or therein; (ii) be construed to prohibit or limit the Sponsor from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Effective Period, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; *provided*, that any delay or other impact on consummation of the Restructuring Transactions contemplated by the Plan caused by the Sponsor's opposition to (x) any relief that is inconsistent with such Restructuring Transactions or (y) any relief that is adverse to the interests of the Sponsor sought by the Debtors (or any other party), shall not constitute a violation of this Agreement; or (iii) impair or waive the rights of the Sponsor to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

5.03.    <u>Commitment of the Debtors</u>.

(a)    From the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Debtors, the Debtors agree, and agree to cause each of their direct and indirect subsidiaries to:

(i)    negotiate in good faith all Restructuring Documents and take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement;

(ii)    obtain orders of the Bankruptcy Court in respect of the Restructuring Transactions, including approval of the BCA Approval Order, the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order;

(iii)    support and consummate the Restructuring Transactions in accordance with this Agreement within the time-frames contemplated under this Agreement and in compliance with each Milestone;

(iv)    execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions;

(v)    use reasonable best efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(vi)    pay the reasonable and documented fees and expenses of the Consenting Creditors as set forth in Section 13 of this Agreement;

(vii)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Creditors, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (1) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (3) dismissing any of the Chapter 11 Cases, or (4) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(viii)    support and use commercially reasonable efforts to consummate the (x) DIP Term Financing pursuant to the DIP Orders and the DIP Term Documents (including the exchange and conversion of prepetition term loans into Roll-Up DIP Loans) and (y) the DIP ABL Financing pursuant to the DIP Orders and the DIP ABL Documents;

(ix)    promptly notify the Required Consenting Creditors in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(x)    timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Creditors, to any motion, application, or adversary proceeding (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(xi)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Required Consenting Creditors; *provided, however,* that the economic outcome for the Required Consenting Creditors, the anticipated timing of confirmation and the Plan Effective Date, and other materials terms as contemplated herein must be substantially preserved, as determined by the Required Consenting Creditors;

(xii)    if the Debtors know of a breach by any Debtor in respect of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) days of such actual knowledge) to the Required Consenting Creditors and the Sponsor and promptly take all remedial action necessary to cure such breach by an such Debtor;

(xiii)    timely file a formal response to any motion or other pleading filed with the Bankruptcy Court by any party objecting to approval of the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, the Confirmation Order, or any other Restructuring Documents contemplated under this Agreement;

(xiv)    operate their business in the ordinary course, taking into account the Restructuring Transactions;

(xv)    not modify the Plan or any other Restructuring Documents, in whole or in part, in a manner that is inconsistent with this Agreement, subject to Section 16 hereof; and

(xvi)    not directly or indirectly (A) delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, or otherwise take any action which would, or which would reasonably be expected to, breach or be inconsistent with this Agreement, (B) propose, file, seek, solicit, or support any Alternative Transaction, or (C) support, encourage or direct any other person or entity to take any action contemplated in (A) and (B) of this Section 5.03(a)(xvi).

(b) Notwithstanding the foregoing Section 5.03(a), without limiting the rights and obligations of the Parties under Section 11 (including, without limitation, the Debtors' termination rights under Section 11.03), (i) if any of the Debtors receive a proposal or expression of interest regarding any Alternative Transaction during the period from the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Debtors, the Debtors shall promptly notify counsel to the Term Loan Agent and the Sponsor of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, (ii) the Debtors shall promptly furnish to counsel to the Term Loan Agent and the Sponsor copies of any written offer, oral offer, or any other information (unless prohibited by separate agreement) that they receive relating to the foregoing and shall promptly inform counsel to the Term Loan Agent and the Sponsor of any material changes to such proposals, and (iii) the Debtors shall not enter into any confidentiality agreement with a party interested in an Alternative Transaction unless such party consents to identifying and providing to counsel to the Term Loan Agent and the

Sponsor (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 5.03(b).

**Section 6.**        *Transfer of Debtor Claims/Interests.*

(a)        During the Effective Period, no Consenting Creditor or Sponsor shall sell, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership[2]) in the Debtor Claims/Interests to any party (other than an entity that is controlled by or is under common control with such Consenting Creditor (a "**Related Party**")) or Sponsor, respectively, unless the following requirements have been satisfied (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

(i)        the intended transferee executes and delivers to counsel to the Debtors, counsel to the Term Loan Agent, and counsel to the Sponsor, on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit B** (a "**Transfer Agreement**");

(ii)        with respect to the Transfer of (a) Term Loan Claims, (b) Loans and Commitments under (and in each case, as defined in) the DIP Term Loan Credit Agreement, and (c) Backstop Commitments (as defined in the Backstop Commitment Agreement)(each of (a),(b) and (c), a "**Restructuring Claim**" and together the "**Restructuring Claims**"), the Transfer complies in all respects with the following requirement (the "**Stapling Requirement**"):

(A)        simultaneously with a Consenting Creditor's Transfer of all or any portion of a Restructuring Claim, such Consenting Creditor and its Contracted Related Parties shall be obligated to make a *proportionate* Transfer of each of the Restructuring Claims held by the Consenting Creditor and its Contracted Related Parties to the same Permitted Transferee (and/or its Related Parties) (for the avoidance of doubt, the amount shall be determined by dividing the amount of the individual type of Restructuring Claim proposed to be sold by the total amount of the same type of Restructuring Claim held by the Consenting Creditor and its Contracted Related Parties and then applying that percentage to the aggregate amount of each type of Restructuring Claim held by the Consenting Creditor and its Contracted Related Parties ); *provided*, that Transfers by a Consenting Creditor of Restructuring Claims made to such Consenting Creditor's Related Parties are not subject to the Stapling Requirement.

---

[2]        As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such claims or interests.

(B)     As used herein, "**Contracted Related Parties**" means any Related Party that is a party to this Agreement, the Backstop Commitment Agreement or the DIP Term Loan Agreement.

(iii)     with respect to the Transfer of any Debtor Interests only, such Transfer shall not (A) violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses or (B) in the reasonable business judgment of the Debtors and their legal and tax advisors, adversely (1) affect the Debtors' ability to maintain the value of and utilize their net operating loss carryforwards or other tax attributes or (2) the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring Transaction.

(b)     The Debtors shall have five (5) business days from receiving notice of the Transfer Agreement with respect to the Transfer of any Debtor Interests in accordance with this Section 6(a)(i) to object to such Transfer Agreement for the reasons described in Section 6(a)(iii).

(c)     Notwithstanding Section 6(a), a Qualified Marketmaker[3] that acquires any Debtor Claims/Interests subject to this Agreement with the purpose and intent of acting as a Qualified Marketmaker for such Debtors Claims/Interests shall not be required to execute and deliver to counsel a Transfer Agreement in respect of such Debtor Claims/Interests if (i) such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) consistent with the Stapling Requirements within three (3) business days of its acquisition to a transferee that is an entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement); and (iii) the transfer otherwise is a Permitted Transfer.

(d)     This Agreement shall in no way be construed to preclude the Consenting Creditors or Sponsor from acquiring additional Debtor Claims/Interests or effecting a Transfer of all or a portion of its Debtor Claims/Interests to an entity controlled by or under common control with such Consenting Creditors or Sponsor, as applicable, as of the date of such Transfer); *provided*, that (i) any such Consenting Creditor or Sponsor or entity that acquires Debtor Claims/Interests, as applicable, after the Agreement Effective Date shall promptly notify counsel to the Debtors of such acquisition including the amount of such acquisition, who shall then promptly notify counsel to the Term Loan Agent and Sponsor and (ii) such Debtor Claims/Interests shall automatically and immediately upon acquisition by such Consenting Creditor, Sponsor, or entity, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Debtors or counsel to the Term Loan Agent or Sponsor) and subsequent Transfers shall be subject to this Section 6.

(e)     Upon the completion of any Transfer of Debtor Claims in accordance with this Section 6, the transferee shall be deemed a Consenting Creditor hereunder with respect to such

---

[3]     As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

transferred rights, obligations and claims and the Transferor shall be deemed to relinquish its rights and claims (and be released from its obligations under this Agreement) with respect to such transferred Debtor Claims.

(f)    Any Transfer of any Debtor Claims/Interests made in violation of this Section 6 shall be void *ab initio* and of no force and effect and shall not create any obligation or liability of any Consenting Creditor or the Debtors to the purported transferee.

**Section 7.    *Representations and Warranties of Consenting Creditors and Sponsor.*** Each Consenting Creditor and Sponsor, severally, and not jointly, represents and warrants for itself and not any other Person or Entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(a)    it is the beneficial owner of the face amount of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtor Claims/Interests, as reflected on such Consenting Creditor's or Sponsor's signature page to this Agreement (such Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**");

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning the Owned Debtor Claims/Interests;

(c)    it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "**Securities Act**"), (iii) a Regulation S non-U.S. person, or (iv) the foreign equivalent of (i) or (ii) above;

**Section 8.    *Mutual Representations and Warranties.*** Each (i) Consenting Creditor and Sponsor, severally, and not jointly, and (ii) Debtor, on a joint and several basis, hereby represents and warrants for itself and not any other Person or Entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

8.01.    Enforceability. It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

8.02.    No Consent or Approval. Except as expressly provided in this Agreement, the Plan, the Term Sheet, or the Bankruptcy Code, no consent or approval is required by any other Person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform the respective obligations under, this Agreement.

8.03.    Power and Authority. Except as expressly provided in this Agreement and subject to applicable law, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and, to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement.

8.04.    <u>Governmental Consents</u>.  Except as expressly set forth herein and with respect to the Debtors' execution and performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), the execution, delivery, and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

8.05.    <u>No Conflicts</u>.  The execution, delivery, and performance of this Agreement does not and shall not: (a) violate any provision of law, rules, or regulations applicable to it or any of its subsidiaries in any material respect; (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring Transactions.

8.06.    <u>Fiduciary Duties</u>.  It has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or Entity, would prevent it from taking any action required of it under this Agreement.

