James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (*pro hac vice* pending)
Steven N. Serajeddini (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:       (312) 862-2200

-and-

Joshua A. Sussberg, P.C. (*pro hac vice* pending)
Matthew C. Fagen (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:       (804) 644-1700
Facsimile:       (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GYMBOREE CORPORATION, *et al.*,[1] | ) | Case No. 17-32986 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF DAVID KURTZ IN SUPPORT OF
## THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN
## POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
## CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY
## ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION
## TO THE PREPETITION LENDERS, (V) MODIFYING THE AUTOMATIC STAY,
## (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

I, David Kurtz, make this Declaration pursuant to 28 U.S.C. § 1746:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588).  The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

1.      I submit this declaration (this "<u>Declaration</u>") in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling A Final Hearing, and (VII) Granting Related Relief* (the "<u>Motion</u>")[2] seeking relief for the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>").

2.      In particular, I submit this Declaration in support of my view that the DIP Facilities (a) are the product of an arm's-length, good faith negotiation process, (b) are the best available—and, indeed, possibly the only workable—postpetition financing option for the Debtors, and (c) contain reasonable and appropriate terms and conditions under the circumstances.

3.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from the Debtors' advisors or employees working directly with me or from other members of the Lazard team working under my supervision or direction, or from the Debtors' books and records.  Specifically, I have overseen a Lazard team which, since January 2017, has been one of the principal advisors for the Debtors, and in that capacity I have been directly involved in the matters leading up the Debtors' chapter 11 filings.  I am not being specifically compensated for this testimony other than through payments received by Lazard, Ltd. (together with Lazard Frères & Co. LLC and Lazard Middle Market LLC, "<u>Lazard</u>")  as a professional whose retention the Debtors are seeking to obtain this Court's approval of pursuant to an application to be filed with this Court at a later date.  I am

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

over the age of 18 years and authorized to submit this declaration on behalf of the Debtors.  If I

were called upon to testify, I could and would competently testify to the facts set forth herein.

### Background and Qualifications

4.       I am a Vice Chairman and the Global Head of the Restructuring Group of the firm

Lazard Frères & Co. LLC.  I have a broad range of experience in financial advisory assignments,

including extensive experience with chapter 11 restructurings.  During the course of my career, I

have advised companies and creditor groups in connection with raising capital in the bankruptcy

context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-

in-possession and exit financing loans.  I also have extensive experience representing companies,

creditors, and other constituencies in transactions involving the sale of all or substantially all of a

company's assets.    Additionally, I have performed numerous enterprise valuations in the

bankruptcy context.  I have submitted declarations and provided expert testimony related to those

matters in a number of chapter 11 cases.

5.       I have been employed by Lazard since 2002 and have extensive experience as an

advisor in corporate restructurings.  I have advised companies, creditors, and investors in

connection with numerous in-court and out-of-court restructurings and recapitalizations.

6.       Prior to joining Lazard, I was a partner at Mayer, Brown & Platt from 1986 to

1989, a partner at Jones Day from 1989 to 1999, and a senior partner in the Corporate

Restructuring Department at Skadden, Arps, Slate, Meagher & Flom LLP from 1999 to 2002.  I

hold FINRA Series 7 General Securities Representative, Series 79 Investment Banking

Representative, and Series 24 General Securities Principal licenses.  I have a J.D. and B.A. from

Case Western Reserve University.  I am a fellow of the American College of Bankruptcy, and

served as a member of the Board of Directors from 2005 to 2011.  I am also a frequent lecturer

on bankruptcy- and reorganization-related topics and I have co-authored "Representing the

Unsecured Creditors' Committee in Insolvency Restructurings," Workout & Turnarounds II (1999), Wiley and Sons.

7.     Lazard Frères & Co. LLC is the primary U.S. operating subsidiary of an international financial investment banking, financial advisory, and asset management firm. Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority.  Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 150 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.  In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and buyers in chapter 11 proceedings.

## The Debtors' Capital Structure

8.     As of the Petition Date, the Debtors have approximately $1.1 billion in total funded debt obligations.  This consists of approximately $81 million outstanding under the senior secured asset-based revolving credit facility, $48 million outstanding under the Debtors' senior secured asset-based term loan, $789 million in aggregate principal amount outstanding under the Debtors' senior secured term loan, and $171 million in unsecured senior notes.

