**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| THE GYMBOREE CORPORATION, *et al.*,[1] | ) | Case No. 17-32986 (KLP) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF THE GYMBOREE CORPORATION AND ITS DEBTOR AFFILIATES**

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

- and -

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  June 16, 2017

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588).  The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF THE GYMBOREE CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE XII HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS AND CERTAIN PROPONENTS OF THE RESTRUCTURING SUPPORT AGREEMENT. ALL SUCH PARTIES URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT WAS NOT FILED WITH THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE AUTHORITY AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS

OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND CONSISTENT WITH THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................................................1

II.     PRELIMINARY STATEMENT ................................................................................................1

III.    OVERVIEW OF THE PLAN......................................................................................................2

        A.    Purpose and Effect of the Plan ....................................................................................2
        B.    Substantial Debt-for-Equity Exchange........................................................................3
        C.    Rights Offerings ...........................................................................................................3
        D.    New Gymboree Common Shares..................................................................................4
        E.    Management Incentive Plan. ........................................................................................5
        F.    Exit Facilities. ..............................................................................................................5
        G.    Li & Fung Agency Agreement......................................................................................5
        H.    Releases.........................................................................................................................5

IV.     QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        PLAN ............................................................................................................................................6

        A.    What is chapter 11?.......................................................................................................6
        B.    Why are the Debtors sending me this Disclosure Statement? ......................................6
        C.    Am I entitled to vote on the Plan?................................................................................6
        D.    What will I receive from the Debtors if the Plan is consummated?..............................7
        E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
              Facility Claim, or a Priority Tax Claim?......................................................................9
        (i)   Administrative Claims ..................................................................................................9
        F.    Are any regulatory approvals required to consummate the Plan?...............................11
        G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ...................11
        H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
              Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
              "Consummation?" ......................................................................................................11
        I.    What are the sources of Cash and other consideration required to fund the Plan?......12
        J.    Are there risks to owning the New Gymboree Common Shares upon emergence from
              chapter 11?..................................................................................................................12
        K.    Will the final amount of Allowed General Unsecured Claims affect my recovery under
              the Plan?......................................................................................................................12
        L.    Will there be releases and exculpation granted to parties in interest as part of the Plan? ...............12
        M.    What impact does the Claims Bar Date have on my Claim? .......................................15
        N.    What is the deadline to vote on the Plan? ...................................................................15
        O.    How do I vote for or against the Plan?........................................................................16
        P.    Why is the Bankruptcy Court holding a Confirmation Hearing?................................16
        Q.    When is the Confirmation Hearing set to occur?........................................................16
        R.    What is the purpose of the Confirmation Hearing?.....................................................16
        S.    What is the effect of the Plan on the Debtors' ongoing business? ..............................16
        T.    Will any party have significant influence over the corporate governance and operations of
              the Reorganized Debtors? ...........................................................................................17
        U.    Who do I contact if I have additional questions with respect to this Disclosure Statement
              or the Plan? ................................................................................................................17
        V.    Do the Debtors recommend voting in favor of the Plan?............................................18
        W.    Who Supports the Plan?..............................................................................................18

V.      THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ................18

        A.    Restructuring Support Agreement...............................................................................18
        B.    The Plan ......................................................................................................................18

**VI.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT** ................................20

    A.    Certain Key Terms Used in this Disclosure Statement ................................20
    B.    Additional Important Information ................................21

**VII.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ............23

    A.    The Debtors ................................23
    B.    Prepetition Capital Structure ................................23

**VIII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS** ................................25

    A.    Challenging Operating Environment and Operational Right Sizing ................................25
    B.    Supply Chain Challenges. ................................25
    C.    Prepetition Waiver/Amendment ................................26
    D.    Management Changes ................................26
    E.    Exploration of Strategic Alternatives ................................27

**IX.    PREPETITION TRANSACTIONS** ................................28

    A.    Take Private ................................28
    B.    Play & Music Transaction ................................29

**X.    EVENTS OF THE CHAPTER 11 CASES** ................................30

    A.    Corporate Structure upon Emergence ................................30
    B.    Expected Timetable of the Chapter 11 Cases ................................30
    C.    First Day Relief ................................30
    D.    Litigation Matters ................................30
    E.    Independent Investigation ................................30

**XI.    PROJECTED FINANCIAL INFORMATION** ................................31

**XII.    RISK FACTORS** ................................31

    A.    Bankruptcy Law Considerations ................................31
    B.    Risks Related to Recoveries under the Plan ................................36
    C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses ................................38

**XIII.    SOLICITATION AND VOTING PROCEDURES** ................................39

    A.    Holders of Claims Entitled to Vote on the Plan ................................40
    B.    Voting Record Date ................................40
    C.    Voting on the Plan ................................40
    D.    Ballots Not Counted ................................40

**XIV.    CONFIRMATION OF THE PLAN** ................................41

    A.    Requirements for Confirmation of the Plan ................................41
    B.    Best Interests of Creditors/Liquidation Analysis ................................41
    C.    Feasibility ................................41
    D.    Acceptance by Impaired Classes ................................42
    E.    Confirmation Without Acceptance by All Impaired Classes ................................42
    F.    Valuation of the Debtors ................................43

**XV.    CERTAIN SECURITIES LAW MATTERS** ................................43

    A.    Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers ................................43
    B.    Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers ................................44
    C.    Shares issuable pursuant to the Rights Offerings. ................................45

**XVI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**..................................................................................................................**45**

A.    Introduction............................................................................................................45
B.    Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors..................................................................................................47
C.    Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Class 3 Term Loan Secured Claims ........................................................................49
D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims.............53

**XVII.    RECOMMENDATION** ...........................................................................................**57**

**EXHIBITS**

EXHIBIT A     Plan of Reorganization

EXHIBIT B     Restructuring Support Agreement

EXHIBIT C     Corporate Structure Chart

EXHIBIT D     Disclosure Statement Order

EXHIBIT E     Financial Projections

EXHIBIT F     Valuation Analysis

EXHIBIT G     Liquidation Analysis

## I.    INTRODUCTION

The Gymboree Corporation ("Gymboree") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to Holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Reorganization of The Gymboree Corporation and Its Debtor Affiliates* (the "Plan"), dated June 16, 2017.[2]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Gymboree and each of its affiliated Debtors.

THE DEBTORS AND THE PARTIES TO THE RESTRUCTURING SUPPORT AGREEMENT (COLLECTIVELY, THE "PROPONENTS") BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS AND THE OTHER PROPONENTS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.

## II.    PRELIMINARY STATEMENT

Amidst the challenges facing many in the retail industry, the Debtors commence these Chapter 11 Cases with a comprehensive pre-negotiated restructuring in hand, together with key creditor support.  After more than four months of diligence and arms' length negotiations with certain secured term loan lenders (the "Consenting Term Loan Lenders"), the Debtors have reached agreement with approximately 66%[3] of lenders holding Gymboree's $788.8 million secured term loan to fund and support an expedited restructuring that will ensure a viable enterprise and maximize stakeholder recoveries.  The key terms of the prenegotiated restructuring contemplate a reduction of approximately $1 billion in indebtedness, an infusion of up to $115 million in new money (through both a term loan debtor-in-possession financing facility and two fully backstopped rights offerings), and a rationalization of the Debtors' retail footprint.  As contemplated in the Restructuring Support Agreement, dated as of June 11, 2017 (a copy of which is attached hereto as **Exhibit A**), the Debtors intend to move swiftly through these cases and obtain confirmation of a chapter 11 plan by September 24, 2017.

Gymboree was founded in San Francisco, California in 1976 as the first program to promote child growth and learning through playtime with parents.  Following its inception, Gymboree specialized in creating activities to help develop the cognitive, physical, and social skills of children as they play.  In 1986, Gymboree launched its first retail store in California to provide children's apparel to complement Gymboree's existing development programs. Over the course of the next three decades, Gymboree expanded its domestic and international presence to approximately 1,300 specialty retail stores operating under three brands:  Gymboree; Janie & Jack (a higher-end offering launched in 2002); and Crazy 8 (a value-oriented line launched in 2007).  Gymboree's product and price diversification allowed it to maximize market exposure and create consumer loyalty in several different consumer segments.

Unfortunately, the Debtors, like many other apparel and retail companies, have recently fallen victim to adverse macro-trends, including the general shift away from brick-and-mortar stores to online retail channels.  More specifically, retail companies like Gymboree, with a substantial brick-and-mortar presence, bear higher expenses than web-based retailers and are heavily dependent on store traffic, which has decreased significantly as consumers increasingly shop online rather than in malls or shopping centers.  In addition to competing against online retailers, the Debtors have struggled against other established brick-and-mortar retailers, such as Children's Place and the Gap, who have less leveraged capital structures.  With less debt to service, these competitors are able to offer lower prices than the Debtors and still bear the high operating expenses associated with brick-and-mortar retail.

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

[3]    Exclusive of the $20 million Li & Fung Term Loan, as described and defined below.

These developments, compounded with an underdeveloped online presence and wholesale platform, have adversely impacted the Debtors' sales and operations, with EBITDA declining by 24% over the last year, from approximately $94 million in 2015 to approximately $71 million in 2016.  These declines directly—and negatively—impacted liquidity.  Moreover, the Debtors were facing looming debt maturities, beginning in December 2017.

To protect the inherent value in its businesses and to address the existing macro-economic challenges, Gymboree has been proactive in developing strategies to maintain its market position and improve performance in the challenging retail climate.  In particular, Gymboree is implementing real estate rationalization measures and other operational efficiency initiatives and developing its wholesale business and online sales presence.

And unlike many retailers with challenged business models that have been unable to continue operations as a going concern, Gymboree has negotiated a comprehensive reorganization to preserve its existing and highly relevant operations, aided by a deeply-loyal customer base.  The Plan provides the Debtors with the framework for a deleveraging transaction that will allow the Debtors to emerge as a stronger, better capitalized business positioned to thrive for years to come.

## III.    OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce long-term debt and annual interest payments and preserve the Debtors' existing liquidity, resulting in a stronger, delevered balance sheet.  Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion.  The key terms of the Plan are as follows:

### A.    Purpose and Effect of the Plan

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11 of the Bankruptcy Code, a debtor may reorganize its business for the benefit of its stakeholders.  The consummation of a plan of reorganization is the principal objective of a chapter 11 case.  A plan of reorganization sets forth how a debtor will treat claims and equity interests.

A bankruptcy court's confirmation of a plan of reorganization binds the debtor, any entity or person acquiring property under the plan, any creditor of or equity security holder in a debtor, and any other entities and persons to the extent ordered by the bankruptcy court pursuant to the terms of the confirmed plan, whether or not such entity or person is impaired pursuant to the plan, has voted to accept the plan, or receives or retains any property under the plan.

Among other things (subject to certain limited exceptions and except as otherwise provided in the Plan or the Confirmation Order), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and interests of pre-bankruptcy equity security holders and substitute the obligations set forth in the Plan for those pre-bankruptcy Claims and Interests.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan does not contemplate the substantive consolidation of the Debtors' estates.  Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in these Chapter 11 Cases.  Holders of Allowed Claims or Interests against each of the Debtors will receive the same recovery provided to other Holders of Allowed Claims or Interests in the applicable Class and will be entitled to their share of assets available for distribution to such Class.

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to achieve the goals of its long-range business plan, make the distributions contemplated under the Plan and pay certain continuing obligations in the ordinary course of the Reorganized Debtors' business.  The Reorganized Debtors' financial projections are set forth on Exhibit E.  Although the Debtors' believe the projections are reasonable and appropriate, they include a number of assumptions and are subject to a number of risk factors and to significant uncertainty.  Actual results may differ from the projections, and the differences may be material.

### B.    Substantial Debt-for-Equity Exchange

As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate principal amount of approximately $1.1 billion, consisting primarily of approximately (a) $81.0 million under the ABL Revolving Credit Facility, (b) $47.5 million outstanding under the ABL Term Loan Facility, (c) $788.8 million outstanding under the Term Loan Credit Agreement, and (d) $171.0 million in Unsecured Notes.

If the Plan is confirmed, Gymboree will emerge from these Chapter 11 Cases with approximately $800 million less funded debt. Gymboree's pro forma exit capital structure will consist of (a) a $225 million Exit Revolving Facility, (b) a $48.5 million Exit ABL Term Loan Replacement Facility, (c) a $35 million Exit Term Loan Facility, and (d) the New Gymboree Common Shares.

Specifically, the Plan contemplates the following restructuring transactions:

- The Debtors' Prepetition ABL Facility has been rolled up into the DIP ABL Facility, a $273.5 million asset-based lending facility consisting of an up to $225 million DIP Revolving Loan and an up to $48.5 million DIP Term Loan.  On the Effective Date, the DIP ABL Revolver Lenders will either be (a) indefeasibly repaid in full in cash or (b) if a DIP ABL Revolver Lender consents, such lender's outstanding DIP ABL Revolving Loan Claims and commitments under the DIP ABL Facility will convert into commitments under a replacement asset-based revolving loan facility.  Similarly, on the Effective Date, the DIP ABL Term Loan Lenders will either be (a) indefeasibly repaid in full in cash or (b) if a DIP ABL Term Loan Lender consents, such lender's outstanding DIP ABL Term Loan Claims and commitments under the DIP ABL Facility will convert into commitments under a replacement asset-based term loan facility.

- Certain of the Debtors' Term Loan Lenders have provided the Debtors with a DIP Term Loan Facility of up to $105 million to finance these Chapter 11 Cases, including up to $35 million of new money and $70 million of rolled up Term Loans.  On the Effective Date, the rolled up Term Loans shall convert into New Gymboree Common Shares equal to 41.0% of the New Gymboree Common Shares outstanding on the Effective Date, subject to dilution by the Management Incentive Plan and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion (the "Roll-Up DIP Conversion Shares") and the new money loans shall convert into an exit term loan facility provided by the DIP Term Loan Lenders.

- The Term Loan Lenders (on account of their Term Loan Secured Claims) will receive their Pro Rata share of 100 percent of the New Gymboree Common Shares, reduced by:  (a) the Rights Offerings Shares; (b) the Roll-Up DIP Conversion Shares; (c); the Backstop Commitment Premium Shares; and (d) any DIP Surplus Conversion Shares (if any) (the remaining shares, the "Term Loan Common Shares").

- Holders of Critical Trade Claims necessary to the business plan of the Reorganized Debtors will be paid in full in Cash.

- Holders of General Unsecured Claims will not be entitled to any recovery on account of such claims.

- All Interests in Gymboree will be extinguished.

### C.    Rights Offerings

On June 11, 2017, the Debtors and the Backstop Parties entered into the Backstop Commitment Agreement, pursuant to which the Backstop Parties agreed to backstop each of the rights offerings (the "Rights Offerings").  On June 16, 2017, the Debtors filed a motion to assume the Backstop Commitment Agreement.  Under the Backstop Commitment Agreement and the Plan, the Debtors shall commence each of the Rights Offerings to raise up to $80 million in new money investments (the "Maximum Rights Offerings Amount").  In accordance with the Backstop Commitment Agreement and the Plan, the Maximum Rights Offerings Amount shall be reduced on or about the 14th day before the Confirmation Hearing to an amount necessary (rounded to the nearest half million) for the Reorganized Debtors to maintain approximately (but no less than) $50,000,000 at month end of projected

liquidity for the 12-month period following the Effective Date, assuming for purposes of such calculation that the New Money DIP Loans are fully drawn, in accordance with the Backstop Commitment Agreement and the Restructuring Support Agreement (the "Adjusted Rights Offerings Amount").  At the Maximum Rights Offerings Amount, the New Common Gymboree Shares purchased pursuant to the Rights Offerings will represent 46.9% of the New Gymboree Common Shares outstanding as of the Effective Date, subject to a downward ratable adjustment to account for the difference (if any) between the Maximum Rights Offerings Amount and the Adjusted Rights Offerings Amount, subject to dilution by the Management Incentive Plan and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion.

Through the Rights Offerings, each holder (an "Eligible Holder") of an Allowed Term Loan Secured Claim (an "Eligible Claim") shall have the opportunity, subject to the terms and conditions set forth in the Plan and the Rights Offerings Procedures, to purchase the Rights Offerings Shares; provided, however, that in connection with the 4(a)(2) Rights Offering, such Eligible Holders must that have also timely and validly completed and returned a properly completed Institutional Accredited Investor Questionnaire certifying that it is an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3) and (7) promulgated under the Securities Act) or a qualified institutional buyer (as defined in Rule 144A promulgated under the Securities Act) and will be required to agree that it is acquiring the New Gymboree Common Shares for its own account for investment purposes only and not with a view to resale or distribution.  Each of the Rights Offerings will be fully backstopped by certain Term Loan Lenders in accordance with the Backstop Commitment Agreement (collectively, the "Backstop Parties").  Subscription Rights under each of the Rights Offerings are available to all holders of Allowed Term Loan Secured Claims on a Pro Rata basis basis pursuant to Article III.B of the Plan; provided, that all DIP Term Loan Lenders are required to exercise the Subscription Rights allocated to them.

In connection with the Plan, after obtaining approval of (i) the Section 1145 Rights Offering Procedures by the Bankruptcy Court, the Debtors shall launch a rights offering under Section 1145 to Eligible Holders, pursuant to which Eligible Holders will be entitled to receive their Pro Rata share of Subscription Rights to acquire New Gymboree Common Shares in accordance with the 1145 Rights Offering Procedures and (ii) the 4(a)(2) Rights Offering Procedures by the Bankruptcy Court, the Debtors shall launch a rights offering under Section 4(a)(2) of the Securities Act to Eligible Holders, pursuant to which Eligible Holders will be entitled to receive their Pro Rata share of Subscription Rights to acquire New Gymboree Common Shares not otherwise available for issuance under Section 1145 of the Bankruptcy Code, in each case, issued by the Debtors, on the terms and conditions set forth in the Plan, Restructuring Support Agreement, and Backstop Commitment Agreement, at a purchase price equal to 100% of the principal amount of such New Gymboree Common Shares so acquired, at a 35% discount to a stipulated equity value of $262.5 million based on a total enterprise value of $430 million; provided, that in the event of a DIP Surplus Conversion, the Share Ratio shall be adjusted to use the preceding stipulated equity value, increased by the amount of the DIP Surplus Amount. Under the terms of the Plan and the Backstop Commitment Agreement, as consideration for the Backstop Parties agreeing to purchase the Rights Offering Shares, each Backstop Party will receive, on account of its backstop commitment, its Pro Rata share of a premium equal to 5% of the Maximum Rights Offerings Amount (the "Backstop Commitment Premium"), which shall be satisfied by 2.3% of the New Gymboree Common Shares, subject to an upward adjustment to account for any dilution that would otherwise result from the issuance of any DIP Surplus Conversion Shares (the "Backstop Commitment Premium Shares").

The 1145 Rights Offering Procedures and the 4(a)(2) Rights Offering Procedures will be authorized pursuant to the Disclosure Statement Order, a form of which is attached as **Exhibit D** to this Disclosure Statement.

### D.    New Gymboree Common Shares.

All existing Interests in Gymboree will be cancelled as of the Effective Date and Reorganized Gymboree will issue the New Gymboree Common Shares.

Reorganized Gymboree shall be authorized without the need for any further corporate action, and without any further action by the holders of Claims or Interests or any other Person, to issue or reserve for issuance a sufficient number of New Gymboree Common Shares at least equal to the number of New Gymboree Common Shares contemplated by the Plan, including the Term Loan Common Shares, the Rights Offerings Shares, the Backstop Commitment Premium Shares, the Roll-Up Dip Conversion Shares, the DIP Surplus Shares (if any), and

options or other equity awards issued pursuant to the Management Incentive Plan (or New Gymboree Common Shares issued upon the exercise or vesting thereof). Reorganized Gymboree will also enter into a Registration Rights Agreement pursuant to which such Holders will have certain registration rights.

On the Effective Date, the New Organizational Documents shall provide for a certain number of authorized New Gymboree Common Shares at least equal to the number of such New Gymboree Common Shares contemplated by the Plan. All of the New Gymboree Common Shares issued or reserved for issuance pursuant to the Plan shall be duly authorized and, when issued, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to in Article VI of the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### E.    Management Incentive Plan.

The percentage of New Gymboree Common Shares to be set aside for the Management Incentive Plan shall be up to ten percent of the New Gymboree Common Shares contemplated by the Plan, on a fully diluted basis, to be issued to management of the Reorganized Debtors after the Effective Date at the sole discretion of the Reorganized Gymboree Board and on terms to be determined by the Reorganized Gymboree Board. The Confirmation Order shall authorize the Reorganized Gymboree Board to adopt the Management Incentive Plan. The issuance of New Gymboree Common Shares under the Management Incentive Plan, if any, would dilute all of the New Gymboree Common Shares, including the Rights Offerings Shares and the Term Loan Common Shares (as applicable), equally.

### F.    Exit Facilities.

On the Effective Date, subject to the terms of the Plan, the Reorganized Debtors shall enter into the Exit ABL Revolving Facility, the Exit ABL Term Loan Replacement Facility, and the Exit Term Loan Facility. The Reorganized Debtors shall use the Cash proceeds provided under the Exit Facilities to fund ongoing operations and distributions under the Plan, and satisfy certain other Cash obligations under the Plan. The Exit Facilities shall be on terms set forth in the Exit Facility Documents.

### G.    Li & Fung Agency Agreement.

On the Effective Date the Debtors shall assume the Li & Fung Agency Agreement and, thereupon, the Li & Fung Letter of Credit and the Li & Fung Term Loan Claim shall be deemed assigned to Reorganized Gymboree and cancelled without further action or consideration to Li & Fung.

### H.    Releases.

The Plan contains certain releases (as described more fully in Article IV.L hereof), including mutual releases between  (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Sponsor; (d) the Backstop Parties; (e) the Term Loan Agent; (f) the DIP Term Loan Lenders; (g) the DIP Term Loan Agent; (h) the ABL Agents; (i) the ABL Lenders; (j) the DIP ABL Lenders; (k) the DIP ABL Agent; (l) with respect to each of the foregoing entities in clauses (a) through (k), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (m) with respect to each of the foregoing Entities in clauses (a) through (l), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (l), each solely in their capacity as such).

The Plan also provides that all Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not object to the releases will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things: (a) the releases, exculpations, and injunctions are specific; (b) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) the releases are a condition to the global settlement and a necessary part of the Plan; and (d) each of the Released Parties and Exculpated Parties has afforded value to the Debtors and aided in the reorganization process, which facilitated the Debtors' ability to propose and pursue confirmation of a value-maximizing restructuring. Further, the releases, exculpations, and injunctions have the support of the vast majority of the Holders of the Debtors' Term Loan Secured Claims and the Sponsor. The Debtors believe that each of the Released Parties and Exculpated Parties has played an integral role in formulating or enabling the Debtors to propose the Plan and has expended significant time and resources analyzing and negotiating the issues presented by the Debtors' prepetition capital structure. The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.[4]

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan of reorganization is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest Holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold. Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below.

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |

---

[4]    The foregoing paragraph is subject to Article X.E hereof.

| Class | Claim/Interest | Status | Voting Rights |
|-------|----------------|--------|---------------|
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | Critical Trade Claims | Unimpaired | Presumed to Accept |
| 5 | General Unsecured Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Claims | Unimpaired /Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Gymboree | Impaired | Deemed to Reject |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[5]**

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| 1 | Other Secured Claims | In full and final satisfaction of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder thereof will receive: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired. | $26.0 | 100.0% |

---

[5]     The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes.  For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

| 2 | Other Priority Claims | In full and final satisfaction of each Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, , each Holder thereof will receive payment in full in Cash or other treatment rendering such Claim Unimpaired. | $0 | 100.0% |
|---|---|---|---|---|
| 3 | Term Loan Secured Claims | In full and final satisfaction of each Allowed Term Loan Secured Claim, except to the extent that a Holder of an Allowed Term Loan Secured Claim agrees to a less favorable treatment, each Holder thereof will receive its Pro Rata share of: (a) the Term Loan Common Shares; and (b) the Subscription Rights; *provided*, that the Li & Fung Term Loan Claim shall not be entitled to any recovery under the Plan so long as the Li & Fung Agreement has been assumed in connection with the Plan. | $699.0 million plus accrued but unpaid interest prepetition interest | [●]% |
| 4 | Critical Trade Claims | In full and final satisfaction of each Allowed Critical Trade Claim, except to the extent that a Holder of an Allowed Critical Trade Claim agrees to a less favorable treatment, each Holder thereof will receive Cash in an amount equal to such Allowed Critical Trade Claim (only to the extent not already satisfied by payments made pursuant to an order of the Bankruptcy Court) on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such allowed Critical Trade Claim. | $0[6] | 100.0% |
| 5 | General Unsecured Claims | In full and final satisfaction of each Allowed General Unsecured Claim, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each Holder thereof will neither receive nor retain any consideration under the Plan.   On the Effective Date, each General Unsecured Claim shall be Disallowed in full, released and discharged. | $35.6 million – $48.8 million | 0% |
| 6 | Intercompany Claims | In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Required Consenting Creditors; *provided*, that no distributions shall be made on account of any such Intercompany Claims. | N/A | N/A |

---

[6]    The Debtors anticipate satisfying all Claims that would constitute Critical Trade Claims in full in Cash during the pendency of the Chapter 11 Cases pursuant to the First Day Orders.  To the extent that any such Claims are not satisfied in full in Cash during the pendency of the Chapter 11 Cases, the Debtors will satisfy such Claims as Critical Trade Claims.

| 7 | Intercompany Interests | In full and final satisfaction of each Allowed Intercompany Interest, each Intercompany Interest shall be Reinstated solely to maintain the Debtors' corporate structure. | N/A | N/A |
| 8 | Interests in Gymboree | In full and final satisfaction of each Allowed Interest in Gymboree, each Allowed Interest in Gymboree shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Gymboree shall be entitled to any recovery or distribution under the Plan on account of such Interests. | N/A | 0% |

### E.  What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim?

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

### (i)  Administrative Claims

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or are payable on account of the Backstop Commitment Premium, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of:  (a)  the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

Holders of Administrative Claims that are required to File and serve a request for such payment of such Administrative Claims that do not file and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Reorganized Debtors or their property, and such Administrative Claims shall be deemed discharged as of the Effective Date without the need for any objection from the Reorganized Debtors or any action by the Bankruptcy Court.

(ii)    **DIP Claims**

DIP Claims will be satisfied as set forth in Article II.D of the Plan, as summarized herein.  As of the Plan Effective Date, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, and expenses.

(a)    **Roll-Up DIP Claims**

Except to the extent that a Holder of an Allowed Roll-Up DIP Claim agrees to a less favorable treatment, in full and final satisfaction of the Allowed Roll-Up DIP Claims, each Holder of an Allowed Roll-Up DIP Claim will receive its Pro Rata share of the Roll-Up DIP Conversion Shares.  Upon the satisfaction of the Allowed DIP Roll-Up Claims in accordance with the preceding sentence, all Liens and security interests granted to secure the Allowed Roll-Up DIP Claim shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(b)    **New Money Dip Loan Claims**

Except to the extent that a Holder of an Allowed New Money DIP Loan Claim agrees to a less favorable treatment, on the Effective Date, in full satisfaction of the Allowed New Money DIP Loan Claims, each Holder of an Allowed New Money DIP Loan Claim will either: be repaid in full in Cash or receive its Pro Rata share of the Exit Term Loan Facility (the "Base Treatment"); provided, that if (a) on the first business day after entry of the Confirmation Order the most recently delivered Budget projects that any amount in the DIP Funding Account (as defined in the DIP Term Loan Credit Agreement) will remain undrawn immediately prior to the occurrence of the then-projected Effective Date (the "DIP Surplus Amount") and (b) the Required Consenting Creditors elect to receive DIP Surplus Conversion Shares (such election to be made no later than 5 business days after entry of the Confirmation Order) (a "DIP Surplus Conversion"), then on the Effective Date, each Holder of an Allowed New Money DIP Loan Claim will receive its Pro Rata share of the DIP Surplus Conversion Shares, and the amount of New Money DIP Loan Claims entitled to the Base Treatment will be reduced ratably among the Holders by the DIP Surplus Amount; provided, further, that to the extent that after an election as described in clause (b) of this paragraph, a subsequent Budget indicates that the DIP Surplus Amount on the then-projected Effective Date is different than that indicated in the most recent Budget prior to such election, then the amount of DIP Surplus Conversion shares may be adjusted accordingly as determined by the Debtors and the Required Consenting Creditors; provided, further, that in lieu of receiving a Cash repayment in satisfaction of any Allowed New Money DIP Loan Claims subject to the Base Treatment, each Holder thereof may instead elect not to receive such Cash repayment and apply such amount towards any funding obligations under the Backstop Commitment Agreement or in connection with the Rights Offerings, in each case, in the manner set forth in the DIP Term Loan Credit Agreement and upon notice to the Debtors and the DIP Term Loan Agent, and prior to the Subscription Escrow Funding Date.

Notwithstanding, the foregoing, to the extent there is a DIP Surplus Amount and the Required Consenting Creditors do not elect to receive DIP Surplus Conversion Shares, then on the date that is one Business Day prior to the election described in the paragraph above, the Debtors shall be permitted to draw an amount of New Money DIP Loans equal to the portion of the DIP Surplus Amount not subject to the election, to the extent necessary to permit the Debtors to meet the Projected Liquidity Requirement (as defined in the Backstop Commitment Agreement) on the Effective Date (after taking into account availability under the Exit Credit Facilities upon the occurrence of the Effective Date).

(c)    **DIP ABL Revolving Loan Claims**

Except to the extent that a Holder of an Allowed DIP ABL Revolving Loan Claim agrees to a less favorable treatment, in full satisfaction of each Allowed DIP ABL Revolving Loan Claim, each Holder thereof will either be:  (a) indefeasibly repaid in full in Cash on the Effective Date or (b) with the consent of such Holder, receive its Pro Rata share of the Exit ABL Revolving Facility.  Upon the payment or satisfaction of the Allowed DIP ABL Revolving Loan Claims and the Allowed DIP ABL Term Loan Claims in accordance with Article II.D of the Plan, all Liens and security interests granted to secure the Allowed DIP ABL Revolving Loan Claims and the

Allowed DIP ABL Term Loan Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity. As used in this paragraph "repaid in full in Cash" shall mean the indefeasible payment in full in Cash of all DIP ABL Obligations, the cancellation, backing, or Cash collateralization of letters of credit under the DIP Facility in accordance with the terms of the DIP ABL Documents, and the termination of the DIP ABL Agents' and DIP ABL Lenders' obligation to extend credit under the DIP ABL Facility.

### (d)  DIP ABL Term Loan Claims

Except to the extent that a Holder of an Allowed DIP ABL Term Loan Claim agrees to a less favorable treatment, in full satisfaction of each Allowed DIP ABL Term Loan Claim, each Holder thereof will either be:  (a) indefeasibly repaid in full in Cash on the Effective Date or (b) with the consent of such Holder, receive its Pro Rata share of the Exit ABL Term Loan Replacement Facility.  As used in this paragraph "repaid in full in Cash" shall mean the indefeasible payment in full in Cash of all DIP ABL Obligations, the cancellation, backing, or Cash collateralization of letters of credit under the DIP Facility in accordance with the terms of the DIP ABL Documents, and the termination of the DIP ABL Agents' and DIP ABL Lenders' obligation to extend credit under the DIP ABL Facility.

### (iii)  Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein.  Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of its Claim, payments in Cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### F.  Are any regulatory approvals required to consummate the Plan?

There are no known regulatory approvals that are required to consummate the Plan.  However, to the extent such any such regulatory approvals or other authorizations, consents, rulings, or documents are necessary to implement and effectuate the Plan, it is a condition precedent to the Effective Date that they be obtained.

### G.  What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative transaction may provide Holders of Claims with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* "*Confirmation of the Plan - Best Interests of Creditors/Liquidation Analysis*," which begins on page 41 of this Disclosure Statement, and the Liquidation Analysis attached as **Exhibit G**.

### H.  If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* "*Confirmation of the Plan*," which begins on page 41 of this Disclosure Statement, for a discussion of the conditions precedent to consummation of the Plan.

**I.**        **What are the sources of Cash and other consideration required to fund the Plan?**

The Plan and distributions thereunder will be funded by the following sources of Cash and consideration: (a) Cash on hand, including proceeds of the DIP Term Loan Facility and the DIP ABL Facility; (b) the Rights Offerings; (c) the issuance and distribution of New Gymboree Common Shares; and (d) the proceeds from the Exit Facilities, as applicable.

**J.**        **Are there risks to owning the New Gymboree Common Shares upon emergence from chapter 11?**

Yes. *See* "Risk Factors," which begins on page 31 of this Disclosure Statement.

**K.**        **Will the final amount of Allowed General Unsecured Claims affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately $35.6 million to $48.8 million.  No distributions under the Plan shall be made on account of Allowed General Unsecured Claims. Although the Debtors' estimate of General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

Moreover, the Debtors may in the future reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages claims not accounted for in this estimate.  Further, the Debtors, the Consenting Creditors, or the official committee of unsecured creditors appointed in the Chapter 11 Cases (if any) may object to certain proofs of claim, and any such objections could ultimately cause the total amount of General Unsecured Claims to change.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the the total amount of Allowed General Unsecured Claims could change as well.

Finally, the Debtors or any official committees appointed in the Chapter 11 Cases may object to certain proofs of claim, and any such objections ultimately could change the total amount of Allowed General Unsecured Claims, and such changes could be Material.

**L.**        **Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, Article VIII of the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties.  The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors, the Sponsor, and the Consenting Creditors in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest.  Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

All Holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan <u>and</u> do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.  The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Fourth Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### 1. *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors. The ABL Administrative Agent and the Term Loan Agent shall execute and deliver all documents reasonably requested by the Reorganized Debtors the agent(s) under the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.**

### 2. *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:**

    **(a)  the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents;**

    **(b)  any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;**

    **(c)  the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New Gymboree Common Shares) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or**

    **(d)  the business or contractual arrangements between any Debtor and any Released Party (including the ABL Credit Agreement and the Prepetition ABL Facility (as defined in the DIP Orders)), and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.**

**Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan Release by Holders of Claims or Interests.**

13

### 3. *Release by Holders of Claims or Interests*

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

(a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents;

(b) any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

(c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d) the business or contractual arrangements between any Debtor and any Released Party (including the ABL Credit Agreement and the Prepetition ABL Facility (as defined in the DIP Orders)), and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

### 4. *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law,

14

rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5.  *Injunction*

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

### M.    What impact does the Claims Bar Date have on my Claim?

The Bankruptcy Court has established [●], 2017, at 5:00 p.m., prevailing Eastern Time, as the Claims bar date (the "Bar Date") in the Chapter 11 Cases.  The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, must file proofs of claim on or before the Bar Date: (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("Schedules") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim Allowed in a different classification or amount from that identified in the Schedules; (3) any entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim Allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the Bar Date: (1) such person or entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date.

### N.    What is the deadline to vote on the Plan?

The Voting Deadline is August 24, 2017, at 5:00 p.m. (prevailing Eastern Time).