8.07.    <u>Other Representations</u>.  It has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

**Section 9.**    *Acknowledgement*.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The Debtors will not solicit acceptances of any Plan from Consenting Creditors in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 10.**    *Cooperation and Support.*

(a)    The Required Consenting Creditors and the Sponsor shall have a reasonable opportunity to review and comment on first-day pleadings (the "**First Day Pleadings**").  The Debtors shall use commercially reasonable efforts to incorporate the comments of the Required Consenting Creditors and the Sponsor as to the First Day Pleadings.

(b)    Additionally, during the Effective Period, the Debtors will use reasonable best efforts to provide draft copies of all material motions, pleadings, and documents other than the First Day Pleadings that the Debtors intend to file with the Bankruptcy Court to counsel to the Term Loan Agent and the Sponsor at least three (3) days before the date on which Debtors intend to file such motions.  To the extent such documents do not constitute Restructuring Documents (which shall be subject to the consent and approval rights of the Debtors, the Required Consenting Creditors, and the Sponsor as set forth in Section 3 of this Agreement), the Debtors shall consult

in good faith with counsel to the Term Loan Agent and the Sponsor regarding the form and substance of such documents.

(c)    The Debtors shall (i) provide to the Consenting Creditors' and the Sponsor's advisors timely and reasonable responses to all reasonable diligence requests, in each case for purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs; and (ii) promptly notify counsel to the Term Loan Agent and the Sponsor of any newly commenced material governmental or third party litigations, investigations, or hearing against any of the Debtors.

## Section 11.    *Termination Events.*

11.01.    <u>Consenting Creditor Termination Events</u>. This Agreement may be terminated as between the Consenting Creditors and the other Parties, in each case, upon five (5) business days written notice delivered in accordance with Section 18.09 hereof by the Required Consenting Creditors pursuant to this Section 11.01 upon the occurrence and continuation of any of the following events (provided that the foregoing Required Consenting Creditors have not failed to perform or comply in all material respects with the terms and conditions of this Agreement):

(a)    the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of the Required Consenting Creditors in violation of their obligations under this Agreement or (ii) such Milestone is waived in accordance with Section 4;

(b)    the effective date of the Plan (the "**Plan Effective Date**") shall not have occurred on or before December 15, 2017 (the "**Outside Date**");

(c)    the occurrence of a material breach by any Party other than the Required Consenting Creditors of this Agreement; *provided*, that (i) such Required Consenting Creditors shall transmit a notice to the Debtors, the Sponsor, and the other Consenting Creditors pursuant to Section 18.09 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 18.09 hereof) and, in either case, if such breach is capable of being cured, the breaching Party shall have five (5) business days after receiving such notice to cure any breach;

(d)    the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have the effect of preventing substantial consummation of the Restructuring Transactions; *provided*, that the Debtors shall have five (5) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (ii) is acceptable to the Required Consenting Creditors;

(e)    the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Required Consenting Creditors, or (iii) appointment of a trustee, receiver, or

14

examiner with expanded powers beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)    any Debtor, without the prior consent of the Required Consenting Creditors, (i) amends, or modifies, or files a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is materially inconsistent with this Agreement, (ii) suspends or revokes the Restructuring Transactions, or (iii) publicly announces its intention to take any such action listed in Sub-Clauses (i) and (ii) of this subsection;

(g)    any of the Restructuring Documents do not comply with Section 3 of this Agreement or any other document or agreement necessary to consummate the Restructuring Transactions is not reasonably satisfactory to the Required Consenting Creditors;

(h)    any Debtor makes any filing in support of, enters into an agreement with respect to, or announces its support for any Alternative Transaction or that it will file any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets (other than as provided for in the Plan), without the prior written consent of the Required Consenting Creditors;

(i)    the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not substantially consistent with this Agreement or otherwise consented to by the Required Consenting Creditors;

(j)    the Debtors' failure to consummate the DIP ABL Financing;

(k)    the occurrence of any Event of Default under the DIP Term Documents, the DIP ABL Documents, or the DIP Orders, as applicable, that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

(l)    a breach by any Debtor or any other Party of any representation, warranty, or covenant of such Debtor or other Party set forth in Section 8 of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Debtors of written notice and description of such breach from any other Party;

(m)    any Debtor or Sponsor files a motion, application, or adversary proceeding (or any Debtor or other Party supports any such motion, application, or adversary proceeding filed or commence by any third party) (i) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Term Loan Claims, or (ii) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(n)    a determination is made with respect to any Debtor pursuant to Section 11.03(b) that its continued support of the Restructuring Transactions would be inconsistent with its fiduciary obligations under applicable law;

(o)    any Debtor terminates its obligations under and in accordance with Section 11.03 of this Agreement;

(p)    the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(q)    the DIP Orders or any of the orders confirming the Plan or approving the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Creditors or a motion for reconsideration, reargument, or rehearing with respect to such orders has been filed and the Debtors have failed to timely object to such motion; or

(r)    the occurrence of a Maturity Date (as defined in each of the DIP Credit Agreements).

The Interim DIP Order will provide that the Consenting Creditors are authorized to take any steps necessary (including, without limitation, sending any notice contemplated hereunder) to effectuate the termination of this Agreement notwithstanding section 362 of the Bankruptcy Code or any other applicable law and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the Required Consenting Creditors; *provided,* that following the commencement of the Chapter 11 Cases and until such time as the Interim DIP Order (which includes the foregoing provision) is entered, the occurrence of any Termination Event in this Section 11.01 shall result in the automatic termination of this Agreement five days following such occurrence unless waived in writing by the Required Consenting Creditors.

11.02.  Sponsor's Termination Events.  This Agreement may be terminated as between the Sponsor and the other Parties upon five (5) business days written notice delivered in accordance with Section 18.09 hereof by the Sponsor pursuant to this Section 11.02 upon the occurrence and continuation of any of the following events (provided that the Sponsor has not failed to perform or comply in all material respects with the terms and conditions of this Agreement):

(a) the occurrence of a material breach by any Party other than the Sponsor of this Agreement; *provided,* that (i) the Sponsor shall transmit a notice to the Debtors and the Consenting Creditors pursuant to Section 18.09 hereof detailing any such breach and, if such breach is capable of being cured, the breaching Party shall have five (5) business days after receiving such notice to cure any breach;

(b) the entry of an order by the Bankruptcy Court denying confirmation of the Plan; and

(c) a Release Revocation Event (as defined herein).

11.03.  Debtors' Termination Events.  Any Debtor may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 18.09 hereof, upon the occurrence of any of the following events:

(a)    the breach by any of the Consenting Creditors of any material provision set forth in this Agreement that remains uncured for a period of five (5) business days after the receipt by the Consenting Creditors of notice of such breach;

(b)    the board of directors, board of managers, or a similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Restructuring Transactions would be inconsistent with applicable law or its fiduciary obligations under applicable law, including having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable to such Debtor's estate than the Restructuring Transactions and that continued support of the Restructuring Transactions pursuant to this Agreement would be inconsistent with its fiduciary obligations; or

(c)    the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring Transactions; *provided*, that the Debtors have made reasonable best efforts to cure, vacate, reverse, or have overruled such ruling or order prior to terminating this Agreement.

11.04.    <u>Mutual Termination</u>.    This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among each of the Debtors, the Sponsor, and the Required Consenting Creditors.

11.05.    <u>Termination Upon Completion of the Restructuring Transaction</u>.    This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date, subject to Section 12 of this Agreement.

11.06.    <u>Effect of Termination</u>.    The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, and 11.05 shall be referred to as a "**Termination Date**." Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement. Upon the occurrence of a Termination Date with respect to the Consenting Creditors or the Sponsor, any and all consents or ballots tendered by such Consenting Creditors or the Sponsor, as applicable, shall be deemed, for all purposes, to be null and void *ab initio* and shall not be used in any manner in connection with the Restructuring Transactions or otherwise. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit the Debtors, the Sponsor, or any of the Consenting Creditors from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Creditor, (b) any right of any Consenting Creditor, or the ability of any Consenting Creditor, to protect and preserve its rights (including rights under this Agreement), remedies, and

17

interests, including its claims against any Debtor, Sponsor, or Consenting Creditor, and (c) any right of the Sponsor, or the ability of the Sponsor to protect and preserve its rights (including any rights under this Agreement), remedies, and interests, including its claims against any Debtor or Consenting Creditor. Nothing in this Section 11.06 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 11.03(b).

**Section 12.**    *Survival*.    Notwithstanding the termination of this Agreement pursuant to Section 11, the agreements and obligations of the Parties in Sections 14 and 15 hereof (and any defined terms needed for the interpretation of any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

**Section 13.**    *Fees and Expenses*.    The Debtors shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) of the attorneys, accountants, other professionals, advisors and consultants of the Term Loan Agent and the Consenting Creditors (whether incurred directly by the Consenting Creditors or on their behalf through the Term Loan Agent and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of (a) Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") as legal counsel, (b) McGuireWoods LLP as local counsel, (c) Rothschild Inc. ("**Rothschild**") as financial advisor and investment banker, and (d) Carriage House Capital Advisors, LLC ("**Carriage House**") as consultant, and any such other advisors or consultants as may be reasonably retained on behalf of the Consenting Creditors in consultation with the Debtors, in each case, including all amounts payable or reimbursable under applicable fee or engagement letters with the Debtors (which agreements shall not be terminated by the Debtors before the termination of this Agreement), the DIP Order, or the Term Loan Credit Agreement.

**Section 14.**    *Release*.

14.01.    On the Agreement Effective Date, (x) each Consenting Creditor, and subject in all respects to Section 15, on behalf of itself and its predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals (in each case in their capacity as such) (collectively, the "**Consenting Creditor Releasing Parties**"), expressly and generally releases, acquits and discharges (i) the Sponsor; (ii) the Sponsor's respective predecessors, successors and assigns, subsidiaries, Affiliates (in each case of the foregoing, except the Debtors), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals of the Sponsor; and (iii) the current and former Sponsor-appointed directors of the Debtors and its subsidiaries (in each case in their capacity as such) ((i) through (iii), collectively, the "**Sponsor Released Parties**") from, any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Debtors and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or

otherwise, by statute or otherwise, that such Consenting Creditor Releasing Parties (whether individually or collectively), ever had, now has or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including, without limitation, the purchase, sale, rescission, or any other transaction relating to any security of the Debtors, or any other transaction) or the negotiation, formulation or preparation of the Restructuring Transactions, in each case, arising on or before the execution of this Agreement. For the avoidance of doubt, the foregoing shall not operate as a release of any Debtor.