9.     As noted in the First Day Declaration, the Prepetition ABL Facility and the Prepetition Term Loan Facility are collateralized by first and second liens on substantially all of the Debtors' assets.  *See* First Day Declaration ¶¶ 49-50.  Specifically, I understand that the Debtors' obligations under the Prepetition ABL Facility are secured, subject to certain

exceptions, by (a) a perfected first priority security interest on substantially all of the Debtors'

personal property, including accounts receivable, credit card receivables, inventory, deposit

accounts, securities and commodities accounts, cash and cash equivalents (but excluding

intellectual property) (collectively, "Prepetition ABL Collateral"), and (b) a second priority lien

on the Prepetition Term Loan Priority Collateral (as defined below), including the Debtors'

intellectual property.  I further understand that the Debtors' obligations under the Prepetition

Term Loan Facility are secured by (a) a first priority lien on the Debtors' capital stock and

intellectual property (collectively, the "Prepetition Term Loan Collateral"), and a second priority

lien on the Prepetition ABL Collateral.

### The Debtors' Need for DIP Financing

10.     As detailed in the First Day Declaration, the Debtors operate approximately 1,300

retail stores in the United States, Puerto Rico, and Canada, and have franchised stores in South

Korea, Australia, parts of Latin America, and the Middle East.  *See* First Day Declaration ¶ 19.

The Debtors have struggled recently due to, among other things, adverse macro-trends, including

the general shift away from brick-and-mortar stores to online retail channels.

11.     The Debtors, moreover, have faced and continue to face liquidity crises that have

harmed the Debtors' ability to continue receiving inventory.  *See* First Day Declaration ¶ 59.

Specifically, the Debtors have advised that, during the course of the last several months, certain

vendors, including the Debtors' largest agent of sourced product, Li & Fung (the agent through

which the Debtors source approximately 93% of their inventory), threatened to withdraw trade

credit and suspend shipping inventory unless the Debtors paid up front or provided further credit

protection.

12.     The Debtors believe that the uninterrupted flow of fresh inventory is critical to the

Debtors' business and that any withdrawal of trade credit, trade tightening, or vendor contraction

across the Debtors' business would be detrimental to the Debtors' ability to obtain fresh inventory. Any such problems in obtaining fresh inventory adversely affects cash flow generation and also exacerbates the ABL Facility borrowing base constraints given that the Debtors' inventory levels represent a substantial portion of the Prepetition ABL Facility borrowing base. That would in turn further limit the Debtors' ability to obtain fresh inventory thereby further exacerbating the Debtors' inventory and liquidity problems.

13.    Recognizing the need to explore capital structure alternatives and address these liquidity issues, the Debtors, in January 2017, retained Lazard as investment banker. As detailed in the First Day Declaration, *see* First Day Declaration ¶ 69, beginning in March 2017, the Debtors, aided by Lazard, began to explore comprehensive restructuring alternatives that would strengthen the Debtors' balance sheet and provide near-term liquidity support.

**Prepetition Efforts to Secure Liquidity & Negotiations
Over the DIP and Restructuring Support Agreements**

14.    Prior to the commencement of these cases, the Debtors commenced discussions with stakeholders by approaching the Prepetition Term Loan Agent and advisors to the Unsecured Notes to seek additional sources of prepetition liquidity and explore restructuring options. Certain Prepetition Term Loan Lenders signed non-disclosure agreements in order to review the Company's liquidity position and to conduct in-depth financial due diligence on the Debtors.

15.    After significant arms'-length and good faith negotiations, the Debtors and the Prepetition Term Loan Lenders reached several key agreements to address the Debtors' prepetition liquidity concerns in order to help the Debtors continue as going-concerns and maximize the value of the Debtors for all stakeholders. Specifically:

(1)     On April 21, 2017, the Prepetition Term Loan Lenders executed a certain Term Loan Second Amendment, allowing the Debtors to issue a $20 million incremental term loan to Li & Fung in exchange for Li & Fung's active support of the Debtors' restructuring and continued promotion of the Debtors' business. *See* First Day Declaration ¶ 61;

(2)     On May 12, 2017, the Prepetition Term Loan Lenders executed a certain Restricted Cash Amendment to provide the Debtors with access of up to $40 million in cash that was restricted under the Term Loan credit agreement, in order to fund the Debtors' working capital needs prior to the Petition Date, which would allow the Debtors enough liquidity to finalize restructuring negotiations and prepare for a soft-landing into chapter 11; and

(3)     Also on May 12, 2017 the the Prepetition ABL Agents and Prepetition ABL Lenders agreed to waive a Specified Event of Default under the ABL Credit Agreement, thus allowing the Debtors to remain in compliance with the ABL Credit Agreement, *see id.* ¶¶ 65-66 (the foregoing three agreements, the "Prepetition Liquidity Agreements").