### O.    How do I vote for or against the Plan?

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to Holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by August 24, 2017, at 5:00 p.m. (prevailing Eastern Time) at the following address:  Gymboree Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 3rd Floor, New York, NY 10022 (or returned in accordance with the instructions otherwise set forth on your ballot).  *See* Article XIII of this Disclosure Statement, which begins on page 40 of this Disclosure Statement.

### P.    Why is the Bankruptcy Court holding a Confirmation Hearing?

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

### Q.    When is the Confirmation Hearing set to occur?

The Bankruptcy Court has scheduled the Confirmation Hearing for September 7, 2017, at 11:00 a.m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than August 24, 2017, at 5:00 (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national editions of the *Wall Street Journal* and *USA Today* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

### R.    What is the purpose of the Confirmation Hearing?

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

### S.    What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**T.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.   The Reorganized Gymboree Board will be composed of seven members as of the Effective Date as follows:  (a) the CEO of The Gymboree Corporation immediately prior to the occurrence of the Plan Effective Date, who shall be CEO of the Reorganized Gymboree; (b) Ron Beegle of Carriage House Capital Advisors, LLC; (c) one member selected by Brigade Capital Management; (d) one member selected by OppenheimerFunds, Inc.; (e) one member selected by Searchlight Capital Partners; and (f) two members selected by the Required Consenting Creditors; *provided*, that if at any time prior to the Plan Effective Date any entity specified in (c), (d), or (e) does not have aggregate holdings (together with its Affiliates that own, manage, direct or have investment authority with respect to the Debtors' indebtedness) that would entitle such entity to a pro forma allocation of at least 9.5% of the New Gymboree Common Shares (prior to dilution by the Management Incentive Plan) outstanding on a pro forma basis as of the Effective Date, then such entity shall not be entitled to select a director and such director will instead be selected by the Required Consenting Creditors.  Provisions regarding the removal, appointment, and replacement of members of the subsequent Reorganized Gymboree shall be determined by the Required Consenting Creditors.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the Reorganized Gymboree Board, as well as those Persons that will serve as an officer of Reorganized Gymboree.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the Reorganized Gymboree Board will be disclosed in the New Organizational Documents.

As of the Effective Date, the New Gymboree Common Shares shall be subject to a stockholders' agreement, substantially in the form included in the Plan Supplement, containing terms and conditions that are reasonably acceptable to the Required Consenting Creditors, and each holder of the New Gymboree Common Shares will be bound thereby without the need for execution by any party thereto other than Reorganized Gymboree.

**U.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Notice and Claims Agent, Prime Clerk LLC:

> *By regular mail at:*
> **Gymboree Ballot Processing**
> **c/o Prime Clerk LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**
>
> *By hand delivery or overnight mail at:*
> **Gymboree Ballot Processing**
> **c/o Prime Clerk LLC**
> **830 Third Avenue, 3rd Floor**
> **New York, NY 10022**
>
> *By electronic mail at:*
> **gymboreeballots@primeclerk.com**
>
> *By telephone at:*
> **(844)-822-9233 (U.S. and Canada)**
> **(646)-486-7945 (International)**

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' notice, claims, and solicitation agent at the address above or by downloading the exhibits and documents from the website of the Debtors' notice, claims, and solicitation agent at https://cases.primeclerk.com/gymboree (free of charge) or the Bankruptcy Court's website at www.vaeb.uscourts.gov (for a fee).

### V.      Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging, is in the best interest of all Holders of Claims and Interests, and that other alternatives fail to realize or recognize the value inherent under the Plan.

### W.      Who Supports the Plan?

The Plan is supported by the Debtors, the Sponsor, and the Consenting Creditors, as set forth in the Restructuring Support Agreement.

## V.      THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.      Restructuring Support Agreement

On June 11, 2017, the Debtors, the Sponsor, and certain of the Term Loan Lenders holding approximately 66% of the outstanding principal amount under the Term Loan Credit Agreement entered into the Restructuring Support Agreement.  Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the prearranged restructuring contemplated thereby, including the Plan.  The restructuring transactions contemplated by the Plan will significantly reduce the Debtors' funded-debt obligations and annual interest payments and result in a stronger balance sheet for the Debtors.

The Plan represents a significant step in the Debtors' months-long restructuring process.  The Restructuring Support Agreement together with the DIP Facilities, the two Rights Offerings, and to the extent consummated, the Exit Facilities, contemplated thereby, will allow the Debtors to proceed expeditiously through chapter 11 to a successful emergence.  The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Debtors to conduct competitive operations going forward.

### B.      The Plan

As discussed in Article III herein, the Plan contemplates a debt-for-equity conversion effectuated through a chapter 11 plan under the following key terms:

#### 1.      Equity Interests and Other Securities

The issuance of Securities under the Plan, including the New Gymboree Common Shares and options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized without the need for any further corporate action and without any action by the Holders of Claims or Interests.

All of the New Gymboree Common Shares issued pursuant to the Plan, including any options for the purchase thereof and equity awards associated therewith, shall be duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors, as applicable, validly issued, fully paid, and non-assessable.  Each distribution and issuance of the New Gymboree Common Shares under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 2.  *Exit Facilities*

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities.  Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the satisfaction of the DIP Claims in accordance with Article II.D of the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 3.  *Use of Proceeds*

Proceeds from the DIP Term Loan Facility, the DIP ABL Facility, both of the Rights Offerings, and Exit Facilities, as applicable, will be used, among other things, to fund certain distributions under the Plan, the Debtors' operations and administration of the Chapter 11 Cases, as well as for general corporate purposes.

### 4.  *Recovery to Holders of Term Loan Secured Claims*

In full and final satisfaction of each Allowed Term Loan Secured Claim, each Holder thereof will receive its Pro Rata share of: (a) the Term Loan Common Shares; and (b) the Subscription Rights; *provided*, that the Li & Fung Term Loan Claim shall not be entitled to any recovery under the Plan so long as the Li & Fung Agreement has been assumed in connection with the Plan.

### 5.  *Recovery to Holders of Critical Trade Claims*

Except to the extent that a Holder of an Allowed Critical Trade Claim agrees to a less favorable treatment, in full and final satisfaction of each Allowed Critical Trade Claim, each Holder thereof will receive Cash in an amount equal to such Allowed Critical Trade Claim (only to the extent not already satisfied by payments made pursuant to an order of the Bankruptcy Court) on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed Critical Trade Claim.

### 6.  *Recovery to Holders of General Unsecured Claims*

Holders of General Unsecured Claims shall neither receive nor retain any consideration under the Plan.  On the Effective Date, each General Unsecured Claim shall be Disallowed in full, released and discharged.

### 7.  *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the

provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan.  The Plan shall  be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

***Please refer to Article XV herein for a more detailed discussion of securities law considerations related to the securities to be issued pursuant to the Rights Offerings.***

## VI.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

### A.    Certain Key Terms Used in this Disclosure Statement

The following are some of the defined terms used in this Disclosure Statement.  This is not an exhaustive list of defined terms in the Plan or this Disclosure Statement, but is provided for ease of reference only.  Please refer to the Plan for additional defined terms.

"1145 Rights Offering" means the rights offering for New Gymboree Common Shares to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 1145 of the Bankruptcy Code, in accordance with the 1145 Rights Offering Procedures.

"1145 Rights Offering Procedures" means the procedures set forth in Schedule 12 to the Disclosure Statement Order, as they may be amended or modified from time to time in a manner that is reasonably acceptable to the Debtors and the Requisite Commitment Parties.

"1145 Rights Offering Shares" means New Gymboree Common Shares issued pursuant to the 1145 Rights Offering.

"1145 Subscription Rights" means the rights to purchase New Gymboree Common Shares at the per share purchase price stated in the Backstop Commitment Agreement.

"4(a)(2) Rights Offering" means the rights offering for New Gymboree Common Shares to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act, in accordance with the 4(a)(2) Rights Offering Procedures.

"4(a)(2) Rights Offering Procedures" means the procedures set forth in Schedule 13 to the Disclosure Statement Order, as they may be amended or modified from time to time in a manner that is reasonably acceptable to the Debtors and the Requisite Commitment Parties.

"4(a)(2) Rights Offering Shares" means the New Gymboree Common Shares issued pursuant to the 4(a)(2) Rights Offering.

"4(a)(2) Subscription Rights" means the rights to purchase New Gymboree Common Shares at the per share purchase price stated in the Backstop Commitment Agreement.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Eastern District of Virginia.

"Bankruptcy Rules" means Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

"Chapter 11 Cases" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

"Claim" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

"Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

"Interests" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any claim against the Debtors subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

"Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms thereof, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement) to be Filed by the Debtors no later than eight days before the Voting Deadline, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors, including the following, as applicable: (a) New Organizational Documents; (b)  Exit Facility Credit Agreements; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) New Stockholders' Agreement; (g) Registration Rights Agreement; (h) a document listing the members of the New Boards and the officers of the Reorganized Debtors; and (i) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan.

"Rights Offerings" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering, each of which shall be conducted in accordance with the Backstop Commitment Agreement, the Restructuring Support Agreement, and the applicable Rights Offerings Procedures.

"Rights Offerings Procedures" means collectively the 1145 Rights Offering Procedures and the 4(a)(2) Rights Offering Procedures as approved by the Disclosure Statement Order.

"Rights Offerings Shares" means, collectively, the 1145 Rights Offering Shares and the 4(a)(2) Rights Offering Shares to be purchased by the Term Loan Lenders pursuant to the Rights Offerings.  For the avoidance of doubt, the term "Rights Offerings Shares" does not include the New Gymboree Common Shares issued on account of the Backstop Commitment Premium.

"Subscription Rights" means collectively the 1145 Subscription Rights and the 4(a)(2) Subscription Rights.

## B.    Additional Important Information

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to go effective will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including the section entitled "*Risk Factors*," and the Plan before submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan. The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement; however, the financial information contained in this Disclosure Statement or incorporated herein by reference has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

Upon Confirmation of the Plan, the securities described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder (the "Securities Act"), or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in (a) Section 1145 of the Bankruptcy Code or (b) Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder. Other securities may be issued pursuant to other applicable exemptions under the federal securities laws. All securities issued pursuant to the exemption from registration set forth in Section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. Each Eligible Offeree must be prepared to bear the economic risk of the investment in the New Gymboree Common Shares issued under Section 4(a)(2) of the Securities Act or Regulation D for an indefinite period of time, since the New Gymboree Common Shares cannot be transferred or resold unless (i) they are registered under the Securities Act and under any other applicable securities laws or (ii) pursuant to an exemption from such registration.

There is not and there may not be a public market for the New Gymboree Common Shares, and Gymboree does not intend to seek any listing of the New Gymboree Common Shares on any stock exchange or other trading market of any type whatsoever. Accordingly, there can be no assurance that an active trading market for the New Gymboree Common Shares will ever develop or, if such a market does develop, that it will be maintained.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. The Debtors consider all statements regarding anticipated or future matters, to be forward-looking statements. Forward-looking statements may include statements about the Debtors':

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- levels of indebtedness, liquidity, and compliance with debt covenants;

- financial strategy, budget, projections, and operating results;

- general economic and business conditions;

- counterparty credit risk;

- the outcome of pending and future litigation;

- uncertainty regarding the Debtors' future operating results; and

- plan, objections, and expectations.

Statements concerning these and other matters are not guarantees of the Reorganized Debtors' future performance.  There are risks, uncertainties, and other important factors that could cause the Reorganized Debtors' actual performance or achievements to be different from those they may project, and the Debtors undertake no obligation to update the projections made herein.  These risks, uncertainties, and factors may include the following: the Debtors' ability to confirm and consummate the Plan; the potential that the Debtors may need to pursue an alternative transaction if the Plan is not confirmed; the Debtors' ability to reduce their overall financial leverage; the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees; the risks associated with operating the Debtors' businesses during the Chapter 11 Cases; customer and vendor responses to the Chapter 11 Cases; the Debtors' inability to discharge or settle Claims during the Chapter 11 Cases; general economic, business, and market conditions; exposure to litigation; the Debtors' ability to implement cost reduction initiatives in a timely manner; the Debtors' ability to divest existing businesses; and adverse tax changes.

## VII.   THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.   The Debtors

Gymboree, along with its affiliated Debtors, is one of the largest children's apparel specialty retailers in North America, offering collections of high-quality apparel, and accessories for the 0 to 14 age group under the Gymboree, Janie and Jack, and Crazy 8 brands.  Headquartered in San Francisco, California, Gymboree operates approximately 1,300 retail stores in the United States, Canada, and Puerto Rico.  With dedicated in-house design and merchandising teams for each of its three brands, the Debtors maintain full control across brand offerings.  The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of merchandise to their brick-and-mortar locations.  Manufacturers generally manufacture and ship inventory and other goods to the Debtors "freight on board" ("FOB").  Under an FOB arrangement, the Debtors pay freight forwarders to transport merchandise and other goods from Asia to the United States.  Typically, the supply of retail inventory flows in accordance with the below graphic, with title transferring to the Debtors at the foreign port when merchandise and goods are loaded for shipment to the United States.

As of the Petition Date, the Debtors have approximately 12,000 full and part-time, with a significant number of seasonal employees traditionally hired during each holiday selling season.  None of Debtors' employees are represented by a labor union.  A corporate organization chart is attached to the Disclosure Statement as **Exhibit C**.

### B.   Prepetition Capital Structure

As of the Petition Date,[7] the Debtors reported approximately $1.1 billion in total funded debt.  As described in greater detail below, the Debtors' significant funded debt obligations include: (a) approximately $81.0 million in principal amount of obligations under the Debtors' ABL Revolver Facility; (b) approximately $47.5 million in principal amount of obligations under the Debtors' ABL Term Loan; (c) approximately $788.8 million in

---

[7]   These financial figures reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

principal amount of obligations under the Debtors' Term Loan Credit Agreement, including the Li & Fung Term Loan Claim; and (d) approximately $171.0 million of Unsecured Notes.

### 1.   ABL Credit Agreement

The Gymboree Corporation, as lead borrower, the other borrowers party thereto, the guarantors party thereto (the "ABL Guarantors"), the revolving lenders party thereto (the "ABL Revolving Lenders"), the term lenders party thereto (the "ABL Term Lenders" and, together with the ABL Revolving Lenders, the "ABL Lenders"), Bank of America, N.A., as administrative agent and collateral agent (in such capacities, the "ABL Administrative Agent"), and Pathlight Capital LLC, as ABL term loan agent (in such capacity, the "ABL Term Agent" and, together with the ABL Administrative Agent, the "ABL Agents"), are parties to that certain Amended and Restated Credit Agreement, dated as of March 30, 2012 (as amended, restated, supplemented, or otherwise modified from time to time, the "ABL Credit Agreement").[8]   The ABL Credit Agreement provides for a senior secured revolving credit facility, with a maximum availability of $225 million, and a senior secured term loan of $50 million, subject to a borrowing base.  As of the Petition Date, the aggregate borrowing base (i.e., the effective maximum availability) was approximately $172.2 million.  Each ABL Guarantor has guaranteed all obligations under the ABL Facility.  The obligations under the ABL Facility are secured, subject to certain exceptions, by a first priority lien on certain of the Debtors' assets, including, without limitation, accounts receivable, inventory, Cash and Cash equivalents and a second priority lien on the Debtors' capital stock and other personal property, including the Debtors' intellectual property and investment contracts. As of the Petition Date, approximately $81.0 million in borrowings and approximately $49.3 million of letters of credit was outstanding under the ABL Revolver Facility. Approximately $47.5 million was outstanding under the ABL Term Loan.  Upon entry of the interim DIP Order, all outstanding ABL Obligations were converted into DIP ABL Obligations.[9]

### 2.   Term Loan

On February 11, 2011, The Gymboree Corporation, as borrower, entered into that certain Amended and Restated Credit Agreement (as amended from time to time, the "Term Loan Credit Agreement"), with the other Debtor guarantors, Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent (the "Term Loan Agent"), and the lender parties thereto (the "Term Loan Lenders").  The Term Loan Facility matures in February 2018.  Term Loan Facility obligations are secured by a first priority lien on the Debtors' capital stock, intellectual property, and investment contracts and a second priority lien on all of the Debtors' other personal property, including accounts receivable, inventory, Cash and Cash equivalents.  As of the Petition Date, approximately $790 million in aggregate principal amount remained outstanding under the Term Loan.

### 3.   Unsecured Senior Notes

In connection with the Acquisition, Gymboree issued $400 million aggregate principal amount of 9.125% Unsecured Notes under the Indenture, dated November 23, 2010, with Gymboree as issuer, Deutsche Bank Trust Company Americas as indenture trustee, and certain of the Debtors as guarantors (the "Indenture").  As of the Petition Date, $171.0 million in aggregate principal amount of Unsecured Notes remains outstanding.

Since 2012, Gymboree has repurchased Unsecured Notes with an aggregate total principal amount of approximately $229 million for approximately $113.5 million in cash through privately negotiated transactions, open market transactions, and a cash tender offer.  As a result, Gymboree recorded gains of approximately $108.5 million on account of the extinguishment of debt, net of approximately $6.9 million in charges related to the write-off of deferred financing costs associated with such debt.

---

[8]   The ABL Guarantors under the ABL Revolver Facility are Gymboree's domestic subsidiaries and Giraffe Intermediate B. Inc.

[9]   The ABL Obligations remain subject to review pursuant to the DIP Order.  Until such time as the challenge period provided for in the DIP Order has expired, the Debtors will continue to have contingent indemnification obligations under the ABL Credit Agreement which, to the extent allowed under the Bankruptcy Code, they may be required to pay in full in Cash on the Effective Date.

The Unsecured Notes are due in December 2018 and require semiannual coupon payments on June 1 and December 1.  The Debtors did not pay the coupon payment due on June 1, 2017.

## VIII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These factors include the general downturn in the retail industry, which led to a decrease in sales and increased operating losses, and the marked shift away from brick-and-mortar retail to online channels.  These factors have made it increasingly difficult for Debtors to maintain their cost structure as sales have remained slightly depressed, and impaired the Debtors' liquidity.

### A.    Challenging Operating Environment and Operational Right Sizing

The Debtors, like many other apparel and retail companies, have faced a challenging commercial environment as of late brought on by a shift away from traditional shopping at brick-and-mortar stores.  Given the Debtors' substantial brick-and-mortar presence and associated expenses, the Debtors' businesses have been heavily dependent on store traffic and resulting sales conversions to meet sales and profitability targets.  However, the apparel retail industry has made a permanent shift towards a more online-centric platform, in which retailers are selling more of their products via company websites or through larger retailers such as Amazon.  This has contributed to the Debtors' negative or declining same store sales trends since the second quarter of 2016, with accelerating declines throughout 2016 and into 2017.  Gymboree-operated stores in the United States have been hit particularly hard, with same store sales down 12% in both the third and fourth quarter of 2016.

The Debtors' brick-and-mortar struggles have been compounded by their underdeveloped online presence and wholesale platform.  Although online sales account for an increasing proportion of retail spending in general, the Debtors' online sales remain stagnant, comprising less than a quarter of their total sales.  In addition, the Debtors' wholesale platform, which facilitates the sale of large quantities of merchandise to bulk retailers such as T.J. Maxx and Costco, while promising, is still in its initial stages.  With more modern and customer-focused online and e-commerce models, the Debtors' competitors, along with competing wholesale channels, continue to place downward pressure on the Debtors' revenue.

The Debtors' sales have also declined due to increasing competition, both with other competitors and between the Debtors' three lines.  Most competitors in the children's apparel space, such as Children's Place and the Gap, are not as leveraged as the Debtors.  As a result, these competitors can engage in price wars with Gymboree and run promotions and sales for longer periods of time.

### B.    Supply Chain Challenges.

As a result of the global nature of their operations, the Debtors regularly transact business with entities located outside of the United States.  For example, the Debtors purchase goods and materials and obtain services from merchant vendors located in China, Vietnam, Indonesia, Cambodia, and India.  All of the merchant vendors supply goods that are crucial to the Debtors' ongoing operations.  Importantly, the Debtors' business operations depend on the timely and uninterrupted flow of inventory through their supply chain.  At any given time, the Debtors are engaged with such vendors to:  (i) produce goods in accordance with current purchase orders; (ii) ship merchandise to stock the Debtors' retail stores, distribution centers, and fulfill online orders; and (iii) negotiate the terms of future purchase orders.  Historically, the Debtors have enjoyed favorable trade terms, including payment terms of as many as 75 days from the date of shipment, with many merchant vendors funding out-of-pocket fabric and production costs necessary to manufacture goods.

As the Debtors' liquidity has tightened, their supply chain vendors have unsurprisingly begun to put pressure on the supply chain cost structure.  Since January 2017, when media coverage broke out regarding certain leadership changes and Gymboree's looming debt overhang, numerous vendors have demanded revised trade terms, including prepayments or cash on delivery and have discontinued ordinary course extensions of credit to the Debtors.  Several vendors have threatened to suspend shipping inventory until the Debtors pay upfront.  This shift in payment terms both strained the Debtors' liquidity and put the delivery of the Debtors' Winter 2017 purchase orders at material risk, jeopardizing the Debtors' ability to fully capitalize on customer demand during the peak holiday selling season.

In light of these threats, Gymboree entered into a letter agreement with Li & Fung (the "Li & Fung Letter Agreement") on April 21, 2017, pursuant to which Gymboree agreed to (a) provide a $10 million standby letter of credit for the benefit of Li & Fung (the "Li & Fung Letter of Credit") and (b) issue to Li & Fung a $20 million incremental term loan under the Term Loan Credit Agreement (the "Li & Fung Term Loan").  As consideration, Li & Fung agreed to, among other things, provide extensions of credit to vendors in Bangladesh with respect to the Debtors' current and future purchase orders in the ordinary course, actively promote and support positive messaging to vendors to maintain current trade terms, and forbear from exercising any remedies against the Debtors.

In accordance with the Li & Fung Letter Agreement, on April 21, 2017, Gymboree, as borrower, the guarantors party thereto, Li & Fung, the Term Loan Agent, and the Term Loan Lenders party thereto, entered into the Waiver and Amendment No. 2 to Amended and Restated Credit Agreement (the "Term Loan Second Amendment"), pursuant to which the Debtors amended the Term Loan Credit Agreement to issue the Li & Fung Term Loan.

On May 24, 2017, the Debtors and Li & Fung amended the BAA (the "BAA Amendment").  Pursuant to the BAA Amendment, the Debtors agreed to provide Li & Fung with up to $15 million in cash to deliver partial payments to certain vendors to assure timely delivery of Winter 2017 purchase orders.  As a result, the Debtors were able to secure Li & Fung's continued services and the commitment of various vendors to honor existing trade terms with respect to Winter 2017 purchase orders and ensure runway to negotiate Gymboree's comprehensive restructuring.10

As is typical in the apparel industry, the Debtors' inventory represents a substantial portion of the ABL Facility borrowing base.  Thus, the aforementioned delay in vendors' shipment of new inventory to the Debtors limits the Debtors' ability to borrow under the ABL Facility which, in a vicious cycle, further limits the Debtors' ability to secure fresh inventory.

### C.    Prepetition Waiver/Amendment

On May 12, 2017, the ABL Agents and the ABL Lenders received notice that the Debtors had failed to comply with a requirement of the ABL Credit Agreement that Gymboree and its Restricted Subsidiaries (as defined in the ABL Credit Agreement) maintain, at all times, Combined Availability (as defined in the ABL Credit Agreement) in excess of the greater of (a) $17,500,000 and (b) ten percent of the term loan borrowing base under the ABL Credit Agreement, which constituted an event of default under the ABL Credit Agreement (the "Specified Event of Default").  Gymboree engaged in arm's length negotiations with the ABL Agents and the ABL Lenders and entered into that certain Waiver to Amended and Restated Credit Agreement, with the ABL Guarantors, the ABL Lenders, and the ABL Agents, dated as of May 22, 2017, pursuant to which the ABL Agents and the ABL Lenders agreed to waive the Specified Event of Default, allowing the Debtors to remain in compliance with the ABL Credit Agreement.  In exchange, the Debtors agreed to weekly status calls with the ABL Agents to discuss financial operations and performance, provide weekly borrowing base certificates, cooperate with the ABL Administrative Agent to establish cash management arrangements, and authorize the retention of Berkeley Research Group, LLC as a consultant and financial advisor to the ABL Administrative Agent.

On May 12, 2017, the Debtors, the Term Loan Agent, and the Term Loan Lenders again amended the Term Loan Credit Agreement (the "Restricted Cash Amendment") to provide the Debtors with access to $40 million in cash that was restricted under the Term Loan Credit Agreement to fund the Debtors' working capital needs before the Petition Date.

### D.    Management Changes

---

10   Without access to the restricted cash, the Debtors would have been unable to amend the BAA, and vendors would have tightened trade terms, likely resulting in delayed or cancelled shipments, lost vendors relationships, and misaligned inventory.  These supply chain challenges would have placed increased pressure on the Debtors liquidity position, including by reducing the borrowing base under the ABL Facility.

On March 14, 2017, Mark Breitbard, who had been the Chief Executive Officer of Gymboree since January 8, 2013, formally announced his resignation, effective April 3, 2017.  The Debtors appointed long-time director Mark Weikel as interim Chief Executive Officer, effective April 3, 2017, and continued their nationwide search to identify a permanent Chief Executive Officer.

On May 22, 2017, the Debtors appointed Daniel J. Griesemer as Chief Executive Officer.  On June 11, 2017, Andy North, who had been Chief Financial Officer of Gymboree since November 17, 2014, formally announced his resignation, effective immediately.  The Debtors appointed Liyuan Woo, Director at AlixPartners, as interim Chief Financial Officer, effective immediately, and have initiated a nationwide search to identify a permanent Chief Financial Officer.

### E.      Exploration of Strategic Alternatives

Recognizing the need to explore restructuring alternatives, in January 2017, the Debtors retained Kirkland & Ellis LLP, as legal advisor, and Lazard Freres & Co. LLC ("Lazard"), as investment banker.  In March 2017, the Debtors retained AlixPartners, as restructuring and financial advisor.  Together, the Debtors and their advisors analyzed the Debtors' capital structure and potential sources of liquidity and runway to facilitate the operational changes necessary to reduce the burdensome operational costs associated with their brick and mortar footprint, including various restructuring and recapitalization options.

Shortly after beginning to explore restructuring alternatives, the Debtors commenced a detailed review of their entire real estate portfolio to identify underperforming stores as part of an overall strategy to reduce and optimize their existing store footprint.  In April 2017, the Debtors engaged A&G to help develop the Debtors' go-forward real estate strategy and assist with restructuring and renegotiating the Debtors' current real estate leases.  As part of the restructuring, the Debtors plan to exit or renegotiate leases across their portfolio.  Indeed, in the weeks preceding the Petition Date, the Debtors conducted a store-by-store performance analysis to, among other things, identify certain unprofitable stores to close and wind down.  In connection with these efforts, and after an extensive review and selection process, the Debtors engaged Tiger Capital Group, LLC and Great American Group, LLC to liquidate the inventory in the closing stores and otherwise prepare the stores for turnover to the applicable landlords.

#### 1.      Discussions with Creditors

Beginning in March 2017, the Debtors commenced comprehensive restructuring negotiations with the Consenting Term Loan Lenders and the Term Loan Agent's advisors, Milbank, Tweed, Hadley & McCloy LLP and Rothschild & Co. (the "Term Loan Agent Advisors").  The Debtors were also approached by, and engaged in conversations over the last several months with, advisors to a group of Unsecured Noteholders.  The Debtors have facilitated the diligence of both creditor groups' advisors for the last several months.

In May 2017, the Consenting Term Loan Lenders signed nondisclosure agreements with the Debtors and were given access to certain of the Debtors' confidential information to negotiate a restructuring transaction.  Since the Consenting Term Loan Lenders became restricted, the Debtors and their advisors have engaged in a number of substantive meetings and telephone conferences with the Consenting Term Loan Lenders and the Term Loan Agent Advisors regarding comprehensive restructuring alternatives that would strengthen the Debtors' balance sheet and provide necessary liquidity.  After extensive negotiations, the Debtors and the Consenting Term Loan Lenders entered into the Restructuring Support Agreement on June 11, 2017.

#### 2.      Restructuring Support Agreement

On June 11, 2017, after extensive negotiations, the Debtors entered into the Restructuring Support Agreement with Holders of approximately 66% by principal amount of Claims under the Term Loan Credit Agreement, excluding the Li & Fung Term Loan Claim.  The Restructuring Support Agreement contemplates a comprehensive reorganization, through a chapter 11 plan, that will result in a substantial deleveraging of the Debtors' balance sheet by approximately $1 billion.  The key terms of the restructuring include the following:

- a $105 million debtor-in-possession term loan credit facility, including $35 million in new money debtor-in-possession term loans and the roll-up of $70 million of term loans under the existing

term loan facility into amounts outstanding under the debtor-in-possession term loan credit facility (the "DIP Term Loan Facility");

- a $273.5 million debtor-in-possession revolving credit facility pursuant to which all amounts outstanding under the ABL Facility will be rolled-up into a postpetition ABL credit facility on terms similar to those under the ABL Facility (the "DIP ABL Facility");

- up to $80 million in new equity capital by way of two Rights Offerings, each of which is fully backstopped by the Consenting Term Loan Lenders, to allow the Debtors to emerge from chapter 11 with sufficient liquidity to fund the business; and

- All Term Loan Lenders will be afforded the opportunity to participate in the DIP Term Loan Facility and the Rights Offerings.

The restructuring transactions contemplate pro forma equity ownership as follows:[11]

- Term Loan Lenders who contribute their Pro Rata share of the $35 million new money DIP Term Loan Facility and their Pro Rata share of the up to $80 million Rights Offerings will obtain the benefit of the $70 million DIP Term Loan Facility roll-up and ultimately share Pro Rata in 87.9% of the newly-issued common shares (the "New Gymboree Common Shares"), with an additional 2.3% of the New Gymboree Common Shares distributed to the Consenting Term Loan Lenders who have agreed to backstop each of the Rights Offerings.

- Non-participating Term Loan Lenders will receive their Pro Rata share of 9.8% of the New Gymboree Common Shares.

- Up to 10% of New Gymboree Common Shares (on a fully diluted basis) shall be reserved for issuance in connection with the Management Incentive Plan.

### 3.  *DIP Financing*

To fund the administration of these chapter 11 cases, the ABL Lenders and certain Term Loan Lenders have agreed to provide debtor-in-possession financing. The ABL Lenders have agreed to continue to lend money on terms similar to those under the Debtors' existing asset-based lending facility, providing the $273.5 million DIP ABL Facility, pursuant to which both the revolving and term loan commitments under the Debtors' existing asset-based credit facility will convert into the DIP ABL Facility.

The Term Loan Lenders have agreed to provide the DIP Term Loan Facility, consisting of (a) $35 million in new money delayed draw term loans (the "New Money DIP Loans") and (b) $70 million in term loans outstanding under the Debtors' existing term loan credit facility (the "Roll-Up DIP Loans").

On June 12, 2017, the Court approved the Debtors' entry into the DIP ABL Facility and the DIP Term Loan Facility on an interim basis. *See* Docket No. 86. Upon entry of the interim order, (i) all outstanding obligations under the ABL Facility converted into obligations under the DIP ABL Facility and (ii) the Roll-Up DIP Loans converted into obligations under the DIP Term Loan Facility. A hearing to consider the Debtors' entry into the DIP ABL Facility and DIP Term Loan Facility on a final basis is scheduled for July 11, 2017 at 1:00 p.m., prevailing Eastern Time.

## IX.   PREPETITION TRANSACTIONS

### A.   Take Private

---

[11]   The sizes of the Rights Offerings are dependent on the Debtors' projected post-emergence liquidity need. The pro forma equity ownership shown below assumes an aggregate of $80 million for the Rights Offerings.

On October 11, 2010, Gymboree entered into an agreement and plan of merger (the "Merger Agreement") with Giraffe Holding, Inc. ("Parent"), a Delaware corporation and Giraffe Acquisition Corporation ("Acquisition Sub"), a Delaware corporation and indirect wholly-owned subsidiary of Parent controlled by investment funds sponsored by the Sponsor. Pursuant to the Merger Agreement, Acquisition Sub commenced a tender offer on October 25, 2010 to acquire all outstanding shares of The Gymboree Corporation at a price of $65.40 per share, or $1.76 billion. The purchase price represented a 23.5% premium to Gymboree's closing stock price on October 8, 2010, the last full trading day before the announcement of the Merger Agreement.

On November 23, 2010, Acquisition Sub was merged with and into The Gymboree Corporation in accordance with the Merger Agreement, with The Gymboree Corporation continuing as the surviving entity and a wholly owned subsidiary of Parent (the "Acquisition"). **As a result of the Acquisition, investment funds sponsored by the Sponsor indirectly owned a controlling interest in Parent, effectively acquiring Gymboree.**

Gymboree's Board of Directors (the "Board") appointed a special committee of independent directors of the Board (the "2010 Special Committee") to review the Acquisition. The 2010 Special Committee was advised by Goldman, Sachs & Co. as its exclusive financial advisor and Skadden, Arps, Slate, Meagher & Flom LLP as its counsel. Both Goldman, Sachs & Co. and Peter J. Solomon Company provided fairness opinions to the 2010 Special Committee and agreed that the Acquisition was a fair and equitable transaction. Following the 2010 Special Committee's recommendation that the tender offer and the Acquisition were advisable, fair to, and in the best interests of the stockholders of Gymboree, the Board unanimously approved the Acquisition and the other transactions completed by the Merger Agreement.

### B.    Play & Music Transaction

Until July 15, 2016, Gymboree, through its then-subsidiary Gymboree Play Programs, Inc. ("GPPI"), offered directed parent-child developmental play programs ("Gymboree Play & Music") at certain locations in the United States and other countries. Gymboree owned and operated six corporate Gymboree Play & Music centers and franchised more than 150 centers in the United States. For international sites, Gymboree contracted with master-franchisees in the applicable territories that operated and subfranchised the Gymboree Play & Music centers. In China, the largest international Gymboree Play & Music market, Gymboree (Tianjin) Educational Information Consultation Co. Ltd. ("Gymboree Tianjin") was the master franchisee. Gymboree Tianjin and Gymboree (China) Commercial and Trading Co. Ltd. ("Gymboree China"), the operator of Gymboree retail stores in China, was indirectly controlled by investment funds sponsored by the Sponsor. Gymboree had no ownership interest in Gymboree Tianjin or Gymboree China.

On July 15, 2016, Gymboree closed a transaction (the "Play & Music Transaction") to sell all the equity of GPPI, together with assignments and licenses to certain intellectual property used in connection with the Gymboree Play & Music business to Zeavion, a Singapore-based investment group. Upon closing of the Play & Music Transaction, Zeavion acquired the entire Gymboree Play & Music enterprise, including its central operations and centers in North America.

As consideration for the Play & Music Transaction, Gymboree received $128.1 million in cash, approximately $109 million of which was restricted for purposes of paying down outstanding obligations under the term loan credit agreement and capital expenditures. Gymboree has used the proceeds of the sale to delever its balance sheet, invest in its online offerings, store network, and supply chain infrastructure. As of the Petition Date, the remaining balance of the restricted cash attributable to the Play & Music Transaction was approximately $13.6 million. Concurrent with the sale of Gymboree Play & Music, non-Debtor Gymboree Investment Holdings L.P. sold Gymboree Tianjin and Gymboree China to Zeavion.