14.02. On the Agreement Effective Date, the Sponsor, subject in all respects to Section 15, on behalf of itself and its predecessors, successors and assigns, subsidiaries, Affiliates (in each case of the foregoing, except the Debtors), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals of the Sponsor (in each case in their capacity as such) (collectively, the "**Sponsor Releasing Parties**" and, together with Consenting Creditor Releasing Parties, the "**Releasing Parties**"), expressly and generally releases, acquits and discharges (i) the Sponsor, (ii) the other applicable Sponsor Released Parties, (iii) each Consenting Creditor, and (iv) each Consenting Creditor's respective predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals of each Consenting Creditor (in each case in their capacity as such) ((iii) through (iv), collectively, the "**Consenting Creditor Released Parties**") from, any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Debtors and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Sponsor Releasing Parties (whether individually or collectively), ever had, now has or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including, without limitation, the purchase, sale, rescission, or any other transaction relating to any security of the Debtors) or the negotiation, formulation or preparation of the Restructuring Transactions, in each case, arising on or before the execution of this Agreement; *provided*, that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification claims against the Debtors or any of its insurance carriers or any rights as beneficiaries of any insurance policies (including any indemnification obligations and insurance policies that may be assumed by the Reorganized Debtors consistent with this Agreement).

14.03. Subject to Section 15, each of the Releasing Parties knowingly grants the releases under this Section 14 (collectively, the "**Release**") notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party expressly waives any and all rights that such Releasing Party may have under any statute or common law principle which would limit the

effect of the Release to those claims actually known or suspected to exist as of before the Agreement Effective Date.

14.04.  In the event that any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar entity is successful in pursuing any claim, cause of action, or litigation against any Sponsor Released Party with respect to any claims released pursuant to the Release, each Releasing Party agrees that it shall not recover any funds received, awarded, or arising from settlement, judgment, or other resolution of such actual or threatened claim, cause of action or litigation, and shall assign any such recoveries to, and hold them in trust for, such Sponsor Released Party.

14.05.  Subject to Section 15, in connection with their agreement to the foregoing Release, the Releasing Parties knowingly and voluntarily waive and relinquish any and all provisions, rights and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

14.06.  Each of the Releasing Parties hereby represents and warrants that it has access to adequate information regarding the terms of this Agreement, the scope and effect of the Release, and all other matters encompassed by this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement. Each of the Releasing Parties further represents and warrants that it has not relied upon any other Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement.

**Section 15.**    *Revocation of Release.*

15.01.  Subject to Section 15.03, a Release provided in Section 14 shall be deemed revoked if any Party receives a notice from any other Party (each, a "**Release Revocation Notice**") of the occurrence of a Release Revocation Event (as defined herein) and the recipient(s) of the Release Revocation Notice fails to cure such Release Revocation Event within five (5) business days of receipt of such Release Revocation Notice (the "**Revocation Cure Period**") or such Release Revocation Notice is not otherwise rescinded; *provided*, that in the event the recipient(s) of a Release Revocation Notice disputes either the occurrence of a Release Revocation Event or the failure of the recipient(s) to cure the Release Revocation Event within the Revocation Cure Period, such recipient(s) shall have ten (10) business days from the expiration of the Revocation Cure Period to seek a determination by the Bankruptcy Court as to whether a Release Revocation Event occurred and was not cured within the Revocation Cure Period.

15.02.  Release Revocation Event.  For the purposes of this Agreement, a "**Release Revocation Event**" means any of the following:

(a) a breach by any Party (other than the Releasing Party seeking to revoke the Release) of any material representation, warranty, covenant, or other provision of this Agreement that gives rise to a termination right under this Agreement; and

(b) this Agreement is terminated with respect to any Debtor, including, without limitation, as a result of a Debtor's determination pursuant to Section 11.03(b).

Notwithstanding subsections (a) and (b) of this Section 15.02, if the economic outcome for the Required Consenting Creditors, the timing of confirmation and the Plan Effective Date, and all other material terms as contemplated herein are substantially preserved, in each case as determined by the Required Consenting Creditors, the foregoing subsections (a) and (b) shall not constitute a Release Revocation Event (other than with respect to a breach of this Agreement by the Sponsor).

15.03.  Effect of Revocation of Release.

(a) Revocation of a Release as a result of a Release Revocation Event as contemplated in subsections (b) and (c) hereof shall result in a full and complete restoration of any and all claims, liabilities, and causes of action subject to such Release, and such Release shall be void *ab initio*, in each case, to the extent contemplated in subsections (b) and (c) of this Section 15.03.

(b) In the case of a Release Revocation Event under Section 15.02(a), (i) if the breaching Party is a Sponsor, the Release in Section 14.01 shall be revoked with respect to all of the Sponsor Released Parties (and such Sponsor Released Parties shall no longer have the benefit of such Release), and (ii) if the breaching Party is a Consenting Creditor, the Releases in section 14.02 shall be revoked solely with respect to such breaching Consenting Creditor and its respective Consenting Creditor Released Parties (and such Consenting Creditor Released Parties shall no longer have the benefit of such Release). Other than as set forth in this Section 15.02(b), the revocation of any Release under section 15.02(a) shall not operate as a revocation of, nor otherwise impair or affect, any other Release.

(c) In the case of a Release Revocation Event under Sections 15.02(b), the Releases in Sections 14.01 and 14.02 shall be revoked in their entireties.

**Section 16.    *Amendments*.** This Agreement (including the Exhibits and Schedules), may not be modified, amended, or supplemented in any manner except in writing signed by each of the Debtors and the Required Consenting Creditors; *provided* that any such modification, amendment, or supplement that is reasonably anticipated to have an adverse impact on any Sponsor Released Party may only be effected by a writing signed by each of the Debtors, the Required Consenting Creditors, and the Sponsor. Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 17.    *Fiduciary Duties*.** Nothing in this Agreement shall require the Debtors, nor the Debtors' directors, managers, and officers, to take or refrain from taking any action (including, without limitation, terminating this Agreement under Section 11), to the extent such person or persons determines, based on the advice of counsel, that taking, or refraining from taking, such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided*, that this Section 17 shall not impede any Party's right to terminate this Agreement pursuant to Section 11.

**Section 18.**    *Miscellaneous*.

18.01.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

18.02.  <u>Complete Agreement</u>.  This Agreement (including the Exhibits and Schedules) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements, and understandings, whether oral or written, among the Parties with respect thereto.

18.03.  <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

18.04.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in either the United States District Court for the Southern District of New York or any New York state court (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter; *provided*, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

18.05.  <u>Trial by Jury Waiver</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

18.06.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

18.07.  <u>Interpretation and Rules of Construction</u>.  This Agreement is the product of good faith negotiations among the Debtors, the Sponsor, and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption

with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Debtors and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel. In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

18.08.  Successors and Assigns.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

18.09.  Notices.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

      (a)     if to a Debtor, to:

> The Gymboree Corporation
> 71 Stevenson Street, Suite 2200
> San Francisco, CA 94105
> Attention:  Kimberly MacMillan
>             kimberly_macmillan@gymboree.com

> with copies (which shall not constitute notice) to:

> Kirkland & Ellis LLP
> 300 North LaSalle Street
> Chicago, IL 60654
> Attention:  Anup Sathy, P.C.
>             anup.sathy@kirkland.com

>             Steven N. Serajeddini
>             steven.serajeddini@kirkland.com

> -and-

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, New York 10022
> Attention:  Joshua A. Sussberg, P.C.
>             joshua.sussberg@kirkland.com

>             Matthew C. Fagen
>             matthew.fagen@kirkland.com

      (b)     if to the Consenting Creditors, to:

The address set forth on each such Consenting Creditors' signature page (or as directed by any transferee thereof), as the case may be.

With a copy to counsel to the Term Loan Agent (which shall not constitute notice):

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
Attention:  Dennis F. Dunne
            ddunne@milbank.com

            Evan R. Fleck
            efleck@milbank.com

     -and-

McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
Attention:  Dion W. Hayes
            dhayes@mcguirewoods.com

(c)      if to the Sponsor, to:

Bain Capital Partners, LLC
200 Clarendon Street
Boston, MA 02116
Attention:  David Hutchins
             dhutchins@baincapital.com

with copies (which shall not constitute notice) to:

Weil Gotshal & Manges LLP
767 5th Avenue
New York, NY 10153
Attention:  Matt Barr
            matt.barr@weil.com

            Robert Lemons
            Robert.lemons@weil.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received. For purposes of this Agreement, any consents or approvals of the Required Consenting Creditors may be provided by counsel to the Term Loan Agent.

18.10.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.

18.11.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

18.12.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

18.13.  <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the agreements, representations, warranties, and obligations of the Consenting Creditors under this Agreement are, in all respects, several and not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other Entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement. The Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and the Consenting Creditors do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.  No action taken by any Consenting Creditor pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Consenting Creditors are in any way acting in concert or as such a "group."

18.14.  <u>Reservation of Rights</u>.

(a) Except as expressly provided in this Agreement or the Term Sheet, including Section 5.01 of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including without limitation, its claims against any of the other Parties.