16.     In tandem with the foregoing negotiations over the Prepetition Liquidity Agreements, the Debtors and the Prepetition Term Loan Lenders also engaged in discussions on restructuring options for the Debtors.  The Debtors initially provided the financial and legal advisors to the Prepetition Term Loan Agent with a restructuring proposal on March 26, 2017 and followed up with a more detailed, legal term sheet on April 13, 2017.  After conducting in-depth financial and legal due diligence, certain Prepetition Term Loan Lenders holding

approximately 66% of the claims under the prepetition Term Loan Credit Agreement (the "Consenting Term Loan Lenders") responded to the Debtors' proposal with a restructuring term sheet (certain key terms were provided orally on May 22, 2017 and a term sheet followed on May 28, 2017) detailing terms of a proposed DIP financing and restructuring agreement (such term sheet, the "Restructuring Term Sheet").

17.     The Restructuring Term Sheet proposed a series of transactions to provide liquidity to and to recapitalize the Debtors.   After significant arms'-length and good faith negotiations to refine the proposal contemplated by the Restructuring Term Sheet, the Debtors and the Consenting Term Loan Lenders agreed to the Restructuring Support Agreement.   Under the series of transactions contemplated by the Restructuring Support Agreement, the Consenting Term Loan Lenders would provide $105 million in DIP financing (including $35 million in New Money Loans (defined below) and a $70 million refinancing of existing obligations under the Term Loan Facility), backstop an up to $80 million rights offering (the "Rights Offering"), and support a restructuring that would convert the obligations outstanding under the Term Loan Facility to common equity in the reorganized Debtors upon emergence from Chapter 11.   Under the Restructuring Support Agreement, each of the Term Loan Lenders would be given the opportunity to provide their respective pro rata share of the $35 million in New Money Loans (with any shortfall backstopped by the Consenting Term Loan Lenders) and, in connection with such commitment, participate in the "roll-up" of up to $70 million of the existing Prepetition Term Loans into $70 million of Roll-Up Loans (defined below) and agree to commit to their pro rata share of the Rights Offering (the "Subscription Procedures").   The Restructuring Support Agreement further provides that the $70 million in Roll-Up Loans would then convert to common equity in the Reorganized Debtors upon the Debtors' emergence from chapter 11

pursuant to a confirmed plan, and the $35 million in New Money Loans would either roll into an exit facility, be eliminated through a refinancing by the Debtors or, to the extent any commitment was underdrawn, invest the undrawn amount in the form of equity in the Reorganized Debtors upon the Debtors' emergence from chapter 11 pursuant to a confirmed plan.

18.      It is my understanding based on my discussions with the financial advisor retained on behalf of the Prepetition Term Loan Agent that the Restructuring Support Agreement, a form commitment letter and other solicitation materials will be posted to the lender data site maintained by the Prepetition Term Loan Agent and accessible to all Prepetition Term Loan Lenders, and that the Prepetition Term Loan Agent and its advisors will convene a telephonic meeting for all Prepetition Term Loan Lenders to discuss the proposed restructuring transactions, including the Restructuring Support Agreement.

19.      After receiving the Restructuring Term Sheet, Lazard, on behalf of the Debtors, approached the Prepetition ABL Lenders to seek complementary asset-based DIP financing to fund the Debtors' working capital needs during the pendency of these chapter 11 cases. The Debtors conducted extensive and hard-fought negotiations with the Prepetition ABL Lenders, resulting in the ABL Revolver Lenders' agreement to provide a $273.5 million DIP ABL Credit Facility on terms similar to those provided under the Prepetition ABL Facility.  The lenders under the term loan component of the DIP ABL Credit Facility also agreed to increase the inventory advance rates by 1% of the Prepetition ABL Facility, increasing overall availability under the DIP ABL Credit Facility.  Pursuant to the terms of the DIP ABL Documents, upon entry of the Interim Order, amounts outstanding under the DIP ABL Credit Facility will be converted into obligations under the DIP ABL Credit Facility.