The Board appointed a special committee of independent directors of the Board (the "2016 Special Committee") to review the Play & Music Transaction. The 2016 Special Committee met frequently throughout the sale process to review and discuss the draft sale agreements and the status of negotiations related to the Play & Music Transaction. The 2016 Special Committee's financial advisor, Houlihan Lokey, issued a fairness opinion with respect to the Play & Music Transaction. Based on these findings, the Special Committee determined that the Play & Music Transaction was fair and in the best interests of Gymboree, and recommended that the Board approve the Play & Music Transaction. The Board unanimously approved the Play & Music Transaction.

## X.    EVENTS OF THE CHAPTER 11 CASES

### A.    Corporate Structure upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 within 110 days of the Petition Date.  **No assurances can be made, however, that the Bankruptcy Court will enter various orders on the timetable anticipated by the Debtors.**

### C.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of James A. Mesterharm, Chief Restructuring Officer of the Gymboree Corporation, in Support of the Chapter 11 Petitions and First Day Motions* [Docket No. 29], filed on June 12, 2017.  Significantly, pursuant to the First Day Motions, the Debtors sought and were granted the authority to pay the Claims of a number of their vendors in full, in the regular course of business.

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/gymboree.

### D.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### E.    Independent Investigation

On May 18, 2017, The Gymboree Corporation appointed Mr. Steven Winograd to the Board to serve as an independent director.  Mr. Winograd has experience serving on boards of directors, including as an independent director, having served on, among others, the board of Caesars Entertainment Operating Company since June 2014, and the board of Linn Acquisition Company LLC on behalf of Berry Petroleum Company LLC during 2016-2017.

30

Mr. Winograd has more than 33 years of experience as an investment banker, during which he has completed numerous transactions for a wide variety of public and private companies including mergers and acquisitions, debt and equity financings, and restructurings.  Mr. Winograd received a BA from Wesleyan University and an MBA from the Columbia University Graduate School of Business.

In connection with the appointment of Mr. Winograd, by resolutions (the "Resolutions") adopted on May 18, 2017, The Gymboree Corporation formed a special committee (the "Special Committee") to explore strategic and/or financial alternatives and Transactions (as defined in the Resolutions) in connection with the Board's consideration of such Transactions.  Under the Resolutions, the Board shall not approve a Transaction (as defined in the Resolutions) that is deemed by the Special Committee to be in whole or in part an interested party transaction unless approved by the Special Committee.  The Special Committee consists of one member, Mr. Winograd.  The Special Committee is advised by legal, financial, and other advisors as it determines necessary and appropriate, and controls any privilege related to that work.  At Mr. Winograd's direction, Gymboree has engaged the law firm of Munger, Tolles & Olson LLP as directed by Mr. Winograd and the Special Committee to provide advice with respect to conflict matters.  Those matters include the review of transactions with the Sponsor and the appropriateness of the Debtors' release of the Sponsor as set forth in the Restructuring Term Sheet attached to the Restructuring Support Agreement and to take effect at emergence under the proposed plan of reorganization.  The Debtors reserve the right to amend those release provisions and reserve all rights pending the investigation by the Special Committee.

## XI.    PROJECTED FINANCIAL INFORMATION

Attached hereto as **Exhibit D** is a projected consolidated income statement, which includes consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning 2017 and continuing through 2021.  The Financial Projections are based on an assumed Effective Date of September 30, 2017.  To the extent that the Effective Date occurs before or after September 30, 2017, recoveries on account of Allowed Claims could be impacted.

Creditors and other interested parties should see the below "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

## XII.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

#### 1.    *Parties in Interest May Object to the Plan's Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Effective Date will not take place.

### 3. The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Interests as those proposed in the Plan.

### 4. The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting Holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, Holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5. The Restructuring Support Agreement Could Be Terminated, Which Would Leave the Debtors Without a Clear Path Forward to Reorganize

The Debtors' ability to consummate a value-maximizing restructuring may be materially impaired by a termination of the Restructuring Support Agreement.  The Restructuring Support Agreement may be terminated, upon five business days written notice, by the Required Consenting Creditors upon the occurrence and continuation of any of the following events; provided that only the Required Consenting Creditors may terminate the Restructuring Support Agreement upon the occurrence and continuation of any of the events set forth in section 11.01 of the Restructuring Support Agreement:

a)         the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of the Required Consenting Creditors in violation of their obligations under this

Agreement or (ii) such Milestone is waived in accordance with Section 4 of the Restructuring Support Agreement;

b)    the effective date of the Plan (the "<u>Plan Effective Date</u>") shall not have occurred on or before December 15, 2017 (the "<u>Outside Date</u>");

c)    the occurrence of a material breach by any Party other than the Required Consenting Creditors of this Agreement; provided, that (i) such Required Consenting Creditors shall transmit a notice to the Debtors, the Sponsor, and the other Consenting Creditors pursuant to Section 18.09 of the Restructuring Support Agreement, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 18.09 of the Restructuring Support Agreement) and, in either case, if such breach is capable of being cured, the breaching Party shall have five (5) business days after receiving such notice to cure any breach;

d)    the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have the effect of preventing substantial consummation of the Restructuring Transactions; provided, that the Debtors shall have five (5) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (ii) is acceptable to the Required Consenting Creditors;

e)    the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Required Consenting Creditors, or (iii) appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

f)    any Debtor, without the prior consent of the Required Consenting Creditors, (i) amends, or modifies, or files a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is materially inconsistent with this Agreement, (ii) suspends or revokes the Restructuring Transactions, or (iii) publicly announces its intention to take any such action listed in Sub-Clauses (i) and (ii) of this subsection;

g)    any of the Restructuring Documents do not comply with Section 3 of this Agreement or any other document or agreement necessary to consummate the Restructuring Transactions is not reasonably satisfactory to the Required Consenting Creditors;

h)    any Debtor makes any filing in support of, enters into an agreement with respect to, or announces its support for any Alternative Transaction or that it will file any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets (other than as provided for in the Plan), without the prior written consent of the Required Consenting Creditors;

i)    the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not substantially consistent with this Agreement or otherwise consented to by the Required Consenting Creditors;

j)    the Debtors' failure to consummate the DIP ABL Financing;

33

k)      the occurrence of any Event of Default under the DIP Term Documents, the DIP ABL Documents, or the DIP Orders, as applicable, that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

l)      a breach by any Debtor or any other Party of any representation, warranty, or covenant of such Debtor or other Party set forth in Section 8 of the Restructuring Support Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Debtors of written notice and description of such breach from any other Party;

m)     any Debtor or Sponsor files a motion, application, or adversary proceeding (or any Debtor or other Party supports any such motion, application, or adversary proceeding filed or commence by any third party) (i) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Term Loan Claims, or (ii) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

n)      a determination is made with respect to any Debtor pursuant to Section 11.03(b) of the Restructuring Support Agreement that its continued support of the Restructuring Transactions would be inconsistent with its fiduciary obligations under applicable law;

o)      any Debtor terminates its obligations under and in accordance with Section 11.03 of the Restructuring Support Agreement;

p)      the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

q)      the DIP Orders or any of the orders confirming the Plan or approving the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Creditors or a motion for reconsideration, reargument, or rehearing with respect to such orders has been filed and the Debtors have failed to timely object to such motion; or

r)      the occurrence of a Maturity Date (as defined in each of the DIP Credit Agreements).

The Debtors believe that the Restructuring Support Agreement provides stability by, among other things, ensuring cooperation among creditors. The Debtors believe that the Plan and restructuring contemplated by the Restructuring Support Agreement avoids all of the foregoing, and implements an expeditious reorganization of the Debtors.

### 6.   *Nonconsensual Confirmation*

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 7. *Continued Risk Upon Confirmation*

Even if a chapter 11 plan of reorganization is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code will give the Debtors the exclusive right to propose the Plan and will prohibit creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their petitions for chapter 11 relief. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 8. *The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code*

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 9. *The Debtors May Object to the Amount or Classification of a Claim*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 10. *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 11. *Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 12.  *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### B.  Risks Related to Recoveries under the Plan

### 13.  *The Debtors May Not Be Able to Achieve Their Projected Financial Results*

With respect to Holders of Interests in the Reorganized Debtors, the Reorganized Debtors may not be able to achieve their projected financial results. The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the particular industry segments in which the Debtors operate in particular. While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized. If the Debtors do not achieve their projected financial results, (a) the value of the New Gymboree Common Shares may be negatively affected, (b) the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date, and (c) the Debtors may be unable to service their debt obligations as they come due. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 14.  *The Reorganized Debtors' New Gymboree Common Shares May Not Be Publicly Traded*

There can be no assurance that an active market for the New Gymboree Common Shares will develop, nor can any assurance be given as to the prices at which such stock might be traded. The New Gymboree Common Shares to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange as of the Effective Date. Further, the New Gymboree Common Shares to be issued under the Plan have not been registered under the Securities Act, any state securities laws or the laws of any other jurisdiction. Absent such registration, the New Gymboree Common Shares (other than the New Gymboree Common Shares issued under the exemption provided in section 1145 of the Bankruptcy Code) may be offered or sold only in transactions that are not subject to, or that are exempt from, the registration requirements of the Securities Act and other applicable securities laws. As explained in more detail in Article XV herein, most recipients of New Gymboree Common Shares will be able to resell such securities without registration pursuant to the exemption provided by Rule 144 under the Securities Act ("Rule 144"), subject to any restrictions set forth in the certificate of incorporation and bylaws of Gymboree.

On the Effective Date, the Reorganized Debtors shall be private, non-SEC reporting companies; provided, that the New Organizational Documents shall require that from and after the Effective Date, Reorganized Gymboree shall provide to the Holders of New Gymboree Common Shares such audited annual and unaudited quarterly financial statements for such periods as would be required if it were a public reporting company, with such statements being prepared in accordance with GAAP.

### 15. The Restructuring of the Debtors May Adversely Affect the Debtors' Tax Attributes

Under federal income tax law, a corporation is generally permitted to deduct from taxable income NOLs carried forward from prior years. The Debtors have state NOL carryforwards of approximately $18.3 million as of January 31, 2017. The Debtors' ability to utilize their NOL carryforwards and other tax attributes to offset future taxable income and to reduce federal income tax liability is subject to certain requirements and restrictions. In general, such NOLs and other tax attributes could be reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Internal Revenue Code of 1986, as amended (the "Tax Code") or to offset any taxable gains recognized by the Debtors attributable to the restructuring transactions. In addition, if the Debtors experience an "ownership change," as defined in section 382 of the Tax Code, then their ability to use the NOL carryforwards may be substantially limited, which could have a negative impact on the Debtors' financial position and results of operations. Generally, there is an "ownership change" if one or more stockholders owning 5 percent or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period. Following the implementation of a plan of reorganization, it is possible that an "ownership change" may be deemed to occur. Under section 382 of the Tax Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors currently expect that their net operating loss carryforwards and other tax attributes may be significantly reduced, eliminated, or limited in connection with the restructuring transactions, through a combination of one or more of the above factors.

For a detailed description of the effect consummation of the Plan may have on the Debtors' tax attributes, see "*Certain United States Federal Income Tax Consequences of the Plan*," which begins on page 45 herein.

### 16. The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting. However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.

By rules of the Securities and Exchange Commission, the Debtors have not evaluated their internal controls over financial reporting, the purpose of which would be for management to report on the effectiveness of the Debtors' internal controls over financial reporting that would be needed to comply with Section 404(a) of the Sarbanes Oxley Act of 2002. As the Debtors progress towards preparing for the reporting requirements associated with internal controls over financial reporting as prescribed in the Sarbanes Oxley Act of 2002, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors'' businesses, results of operations, and financial condition.

Additionally, as a result of our recent workforce reduction and additional employee turnover, the Debtors have experienced changes in their internal controls over financial reporting. The changes in the Debtors' workforce have resulted in necessary changes to the Debtors' system of internal controls as certain employees are performing control activities that they were not previously performing. The Debtors expect continued changes in their system of internal controls as the Debtors align their control structure with the Debtors' current workforce. A changing internal control environment increases the risk that the Debtors' system of internal controls is not designed effectively or that internal control activities will not occur as designed.

### C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 17.    *The Debtors May Not Be Able to Generate Sufficient Cash to Service All of Their Indebtedness*

The Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control (including the factors discussed in Article XI., which begins on page 31, herein).  The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to pay the principal, premium, if any, and interest on their indebtedness, including the notes.

#### 18.    *The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases*

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the restructuring transactions specified in the Plan or an alternative restructuring transaction; (b) ability to obtain court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, vendors, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways.  For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities.  Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 19.    *Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses*

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations.  A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses.  In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.  So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 20. *Financial Results May Be Volatile and May Not Reflect Historical Trends*

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 21. *The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases*

The Debtors are currently subject to or interested in certain legal proceedings, some of which may adversely affect the Debtors. In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 22. *The Loss of Key Personnel Could Adversely Affect the Debtors' Operations*

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers. The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees. As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 23. *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations*

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all claims that arise prior to the Debtors' filing a petition for reorganization under the Bankruptcy Code or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be discharged in accordance with the terms of the plan of reorganization. Any claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

## XIII.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

*The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan.*

<div style="border: 1px solid black;">

**THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

</div>

### A.        Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all Holders of claims and interests against a debtor are entitled to vote on a chapter 11 plan.  The table in Article IV.C of this Disclosure Statement, which begins on page 4 hereof, provides a summary of the status and voting rights of each Class (and, therefore, of each Holder within such Class absent an objection to the Holder's Claim or Interest) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from Holders of Claims in Class 3 (the "Voting Class").  The Holders of Claims in the Voting Class are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Class have the right to vote to accept or reject the Plan.

The Debtors are *not* soliciting votes from Holders of Claims and Interests in Classes 1, 2, 4, 5, 6, 7, or 8.  Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Class, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.        Voting Record Date

**The Voting Record Date is July 24, 2017**.  The Voting Record Date is the date on which it will be determined which Holders of Claims in the Voting Class are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the Holder of a Claim.

### C.        Voting on the Plan

**The Voting Deadline is August 24, 2017, at 5:00 p.m.** prevailing Eastern Time.  In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered in accordance with the instructions on your ballot so that the ballots are **actually received** by the Debtors' voting and claims agent (the "Voting and Claims Agent") on or before the Voting Deadline:

### D.        Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**:  (1) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means not specifically approved pursuant to the Disclosure Statement Order; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee, or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,
> PLEASE CONTACT THE VOTING AND CLAIMS AGENT TOLL-FREE (844) 822-9233.
> ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE
> NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL <u>NOT</u> BE COUNTED.**

## XIV.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of Holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each Holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **<u>Exhibit G</u>** and incorporated herein by reference is a liquidation analysis (the "<u>Liquidation Analysis</u>") prepared by the Debtors with the assistance of AlixPartners, the Debtors' financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan.  Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to Holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Gymboree Common Shares to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following

their emergence from chapter 11 and that the Plan will meet the feasibility requirements of the Bankruptcy Code. The Financial Projections are attached hereto as **Exhibit E** and incorporated herein by reference.

### D.     Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[12]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of Allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.     Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, *however*, the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document in a manner consistent with the Restructuring Support Agreement, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.     No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.     Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

---

[12]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  The Valuation Analysis is set forth in **Exhibit F** attached hereto and incorporated herein by reference.

## XV.    CERTAIN SECURITIES LAW MATTERS

The issuance of, and the distribution under, the Plan of the New Gymboree Common Shares on account of Allowed Term Loan Claims and the New Gymboree Common Shares issued as a payment of the Commitment Premium will be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.  In addition, (a)(i) 1145 Subscription Rights and (ii) New Gymboree Common Shares issued either (w) pursuant to the 1145 Rights Offering or (x) in connection with the Roll-Up DIP Conversion Shares will be exempt under section 1145 of the Bankruptcy Code and (b)(i) 4(a)(2) Subscription Rights and (ii) New Gymboree Common Shares issued pursuant to the 4(a)(2) Rights Offering or in connection with (y) the DIP Surplus Conversion Shares or (z) any Unsubscribed Shares (as defined in the Backstop Commitment Agreement) will be exempt under Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.

### A.    Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale pursuant to a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or interest in, the debtor or such affiliate, or principally in such exchange and partly for Cash.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right.  In reliance upon this exemption, the New Gymboree Common Shares issued under the Plan (other than those issued pursuant to the 4(a)(2) Rights Offering or that are Unsubscribed Shares or DIP Surplus Conversion Shares) will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "**underwriter**" as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"**Control**," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "**controlling person**" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 which permits the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

## B.      Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers

Section 4(a)(2) of the Securities Act provides that the issuance of securities by an issuer in transactions not involving a public offering are exempt from registration under the Securities Act. Regulation D is a non-exclusive safe harbor from registration promulgated by the SEC under Section 4(a)(2) of the Securities Act.

The Debtor believes that the New Gymboree Common Shares issued in connection with the 4(a)(2) Rights Offering, as well as in connection with (x) the purchase of the Unsubscribed Shares or (y) the issuance of any DIP Surplus Conversion Shares are issuable without registration under the Securities Act in reliance upon the exemption from registration provided under Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. Only 4(a)(2) Eligible Holders that are "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act) or "qualified institutional buyers" within the meaning of Rule 144A will be eligible to participate in the 4(a)(2) Rights Offering. The 4(a)(2) Rights Offering Shares will be "restricted securities" (within the meaning of Rule 144), subject to the transfer restrictions applicable thereto. Such securities will be subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration, under the Securities Act and other applicable law.

The Debtor believes that the Rule 144 exemption will not be available with respect to any holders of 4(a)(2) Rights Offering Shares (whether held by non-affiliates or affiliates) until at least six (6) months after the Effective Date. Accordingly, unless a resale registration statement becomes effective sooner, holders of 4(a)(2) Rights Offering Shares will be required to hold their 4(a)(2) Rights Offering Shares for at least six (6) months and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to a resale registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

Each book entry position or certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any 4(a)(2) Rights Offering Share shall, upon issuance, be deemed to contain or be stamped or otherwise imprinted, as applicable, with a restrictive legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

Reorganized Gymboree will reserve the right to require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Rights Offering Shares. Reorganized Gymboree will also reserve the right to stop the transfer of any 4(a)(2) Rights Offering Shares if such transfer is not in compliance with Rule 144, pursuant to a resale registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.

Recipients of the New Gymboree Common Shares issued in connection with the Rights Offerings and the Plan are advised to consult with their own legal advisors as to the availability of any such an exemption from registration requirements under state law in any given instance and as to any applicable requirements or conditions to such availability.

### C.    Shares issuable pursuant to the Rights Offerings.

The aggregate number of New Gymboree Common Shares to be issued pursuant to the Rights Offerings or purchased by the Backstop Parties pursuant to the Backstop Commitment Agreement will be a number of securities equal to the Rights Offering Amount divided by the Purchase Price.

#### 1.    1145 Rights Offering

The aggregate number of 1145 Rights Offering Shares to be offered to Holders of Allowed Term Loan Claims in the 1145 Rights Offering will be set such that the aggregate number of 1145 Rights Offering Shares will be equal to a number that is 1% less than the aggregate number of New Gymboree Common Shares that will be issued to all holders of Allowed Term Loan Claims in full and final satisfaction of the Allowed Term Loan Claims (and, accordingly, the number of 1145 Rights Offering Shares acquired by each Eligible Holder, including each Holder of Allowed Term Loan Claims that fully exercises its rights, in the 1145 Rights Offering will be less than the aggregate number of New Gymboree Common Shares that will be issued to such Holder of Allowed Term Loan Claims in full and final satisfaction of its Allowed Term Loan Claims). For example, if 10,000,000 New Gymboree Common Shares will be issued to all holders of Allowed Term Loan Claims in full and final satisfaction of the Allowed Term Loan Claims, then the maximum aggregate number of 1145 Rights Offering Shares will be no more than 9,900,000.

Because Holders of Allowed Term Loan Claims will receive more securities on account of their Allowed Term Loan Claims than the number of 1145 Rights Offering Shares received in the 1145 Rights Offering, the value of an Allowed Term Loan Claim held by a Holder of Allowed Term Loan Claims, as implied by the value of distributions to be made under the Plan, exceeds the Cash value payable on account of such claim pursuant to the 1145 Subscription Rights, Holders of Allowed Term Loan Claims are receiving "principally" securities on account of their Allowed Term Loan Claims under the Plan and are only "partly" receiving securities for Cash, all in accordance with section 1145(a)(1) of the Bankruptcy Code. Accordingly, the Debtors believe that the securities issued in the 1145 Rights Offering satisfy all the requirements of section 1145(a)(1) of the Bankruptcy Code and are, therefore, exempt from registration under the Securities Act and state securities laws (except with respect to an underwriter as described above). As a result, the value of the direct distributions being made to Holders of Allowed Term Loan Claims (excluding the securities issued in the 1145 Rights Offering, and, if applicable, the securities issued in the 4(a)(2) Rights Offering and in connection with the purchase of Unsubscribed Shares (as defined in the Backstop Commitment Agreement)) exceeds the value of the capital being raised pursuant to the exercise of the 1145 Subscription Rights. Further, the size of the 1145 Rights Offering (both dollar amount and number of securities) will be less than the amount and number of securities issued on account of the Allowed Term Loan Claims.

#### 2.    4(a)(2) Rights Offering

The aggregate number of New Gymboree Common Shares to be offered to Holders of Allowed Term Loan Claims in the 4(a)(2) Rights Offerings will be equal to the total number of shares issued with respect to the Rights Offerings Amount, less the total number of 1145 Shares.

On the Effective Date, Reorganized Gymboree will consummate each of the Rights Offerings. Both Rights Offerings will be fully backstopped by the Commitment Parties in accordance with and subject to the terms and conditions of the Backstop Commitment Agreement. Unless otherwise expressly allowed in the Rights Offerings or Rights Offerings Procedures, the right to participate in the Rights Offerings may not be sold, transferred, or assigned.

## XVI.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.    Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Term Loan Secured Claims. This summary is based on the Tax Code, the U.S. Treasury Regulations promulgated thereunder (the

"Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. The Debtors have not requested, and do not intend to request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, trusts, governmental authorities or agencies, dealers and traders in securities, subchapter S corporations, persons who hold Claims or who will hold the New Gymboree Common Shares as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below. This summary does not address the U.S. federal income tax consequences to holders (i) whose Claims are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. Holder" is any holder of a Claim that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

The tax consequences of the implementation of the Plan to the Debtors will differ depending on whether the Restructuring Transactions include a taxable sale of the Debtors' assets and/or stock.

If the transaction undertaken pursuant to the Plan is structured as a taxable sale of the assets and/or stock of any Debtor (a "Taxable Transaction"), such Debtor would recognize gain or loss upon the transfer in an amount equal to the difference between the fair market value of the assets sold and the Debtor's tax basis in such assets. The Debtors have not yet determined whether or not they intend to structure the Restructuring Transactions as a Taxable Transaction, whether in whole or in part. Such decision will depend on, among other things, whether assets being sold pursuant to a Taxable Transaction have a fair market value in excess of tax basis (i.e., a "built-in gain") or a fair market value less than tax basis (*i.e.*, a "built-in loss"), in the case of assets with built-in gains, whether sufficient tax attributes are available to offset any such built-in gains, and how the fair market value of such assets compares to the expected tax basis of such assets after their tax basis is reduced for COD Income.

If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, the Reorganized Debtor will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock, the Debtor whose stock is transferred will retain its basis in its assets, subject to reduction due to COD Income, as described below.

For the period ending January 31, 2017, the Debtors had approximately $18.3 million of state net operating losses ("NOLs"). The Debtors are currently generating additional tax losses, which will ultimately increase the Debtors' NOLs and other tax attributes. As discussed below, the Debtors' NOLs are expected to be eliminated upon implementation of the Plan.

*1.      Cancellation of Debt and Reduction of Tax Attributes*

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such satisfied indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not, however, required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the Tax Code. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

In connection with the Restructuring Transactions, the Debtors expect to realize significant COD Income. The amount of the tax attributes required to be reduced will depend on whether the transactions undertaken pursuant to the Plan are structured as a Taxable Transaction. The exact amount of any COD Income that will be realized by the Debtors will not be determinable until the consummation of the Plan. Regardless of the implemented structure, the Debtors expect, however, that the amount of such COD Income will be sufficient to eliminate all of their NOLs and tax credits allocable to periods prior to the Effective Date. In addition, depending on the structure of the transactions undertaken pursuant to the Plan, some of the Debtors' tax basis in their assets may be reduced by COD Income that is not absorbed by the NOLs and tax credits.

### 2.    *Limitation of NOL Carryforwards and Other Tax Attributes*

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of any remaining NOLs, tax credit carryforwards, net unrealized built-in losses, and possibly certain other attributes of the Reorganized Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the issuance of New Gymboree Common Shares in connection with the Rights Offerings and the distribution of the New Gymboree Common Shares pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.  The Debtors do not expect to have a net unrealized built-in loss at the time the Plan goes effective.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs:  2.09 percent for June 2017).  The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits.  Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses thereafter would be effectively eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is

48

not required to reduce their NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses. The resulting limitation would be determined under the regular rules for ownership changes.

As discussed above, the Debtors expect that all of the Debtors' NOLs allocable to periods prior to the Effective Date will be eliminated and hence will not be subject to the section 382 limitation following the year in which the Effective Date occurs. The availability to the Debtors of either the 382(l)(5) Exception or the 382(l)(6) Exception will depend on the structure of the transactions undertaken pursuant to the Plan.

### 3.    *Alternative Minimum Tax*

In general, an alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income ("<u>AMTI</u>") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in certain years, which can offset 100 percent of a corporation's AMTI, only 90 percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause the Reorganized Debtors to owe an amount of federal and state income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors. Any AMT that a corporation pays will generally be allowed as a nonrefundable credit against its regular federal income tax liability in future years when the corporation is not subject to AMT. Any unused credit is carried forward indefinitely.

### C.    **Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Class 3 Term Loan Secured Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan. Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

Pursuant to the Plan, in exchange for full and final satisfaction, settlement, release and discharge of the Class 3 Term Loan Secured Claims, each Holder thereof will receive its Pro Rata share of: (a) the Term Loan Common Shares; and (b) the Subscription Rights; *provided*, that the Li & Fung Term Loan Claim shall not be entitled to any recovery under the Plan so long as the Li & Fung Agency Agreement has been assumed in connection with the Plan.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Term Loan Secured Claims will depend, in part, on whether the transactions undertaken pursuant to the Plan constitute a Taxable Transaction or a transaction treated as a reorganization within the meaning of the tax law (a "<u>Reorganization</u>"). If the transactions undertaken pursuant to the Plan constitute a Reorganization, the U.S. federal income tax consequences to such U.S. Holders of Term Loan Secured Claims will further depend on whether the Claims surrendered constitute "securities" for U.S. federal income tax purposes.

### 4.    *Treatment of a Debt Instrument as a "Security"*

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. The Allowed Term

Loan Claims had a term to maturity of approximately seven (7) years when issued.  There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

### 5.    *Taxable Transaction*

To the extent that the transactions undertaken pursuant to the Plan constitute a Taxable Transaction, a U.S. Holder of an Allowed Term Loan Secured Claim would be treated as exchanging its Claims for the New Gymboree Common Shares and, if applicable, Subscription Rights in a fully taxable exchange under section 1001 of the Tax Code.

A U.S. Holder of an Allowed Term Loan Secured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (a) the total fair market value of the New Gymboree Common Shares and Subscription Rights received in exchange for its Allowed Term Loan Secured Claim (subject to "Accrued Interest" discussed in Article XVI.C.8 herein) and (b) the U.S. Holder's adjusted tax basis in its Allowed Term Loan Secured Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Term Loan Secured Claim for more than one year at the time of the exchange.  The deductibility of capital losses is subject to certain limitations as discussed below.  To the extent that a portion of the consideration received in exchange for its Allowed Term Loan Secured Claim is allocable to accrued but untaxed interest, the U.S. Holder may recognize ordinary income.  *See* "Accrued Interest" and "Market Discount" in Articles XVI.C.8 and XVI.C.10, respectively, which begin on page 51, herein. A U.S. Holder's tax basis in each of the New Gymboree Common Shares and Subscription Rights should be equal to their respective fair market values.  A U.S. Holder's holding period for each item of consideration received on the Effective Date should begin on the day following the Effective Date.

### 6.    *Reorganization*

If the transactions undertaken pursuant to the Plan constitute a Reorganization a U.S. Holder of an Allowed Term Loan Secured Claim that receives New Gymboree Common Shares and, if applicable, Subscription Rights in satisfaction of such Claim should recognize no gain or loss (or bad debt deduction) if  such Claim qualifies as a security.  To the extent that a portion of such New Gymboree Common Shares and/or Subscription Rights is allocable to accrued but untaxed interest, however, the U.S. Holder may recognize ordinary income (as discussed in greater detail in "Accrued Interest" below).  A U.S. Holder's aggregate tax basis in the New Gymboree Common Shares and Subscription Rights received pursuant to a Reorganization in satisfaction of the U.S. Holder's Claim that qualifies as a security, apart from amounts allocable to accrued but untaxed interest, generally should equal the U.S. Holder's tax basis in such surrendered Claim.  The holding period of any such New Gymboree Common Shares and Subscription Rights received under the Plan, apart from amounts allocable to accrued but untaxed interest, generally should include the holding period of such surrendered Claim.

If (i) the transactions undertaken pursuant to the Plan constitute a Reorganization and the Allowed Term Loan Secured Claims are not treated as securities, a U.S. Holder of such Claim will be treated as exchanging such Claim for New Gymboree Common Shares and, if applicable, Subscription Rights in a taxable exchange under section 1001 of the IRC.  The U.S. federal income tax consequences to such U.S. Holder will be substantially similar to the consequences, described above, that such U.S. Holder would have experienced in a Taxable Transaction.

### 7.    *Treatment of Subscription Rights*

Holders who elect not to exercise their Subscription Rights may be entitled to claim a capital loss equal to amount of tax basis allocated to the unexercised Subscription Rights they receive.  *See* "Limitation on Use of Capital

Losses" in Article XVI.C.13, herein.  Such holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the Subscription Rights they receive.  For a holder electing to exercise their Subscription Rights, such a holder will be treated as purchasing, in exchange for its applicable Subscription Rights and the amount of Cash funded by the holder to exercise its applicable Subscription Rights, the Rights Offering Shares it is entitled to pursuant to the terms of the exercised Subscription Rights.  Any such purchase generally will be treated as the exercise of an option under general tax principles, and as such a holder should not recognize income, gain, or loss for U.S. federal income tax purposes on the exercise.  A holder's tax basis in the Rights Offering Shares received pursuant to the exercise, will equal the sum of the amount of Cash paid by the holder to exercise its Subscription Rights plus such holder's tax basis in its Subscription Rights immediately before the exercise.  A holder's holding period for the Rights Offering Shares received on the Effective Date pursuant to the exercise should begin on the day following the Effective Date.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 8.    *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder).  Conversely, a U.S. Holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. Holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Claim, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to U.S. Holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 9.    *Medicare Tax*

Certain U.S. Holders that are individual, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Gymboree Common Shares.

### 10.    *Market Discount*

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis

amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).  To the extent the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. Holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the exchanged debt instrument.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 11.  *Dividends on New Gymboree Common Shares*

Any distributions made on account of New Gymboree Common Shares will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized Debtors as determined under U.S. federal income tax principles.  To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

### 12.  *Sale, Redemption, or Repurchase of New Gymboree Common Shares*

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Gymboree Common Shares.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the New Gymboree Common Shares for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.  Under the recapture rules of section 108(e)(7) of the Tax Code, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Gymboree Common Shares as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Claim or recognized an ordinary loss on the exchange of its Allowed Claim for New Gymboree Common Shares.

### 13.  *Limitation on Use of Capital Losses*

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses.  For a non-corporate U.S. Holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains.  A non-corporate U.S. Holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, capital losses may only be used to offset capital gains.  A corporate U.S. Holder that has more capital losses than

may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D.    Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan and includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. Holders.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to non-U.S. Holders are complex. Each non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the non-U.S. tax consequences of the consummation of the Plan to such non-U.S. Holders.

### 14.    Gain Recognition

To the extent that the Restructuring Transactions are treated as a taxable exchange or otherwise result in the recognition of taxable gain for U.S. federal income tax purposes, any gain realized by a non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (a) the non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (b) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  To claim an exemption from withholding tax, such non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 15.    Accrued Interest

Payments to a non-U.S. Holder that are attributable to accrued interest generally will not be subject to U.S. federal income tax or withholding, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. Holder is not a U.S. person, unless:

- the non-U.S. Holder actually or constructively owns 10% or more of the total combined voting power of all classes of the Reorganized Debtor's stock entitled to vote;

- the non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Reorganized Debtor (each, within the meaning of the Tax Code);

- the non-U.S. Holder is a bank receiving interest described in section 881(c)(3)(A) of the Tax Code; or

- such interest is effectively connected with the conduct by the non-U.S. Holder of a trade or business within the United States (in which case, provided the non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are

53

attributable to the accrued interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. Holder that does not qualify for the exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on any payments that are attributable to accrued but untaxed interest.  For purposes of providing a properly executed IRS Form W-8BEN or W-8BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.  As described above in more detail under the heading "Accrued Interest," the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of such Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.

### 16.  Dividends on New Gymboree Common Shares

Any distributions made with respect to New Gymboree Common Shares will constitute dividends for U.S. federal income tax purposes to the extent of the Reorganized Debtor's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a non-U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the non-U.S. Holder's basis in its shares. Any such distributions in excess of a non-U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange as described below; see "Sale, Redemption, or Repurchase of New Gymboree Common Shares" in Article XVI.C.12 herein).  Except as described below, dividends paid with respect to New Gymboree Common Shares held by a non-U.S. Holder that are not effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable).  A non-U.S. Holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-8BEN-E (or a successor form) upon which the non-U.S. Holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments.  Dividends paid with respect to New Gymboree Common Shares held by a non-U.S. Holder that are effectively connected with a non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. Holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

### 17.  *Sale, Redemption, or Repurchase of New Gymboree Common Shares*

A non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a Cash redemption) of New Gymboree Common Shares unless:

(i)     such non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; or

(ii)    such gain is effectively connected with such non-U.S. Holder's conduct of a U.S. trade or business (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. Holder in the United States); or

(iii)   the Reorganized Debtors are or have been during a specified testing period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of New Gymboree Common Shares.  If the second exception applies, the non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).  The Debtors consider it unlikely, based on their current business plans and operations, that any of the Reorganized Debtors will become a "U.S. real property holding corporation" in the future.

### 18.  FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30% on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on New Gymboree Common Shares), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Gymboree Common Shares).  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding.

FATCA withholding rules currently apply to U.S.-source payments of fixed or determinable, annual or periodic income, and will apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Each non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. Holder's ownership of New Gymboree Common Shares.