(b) Without limiting Section 11.06 and Sub-Clause (a) of this Section 18.14 in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims, and defenses, subject to Section 18.11 of this Agreement.  This Agreement, the Plan, and any related document

shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

18.15. <u>Severability and Construction</u>. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

18.16. <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

18.17. <u>Additional Parties</u>. Without in any way limiting the requirements of Section 6 of this Agreement, additional Term Loan Lenders may elect to become Parties to this Agreement upon execution and delivery to the other Parties of a Joinder Agreement in the form attached hereto as **Exhibit C**. Each such additional Party shall become a Consenting Creditor under this Agreement in accordance with the terms of this Agreement and shall be bound by the terms and conditions of this Agreement, deemed to make all representations and warranties contained herein as of the date of the execution and delivery of such Joinder Agreement, and shall be both a Releasing Party and Released Party as if it was an original signatory of this Agreement as of the date hereof.

18.18. <u>Other Support Agreements.</u> Until a Termination Date with respect to the Debtors, no Debtor shall enter into any other restructuring support agreement related to a partial or total restructuring of the Debtors' balance sheet unless such support agreement is consistent in all respects with the Restructuring Term Sheet and is reasonably acceptable to the Required Consenting Creditors.

18.19. <u>Confidentiality</u>. The terms of any existing confidentiality agreements executed by and among any of the Parties as of the date hereof shall remain in full force in accordance with their terms. Except as required by applicable law, rule, or regulation or as ordered by the Bankruptcy Court or other court of competent jurisdiction, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Consenting Creditor without such Consenting Creditor's prior written consent; *provided*, that the Debtors may publicly disclose the aggregate holdings of all Consenting Creditors.

18.20. <u>Consent Rights Preserved</u>. Notwithstanding any provision in any order approving any First Day Pleading that grants the Debtors discretion to take any action that is subject to consent or approval rights of the Consenting Creditors hereunder, the entry of such order shall not be deemed a waiver of such consent or approval rights hereunder.

*[Remainder of page intentionally left blank.]*

**THE GYMBOREE CORPORATION**

By: _____
    Daniel J. Griesemer
    Chief Executive Officer

**GIRAFFE INTERMEDIATE B, INC.**

By: _____
    Daniel J. Griesemer
    Chief Executive Officer

**GYM-CARD, LLC**

By: _____
    Daniel J. Griesemer
    Chief Executive Officer

**GYM-MARK, INC.**

By: _____
    Daniel J. Griesemer
    Chief Executive Officer

**GYMBOREE MANUFACTURING, INC.**

By: _____
    Daniel J. Griesemer
    Chief Executive Officer

**GYMBOREE OPERATIONS, INC.**

By: _____
    Daniel J. Griesemer
    Chief Executive Officer

*Debtor Signature Page to Restructuring Support Agreement*

**GYMBOREE RETAIL STORES, INC.**

By:

Daniel J. Griesemer
Chief Executive Officer

**S.C.C. WHOLESALE, INC.**

By:

Daniel J. Griesemer
Chief Executive Officer

*Debtor Signature Page to Restructuring Support Agreement*

**<u>EXHIBIT A</u> to
the Restructuring Support Agreement**

**Restructuring Term Sheet**

*EXECUTION VERSION*

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## RESTRUCTURING TERM SHEET

This term sheet (this "**Restructuring Term Sheet**") describes the principal terms of a restructuring of the Gymboree Corporation ("**Gymboree**") and certain of its directly and indirectly-owned subsidiaries listed on **Annex I**, and Giraffe Intermediate B, Inc. (collectively, the "**Debtors**" and, such restructuring, the "**Restructuring**") through cases (the "**Chapter 11 Cases**") that will be filed under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**").

The governing documents with respect to the Restructuring will contain terms and conditions that are dependent on each other, including those described in this Restructuring Term Sheet and the Restructuring Support Agreement, dated as of June 11, 2017, to which this Restructuring Term Sheet is attached (as may be amended in accordance with its terms, the "**Restructuring Support Agreement**"). This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring, which shall be subject to the applicable consent and approval rights of the Parties as set forth in the Restructuring Support Agreement and the other Restructuring Documents. Capitalized terms used but not otherwise defined later in this Restructuring Term Sheet or in the Restructuring Support Agreement have the meanings ascribed to such terms as set forth on **Annex II**.

This Restructuring Term Sheet is a draft, is intended for discussions purposes, and is subject to Federal Rule of Evidence 408.

| **OVERVIEW OF THE RESTRUCTURING** | |
|---|---|
| **Implementation** | The Debtors will effectuate the Restructuring through the filing of the Chapter 11 Cases and confirmation of a plan of reorganization under chapter 11 of the Bankruptcy Code (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, the "**Plan**"), which shall be consistent with this Restructuring Term Sheet, subject to the terms and conditions set forth in the Restructuring Support Agreement. As further described herein, the Restructuring is proposed to be funded through (i) the consensual use of cash collateral under the DIP Orders; (ii) $35 million in New Money DIP Loans under the DIP Term Loan Facility and $70 million in Roll-up DIP Loans; (iii) a DIP ABL Facility; (iv) up to $80 million of Rights Offerings under the Plan; and (v) the Exit Credit Facilities. |
| **DIP ABL Facility** | The Debtors have obtained a commitment from certain ABL Revolver Lenders and ABL Term Loan Lenders to provide an approximately $273.5 million debtor-in-possession financing facility on terms reasonably acceptable to the Required Consenting Creditors (the "**DIP ABL Facility**"), pursuant to which the commitments and loans of the ABL Lenders under the ABL Facility will convert into the DIP ABL Facility during the Chapter 11 Cases pursuant to the DIP Orders. |
| **DIP Term Loan Facility** | Certain Term Loan Lenders (in their capacities as such, the "**Initial DIP Term Lenders**") have committed to provide the Debtors with a $105 million debtor-in-possession financing facility (the "**DIP Term Loan Facility**") consisting of (a) $35 million in new money delayed draw term loans (the "**New Money DIP Loans**") to fund the Chapter 11 Cases and (b) $70 million of term loans (the "**Roll-up DIP Loans**") rolling up amounts due and owing to the DIP Term Lenders, on terms and conditions acceptable to the Required Consenting Creditors. Additional Prepetition Term Lenders (in their capacities as such, the "**Electing DIP Term Lenders**" and together with the Initial DIP Term Lenders, the "**DIP Term Lenders**") will have the right to commit to their ratable share of the DIP Term Loan Facility before the Election Date (which shall be the date that is 14 days after the entry of the Interim DIP Order) by executing the Restructuring Support Agreement and taking such other actions as specified in the election procedures that are reasonably acceptable to the Debtors and the Term Loan Agent (the "**Election Procedures**"), which will require each Electing DIP Term Lender, to agree, among other things, to support the Restructuring and fully subscribe to its ratable portion of the Rights Offerings. |
| **Backstop Commitment Agreement and Rights Offerings** | The Plan will provide for new money rights offerings consisting of (i) a rights offering in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code (the "**1145 Rights Offering**") and (ii) a rights offering in reliance upon the exemption from registration provided in section 4(a)(2) of the Securities Act (the "**4(a)(2) Rights Offering**" and together with the 1145 Rights Offering, the "**Rights Offerings**") to Term Loan Lenders to purchase the |

2

| | |
|---|---|
| | Rights Offering Shares of up to $80 million in the aggregate (the "**Maximum Rights Offering Amount**"), subject to reduction to such amount as is reasonably determined in accordance with the Backstop Commitment Agreement (on or about, but no later than, the 14th day before the Plan confirmation hearing) as necessary for the Reorganized Debtors to maintain approximately (but no less than) $50 million of projected liquidity for the 12 months following the Plan Effective Date (and assuming for purposes of such calculation that the New Money DIP Loans are fully drawn) (the "**Adjusted Rights Offering Amount**"). |
| | The Maximum Rights Offering Amount will be fully backstopped by certain Term Loan Lenders (in their capacities as such, the "**Backstop Parties**") and the Rights Offerings will be conducted, subject in all respects to the terms and conditions set forth in the Backstop Commitment Agreement.  In consideration for their agreement to backstop the Rights Offerings, each Backstop Party will receive its pro rata share of a premium equal to 5% of the Maximum Rights Offering Amount (the "**Backstop Premium**"), which shall be satisfied by the Backstop Premium Shares and will be treated as an administrative expense of the Debtors (and otherwise payable in cash if the Restructuring is not consummated for any reason other than as specified in the Backstop Commitment Agreement). |
| **Exit ABL Revolving Facility** | The Debtors will enter into either (a) a replacement asset-based revolving loan facility from the ABL Revolving Lenders pursuant to which the ABL Revolving Lenders will convert all revolving commitments under the DIP ABL Facility into commitments under such replacement facility on the Plan Effective Date or (b) a new asset-based revolving loan facility in an amount sufficient to repay the DIP ABL Facility in full and to provide incremental liquidity, in either case, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors (the "**Exit ABL Revolving Facility**"). |
| **Exit ABL Term Loan Replacement Facility** | The Debtors will use commercially reasonable efforts to obtain either (a) a replacement term loan facility from the ABL Term Loan Lenders pursuant to which the ABL Term Loan Lenders will convert all ABL Term Loan Facility Claims into commitments under such replacement facility on the Plan Effective Date, or (b) a third-party term loan facility sufficient to pay the ABL Term Loan Facility Claims in full on the Plan Effective Date, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors (the "**Exit ABL Term Loan Replacement Facility**") and obtain proposals and a written commitment for such Exit ABL Term Loan Replacement facility by the applicable Milestones on the best available terms. |
| **Exit Term Loan Facility** | The New Money DIP Loans will be replaced or refinanced on the Plan Effective Date by an exit term loan facility (the "**Exit Term Loan Facility**" and together with the ABL Revolving Facility, and the Exit ABL Term Loan Replacement Facility, the "**Exit Credit Facilities**") provided by the DIP Term Lenders, substantially as set forth on the term sheet attached as **Annex IV** (the "**Exit Term Loan Facility Term Sheet**") and otherwise reasonably acceptable to the Required Consenting |

| | |
|---|---|
| | Creditors, subject to the Debtors' ability to obtain an alternative term loan facility sufficient to pay the New Money DIP Loan Claims in full on the Plan Effective Date, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors. The Debtors will use commercially reasonable efforts to obtain proposals and written commitments for an Exit Term Loan Facility sufficient to refinance the New Money DIP Loan Claims and the ABL Term Loan Facility Claims on the best available terms. |
| **Milestones** | The Debtors will implement the Restructuring in accordance with the following milestones (the "**Milestones**"): |

1. No later than June 11, 2017, the Petition Date shall have occurred.

2. No later than 3 days following the Petition Date (June 14, 2017), the Debtors shall have obtained entry of the Interim DIP Order.