**The DIP Marketing Process**

20.     In parallel to negotiating the foregoing, the Debtors sought to ensure that the terms received for the Proposed DIP Financing from the prepetition lenders were the most favorable terms available in light of the circumstances of these chapter 11 cases.  Lazard, on behalf of the Debtors, therefore sought to solicit offers from third parties to provide DIP financing on more favorable terms.  Lazard contacted over a dozen potential lenders to provide asset-based DIP financing.  Of the parties Lazard contacted as part of the process (such process, the "DIP Marketing"), twelve executed confidentiality agreements.  Parties that executed such agreements were provided with access to a virtual dataroom.

21.     Ultimately, no party submitted a bid to provide DIP financing on any more favorable, workable terms.  Market feedback was that because the Prepetition ABL Lenders and Prepetition Term Loan Lenders were willing to provide DIP financing, the opportunity to provide a DIP facility was not attractive to potential third-party lenders.  Third parties felt that the prepetition lenders would be able to provide more favorable terms than they could because of the prepetition lenders' existing credit relationships with the Debtors and their preexisting knowledge of the Debtors' business.  Additionally, no third party was willing to provide DIP financing (in either asset-based or term-loan form) on any workable terms because: (i) the Prepetition ABL Lenders and the Prepetition Term Loan Lenders made it clear that they would not consent to having their liens on the Debtors' assets primed; (ii) the Debtors' already twice-collateralized assets would not support a third-lien DIP; and (iii) the Debtors lacked the equity cushion needed to support an unsecured DIP.

22.     Additionally, Lazard has been publicly associated with the Debtors' recapitalization efforts since January 2017.  In my experience, Lazard's public association with recapitalization efforts generally leads to unsolicited inbound offers to provide DIP financing if

the market supports third-party DIP financing.  In this instance, very limited actual inbounds were received.

### The Debtors' Selection of the Proposed DIP Facilities

23.     Based on the DIP Marketing, my experience, current market conditions, the Debtors' circumstances, and my participation in and supervision of the negotiations around the Proposed DIP Facilities and the broader restructuring transaction, I believe that the Proposed DIP Facilities represent the best option available to address the Debtors' liquidity needs, and that the terms and conditions of the Proposed DIP Facilities are the product of hard-fought negotiations and are reasonable and appropriate given the circumstances.  It is my conclusion, in addition to representing the best option, in my view, the Proposed DIP Facilities are likely the only workable source of post-petition financing available to the Debtors that presents a reasonable prospect of reorganization.

### Effects of the Proposed DIP Facilities

24.     As a result of the efforts described above, the Debtors have arrived in chapter 11 with a transaction structure and process that they believe will preserve and capitalize on the value inherent in their business and brand by giving them an executable path toward a potential reorganization.  The Proposed DIP Facilities were designed by the parties and selected by the Debtors to facilitate a process that is intended to maximize the likelihood of a going-concern transaction for the benefit of stakeholders enterprise-wide, and the confirmation of a chapter 11 plan that intends to maximize the value of the estates.  Absent the funds provided by the Proposed DIP Facilities, on the terms negotiated, the Debtors would likely be forced to liquidate or "fire-sell" their business, with stakeholders likely receiving lesser recoveries than they would in a chapter 11 reorganization, and many other parties in interest, including thousands of employees, suffering harm in the process.

25.     Moreover, as the Debtors utilize the financing provided by the Proposed DIP
Facilities to acquire additional inventory, the Debtors hope to arrest—and indeed reverse—the
downward liquidity spiral described above, *see* ¶ 11, *supra*, by increasing the borrowing base
under the DIP ABL Facility.  This increased borrowing base should, in turn, provide the Debtors
with necessary capital to purchase even more inventory.  Additionally, the Debtors have advised
that the Proposed DIP Financing is needed to meet other ordinary working capital and business
operating needs as well, and to fund the expenses associated with the Debtors' chapter 11 cases,
including the closing of up to 450, contingent upon lease negotiations with the Debtors'
landlords.

26.     As detailed in the First Day Declaration, *see* ¶ 81, and Mesterharm Declaration,
*see* ¶ 16, in the absence of immediate access to the additional liquidity provided by the Proposed
DIP Facilities, the Debtors' access to the cash needed to operate the business would evaporate
and trade creditors would likely cease extending credit, creating a vicious cycle.  Accordingly,
absent immediate access to the Proposed DIP Facilities, the Debtors would likely have to
liquidate in short order, which would be value-destructive.  As set forth in the Motion, the
requested amount of interim financing will ensure that the Debtors have the necessary liquidity
to continue to operate without material disruption following the Petition Date.