### E.      Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends.  The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the

Holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XVII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  June 16, 2017

Respectfully submitted,

The Gymboree Corporation,
on behalf of itself and each of the other Debtors

By:  */s/ James A. Mesterharm*
Name: James A. Mesterharm
Title:   Chief Restructuring Officer

Prepared by:

Dated:  June 16, 2017                */s/ Michael A. Condyles*
Richmond, Virginia                Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192
Email:          Michael.Condyles@KutakRock.com
Peter.Barrett@KutakRock.com
Jeremy.Williams@KutakRock.com

-and-

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:          james.sprayregen@kirkland.com
anup.sathy@kirkland.com
steven.serajeddini@kirkland.com

**-and-**

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          joshua.sussberg@kirkland.com
matthew.fagen@kirkland.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

57

**<u>Exhibit A</u>**

**Plan of Reorganization**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| THE GYMBOREE CORPORATION, *et al.*,[1] | § | Case No. 17-32986 (KLP) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## JOINT CHAPTER 11 PLAN OF REORGANIZATION
## OF THE GYMBOREE CORPORATION AND ITS DEBTOR AFFILIATES

---

**NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER, ACCEPTANCE, COMMITMENT, OR LEGALLY BINDING OBLIGATION OF THE DEBTORS, ANY OF THE RESTRUCTURING SUPPORT PARTIES, OR ANY OTHER PARTY IN INTEREST.**

**YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

**THIS PLAN IS SUBJECT TO APPROVAL BY THE BANKRUPTCY COURT AND OTHER CUSTOMARY CONDITIONS. THIS PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES.**

---

James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:       (312) 862-2000
Facsimile:        (312) 862-2200

-and-

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:        (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:       (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

Dated:  June 16, 2017

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588).  The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

# TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**...................................................................................................1

    A.    Defined Terms ..........................................................................................................1
    B.    Rules of Interpretation ...........................................................................................15
    C.    Computation of Time .............................................................................................15
    D.    Governing Law .......................................................................................................15
    E.    Reference to Monetary Figures ..............................................................................15
    F.    Controlling Document ............................................................................................16

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** .............................16

    A.    Administrative Claims ...........................................................................................16
    B.    Professional Compensation ....................................................................................16
    C.    Priority Tax Claims ................................................................................................17
    D.    DIP Claims .............................................................................................................17
    E.    Statutory Fees.........................................................................................................18

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ...........19

    A.    Summary of Classification .....................................................................................19
    B.    Treatment of Claims and Interests .........................................................................19
    C.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .................22
    D.    Elimination of Vacant Classes ...............................................................................22
    E.    Voting Classes; Presumed Acceptance by Non-Voting Classes ............................22
    F.    Intercompany Interests ...........................................................................................22
    G.    Subordinated Claims and Interests .........................................................................22

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ......................................22

    A.    Restructuring Transactions .....................................................................................22
    B.    General Settlement of Claims .................................................................................23
    C.    Sources of Consideration for Plan Distributions ...................................................23
    D.    Li & Fung Agency Agreement ..............................................................................25
    E.    Corporate Existence ...............................................................................................25
    F.    Vesting of Assets in the Reorganized Debtors ......................................................25
    G.    Cancellation of Existing Securities and Instruments .............................................25
    H.    Corporate Action ....................................................................................................25
    I.    New Organizational Documents .............................................................................26
    J.    Directors and Officers of the Reorganized Debtors ..............................................26
    K.    Effectuating Documents; Further Transactions......................................................26
    L.    Exemption from Certain Taxes and Fees ...............................................................27
    M.    Preservation of Causes of Action ..........................................................................27
    N.    Director and Officer Liability Insurance ...............................................................27
    O.    Management Incentive Plan ....................................................................................28
    P.    Employee Obligations ............................................................................................28
    Q.    Reporting Upon Emergence ...................................................................................28

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .....28

    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ...................28
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases.....................29
    C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases...................29
    D.    Indemnification Obligations....................................................................................30
    E.    Insurance Policies ...................................................................................................30
    F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements .............30
    G.    Reservation of Rights .............................................................................................31
    H.    Nonoccurrence of Effective Date...........................................................................31
    I.    Contracts and Leases Entered Into After the Petition Date ...................................31

i

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ................................................**31**
A.    Timing and Calculation of Amounts to Be Distributed ................................ 31
B.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ....................... 31
C.    Registration or Private Placement Exemption .............................................. 32
D.    Tax Issues and Compliance with Tax Requirements ..................................... 33
E.    Allocations ............................................................................... 34
F.    No Postpetition Interest on Claims ............................................ 34
G.    Setoffs and Recoupment .................................................. 34
H.    Claims Paid or Payable by Third Parties ............................................. 34

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS** ........................................................................**35**
A.    Allowance of Claims ........................................................ 35
B.    Claims Administration Responsibilities ............................................ 35
C.    Estimation of Claims ............................................................ 35
D.    Adjustment to Claims Without Objection .......................................... 36
E.    Time to File Objections to Claims ................................................ 36
F.    Disallowance of Claims ........................................................ 36
G.    Amendments to Claims ......................................................... 36
H.    No Distributions Pending Allowance ............................................. 36
I.    Distributions After Allowance .................................................. 36

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ......................**37**
A.    Compromise and Settlement of Claims, Interests, and Controversies ........................... 37
B.    Discharge of Claims and Termination of Interests ..................................... 37
C.    Term of Injunctions or Stays .................................................... 37
D.    **Release of Liens** ............................................................. 37
E.    **Debtor Release** .............................................................. 38
F.    **Release by Holders of Claims or Interests** ........................................ 38
G.    **Exculpation** ................................................................ 39
H.    **Injunction** ................................................................. 39
I.    Protection Against Discriminatory Treatment ........................................ 40
J.    Recoupment .................................................................. 40
K.    Subordination Rights .......................................................... 40

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ..........................................................................**40**
A.    Conditions Precedent to the Effective Date ........................................ 40
B.    Waiver of Conditions .......................................................... 41
C.    Substantial Consummation ...................................................... 41
D.    Effect of Nonoccurrence of Conditions to the Effective Date ............................. 41

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ..........................**41**
A.    Modification and Amendments ................................................... 41
B.    Effect of Confirmation on Modifications ........................................... 42
C.    Revocation or Withdrawal of the Plan ............................................. 42

**ARTICLE XI. RETENTION OF JURISDICTION** .................................................**42**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ...............................................**44**
A.    Immediate Binding Effect ...................................................... 44
B.    Additional Documents ......................................................... 44
C.    Dissolution of the Committee ................................................... 44
D.    Reservation of Rights ......................................................... 44
E.    Successors and Assigns ........................................................ 45
F.    Service of Documents ......................................................... 45

G.      Entire Agreement .......................................................................................................46
H.      Exhibits .....................................................................................................................46
I.      Nonseverability of Plan Provisions ...........................................................................46
J.      Votes Solicited in Good Faith ...................................................................................46
K.      Waiver or Estoppel....................................................................................................46

## INTRODUCTION

The Gymboree Corporation ("<u>Gymboree</u>") and its debtor affiliates, as debtors and debtors in possession (each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>"), propose this joint plan of reorganization (together with the documents comprising the Plan Supplement, the "<u>Plan</u>") for the resolution of outstanding Claims against, and Interests in, the Debtors.  Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof.  Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code, and the Plan constitutes a separate plan of reorganization for each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.    "*1145 Rights Offering*" means the rights offering for shares of New Gymboree Common Shares to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 1145 of the Bankruptcy Code, in accordance with the 1145 Rights Offering Procedures.

2.    "*1145 Rights Offering Procedures*" means the procedures set forth in Schedule 12 to the Disclosure Statement Order, as they may be amended or modified from time to time in a manner that is reasonably acceptable to the Debtors and the Requisite Commitment Parties, such consent not to be unreasonably withheld.

3.    "*1145 Rights Offering Shares*" means New Gymboree Common Shares issued pursuant to the 1145 Rights Offering.

4.    "*1145 Subscription Rights*" means the rights to purchase New Gymboree Common Shares at the per share purchase price stated in the Backstop Commitment Agreement.

5.    "*4(a)(2) Rights Offering*" means the rights offering for New Gymboree Common Shares to be conducted in reliance upon the exemption from registration under the Securities Act provided in Section 4(a)(2) of the Securities Act, in accordance with the 4(a)(2) Rights Offering Procedures.

6.    "*4(a)(2) Rights Offering Procedures*" means the procedures set forth in Schedule 13 to the Disclosure Statement Order, as they may be amended or modified from time to time in a manner that is reasonably acceptable to the Debtors and the Requisite Commitment Parties.

7.    "*4(a)(2) Rights Offering Shares*" means the shares of New Gymboree Common Shares issued pursuant to the 4(a)(2) Rights Offering.

8.    "*4(a)(2) Subscription Rights*" means the rights to purchase New Gymboree Common Shares at the per share purchase price stated in the Backstop Commitment Agreement.

9.    "*ABL Agents*" means, collectively, the ABL Term Loan Agent and the ABL Administrative Agent.

10.      "*ABL Credit Agreement*" means that certain Second Amendment to Amended and Restated Credit Agreement, dated as of April 22, 2016 (as amended from time to time), by and among Gymboree, as the borrower, certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, the ABL Agents, and the ABL Lenders.

11.      "*ABL Documents*" means the ABL Credit Agreement and any other agreements and documents executed in connection with or related thereto.

12.      "*ABL Lenders*" means, collectively, the ABL Revolver Lenders and the ABL Term Loan Lenders.

13.      "*ABL Obligations*" shall have the meaning set forth in the DIP Orders.

14.      "*ABL Administrative Agent*" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the ABL Credit Agreement.

15.      "*ABL Revolver Lenders*" means the Revolving Secured Parties, as defined in the ABL Credit Agreement.

16.      "*ABL Term Loan Agent*" means Pathlight Capital LLC, in its capacity as term loan agent under the ABL Credit Agreement.

17.      "*ABL Term Loan Lenders*" means the ABL Term Secured Parties, as defined in the ABL Credit Agreement.

18.      "*Adjusted Rights Offerings Amount*" means the amount of new money to be raised (rounded to the nearest half million) pursuant to the Rights Offerings that is reasonably determined on or about the 14th day before the Confirmation Hearing to be necessary for the Reorganized Debtors have on the Effective Date the aggregate amount of liquidity required in order to maintain approximately (but no less than) a minimum liquidity of $50,000,000 at month end of projected liquidity over the 12 month period following the Effective Date (assuming for the purposes of such calculation that the New Money DIP Loans are fully drawn) as determined in accordance with the Backstop Commitment Agreement and Restructuring Support Agreement.

19.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (d) all DIP Claims; and (e) the Backstop Commitment Premium.

20.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which:  (a) with respect to Administrative Claims other than Professional Fee Claims, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days after the Effective Date.

21.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

22.      "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Court; *provided*, that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof

2

has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow" and "Allowing" shall have correlative meanings.

23. "*Avoidance Actions*" means any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtors, the debtors in possession, the Estates, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

24. "*Backstop Approval Order*" means the order of the Bankruptcy Court entered on [●], 2017 [Docket No. [●]].

25. "*Backstop Commitment Agreement*" means that certain Backstop Commitment Agreement, dated as of June 11, 2017, as may be amended or modified from time to time in accordance with the terms thereof and the Backstop Approval Order, pursuant to which the Backstop Parties have agreed to backstop the Rights Offerings.

26. "*Backstop Commitment Premium*" means a premium equal to 5% of the Maximum Rights Offerings Amount, which shall be satisfied by the Backstop Commitment Premium Shares pursuant to the Plan.

27. "*Backstop Commitment Premium Shares*" means 2.3% of the New Gymboree Common Shares, subject to dilution by the Management Incentive Plan, issued as payment of the Backstop Commitment Premium in accordance with the Backstop Commitment Agreement.

28. "*Backstop Parties*" means, at any time or from time to time, the Term Loan Lenders that have committed to fund the Rights Offerings and are signatories to the Backstop Commitment Agreement, solely in their capacities as such, including their respective permitted transferees, successors and assigns, all in accordance with the Backstop Commitment Agreement.

*29.* "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time, as applicable to the Chapter 11 Cases.

30. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Eastern District of Virginia having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Eastern District of Virginia.

31. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, each as amended from time to time.

32. "*Bar Date*" means the date or dates to be established by the Bankruptcy Court by which Proofs of Claim must be Filed.

33. "*Base Treatment*" has the meaning set forth in Article II.D of this Plan.

34. "*Budget*" has the meaning set forth in the DIP Order.

3

35.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

36.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

37.    "*Causes of Action*" means any claims, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

38.    "*Chapter 11 Cases*" means when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Bankruptcy Court.

39.    "*Claim*" means a claim, as defined in section 101(5) of the Bankruptcy Code, asserted against a Debtor.

40.    "*Claims Objection Bar Date*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Bankruptcy Court for objecting to Claims.

41.    "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

42.    "*Class*" means a category of Claims or Interests under section 1122(a) of the Bankruptcy Code.

43.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan.

44.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

45.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

46.    "*Confirmation Order*" means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

47.    "*Consenting Creditors*" means each Term Loan Lender that is a party to the Restructuring Support Agreement.

48.    "*Consummation*" means the occurrence of the Effective Date.

49.    "*Creditors' Committee*" means the official committee of unsecured creditors, if any, appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

50.    "*Critical Trade Claim*" means any Claim held by a creditor that provides goods and services necessary to the continued operation of the Reorganized Debtors.

4

51.     "*Cure Claim*" means a monetary Claim based upon a Debtor's defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

52.     "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include:  (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) Cure Claims to be paid in connection therewith; and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

53.     "*D&O Liability Insurance Policies*" means all insurance policies (including any "tail policy") of any of the Debtors for current or former directors', managers', and officers' liability.

54.     "*Debtors*" means, collectively:  Gymboree; Giraffe Intermediate B, Inc.; Gym-Card LLC; Gym-Mark, Inc.; Gymboree Manufacturing, Inc.; Gymboree Retail Stores, Inc.; Gymboree Operations, Inc.; and S.C.C. Wholesale, Inc., the debtors and debtors in possession in the Chapter 11 Cases.

55.     "*DIP ABL Administrative Agent*" means Bank of America, N.A., in its capacity as administrative agent and collateral agent under the DIP ABL Credit Agreement, together with its respective successors and assigns in such capacity.

56.     "*DIP ABL Agents*" means the DIP ABL Administrative Agent and the DIP ABL Term Agent.

57.     "*DIP ABL Claims*" means, collectively, the DIP ABL Revolving Loan Claims and DIP ABL Term Loan Claims.

58.     "*DIP ABL Credit Agreement*" means that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement, dated as of June 15, 2017, by and among the Debtors, the DIP ABL Lenders, and the DIP ABL Agents, as it may be amended, restated, supplemented, or otherwise modified from time to time.

59.     "*DIP ABL Documents*" means the DIP ABL Credit Agreement and any other agreements and documents executed in connection with or related thereto.

60.     "*DIP ABL Facility*" means that certain $273,450,000 postpetition debtor-in-possession financing facility available under the DIP ABL Credit Agreement.

61.     "*DIP ABL Lenders*" means the DIP ABL Revolver Lenders and the DIP ABL Term Loan Lenders.

62.     "*DIP ABL Obligations*" shall have the meaning set forth in the DIP Orders.

63.     "*DIP ABL Revolver Lenders*" means the Revolving Secured Parties, as defined in the DIP ABL Credit Agreement.

64.     "*DIP ABL Revolving Loan Claims*" means any and all Claims derived from, based upon, or secured by, the DIP ABL Documents.

65.     "*DIP ABL Revolving Loans*" means the Revolving Credit Loans, as defined in the DIP ABL Credit Agreement.

66.     "*DIP ABL Term Agent*" means Pathlight Capital LLC in its capacity as term loan agent under the DIP ABL Credit Agreement, together with its respective successors and assigns.

67.     "*DIP ABL Term Loan Lenders*" means the ABL Term Secured Parties, as defined in the DIP ABL Credit Agreement.

68.   "*DIP ABL Term Loan Claims*" means any and all Claims derived from, based upon, or secured by, the DIP ABL Documents.

69.   "*DIP ABL Term Loans*" means the ABL Term Loan, as defined in the DIP ABL Credit Agreement.

70.   "*DIP Agents*" means, collectively, the DIP ABL Agents and DIP Term Loan Agent.

71.   "*DIP Claims*" means, collectively, the DIP ABL Claims and the DIP Term Loan Claims.

72.   "*DIP Credit Agreements*" means, collectively, the DIP ABL Credit Agreement and the DIP Term Loan Credit Agreement.

73.   "*DIP Election Date*" means June 26, 2017.

74.   "*DIP Facilities*" shall have the meaning set forth in the DIP Orders.

75.    "*DIP Lenders*" means, collectively, DIP ABL Lenders and the DIP Term Loan Lenders.

76.   "*DIP Orders*" means, collectively, the interim and final orders entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreements and incur postpetition obligations thereunder.

77.   "*DIP Surplus Amount*" has the meaning set forth in Section II.D of the Plan.

78.   "*DIP Surplus Conversion*" has the meaning set forth in Section II.D of the Plan.

79.   "*DIP Surplus Conversion Shares*" means the New Gymboree Common Shares issued and purchased on account of the DIP Surplus Amount at the Share Ratio, subject to dilution by the Management Incentive Plan.

80.   "*DIP Term Loan Agent*" means Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent under the DIP Term Loan Credit Agreement, together with its respective successors and assigns in such capacity.

81.   "*DIP Term Loan Claims*" means, collectively, the New Money DIP Loan Claims and the Roll-Up DIP Claims.

82.   "*DIP Term Loan Credit Agreement*" means that certain Credit Agreement, dated as of June 15, 2017, by and among the Debtors, the DIP Term Loan Lenders, and the DIP Term Loan Agent, as it may be amended, restated, supplemented, or otherwise modified from time to time.

83.   "*DIP Term Loan Facility*" means, collectively, the New Money DIP Loans and the Roll-Up DIP Loans.

84.   "*DIP Term Loan Lenders*" means, collectively, the Initial DIP Term Loan Lenders and the Electing DIP Term Loan Lenders.

85.   "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that:  (a) has been disallowed by a Final Order; (b) is Scheduled as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely Filed under applicable law or the Plan; (c) is not Scheduled and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise

deemed timely Filed under applicable law or the Plan; (d) has been withdrawn by agreement of the applicable Debtor and the Holder thereof; or (e) has been withdrawn by the Holder thereof.

86.      "*Disclosure Statement*" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

87.      "*Disclosure Statement Order*" means the order entered by the Bankruptcy Court approving the Disclosure Statement, entered on [●], 2017 [Docket No. [●]].

88.      "*Disputed*" means a Claim that is not yet Allowed.

89.      "*Distribution Record Date*" means the date for determining which Holders of Claims are eligible to receive distributions hereunder and shall be the Effective Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided*, that the Distribution Record Date shall not apply to publicly held securities.

90.      "*DTC*" means the Depository Trust Company.

91.      "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective.

92.      "*Electing DIP Term Loan Lender*" means any Term Loan Lender who executes the Restructuring Support Agreement and the DIP Term Loan Credit Agreement subsequent to the Petition Date and prior to the DIP Election Date, and thereby commits to, among other things, (i) fund its ratable share of the DIP Term Loan Facility, (ii) support the Plan, and (iii) fully exercise its Subscription Rights.

93.      "*Eligible Holder*" means each Holder of a Term Loan Secured Claim as of the Record Date.

94.      "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

95.      "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

96.      "*Exculpated Parties*" means collectively, and in each case in its capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Backstop Parties; (d) the Term Loan Agent; (e) the DIP Term Loan Lenders; (f) the DIP Term Loan Agent; (g) the DIP ABL Agents; (h) the DIP ABL Lenders; (i) the Sponsor; (j) the ABL Agents; (k) the ABL Lenders; (l) with respect to each of the foregoing entities in clauses (a) through (k), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (m) with respect to each of the foregoing Entities in clauses (a) through (l), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (l), each solely in their capacity as such).

97.      "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

98.      "*Exit ABL Revolving Facility*" means either (a) a replacement asset-based revolving loan facility, pursuant to which the DIP ABL Revolver Lenders will convert all of their outstanding DIP ABL Revolving Loan Claims and commitments under the DIP ABL Facility into commitments under such Exit ABL Revolving Facility or (b) a new asset-based revolving loan facility in an amount sufficient to repay in full in Cash on the Effective Date the portion of the DIP ABL Facility provided by the DIP ABL Revolver Lenders and to provide incremental liquidity, in either case, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors.

99.     "*Exit ABL Term Loan Replacement Facility*" means either (a) an asset-based term loan facility pursuant to which the DIP ABL Term Loan Lenders will convert all of their outstanding DIP ABL Term Loan Claims and commitments under the DIP ABL Facility into commitments under such Exit ABL Term Loan Replacement Facility or (b) a new asset-based term loan facility in an amount sufficient to repay in full in Cash on the Effective Date the portion of the DIP ABL Facility provided by the DIP ABL Term Loan Lenders, in either case, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors.

100.    "*Exit Facilities*" means, collectively, the Exit ABL Revolving Facility, the Exit ABL Term Loan Replacement Facility, and Exit Term Loan Facility.

101.    "*Exit Facility Credit Agreements*" means the credit agreements governing the Exit Facilities.

102.    "*Exit Facility Documents*" means the agreements and related documents governing the Exit Facilities.

103.    "*Exit Term Loan Facility*" means the exit term loan facility provided by the DIP Term Loan Lenders, substantially on the terms set forth on the Exit Term Loan Facility Term Sheet and otherwise reasonably acceptable to the Required Consenting Creditors, subject to the Debtors' ability to obtain an alternative term loan facility sufficient to pay the New Money DIP Loan Claims in full in Cash on the Effective Date.

104.    "*Exit Term Loan Facility Term Sheet*" means the term sheet attached as Annex 4 to Exhibit A to the Restructuring Support Agreement that sets forth the terms on which the DIP Term Loan Lenders have agreed to provide the Exit Term Loan Facility.

*105.*    "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

106.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

107.    "*Final Order*" means (i) an order or judgment of the Bankruptcy Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Bankruptcy Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Case (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules of the Bankruptcy Court, may be filed relating to such order shall not prevent such order from being a Final Order.

108.    "*General Unsecured Claim*" means any Claim, including the Term Loan Deficiency Claim and the Unsecured Note Claim, other than (a) an Administrative Claim, (b) a Secured Tax Claim, (c) an Other Secured Claim, (d) a Priority Tax Claim, (e) an Other Priority Claim, (f) a Term Loan Secured Claim, (g) a Critical Trade Claim, (h) an Intercompany Claim, or (i) a DIP Claim.

109.    "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

110.    "*Gymboree*" means The Gymboree Corporation.

8

111.    "*Gymboree Consolidated Group*" has the meaning set forth in Section VI.D of the Plan.

112.    "*Holder*" means an Entity holding a Claim or Interest, as applicable.

113.    "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

114.    "*Initial DIP Term Loan Lenders*" means, collectively, certain Consenting Creditors that committed to provide the Debtors with the DIP Term Loan Facilities, in their capacities as the DIP Term Loan Lenders.

115.    "*Intercompany Claim*" means any Claim held by a Debtor or a Debtor's Affiliate against a Debtor or a Debtor's Affiliate.

116.    "*Intercompany Interest*" means, other than an Interest in Gymboree, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

117.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor.

118.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as amended from time to time, as applicable to the Chapter 11 Cases.

119.    "*Li & Fung*" means LF Centennial Pte Ltd. and its Affiliates.

120.    "*Li & Fung Agency Agreement*" means that certain agreement by and between Gymboree Manufacturing, Inc. and Li & Fung, dated as of February 28, 2015, as amended from time to time.

121.    "*Li & Fung Letter Agreement*" means that certain letter agreement by and between Gymboree and Li & Fung, dated as of April 21, 2017.

122.    "*Li & Fung Letter of Credit*" means that certain $10,000,000 letter of credit provided to Li & Fung pursuant to the Li & Fung Letter Agreement.

123.    "*Li & Fung Term Loan Claim*" means the $20,000,000 Term Loan Claim held by Li & Fung, which shall be assigned to the Reorganized Debtors on the Effective Date and canceled without further action or consideration to Li & Fung.

124.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

125.    "*Management Incentive Plan*" means a post-Effective Date management incentive plan, the material terms of which shall be consistent with Article IV of the Plan.

126.    "*Management Severance Plan*" means that certain management severance plan for Gymboree, effective as of January 8, 2013.

127.    "*Maximum Rights Offerings Amount*" means $80,000,000.

128.    "*New Boards*" means the initial board of directors, members, or managers, as applicable, of each Reorganized Debtor.

129.    "*New Gymboree Common Shares*" means the common shares of Reorganized Gymboree to be issued under the Plan.

130.    "*New Money DIP Loan Claim*" means any Claim derived from or based upon the New Money DIP Loans.

131.    "*New Money DIP Loans*" means the $35,000,000 in new money delayed draw term loans extended to the Debtors pursuant to the DIP Term Loan Credit Agreement and DIP Order.

*132.*    "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, which forms shall be included in the Plan Supplement and shall be in form and substance reasonably acceptable to the Required Consenting Creditors.

133.    "*New Stockholders' Agreement*" means the agreement with respect to the New Gymboree Common Shares, the form of which shall be included in the Plan Supplement and which shall be consistent with the Restructuring Support Agreement or otherwise reasonably acceptable to the Required Consenting Creditors.

134.    "*Non-Debtor*" has the meaning set forth in Section VI.D of the Plan.

135.    "*Non-Debtor Subsidiaries*" means:  Gym-IPCO, LLC, Gymboree Play Programs, Inc., Gymboree Australia Pty Ltd., Gymboree Island LLC, Gymboree Inc., Gymboree Canada Inc., and Gymboree Korea Ltd.

136.    "*Notice and Claims Agent*" means Prime Clerk LLC.

137.    "*Other Priority Claim*" means any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

138.    "*Other Secured Claim*" means any Secured Claim, other than (a) claims arising under the Debtors' prepetition asset-based lending credit facility or (b) a Term Loan Secured Claim.

139.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

140.    "*Petition Date*" means June 11, 2017, the date on which the Debtors commenced the Chapter 11 Cases.

141.    "*Plan*" means this plan of reorganization, as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto.

142.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan (as amended, supplemented, or modified from time to time in accordance with the terms thereof, the Plan, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement) to be Filed by the Debtors no later than eight days before the Voting Deadline, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors, including the following, as applicable: (a) New Organizational Documents; (b)  Exit Facility Credit Agreements; (c) Schedule of Assumed Executory Contracts and Unexpired Leases; (d) Schedule of Rejected Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) New Stockholders' Agreement; (g) Registration Rights Agreement; (h) a document listing the members of the New Boards and the officers of the Reorganized Debtors; and (i) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date in accordance with Article X of the Plan.

143.    "*Priority Claims*" means, collectively, Priority Tax Claims and Other Priority Claims.

144.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

10

145.    "*Professional*" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

146.    "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Confirmation Date to the extent such fees and expenses have not been previously paid.

147.    "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the total Professional Fee Reserve Amount funded by the Reorganized Debtors on the Effective Date.

148.    "*Professional Fee Reserve Amount*" means the aggregate amount of Professional Fee Claims that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Effective Date, which estimates Professionals shall deliver to the Debtors as set forth in Article II.B of this Plan.

149.    "*Proof of Claim*" means a proof of Claim Filed in the Chapter 11 Cases.

150.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

151.    "*Registration Rights Agreement*" means the Registration Rights Agreements with respect to the New Gymboree Common Shares, substantially in the form to be included in the Plan Supplement.

152.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

153.    "*Released Party*" means each of the following in their capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Sponsor; (d) the Backstop Parties; (e) the Term Loan Agent; (f) the DIP Term Loan Lenders; (g) the DIP Term Loan Agent; (h) the ABL Agents; (i) the ABL Lenders; (j) DIP ABL Lenders; (k) the DIP ABL Agents; (l) with respect to each of the foregoing entities in clauses (a) through (k), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (m) with respect to each of the foregoing Entities in clauses (a) through (l), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (l), each solely in their capacity as such); *provided*, that any Holder of a Claim or Interest that objects to or votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party."

154.    "*Releasing Party*" means each of the following in their capacity as such:  (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Sponsor; (d) the Backstop Parties; (e) the Term Loan Agent; (f) the DIP Term Loan Lenders; (g) the DIP Term Loan Agent; (h) the ABL Agents; (i) the ABL Lenders; (j) the DIP ABL Lenders; (k) the DIP ABL Agents; (l) with respect to each of the foregoing entities in clauses (a) through (k), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; (m) with respect to each of the foregoing Entities in clauses (a) through (l), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (l), each solely in their capacity as such); (n) all Holders of Claims and Interests that are deemed to accept the Plan; (o) all Holders of Claims and Interests who vote to accept the Plan; and (p) all Holders in voting Classes who abstain from voting on the Plan <u>and</u> who do not object to the Plan.

155.    "*Reorganized Debtors*" means Reorganized Gymboree and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan.

156.    "*Reorganized Gymboree*" means either (a) Gymboree, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Gymboree Common Shares to be distributed or sold pursuant to the Plan.

157.    "*Reorganized Gymboree Board*" means the board of directors of Reorganized Gymboree on and after the Effective Date.

158.    "*Required Backstop Parties*" has the meaning set forth in the Backstop Commitment Agreement.

159.    "*Required Consenting Creditors*" has the meaning set forth in the Restructuring Support Agreement.

160.    "*Restructuring*" means the restructuring of the Debtors on the terms of the Plan and the Restructuring Support Agreement.

161.    "*Restructuring Documents*" means the Plan, the Disclosure Statement, the Plan Supplement, and the various agreements and other documents formalizing or implementing the Plan and the transactions contemplated thereunder, each subject to the Backstop Commitment Agreement and Restructuring Support Agreement.

162.    "*Restructuring Support Agreement*" means that certain Restructuring Support Agreement, dated as of June 11, 2017, by and among the Debtors and the Restructuring Support Parties, including all exhibits and schedules attached thereto, as may be amended from time to time in accordance with the terms thereof.

163.    "*Restructuring Support Parties*" means, collectively, (a) the Consenting Creditors and (b) the Sponsor, in each case, that are party to the Restructuring Support Agreement.

164.    "*Restructuring Term Sheet*" means the term sheet attached as Exhibit A to the Restructuring Support Agreement.

165.    "*Restructuring Transactions*" means those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions that the Debtors and the Required Consenting Creditors reasonably determine to be necessary to implement the Restructuring, as described in more detail in Article IV.A herein.

166.    "*Rights Offerings*" means, collectively, the 1145 Rights Offering and the 4(a)(2) Rights Offering, each of which shall be conducted in accordance with the Backstop Commitment Agreement, the Restructuring Support Agreement, and the applicable Rights Offerings Procedures.

167.    "*Rights Offerings Amount*" means the lower of the Maximum Rights Offerings Amount and the Adjusted Rights Offerings Amount.

168.    "*Rights Offerings Participants*" means those Term Loan Lenders who duly subscribe for Rights Offerings Shares in accordance with the Rights Offerings Procedures.

169.    "*Rights Offerings Procedures*" means collectively the 1145 Rights Offering Procedures and the 4(a)(2) Rights Offering Procedures as approved by the Disclosure Statement Order.

170.    "*Rights Offerings Record Date*" means the record date(s) set by the Rights Offerings Procedures, as of which date an entity must be a record Holder of Allowed Term Loan Claims in order to be eligible to be a Rights Offerings Participant.

12

171.    "*Rights Offerings Shares*" means, collectively, the 1145 Rights Offering Shares and the 4(a)(2) Rights Offering Shares to be purchased by the Term Loan Lenders pursuant to the Rights Offerings.  For the avoidance of doubt, the term "Rights Offerings Shares" does not include the New Gymboree Common Shares issued on account of the Backstop Commitment Premium.

172.    "*Roll-Up DIP Claim*" means any Claim derived from or based upon the Roll-Up DIP Loans.

173.    "*Roll-Up DIP Conversion Shares*" means the New Gymboree Common Shares, purchased at the Share Ratio, equal to 41.0% of the New Gymboree Common Shares, subject to dilution by the Management Incentive Plan and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion.

174.    "*Roll-Up DIP Loans*" means the $70,000,000 of Term Loan Claims rolled-up pursuant to the DIP Term Loan Credit Agreement and DIP Order.

175.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which shall be in form and substance acceptable to each of the Debtors and the Required Consenting Creditors.

176.    "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule (including any amendments or modifications thereto), if any, of the Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as amended by the Debtors from time to time in accordance with the Plan, which shall be in form and substance acceptable to each of the Debtors and the Required Consenting Creditors.

177.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

178.    "*Secured*" means when referring to a Claim: (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the applicable Holder's interest in the applicable Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim.

179.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, together with the rules and regulations promulgated thereunder, as amended from time to time.

180.    "*Security*" means a security as defined in section 2(a)(1) of the Securities Act.

181.    "*Share Ratio*" means a per share purchase price for New Gymboree Common Shares based on a 35% discount to a stipulated equity value of $262.5 million based on a total enterprise value of $430 million (each of which stipulated equity value and enterprise value shall remain fixed regardless of whether the Adjusted Rights Offerings Amount is equal to or less than the Maximum Rights Offerings Amount); *provided*, that in the event of a DIP Surplus Conversion, the Share Ratio shall be adjusted to use the preceding stipulated equity value, increased by the amount of the DIP Surplus Amount.

182.    "*Sponsor*" means Bain Capital Private Equity, LP on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its Affiliates that directly or indirectly hold interests in the Debtors.

183.     "*Subscription Escrow Funding Date*" has the meaning set forth in the Backstop Commitment Agreement.

184.     "*Subscription Rights*" means collectively the 1145 Subscription Rights and the 4(a)(2) Subscription Rights.

185.     "*Term Loan Agent*" means Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative and collateral agent under the Term Loan Credit Agreement, and any successor thereto.

186.     "*Term Loan Claim*" means any Claim derived from or based upon the Term Loan Credit Agreement.

187.     "*Term Loan Common Shares*" means 100% of the New Gymboree Common Shares outstanding on the Effective Date, reduced by:  (a) the Rights Offerings Shares; (b) the Roll-Up DIP Conversion Shares; (c); the Backstop Commitment Premium Shares; and (d) the DIP Surplus Conversion Shares (if any).    Assuming the Maximum Rights Offerings Amount, the Term Loan Common Shares will be equal to 9.8% of the New Gymboree Common Shares outstanding on the Effective Date (prior to a ratable upward adjustment to account for the difference (if any) between the Maximum Rights Offerings Amount and the Adjusted Rights Offerings Amount), before any dilution by the DIP Surplus Conversion Shares (if any) after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion and subject to further dilution by the Management Incentive Plan.

188.     "*Term Loan Credit Agreement*" means that certain Amended and Restated Credit Agreement, dated as of February 11, 2011 (as amended from time to time), by and among Gymboree, as the borrower; certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, the Term Loan Agent, and the Term Loan Lenders.

189.     "*Term Loan Deficiency Claim*" means any Term Loan Claim that is not a Secured Claim.

190.     "*Term Loan Lenders*" means the lending institutions party from time to time to the Term Loan Credit Agreement.

191.     "*Term Loan Secured Claim*" means any Term Loan Claim that is a Secured Claim.

192.     "*U.S. Trustee*" means the Office of the United States Trustee for the Eastern District of Virginia.

193.     "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

194.     "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that are unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash.

195.     "*Unsecured Note Claim*" means any Claim derived from or based upon the Unsecured Notes or the Unsecured Notes Indenture.