3. No later than 5 days after the Petition Date (June 16, 2017), the Debtors shall have filed a motion seeking entry of an order approving the Debtors' entry into the Backstop Commitment Agreement (the "**BCA Approval Order**").

4. No later than 5 days after the Petition Date (June 16, 2017), the Debtors shall have filed the Plan, the Disclosure Statement, and a motion seeking approval of the Disclosure Statement and Solicitation Materials.

5. No later than 10 days after the Petition Date (June 21, 2017), the Debtors shall have filed a motion seeking entry of an order approving going out-of-business sales and related relief (the "**GOB Order**").

6. No later than 10 days following the Petition Date (June 21, 2017), the Debtors shall have filed a motion seeking to extend the date by which to assume or reject unexpired leases of non-residential real property.

7. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained entry of the Final DIP Orders.

8. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained entry of the BCA Approval Order.

9. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained entry of the GOB Order.

10. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained one or more proposals containing a description of the material terms and conditions for the Exit ABL Term Loan Replacement Facility or demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such proposals were not available.

11. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained one or more proposals containing a description of the material terms and conditions for (a) an Exit Term Loan Facility sufficient to refinance the New Money DIP Loan Claims and (b) an Exit Term Loan Facility sufficient to

refinance both the Exit Term Loan Facility and the ABL Term Loan Facility Claims, or shall have demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such proposals were not available.

12. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained one or more proposals containing a description of the material terms and conditions for the refinancing of the DIP ABL Facility (which need not be a traditional asset-backed financing arrangement), or shall have demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such proposals were not available.

13. No later than 50 days after the filing of the Plan, Disclosure Statement, and a motion seeking approval of the Disclosure Statement and Solicitation Materials, the Debtors shall have obtained entry of the Disclosure Statement Order approving the Disclosure Statement and Solicitation Materials.

14. No later than 75 days following the Petition Date (August 25, 2017), the Debtors shall have obtained a written commitment for the Exit ABL Term Loan Replacement Facility that is in form and substance reasonably satisfactory to the Required Consenting Creditors or demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such commitment was not available.

15. No later than 75 days following the Petition Date (August 25, 2017), the Debtors shall have obtained written commitments for (a) an Exit Term Loan Facility sufficient to refinance the New Money DIP Loan Claims and (b) an Exit Term Loan Facility sufficient to refinance both the Exit Term Loan Facility and the ABL Term Loan Facility Claims, or shall have demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such commitments were not available.

16. No later than 75 days following the Petition Date (August 25, 2017), either (i) the ABL Lenders shall have agreed to provide the Exit ABL Revolving Facility and to convert all commitments under the DIP ABL Facility into such Exit Revolving Facility on the Plan Effective Date, or (ii) the Debtors shall have obtained a written commitment from another financing source to provide the Exit ABL Revolving Facility (which need not be a traditional asset-backed financing arrangement) on the Plan Effective Date, in either case, in form and substance reasonably satisfactory to the Required Consenting Creditors.

17. No later than 105 days following the Petition Date (September 24, 2017), the Debtors shall have obtained entry of the Confirmation Order.

18. No later than the earliest of (a) 120 days following the Petition Date (October 9, 2017) and (b) 15 days following the entry of the Confirmation Order, the Plan Effective Date shall have occurred.

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **DIP ABL Facility Claims** | In full satisfaction of each allowed DIP ABL Facility Claim, each Holder thereof will either be, subject to the consent of the Required Consenting Creditors: (a) repaid in full in cash or (b) with the consent of such Holder, receive its *pro rata* share of the Exit ABL Revolving Facility or the Exit ABL Term Loan Replacement Facility, as applicable. | N/A |
| **New Money DIP Loan Claims** | In full satisfaction of the allowed New Money DIP Loan Claims, each Holder of an allowed New Money DIP Loan Claim will either: be repaid in full in cash[1] or receive its *pro rata* share of the Exit Term Loan Facility (the "**Base Treatment**"); *provided*, that if (a) on the first business day after entry of the Confirmation Order the most recently delivered Budget (as defined in the DIP Orders) projects that any amount in the DIP Funding Account (as defined in the DIP Term Loan Credit Agreement) will remain undrawn immediately prior to the occurrence of the then-projected Plan Effective Date (the "**DIP Surplus Amount**"), (b) the Required Consenting Creditors elect to receive DIP Surplus Conversion Shares (such election to be made no later than 5 business days after entry of the Confirmation Order) (a "**DIP Surplus Conversion**"), then (c) on the Plan Effective Date, each Holder of an allowed New Money DIP Loan Claim will receive its *pro rata* share of the DIP Surplus Conversion Shares, and (d) the amount of New Money DIP Loan Claims entitled to the Base Treatment will be reduced ratably among the Holders by the DIP Surplus Amount.[2]<br><br>Notwithstanding the foregoing, to the extent there is a DIP Surplus Amount and the Required Consenting Creditors do not elect to receive DIP Surplus Conversion Shares, then on the date that is one business day prior to the election described in footnote two of the preceding paragraph, the Debtors shall be permitted to draw an amount of New Money DIP Loans equal to the portion of the DIP Surplus Amount | N/A |

---

[1]    In lieu of receiving a cash repayment in satisfaction of any New Money DIP Loan Claims subject to the Base Treatment, each Holder thereof may instead elect not to receive such cash repayment and apply such amount towards any funding obligations under the Backstop Commitment Agreement or in connection with the Rights Offerings, in each case, in the manner set forth in the DIP Term Loan Credit Agreement and upon notice to the Debtors and the DIP Term Loan Agent, and prior to the Subscription Escrow Funding Date (as defined in the Backstop Commitment Agreement)

[2]    To the extent that after an election as described in clause (b) of this paragraph, a subsequent Budget indicates that the DIP Surplus Amount on the then-projected Plan Effective Date is different than that indicated in the most recent Budget prior to the election, then the amount of DIP Surplus Conversion shares may be adjusted accordingly as determined by the Debtors and the Required Consenting Creditors.

| | | |
|---|---|---|
| | not subject to the election, to the extent necessary to permit the Debtors to meet the Projected Liquidity Requirement (as defined in the Backstop Commitment Agreement) on the Plan Effective Date (after taking into account availability under the Exit Credit Facilities upon the occurrence of the Plan Effective Date). | |
| **Roll-Up DIP Claims** | In full satisfaction of the allowed Roll-up DIP Claims, each Holder of an allowed Roll-up DIP Claim will receive its *pro rata* share of the Roll-Up DIP Conversion Shares. | |
| **Administrative Claims** | Except to the extent that a Holder of an allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| **Priority Tax Claims** | In full satisfaction of the allowed Priority Tax Claims, each Holder of an allowed Priority Tax Claim will be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | N/A |
| **Other Secured Claims** | In full satisfaction of each allowed Other Secured Claim, each Holder thereof will receive: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such claim Unimpaired. | Unimpaired; deemed to accept. |
| **Other Priority Claims** | Except to the extent that a Holder of an allowed Other Priority Claim and the Debtor against which such allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each allowed Other Priority Claim against the Debtors, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Term Loan Secured Claims** | In full satisfaction of each allowed Term Loan Secured Claim, each Holder thereof will receive its *pro rata* share of: (a) the Term Loan Common Shares; and (b) the Rights; *provided*, that the Li & Fung Term Loan Claim shall not be entitled to any recovery under the Plan so long as the Li & Fung Agreement has been assumed in connection with the Plan. | Impaired; entitled to vote. |
| **Critical Trade Claims** | In full satisfaction of each allowed Critical Trade Claim, each Holder thereof will receive cash in an amount equal to such allowed Critical Trade Claim (only to the extent not already satisfied by payments made pursuant to an order of the Bankruptcy Court) on the later of: (a) the Plan Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such allowed Critical | Unimpaired; deemed to accept. |

| | Trade Claim. | |
|---|---|---|
| **General Unsecured Claims** | General Unsecured Claims shall not be entitled to any recovery or distribution under the Plan. | Impaired; deemed to reject. |
| **Intercompany Claims** | Unless otherwise provided for under the Plan, each Debtor Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Required Consenting Creditors; *provided*, that no distributions shall be made on account of any such Debtor Intercompany Claims on the Plan Effective Date. | Unimpaired; deemed to accept **or** Impaired; deemed to reject. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept. |
| **Existing Common Stock** | All Interests (other than Intercompany Interests) will be cancelled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Common Stock shall be entitled to any recovery or distribution under the Plan on account of such Interests. | Impaired; deemed to reject. |

| **OTHER TERMS OF THE RESTRUCTURING** | |
|---|---|
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Restructuring Term Sheet or the Restructuring Support Agreement, the Debtors shall assume or reject, as the case may be, executory contracts and unexpired leases in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors; *provided*, that the Debtors shall assume the Li & Fung Agreement. |
| **Cash Collateral and Adequate Protection** | The DIP Orders shall provide for the Debtors' consensual use of the cash collateral of the Term Loan Lenders on the terms and conditions set forth in the DIP Term Loan Facility Term Sheet and as otherwise may be reasonably acceptable to the Required Consenting Creditors. |
| **Li & Fung** | Pursuant to the Critical Vendor Motion (as defined below), the Debtors shall seek entry of interim and final orders to make payments to the Li & Fung vendors, through Li & Fung, as they come due in the ordinary course of business during the pendency of the chapter 11 cases under the Li & Fung Agreement. Li & Fung shall be included in the Critical Vendor Motion and, in consideration of being treated as a Critical Vendor, agrees to continue to perform under the Li & Fung Agreement on terms and conditions consistent with past practice (*i.e.*, 75 day terms) and on the Plan Effective Date release the $10 million letter of credit provided in connection with the Li & Fung Agreement. |
| **Critical Vendor Orders** | The Debtors shall file one or more motions (the "**Critical Vendors Motions**") seeking entry of interim and final orders (in each case, in form and substance reasonably acceptable to the Required Consenting Creditors) to make payments to certain critical and critical foreign vendors ("**Critical Vendors**") on account of prepetition and postpetition claims as they come due in the ordinary course of business during the |