27.     In addition, because the Debtors operate in a highly competitive industry, a
seamless transition and ability to continue operations uninterrupted will be imperative if the
Debtors are to preserve their brands, and the loyalty and goodwill of their customers, suppliers,
and employees.  The Debtors expect that these constituents will be focused on whether these
chapter 11 cases are appropriately capitalized to result in the continuation of the Debtors'
business as a going concern.  The Debtors believe that if there is any significant doubt about the

Debtors' future, the willingness of their vendors to accept new purchase orders for long lead-time goods on anything other than cash-in-advance terms will be significantly and negatively impacted.  The Debtors believe that the proposed DIP Facilities will provide a strong and reassuring message to the Debtors' customers, vendors, landlords and employees that these chapter 11 cases are well-funded and positioned for a reorganization.

28.    In sum, the Proposed DIP Facilities are intended to bridge the Debtors to the effective date of a plan by providing them with necessary liquidity to prosecute these chapter 11 cases and to meet ongoing working capital and operating needs.  Absent access to the Proposed DIP Facilities, the Debtors would likely need to liquidate to the detriment of their stakeholders.

**Material Terms of the Proposed DIP Facilities**

29.    The Proposed DIP Facilities consist of: (a) the DIP ABL Facility, with a commitment of $273.5 million, funded by the Prepetition ABL Lenders and (b) the DIP Term Loan Facility, with a commitment of $105 million.  Together, these facilities are designed to provide the Debtors with an immediate infusion of liquidity to fund inventory purchases and other administrative obligations of these chapter 11 cases through an initial up to $20 million draw on the DIP Term Loan Facility on or after the date of the Court's entry of an interim order approving the DIP Term Loan Facility, while continuing to fund the Debtors' working capital needs through the use of the DIP ABL Facility.

30.    The DIP ABL Facility consists of two tranches of debt: (i) a senior secured asset-based revolving credit facility (the "DIP ABL Revolver") with a $225 million commitment and (ii) an asset-based term loan (the "DIP ABL Term Loan") with a $48.5 million commitment (together, the "DIP ABL Loans").  Upon entry of the Interim Order, the Debtors' obligations under the ABL Facility will convert into obligations under the DIP ABL Credit Facility.

13

31.     Subject to certain exceptions set forth in the DIP Documents, the DIP ABL Facility will be provided as senior secured financing on a superpriority basis, secured by a perfected non-avoidable first priority lien on: (a) all ABL Priority Collateral, including the proceeds of the Debtors' real property leases and the proceeds of avoidance actions; (b) all unencumbered property of the Debtors that is of a type that would be ABL Priority Collateral; and (c) all Term Loan Priority Collateral, junior only to the liens of the DIP Term Loan Facility and the Prepetition Term Loan Facility.

32.     The DIP Term Loan Facility consists of: (a) new money loans, a multi-draw term loan facility with a commitment of $35 million (the "New Money Loans"), and (b) roll-up loans, in a principal amount equal to $70 million to refinance amounts due and owing to the DIP Term Loan Lenders under the Term Loan Credit Agreement (the "Roll-Up Loans").  The New Money Loans will be funded: (a) initially, up to $20 million on or after the Bankruptcy Court's entry of an interim order approving the DIP Term Loan Facility and (b) an additional $15 million drawable in not more than three draws following the Bankruptcy Court's entry of a final order approving the DIP Term Loan Facility.

33.     Subject to the certain exceptions set forth in the DIP Documents, the DIP Term Loan Facility will be provided as senior secured financing on a superpriority basis, secured by a perfected, non-avoidable, first priority lien on: (a) all Term Priority Collateral; (b) all unencumbered property of the Debtors that is of a type that would be Term Priority Collateral; and (c) all ABL Priority Collateral, junior only to the liens of the DIP ABL Facility and the Prepetition ABL Facility.

34.     Upon the Debtors' emergence from Chapter 11, the Roll-Up Loans will convert into new common equity of the reorganized Debtors under the terms and conditions specified in

14

the Restructuring Support Agreement, and the New Money Loans shall be repaid in full in cash or converted by the Debtors into a five-year exit facility of the reorganized Debtors upon the Debtors' emergence from chapter 11 pursuant to a confirmed plan.  The DIP Term Loan Facility will mature on the earliest of: (a) the six-month anniversary of the Petition Date; (b) the effective date of a plan of reorganization in any of the chapter 11 cases; (c) the conversion of any chapter 11 case to a case under chapter 7 of the Bankruptcy Code; (d) the consummation of a sale of all or substantially all of the assets of any of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise; (e) the acceleration of the loans or termination of the commitments under the DIP Term Loan Facility; (f) the date that is 35 days after the Petition Date if the Final Order Entry Date shall not have occurred by such date; (g) the dismissal of any of the chapter 11 cases; and (h) the occurrence of other customary maturity events.