196.     "*Unsecured Notes*" means the 9.125% unsecured senior notes due December 1, 2018, issued by Gymboree pursuant to the Unsecured Notes Indenture.

197.     "*Unsecured Notes Indenture*" means that certain Indenture, dated as of November 23, 2010, as amended, modified, or supplemented from time to time, by and between Gymboree, as issuer, the Unsecured Notes Indenture Trustee, and certain of the Debtors, as guarantors.

198.     "*Unsecured Notes Indenture Trustee*" means Deutsche Bank Trust Company Americas, in its capacity as indenture trustee under the Unsecured Notes Indenture, and any successor thereto.

199.    "*Voting Deadline*" means August 29, 2017, at 5:00 p.m. (prevailing Eastern Time).

B.    *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

D.    *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or Reorganized Debtor, as applicable.

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and any document included in the Plan Supplement, the terms of the relevant provision in the Plan shall control (unless stated otherwise in such document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims, DIP Claims, or are payable on account of the Backstop Commitment Premium, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Claim shall be paid in full in Cash the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements and/or arrangements governing, instruments evidencing, or other documents relating to such transactions (and no requests for payment of such Administrative Claims must be Filed or served).  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim Allowed by Final Order.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party by the Claims Objection Bar Date.

B.    *Professional Compensation*

1.    <u>Final Fee Applications and Payment of Professional Fee Claims</u>

All requests for final Allowance and payment of Professional Fee Claims must be Filed no later than 45 days after the Effective Date.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code.  The Reorganized Debtors shall pay Professional Fee Claims in Cash in the amount the Bankruptcy Court Allows.

2.    <u>Professional Fee Escrow Account</u>

On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates.  The

amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors as soon as reasonably practicable after such Professional Fee Claims are Allowed.  When all Allowed amounts owing to the Professionals have been paid in full, any amount remaining in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors without any further action or order of the Bankruptcy Court.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims will be paid by the Reorganized Debtors.

      3.     <u>Professional Fee Reserve Amount</u>

Professionals shall reasonably estimate their unpaid Professional Fee Claims, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

      4.     <u>Post-Confirmation Date Fees and Expenses</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.     *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor against which such Allowed Priority Tax Claim is asserted agree to a less favorable treatment for such Holder, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of its Claim, payments in Cash in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

D.     *DIP Claims*

As of the Effective Date, the DIP Claims shall be Allowed Claims in the full amount outstanding under the DIP Credit Agreements, including principal, interest, fees, and expenses.

      1.     <u>Roll-Up DIP Claims</u>

Except to the extent that a Holder of an Allowed Roll-Up DIP Claim agrees to a less favorable treatment, in full and final satisfaction of the Allowed Roll-Up DIP Claims, each Holder of an Allowed Roll-Up DIP Claim will receive, on the Effective Date, its Pro Rata share of the Roll-Up DIP Conversion Shares.  Upon the satisfaction of the Allowed DIP Roll-Up Claims in accordance with the preceding sentence, all Liens and security interests granted to secure the Allowed Roll-Up DIP Claim shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

      2.     <u>New Money DIP Loan Claims</u>

Except to the extent that a Holder of an Allowed New Money DIP Loan Claim agrees to a less favorable treatment, on the Effective Date, in full satisfaction of the Allowed New Money DIP Loan Claims, each Holder of an Allowed New Money DIP Loan Claim will either: be repaid in full in Cash or receive its Pro Rata share of the Exit Term Loan Facility (the "<u>Base Treatment</u>"); *provided*, that if (a) on the first business day after entry of the

Confirmation Order the most recently delivered Budget projects that any amount in the DIP Funding Account (as defined in the DIP Term Loan Credit Agreement) will remain undrawn immediately prior to the occurrence of the then-projected Effective Date (the "DIP Surplus Amount") and (b) the Required Consenting Creditors elect to receive DIP Surplus Conversion Shares (such election to be made no later than 5 business days after entry of the Confirmation Order) (a "DIP Surplus Conversion"), then on the Effective Date, each Holder of an Allowed New Money DIP Loan Claim will receive its Pro Rata share of the DIP Surplus Conversion Shares, and the amount of New Money DIP Loan Claims entitled to the Base Treatment will be reduced ratably among the Holders by the DIP Surplus Amount; *provided*, *further*, that to the extent that after an election as described in clause (b) of this paragraph, a subsequent Budget indicates that the DIP Surplus Amount on the then-projected Effective Date is different than that indicated in the most recent Budget prior to such election, then the amount of DIP Surplus Conversion Shares may be adjusted accordingly as determined by the Debtors and the Required Consenting Creditors; provided, further, that in lieu of receiving a Cash repayment in satisfaction of any Allowed New Money DIP Loan Claims subject to the Base Treatment, each Holder thereof may instead elect not to receive such Cash repayment and apply such amount towards any funding obligations under the Backstop Commitment Agreement or in connection with the Rights Offerings, in each case, in the manner set forth in the DIP Term Loan Credit Agreement and upon notice to the Debtors and the DIP Term Loan Agent, and prior to the Subscription Escrow Funding Date.

Notwithstanding, the foregoing, to the extent there is a DIP Surplus Amount and the Required Consenting Creditors do not elect to receive DIP Surplus Conversion Shares, then on the date that is one Business Day prior to the election described in the paragraph above, the Debtors shall be permitted to draw an amount of New Money DIP Loans equal to the portion of the DIP Surplus Amount not subject to the election, to the extent necessary to permit the Debtors to meet the Projected Liquidity Requirement (as defined in the Backstop Commitment Agreement) on the Effective Date (after taking into account availability under the Exit Credit Facilities upon the occurrence of the Effective Date).

3.     DIP ABL Revolving Loan Claims

Except to the extent that a Holder of an Allowed DIP ABL Revolving Loan Claim agrees to a less favorable treatment, in full satisfaction of each Allowed DIP ABL Revolving Loan Claim, on the Effective Date, each Holder thereof will either be:  (a) indefeasibly repaid in full in Cash on the Effective Date or (b) with the consent of such Holder, receive its Pro Rata share of the Exit ABL Revolving Facility.  Upon the payment or satisfaction of the Allowed DIP ABL Revolving Loan Claims and the DIP ABL Term Loan Claims in accordance with this Article II.D, all Liens and security interests granted to secure the Allowed DIP ABL Revolving Loan Claims and the DIP ABL Term Loan Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.  As used in this paragraph "repaid in full in Cash" shall mean the indefeasible payment in full in cash of all DIP ABL Obligations, the cancellation, backing, or cash collateralization of letters of credit under the DIP Facility in accordance with the terms of the DIP ABL Documents, and the termination of the DIP ABL Agents' and DIP ABL Lenders' obligation to extend credit under the DIP ABL Facility.

4.     DIP ABL Term Loan Claims

Except to the extent that a Holder of an Allowed DIP ABL Term Loan Claim agrees to a less favorable treatment, in full satisfaction of each Allowed DIP ABL Term Loan Claim, each Holder thereof will either be:  (a) indefeasibly repaid in full in Cash on the Effective Date or (b) with the consent of such Holder, receive its Pro Rata share of the Exit ABL Term Loan Replacement Facility.  As used in this paragraph "repaid in full in Cash" shall mean the indefeasible payment in full in cash of all DIP ABL Obligations, the cancellation, backing, or cash collateralization of letters of credit under the DIP Facility in accordance with the terms of the DIP ABL Documents, and the termination of the DIP ABL Agents' and DIP ABL Lenders' obligation to extend credit under the DIP ABL Facility.

E.     *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the United States Code before the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Reorganized Debtors shall pay any and all

18

such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the U.S. Trustee.  Each Reorganized Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of the applicable Debtor's Chapter 11 Case being closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Summary of Classification*

Claims and Interests, except for DIP Claims, Administrative Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied before the Effective Date.

1.    Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 3 | Term Loan Secured Claims | Impaired | Entitled to Vote |
| 4 | Critical Trade Claims | Unimpaired | Presumed to Accept |
| 5 | General Unsecured Claims | Impaired | Deemed to Reject |
| 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 7 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 8 | Interests in Gymboree | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests*

1.    Class 1 – Other Secured Claims

a.    *Classification*:  Class 1 consists of Other Secured Claims against any Debtor.

b.    *Treatment*:  In full and final satisfaction of each Allowed Other Secured Claim, except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, each Holder thereof will receive: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such Claim Unimpaired.

c.    *Voting*:  Class 1 is Unimpaired.  Holders of Class 1 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

2.       Class 2 – Other Priority Claims

    a.       *Classification*:  Class 2 consists of Other Priority Claims.

    b.       *Treatment*:  In full and final satisfaction of each Allowed Other Priority Claim, except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, , each Holder thereof will receive payment in full in Cash or other treatment rendering such Claim Unimpaired.

    c.       *Voting*:  Class 2 is Unimpaired.  Holders of Class 2 Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, and are not entitled to vote to accept or reject the Plan.

3.       Class 3 – Term Loan Secured Claims

    a.       *Classification*:  Class 3 consists of all Term Loan Secured Claims.

    b.       *Allowance*:  The Term Loan Claims shall be Allowed in the aggregate amount of $698,750,000, plus accrued but unpaid interest, fees and all other amounts due under the Term Loan Credit Agreement; *provided*, *for the avoidance of doubt*, that so long as the Li & Fung Agency Agreement has been assumed in connection with the Plan, the Li & Fung Term Loan Claim shall not be Allowed and shall be deemed assigned to the Debtors and canceled without further action or consideration to Li & Fung.

    c.       *Treatment*:  In full and final satisfaction of each Allowed Term Loan Secured Claim, except to the extent that a Holder of an Allowed Term Loan Secured Claim agrees to a less favorable treatment, each Holder thereof will receive its Pro Rata share of: (a) the Term Loan Common Shares; and (b) the Subscription Rights; *provided*, that the Li & Fung Term Loan Claim shall not be entitled to any recovery under the Plan so long as the Li & Fung Agreement has been assumed in connection with the Plan.

    d.       *Voting*:  Class 3 is Impaired.  Holders of Allowed Class 3 Claims are entitled to vote to accept or reject the Plan.

4.       Class 4 – Critical Trade Claims

    a.       *Classification*:  Class 4 consists of all Critical Trade Claims.

    b.       *Treatment:*  In full and final satisfaction of each Allowed Critical Trade Claim, except to the extent that a Holder of an Allowed Critical Trade Claim agrees to a less favorable treatment, each Holder thereof will receive Cash in an amount equal to such Allowed Critical Trade Claim (only to the extent not already satisfied by payments made pursuant to an order of the Bankruptcy Court) on the later of:  (a) the Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such allowed Critical Trade Claim.

    c.       *Voting:*  Class 4 is Unimpaired.   Holders of Allowed Critical Trade Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Class 4 Claims are not entitled to vote to accept or reject the Plan.

5.      <u>Class 5 – General Unsecured Claims</u>

 a. *Classification*:  Class 5 consists of all General Unsecured Claims.

 b. *Treatment*:  In full and final satisfaction of each Allowed General Unsecured Claim, except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each Holder thereof will neither receive nor retain any consideration under the Plan.  On the Effective Date, each General Unsecured Claim shall be Disallowed in full, released and discharged.

 c. *Voting*:  Class 5 is Impaired.  Holders of Allowed Class 5 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

6.      <u>Class 6 – Intercompany Claims</u>

 a. *Classification*:  Class 6 consists of all Intercompany Claims.

 b. *Treatment*: In full and final satisfaction of each Allowed Intercompany Claim, each Allowed Intercompany Claim, unless otherwise provided for under the Plan, will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Required Consenting Creditors; *provided*, that no distributions shall be made on account of any such Intercompany Claims.

 c. *Voting*:  Class 6 is either Unimpaired, and the Holders of Intercompany Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code, or Impaired, and the Holders of Allowed Class 6 Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.      <u>Class 7 – Intercompany Interests</u>

 a. *Classification*:  Class 7 consists of all Intercompany Interests.

 b. *Treatment*:  In full and final satisfaction of each Allowed Intercompany Interest, each Intercompany Interest shall be Reinstated solely to maintain the Debtors' corporate structure.

 c. *Voting*:  Class 7 is Unimpaired, and Holders of Intercompany Interests are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

8.      <u>Class 8 –Interests in Gymboree</u>

 a. *Classification*:  Class 8 consists of all Interests in Gymboree.

 b. *Treatment*:  In full and final satisfaction of each Allowed Interest in Gymboree, each Allowed Interest in Gymboree shall be canceled, released, and extinguished, and will be of no further force or effect and no Holder of Interests in Gymboree shall be entitled to any recovery or distribution under the Plan on account of such Interests.

 c. *Voting*:  Class 8 is Impaired.  Holders of Interests in Gymboree are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

21

C.        *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class(es) of Claims and Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

D.        *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.        *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class of Claims or Interests is eligible to vote and no Holder of Claims or Interests, as applicable, in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

F.        *Intercompany Interests*

Holders of Intercompany Interests are retaining their respective Interests not on account of their Intercompany Interests, but rather for the purposes of administrative convenience, for the ultimate benefit of the Holders of New Gymboree Common Shares, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  For the avoidance of doubt, any Interest in a non-Debtor owned by a Debtor shall continue to be owned by the applicable Reorganized Debtor.

G.        *Subordinated Claims and Interests*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and their respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors, as applicable, reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.        *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including, without limitation:   (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Restructuring Transactions; (e) all

transactions necessary to provide for the purchase of substantially all of the assets of, or Interests in, any of the Debtors by one or more Entities to be wholly owned by Reorganized Gymboree, which purchase may be structured as a taxable transaction for United States federal income tax purposes; (f) pursuant to the Rights Offerings Procedures and the Backstop Commitment Agreement, the implementation of the Rights Offerings, the distribution of the Subscription Rights to the Rights Offerings Participants as of the Rights Offerings Record Date, and the issuance of the New Gymboree Common Shares in connection therewith; and (g) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B.    *General Settlement of Claims*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, satisfied, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.

C.    *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan from the following sources:

1.    <u>Cash on Hand</u>

The Reorganized Debtors shall use Cash on hand to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan.

2.    <u>Issuance and Distribution of New Gymboree Common Shares</u>

On the Effective Date, the Reorganized Debtors shall issue the New Gymboree Common Shares to fund distributions to certain Holders of Allowed Claims in accordance with Article III of the Plan. The issuance of New Gymboree Common Shares under the Plan, as well as options, or other equity awards, if any, reserved under the Management Incentive Plan, is duly authorized without the need for any further corporate action and without any further action by the Debtors or Reorganized Debtors or the Holders of Claims.

Reorganized Gymboree will have one class of common equity interests, the New Gymboree Common Shares.

On the Effective Date, Holders of New Gymboree Common Shares shall be parties to the New Stockholders' Agreement, in substantially the form included in the Plan Supplement, containing terms and conditions that are acceptable to the Required Consenting Creditors. On the Effective Date, Reorganized Gymboree shall enter into and deliver the New Stockholders' Agreement to each Entity that is intended to be a party thereto, and such New Stockholders' Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms, and each Holder of New Gymboree Common Shares shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized Gymboree.

3.    <u>Exit Facilities</u>

On the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities. Confirmation of the Plan shall be deemed approval of the Exit Facilities and the Exit Facility Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the payment of all fees, indemnities, and expenses provided

for therein, and authorization of the Reorganized Debtors to enter into and execute the Exit Facility Documents and such other documents as may be required to effectuate the Exit Facilities.

On the later of (i) the Effective Date and (ii) the satisfaction of the DIP Claims in accordance with Article II.D of the Plan, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be granted, (b) shall be legal, binding, and enforceable Liens on, and security interests in, the applicable collateral in accordance with the respective terms of the Exit Facility Documents, (c) shall be deemed perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the respective Exit Facility Documents, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests shall be authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order (subject solely to the occurrence of the Effective Date) and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

4.    Rights Offerings

The Debtors shall distribute the Subscription Rights to the Rights Offerings Participants as set forth in the Plan, the Backstop Commitment Agreement and the Rights Offerings Procedures.  Pursuant to the Backstop Commitment Agreement and the Rights Offerings Procedures, the Rights Offerings shall be open to all Term Loan Lenders, and all DIP Term Loan Lenders shall be required to exercise the Subscription Rights allocated to them. Rights Offerings Participants shall be entitled to participate in the Rights Offerings up to a maximum amount of each Holder's Pro Rata share of the Adjusted Rights Offerings Amount.  Rights Offerings Participants shall have the right to purchase their allocated Rights Offerings Shares at the per share purchase price set forth in the Backstop Commitment Agreement and the Rights Offerings Procedures.

Upon exercise of the Subscription Rights by the Rights Offerings Participants pursuant to the terms of the Backstop Commitment Agreement and the Rights Offerings Procedures, the Reorganized Debtors shall be authorized to issue the Rights Offerings Shares in accordance with the Plan, the Backstop Commitment Agreement, and the Rights Offerings Procedures.

Pursuant to the Backstop Commitment Agreement, (a) the Backstop Parties shall purchase any Rights Offerings Shares not subscribed to for purchase by Holders of Allowed Term Loan Claims who are not DIP Term Loan Lenders as part of the Rights Offerings at the per share purchase price set forth in the Backstop Commitment Agreement.  On the Effective Date, the rights and obligations of the Debtors under the Backstop Commitment Agreement shall vest in the Reorganized Debtors, as applicable.

At the Maximum Rights Offerings Amount, the Rights Offerings Shares (on an as converted basis) will represent 46.9% of the New Gymboree Common Shares outstanding on the Effective Date (subject to a downward ratable adjustment to account for the difference (if any) between the Maximum Rights Offerings Amount and the Adjusted Rights Offerings Amount), subject to dilution by the Management Incentive Plan and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion.  For the avoidance of doubt, if the Debtors are required to reduce the Rights Offerings Amount pursuant to Article IV.C.4 hereof, they shall first reduce the size of the 4(a)(2) Rights Offering and only once such 4(a)(2) Rights Offering has been reduced to zero, thereafter reduce the size of the 1145 Rights Offering.

In addition, on the Effective Date (or earlier in the case of termination of the Backstop Commitment Agreement), the Backstop Commitment Premium (which shall be an administrative expense) shall be distributed or paid to the Backstop Parties under and as set forth in the Backstop Commitment Agreement, the Backstop Approval Order, and the Restructuring Term Sheet.

D.       *Li & Fung Agency Agreement*

On the Effective Date, the Debtors shall assume the Li & Fung Agency Agreement and, thereupon, the Li & Fung Letter of Credit and the Li & Fung Term Loan Claim shall be deemed assigned to Reorganized Gymboree and canceled without further action or consideration to Li & Fung.

E.       *Corporate Existence*

Except as otherwise provided in the Plan, the New Organizational Documents, the New Stockholders' Agreement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

F.       *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including interests held by the Debtors in their respective non-Debtor subsidiaries, shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

G.       *Cancellation of Existing Securities and Instruments*

Except as otherwise provided in the Restructuring Support Agreement, the Plan, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the later of (i)  the Effective Date, and (ii) the satisfaction of the DIP Claims in accordance with Article II.D of the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the ABL Credit Agreement, the Term Loan Credit Agreement, the Unsecured Notes, the Unsecured Notes Indenture, and any other credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged.

H.       *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Restructuring Transactions; (2) the selection of the directors and officers for the Reorganized Debtors; (3) the entry into the Exit Facilities and the incurrence of credit thereunder; (4) the adoption of the Management Incentive Plan by the Reorganized Gymboree Board; (5) the issuance and distribution of the New Gymboree Common Shares; and (6) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate action required by the Debtors, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, or the Reorganized Debtors.

On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including the Exit Facilities, the New Gymboree Common Shares, the Registration Rights Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Bankruptcy Court.  The authorizations and approvals contemplated by this Article IV.H shall be effective notwithstanding any requirements under non-bankruptcy law.

I.       *New Organizational Documents*

On the Effective Date, each of the Reorganized Debtors will file its New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation.  The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code and in form and substance reasonably acceptable to the Required Consenting Creditors.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

J.       *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the terms of the current members of the board of directors of the Debtors shall expire, and the New Boards and new officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  The Reorganized Gymboree Board will be composed of seven members as of the Effective Date as follows: (a) Chief Executive Officer of the Reorganized Gymboree (who shall be the Chief Executive Officer of The Gymboree Corporation immediately prior to the occurrence of the Effective Date); (b) Ron Beegle of Carriage House Capital Advisors, LLC; (c) one member selected by Brigade Capital Management; (d) one member selected by OppenheimerFunds, Inc.; (e) one member selected by Searchlight Capital Partners; and (f) two members selected by the Required Consenting Creditors; *provided*, that if at any time prior to the Effective Date any Entity specified in (c), (d), or (e) does not have aggregate holdings (together with its Affiliates that own, manage, direct or have investment authority with respect to the Debtors' indebtedness) that would entitle such Entity to an allocation of at least 9.5% of the New Gymboree Common Shares outstanding on a pro forma basis as of the Effective Date, then such Entity shall not be entitled to select a director and such director will instead be selected by the Required Consenting Creditors.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent reasonably practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Boards, as well as those Persons that will serve as officers of the Reorganized Debtors.  Such initial officers of the Reorganized Debtors shall be reasonably acceptable to the Required Consenting Creditors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Provisions regarding the removal, appointment, and replacement of members of the New Boards will be disclosed in the New Organizational Documents.

K.       *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, their officers, and the members of the New Boards, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Gymboree Common Shares, and the Exit Facilities, in the name of and on behalf of Reorganized Gymboree or the Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents.

L.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto, or the issuance, transfer or exchange of any security under the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

M.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, Article IV, and Article I.A, hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in the Reorganized Debtors' sole discretion.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

N.    *Director and Officer Liability Insurance*

To the extent that the D&O Liability Insurance Policies are considered to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all unexpired D&O Liability Insurance Policies with respect to the Debtors' directors, managers, officers, and employees serving on or before the Petition Date pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be Filed.

Under the Restructuring, all indemnification obligations in place as of the Effective Date (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective

27

Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

O.      *Management Incentive Plan*

The Reorganized Gymboree Board will be authorized to implement the Management Incentive Plan.  The Management Incentive Plan shall provide for the issuance of options and/or equity based compensation to certain members of management of Reorganized Gymboree.  New Gymboree Common Shares representing up to 10% of the New Gymboree Common Shares outstanding as of the Effective Date on a fully-diluted basis shall be reserved for issuance in connection with the Management Incentive Plan.  The participants in the Management Incentive Plan, the allocation of Management Incentive Plan compensation to participants (including the amounts allocated, the timing of grants, and the form of options and/or equity compensation allocated) and the terms and conditions of such options and equity compensation (including performance, time based vesting, exercise price, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the Reorganized Gymboree Board in its sole discretion.

P.      *Employee Obligations*

On the Effective Date, the Debtors shall be deemed to have assumed each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors (but excluding any severance agreements with any of Debtors' former employees); *provided*, that any of the foregoing that are included in the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement that was not previously disclosed to the Term Loan Agent's advisors on or before the date of entry into the Restructuring Support Agreement shall be assumed subject to the consent of the Required Consenting Creditors on or before the Effective Date; *provided*, *further*, that the Management Severance Plan and employment agreements will be assumed as modified so as to clarify that the Restructuring (and any related changes in duties that result from Gymboree no longer being a publicly-traded company as of the Effective Date) will not constitute a "good reason" event for the purposes of the Management Severance Plan or any employment agreement.  Following the Effective Date, the Reorganized Debtors shall not amend the Management Severance Plan without the consent of the participating employees for a period of one year after the Effective Date.

Q.      *Reporting Upon Emergence*

Reorganized Gymboree will be a private company on the Effective Date; provided, that from and after the Effective Date, Reorganized Gymboree shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements).

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases will be deemed assumed by the Reorganized Debtors in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, subject to the consent of the Required Consenting Creditors, not to be unreasonably withheld, and regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the

Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order through and including 45 days after the Effective Date; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.  Except as other provided in the Plan, the Debtors shall assume or reject, as the case may be, executory contracts and unexpired leases in the Plan Supplement; *provided*, that the Debtors shall assume the Li & Fung Agency Agreement.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date, the Debtors or Reorganized Debtors, as applicable, will be deemed rejected as the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Counterparties to Executory Contracts or Unexpired Leases listed on the Schedule of Rejected Executory Contracts and Unexpired Leases shall be served with a notice of rejection of Executory Contracts and Unexpired Leases substantially in the form approved by the Bankruptcy Court pursuant to the Bankruptcy Court order approving the Disclosure Statement as soon as reasonably practicable following entry of the Bankruptcy Court order approving the Disclosure Statement.  Proofs of Claims with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court within the earliest to occur of (1) 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection or (2) 30 days after notice of any rejection that occurs after the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim, as reflected on the Cure Notice, in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any Cure Claim (2) the ability of the Reorganized Debtors or any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims shall be made following the entry of a Final Order resolving the dispute and approving the assumption.

29

At least 10 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed amounts of Cure Claims to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or related Cure Claim must be Filed, served, and actually received by the Debtors at least seven days before the Confirmation Hearing.** Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure Claim will be deemed to have assented to such assumption and Cure Claim. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 10 day deadline, a Cure Notice of proposed assumption and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed.

If the Bankruptcy Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, may add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Indemnification Obligations*

All indemnification obligations in place as of the Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose; *provided*, that any of the foregoing included in the Schedule of Assumed Executory Contracts and Unexpired Leases contained in the Plan Supplement that was not previously disclosed to the advisors for the Consenting Creditors on or before the date of entry into the Restructuring Support Agreement shall be assumed subject to the consent of the Required Consenting Creditors on or before the Confirmation Date, which consent shall not be unreasonably withheld.

E.    *Insurance Policies*

Without limiting Article IV.N, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases or the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.

H.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Executory Contract or Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

I.    *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and/or Unexpired Leases assumed by such Debtor, will be performed by the applicable Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected under the Plan will survive and remain unaffected by entry of the Confirmation Order, except as provided therein.

# ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Interest (or such Holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Interests in each applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.    Delivery of Distributions

a.    **Delivery of Distributions to Holders of Critical Trade Claims**

Distributions to Holders of Critical Trade Claims shall be made on the later of (i) the Effective Date and (ii) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such Allowed Critical Trade Claim, or as soon thereafter as reasonably practicable.

31

b.    **Delivery of Distributions in General**

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims, except as otherwise provided in this Article VI, or Interests shall be made to Holders of record as of the Distribution Record Date by the Reorganized Debtors:  (1) to the signatory set forth on any of the Proof of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on such Holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2.    No Fractional Distributions

No fractional shares of New Gymboree Common Shares shall be distributed, and no Cash shall be distributed in lieu of such fractional shares.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Gymboree Common Shares that is not a whole number, the actual distribution of shares of New Gymboree Common Shares shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Gymboree Common Shares to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

3.    Minimum Distributions

Holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each such Claim shall be discharged pursuant to Article VIII and its Holder is forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

4.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the applicable Reorganized Debtors without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

C.    *Registration or Private Placement Exemption*

Each of the New Gymboree Common Shares and the Subscription Rights are or may be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

The offer, issuance, and distribution of the 1145 Subscription Rights and the New Gymboree Common Shares issuable upon exercise thereof (in the form of 1145 Rights Offerings Shares) and the New Gymboree Common Shares to the Holders of Allowed Term Loan Claims under the 1145 Rights Offering, the Backstop Commitment Agreement (on account of the Backstop Commitment Premium which shall be an Allowed Administrative Claim), the Roll-Up DIP Conversion Shares and the Plan shall be exempt (except with respect to an

32

entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code), pursuant to section 1145 of the Bankruptcy Code, without further act or action, from registration under (i) the Securities Act, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of securities. Each of the foregoing securities (a) is not a "restricted security" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any initial recipient thereof that (i) at the time of transfer, is not an "affiliate" of the Reorganized Gymboree as defined in Rule 144(a)(1) under the Securities Act and has not been such an "affiliate" within 90 days of such transfer, and (ii) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.

The offer, issuance and distribution of the 4(a)(2) Subscription Rights and the New Gymboree Common Shares issuable upon exercise thereof (in the form of 4(a)(2) Rights Offerings Shares) and the New Gymboree Common Shares pursuant to the 4(a)(2) Rights Offering, the Backstop Commitment Agreement (with respect to the Unsubscribed Shares), the DIP Surplus Conversion Shares and the Plan shall be exempt (including with respect to an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code ) from registration under the Securities Act pursuant to Section 4(a)(2) thereof and/or Regulation D thereunder. To the extent issued in reliance on Section 4(a)(2) of the Securities Act or Regulation D thereunder, each will be "restricted securities" subject to resale restrictions and may be resold, exchanged, assigned or otherwise transferred only pursuant to registration, or an applicable exemption from registration under the Securities Act and other applicable law. In that regard, each of the Backstop Parties has made customary representations to the Debtors including that each is an "accredited investor" (as defined under Rule 501(a)(1), (2), (3), and (7) promulgated under the Securities Act) or a qualified institutional buyer (as defined under Rule 144A promulgated under the Securities Act).

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Gymboree Common Shares through the facilities of DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Gymboree Common Shares or under applicable securities laws. DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Gymboree Common Shares issued under the Plan are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Gymboree Common Shares issued under the Plan are exempt from registration and/or eligible for DTC book entry delivery, settlement, and depository services.

D.      *Tax Issues and Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

The Restructuring will be effectuated and structured in a tax-efficient manner determined by the Debtors and the Required Consenting Creditors; *provided*, that:  (i) if the Restructuring gives rise to any Cash income taxes payable by any non-Debtor member of any consolidated, combined or unitary tax group of which Gymboree or any of its subsidiaries is a member (such group, a "Gymboree Consolidated Group" and such non-Debtor member, a "Non-Debtor"), the Plan shall provide that any such taxes shall be paid by the Reorganized Debtors; and (ii) any tax losses generated by a Non-Debtor or Debtor arising in connection with the cancelation or worthlessness of any stock of any Non-Debtor, or otherwise in connection with the Restructuring, shall be available to shelter any income or gain arising in connection with the Restructuring without any requirement for the Debtors to compensate the

Sponsor or any Non-Debtor for the use of such losses; *provided*, *however*, *for the avoidance of doubt*, that nothing in the Plan or Restructuring Support Agreement shall limit the Sponsor's ability to recognize any loss it may have with respect to its stock in Giraffe Holdings, Inc. following the occurrence of the Effective Date in accordance with the terms of the Plan and Restructuring Support Agreement.

E.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

F.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

G.      *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, set off against or recoup any payments or distributions to be made pursuant to the Plan in respect of any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the Holder of such Claim.

H.      *Claims Paid or Payable by Third Parties*

1.      <u>Claims Paid by Third Parties</u>

To the extent that the Holder of an Allowed Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, such Claim shall be Disallowed without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything herein to the contrary

(including, without limitation, Article VIII), nothing shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Allowance of Claims*

After the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.    *Claims Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors and the Consenting Creditors shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtors shall have the sole authority to (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (2) settle, compromise, or resolve any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

C.    *Estimation of Claims*

Before, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including, without limitation, pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision to the contrary in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors or Reorganized Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.    *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.    *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before the Claims Objection Bar Date.

F.    *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.  All Proofs of Claim Filed on account of an Indemnification Obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

**Except as otherwise provided herein or as agreed to by the Reorganized Debtors, any and all Proofs of Claim Filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and Holders of such Claims may not receive any distributions on account of such Claims, unless such late Proof of Claim has been deemed timely Filed by a Final Order.**

G.    *Amendments to Claims*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

H.    *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtors.

I.    *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided herein.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

        Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle any Claims and Causes of Action against other Entities.

B.      *Discharge of Claims and Termination of Interests*

        Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Term of Injunctions or Stays*

        Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

D.      **Release of Liens**

        **Except as otherwise specifically provided in the Plan, the Exit Facility Documents, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or Reorganized Debtors.  The ABL Agent and the Term Loan Agent shall**

37

execute and deliver all documents reasonably requested by the Reorganized Debtors or the agent(s) under the Exit Facilities to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements (to the extent applicable) with respect thereto.

E.      *Debtor Release*

        Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

    (a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents;

    (b) any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

    (c) the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities (including the New Gymboree Common Shares) pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

    (d) the business or contractual arrangements between any Debtor and any Released Party (including the ABL Credit Agreement and the Prepetition ABL Facility (as defined in the DIP Orders), and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

        Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan Release by Holders of Claims or Interests.

F.      *Release by Holders of Claims or Interests*

        As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

    (a) the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents;

    (b) any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract,

38

instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan;

(c)   the Chapter 11 Cases, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or

(d)   the business or contractual arrangements between any Debtor and any Released Party (including the ABL Credit Agreement and the Prepetition ABL Facility (as defined in the DIP Orders), and any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

G.   *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the DIP Credit Agreements, the DIP Facilities, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H.   *Injunction*

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to

any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

I.        *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because the Debtors have been debtors under chapter 11 of the Bankruptcy Code, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases), or have not paid a debt that is dischargeable in the Chapter 11 Cases.

J.        *Recoupment*

In no event shall any Holder of a Claim be entitled to recoup against such Claim any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has provided notice of such recoupment in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.        *Subordination Rights.*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

A.        *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B hereof):

1.        The Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Backstop Parties;

2.        The Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Required Consenting Creditors;

3.        The Debtors shall not be in default under the DIP Credit Agreements or the DIP Orders (or, to the extent that the Debtors have been or are in default on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured in a manner consistent with the DIP Credit Agreements and the DIP Order, as applicable);

4.      All conditions precedent to the effectiveness of the Exit Facilities shall have been satisfied or duly waived;

5.      The Confirmation Order shall have been duly entered and in full force and effect;

6.      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;

7.      The final version of the schedules, documents, and exhibits contained in the Plan Supplement, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement in all material respects and otherwise approved by the Restructuring Support Parties and the Debtors consistent with their respective consent and approval rights as set forth in Section 3 of the Restructuring Support Agreement;

8.      All fees, expenses, and other amounts payable pursuant to the Restructuring Support Agreement, the Backstop Commitment Agreement, and the DIP Orders shall have been paid in full;

9.      All Allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and

10.     The Debtors shall have implemented the Restructuring Transactions in a manner consistent in all material respects with the Plan and the Restructuring Support Agreement.

B.      *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors and the Required Consenting Creditors without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.      *Effect of Nonoccurrence of Conditions to the Effective Date*

If the Effective Date does not occur on or before the termination of the Restructuring Support Agreement or the Backstop Commitment Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims or Interests; (2) prejudice in any manner the rights of the Debtors, any Holders of a Claim or Interest, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect; *provided*, *however*, that all provisions of the Restructuring Support Agreement and Backstop Commitment Agreement that survive termination of those agreements shall remain in effect in accordance with the terms thereof.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained in the Plan and the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127

of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan and the Restructuring Support Agreement, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan; *provided*, that any modifications or amendments that impact the treatment of the ABL Claims and DIP ABL Claims shall require the consent of the ABL Agents and DIP ABL Agents, as applicable.