| | |
|---|---|
| | pendency of the chapter 11 cases.  As a condition to receiving such payments, each such Critical Vendor shall agree to continue to provide goods and services to the Debtors on terms and conditions reasonably acceptable to the Debtors and the Required Consenting Creditors.  Li & Fung (and vendors who sell through Li & Fung) shall be included under the Critical Vendor Motion and, in consideration for being treated as a Critical Vendor, Li & Fung (and vendors who sell through Li & Fung) will continue to perform in accordance with the Li & Fung Agreement consistent with past practice (*i.e.*, 75 day terms). |
| **Charter; Bylaws; Corporate Governance** | Corporate governance for the Reorganized Debtors, including charters, bylaws, operating agreements, or other organization or formation documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code, as applicable, and in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors.  The New Gymboree Common Shares shall be subject to a stockholders' agreement, substantially in the form included in the Plan Supplement, containing terms and conditions that are reasonably acceptable to the Required Consenting Creditors and each holder of the New Gymboree Common Shares will be bound thereby without the need for execution by any party thereto other than Reorganized Gymboree.<br><br>The Reorganized Gymboree Board will be comprised of seven members as of the Plan Effective Date as follows:<br><br>   (i)   Gymboree's chief executive officer immediately prior to the occurrence of the Plan Effective Date, who shall be chief executive officer of Reorganized Gymboree;<br><br>   (ii)   Ron Beegle of Carriage House Capital Advisors, LLC<br><br>   (iii)   one member selected by Brigade Capital Management<br><br>   (iv)   one member selected by OppenheimerFunds, Inc.<br><br>   (v)   one member selected by Searchlight Capital Partners; and<br><br>   (vi)   two members selected by the Required Consenting Creditors;<br><br>*provided*, that if at any time prior to the Plan Effective Date any entity specified in (iii), (iv) or (v) does not have aggregate holdings (together with its Affiliates that own, manage, direct or have investment authority with respect to Gymboree's indebtedness) that would entitle such entity to an allocation of at least 9.5% of the New Gymboree Common Shares (prior to dilution by the MIP) outstanding on a *pro forma* basis on the Plan Effective Date, then such entity shall not be entitled to select a director and such director will instead be selected by the Required Consenting Creditors.  Provisions regarding the removal, appointment, and replacement of members of the subsequent Reorganized Gymboree Board to be determined by the Required Consenting Creditors. |
| **Initial Officers** | All initial officers of the Reorganized Debtors shall be disclosed in the Plan Supplement and shall be reasonably acceptable to the Required Consenting Creditors. |

| | |
|---|---|
| **Tax Issues** | The Restructuring will be effectuated and structured in a tax-efficient manner determined by the Debtors and the Required Consenting Creditors; *provided* that: (i) if the Restructuring gives rise to any cash income taxes payable by any non-debtor member of any consolidated, combined or unitary tax group of which Gymboree or any of its subsidiaries is a member (such group, a "**Gymboree Consolidated Group**" and such non-debtor member, a "**Non-Debtor**"), the Plan shall provide that any such taxes shall be paid by the Reorganized Debtors; and (ii) any tax losses generated by a Non-Debtor or Debtor arising in connection with the cancellation or worthlessness of any stock of any Non-Debtor, or otherwise in connection with the Restructuring, shall be available to shelter any income or gain arising in connection with the Restructuring without any requirement for the Debtors to compensate the Sponsor or any Non-Debtor for the use of such losses; *provided, however*, for the avoidance of doubt, that nothing in the Restructuring Support Agreement shall limit the Sponsor's ability to recognize any loss it may have with respect to its stock in Giraffe Holdings, Inc. following the occurrence of the Plan Effective Date in accordance with the terms of the Restructuring Support Agreement. |
| **Exemption from SEC Registration** | The issuance of all securities in connection with the Plan, including the New Equity Interests, will be exempt from SEC registration to the fullest extent permitted by law. |
| **Company Status and Reporting Upon Emergence** | Reorganized Gymboree will be a private company on the Plan Effective Date; *provided*, that from and after the Plan Effective Date, Reorganized Gymboree shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements). |
| **Company Status Upon Chapter 11 Filing** | The Company shall cease filing SEC reports on the Petition Date. |
| **Registration Rights** | Registration rights shall be determined in connection with the Plan Supplement in a form reasonably acceptable to the Debtors and the Required Consenting Creditors. |
| **Employment Obligations** | On the Plan Effective Date, the Debtors shall be deemed to have assumed each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors |

| | |
|---|---|
| | (but excluding any severance agreements with any of Debtors' former employees); *provided*, that any of the foregoing included in the schedule of assumed contracts contained in the Plan Supplement that was not previously disclosed to the advisors for the Consenting Creditors on or before the date of entry into the Restructuring Support Agreement shall be assumed subject to the consent of the Required Consenting Creditors on or before the Confirmation Date, which consent shall not be unreasonably withheld; *provided, further,* that the Debtors' Management Severance Plan and employment agreements will be assumed as modified so as to clarify that the Restructuring (and any related changes in duties that result from Gymboree no longer being a publicly-traded company as of the Plan Effective Date) will not constitute a Good Reason event for the purposes of the Management Severance Plan or any employment agreement. Following the Plan Effective Date, the Reorganized Debtors shall not amend the management severance plan without the consent of the participating employees for a period of one year after the Plan Effective Date. |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | All indemnification obligations in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Plan Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose: *provided*, that any of the foregoing included in the schedule of assumed contracts contained in the Plan Supplement that was not previously disclosed to the advisors for the Consenting Creditors on or before the date of entry into the Restructuring Support Agreement shall be assumed subject to the consent of the Required Consenting Creditors on or before the Confirmation Date, which consent shall not be unreasonably withheld. |
| **Director, Officer, Manager, and Employee Tail Coverage** | On the Plan Effective Date, the Debtors shall be deemed to have assumed all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") and of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors. Any extensions, renewals and new liability insurance policies purchased by the Debtors shall be reasonably acceptable to the Required Consenting Creditors. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring** | On the Plan Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and |

11

| Documents | other documents required to be issued pursuant to the Restructuring. |
|---|---|
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Discharge, Release, Injunction, and Exculpation** | In addition to the releases under the Restructuring Support Agreement, the Plan will provide for customary release, discharge, injunction and exculpation provisions, substantially as set forth in **Annex III**. |
| **Conditions Precedent to the Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Plan Effective Date, including the following: |

    (i)    the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Backstop Parties;

    (ii)    the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Consenting Creditors;

    (iii)    the Debtors shall not be in default under the DIP Credit Agreements or the DIP Orders (or, to the extent that the Debtors have been or are in default on the proposed Effective Date, such default shall have been waived by the lenders thereunder or cured in a manner consistent with the DIP Credit Agreements and the DIP Orders, as applicable);

    (iv)    all conditions precedent to the effectiveness of the Exit Credit Facilities shall have been satisfied or duly waived;

    (v)    the Confirmation Order shall have been duly entered and in full force and effect;

    (vi)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;

    (vii)    the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement in all material respects and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 3 of the Restructuring Support Agreement, and shall have been filed in a manner consistent with the Restructuring Support Agreement;

    (viii)    all fees, expenses, and other amounts payable pursuant to the Restructuring Support Agreement, the Backstop Commitment Agreement, and the DIP Orders (including, without limitation, the fees and expenses of Milbank, McGuireWoods, Rothschild, and Carriage House payable thereby) shall have been paid in full;

    (ix)    all allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts

|  | | sufficient to pay such allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and |
|  | (x) | the Debtors shall have implemented the Restructuring in a manner consistent in all material respects with the Plan and the Restructuring Support Agreement. |

*EXECUTION VERSION*

## ANNEX I

## SUBSIDIARIES PARTY TO RESTRUCTURING

Gym-Card, LLC

Gym-Mark, Inc.

Gymboree Manufacturing, Inc.

Gymboree Operations, Inc.

Gymboree Retail Stores, Inc.

S.C.C. Wholesale, Inc.

## ANNEX II

### DEFINITIONS

| Term | Definition |
|------|-----------|
| **ABL Claims** | Collectively, ABL Term Loan Claims and ABL Revolver Claims. |
| **ABL Lenders** | Collectively, the ABL Revolver Lenders and the ABL Term Lenders. |
| **ABL Revolver Claims** | Any claim held by the ABL Revolver Lenders, in their capacity as such, arising under, derived from, or based on the ABL Credit Agreement |
| **ABL Revolver Lenders** | Any Revolving Credit Lender, as defined in the ABL Credit Agreement. |
| **ABL Term Lenders** | As defined in the ABL Credit Agreement. |
| **ABL Term Loan Claims** | Any claim held by the ABL Term Lenders, in their capacity as such, arising under, derived from, or based on the ABL Credit Agreement. |
| **ABL Credit Agreement** | The Second Amendment to Amended and Restated Credit Agreement, dated as of April 22, 2016 (as amended from time to time), by and among Gymboree, as the borrower; certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, Bank of America, N.A., in its capacity as administrative agent for the ABL Revolver Lenders, Pathlight Capital LLC, in its capacity as agent for the ABL Term Lenders, the ABL Revolver Lenders, and the ABL Term Lenders. |
| **Administrative Claim** | A Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| **Affiliate** | With respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code. |
| **Backstop Premium Shares** | New Gymboree Common Shares issued as payment of the Backstop Premium in accordance with the Backstop Commitment Agreement equal to 2.3% of the New Gymboree Common Shares on the Plan Effective Date, subject to dilution by the MIP. |
| **Cause of Action** | Any claims, Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise.   Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code. |