35.    Under the Proposed DIP Facilities, the Debtors have also agreed, subject to Court approval, to pay certain fees to the DIP Agents and the DIP Lenders.  In particular, as noted above, the Debtors have agreed to pay:

(a)    to the DIP ABL Agents and DIP ABL Lenders (in accordance with the terms of the DIP ABL Credit Facility):  (a) closing fees; (b) an unused commitment fee equal to 0.375% per annum of the undrawn commitments; and (c) additional fees payable to the DIP ABL Agents, for their own accounts, in consideration of the DIP ABL Agents' service as DIP ABL Agent;

(b)    to the DIP Term Loan Lenders (in accordance with the terms of the DIP Term Loan Facility) a commitment fee in the amount equal to 2.00% of the aggregate amount of the New Money Commitments (as defined in the DIP Term Loan Agreement); and additional fees and expenses payable to the DIP Term Loan Agent, for its own account;

(c)    to the Backstop Lenders, an amount equal to 3.5% of the aggregate New Money Commitments (as defined in the DIP Term Loan Agreement); and

(d)    no fees payable on account of the DIP Roll-Up Loans.

36. Finally, the Proposed DIP Facilities also provide for certain milestones that the Debtors must meet throughout their chapter 11 cases, *see* First Day Declaration ¶ 74, and failure to meet any such milestones would constitute an event of default under the Proposed DIP Facilities.

<u>The Terms of the DIP Loans Are the
Best Available Under the Circumstances</u>

37. The Prepetition ABL Lenders and the Prepetition Term Loan Lenders assert that all of the Debtors' material assets are encumbered under their existing capital structure which, along with the Debtors' uncertain financial condition and challenging macroeconomic conditions in the retail apparel industry, restricts the general availability of, and options for, postpetition financing. The prepetition Prepetition ABL Lenders and the prepetition Prepetition Term Loan Lenders also made it clear to the Debtors and Lazard that they would not consent to "priming" debtor-in-possession financing provided by a third party. Additionally, due to the Debtors' high level of existing secured debt, it is clear that the Debtors do not possess a sufficient equity cushion to allow for postpetition financing that would prime existing lenders' liens on a nonconsensual basis. It is my belief, based on my experience, that a priming fight at the outset of these cases would be extremely value destructive and may result in a liquidation of the Debtors' business.

38. The Debtors' high level of secured debt obligations also makes it unlikely that any third-party lenders would be willing to provide postpetition financing on an unsecured or junior priority basis, as was borne out in the DIP Marketing.

39. Additionally, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily requiring the payment of additional professional fees. In

contrast, the Proposed DIP Facilities offered by the DIP Lenders allow the Debtors to: (a) avoid engaging in a costly and time-consuming priming fight at the outset of these chapter 11 cases; (b) avoid incurring additional expenses related to a third-party proposal; and (c) enter into a consensual transaction with their prepetition creditors who, in addition to having adequate protection rights, already know the Debtors and its business plan well, and have already provided value to the Debtors and their restructuring efforts prior to the commencement of these chapter 11 cases.

40.     Also, as noted above, *see* ¶ 30, under the Proposed DIP Facilities, upon entry of the Interim Order, the Debtors' obligations under the ABL Facility will convert into obligations under the DIP ABL Credit Facility.  The conversion of the Prepetition ABL Obligations into DIP ABL Obligations is expected to create availability under the DIP ABL Credit Facility during the pendency of these cases, allowing the Debtors to continue purchasing critical inventory at an interest rate under the DIP ABL Credit Facility that is lower than the current interest rate including default interest.

41.     Because the obligations under the ABL Facility are fully secured by perfected, first priority liens with respect to, among other things, inventory and receivables, with a value the Debtors believe to be in excess of outstanding borrowings, the conversion of such ABL Obligations into DIP ABL Obligations merely accelerates the satisfaction of the ABL Obligation.  Accordingly, it is my view that the conversion of the Prepetition ABL Obligations into DIP ABL Obligation should benefit the Debtors' and their estates.