B.       *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.       *Revocation or Withdrawal of the Plan*

Subject to the provisions of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

**ARTICLE XI.**
**RETENTION OF JURISDICTION**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters arising out of or related to the Chapter 11 Cases and the Plan, including jurisdiction to:

1.       Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims;

2.       Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.       Resolve any matters related to:  (a) the assumption or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Amounts pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.       Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5. Adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6. Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7. Adjudicate, decide, or resolve any and all matters related to sections 1141 and 1145 of the Bankruptcy Code;

8. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9. Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10. Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11. Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

13. Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.H.1 hereof;

14. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16. Adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17. Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. Hear and determine all disputes involving the Restructuring Support Agreement, the Rights Offerings, and the Backstop Commitment Agreement;

20. Hear and determine all disputes involving the Exit Facilities;

21. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

43

22.      Hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred before or after the Effective Date;

23.      Enforce all orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

24.      Hear any other matter not inconsistent with the Bankruptcy Code;

25.      Enter an order closing the Chapter 11 Cases; and

26.      Enforce the injunction, release, and exculpation provisions provided in Article VIII hereof.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or advisable to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, all Holders of Claims and Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Committee*

On the Effective Date, the Committee, if any is appointed, shall dissolve automatically and the members thereof shall be released and discharged from all rights, duties, responsibilities, and liabilities arising from, or related to, the Chapter 11 Cases and under the Bankruptcy Code, except for the limited purpose of prosecuting requests for payment of Professional Fee Claims for services and reimbursement of expenses incurred prior to the Effective Date by the Committee and its Professionals.  The Reorganized Debtors shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Creditors' Committee after the Effective Date.

D.      *Reservation of Rights*

Before the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to any Claims or Interests.

E.      *Successors and Assigns*

    The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Service of Documents*

    All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

    the Debtors:      The Gymboree Corporation
                      71 Stevenson Street, Suite 2200
                      San Francisco, California 94105
                      Attn.:  Kimberly MacMillan

                      with copies to:

                      Kirkland & Ellis LLP
                      300 North LaSalle
                      Chicago, Illinois  60654
                      Attn.:  Anup Sathy, P.C. and Steven N. Serajeddini

                      Kirkland & Ellis LLP
                      601 Lexington Avenue
                      New York, NY 10022
                      Attn.:  Joshua A. Sussberg, P.C. and Matthew C. Fagen

    the Consenting Creditors: the address set forth on each such Consenting Creditors' signature page to the Restructuring Support Agreement (or as directed by any transferee thereof), as the case may be.

                      with copies to:

                      Milbank, Tweed, Hadley &McCloy LLP:
                      28 Liberty Street
                      New York, NY 10005
                      Attn.:  Dennis F. Dunne
                              Evan R. Fleck

    the Sponsor:      Bain Capital Private Equity, LP
                      200 Clarendon Street
                      Boston, MA 02116
                      Attn.:  David Hutchins

                      with copies to:

                      Weil Gotshal & Manges LLP
                      767 5th Avenue
                      New York, NY 10153
                      Attn.:  Matt Barr and Robert Lemons

    After the Effective Date, the Reorganized Debtors shall have the authority to send a notice to parties in interest providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, such party must File a

renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

G.      *Entire Agreement*

Except as otherwise indicated, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at **https://cases.primeclerk.com/Gymboree** or the Bankruptcy Court's website at www.vaeb.uscourts.gov.

I.      *Nonseverability of Plan Provisions*

If, before Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:  (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; and (3) nonseverable and mutually dependent.

J.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, managers, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law (including the Securities Act), rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

K.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured, or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed before the Confirmation Date.

*[Remainder of page intentionally left blank]*

Respectfully submitted, as of the date first set forth above,

THE GYMBOREE CORPORATION (on behalf of itself and all other Debtors)

By: _*/s/ James A. Mesterharm*_____
Name:    James A. Mesterharm
Title:    Chief Restructuring Officer

## **Exhibit B**

**Restructuring Support Agreement**

*EXECUTION COPY*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This Restructuring Support Agreement (including all exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "**Agreement**")[1] is made and entered into as of June 11, 2017, by and among the following parties (each of the foregoing described in sub-clauses (i), (ii), and (iii), a "**Party**" and, collectively, the "**Parties**"):

    i.    The Gymboree Corporation ("**Gymboree**") and its undersigned direct and indirect subsidiaries and Giraffe Intermediate B, Inc. (collectively, the "**Debtors**");

    ii.    Bain Capital Private Equity, LP on behalf of itself and each of its affiliated investment funds or investment vehicles managed or advised by it, and its Affiliates that directly or indirectly hold interests in the Debtors (collectively, the "**Sponsor**"); and

    iii.    the lenders party to that certain Amended and Restated Credit Agreement, dated as of February 11, 2011 (as amended, restated, modified, or supplemented from time to time, the "**Term Loan Credit Agreement**"), by and among Gymboree, as borrower, certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (solely in such capacities, the "**Term Loan Agent**") that are or may become in accordance with Section 6 of this Agreement (collectively, the "**Consenting Creditors**").

## RECITALS

**WHEREAS**, the Parties have engaged in good faith, arm's-length negotiations regarding the restructuring and recapitalization of the Debtors, including with respect to the Debtors' respective obligations under the Term Loan Agreement;

**WHEREAS**, the Parties desire to effectuate a restructuring and recapitalization of the Debtors as set forth in the Restructuring Term Sheet through the confirmation and consummation of a prenegotiated chapter 11 plan of reorganization (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Plan**") and certain related

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the term sheet attached hereto as **Exhibit A** (the "**Restructuring Term Sheet**"), subject to Section 2 hereof.

transactions, all of which shall be on the terms and conditions described in this Agreement (such transactions, the "**Restructuring Transactions**");

**WHEREAS**, to facilitate the consummation of the Restructuring Transactions, the Debtors intend to commence voluntary reorganization cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**") and promptly file the Plan and a related disclosure statement (as may be amended or supplemented from time to time in accordance with the terms of this Agreement, the "**Disclosure Statement**") prior to soliciting votes on the Plan in accordance with section 1125 of the Bankruptcy Code;

**WHEREAS**, certain Consenting Creditors have agreed to provide the Debtors with a $105 million debtor-in-possession financing facility ("**DIP Term Loan Financing**") consisting of (a) up to $35 million in new money delayed draw term loans") to fund the Chapter 11 Cases and (b) $70 million of term loans to refinance amounts due and owing under the Term Loan Credit Agreement, substantially on the terms set forth in the Debtor-in-Possession Credit Agreement, dated as of June 11, 2017 and entered into concurrently herewith (the "**DIP Term Loan Agreement**"), and subject to entry of the DIP Orders (as defined below);

**WHEREAS**, certain Consenting Creditors have agreed to fund up to $80 million in two new money rights offerings (the "**Rights Offerings**") in connection with the Restructuring Transactions pursuant to that certain Backstop Commitment Agreement, dated as of June 11, 2017 and entered into concurrently herewith (the "**Backstop Commitment Agreement**") and in accordance with the rights offering procedures attached to the Backstop Commitment Agreement (the "**Rights Offering Procedures**"); and

**WHEREAS**, the following sets forth the agreement among the Parties concerning their respective rights and obligations in respect of the Restructuring Transactions.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**    *Agreement Effective Date*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m. (prevailing Eastern Time), on the date on which: (a)(i) the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Term Loan Agent; and (ii) holders of at least 66% of the aggregate principal amount of all claims outstanding under the Term Loan Credit Agreement (any such claims, the "**Term Loan Claims**") (determined without regard to any claims held by a person or entity that is an "insider" as that term is defined in section 101(31) of the Bankruptcy Code and excluding the 2017 Incremental Term Loan (as defined in the Term Loan Credit Agreement)) shall have executed and delivered to the Debtors counterpart signature pages of this Agreement; (b) the Sponsor shall have executed and delivered counterpart signatures of this Agreement to the Debtors; and (c) the Debtors have given notice to counsel to the Term Loan Agent and the Sponsor in accordance with

Section 18.09 hereof that each of the foregoing conditions set forth in this Section 1, in each case, has been satisfied and this Agreement is effective (such date, the "**Agreement Effective Date**").

**Section 2.**      ***Exhibits and Schedules Incorporated by Reference***.  Each of the exhibits hereto (including the Restructuring Term Sheet) and any schedules to such exhibits (collectively, the "**Exhibits and Schedules**")) is expressly incorporated herein and made a part of this Agreement, and as used in this Agreement, all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

**Section 3.**      ***Definitive Documentation***.

(a)      The definitive documents and agreements governing the Restructuring Transactions (collectively, the "**Restructuring Documents**") shall consist of this Agreement and each of the following documents:

(i)      the Plan (and all exhibits thereto);

(ii)      the Confirmation Order and pleadings in support of entry of the Confirmation Order;

(iii)      the Disclosure Statement, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "**Disclosure Statement Order**");

(iv)      all other documents that are contained in any supplements filed in connection with the Plan (collectively, the "**Plan Supplement**");

(v)      (A) the interim order or orders authorizing the use of cash collateral and debtor-in-possession financing (each, an "**Interim DIP Order**") and (B) the final order or orders authorizing the use of cash collateral and debtor-in-possession financing (each, a "**Final DIP Order**" and together with the Interim DIP Order, collectively, the "**DIP Orders**");

(vi)      the DIP Term Loan Credit Agreement, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "**DIP Term Documents**");

(vii)      the post-petition debtor-in-possession credit agreement (together with the DIP Term Loan Credit Agreement, the "**DIP Credit Agreements**") for the $273.5 revolving debtor-in-possession financing facility (the "**DIP ABL Facility**" and the financing associated therewith, the "**DIP ABL Financing**") to be entered into in accordance with the DIP Orders by the Debtors, Bank of America, N.A., as Administrative Agent, and the lenders party thereto, including any amendments, modifications, supplements thereto, and together with any related

notes, certificates, agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith (collectively, the "**DIP ABL Documents**");

       (viii)   the credit agreements for the Exit Credit Facilities, including any amendments, modifications, supplements thereto, and together with any related notes, certificates, agreements, intercreditor agreements, security agreements, documents, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection therewith;

       (ix)   any documents relating to corporate governance matters; and

       (x)   an order or orders of the Bankruptcy Court approving the Debtors' assumption of, and performance under, the Backstop Commitment Agreement (the "**BCA Approval Order**");

(b) Certain of the Restructuring Documents remain subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, and shall otherwise be in form and substance acceptable to each of the Debtors and the Required Consenting Creditors. As used herein and the Restructuring Term Sheet: (i) the term "**Required Consenting Creditors**" means, at any relevant time, (a) if the Initial Consenting Creditors (as defined below) then collectively hold at least 40.0% of the principal amount of all outstanding Term Loan Claims at such time, the Majority Initial Consenting Creditors (as defined below) and (b) if the Initial Consenting Creditors then collectively hold less than 40.0% of the principal amount of all outstanding Term Loan Claims at such time, Consenting Creditors then collectively holding greater than 50.0% by principal amount outstanding of the Term Loan Claims held by all Consenting Creditors at such time; (ii) the term "**Initial Consenting Creditor**" means any Consenting Creditor that became a Party to this Agreement on June 11, 2017; and (iii) the term "**Majority Initial Consenting Creditors**" means, at any relevant time, Initial Consenting Creditors then collectively holding at least 50.0% by principal amount outstanding of Term Loan Claims held by all Initial Consenting Creditors at such time.

**Section 4.**   *Milestones*.   As provided in and subject to Section 5.03, the Debtors shall implement the Restructuring Transactions in accordance with the milestones set forth in the Restructuring Term Sheet (the "**Milestones**"). Each Milestone may only be extended with the express prior written consent of the Required Consenting Creditors, not to be unreasonably withheld.

**Section 5.**   *Commitments Regarding the Restructuring Transactions*.

5.01.   Commitment of the Consenting Creditors.

(a)   From the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Consenting Creditors, each of the Consenting Creditors agrees (on a several but not joint basis) to:

(i)      to the extent permitted to vote to accept or reject the Plan (and subject to the actual receipt by such Consenting Creditor of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code), vote each of its claims against the Debtors (including each of its Term Loan Claims and any other claims against the Debtors (such claims, together with any claims the Sponsor may have against the Debtors, the "**Debtor Claims**")) and any interests in the Debtors (such interests, together with any interests the Sponsor may have in the Debtors, the "**Debtor Interests**" and collectively with the Debtor Claims, the "**Debtor Claims/Interests**") to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis;

(ii)      negotiate in good faith the Restructuring Documents and use reasonable best efforts to take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement;

(iii)      use reasonable best efforts to support and take all actions necessary or appropriate to facilitate the solicitation, confirmation and consummation of the Plan and the Restructuring Transactions;

(iv)      consent to and use reasonable best efforts to support the release, discharge, exculpation, and injunction provisions contained in the Plan (and not "opt out" of such provisions in the Plan);

(v)      not object to or join in any objection to, and use reasonable best efforts to support approval of, the BCA Approval Order, the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order;

(vi)      not change or withdraw (or cause to be changed or withdrawn) any vote(s) to accept the Plan; *provided*, *however*, that if a Termination Date occurs before consummation of the Restructuring Transactions, all votes tendered by such Consenting Creditors to accept the Plan shall be immediately revoked and deemed void *ab initio* in accordance with Section 11;

(vii)      fully subscribe to its ratable portion of the Rights Offerings on account of its Term Loan Claims; and

(viii)      not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions, or otherwise take any action which would, or which would reasonably be expected to, breach or be inconsistent with this Agreement, (B) propose, file, support, or vote for any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership sale of assets, financing (debt or equity), restructuring of the Debtors, other than the Restructuring Transactions (each, an "**Alternative Transaction**"), or (C) support, encourage or direct any other person or entity to take any action contemplated in (A) and (B) of this Section 5.01(a)(viii).

(b)      Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Consenting Creditor nor the acceptance of the Plan by any Consenting Creditor shall: (i) be construed to prohibit any Consenting Creditor from contesting whether any

matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the other Restructuring Documents, or exercising any rights (including any consent and approval rights contemplated under this Agreement or the other Restructuring Documents) or remedies specifically reserved herein or therein; (ii) be construed to prohibit or limit any Consenting Creditor from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Effective Period, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; *provided*, that any delay or other impact on consummation of the Restructuring Transactions contemplated by the Plan caused by a Consenting Creditor's opposition to (x) any relief that is inconsistent with such Restructuring Transactions, (y) a motion by the Debtors to enter into a material executory contract, lease, or other arrangement outside of the ordinary course of its business without obtaining the prior written consent of the Required Consenting Creditors, not to be unreasonably withheld, or (z) any relief that is adverse to the interests of the Consenting Creditors sought by the Debtors (or any other party), shall not constitute a violation of this Agreement; or (iii) impair or waive the rights of any Consenting Creditor to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

5.02.    <u>Commitment of the Sponsor</u>.

(a)    From the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Sponsor, the Sponsor agrees to:

(i)    to the extent permitted to vote to accept or reject the Plan (and subject to the actual receipt by the Sponsor of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code), vote each of its Debtor Claims/Interests to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis;

(ii)    use reasonable best efforts to support and take all actions necessary or appropriate to facilitate the solicitation, confirmation and consummation of the Plan and the Restructuring Transactions;

(iii)    consent to and use reasonable best efforts to support the release, discharge, exculpation, and injunction provisions contained in the Plan (and not "opt out" of such provisions in the Plan);

(iv)    not object to or join in any objection to, and use reasonable best efforts to support approval of, the BCA Approval Order, the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order;

(v)    not change or withdraw (or cause to be changed or withdrawn) any vote(s) to accept the Plan;

(vi)    not directly or indirectly (A) object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, or otherwise take any action which would, or which would reasonably be expected

6

to, breach or be inconsistent with this Agreement, (B) propose, file, support, or vote for any Alternative Transaction, or (C) support, encourage or direct any other person or entity to take any action contemplated in (A) and (B) of this Section 5.02(a)(vi);

(vii)    not pledge, encumber, assign, sell or otherwise transfer, including by the utilization of a worthless stock deduction, offer or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its shares, stock, or other interests in the Debtors to the extent it will impair any Debtor's tax attributes;

(viii)    not assert any claims of any kind or priority against the Debtors in the Chapter 11 Cases (provided, that the Sponsor and each Sponsor Released Party (as defined herein) shall have the right to file a proof of claim in the Chapter 11 Cases in compliance with the bar date to preserve its right to assert its claims if this Agreement terminates in accordance with its terms);

(ix)    not take any action, or cause any Non-Debtor or Debtor to take any action, that would generate taxable income for the Debtors or any Non-Debtor outside the ordinary course of business of the Debtors, or cause any Non-Debtor or Debtor to cease to be a member of an existing Gymboree Consolidated Group; and

(x)    cooperate (and cause any Non-Debtors over which it has control to cooperate) with the Debtors and the Reorganized Debtors in connection with any Gymboree Consolidated Group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Plan Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld); *provided*, that reasonable expenses incurred by the Non-Debtors at the request of the Reorganized Debtors in connection with this sentence shall be borne by the Reorganized Debtors.

(b)    Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by the Sponsor nor the acceptance of the Plan by the Sponsor shall: (i) be construed to prohibit the Sponsor from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the other Restructuring Documents, or exercising any rights (including any consent and approval rights contemplated under this Agreement or the other Restructuring Documents) or remedies specifically reserved herein or therein; (ii) be construed to prohibit or limit the Sponsor from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, during the Effective Period, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions; *provided*, that any delay or other impact on consummation of the Restructuring Transactions contemplated by the Plan caused by the Sponsor's opposition to (x) any relief that is inconsistent with such Restructuring Transactions or (y) any relief that is adverse to the interests of the Sponsor sought by the Debtors (or any other party), shall not constitute a violation of this Agreement; or (iii) impair or waive the rights of the Sponsor to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

5.03.   <u>Commitment of the Debtors</u>.

(a)     From the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Debtors, the Debtors agree, and agree to cause each of their direct and indirect subsidiaries to:

(i)     negotiate in good faith all Restructuring Documents and take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement;

(ii)    obtain orders of the Bankruptcy Court in respect of the Restructuring Transactions, including approval of the BCA Approval Order, the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, and the Confirmation Order;

(iii)   support and consummate the Restructuring Transactions in accordance with this Agreement within the time-frames contemplated under this Agreement and in compliance with each Milestone;

(iv)    execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions;

(v)     use reasonable best efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions;

(vi)    pay the reasonable and documented fees and expenses of the Consenting Creditors as set forth in Section 13 of this Agreement;

(vii)   timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Creditors, to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (1) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (2) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (3) dismissing any of the Chapter 11 Cases, or (4) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(viii)  support and use commercially reasonable efforts to consummate the (x) DIP Term Financing pursuant to the DIP Orders and the DIP Term Documents (including the exchange and conversion of prepetition term loans into Roll-Up DIP Loans) and (y) the DIP ABL Financing pursuant to the DIP Orders and the DIP ABL Documents;

(ix)    promptly notify the Required Consenting Creditors in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(x)     timely file a formal objection, in form and substance reasonably acceptable to the Required Consenting Creditors, to any motion, application, or adversary proceeding (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(xi)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the transactions contemplated in this Agreement or the Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Required Consenting Creditors; *provided, however,* that the economic outcome for the Required Consenting Creditors, the anticipated timing of confirmation and the Plan Effective Date, and other materials terms as contemplated herein must be substantially preserved, as determined by the Required Consenting Creditors;

(xii)    if the Debtors know of a breach by any Debtor in respect of any of the obligations, representations, warranties, or covenants of the Debtors set forth in this Agreement, furnish prompt written notice (and in any event within three (3) days of such actual knowledge) to the Required Consenting Creditors and the Sponsor and promptly take all remedial action necessary to cure such breach by an such Debtor;

(xiii)    timely file a formal response to any motion or other pleading filed with the Bankruptcy Court by any party objecting to approval of the Solicitation Materials, the Disclosure Statement Order, the DIP Orders, the Confirmation Order, or any other Restructuring Documents contemplated under this Agreement;

(xiv)    operate their business in the ordinary course, taking into account the Restructuring Transactions;

(xv)    not modify the Plan or any other Restructuring Documents, in whole or in part, in a manner that is inconsistent with this Agreement, subject to Section 16 hereof; and

(xvi)    not directly or indirectly (A) delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transaction, or otherwise take any action which would, or which would reasonably be expected to, breach or be inconsistent with this Agreement, (B) propose, file, seek, solicit, or support any Alternative Transaction, or (C) support, encourage or direct any other person or entity to take any action contemplated in (A) and (B) of this Section 5.03(a)(xvi).

(b) Notwithstanding the foregoing Section 5.03(a), without limiting the rights and obligations of the Parties under Section 11 (including, without limitation, the Debtors' termination rights under Section 11.03), (i) if any of the Debtors receive a proposal or expression of interest regarding any Alternative Transaction during the period from the Agreement Effective Date until the occurrence of a Termination Date (as defined in Section 11.06) applicable to the Debtors, the Debtors shall promptly notify counsel to the Term Loan Agent and the Sponsor of any such proposal or expression of interest, with such notice to include the material terms thereof, including (unless prohibited by a separate agreement) the identity of the person or group of persons involved, (ii) the Debtors shall promptly furnish to counsel to the Term Loan Agent and the Sponsor copies of any written offer, oral offer, or any other information (unless prohibited by separate agreement) that they receive relating to the foregoing and shall promptly inform counsel to the Term Loan Agent and the Sponsor of any material changes to such proposals, and (iii) the Debtors shall not enter into any confidentiality agreement with a party interested in an Alternative Transaction unless such party consents to identifying and providing to counsel to the Term Loan Agent and the

Sponsor (under a reasonably acceptable confidentiality agreement) the information contemplated under this Section 5.03(b).

**Section 6.**        *Transfer of Debtor Claims/Interests.*

(a)        During the Effective Period, no Consenting Creditor or Sponsor shall sell, assign, transfer, permit the participation in, or otherwise dispose of (each, a "**Transfer**") any ownership (including any beneficial ownership[2]) in the Debtor Claims/Interests to any party (other than an entity that is controlled by or is under common control with such Consenting Creditor (a "**Related Party**")) or Sponsor, respectively, unless the following requirements have been satisfied (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

(i)        the intended transferee executes and delivers to counsel to the Debtors, counsel to the Term Loan Agent, and counsel to the Sponsor, on the terms set forth below an executed form of the transfer agreement in the form attached hereto as **Exhibit B** (a "**Transfer Agreement**");

(ii)        with respect to the Transfer of (a) Term Loan Claims, (b) Loans and Commitments under (and in each case, as defined in) the DIP Term Loan Credit Agreement, and (c) Backstop Commitments (as defined in the Backstop Commitment Agreement)(each of (a),(b) and (c), a "**Restructuring Claim**" and together the "**Restructuring Claims**"), the Transfer complies in all respects with the following requirement (the "**Stapling Requirement**"):

(A)        simultaneously with a Consenting Creditor's Transfer of all or any portion of a Restructuring Claim, such Consenting Creditor and its Contracted Related Parties shall be obligated to make a *proportionate* Transfer of each of the Restructuring Claims held by the Consenting Creditor and its Contracted Related Parties to the same Permitted Transferee (and/or its Related Parties) (for the avoidance of doubt, the amount shall be determined by dividing the amount of the individual type of Restructuring Claim proposed to be sold by the total amount of the same type of Restructuring Claim held by the Consenting Creditor and its Contracted Related Parties and then applying that percentage to the aggregate amount of each type of Restructuring Claim held by the Consenting Creditor and its Contracted Related Parties ); *provided*, that Transfers by a Consenting Creditor of Restructuring Claims made to such Consenting Creditor's Related Parties are not subject to the Stapling Requirement.

---

[2]    As used herein, the term "**beneficial ownership**" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims/Interests or the right to acquire such claims or interests.

(B)     As used herein, "**Contracted Related Parties**" means any Related Party that is a party to this Agreement, the Backstop Commitment Agreement or the DIP Term Loan Agreement.

(iii)     with respect to the Transfer of any Debtor Interests only, such Transfer shall not (A) violate the terms of any order entered by the Bankruptcy Court with respect to preservation of net operating losses or (B) in the reasonable business judgment of the Debtors and their legal and tax advisors, adversely (1) affect the Debtors' ability to maintain the value of and utilize their net operating loss carryforwards or other tax attributes or (2) the Debtors' ability to obtain the regulatory consents or approval necessary to effectuate the Restructuring Transaction.

(b)     The Debtors shall have five (5) business days from receiving notice of the Transfer Agreement with respect to the Transfer of any Debtor Interests in accordance with this Section 6(a)(i) to object to such Transfer Agreement for the reasons described in Section 6(a)(iii).

(c)     Notwithstanding Section 6(a), a Qualified Marketmaker[3] that acquires any Debtor Claims/Interests subject to this Agreement with the purpose and intent of acting as a Qualified Marketmaker for such Debtors Claims/Interests shall not be required to execute and deliver to counsel a Transfer Agreement in respect of such Debtor Claims/Interests if (i) such Qualified Marketmaker transfers such Debtor Claims/Interests (by purchase, sale, assignment, participation, or otherwise) consistent with the Stapling Requirements within three (3) business days of its acquisition to a transferee that is an entity that is not an Affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement); and (iii) the transfer otherwise is a Permitted Transfer.

(d)     This Agreement shall in no way be construed to preclude the Consenting Creditors or Sponsor from acquiring additional Debtor Claims/Interests or effecting a Transfer of all or a portion of its Debtor Claims/Interests to an entity controlled by or under common control with such Consenting Creditors or Sponsor, as applicable, as of the date of such Transfer); *provided*, that (i) any such Consenting Creditor or Sponsor or entity that acquires Debtor Claims/Interests, as applicable, after the Agreement Effective Date shall promptly notify counsel to the Debtors of such acquisition including the amount of such acquisition, who shall then promptly notify counsel to the Term Loan Agent and Sponsor and (ii) such Debtor Claims/Interests shall automatically and immediately upon acquisition by such Consenting Creditor, Sponsor, or entity, as applicable, be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Debtors or counsel to the Term Loan Agent or Sponsor) and subsequent Transfers shall be subject to this Section 6.

(e)     Upon the completion of any Transfer of Debtor Claims in accordance with this Section 6, the transferee shall be deemed a Consenting Creditor hereunder with respect to such

---

[3]     As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

transferred rights, obligations and claims and the Transferor shall be deemed to relinquish its rights and claims (and be released from its obligations under this Agreement) with respect to such transferred Debtor Claims.

(f)    Any Transfer of any Debtor Claims/Interests made in violation of this Section 6 shall be void *ab initio* and of no force and effect and shall not create any obligation or liability of any Consenting Creditor or the Debtors to the purported transferee.

**Section 7.    *Representations and Warranties of Consenting Creditors and Sponsor.*** Each Consenting Creditor and Sponsor, severally, and not jointly, represents and warrants for itself and not any other Person or Entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

(a)    it is the beneficial owner of the face amount of the Debtor Claims/Interests, or is the nominee, investment manager, or advisor for beneficial holders of the Debtor Claims/Interests, as reflected on such Consenting Creditor's or Sponsor's signature page to this Agreement (such Debtor Claims/Interests, the "**Owned Debtor Claims/Interests**");

(b)    it has the full power and authority to act on behalf of, vote, and consent to matters concerning the Owned Debtor Claims/Interests;

(c)    it is either (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (ii) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act of 1933, as amended (the "**Securities Act**"), (iii) a Regulation S non-U.S. person, or (iv) the foreign equivalent of (i) or (ii) above;

**Section 8.    *Mutual Representations and Warranties.*** Each (i) Consenting Creditor and Sponsor, severally, and not jointly, and (ii) Debtor, on a joint and several basis, hereby represents and warrants for itself and not any other Person or Entity that the following statements are true, correct, and complete, to the best of its actual knowledge, as of the date hereof:

8.01.    <u>Enforceability</u>.  It is validly existing and in good standing under the laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

8.02.    <u>No Consent or Approval</u>.  Except as expressly provided in this Agreement, the Plan, the Term Sheet, or the Bankruptcy Code, no consent or approval is required by any other Person or Entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform the respective obligations under, this Agreement.

8.03.    <u>Power and Authority</u>.  Except as expressly provided in this Agreement and subject to applicable law, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and, to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement.

8.04.   <u>Governmental Consents</u>.  Except as expressly set forth herein and with respect to the Debtors' execution and performance of this Agreement (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), the execution, delivery, and performance by it of this Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body.

8.05.   <u>No Conflicts</u>.  The execution, delivery, and performance of this Agreement does not and shall not: (a) violate any provision of law, rules, or regulations applicable to it or any of its subsidiaries in any material respect; (b) violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries; or (c) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any contractual obligation to which it is a party, which conflict, breach, or default, would have a material adverse effect on the Restructuring Transactions.

8.06.   <u>Fiduciary Duties</u>.  It has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or Entity, would prevent it from taking any action required of it under this Agreement.

8.07.   <u>Other Representations</u>.  It has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

**Section 9.**    *Acknowledgement*.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The Debtors will not solicit acceptances of any Plan from Consenting Creditors in any manner inconsistent with the Bankruptcy Code or applicable bankruptcy law.

**Section 10.**    *Cooperation and Support.*

(a)    The Required Consenting Creditors and the Sponsor shall have a reasonable opportunity to review and comment on first-day pleadings (the "**First Day Pleadings**").  The Debtors shall use commercially reasonable efforts to incorporate the comments of the Required Consenting Creditors and the Sponsor as to the First Day Pleadings.

(b)    Additionally, during the Effective Period, the Debtors will use reasonable best efforts to provide draft copies of all material motions, pleadings, and documents other than the First Day Pleadings that the Debtors intend to file with the Bankruptcy Court to counsel to the Term Loan Agent and the Sponsor at least three (3) days before the date on which Debtors intend to file such motions.  To the extent such documents do not constitute Restructuring Documents (which shall be subject to the consent and approval rights of the Debtors, the Required Consenting Creditors, and the Sponsor as set forth in Section 3 of this Agreement), the Debtors shall consult

13

in good faith with counsel to the Term Loan Agent and the Sponsor regarding the form and substance of such documents.

(c)     The Debtors shall (i) provide to the Consenting Creditors' and the Sponsor's advisors timely and reasonable responses to all reasonable diligence requests, in each case for purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects, and affairs; and (ii) promptly notify counsel to the Term Loan Agent and the Sponsor of any newly commenced material governmental or third party litigations, investigations, or hearing against any of the Debtors.

**Section 11.**    *Termination Events*.

11.01.    <u>Consenting Creditor Termination Events</u>. This Agreement may be terminated as between the Consenting Creditors and the other Parties, in each case, upon five (5) business days written notice delivered in accordance with Section 18.09 hereof by the Required Consenting Creditors pursuant to this Section 11.01 upon the occurrence and continuation of any of the following events (provided that the foregoing Required Consenting Creditors have not failed to perform or comply in all material respects with the terms and conditions of this Agreement):

(a)     the failure to meet any of the Milestones unless (i) such failure is the result of any act, omission, or delay on the part of the Required Consenting Creditors in violation of their obligations under this Agreement or (ii) such Milestone is waived in accordance with Section 4;

(b)     the effective date of the Plan (the "**Plan Effective Date**") shall not have occurred on or before December 15, 2017 (the "**Outside Date**");

(c)     the occurrence of a material breach by any Party other than the Required Consenting Creditors of this Agreement; *provided*, that (i) such Required Consenting Creditors shall transmit a notice to the Debtors, the Sponsor, and the other Consenting Creditors pursuant to Section 18.09 hereof, detailing any such breach and (ii) any other Consenting Creditor may transmit a notice to any Party detailing a breach (while providing copies of such notice pursuant to Section 18.09 hereof) and, in either case, if such breach is capable of being cured, the breaching Party shall have five (5) business days after receiving such notice to cure any breach;

(d)     the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling, or order that, in each case, would have the effect of preventing substantial consummation of the Restructuring Transactions; *provided*, that the Debtors shall have five (5) business days after issuance of such injunction, judgment, decree, charge, ruling, or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of this Agreement, or (ii) is acceptable to the Required Consenting Creditors;

(e)     the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Required Consenting Creditors, or (iii) appointment of a trustee, receiver, or

14

examiner with expanded powers beyond those set forth in section 1106(a)(3) or (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(f)     any Debtor, without the prior consent of the Required Consenting Creditors, (i) amends, or modifies, or files a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is materially inconsistent with this Agreement, (ii) suspends or revokes the Restructuring Transactions, or (iii) publicly announces its intention to take any such action listed in Sub-Clauses (i) and (ii) of this subsection;

(g)     any of the Restructuring Documents do not comply with Section 3 of this Agreement or any other document or agreement necessary to consummate the Restructuring Transactions is not reasonably satisfactory to the Required Consenting Creditors;

(h)     any Debtor makes any filing in support of, enters into an agreement with respect to, or announces its support for any Alternative Transaction or that it will file any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets (other than as provided for in the Plan), without the prior written consent of the Required Consenting Creditors;

(i)     the Bankruptcy Court enters any order authorizing the use of cash collateral or post-petition financing that is not substantially consistent with this Agreement or otherwise consented to by the Required Consenting Creditors;

(j)     the Debtors' failure to consummate the DIP ABL Financing;

(k)     the occurrence of any Event of Default under the DIP Term Documents, the DIP ABL Documents, or the DIP Orders, as applicable, that has not been cured (if susceptible to cure) or waived in accordance with the terms thereof;

(l)     a breach by any Debtor or any other Party of any representation, warranty, or covenant of such Debtor or other Party set forth in Section 8 of this Agreement that could reasonably be expected to have a material adverse impact on the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Debtors of written notice and description of such breach from any other Party;

(m)     any Debtor or Sponsor files a motion, application, or adversary proceeding (or any Debtor or other Party supports any such motion, application, or adversary proceeding filed or commence by any third party) (i) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Term Loan Claims, or (ii) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims;

(n)     a determination is made with respect to any Debtor pursuant to Section 11.03(b) that its continued support of the Restructuring Transactions would be inconsistent with its fiduciary obligations under applicable law;

15

(o)      any Debtor terminates its obligations under and in accordance with Section 11.03 of this Agreement;

(p)      the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(q)      the DIP Orders or any of the orders confirming the Plan or approving the Disclosure Statement are reversed, stayed, dismissed, vacated, reconsidered, modified, or amended without the consent of the Required Consenting Creditors or a motion for reconsideration, reargument, or rehearing with respect to such orders has been filed and the Debtors have failed to timely object to such motion; or

(r)      the occurrence of a Maturity Date (as defined in each of the DIP Credit Agreements).

The Interim DIP Order will provide that the Consenting Creditors are authorized to take any steps necessary (including, without limitation, sending any notice contemplated hereunder) to effectuate the termination of this Agreement notwithstanding section 362 of the Bankruptcy Code or any other applicable law and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code or any other applicable law without the prior written consent of the Required Consenting Creditors; *provided,* that following the commencement of the Chapter 11 Cases and until such time as the Interim DIP Order (which includes the foregoing provision) is entered, the occurrence of any Termination Event in this Section 11.01 shall result in the automatic termination of this Agreement five days following such occurrence unless waived in writing by the Required Consenting Creditors.