| Term | Definition |
|---|---|
| **Claim** | As defined in section 101(5) of the Bankruptcy Code against a Debtor. |
| **Class** | A category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan, which shall be consistent with this Restructuring Term Sheet and the Restructuring Support Agreement. |
| **Consummation** | The occurrence of the Plan Effective Date. |
| **Critical Trade Claims** | Any Claim held by a creditor that provides goods necessary to the continued operation of the Reorganized Debtors; *provided*, that the holder of such Claim has agreed to continue to provide goods and services to the Reorganized Debtors on terms and conditions reasonably acceptable to the Debtors and the Required Consenting Creditors. |
| **DIP ABL Facility Claims** | Any Claim derived from or based upon the DIP ABL Facility. |
| **DIP Facility Claims** | The DIP ABL Facility Claims and the DIP Term Loan Claims. |
| **DIP Surplus Conversion Shares** | The New Gymboree Common Shares issued on account of the DIP Surplus Amount (pursuant to the exemption from registration available under Section 4(a)(2) of the Securities Act) and purchased at the Share Ratio, subject to dilution from the MIP. |
| **DIP Term Loan Agent** | Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent, and any successor thereto. |
| **DIP Term Loan Facility Claims** | The DIP New Money Loan Claims and the DIP Roll-up Claims. |
| **Plan Effective Date** | The first date upon which all of the conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan.  The date upon which the Plan Effective Date is proposed to occur by the Debtors shall be reasonably acceptable to the Required Consenting Creditors. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code. |

| Term | Definition |
|---|---|
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Backstop Parties; (d) the Term Loan Agent; (e) the DIP Term Lenders; (f) the DIP Term Loan Agent; (g) the Sponsor; (h) with respect to each of the foregoing entities in clauses (a) through (g), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (h), each solely in their capacity as such). |
| **Existing Common Stock** | Shares of common stock in Gymboree. |
| **General Unsecured Claim** | Any Claim, including the Term Loan Deficiency Claim and the Unsecured Note Claim, other than an Administrative Claim, a Professional Fee Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, an ABL Claim, a Term Loan Secured Claim, a Li & Fung Term Loan Claim, a Critical Vendor Claim, or a DIP Facility Claim. |
| **Holder** | An Entity holding a Claim or Interest, as applicable. |
| **Impaired** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | A Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate. |
| **Intercompany Interest** | An Interest in any Debtor other than Gymboree. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |
| **Li & Fung** | LF Centennial Pte Ltd. and its Affiliates. |
| **Li & Fung Agreement** | That certain agreement by and between Gymboree Manufacturing, Inc. and LF Centennial Pte Ltd, dated as of February 28, 2015, as amended from time to time, in each case, in a manner reasonably acceptable to the Debtors and the Required Consenting Creditors. |
| **Li & Fung Term Loan Claim** | Any Claim arising in connection with the 2017 Incremental Term Loan (as defined in the Term Loan Credit Agreement). |
| **MIP** | The management equity incentive plan implemented by the Reorganized Gymboree Board that provides for the issuance of options and/or equity based compensation to members of the management of Reorganized Gymboree. New Gymboree Common Shares representing up to 10% of the New Gymboree Common Shares outstanding on the Plan Effective |

| Term | Definition |
|------|------------|
|  | Date, on a fully-diluted basis, shall be reserved for issuances in connection with the MIP. The participants in the MIP, the allocation of MIP compensation to participants (including the amounts allocated, the timing of grants, and the form of options and/or equity compensation allocated) and the terms and conditions of such options and/or equity compensation (including performance, time based vesting, exercise price, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the Reorganized Gymboree Board in its sole discretion. |
| **New Gymboree Common Shares** | Reorganized Gymboree will have one class of common equity interests. |
| **New Money DIP Loan Claim** | Any Claim derived from or based upon the New Money DIP Loans. |
| **Other Priority Claim** | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim against any of the Debtors, other than an ABL Claim, a Term Loan Secured Claim, or a Li & Fung Term Loan Claim. |
| **Person** | An individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity. |
| **Petition Date** | The date on which the Debtors commence the Chapter 11 Cases. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code. |
| **Professional Fee Claims** | All Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Plan Effective Date to the extent such fees and expenses have not been previously paid. |
| **Professional Fee Escrow Account** | An interest-bearing account in an amount equal to the total estimated amount of Professional Fee Claims and funded by the Debtors on the Plan Effective Date. |
| **Purchase Price** | The per share purchase price of the Rights Offering Shares at the Share Ratio, as specified herein. |
| **Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |

| Term | Definition |
| --- | --- |
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Sponsor; (c) the Backstop Parties; (d) the Term Loan Agent; (e) the DIP Term Lenders; (f) the DIP Term Loan Agent; (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (f), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (g), each solely in their capacity as such); *provided*, that any Holder of a Claim or Interest that objects to or votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party." |
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Sponsor; (c) the Backstop Parties; (d) the Term Loan Agent; (e) the DIP Term Lenders; (f) the DIP Term Loan Agent; (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (f), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; (h) with respect to each of the foregoing Entities in clauses (a) through (g), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (g), each solely in their capacity as such); (i) all Holders of Claims and Interests that are deemed to accept the Plan; (j) all Holders of Claims and Interests who vote to accept the Plan; and (k) all Holders in voting Classes who abstain from voting on the Plan <u>and</u> who do not object to the Plan. |
| **Reorganized Debtors** | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| **Reorganized Gymboree** | Gymboree, as reorganized pursuant to and under the Plan or any successor thereto. |
| **Reorganized Gymboree Board** | The initial board of directors of Reorganized Gymboree |
| **Rights** | The rights to participate in the Rights Offerings on the terms set forth in the Rights Offering Procedures. |

| Term | Definition |
|---|---|
| **Rights Offering Shares** | New Gymboree Common Shares to be purchased at the Share Ratio pursuant to the Rights Offerings such that at the Maximum Rights Offering Amount the Rights Offering Shares will be equal to 46.9% of the New Gymboree Common Shares outstanding on the Plan Effective Date (subject to a downward ratable adjustment to account for the difference (if any) between the Maximum Rights Offering Amount and the Adjusted Rights Offering Amount), subject to dilution by the MIP and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion. |
| **Roll-Up DIP Conversion Shares** | New Gymboree Common Shares purchased at the Share Ratio equal to 41.0% of the New Gymboree Common Shares, subject to dilution by the MIP and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion. |
| **Roll-up DIP Claim** | Any Claim derived from or based upon the Roll-up DIP Loans. |
| **SEC** | The Securities and Exchange Commission. |
| **Secured** | When referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Share Ratio** | A per share purchase price for New Gymboree Common Shares based on a 35% discount to a stipulated equity value of $262.5 million based on a total enterprise value of $430 million (each of which stipulated equity value and enterprise value shall remain fixed regardless of whether the Adjusted Rights Offering Amount is equal to or less than the Maximum Rights Offering Amount). In the event of a DIP Surplus Conversion, the Share Ratio shall be adjusted to use the stipulated equity value above, increased by the amount of the DIP Surplus Amount. |
| **Term Loan Credit Agreement** | The Amended and Restated Credit Agreement, dated as of February 11, 2011 (as amended from time to time), by and among Gymboree, as the borrower; certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, the Term Loan Agent, and the Term Loan Lenders. |
| **Term Loan Agent** | Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent under the Term Loan Credit Agreement, and any successor thereto. |

| Term | Definition |
|---|---|
| **Term Loan Common Shares** | 100% of the New Gymboree Common Shares outstanding on the Plan Effective Date reduced by each of the following:<br><br>   (a) the Rights Offering Shares,<br><br>   (b) the Roll-Up Conversion Shares,<br><br>   (c) the Backstop Premium Shares, and<br><br>   (d) any DIP Surplus Conversion Shares.<br><br>Assuming the Maximum Rights Offering Amount, the Term Loan Common Shares will be equal to 9.8% of the New Gymboree Common Shares outstanding on the Plan Effective Date (prior to a ratable upward adjustment to account for the difference (if any) between the Maximum Rights Offering Amount and the Adjusted Rights Offering Amount) before any dilution by the DIP Surplus Conversion Shares. The Term Loan Common Shares shall be subject to further dilution by the MIP. |
| **Term Loan Claims** | Any Claim derived from or based upon the Term Loan Credit Agreement (other than the Li & Fung Term Loan Claims). The Term Loan Claims shall be allowed pursuant to the Plan, and shall include all principal, unpaid prepetition interest at the contractual rate, all unpaid postpetition interest at the contractual rate, and all other amounts due and owing under the Term Loan Credit Agreement. Any unpaid fees and expenses owing thereunder shall be paid in cash on the Plan Effective Date. |
| **Term Loan Deficiency Claims** | Any Term Loan Claim that is not a Secured Claim. |
| **Term Loan Lenders** | The lending institutions party from time to time to the Term Loan Credit Agreement. |
| **Term Loan Secured Claim** | Any Secured Claim that is a Term Loan Claim. |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |
| **Unsecured Notes** | The 9.125% unsecured senior notes due December 1, 2018, issued pursuant to that certain Indenture dated November 23, 2010, by and among Gymboree, as issuer; certain of Gymboree's subsidiaries, as guarantors; and the Indenture Trustee. |
| **Unsecured Note Claims** | Any Claim derived from or based upon the Unsecured Notes. |

## ANNEX III

## DISCHARGE, RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS

| | |
|---|---|
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| **Releases by the Debtors** | Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:<br><br>1.    the Debtors, the Debtors' in- or out-of-court restructuring |

|  | efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents; |
|  | 2. any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan; |
|  | 3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or |
|  | 4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing. |
|  | Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Releases by Holders of Claims and Interests of the Debtors** | As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part: |
|  | 1. the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents; |
|  | 2. any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu |

| | |
|---|---|
| | of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan; |
| | 3.  the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or |
| | 4.  any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing. |
| | **Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.** |
| **Exculpation** | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation |

| | |
|---|---|
| | governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunctions** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |

<u>**ANNEX IV**</u>

**TERM LOAN EXIT FACILITY TERM SHEET**

EXECUTION VERSION

ANNEX IV

**THE GYMBOREE CORPORATION**
**Exit Term Loan Facility**

**Summary of Principal Terms and Conditions**

| | |
|---|---|
| **Borrower** | Reorganized Gymboree Corporation, a Delaware corporation (the "**Company**" or the "**Borrower**"), formerly a debtor and debtor-in-possession in the cases filed under Chapter 11 (the "**Chapter 11 Cases**"). |
| **Guarantors** | Each wholly-owned domestic subsidiary that executes a guaranty (collectively, the "**Guarantors**" and together with the Borrower, the "**Credit Parties**"). |
| **Exit Term Loan Facility** | Secured term loan facility (the "**Exit Term Loan Facility**" or the "**Exit Financing**"), the holders thereof referred to as the "**Lenders**", comprised of term loans ("**Exit Term Loans**") converted on a dollar-for-dollar basis from the loans under the Borrowers' debtor-in-possession credit agreement (the "**DIP Facility**") on the Closing Date (as defined below). |
| | The "**Plan**" means the Chapter 11 Plan of Reorganization and the related disclosure statement of the Credit Parties (collectively, the "**Debtors**") to be filed with the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"), in form and substance reasonably satisfactory to the Required Lenders; provided that the Approved Plan of Reorganization (as defined in the DIP Facility) shall be the Plan and be deemed to be reasonably satisfactory to the Required Lenders. The reorganization contemplated by the Plan is referred to herein as the "**Reorganization**." |
| **Use of Proceeds** | Subject to Section 2.11 of the DIP Facility, the Exit Term Loan Facility will be used to refinance in full all outstanding "New Money DIP Loans" under the DIP Facility on the Closing Date. |
| **Closing Date** | The date on which the Exit Term Loans are issued under the Exit Term Loan Facility and the Reorganization is consummated in all material respects pursuant to the Plan (the "**Closing Date**"). |
| **Maturity** | The date that is 5 years after the Closing Date. |
| **Collateral** | The Exit Term Loan Facility will be secured by a perfected security interest in, with the priority described below under "Priority," and lien on substantially all of the Credit Parties' tangible and intangible assets (collectively, the "**Collateral**"), with materiality thresholds and exceptions to be agreed. For purposes hereof "ABL Priority Collateral" and "Term Priority Collateral" shall be substantially consistent with the definitions in that certain Intercreditor Agreement dated as of November 23, 2010, by and among Bank of America, N.A., as ABL agent, Credit Suisse AG, Cayman Islands Branch, as term agent (as amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition Intercreditor** |

|  | **Agreement**"). |
|---|---|
| **Priority** | A first priority lien on all Term Priority Collateral and a second priority lien on all ABL Priority Collateral, other than certain customary baskets to be agreed ("**Permitted Liens**"). |
| **Conditions to Closing** | Usual and customary for facilities of this type, including, without limitation, the following: |

A.  The negotiation, execution and delivery of customary definitive documentation in respect of the Exit Financing consistent with the terms set forth in this Term Sheet and otherwise satisfactory to the Required Lenders and the Administrative Agent (the "**Exit Financing Documentation**").

B.  The reasonable satisfaction of the Required Lenders with:

- The Plan;

- the terms of any new asset-based revolving facility and asset-based term loan facility (collectively, the "**Exit ABL Facility**"), replacing the debtor-in-possession asset-based revolving credit facility and debtor-in-possession asset-based term loan facility in form and substance reasonably satisfactory to the Required Lenders and priority of collateral (i.e. first lien on all ABL Priority Collateral, second lien on Term Priority Collateral), and the definitive documentation in respect thereof; and

- the terms, entry and effectiveness of a confirmation order with respect to the Plan.

C.  The Reorganization shall have been consummated in accordance in all material respects with the Plan (all conditions set forth therein having been satisfied or waived (with any such waiver having been approved by the Required Lenders)), and substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan in accordance in all material respects with its terms shall have occurred substantially contemporaneously with the closing of the Exit Term Loans and such closing shall have occurred not later than [October 15, 2017].

D.  The Required Lenders shall be satisfied that, on the Closing Date, immediately after giving effect to the consummation of the Plan, the issuance of the Exit Term Loans to occur on the Closing Date and any other transactions to occur on the Closing Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness for borrowed money other than indebtedness outstanding under the Exit Financing, the Exit ABL Facility and any additional indebtedness (including but not limited to capital leases) on terms and conditions (including as to amount) satisfactory to the Required Lenders and, if secured, subject to intercreditor arrangements satisfactory to the Required Lenders.

E.  Delivery of evidence that all required insurance has been maintained and that the Administrative Agent has been named as loss payee and additional insured, provided that to the extent the Borrower is not able

to deliver the insurance certificates and endorsements pursuant to this clause (E) by the Closing Date after having used commercially reasonable efforts, such insurance certificates and endorsements shall be delivered within 30 days after the Closing Date (or such longer time as the Administrative Agent may agree).

F.  Accuracy of representations and warranties contained in the Exit Financing Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date) and absence of default and Event of Default under the Exit Financing Documentation.

G.  Compliance with customary documentation conditions, including the delivery of customary legal opinions and closing certificates (including a customary solvency certificate), good standing certificates and certified organizational documents, in each case, in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent.

H.  The Administrative Agent shall have a perfected lien on substantially all of the assets of the Credit Parties, other than Permitted Liens, subject in priority only to the liens granted to the Exit ABL Facility which shall be subject to ranking and intercreditor arrangements satisfactory to the Required Lenders and subject to any agree post-closing perfection requirements.

I.  Receipt by the Administrative Agent of reasonably satisfactory results of customary lien searches.

J.  All requisite governmental and material third party approvals shall have been obtained, and there shall be no litigation, governmental, administrative or judicial action against the Credit Parties, in each case, the obtaining or existence of which would reasonably be expected to restrain, prevent or impose materially burdensome restrictions on the Reorganization or the Exit Term Loans.

K.  Delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer", anti-money laundering rules and regulations, and the Patriot Act.

L.  Payment by the Borrowers on the Closing Date of (i) the reasonable and documented out-of-pocket administrative and collateral agency fee and expenses (including the fees and expenses of one outside counsel to the Administrative Agent) due on such date and (ii) the fees of Carriage House Capital Advisors, LLC, Milbank, Tweed, Hadley & McCloy LLP, Rothschild Inc., and McGuire Woods, in connection with the transactions hereunder, in each case to the extent invoiced two (2) business days prior to the Closing Date.

M.  No default or event of default under the DIP Facility.

- 3 -

| | |
|---|---|
| **Interest Rate** | Adjusted LIBOR Rate plus 11.50% per annum (subject to a 1.00% LIBOR floor) payable quarterly in cash. |
| | During the continuance of an Event of Default, past due amounts under the Exit Term Loan Facility will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable. |
| **Scheduled Amortization** | Commencing following the first year anniversary of the Closing Date, the Exit Term Loans shall be repaid in equal quarterly installments of 5% per annum of the original principal amount of the Exit Term Loans on each December 31, March 31, June 30 and September 30. |
| **Call Protection** | Callable at 105%, 103% and 102% in years 1, 2 and 3 and thereafter at par. |
| **Mandatory Prepayments** | The Exit Term Loans shall be prepaid with: |
| | (i)  100% of the net cash proceeds of non-ordinary course asset sales or casualty or condemnation events (subject to reinvestment rights and baskets and exclusions to be agreed); and |
| | (ii)  100% of the proceeds of debt incurrences (other than debt permitted under the Exit Financing Documentation). |
| **Financial Covenants** | None. |
| **Required Lenders** | Lenders holding a majority of the Exit Term Loans (the "**Required Lenders**"). |
| **Exit Facility Documentation** | The definitive financing documentation for the Exit Term Loan (the "**Exit Facility Documentation**") shall contain representations and warranties, covenants and events of default expressly set forth in this Term Sheet and, to the extent any other terms are not expressly set forth in this *Term Sheet*, will (i) be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date, (ii) contain such other terms as the Company and the Lenders shall reasonably agree (given due regard to the operations, size, industry (and risks and trends associated therewith), geographic locations and businesses of the Credit Parties); it being understood and agreed that the Prepetition Term Loan Agreement will be used as a starting point for the Exit Facility Documentation. |
| **Governing Law** | State of New York. |
| **Administrative Agent** | Credit Suisse AG, Cayman Islands Branch |

4820-4170-3753, v. 6

- 4 -

**<u>EXHIBIT B</u> to**
**the Restructuring Support Agreement**

**Form of Transfer Agreement and Joinder**

**Transfer Agreement and Joinder**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support and Lock-Up Agreement, dated as of _____ (the "**Agreement**"),[1] by and among The Gymboree Corporation and its Affiliates and subsidiaries bound thereto, the Consenting Creditors, and certain other parties, including the transferor to the Transferee of any Term Loan Claims or Debtor Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Creditor**" and a "**Party**" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Revolver Claims (if any) | $[__] |
| ABL Term Loan Claims (if any) | $[__] |
| Term Loan Claims (if any) | $[__] |
| Unsecured Note Claims (if any) | $[__] |
| Existing Common Stock (if any) | [__] shares |

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**<u>EXHIBIT C</u> to**
**the Restructuring Support Agreement**

**Form of Joinder Agreement**

# Joinder Agreement

The undersigned ("**Joining Party**") hereby acknowledges that it has read and understands the Restructuring Support, dated as of _____ (the "**Agreement**"),[1] by and among The Gymboree Corporation and its Affiliates and subsidiaries bound thereto, the Consenting Creditors, and certain other parties, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "**Consenting Creditor**" and a "**Party**" under the terms of the Agreement.

The Joining Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Revolver Claims (if any) | $[___] |
| ABL Term Loan Claims (if any) | $[___] |
| Term Loan Claims (if any) | $[___] |
| Unsecured Note Claims (if any) | $[___] |
| Existing Common Stock (if any) | [___] shares |

---

[1] Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

## Exhibit B

**Corporate Organizational Structure**