42.     As also noted above, *see* ¶ 32, the Roll-Up Loans will be used to refinance amounts due and owing to the DIP Term Loan Lenders under the Term Loan Credit Agreement. This conversion of Term Loan Obligations into DIP Term Loan Obligations is also beneficial to

the Debtors and their estates, and was a necessary prerequisite to the DIP Term Loan Lenders'

provision of $35 million in new, postpetition financing under the DIP Term Loan Documents.

Notably, no Term Loan Obligations will roll into DIP Term Loan Obligations unless the holder

of those Term Loan Obligations provides its pro rata share of new money DIP Term Loans (such

opportunity to provide commitments to provide the New Money Loans to be offered to all Term

Loan Lenders).  Absent the $35 million in new financing from the DIP Term Loan Lenders, it is

likely that the Debtors would have no alternative other than to liquidate their business, or to run a

"fire-sale" going concern sale process, with all stakeholders receiving lesser recoveries than they

otherwise would under a chapter 11 plan.  Accordingly, it is my opinion that the proposed "roll-

up" of a portion of the Debtors' Term Loans is to the benefit of all stakeholders, because it will

allow the Debtors to access the additional liquidity necessary to finance their working capital

during these chapter 11 cases.

   43. Finally, the fees to be paid under the Proposed DIP Facilities were the subject of

arms'-length and good faith negotiation between the Debtors and the DIP Lenders, are an

integral component of the overall terms of the Proposed DIP Facilities, and were required by the

applicable DIP Agents and DIP Lenders as consideration for the extension of postpetition

financing.  In my experience these fees are similar to fees charged for debtor-in-possession

financings in similar circumstances.  The DIP Agreements also contain certain milestones that

the Debtors must meet throughout their chapter 11 cases.  These milestones were negotiated and

required by the DIP Agents and the DIP Lenders as a condition to providing the DIP Facilities.

Accordingly, I believe these fees and milestones are appropriate under the circumstances, and are

the best terms available to the Debtors.

44.    For the reasons stated above, it is my belief that the Proposed DIP Facilities offer the best—and likely only—available financing option for the Debtors to reorganize their business.

### The Proposed DIP Facilities Should Be Approved

45.    Based on my experience in general and my involvement in and supervision of the marketing and negotiation of the Proposed DIP Facilities in this matter, it is my view that the Proposed DIP Facilities are the best available postpetition financing option for the Debtors.  The Proposed DIP Facilities are fully committed and offer necessary liquidity.  I also believe that the Proposed DIP Facilities contain terms that are reasonable given the circumstances.  Further, I believe that the negotiation process was full and fair, was comprehensive, and produced the best available financing option under the circumstances.  Lazard's marketing efforts to date have led me to conclude that there is no interest by other potential lenders to offer financing on workable terms that would reasonably facilitate a value maximizing reorganization transaction, nor is such alternative financing available without priming the Prepetition Secured Parties over their objection.  In short, the Proposed DIP Facilities provide the most favorable, and indeed likely the only, executable transaction available to the Debtors.

46.    In addition, the Debtors require immediate access to the Proposed DIP Facilities to obtain liquidity essential to operate their business and fund the administration of their chapter 11 cases while they work to execute a successful restructuring of their business on a going concern basis, and absent access to the Proposed DIP Facilities the Debtors' estates will suffer material and significant harm.  The ability to effectuate a reorganization of the Debtors' business in an orderly manner to maximize value hinges largely on the Debtors' ability to provide the necessary assurances of available liquidity to key stakeholders, including employees, vendors, and landlords.  The Proposed DIP Facilities should, among other things, enable the Debtors to

send a strong signal to employees, landlords, vendors, and other parties that the Debtors have runway to successfully implement a restructuring. Importantly, the indebtedness under the Roll-Up Loans will convert upon the Debtors' emergence from chapter 11 into common equity of the reorganized Debtors. This obviates the need for the Debtors to repay the Roll-Up Loans in full upon emergence and provides a clear path, not only to funding these chapter 11 cases, but also to the development of a plan and the Debtors' successful exit from chapter 11. Accordingly, if approved, I believe that the Proposed DIP Facilities will preserve and enhance the value of the Debtors' estates.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true correct.

New York, New York                    /s/ *David Kurtz*
June 12, 2017                         _____
                                      David Kurtz
                                      Lazard