11.02.  Sponsor's Termination Events.  This Agreement may be terminated as between the Sponsor and the other Parties upon five (5) business days written notice delivered in accordance with Section 18.09 hereof by the Sponsor pursuant to this Section 11.02 upon the occurrence and continuation of any of the following events (provided that the Sponsor has not failed to perform or comply in all material respects with the terms and conditions of this Agreement):

(a) the occurrence of a material breach by any Party other than the Sponsor of this Agreement; *provided,* that (i) the Sponsor shall transmit a notice to the Debtors and the Consenting Creditors pursuant to Section 18.09 hereof detailing any such breach and, if such breach is capable of being cured, the breaching Party shall have five (5) business days after receiving such notice to cure any breach;

(b) the entry of an order by the Bankruptcy Court denying confirmation of the Plan; and

(c) a Release Revocation Event (as defined herein).

11.03.  Debtors' Termination Events.  Any Debtor may terminate this Agreement as to all Parties upon five (5) business days' prior written notice, delivered in accordance with Section 18.09 hereof, upon the occurrence of any of the following events:

(a)      the breach by any of the Consenting Creditors of any material provision set forth in this Agreement that remains uncured for a period of five (5) business days after the receipt by the Consenting Creditors of notice of such breach;

(b)      the board of directors, board of managers, or a similar governing body of any Debtor determines based on advice of counsel that proceeding with any of the Restructuring Transactions would be inconsistent with applicable law or its fiduciary obligations under applicable law, including having received a proposal or offer for an Alternative Transaction, that such Alternative Transaction is likely to be more favorable to such Debtor's estate than the Restructuring Transactions and that continued support of the Restructuring Transactions pursuant to this Agreement would be inconsistent with its fiduciary obligations; or

(c)      the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any ruling or order enjoining the consummation of a material portion of the Restructuring Transactions; *provided*, that the Debtors have made reasonable best efforts to cure, vacate, reverse, or have overruled such ruling or order prior to terminating this Agreement.

11.04.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among each of the Debtors, the Sponsor, and the Required Consenting Creditors.

11.05.  <u>Termination Upon Completion of the Restructuring Transaction</u>.  This Agreement shall terminate automatically without any further required action or notice on the Plan Effective Date, subject to Section 12 of this Agreement.

11.06.  <u>Effect of Termination</u>.  The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04, and 11.05 shall be referred to as a "**Termination Date**." Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement. Upon the occurrence of a Termination Date with respect to the Consenting Creditors or the Sponsor, any and all consents or ballots tendered by such Consenting Creditors or the Sponsor, as applicable, shall be deemed, for all purposes, to be null and void *ab initio* and shall not be used in any manner in connection with the Restructuring Transactions or otherwise. Notwithstanding anything to the contrary in this Agreement, the foregoing shall not be construed to prohibit the Debtors, the Sponsor, or any of the Consenting Creditors from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Debtor or the ability of any Debtor to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Creditor, (b) any right of any Consenting Creditor, or the ability of any Consenting Creditor, to protect and preserve its rights (including rights under this Agreement), remedies, and

interests, including its claims against any Debtor, Sponsor, or Consenting Creditor, and (c) any right of the Sponsor, or the ability of the Sponsor to protect and preserve its rights (including any rights under this Agreement), remedies, and interests, including its claims against any Debtor or Consenting Creditor. Nothing in this Section 11.06 shall restrict any Debtor's right to terminate this Agreement in accordance with Section 11.03(b).

**Section 12.**   *Survival.*   Notwithstanding the termination of this Agreement pursuant to Section 11, the agreements and obligations of the Parties in Sections 14 and 15 hereof (and any defined terms needed for the interpretation of any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof.

**Section 13.**   *Fees and Expenses.*   The Debtors shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) of the attorneys, accountants, other professionals, advisors and consultants of the Term Loan Agent and the Consenting Creditors (whether incurred directly by the Consenting Creditors or on their behalf through the Term Loan Agent and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of (a) Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**") as legal counsel, (b) McGuireWoods LLP as local counsel, (c) Rothschild Inc. ("**Rothschild**") as financial advisor and investment banker, and (d) Carriage House Capital Advisors, LLC ("**Carriage House**") as consultant, and any such other advisors or consultants as may be reasonably retained on behalf of the Consenting Creditors in consultation with the Debtors, in each case, including all amounts payable or reimbursable under applicable fee or engagement letters with the Debtors (which agreements shall not be terminated by the Debtors before the termination of this Agreement), the DIP Order, or the Term Loan Credit Agreement.

**Section 14.**   *Release.*

14.01.   On the Agreement Effective Date, (x) each Consenting Creditor, and subject in all respects to Section 15, on behalf of itself and its predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals (in each case in their capacity as such) (collectively, the "**Consenting Creditor Releasing Parties**"), expressly and generally releases, acquits and discharges (i) the Sponsor; (ii) the Sponsor's respective predecessors, successors and assigns, subsidiaries, Affiliates (in each case of the foregoing, except the Debtors), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals of the Sponsor; and (iii) the current and former Sponsor-appointed directors of the Debtors and its subsidiaries (in each case in their capacity as such) ((i) through (iii), collectively, the "**Sponsor Released Parties**") from, any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Debtors and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or

otherwise, by statute or otherwise, that such Consenting Creditor Releasing Parties (whether individually or collectively), ever had, now has or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including, without limitation, the purchase, sale, rescission, or any other transaction relating to any security of the Debtors, or any other transaction) or the negotiation, formulation or preparation of the Restructuring Transactions, in each case, arising on or before the execution of this Agreement. For the avoidance of doubt, the foregoing shall not operate as a release of any Debtor.

14.02. On the Agreement Effective Date, the Sponsor, subject in all respects to Section 15, on behalf of itself and its predecessors, successors and assigns, subsidiaries, Affiliates (in each case of the foregoing, except the Debtors), managed accounts or funds or investment vehicles, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals of the Sponsor (in each case in their capacity as such) (collectively, the "**Sponsor Releasing Parties**" and, together with Consenting Creditor Releasing Parties, the "**Releasing Parties**"), expressly and generally releases, acquits and discharges (i) the Sponsor, (ii) the other applicable Sponsor Released Parties, (iii) each Consenting Creditor, and (iv) each Consenting Creditor's respective predecessors, successors and assigns, subsidiaries, Affiliates, managed accounts or funds, and each of such entities' respective current and former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals of each Consenting Creditor (in each case in their capacity as such) ((iii) through (iv), collectively, the "**Consenting Creditor Released Parties**") from, any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtors, any claims asserted or assertable on behalf of any holder of any claim against or interest in the Debtors and any claims asserted or assertable on behalf of any other entity, whether known or unknown, foreseen or unforeseen, matured or unmatured, in law, equity, contract, tort or otherwise, by statute or otherwise, that such Sponsor Releasing Parties (whether individually or collectively), ever had, now has or may have, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including, without limitation, the purchase, sale, rescission, or any other transaction relating to any security of the Debtors) or the negotiation, formulation or preparation of the Restructuring Transactions, in each case, arising on or before the execution of this Agreement; *provided*, that nothing in the foregoing shall result in any of the Debtors' officers and directors waiving any indemnification claims against the Debtors or any of its insurance carriers or any rights as beneficiaries of any insurance policies (including any indemnification obligations and insurance policies that may be assumed by the Reorganized Debtors consistent with this Agreement).

14.03. Subject to Section 15, each of the Releasing Parties knowingly grants the releases under this Section 14 (collectively, the "**Release**") notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party expressly waives any and all rights that such Releasing Party may have under any statute or common law principle which would limit the

effect of the Release to those claims actually known or suspected to exist as of before the Agreement Effective Date.

14.04.  In the event that any third party, trustee, debtor in possession, creditor, estate, creditors' committee, or similar entity is successful in pursuing any claim, cause of action, or litigation against any Sponsor Released Party with respect to any claims released pursuant to the Release, each Releasing Party agrees that it shall not recover any funds received, awarded, or arising from settlement, judgment, or other resolution of such actual or threatened claim, cause of action or litigation, and shall assign any such recoveries to, and hold them in trust for, such Sponsor Released Party.

14.05.  Subject to Section 15, in connection with their agreement to the foregoing Release, the Releasing Parties knowingly and voluntarily waive and relinquish any and all provisions, rights and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.**

14.06.  Each of the Releasing Parties hereby represents and warrants that it has access to adequate information regarding the terms of this Agreement, the scope and effect of the Release, and all other matters encompassed by this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement. Each of the Releasing Parties further represents and warrants that it has not relied upon any other Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement.

**Section 15.**    *Revocation of Release.*

15.01.  Subject to Section 15.03, a Release provided in Section 14 shall be deemed revoked if any Party receives a notice from any other Party (each, a "**Release Revocation Notice**") of the occurrence of a Release Revocation Event (as defined herein) and the recipient(s) of the Release Revocation Notice fails to cure such Release Revocation Event within five (5) business days of receipt of such Release Revocation Notice (the "**Revocation Cure Period**") or such Release Revocation Notice is not otherwise rescinded; *provided*, that in the event the recipient(s) of a Release Revocation Notice disputes either the occurrence of a Release Revocation Event or the failure of the recipient(s) to cure the Release Revocation Event within the Revocation Cure Period, such recipient(s) shall have ten (10) business days from the expiration of the Revocation Cure Period to seek a determination by the Bankruptcy Court as to whether a Release Revocation Event occurred and was not cured within the Revocation Cure Period.

15.02.  <u>Release Revocation Event</u>.  For the purposes of this Agreement, a "**Release Revocation Event**" means any of the following:

(a) a breach by any Party (other than the Releasing Party seeking to revoke the Release) of any material representation, warranty, covenant, or other provision of this Agreement that gives rise to a termination right under this Agreement; and

(b) this Agreement is terminated with respect to any Debtor, including, without limitation, as a result of a Debtor's determination pursuant to Section 11.03(b).

Notwithstanding subsections (a) and (b) of this Section 15.02, if the economic outcome for the Required Consenting Creditors, the timing of confirmation and the Plan Effective Date, and all other material terms as contemplated herein are substantially preserved, in each case as determined by the Required Consenting Creditors, the foregoing subsections (a) and (b) shall not constitute a Release Revocation Event (other than with respect to a breach of this Agreement by the Sponsor).

15.03.  Effect of Revocation of Release.

(a) Revocation of a Release as a result of a Release Revocation Event as contemplated in subsections (b) and (c) hereof shall result in a full and complete restoration of any and all claims, liabilities, and causes of action subject to such Release, and such Release shall be void *ab initio*, in each case, to the extent contemplated in subsections (b) and (c) of this Section 15.03.

(b) In the case of a Release Revocation Event under Section 15.02(a), (i) if the breaching Party is a Sponsor, the Release in Section 14.01 shall be revoked with respect to all of the Sponsor Released Parties (and such Sponsor Released Parties shall no longer have the benefit of such Release), and (ii) if the breaching Party is a Consenting Creditor, the Releases in section 14.02 shall be revoked solely with respect to such breaching Consenting Creditor and its respective Consenting Creditor Released Parties (and such Consenting Creditor Released Parties shall no longer have the benefit of such Release).  Other than as set forth in this Section 15.02(b), the revocation of any Release under section 15.02(a) shall not operate as a revocation of, nor otherwise impair or affect, any other Release.

(c) In the case of a Release Revocation Event under Sections 15.02(b), the Releases in Sections 14.01 and 14.02 shall be revoked in their entireties.

**Section 16.    *Amendments*.**  This Agreement (including the Exhibits and Schedules), may not be modified, amended, or supplemented in any manner except in writing signed by each of the Debtors and the Required Consenting Creditors; *provided* that any such modification, amendment, or supplement that is reasonably anticipated to have an adverse impact on any Sponsor Released Party may only be effected by a writing signed by each of the Debtors, the Required Consenting Creditors, and the Sponsor.  Any proposed modification, amendment, or supplement that is not approved by the requisite Parties as set forth above shall be ineffective and void *ab initio*.

**Section 17.    *Fiduciary Duties*.**  Nothing in this Agreement shall require the Debtors, nor the Debtors' directors, managers, and officers, to take or refrain from taking any action (including, without limitation, terminating this Agreement under Section 11), to the extent such person or persons determines, based on the advice of counsel, that taking, or refraining from taking, such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided*, that this Section 17 shall not impede any Party's right to terminate this Agreement pursuant to Section 11.

**Section 18.**    *Miscellaneous.*

18.01. <u>Further Assurances</u>. Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

18.02. <u>Complete Agreement</u>. This Agreement (including the Exhibits and Schedules) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior negotiations, agreements, and understandings, whether oral or written, among the Parties with respect thereto.

18.03. <u>Headings</u>. The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

18.04. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF. Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in either the United States District Court for the Southern District of New York or any New York state court (the "**Chosen Courts**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Courts; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Courts; and (c) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter; *provided*, that if the Debtors commence the Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

18.05. <u>Trial by Jury Waiver</u>. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

18.06. <u>Execution of Agreement</u>. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

18.07. <u>Interpretation and Rules of Construction</u>. This Agreement is the product of good faith negotiations among the Debtors, the Sponsor, and the Consenting Creditors, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption

with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof. The Debtors and the Consenting Creditors were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel. In addition, this Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.

18.08.  <u>Successors and Assigns</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

18.09.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to a Debtor, to:

The Gymboree Corporation
71 Stevenson Street, Suite 2200
San Francisco, CA 94105
Attention:  Kimberly MacMillan
        kimberly_macmillan@gymboree.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attention:  Anup Sathy, P.C.
        anup.sathy@kirkland.com

        Steven N. Serajeddini
        steven.serajeddini@kirkland.com

-and-

Kirkland & Ellis LLP
601 Lexington Avenue
New York, New York 10022
Attention:  Joshua A. Sussberg, P.C.
        joshua.sussberg@kirkland.com

        Matthew C. Fagen
        matthew.fagen@kirkland.com

(b)      if to the Consenting Creditors, to:

The address set forth on each such Consenting Creditors' signature page (or as directed by any transferee thereof), as the case may be.

With a copy to counsel to the Term Loan Agent (which shall not constitute notice):

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, NY 10005
Attention: Dennis F. Dunne
            ddunne@milbank.com

            Evan R. Fleck
            efleck@milbank.com

-and-

McGuireWoods LLP
800 East Canal Street
Richmond, VA 23219
Attention: Dion W. Hayes
            dhayes@mcguirewoods.com

(c)    if to the Sponsor, to:

Bain Capital Partners, LLC
200 Clarendon Street
Boston, MA 02116
Attention: David Hutchins
            dhutchins@baincapital.com

with copies (which shall not constitute notice) to:

Weil Gotshal & Manges LLP
767 5th Avenue
New York, NY 10153
Attention: Matt Barr
            matt.barr@weil.com

            Robert Lemons
            Robert.lemons@weil.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above. Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received. For purposes of this Agreement, any consents or approvals of the Required Consenting Creditors may be provided by counsel to the Term Loan Agent.

18.10.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.

18.11.  <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions, or the payment of damages to which a Party may be entitled under this Agreement.

18.12.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

18.13.  <u>Relationship Among Parties</u>. Notwithstanding anything herein to the contrary, the agreements, representations, warranties, and obligations of the Consenting Creditors under this Agreement are, in all respects, several and not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other Entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement. The Parties hereto acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors and the Consenting Creditors do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.  No action taken by any Consenting Creditor pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Consenting Creditors are in any way acting in concert or as such a "group."

18.14.  <u>Reservation of Rights</u>.

(a) Except as expressly provided in this Agreement or the Term Sheet, including Section 5.01 of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies, and interests, including without limitation, its claims against any of the other Parties.

(b) Without limiting Section 11.06 and Sub-Clause (a) of this Section 18.14 in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims, and defenses, subject to Section 18.11 of this Agreement. This Agreement, the Plan, and any related document

shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

18.15.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

18.16.  <u>Remedies Cumulative</u>.    All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

18.17.  <u>Additional Parties</u>.  Without in any way limiting the requirements of Section 6 of this Agreement, additional Term Loan Lenders may elect to become Parties to this Agreement upon execution and delivery to the other Parties of a Joinder Agreement in the form attached hereto as **Exhibit C**.  Each such additional Party shall become a Consenting Creditor under this Agreement in accordance with the terms of this Agreement and shall be bound by the terms and conditions of this Agreement, deemed to make all representations and warranties contained herein as of the date of the execution and delivery of such Joinder Agreement, and shall be both a Releasing Party and Released Party as if it was an original signatory of this Agreement as of the date hereof.

18.18.  <u>Other Support Agreements.</u>  Until a Termination Date with respect to the Debtors, no Debtor shall enter into any other restructuring support agreement related to a partial or total restructuring of the Debtors' balance sheet unless such support agreement is consistent in all respects with the Restructuring Term Sheet and is reasonably acceptable to the Required Consenting Creditors.

18.19.  <u>Confidentiality</u>.  The terms of any existing confidentiality agreements executed by and among any of the Parties as of the date hereof shall remain in full force in accordance with their terms.  Except as required by applicable law, rule, or regulation or as ordered by the Bankruptcy Court or other court of competent jurisdiction, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party) the holdings information of any Consenting Creditor without such Consenting Creditor's prior written consent; *provided*, that the Debtors may publicly disclose the aggregate holdings of all Consenting Creditors.

18.20.  <u>Consent Rights Preserved</u>.  Notwithstanding any provision in any order approving any First Day Pleading that grants the Debtors discretion to take any action that is subject to consent or approval rights of the Consenting Creditors hereunder, the entry of such order shall not be deemed a waiver of such consent or approval rights hereunder.

*[Remainder of page intentionally left blank.]*

**THE GYMBOREE CORPORATION**

By: _____
Daniel J. Griesemer
Chief Executive Officer

**GIRAFFE INTERMEDIATE B, INC.**

By: _____
Daniel J. Griesemer
Chief Executive Officer

**GYM-CARD, LLC**

By: _____
Daniel J. Griesemer
Chief Executive Officer

**GYM-MARK, INC.**

By: _____
Daniel J. Griesemer
Chief Executive Officer

**GYMBOREE MANUFACTURING, INC.**

By: _____
Daniel J. Griesemer
Chief Executive Officer

**GYMBOREE OPERATIONS, INC.**

By: _____
Daniel J. Griesemer
Chief Executive Officer

*Debtor Signature Page to Restructuring Support Agreement*

**GYMBOREE RETAIL STORES, INC.**

By: _____

Daniel J. Griesemer
Chief Executive Officer

**S.C.C. WHOLESALE, INC.**

By: _____

Daniel J. Griesemer
Chief Executive Officer

*Debtor Signature Page to Restructuring Support Agreement*

## EXHIBIT A to
### the Restructuring Support Agreement

### Restructuring Term Sheet

*EXECUTION VERSION*

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.   ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.   NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON ANY OF THE PARTIES HERETO.

# RESTRUCTURING TERM SHEET

This term sheet (this "**Restructuring Term Sheet**") describes the principal terms of a restructuring of the Gymboree Corporation ("**Gymboree**") and certain of its directly and indirectly-owned subsidiaries listed on **Annex I**, and Giraffe Intermediate B, Inc. (collectively, the "**Debtors**" and, such restructuring, the "**Restructuring**") through cases (the "**Chapter 11 Cases**") that will be filed under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**").

The governing documents with respect to the Restructuring will contain terms and conditions that are dependent on each other, including those described in this Restructuring Term Sheet and the Restructuring Support Agreement, dated as of June 11, 2017, to which this Restructuring Term Sheet is attached (as may be amended in accordance with its terms, the "**Restructuring Support Agreement**"). This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring, which shall be subject to the applicable consent and approval rights of the Parties as set forth in the Restructuring Support Agreement and the other Restructuring Documents.  Capitalized terms used but not otherwise defined later in this Restructuring Term Sheet or in the Restructuring Support Agreement have the meanings ascribed to such terms as set forth on **Annex II**.

This Restructuring Term Sheet is a draft, is intended for discussions purposes, and is subject to Federal Rule of Evidence 408.

| **OVERVIEW OF THE RESTRUCTURING** | |
|---|---|
| **Implementation** | The Debtors will effectuate the Restructuring through the filing of the Chapter 11 Cases and confirmation of a plan of reorganization under chapter 11 of the Bankruptcy Code (as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, the "**Plan**"), which shall be consistent with this Restructuring Term Sheet, subject to the terms and conditions set forth in the Restructuring Support Agreement.  As further described herein, the Restructuring is proposed to be funded through (i) the consensual use of cash collateral under the DIP Orders; (ii) $35 million in New Money DIP Loans under the DIP Term Loan Facility and $70 million in Roll-up DIP Loans; (iii) a DIP ABL Facility; (iv) up to $80 million of Rights Offerings under the Plan; and (v) the Exit Credit Facilities. |
| **DIP ABL Facility** | The Debtors have obtained a commitment from certain ABL Revolver Lenders and ABL Term Loan Lenders to provide an approximately $273.5 million debtor-in-possession financing facility on terms reasonably acceptable to the Required Consenting Creditors (the "**DIP ABL Facility**"), pursuant to which the commitments and loans of the ABL Lenders under the ABL Facility will convert into the DIP ABL Facility during the Chapter 11 Cases pursuant to the DIP Orders. |
| **DIP Term Loan Facility** | Certain Term Loan Lenders (in their capacities as such, the "**Initial DIP Term Lenders**") have committed to provide the Debtors with a $105 million debtor-in-possession financing facility (the "**DIP Term Loan Facility**") consisting of (a) $35 million in new money delayed draw term loans (the "**New Money DIP Loans**") to fund the Chapter 11 Cases and (b) $70 million of term loans (the "**Roll-up DIP Loans**") rolling up amounts due and owing to the DIP Term Lenders, on terms and conditions acceptable to the Required Consenting Creditors.  Additional Prepetition Term Lenders (in their capacities as such, the "**Electing DIP Term Lenders**" and together with the Initial DIP Term Lenders, the "**DIP Term Lenders**") will have the right to commit to their ratable share of the DIP Term Loan Facility before the Election Date (which shall be the date that is 14 days after the entry of the Interim DIP Order) by executing the Restructuring Support Agreement and taking such other actions as specified in the election procedures that are reasonably acceptable to the Debtors and the Term Loan Agent (the "**Election Procedures**"), which will require each Electing DIP Term Lender, to agree, among other things, to support the Restructuring and fully subscribe to its ratable portion of the Rights Offerings. |
| **Backstop Commitment Agreement and Rights Offerings** | The Plan will provide for new money rights offerings consisting of (i) a rights offering in reliance upon the exemption from registration under the Securities Act provided in section 1145 of the Bankruptcy Code (the "**1145 Rights Offering**") and (ii) a rights offering in reliance upon the exemption from registration provided in section 4(a)(2) of the Securities Act (the "**4(a)(2) Rights Offering**" and together with the 1145 Rights Offering, the "**Rights Offerings**") to Term Loan Lenders to purchase the |

| | |
|---|---|
| | Rights Offering Shares of up to $80 million in the aggregate (the "**Maximum Rights Offering Amount**"), subject to reduction to such amount as is reasonably determined in accordance with the Backstop Commitment Agreement (on or about, but no later than, the 14th day before the Plan confirmation hearing) as necessary for the Reorganized Debtors to maintain approximately (but no less than) $50 million of projected liquidity for the 12 months following the Plan Effective Date (and assuming for purposes of such calculation that the New Money DIP Loans are fully drawn) (the "**Adjusted Rights Offering Amount**").<br><br>The Maximum Rights Offering Amount will be fully backstopped by certain Term Loan Lenders (in their capacities as such, the "**Backstop Parties**") and the Rights Offerings will be conducted, subject in all respects to the terms and conditions set forth in the Backstop Commitment Agreement.  In consideration for their agreement to backstop the Rights Offerings, each Backstop Party will receive its pro rata share of a premium equal to 5% of the Maximum Rights Offering Amount (the "**Backstop Premium**"), which shall be satisfied by the Backstop Premium Shares and will be treated as an administrative expense of the Debtors (and otherwise payable in cash if the Restructuring is not consummated for any reason other than as specified in the Backstop Commitment Agreement). |
| **Exit ABL Revolving Facility** | The Debtors will enter into either (a) a replacement asset-based revolving loan facility from the ABL Revolving Lenders pursuant to which the ABL Revolving Lenders will convert all revolving commitments under the DIP ABL Facility into commitments under such replacement facility on the Plan Effective Date or (b) a new asset-based revolving loan facility in an amount sufficient to repay the DIP ABL Facility in full and to provide incremental liquidity, in either case, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors (the "**Exit ABL Revolving Facility**"). |
| **Exit ABL Term Loan Replacement Facility** | The Debtors will use commercially reasonable efforts to obtain either (a) a replacement term loan facility from the ABL Term Loan Lenders pursuant to which the ABL Term Loan Lenders will convert all ABL Term Loan Facility Claims into commitments under such replacement facility on the Plan Effective Date, or (b) a third-party term loan facility sufficient to pay the ABL Term Loan Facility Claims in full on the Plan Effective Date, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors (the "**Exit ABL Term Loan Replacement Facility**") and obtain proposals and a written commitment for such Exit ABL Term Loan Replacement facility by the applicable Milestones on the best available terms. |
| **Exit Term Loan Facility** | The New Money DIP Loans will be replaced or refinanced on the Plan Effective Date by an exit term loan facility (the "**Exit Term Loan Facility**" and together with the ABL Revolving Facility, and the Exit ABL Term Loan Replacement Facility, the "**Exit Credit Facilities**") provided by the DIP Term Lenders, substantially as set forth on the term sheet attached as **Annex IV** (the "**Exit Term Loan Facility Term Sheet**") and otherwise reasonably acceptable to the Required Consenting |

| | |
|---|---|
| | Creditors, subject to the Debtors' ability to obtain an alternative term loan facility sufficient to pay the New Money DIP Loan Claims in full on the Plan Effective Date, on terms and conditions (and in an amount) reasonably acceptable to the Required Consenting Creditors. The Debtors will use commercially reasonable efforts to obtain proposals and written commitments for an Exit Term Loan Facility sufficient to refinance the New Money DIP Loan Claims and the ABL Term Loan Facility Claims on the best available terms. |
| **Milestones** | The Debtors will implement the Restructuring in accordance with the following milestones (the "**Milestones**"): <br><br> 1. No later than June 11, 2017, the Petition Date shall have occurred. <br><br> 2. No later than 3 days following the Petition Date (June 14, 2017), the Debtors shall have obtained entry of the Interim DIP Order. <br><br> 3. No later than 5 days after the Petition Date (June 16, 2017), the Debtors shall have filed a motion seeking entry of an order approving the Debtors' entry into the Backstop Commitment Agreement (the "**BCA Approval Order**"). <br><br> 4. No later than 5 days after the Petition Date (June 16, 2017), the Debtors shall have filed the Plan, the Disclosure Statement, and a motion seeking approval of the Disclosure Statement and Solicitation Materials. <br><br> 5. No later than 10 days after the Petition Date (June 21, 2017), the Debtors shall have filed a motion seeking entry of an order approving going out-of-business sales and related relief (the "**GOB Order**"). <br><br> 6. No later than 10 days following the Petition Date (June 21, 2017), the Debtors shall have filed a motion seeking to extend the date by which to assume or reject unexpired leases of non-residential real property. <br><br> 7. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained entry of the Final DIP Orders. <br><br> 8. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained entry of the BCA Approval Order. <br><br> 9. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained entry of the GOB Order. <br><br> 10. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained one or more proposals containing a description of the material terms and conditions for the Exit ABL Term Loan Replacement Facility or demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such proposals were not available. <br><br> 11. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained one or more proposals containing a description of the material terms and conditions for (a) an Exit Term Loan Facility sufficient to refinance the New Money DIP Loan Claims and (b) an Exit Term Loan Facility sufficient to |

refinance both the Exit Term Loan Facility and the ABL Term Loan Facility Claims, or shall have demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such proposals were not available.

12. No later than 35 days following the Petition Date (July 16, 2017), the Debtors shall have obtained one or more proposals containing a description of the material terms and conditions for the refinancing of the DIP ABL Facility (which need not be a traditional asset-backed financing arrangement), or shall have demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such proposals were not available.

13. No later than 50 days after the filing of the Plan, Disclosure Statement, and a motion seeking approval of the Disclosure Statement and Solicitation Materials, the Debtors shall have obtained entry of the Disclosure Statement Order approving the Disclosure Statement and Solicitation Materials.

14. No later than 75 days following the Petition Date (August 25, 2017), the Debtors shall have obtained a written commitment for the Exit ABL Term Loan Replacement Facility that is in form and substance reasonably satisfactory to the Required Consenting Creditors or demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such commitment was not available.

15. No later than 75 days following the Petition Date (August 25, 2017), the Debtors shall have obtained written commitments for (a) an Exit Term Loan Facility sufficient to refinance the New Money DIP Loan Claims and (b) an Exit Term Loan Facility sufficient to refinance both the Exit Term Loan Facility and the ABL Term Loan Facility Claims, or shall have demonstrated to the reasonable satisfaction of the Required Consenting Creditors that such commitments were not available.

16. No later than 75 days following the Petition Date (August 25, 2017), either (i) the ABL Lenders shall have agreed to provide the Exit ABL Revolving Facility and to convert all commitments under the DIP ABL Facility into such Exit Revolving Facility on the Plan Effective Date, or (ii) the Debtors shall have obtained a written commitment from another financing source to provide the Exit ABL Revolving Facility (which need not be a traditional asset-backed financing arrangement) on the Plan Effective Date, in either case, in form and substance reasonably satisfactory to the Required Consenting Creditors.

17. No later than 105 days following the Petition Date (September 24, 2017), the Debtors shall have obtained entry of the Confirmation Order.

18. No later than the earliest of (a) 120 days following the Petition Date (October 9, 2017) and (b) 15 days following the entry of the Confirmation Order, the Plan Effective Date shall have occurred.

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | | |
|---|---|---|
| **Type of Claim** | **Treatment** | **Impairment / Voting** |
| **DIP ABL Facility Claims** | In full satisfaction of each allowed DIP ABL Facility Claim, each Holder thereof will either be, subject to the consent of the Required Consenting Creditors: (a) repaid in full in cash or (b) with the consent of such Holder, receive its *pro rata* share of the Exit ABL Revolving Facility or the Exit ABL Term Loan Replacement Facility, as applicable. | N/A |
| **New Money DIP Loan Claims** | In full satisfaction of the allowed New Money DIP Loan Claims, each Holder of an allowed New Money DIP Loan Claim[1] will either: be repaid in full in cash or receive its *pro rata* share of the Exit Term Loan Facility (the "**Base Treatment**"); *provided*, that if (a) on the first business day after entry of the Confirmation Order the most recently delivered Budget (as defined in the DIP Orders) projects that any amount in the DIP Funding Account (as defined in the DIP Term Loan Credit Agreement) will remain undrawn immediately prior to the occurrence of the then-projected Plan Effective Date (the "**DIP Surplus Amount**"), (b) the Required Consenting Creditors elect to receive DIP Surplus Conversion Shares (such election to be made no later than 5 business days after entry of the Confirmation Order) (a "**DIP Surplus Conversion**"), then (c) on the Plan Effective Date, each Holder of an allowed New Money DIP Loan Claim will receive its *pro rata* share of the DIP Surplus Conversion Shares, and (d) the amount of New Money DIP Loan Claims entitled to the Base Treatment will be reduced ratably among the Holders by the DIP Surplus Amount.[2]<br><br>Notwithstanding the foregoing, to the extent there is a DIP Surplus Amount and the Required Consenting Creditors do not elect to receive DIP Surplus Conversion Shares, then on the date that is one business day prior to the election described in footnote two of the preceding paragraph, the Debtors shall be permitted to draw an amount of New Money DIP Loans equal to the portion of the DIP Surplus Amount | N/A |

---

[1]    In lieu of receiving a cash repayment in satisfaction of any New Money DIP Loan Claims subject to the Base Treatment, each Holder thereof may instead elect not to receive such cash repayment and apply such amount towards any funding obligations under the Backstop Commitment Agreement or in connection with the Rights Offerings, in each case, in the manner set forth in the DIP Term Loan Credit Agreement and upon notice to the Debtors and the DIP Term Loan Agent, and prior to the Subscription Escrow Funding Date (as defined in the Backstop Commitment Agreement)

[2]    To the extent that after an election as described in clause (b) of this paragraph, a subsequent Budget indicates that the DIP Surplus Amount on the then-projected Plan Effective Date is different than that indicated in the most recent Budget prior to the election, then the amount of DIP Surplus Conversion shares may be adjusted accordingly as determined by the Debtors and the Required Consenting Creditors.

| | | |
|---|---|---|
| | not subject to the election, to the extent necessary to permit the Debtors to meet the Projected Liquidity Requirement (as defined in the Backstop Commitment Agreement) on the Plan Effective Date (after taking into account availability under the Exit Credit Facilities upon the occurrence of the Plan Effective Date). | |
| **Roll-Up DIP Claims** | In full satisfaction of the allowed Roll-up DIP Claims, each Holder of an allowed Roll-up DIP Claim will receive its *pro rata* share of the Roll-Up DIP Conversion Shares. | |
| **Administrative Claims** | Except to the extent that a Holder of an allowed Administrative Claim and the Debtor against which such allowed Administrative Claim is asserted agree to less favorable treatment for such Holder, each Holder of an allowed Administrative Claim shall receive, in full satisfaction of its Claim, payment in full in cash. | N/A |
| **Priority Tax Claims** | In full satisfaction of the allowed Priority Tax Claims, each Holder of an allowed Priority Tax Claim will be paid in full in cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | N/A |
| **Other Secured Claims** | In full satisfaction of each allowed Other Secured Claim, each Holder thereof will receive: (a) payment in full in cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) Reinstatement of such Claim; or (d) other treatment rendering such claim Unimpaired. | Unimpaired; deemed to accept. |
| **Other Priority Claims** | Except to the extent that a Holder of an allowed Other Priority Claim and the Debtor against which such allowed Other Priority Claim is asserted agree to less favorable treatment for such Holder, in full satisfaction of each allowed Other Priority Claim against the Debtors, each Holder thereof shall receive payment in full in cash or other treatment rendering such Claim Unimpaired. | Unimpaired; deemed to accept. |
| **Term Loan Secured Claims** | In full satisfaction of each allowed Term Loan Secured Claim, each Holder thereof will receive its *pro rata* share of: (a) the Term Loan Common Shares; and (b) the Rights; *provided*, that the Li & Fung Term Loan Claim shall not be entitled to any recovery under the Plan so long as the Li & Fung Agreement has been assumed in connection with the Plan. | Impaired; entitled to vote. |
| **Critical Trade Claims** | In full satisfaction of each allowed Critical Trade Claim, each Holder thereof will receive cash in an amount equal to such allowed Critical Trade Claim (only to the extent not already satisfied by payments made pursuant to an order of the Bankruptcy Court) on the later of: (a) the Plan Effective Date; or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the particular transaction or agreement giving rise to such allowed Critical | Unimpaired; deemed to accept. |

| | Trade Claim. | |
|---|---|---|
| **General Unsecured Claims** | General Unsecured Claims shall not be entitled to any recovery or distribution under the Plan. | Impaired; deemed to reject. |
| **Intercompany Claims** | Unless otherwise provided for under the Plan, each Debtor Intercompany Claim will either be Reinstated or canceled and released at the option of the Debtors in consultation with the Required Consenting Creditors; *provided*, that no distributions shall be made on account of any such Debtor Intercompany Claims on the Plan Effective Date. | Unimpaired; deemed to accept **or** Impaired; deemed to reject. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be Reinstated solely to maintain the Debtors' corporate structure. | Unimpaired; deemed to accept. |
| **Existing Common Stock** | All Interests (other than Intercompany Interests) will be cancelled, released, and extinguished, and will be of no further force or effect and no Holder of Existing Common Stock shall be entitled to any recovery or distribution under the Plan on account of such Interests. | Impaired; deemed to reject. |

| **OTHER TERMS OF THE RESTRUCTURING** | |
|---|---|
| **Executory Contracts and Unexpired Leases** | Except as otherwise provided in this Restructuring Term Sheet or the Restructuring Support Agreement, the Debtors shall assume or reject, as the case may be, executory contracts and unexpired leases in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Required Consenting Creditors; *provided*, that the Debtors shall assume the Li & Fung Agreement. |
| **Cash Collateral and Adequate Protection** | The DIP Orders shall provide for the Debtors' consensual use of the cash collateral of the Term Loan Lenders on the terms and conditions set forth in the DIP Term Loan Facility Term Sheet and as otherwise may be reasonably acceptable to the Required Consenting Creditors. |
| **Li & Fung** | Pursuant to the Critical Vendor Motion (as defined below), the Debtors shall seek entry of interim and final orders to make payments to the Li & Fung vendors, through Li & Fung, as they come due in the ordinary course of business during the pendency of the chapter 11 cases under the Li & Fung Agreement.  Li & Fung shall be included in the Critical Vendor Motion and, in consideration of being treated as a Critical Vendor, agrees to continue to perform under the Li & Fung Agreement on terms and conditions consistent with past practice (*i.e.*, 75 day terms) and on the Plan Effective Date release the $10 million letter of credit provided in connection with the Li & Fung Agreement. |
| **Critical Vendor Orders** | The Debtors shall file one or more motions (the "**Critical Vendors Motions**") seeking entry of interim and final orders (in each case, in form and substance reasonably acceptable to the Required Consenting Creditors) to make payments to certain critical and critical foreign vendors ("**Critical Vendors**") on account of prepetition and postpetition claims as they come due in the ordinary course of business during the |

| | |
|---|---|
| | pendency of the chapter 11 cases.  As a condition to receiving such payments, each such Critical Vendor shall agree to continue to provide goods and services to the Debtors on terms and conditions reasonably acceptable to the Debtors and the Required Consenting Creditors.  Li & Fung (and vendors who sell through Li & Fung) shall be included under the Critical Vendor Motion and, in consideration for being treated as a Critical Vendor, Li & Fung (and vendors who sell through Li & Fung) will continue to perform in accordance with the Li & Fung Agreement consistent with past practice (*i.e.*, 75 day terms). |
| **Charter; Bylaws; Corporate Governance** | Corporate governance for the Reorganized Debtors, including charters, bylaws, operating agreements, or other organization or formation documents, as applicable, shall be consistent with section 1123(a)(6) of the Bankruptcy Code, as applicable, and in form and substance reasonably acceptable to the Debtors and the Required Consenting Creditors.  The New Gymboree Common Shares shall be subject to a stockholders' agreement, substantially in the form included in the Plan Supplement, containing terms and conditions that are reasonably acceptable to the Required Consenting Creditors and each holder of the New Gymboree Common Shares will be bound thereby without the need for execution by any party thereto other than Reorganized Gymboree.\
\
The Reorganized Gymboree Board will be comprised of seven members as of the Plan Effective Date as follows:\
\
    (i)    Gymboree's chief executive officer immediately prior to the occurrence of the Plan Effective Date, who shall be chief executive officer of Reorganized Gymboree;\
\
    (ii)    Ron Beegle of Carriage House Capital Advisors, LLC\
\
    (iii)    one member selected by Brigade Capital Management\
\
    (iv)    one member selected by OppenheimerFunds, Inc.\
\
    (v)    one member selected by Searchlight Capital Partners; and\
\
    (vi)    two members selected by the Required Consenting Creditors;\
\
*provided*, that if at any time prior to the Plan Effective Date any entity specified in (iii), (iv) or (v) does not have aggregate holdings (together with its Affiliates that own, manage, direct or have investment authority with respect to Gymboree's indebtedness) that would entitle such entity to an allocation of at least 9.5% of the New Gymboree Common Shares (prior to dilution by the MIP) outstanding on a *pro forma* basis on the Plan Effective Date, then such entity shall not be entitled to select a director and such director will instead be selected by the Required Consenting Creditors.  Provisions regarding the removal, appointment, and replacement of members of the subsequent Reorganized Gymboree Board to be determined by the Required Consenting Creditors. |
| **Initial Officers** | All initial officers of the Reorganized Debtors shall be disclosed in the Plan Supplement and shall be reasonably acceptable to the Required Consenting Creditors. |

| Tax Issues | The Restructuring will be effectuated and structured in a tax-efficient manner determined by the Debtors and the Required Consenting Creditors; *provided* that: (i) if the Restructuring gives rise to any cash income taxes payable by any non-debtor member of any consolidated, combined or unitary tax group of which Gymboree or any of its subsidiaries is a member (such group, a "**Gymboree Consolidated Group**" and such non-debtor member, a "**Non-Debtor**"), the Plan shall provide that any such taxes shall be paid by the Reorganized Debtors; and (ii) any tax losses generated by a Non-Debtor or Debtor arising in connection with the cancellation or worthlessness of any stock of any Non-Debtor, or otherwise in connection with the Restructuring, shall be available to shelter any income or gain arising in connection with the Restructuring without any requirement for the Debtors to compensate the Sponsor or any Non-Debtor for the use of such losses; *provided, however*, for the avoidance of doubt, that nothing in the Restructuring Support Agreement shall limit the Sponsor's ability to recognize any loss it may have with respect to its stock in Giraffe Holdings, Inc. following the occurrence of the Plan Effective Date in accordance with the terms of the Restructuring Support Agreement. |
|---|---|
| **Exemption from SEC Registration** | The issuance of all securities in connection with the Plan, including the New Equity Interests, will be exempt from SEC registration to the fullest extent permitted by law. |
| **Company Status and Reporting Upon Emergence** | Reorganized Gymboree will be a private company on the Plan Effective Date; *provided*, that from and after the Plan Effective Date, Reorganized Gymboree shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements). |
| **Company Status Upon Chapter 11 Filing** | The Company shall cease filing SEC reports on the Petition Date. |
| **Registration Rights** | Registration rights shall be determined in connection with the Plan Supplement in a form reasonably acceptable to the Debtors and the Required Consenting Creditors. |
| **Employment Obligations** | On the Plan Effective Date, the Debtors shall be deemed to have assumed each of the written contracts, agreements, policies, programs and plans for compensation, bonuses, reimbursement, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the Debtors' current and former employees, directors, officers, and managers, including executive compensation programs and existing compensation arrangements for the employees of the Debtors |

10

| | |
|---|---|
| | (but excluding any severance agreements with any of Debtors' former employees); *provided*, that any of the foregoing included in the schedule of assumed contracts contained in the Plan Supplement that was not previously disclosed to the advisors for the Consenting Creditors on or before the date of entry into the Restructuring Support Agreement shall be assumed subject to the consent of the Required Consenting Creditors on or before the Confirmation Date, which consent shall not be unreasonably withheld; *provided, further,* that the Debtors' Management Severance Plan and employment agreements will be assumed as modified so as to clarify that the Restructuring (and any related changes in duties that result from Gymboree no longer being a publicly-traded company as of the Plan Effective Date) will not constitute a Good Reason event for the purposes of the Management Severance Plan or any employment agreement. Following the Plan Effective Date, the Reorganized Debtors shall not amend the management severance plan without the consent of the participating employees for a period of one year after the Plan Effective Date. |
| **Indemnification of Prepetition Directors, Officers, Managers, et al.** | All indemnification obligations in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be assumed and remain in full force and effect after the Plan Effective Date, and shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose: *provided*, that any of the foregoing included in the schedule of assumed contracts contained in the Plan Supplement that was not previously disclosed to the advisors for the Consenting Creditors on or before the date of entry into the Restructuring Support Agreement shall be assumed subject to the consent of the Required Consenting Creditors on or before the Confirmation Date, which consent shall not be unreasonably withheld. |
| **Director, Officer, Manager, and Employee Tail Coverage** | On the Plan Effective Date, the Debtors shall be deemed to have assumed all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") and of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors. Any extensions, renewals and new liability insurance policies purchased by the Debtors shall be reasonably acceptable to the Required Consenting Creditors. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Issuance of New Securities; Execution of the Plan Restructuring** | On the Plan Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and |

11

| Documents | other documents required to be issued pursuant to the Restructuring. |
|---|---|
| **Retention of Jurisdiction** | The Plan will provide for the retention of jurisdiction by the Bankruptcy Court for usual and customary matters. |
| **Discharge, Release, Injunction, and Exculpation** | In addition to the releases under the Restructuring Support Agreement, the Plan will provide for customary release, discharge, injunction and exculpation provisions, substantially as set forth in **Annex III**. |
| **Conditions Precedent to the Effective Date** | The Plan shall contain customary conditions precedent to occurrence of the Plan Effective Date, including the following: |

The Plan shall contain customary conditions precedent to occurrence of the Plan Effective Date, including the following:

(i)   the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Backstop Parties;

(ii)   the Restructuring Support Agreement shall remain in full force and effect and shall not have been terminated by the Debtors or the Consenting Creditors;

(iii)   the Debtors shall not be in default under the DIP Credit Agreements or the DIP Orders (or, to the extent that the Debtors have been or are in default on the proposed Effective Date, such default shall have been waived by the lenders thereunder or cured in a manner consistent with the DIP Credit Agreements and the DIP Orders, as applicable);

(iv)   all conditions precedent to the effectiveness of the Exit Credit Facilities shall have been satisfied or duly waived;

(v)   the Confirmation Order shall have been duly entered and in full force and effect;

(vi)   the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring;

(vii)   the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, shall be consistent with the Restructuring Support Agreement in all material respects and otherwise approved by the parties thereto consistent with their respective consent and approval rights as set forth in Section 3 of the Restructuring Support Agreement, and shall have been filed in a manner consistent with the Restructuring Support Agreement;

(viii)   all fees, expenses, and other amounts payable pursuant to the Restructuring Support Agreement, the Backstop Commitment Agreement, and the DIP Orders (including, without limitation, the fees and expenses of Milbank, McGuireWoods, Rothschild, and Carriage House payable thereby) shall have been paid in full;

(ix)   all allowed Professional Fee Claims approved by the Bankruptcy Court shall have been paid in full or amounts

|  | sufficient to pay such allowed Professional Fee Claims after the Effective Date shall have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Bankruptcy Court; and |
|  | (x)  the Debtors shall have implemented the Restructuring in a manner consistent in all material respects with the Plan and the Restructuring Support Agreement. |

*EXECUTION  VERSION*

## ANNEX  I

### SUBSIDIARIES PARTY TO RESTRUCTURING

Gym-Card, LLC

Gym-Mark, Inc.

Gymboree Manufacturing, Inc.

Gymboree Operations, Inc.

Gymboree Retail Stores, Inc.

S.C.C. Wholesale, Inc.

## ANNEX II

### DEFINITIONS

| Term | Definition |
|---|---|
| **ABL Claims** | Collectively, ABL Term Loan Claims and ABL Revolver Claims. |
| **ABL Lenders** | Collectively, the ABL Revolver Lenders and the ABL Term Lenders. |
| **ABL Revolver Claims** | Any claim held by the ABL Revolver Lenders, in their capacity as such, arising under, derived from, or based on the ABL Credit Agreement |
| **ABL Revolver Lenders** | Any Revolving Credit Lender, as defined in the ABL Credit Agreement. |
| **ABL Term Lenders** | As defined in the ABL Credit Agreement. |
| **ABL Term Loan Claims** | Any claim held by the ABL Term Lenders, in their capacity as such, arising under, derived from, or based on the ABL Credit Agreement. |
| **ABL Credit Agreement** | The Second Amendment to Amended and Restated Credit Agreement, dated as of April 22, 2016 (as amended from time to time), by and among Gymboree, as the borrower; certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, Bank of America, N.A., in its capacity as administrative agent for the ABL Revolver Lenders, Pathlight Capital LLC, in its capacity as agent for the ABL Term Lenders, the ABL Revolver Lenders, and the ABL Term Lenders. |
| **Administrative Claim** | A Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for a cost or expense of administration of the Chapter 11 Cases entitled to priority under sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code. |
| **Affiliate** | With respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code. |
| **Backstop Premium Shares** | New Gymboree Common Shares issued as payment of the Backstop Premium in accordance with the Backstop Commitment Agreement equal to 2.3% of the New Gymboree Common Shares on the Plan Effective Date, subject to dilution by the MIP. |
| **Cause of Action** | Any claims, Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code. |

| Term | Definition |
|------|------------|
| **Claim** | As defined in section 101(5) of the Bankruptcy Code against a Debtor. |
| **Class** | A category of Holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code. |
| **Confirmation** | Entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to the conditions set forth in the Plan, which shall be consistent with this Restructuring Term Sheet and the Restructuring Support Agreement. |
| **Consummation** | The occurrence of the Plan Effective Date. |
| **Critical Trade Claims** | Any Claim held by a creditor that provides goods necessary to the continued operation of the Reorganized Debtors; *provided*, that the holder of such Claim has agreed to continue to provide goods and services to the Reorganized Debtors on terms and conditions reasonably acceptable to the Debtors and the Required Consenting Creditors. |
| **DIP ABL Facility Claims** | Any Claim derived from or based upon the DIP ABL Facility. |
| **DIP Facility Claims** | The DIP ABL Facility Claims and the DIP Term Loan Claims. |
| **DIP Surplus Conversion Shares** | The New Gymboree Common Shares issued on account of the DIP Surplus Amount (pursuant to the exemption from registration available under Section 4(a)(2) of the Securities Act) and purchased at the Share Ratio, subject to dilution from the MIP. |
| **DIP Term Loan Agent** | Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent, and any successor thereto. |
| **DIP Term Loan Facility Claims** | The DIP New Money Loan Claims and the DIP Roll-up Claims. |
| **Plan Effective Date** | The first date upon which all of the conditions precedent to the effectiveness of the Plan have been satisfied or waived in accordance with the terms of the Plan.  The date upon which the Plan Effective Date is proposed to occur by the Debtors shall be reasonably acceptable to the Required Consenting Creditors. |
| **Entity** | As defined in section 101(15) of the Bankruptcy Code. |
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code. |

| Term | Definition |
|------|-----------|
| **Exculpated Parties** | Collectively, and in each case in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the Consenting Creditors; (c) the Backstop Parties; (d) the Term Loan Agent; (e) the DIP Term Lenders; (f) the DIP Term Loan Agent; (g) the Sponsor; (h) with respect to each of the foregoing entities in clauses (a) through (g), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (i) with respect to each of the foregoing Entities in clauses (a) through (h), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (h), each solely in their capacity as such). |
| **Existing Common Stock** | Shares of common stock in Gymboree. |
| **General Unsecured Claim** | Any Claim, including the Term Loan Deficiency Claim and the Unsecured Note Claim, other than an Administrative Claim, a Professional Fee Claim, a Secured Tax Claim, an Other Secured Claim, a Priority Tax Claim, an Other Priority Claim, an ABL Claim, a Term Loan Secured Claim, a Li & Fung Term Loan Claim, a Critical Vendor Claim, or a DIP Facility Claim. |
| **Holder** | An Entity holding a Claim or Interest, as applicable. |
| **Impaired** | With respect to any Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code. |
| **Intercompany Claim** | A Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate. |
| **Intercompany Interest** | An Interest in any Debtor other than Gymboree. |
| **Interest** | Any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor. |
| **Li & Fung** | LF Centennial Pte Ltd. and its Affiliates. |
| **Li & Fung Agreement** | That certain agreement by and between Gymboree Manufacturing, Inc. and LF Centennial Pte Ltd, dated as of February 28, 2015, as amended from time to time, in each case, in a manner reasonably acceptable to the Debtors and the Required Consenting Creditors. |
| **Li & Fung Term Loan Claim** | Any Claim arising in connection with the 2017 Incremental Term Loan (as defined in the Term Loan Credit Agreement). |
| **MIP** | The management equity incentive plan implemented by the Reorganized Gymboree Board that provides for the issuance of options and/or equity based compensation to members of the management of Reorganized Gymboree. New Gymboree Common Shares representing up to 10% of the New Gymboree Common Shares outstanding on the Plan Effective |

| Term | Definition |
|------|------------|
|  | Date, on a fully-diluted basis, shall be reserved for issuances in connection with the MIP. The participants in the MIP, the allocation of MIP compensation to participants (including the amounts allocated, the timing of grants, and the form of options and/or equity compensation allocated) and the terms and conditions of such options and/or equity compensation (including performance, time based vesting, exercise price, base values, hurdles, forfeiture, repurchase rights and transferability) shall be determined by the Reorganized Gymboree Board in its sole discretion. |
| **New Gymboree Common Shares** | Reorganized Gymboree will have one class of common equity interests. |
| **New Money DIP Loan Claim** | Any Claim derived from or based upon the New Money DIP Loans. |
| **Other Priority Claim** | Any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code. |
| **Other Secured Claim** | Any Secured Claim against any of the Debtors, other than an ABL Claim, a Term Loan Secured Claim, or a Li & Fung Term Loan Claim. |
| **Person** | An individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated association, governmental entity, or political subdivision thereof, or any other entity. |
| **Petition Date** | The date on which the Debtors commence the Chapter 11 Cases. |
| **Priority Tax Claims** | Claims of governmental units of the type described in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the confirmation date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code. |
| **Professional Fee Claims** | All Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Plan Effective Date to the extent such fees and expenses have not been previously paid. |
| **Professional Fee Escrow Account** | An interest-bearing account in an amount equal to the total estimated amount of Professional Fee Claims and funded by the Debtors on the Plan Effective Date. |
| **Purchase Price** | The per share purchase price of the Rights Offering Shares at the Share Ratio, as specified herein. |
| **Reinstated** | With respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code. |

| Term | Definition |
|---|---|
| **Released Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Sponsor; (c) the Backstop Parties; (d) the Term Loan Agent; (e) the DIP Term Lenders; (f) the DIP Term Loan Agent; (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (f), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (g), each solely in their capacity as such); *provided*, that any Holder of a Claim or Interest that objects to or votes to reject the Plan (and thereby opts out of the releases) shall not be a "Released Party." |
| **Releasing Parties** | Collectively, and in each case in its capacity as such: (a) the Consenting Creditors; (b) the Sponsor; (c) the Backstop Parties; (d) the Term Loan Agent; (e) the DIP Term Lenders; (f) the DIP Term Loan Agent; (g) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (f), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equityholders, funds, portfolio companies, management companies; (h) with respect to each of the foregoing Entities in clauses (a) through (g), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors (with respect to clause (g), each solely in their capacity as such); (i) all Holders of Claims and Interests that are deemed to accept the Plan; (j) all Holders of Claims and Interests who vote to accept the Plan; and (k) all Holders in voting Classes who abstain from voting on the Plan and who do not object to the Plan. |
| **Reorganized Debtors** | The Debtors, as reorganized pursuant to and under the Plan or any successor thereto. |
| **Reorganized Gymboree** | Gymboree, as reorganized pursuant to and under the Plan or any successor thereto. |
| **Reorganized Gymboree Board** | The initial board of directors of Reorganized Gymboree |
| **Rights** | The rights to participate in the Rights Offerings on the terms set forth in the Rights Offering Procedures. |

| Term | Definition |
|---|---|
| **Rights Offering Shares** | New Gymboree Common Shares to be purchased at the Share Ratio pursuant to the Rights Offerings such that at the Maximum Rights Offering Amount the Rights Offering Shares will be equal to 46.9% of the New Gymboree Common Shares outstanding on the Plan Effective Date (subject to a downward ratable adjustment to account for the difference (if any) between the Maximum Rights Offering Amount and the Adjusted Rights Offering Amount), subject to dilution by the MIP and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion. |
| **Roll-Up DIP Conversion Shares** | New Gymboree Common Shares purchased at the Share Ratio equal to 41.0% of the New Gymboree Common Shares, subject to dilution by the MIP and the DIP Surplus Conversion Shares after giving effect to the increase in stipulated equity value as a result of the DIP Surplus Conversion. |
| **Roll-up DIP Claim** | Any Claim derived from or based upon the Roll-up DIP Loans. |
| **SEC** | The Securities and Exchange Commission. |
| **Secured** | When referring to a Claim: (a) secured by a lien on property in which any of Debtors has an interest, which lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Debtors' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a secured claim. |
| **Share Ratio** | A per share purchase price for New Gymboree Common Shares based on a 35% discount to a stipulated equity value of $262.5 million based on a total enterprise value of $430 million (each of which stipulated equity value and enterprise value shall remain fixed regardless of whether the Adjusted Rights Offering Amount is equal to or less than the Maximum Rights Offering Amount).  In the event of a DIP Surplus Conversion, the Share Ratio shall be adjusted to use the stipulated equity value above, increased by the amount of the DIP Surplus Amount. |
| **Term Loan Credit Agreement** | The Amended and Restated Credit Agreement, dated as of February 11, 2011 (as amended from time to time), by and among Gymboree, as the borrower; certain of Gymboree's subsidiaries and Giraffe Intermediate B, Inc., as guarantors, the Term Loan Agent, and the Term Loan Lenders. |
| **Term Loan Agent** | Credit Suisse AG, Cayman Islands Branch, in its capacity as administrative agent under the Term Loan Credit Agreement, and any successor thereto. |

| Term | Definition |
|---|---|
| **Term Loan Common Shares** | 100% of the New Gymboree Common Shares outstanding on the Plan Effective Date reduced by each of the following:<br><br>    (a) the Rights Offering Shares,<br><br>    (b) the Roll-Up Conversion Shares,<br><br>    (c) the Backstop Premium Shares, and<br><br>    (d) any DIP Surplus Conversion Shares.<br><br>Assuming the Maximum Rights Offering Amount, the Term Loan Common Shares will be equal to 9.8% of the New Gymboree Common Shares outstanding on the Plan Effective Date (prior to a ratable upward adjustment to account for the difference (if any) between the Maximum Rights Offering Amount and the Adjusted Rights Offering Amount) before any dilution by the DIP Surplus Conversion Shares. The Term Loan Common Shares shall be subject to further dilution by the MIP. |
| **Term Loan Claims** | Any Claim derived from or based upon the Term Loan Credit Agreement (other than the Li & Fung Term Loan Claims). The Term Loan Claims shall be allowed pursuant to the Plan, and shall include all principal, unpaid prepetition interest at the contractual rate, all unpaid postpetition interest at the contractual rate, and all other amounts due and owing under the Term Loan Credit Agreement. Any unpaid fees and expenses owing thereunder shall be paid in cash on the Plan Effective Date. |
| **Term Loan Deficiency Claims** | Any Term Loan Claim that is not a Secured Claim. |
| **Term Loan Lenders** | The lending institutions party from time to time to the Term Loan Credit Agreement. |
| **Term Loan Secured Claim** | Any Secured Claim that is a Term Loan Claim. |
| **Unimpaired** | With respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired. |
| **Unsecured Notes** | The 9.125% unsecured senior notes due December 1, 2018, issued pursuant to that certain Indenture dated November 23, 2010, by and among Gymboree, as issuer; certain of Gymboree's subsidiaries, as guarantors; and the Indenture Trustee. |
| **Unsecured Note Claims** | Any Claim derived from or based upon the Unsecured Notes. |

## ANNEX III

### DISCHARGE, RELEASE, INJUNCTION, AND EXCULPATION PROVISIONS

| Discharge of Claims and Termination of Interests | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Debtor Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. |
| :--- | :--- |
| Releases by the Debtors | Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest, or that any Holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

    1.   the Debtors, the Debtors' in- or out-of-court restructuring |

|  | efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents; |
|  | 2. any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan; |
|  | 3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or |
|  | 4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing. |
|  | Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| **Releases by Holders of Claims and Interests of the Debtors** | As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part: |
|  | 1. the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement or the other Restructuring Documents; |
|  | 2. any Restructuring Document, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu |

| | |
|---|---|
| | of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, or the Plan; |
| | 3. the Chapter 11 Cases, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement; or |
| | 4. any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date relating to any of the foregoing. |
| | Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan. |
| Exculpation | Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon closing of the Chapter 11 Cases or the Effective Date shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation |

| | |
|---|---|
| | governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunctions** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold claims or interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |

## ANNEX IV

### TERM LOAN EXIT FACILITY TERM SHEET

<div align="right">**EXECUTION VERSION**</div>

<div align="center">ANNEX IV

**THE GYMBOREE CORPORATION**
**Exit Term Loan Facility**

**Summary of Principal Terms and Conditions**</div>

| | |
|---|---|
| **Borrower** | Reorganized Gymboree Corporation, a Delaware corporation (the "**Company**" or the "**Borrower**"), formerly a debtor and debtor-in-possession in the cases filed under Chapter 11 (the "**Chapter 11 Cases**"). |
| **Guarantors** | Each wholly-owned domestic subsidiary that executes a guaranty (collectively, the "**Guarantors**" and together with the Borrower, the "**Credit Parties**"). |
| **Exit Term Loan Facility** | Secured term loan facility (the "**Exit Term Loan Facility**" or the "**Exit Financing**"), the holders thereof referred to as the "**Lenders**", comprised of term loans ("**Exit Term Loans**") converted on a dollar-for-dollar basis from the loans under the Borrowers' debtor-in-possession credit agreement (the "**DIP Facility**") on the Closing Date (as defined below). |
| | The "**Plan**" means the Chapter 11 Plan of Reorganization and the related disclosure statement of the Credit Parties (collectively, the "**Debtors**") to be filed with the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**"), in form and substance reasonably satisfactory to the Required Lenders; provided that the Approved Plan of Reorganization (as defined in the DIP Facility) shall be the Plan and be deemed to be reasonably satisfactory to the Required Lenders. The reorganization contemplated by the Plan is referred to herein as the "**Reorganization.**" |
| **Use of Proceeds** | Subject to Section 2.11 of the DIP Facility, the Exit Term Loan Facility will be used to refinance in full all outstanding "New Money DIP Loans" under the DIP Facility on the Closing Date. |
| **Closing Date** | The date on which the Exit Term Loans are issued under the Exit Term Loan Facility and the Reorganization is consummated in all material respects pursuant to the Plan (the "**Closing Date**"). |
| **Maturity** | The date that is 5 years after the Closing Date. |
| **Collateral** | The Exit Term Loan Facility will be secured by a perfected security interest in, with the priority described below under "Priority," and lien on substantially all of the Credit Parties' tangible and intangible assets (collectively, the "**Collateral**"), with materiality thresholds and exceptions to be agreed. For purposes hereof "ABL Priority Collateral" and "Term Priority Collateral" shall be substantially consistent with the definitions in that certain Intercreditor Agreement dated as of November 23, 2010, by and among Bank of America, N.A., as ABL agent, Credit Suisse AG, Cayman Islands Branch, as term agent (as amended, supplemented or otherwise modified prior to the date hereof, the "**Prepetition Intercreditor** |

**Agreement**").

| | |
|---|---|
| **Priority** | A first priority lien on all Term Priority Collateral and a second priority lien on all ABL Priority Collateral, other than certain customary baskets to be agreed ("**Permitted Liens**"). |
| **Conditions to Closing** | Usual and customary for facilities of this type, including, without limitation, the following: |

A. The negotiation, execution and delivery of customary definitive documentation in respect of the Exit Financing consistent with the terms set forth in this Term Sheet and otherwise satisfactory to the Required Lenders and the Administrative Agent (the "**Exit Financing Documentation**").

B. The reasonable satisfaction of the Required Lenders with:

- The Plan;

- the terms of any new asset-based revolving facility and asset-based term loan facility (collectively, the "**Exit ABL Facility**"), replacing the debtor-in-possession asset-based revolving credit facility and debtor-in-possession asset-based term loan facility in form and substance reasonably satisfactory to the Required Lenders and priority of collateral (i.e. first lien on all ABL Priority Collateral, second lien on Term Priority Collateral), and the definitive documentation in respect thereof; and

- the terms, entry and effectiveness of a confirmation order with respect to the Plan.

C. The Reorganization shall have been consummated in accordance in all material respects with the Plan (all conditions set forth therein having been satisfied or waived (with any such waiver having been approved by the Required Lenders)), and substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan in accordance in all material respects with its terms shall have occurred substantially contemporaneously with the closing of the Exit Term Loans and such closing shall have occurred not later than [October 15, 2017].

D. The Required Lenders shall be satisfied that, on the Closing Date, immediately after giving effect to the consummation of the Plan, the issuance of the Exit Term Loans to occur on the Closing Date and any other transactions to occur on the Closing Date, the Credit Parties and their subsidiaries shall have outstanding no indebtedness for borrowed money other than indebtedness outstanding under the Exit Financing, the Exit ABL Facility and any additional indebtedness (including but not limited to capital leases) on terms and conditions (including as to amount) satisfactory to the Required Lenders and, if secured, subject to intercreditor arrangements satisfactory to the Required Lenders.

E. Delivery of evidence that all required insurance has been maintained and that the Administrative Agent has been named as loss payee and additional insured, provided that to the extent the Borrower is not able

- 2 -

to deliver the insurance certificates and endorsements pursuant to this clause (E) by the Closing Date after having used commercially reasonable efforts, such insurance certificates and endorsements shall be delivered within 30 days after the Closing Date (or such longer time as the Administrative Agent may agree).

F.  Accuracy of representations and warranties contained in the Exit Financing Documentation in all material respects (or, in the case of representations and warranties that are qualified by materiality, in all respects) on the Closing Date (except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date) and absence of default and Event of Default under the Exit Financing Documentation.

G.  Compliance with customary documentation conditions, including the delivery of customary legal opinions and closing certificates (including a customary solvency certificate), good standing certificates and certified organizational documents, in each case, in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent.

H.  The Administrative Agent shall have a perfected lien on substantially all of the assets of the Credit Parties, other than Permitted Liens, subject in priority only to the liens granted to the Exit ABL Facility which shall be subject to ranking and intercreditor arrangements satisfactory to the Required Lenders and subject to any agree post-closing perfection requirements.

I.  Receipt by the Administrative Agent of reasonably satisfactory results of customary lien searches.

J.  All requisite governmental and material third party approvals shall have been obtained, and there shall be no litigation, governmental, administrative or judicial action against the Credit Parties, in each case, the obtaining or existence of which would reasonably be expected to restrain, prevent or impose materially burdensome restrictions on the Reorganization or the Exit Term Loans.

K.  Delivery of all documentation and other information required by bank regulatory authorities under applicable "know-your-customer", anti-money laundering rules and regulations, and the Patriot Act.

L.  Payment by the Borrowers on the Closing Date of (i) the reasonable and documented out-of-pocket administrative and collateral agency fee and expenses (including the fees and expenses of one outside counsel to the Administrative Agent) due on such date and (ii) the fees of Carriage House Capital Advisors, LLC, Milbank, Tweed, Hadley & McCloy LLP, Rothschild Inc., and McGuire Woods, in connection with the transactions hereunder, in each case to the extent invoiced two (2) business days prior to the Closing Date.

M.  No default or event of default under the DIP Facility.

- 3 -

| | |
|---|---|
| **Interest Rate** | Adjusted LIBOR Rate plus 11.50% per annum (subject to a 1.00% LIBOR floor) payable quarterly in cash. |
| | During the continuance of an Event of Default, past due amounts under the Exit Term Loan Facility will bear interest at an additional 2.00% *per annum* above the interest rate otherwise applicable. |
| **Scheduled Amortization** | Commencing following the first year anniversary of the Closing Date, the Exit Term Loans shall be repaid in equal quarterly installments of 5% per annum of the original principal amount of the Exit Term Loans on each December 31, March 31, June 30 and September 30. |
| **Call Protection** | Callable at 105%, 103% and 102% in years 1, 2 and 3 and thereafter at par. |
| **Mandatory Prepayments** | The Exit Term Loans shall be prepaid with: |
| | (i)  100% of the net cash proceeds of non-ordinary course asset sales or casualty or condemnation events (subject to reinvestment rights and baskets and exclusions to be agreed); and |
| | (ii)  100% of the proceeds of debt incurrences (other than debt permitted under the Exit Financing Documentation). |
| **Financial Covenants** | None. |
| **Required Lenders** | Lenders holding a majority of the Exit Term Loans (the "**Required Lenders**"). |
| **Exit Facility Documentation** | The definitive financing documentation for the Exit Term Loan (the "**Exit Facility Documentation**") shall contain representations and warranties, covenants and events of default expressly set forth in this Term Sheet and, to the extent any other terms are not expressly set forth in this *Term Sheet*, will (i) be negotiated in good faith within a reasonable time period to be determined based on the expected Closing Date, (ii) contain such other terms as the Company and the Lenders shall reasonably agree (given due regard to the operations, size, industry (and risks and trends associated therewith), geographic locations and businesses of the Credit Parties); it being understood and agreed that the Prepetition Term Loan Agreement will be used as a starting point for the Exit Facility Documentation. |
| **Governing Law** | State of New York. |
| **Administrative Agent** | Credit Suisse AG, Cayman Islands Branch |

4820-4170-3753, v. 6

## **EXHIBIT B** to
### the Restructuring Support Agreement

### Form of Transfer Agreement and Joinder

**Transfer Agreement and Joinder**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support and Lock-Up Agreement, dated as of _____ (the "**Agreement**"),[1] by and among The Gymboree Corporation and its Affiliates and subsidiaries bound thereto, the Consenting Creditors, and certain other parties, including the transferor to the Transferee of any Term Loan Claims or Debtor Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Creditor**" and a "**Party**" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Revolver Claims (if any) | $[___] |
| ABL Term Loan Claims (if any) | $[___] |
| Term Loan Claims (if any) | $[___] |
| Unsecured Note Claims (if any) | $[___] |
| Existing Common Stock (if any) | [___] shares |

---

[1]     Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**<u>EXHIBIT C</u> to**
**the Restructuring Support Agreement**

**Form of Joinder Agreement**

## Joinder Agreement

The undersigned ("**Joining Party**") hereby acknowledges that it has read and understands the Restructuring Support, dated as of _____ (the "**Agreement**"),[1] by and among The Gymboree Corporation and its Affiliates and subsidiaries bound thereto, the Consenting Creditors, and certain other parties, and agrees to be bound by the terms and conditions thereof, and shall be deemed a "**Consenting Creditor**" and a "**Party**" under the terms of the Agreement.

The Joining Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof.

Date Executed:

_____
Name:
Title:

Address:

E-mail address(es):
Telephone:
Facsimile:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Revolver Claims (if any) | $[___] |
| ABL Term Loan Claims (if any) | $[___] |
| Term Loan Claims (if any) | $[___] |
| Unsecured Note Claims (if any) | $[___] |
| Existing Common Stock (if any) | [___] shares |

---

[1]   Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**<u>Exhibit C</u>**

**Corporate Structure Chart**



## Exhibit D

**Disclosure Statement Order**

**[To Come]**

## Exhibit E

**Financial Projections**

**[To Come]**

## Exhibit F

**Valuation Analysis**

**[To Come]**

**<u>Exhibit G</u>**

**Liquidation Analysis**

**[To Come]**