James H.M. Sprayregen, P.C.
Anup Sathy, P.C. (admitted *pro hac vice*)
Steven N. Serajeddini (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

-and-

Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
Matthew C. Fagen (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:      (804) 644-1700
Facsimile:      (804) 783-6192

*Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE GYMBOREE CORPORATION, *et al.*,[1] | ) | Case No. 17-32986 (KLP) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF FIRST AMENDED SUPPLEMENT TO THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF THE GYMBOREE CORPORATION AND ITS DEBTOR AFFILIATES

**PLEASE TAKE NOTICE THAT** on August 17, 2017, the above-captioned debtors and debtors in possession (collectively, the "Debtors"), filed the *Notice of Filing of Supplement to the First Amended Joint Chapter 11 Plan of Reorganization of The Gymboree Corporation and Its Debtor Affiliates* [Docket No. 535] (the "First Plan Supplement").

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors hereby file this first amendment to the First Plan Supplement (this "First Amended Plan Supplement" and, together

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  The Gymboree Corporation (5258); Giraffe Intermediate B, Inc. (0659); Gym-Card, LLC (5720); Gym-Mark, Inc. (6459); Gymboree Manufacturing, Inc. (6464); Gymboree Retail Stores, Inc. (6461); Gymboree Operations, Inc. (6463); and S.C.C. Wholesale, Inc. (6588).  The location of the Debtors' service address is 71 Stevenson Street, Suite 2200, San Francisco, California 94105.

with the First Plan Supplement, the "Plan Supplement"), in support of the *Amended Joint Chapter 11 Plan of Reorganization of The Gymboree Corporation and Its Debtor Affiliates* [Docket No. 583] (as amended or modified from time to time and including all exhibits and supplements thereto, the "Plan"),[2] filed in these chapter 11 cases on August 30, 2017.

**PLEASE TAKE FURTHER NOTICE** that the current draft forms of the following documents, as each may be modified, amended, or supplemented from time to time in accordance with the Plan, are attached hereto:

- **Exhibit A** – Form of New Organizational Documents

   **Exhibit A-1** – Amended and Restated Certificate of Incorporation of [Giraffe New Holding Co., Inc.]

   **Exhibit A-1 (a)** – A comparison showing changes to the Amended and Restated Certificate of Incorporation of [Giraffe New Holding Co., Inc.] filed on August 17, 2017.

   **Exhibit A-2** – Amended and Restated Bylaws of [Giraffe New Holding Co., Inc.]

   **Exhibit A-2 (a)** – A comparison showing changes to the Amended and Restated Bylaws of [Giraffe New Holding Co., Inc.] filed on August 17, 2017.

   **Exhibit A-7** – Amended and Restated Articles of Incorporation of Gymboree Manufacturing, Inc.

   **Exhibit A-8** – Amended and Restated Articles of Incorporation of Gymboree Operations, Inc.

   **Exhibit A-9** – Amended and Restated Articles of Incorporation of Gym-Mark, Inc.

   **Exhibit A-10** – Amended and Restated Articles of Incorporation of S.C.C. Wholesale, Inc.

   **Exhibit A-11** – Articles of Organization—Conversion of Gymboree Retail Stores LLC

- **Exhibit B** – Exit Financing Term Sheets

- **Exhibit E** – Retained Causes of Action

   **Exhibit E (a)** – A comparison showing changes to the Retained Causes of Action filed on August 17, 2017.

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

- **Exhibit F** – New Stockholders' Agreement

  **Exhibit F (a)** – A comparison showing changes to the New Stockholders' Agreement filed on August 17, 2017.

- **Exhibit G** – Registration Rights Agreement

  **Exhibit G (a)** – A comparison showing changes to the Registration Rights Agreement filed on August 17, 2017.

- **Exhibit H** – Section 1129(a)(5) Disclosures

  **Exhibit H (a)** – A comparison showing changes to the Section 1129(a)(5) Disclosures filed on August 17, 2017.

**PLEASE TAKE FURTHER NOTICE** that the documents contained in the Plan Supplement are integral to, and are considered part of, the Plan. If the Plan is approved, the documents contained in the Plan Supplement will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors reserve the right to alter, amend, modify, or supplement any document in the Plan Supplement in accordance with the Plan; *provided*, that if any document in this Plan Supplement is altered, amended, modified, or supplemented in any material respect prior to the date of the Confirmation Hearing, the Debtors will file a blackline of such document with the Bankruptcy Court.

**PLEASE TAKE FURTHER NOTICE** that a hearing at which the Court will consider Confirmation of the Plan (the "Confirmation Hearing") will commence before the Honorable Keith L. Phillips, United States Bankruptcy Judge, on **September 7, 2017**, at **11:00 a.m., prevailing Eastern Time**, in the United States Bankruptcy Court for the Eastern District of Virginia, 701 East Broad Street, Courtroom 5100, Richmond, Virginia 23219. The Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by the filing of a notice of adjournment with the Court.

**PLEASE TAKE FURTHER NOTICE** that if you would like to obtain copies of the Plan, the Plan Supplement, any amendments thereto, and any other related documents, please contact the Debtors' Solicitation Agent, Prime Clerk, LLC, (a) by calling (844) 822-9233 or, for international callers, (646) 486-7945, (b) by email at gymboreeballots@primeclerk.com, or (c) by visiting the Debtors' restructuring website at https://cases.primeclerk.com/gymboree. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: http://www.vaeb.uscourts.gov.

Dated:  August 31, 2017          */s/ Michael A. Condyles*
Richmond, Virginia               Michael A. Condyles (VA 27807)
                                 Peter J. Barrett (VA 46179)
                                 Jeremy S. Williams (VA 77469)
                                 **KUTAK ROCK LLP**
                                 901 East Byrd Street, Suite 1000
                                 Richmond, Virginia 23219-4071
                                 Telephone:    (804) 644-1700
                                 Facsimile:    (804) 783-6192
                                 Email:        Michael.Condyles@KutakRock.com
                                               Peter.Barrett@KutakRock.com
                                               Jeremy.Williams@KutakRock.com

                                 -and-

                                 James H.M. Sprayregen, P.C.
                                 Anup Sathy, P.C. (admitted *pro hac vice*)
                                 Steven N. Serajeddini (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 300 North LaSalle
                                 Chicago, Illinois 60654
                                 Telephone:    (312) 862-2000
                                 Facsimile:    (312) 862-2200
                                 Email:        james.sprayregen@kirkland.com
                                               anup.sathy@kirkland.com
                                               steven.serajeddini@kirkland.com

                                 **-**and-

                                 Joshua A. Sussberg, P.C. (admitted *pro hac vice*)
                                 Matthew C. Fagen (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 601 Lexington Avenue
                                 New York, New York 10022
                                 Telephone:    (212) 446-4800
                                 Facsimile:    (212) 446-4900
                                 Email:        joshua.sussberg@kirkland.com
                                               matthew.fagen@kirkland.com

                                 *Co-Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Form of New Organizational Documents**

## EXHIBIT A-1

**Amended and Restated Certificate of Incorporation of [Giraffe New Holding Co., Inc.]**

**Milbank Draft**
**8/31/17**

# AMENDED AND
# RESTATED CERTIFICATE OF
# INCORPORATION OF
# GIRAFFE NEW HOLDING CO., INC.

Giraffe New Holding Co., Inc., a corporation organized and existing under the laws of the State of Delaware (the "*Corporation*"), pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware, as it may be amended from time to time (the "*DGCL*"), hereby certifies as follows:

1.  The name of this corporation is Giraffe New Holding Co., Inc.  The original Certificate of Incorporation of the Corporation (the "*Original Certificate of Incorporation*") was filed on [●].

2.  The Corporation and its affiliated debtors filed a plan of reorganization pursuant to Chapter 11 of the United States Bankruptcy Code on June 16, 2017, which was confirmed by the United States Bankruptcy Court for the Eastern District of Virginia on [●], 2017 (including all exhibits, schedules and supplements thereto and as amended from time to time in accordance with the terms thereof, the "*Plan*").  This Amended and Restated Certificate of Incorporation of the Corporation (this "*Amended and Restated Certificate of Incorporation*") has been duly adopted in accordance with Sections 242, 245 and 303 of the DGCL, pursuant to the authority granted to the Corporation under Section 303 of the DGCL and pursuant to the Plan.

3.  This Amended and Restated Certificate of Incorporation amends and restates the Original Certificate of Incorporation to read in its entirety as follows:

## ARTICLE I
## NAME OF CORPORATION

The name by which the corporation is to be known is Giraffe New Holding Co., Inc. (the "*Corporation*").

## ARTICLE II
## REGISTERED OFFICE; REGISTERED AGENT

The address of the Corporation's registered office in the State of Delaware is [●]. The name of the registered agent of the corporation at such address is [●].

## ARTICLE III
## PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV
## STOCK

Section 1.    <u>Authorized Stock</u>.    The total number of shares of all classes of capital stock that the Corporation has authority to issue is [●] shares, consisting of: (a) [●] shares of Common Stock, par value $0.01 per share ("***Common Stock***"), and (b) [●] shares of Preferred Stock, par value $0.01 per share ("***Preferred Stock***").    The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of capital stock of the Corporation representing a majority of the voting power of all the then-outstanding shares of capital stock of the Corporation entitled to vote thereon, irrespective of the provisions of Section 242(b)(2) of the DGCL (or any successor provision thereto), unless this Amended and Restated Certificate of Incorporation of the Corporation (this "***Amended and Restated Certificate of Incorporation***"), including any Preferred Stock Designation (as defined below), otherwise requires the vote of the holders of Common Stock or Preferred Stock voting separately as a class.

Section 2.    <u>Common Stock</u>.

(a)    <u>Voting Rights</u>.    Except as otherwise provided in this Amended and Restated Certificate of Incorporation or as required by applicable law, the holders of Common Stock shall at all times vote together as one class on all matters (including the election of directors) submitted to a vote or for the consent of the stockholders of the Corporation.    Each holder of Common Stock shall be entitled to one (1) vote for each share of Common Stock held as of the applicable date on any matter that is submitted to a vote or for the consent of the stockholders of the Corporation.    Except as otherwise required by applicable law, holders of Common Stock shall not be entitled to vote on any amendment to this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation) or pursuant to the DGCL, provided that such amendment does not alter or change the designations, powers, preferences or rights of the shares of Common Stock so as to affect them adversely.

(b)    <u>Dividends</u>.    Subject to the rights of the holders of Preferred Stock, the holders of Common Stock shall be entitled to share equally, on a per share basis, in such dividends and other distributions of cash, property or shares of stock of the Corporation as may be declared by the Board of Directors of the Corporation (the "***Board of Directors***") from time to time with respect to the Common Stock out of assets or funds of the Corporation legally available therefor.

(c)    <u>Liquidation Rights</u>.    In the event of the voluntary or involuntary liquidation, dissolution, distribution of assets or winding up of the Corporation, the holders of Common Stock shall be entitled to share equally, on a per share basis, all assets of the Corporation of whatever kind available for distribution to the holders of Common Stock.

(d)    <u>Merger or Consolidation</u>.    In the case of any distribution or payment in respect of

2

the shares of Common Stock upon the consolidation or merger of the Corporation with or into any other entity, or in the case of any other transaction having an effect on stockholders of the Corporation substantially similar to that resulting from a consolidation or merger, such distribution or payment shall be made ratably on a per share basis among the holders of Common Stock as a single class.

Section 3.    Preferred Stock.    Shares of Preferred Stock may be issued by the Corporation from time to time in one or more series.  The Board of Directors (or any committee to which it may duly delegate the authority granted in this Article IV) is hereby empowered to authorize, to the fullest extent now or hereafter permitted by the laws of the State of Delaware, to provide for the issuance of shares of Preferred Stock in one or more series, for such consideration and for such corporate purposes as the Board of Directors (or such committee thereof) may from time to time determine and, by filing a certificate pursuant to the applicable law of the State of Delaware (hereinafter referred to as a "*Preferred Stock Designation*"), to establish from time to time for each such series the number of shares to be included in each such series, and to fix the designations, powers, rights and preferences of the shares of each such series and any qualifications, limitations or restrictions thereof to the fullest extent now or hereafter permitted by this Amended and Restated Certificate of Incorporation and the laws of the State of Delaware, including, without limitation, voting rights (if any), dividend rights, dissolution rights, conversion rights, exchange rights and redemption rights thereof, as shall be stated and expressed in a resolution or resolutions adopted by the Board of Directors (or such committee thereof) providing for the issuance of such series of Preferred Stock.  Each series of Preferred Stock shall be distinctly designated.

Section 4.    Nonvoting Stock.    To the extent prohibited by Section 1123 of the Bankruptcy Code, the Corporation shall not issue any class or series of nonvoting equity securities; provided, however, that the foregoing (x) will have no force and effect beyond that required under Section 1123 of the Bankruptcy Code and (y) may be amended or eliminated in accordance with applicable law as from time to time in effect.  For the purposes of this Section 4 of this Article IV, any class or series of equity securities that has only such voting rights as are mandated by the DGCL shall be deemed to be nonvoting for purposes of the restrictions of this Section 4 of this Article IV.

## ARTICLE V
## DIRECTORS

Section 1.    Director Powers.    The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  In addition to the powers and authority expressly conferred upon them by statute or by this Amended Restated Certificate of Incorporation or the Bylaws of the Corporation (as may be amended or restated from time to time, the "*Bylaws*"), the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

Section 2.    Number of Directors.    The initial number of directors shall be seven (7). The number of directors shall be fixed from time to time by the affirmative vote of a majority of the Whole Board (as defined below).

Section 3.    <u>Elections</u>.    Unless and except to the extent that the Bylaws shall so require, elections of directors need not be by written ballot.

Section 4.    <u>Classes of Directors and Term of Office</u>.  The Board of Directors shall be divided into three classes, designated Class I, Class II and Class III, and the term of office of directors of one class shall expire at each annual meeting of stockholders of the Corporation, and in all cases as to each director until his or her successor shall be duly elected and qualified or until his or her earlier resignation, removal from office, death or incapacity.  All members of the Board of Directors then in office shall be assigned to a class, and the director(s) assigned to Class I shall hold office for a term expiring at the first regularly scheduled annual meeting of stockholders of the Corporation following the effectiveness of this provision, the director(s) assigned to Class II shall hold office for a term expiring at the second regularly scheduled annual meeting of stockholders of the Corporation following the effectiveness of this provision, and the director(s) assigned to Class III shall hold office for a term expiring at the third regularly scheduled annual meeting of stockholders of the Corporation following the effectiveness of this provision.  At each succeeding annual meeting of stockholders of the Corporation, a number of directors equal to the number of directors of the class whose term expires at the time of such meeting (or, if less, the number of directors properly nominated and qualified for election) shall be elected to hold office until the third succeeding annual meeting of stockholders of the Corporation after their election.

## ARTICLE VI
## AMENDMENTS TO BYLAWS

The Board of Directors shall have the power to adopt, amend or repeal the Bylaws.  Any adoption, amendment or repeal of the Bylaws by the Board of Directors shall require the approval of a majority of the Whole Board.  For purposes of this Amended and Restated Certificate of Incorporation, the term "***Whole Board***" shall mean the total number of authorized directors whether or not there exist any vacancies in previously authorized directorships.

## ARTICLE VII
## DIRECTOR LIABILITY

To the fullest extent permitted by the DGCL, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director (it being understood that, without limiting the foregoing, if in the future the DGCL is amended or modified (including with respect to Section 102(b)(7) thereof) to permit the further limitation or elimination of the personal liability of a director of the Corporation to a greater extent than contemplated above, then the provisions of this <u>Article VII</u> shall be deemed to provide for the elimination of the personal liability of the directors of the Corporation to such greater extent).  This <u>Article VII</u> shall not eliminate or limit the liability of a director for any act or omission occurring prior to the date when this <u>Article VII</u> becomes effective.  Any repeal or amendment or modification of this <u>Article VII</u>, or the adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this <u>Article VII</u>, will, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide a broader

4

limitation on a retroactive basis than permitted prior thereto), and will not adversely affect any limitation on the personal liability of any director of the Corporation at the time of such repeal or amendment or modification or adoption of such inconsistent provision.

## ARTICLE VIII
## INDEMNIFICATION AND INSURANCE

Section 1.    <u>Right to Indemnification</u>.  Each person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise (hereinafter referred to as a "***proceeding***"), by reason of the fact that such person, or a person of whom such person is the legal representative, is or was or has agreed to become a director or officer of the Corporation, or while a director or officer of the Corporation is or was serving or has agreed to serve at the request of the Corporation in any capacity, including as a director, officer, employee, fiduciary or agent, of another corporation or of a partnership, joint venture, trust or other enterprise, including, without limitation, service with respect to employee benefit plans maintained or sponsored by the Corporation or any of its subsidiaries (an "***Indemnitee***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee, fiduciary or agent or in any other capacity while serving as a director, officer, employee, fiduciary or agent, shall be indemnified and held harmless by the Corporation to the fullest extent which it is empowered to do so by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, to the fullest extent permitted by applicable law, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment) against all cost, expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred by such Indemnitee in connection with a proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful.  The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful. Such indemnification shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder, and such indemnification shall inure to the benefit of such person's heirs, executors and administrators.  Notwithstanding the foregoing, except as provided in <u>Section 3</u> of this <u>Article VIII</u> with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any Indemnitee seeking indemnification in connection with a proceeding initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors.

Section 2.    <u>Advancement of Expenses</u>.  To the fullest extent to which it is permitted to do so by the DGCL or other applicable law, the Corporation shall, in advance of the final disposition of the matter, pay the expenses and costs (including attorneys' fees) actually and reasonably incurred by any Indemnitee in defending or otherwise participating in any proceeding

and any appeal therefrom for which such person may be entitled to such indemnification under this Article VIII or otherwise; provided, however, if required by the DGCL, such payment of expenses and costs in advance of the final disposition of the proceeding shall be made only upon receipt by the Corporation of an undertaking by or on behalf of such Indemnitee to repay all amounts advanced if it should be ultimately determined by final judicial decision from which there is no further right to appeal that such Indemnitee is not entitled to be indemnified for such expenses under this Article VIII or otherwise.  Expenses incurred by other employees, fiduciaries and agents who are considered Indemnitees hereunder may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

Section 3.    Procedures for Indemnification of Directors and Officers.    Any indemnification or advancement of expenses under this Article VIII shall be made promptly, and in any event within thirty (30) days, upon the written request of the Indemnitee, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty (20) days.  If a determination by the Corporation that the Indemnitee is entitled to indemnification pursuant to this Article VIII is required, and the Corporation fails to respond within sixty (60) days to a written request for indemnity, the Corporation shall be deemed to have approved the request.  If the Corporation denies a written request for indemnification or advancement of expenses, in whole or in part, or if payment in full pursuant to such request is not made within thirty (30) days (or twenty (20) days in the case of a claim for advancement of expenses), the right to indemnification or advancement of expenses as granted by this Article VIII shall be enforceable by the Indemnitee in any court of competent jurisdiction.  Such Indemnitee's costs and expenses incurred in connection with successfully establishing the right to indemnification, in whole or in part, in any such action or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, shall also be indemnified by the Corporation.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Corporation) that the Indemnitee has not met the standards of conduct which make it permissible under the DGCL for the Corporation to indemnify the Indemnitee for the amount claimed, but the burden of such defense shall be on the Corporation.  Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.  In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article VIII or otherwise, shall be on the Corporation.

Section 4.    Requested Services.  Without limiting the meaning of the phrase "serving at the request of the Corporation" as used herein, any person serving as a director, officer or equivalent executive of (a) another corporation of which a majority of the shares entitled to vote in the election of its directors is owned, directly or indirectly, by the Corporation, or (b) any

employee benefit plan maintained or sponsored by the Corporation or any corporation referred to in clause (a), shall be deemed to be doing so at the request of the Corporation for purposes of Section 1 of this Article VIII.

Section 5.    Contract Rights.  The provisions of this Article VIII shall be deemed to be a contract right between the Corporation and each Indemnitee and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee, fiduciary or agent, or if the relevant provisions of the DGCL or other applicable law cease to be in effect. Such contract right shall vest for each Indemnitee who is a director, officer, employee, fiduciary or agent at the time such person is elected or appointed to such position, and no repeal or modification of this Article VIII or any such law shall affect any such vested rights or obligations then existing with respect to any state of facts or proceeding arising after such election or appointment and prior to such repeal or modification.

Section 6.    Insurance.  The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary or agent of the Corporation or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the DGCL or this Article VIII.

Section 7.    Employees and Agents.  Except as otherwise provided in the Plan, Persons who are not covered by the foregoing provisions of this Article VIII and who are or were employees, fiduciaries or agents of the Corporation, or who are or were serving at the request of the Corporation as employees, fiduciaries or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified to the extent authorized at any time or from time to time by the Board of Directors to the fullest extent of this Article VIII.

Section 8.    Merger or Consolidation.  For purposes of this Article VIII, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including, without limitation, any constituent of a constituent) absorbed in a consolidation or merged in a merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director or officer of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee, fiduciary or agent of another corporation or of a partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article VIII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Section 9.    Non-Exclusivity of Rights.    The rights to indemnification and the advancement of expenses and costs conferred under this Article VIII shall not be exclusive of any other rights to which those seeking indemnification or advancement of expenses and costs may be entitled under any applicable law, provision of this Amended and Restated Certificate of Incorporation, by-law, agreement, vote of stockholders of the Corporation or disinterested

7

directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office.  The Corporation is specifically authorized to enter into individual contracts with any or all of its directors or officers respecting indemnification and advances, to the fullest extent not prohibited by the DGCL or by any other applicable law.

Section 10.    Amendments.  No amendment, repeal or modification of, and no adoption of any provision inconsistent with, any provision of this Article VIII shall adversely affect any right or protection of a director or officer of the Corporation existing by virtue of this Article VIII at the time of such amendment, repeal, modification or adoption.

Section 11.    Jointly Indemnifiable Claims.  Given that certain jointly indemnifiable claims (as defined below) may arise due to the service of the Indemnitee as a director and/or officer of the Corporation at the request of the indemnitee-related entities (as defined below), the Corporation shall be fully and primarily responsible for the payment to the Indemnitee in respect of indemnification or advancement of expenses in connection with any such jointly indemnifiable claims, pursuant to and in accordance with the terms of this Article VIII, irrespective of any right of recovery the Indemnitee may have from the indemnitee-related entities.  Under no circumstance shall the Corporation be entitled to any right of subrogation against or contribution by the indemnitee-related entities and no right of advancement, indemnification or recovery the Indemnitee may have from the indemnitee-related entities shall reduce or otherwise alter the rights of the Indemnitee or the obligations of the Corporation under this Article VIII. In the event that any of the indemnitee-related entities shall make any payment to the Indemnitee in respect of indemnification or advancement of expenses with respect to any jointly indemnifiable claim, the indemnitee-related entity making such payment shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnitee against the Corporation, and the Indemnitee shall execute all documents and instruments reasonably required and shall do all things that may be reasonably necessary to secure such rights, including the execution of such documents and instruments as may be necessary to enable the indemnitee-related entities effectively to bring suit to enforce such rights.  Each of the indemnitee-related entities shall be third-party beneficiaries with respect to this Section 11 of this Article VIII and entitled to enforce this Section 11 of this Article VIII.

(a)    The term "*indemnitee-related entities*" means any corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (other than the Corporation or any other corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise for which the Indemnitee has agreed, on behalf of the Corporation or at the Corporation's request, to serve as a director, officer, employee or agent and which service is covered by the indemnity described herein) from whom an Indemnitee may be entitled to indemnification or advancement of expenses with respect to which, in whole or in part, the Corporation may also have an indemnification or advancement obligation.

(b)    The term "*jointly indemnifiable claims*" shall be broadly construed and shall include, without limitation, any action, suit or proceeding for which the Indemnitee shall be entitled to indemnification or advancement of expenses from both the indemnitee-related entities and the Corporation pursuant to applicable law, any agreement, certificate of incorporation, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or comparable organizational documents of the Corporation or the

8

indemnitee-related entities, as applicable.

## ARTICLE IX
## SECTION 203

The Corporation elects not to be governed by Section 203 of the DGCL.

## ARTICLE X
## AMENDMENTS

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware as they presently exist or may hereafter be amended, subject to any limitations contained elsewhere in this Amended and Restated Certificate of Incorporation, the Corporation may from time to time adopt, amend or repeal any provisions of this Amended and Restated Certificate of Incorporation.

## ARTICLE XI
## SEVERABILITY

If any provision or provisions of this Amended and Restated Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by applicable law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Amended and Restated Certificate of Incorporation (including, without limitation, each portion of any sentence of this Amended and Restated Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

## ARTICLE XII
## FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, to the fullest extent permitted by applicable law, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, or (iv) any action asserting a claim governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware, (or, if the Court of Chancery lacks subject matter jurisdiction, another state or federal court located within the state of Delaware).  Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XII.

* * * * * * * *

**IN WITNESS WHEREOF**, the undersigned has executed this Amended and Restated Certificate of Incorporation this ___ day of [●], 2017.


**GIRAFFE NEW HOLDING CO., INC.**


By: _____
Name:
Title:

## EXHIBIT A-1 (a)

**Comparison of Amended and Restated Certificate of Incorporation of
[Giraffe New Holding Co., Inc.]**

**Milbank Draft**
**8/~~17~~31/17**

## AMENDED AND
## RESTATED CERTIFICATE OF
## INCORPORATION OF
## ⌊GIRAFFE NEW HOLDING CO., INC.⌋

⌊Giraffe New Holding Co., Inc.⌋, a corporation organized and existing under the laws of the State of Delaware (the "***Corporation***"), pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware, as it may be amended from time to time (the "***DGCL***"), hereby certifies as follows:

1. The name of this corporation is ⌊Giraffe New Holding Co., Inc.⌋. The original Certificate of Incorporation of the Corporation (the "***Original Certificate of Incorporation***") was filed on [●].

2. The Corporation and its affiliated debtors filed a plan of reorganization pursuant to Chapter 11 of the United States Bankruptcy Code on June 16, 2017, which was confirmed by the United States Bankruptcy Court for the Eastern District of Virginia on [●], 2017 (including all exhibits, schedules and supplements thereto and as amended from time to time in accordance with the terms thereof, the "***Plan***"). This Amended and Restated Certificate of Incorporation of the Corporation (this "***Amended and Restated Certificate of Incorporation***") has been duly adopted in accordance with Sections 242, 245 and 303 of the DGCL, pursuant to the authority granted to the Corporation under Section 303 of the DGCL and pursuant to the Plan.

3. This Amended and Restated Certificate of Incorporation amends and restates the Original Certificate of Incorporation to read in its entirety as follows:

## ARTICLE I
## NAME OF CORPORATION

The name by which the corporation is to be known is ⌊Giraffe New Holding Co., Inc.⌋ (the "***Corporation***").

## ARTICLE II
## REGISTERED OFFICE; REGISTERED AGENT

The address of the Corporation's registered office in the State of Delaware is [●]. The name of the registered agent of the corporation at such address is [●].

## ARTICLE III
## PURPOSE

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

## ARTICLE IV
## STOCK

Section 1.  Authorized Stock.  The total number of shares of all classes of capital stock that the Corporation has authority to issue is [●] shares, consisting of: (a) [●] shares of Common Stock, par value $[0.01] per share ("*Common Stock*"), and (b) [●] shares of Preferred Stock, par value $[0.01] per share ("*Preferred Stock*").  The number of authorized shares of Common Stock or Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of capital stock of the Corporation representing a majority of the voting power of all the then-outstanding shares of capital stock of the Corporation entitled to vote thereon, irrespective of the provisions of Section 242(b)(2) of the DGCL (or any successor provision thereto), unless this Amended and Restated Certificate of Incorporation of the Corporation (this "*Amended and Restated Certificate of Incorporation*"), including any Preferred Stock Designation (as defined below), otherwise requires the vote of the holders of Common Stock or Preferred Stock voting separately as a class.

Section 2.  Common Stock.

(a)  Voting Rights.  Except as otherwise provided in this Amended and Restated Certificate of Incorporation or as required by applicable law, the holders of Common Stock shall at all times vote together as one class on all matters (including the election of directors) submitted to a vote or for the consent of the stockholders of the Corporation.  Each holder of Common Stock shall be entitled to one (1) vote for each share of Common Stock held as of the applicable date on any matter that is submitted to a vote or for the consent of the stockholders of the Corporation.  Except as otherwise required by applicable law, holders of Common Stock shall not be entitled to vote on any amendment to this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together with the holders of one or more other such series, to vote thereon pursuant to this Amended and Restated Certificate of Incorporation (including any Preferred Stock Designation) or pursuant to the DGCL, provided that such amendment does not alter or change the designations, powers, preferences or rights of the shares of Common Stock so as to affect them adversely.

(b)  Dividends.  Subject to the rights of the holders of Preferred Stock, the holders of Common Stock shall be entitled to share equally, on a per share basis, in such dividends and other distributions of cash, property or shares of stock of the Corporation as may be declared by the Board of Directors of the Corporation (the "*Board of Directors*") from time to time with respect to the Common Stock out of assets or funds of the Corporation legally available therefor.

(c)  Liquidation Rights.  In the event of the voluntary or involuntary liquidation, dissolution, distribution of assets or winding up of the Corporation, the holders of Common Stock shall be entitled to share equally, on a per share basis, all assets of the Corporation of whatever kind available for distribution to the holders of Common Stock.

(d)  Merger or Consolidation.  In the case of any distribution or payment in respect of the shares of Common Stock upon the consolidation or merger of the Corporation with or into

2

any other entity, or in the case of any other transaction having an effect on stockholders of the Corporation substantially similar to that resulting from a consolidation or merger, such distribution or payment shall be made ratably on a per share basis among the holders of Common Stock as a single class.

Section 3.     Preferred Stock.     Shares of Preferred Stock may be issued by the Corporation from time to time in one or more series.  The Board of Directors (or any committee to which it may duly delegate the authority granted in this Article IV) is hereby empowered to authorize, to the fullest extent now or hereafter permitted by the laws of the State of Delaware, to provide for the issuance of shares of Preferred Stock in one or more series, for such consideration and for such corporate purposes as the Board of Directors (or such committee thereof) may from time to time determine and, by filing a certificate pursuant to the applicable law of the State of Delaware (hereinafter referred to as a "***Preferred Stock Designation***"), to establish from time to time for each such series the number of shares to be included in each such series, and to fix the designations, powers, rights and preferences of the shares of each such series and any qualifications, limitations or restrictions thereof to the fullest extent now or hereafter permitted by this Amended and Restated Certificate of Incorporation and the laws of the State of Delaware, including, without limitation, voting rights (if any), dividend rights, dissolution rights, conversion rights, exchange rights and redemption rights thereof, as shall be stated and expressed in a resolution or resolutions adopted by the Board of Directors (or such committee thereof) providing for the issuance of such series of Preferred Stock.  Each series of Preferred Stock shall be distinctly designated.

Section 4.     Nonvoting Stock.     To the extent prohibited by Section 1123 of the Bankruptcy Code, the Corporation shall not issue any class or series of nonvoting equity securities; provided, however, that the foregoing (x) will have no force and effect beyond that required under Section 1123 of the Bankruptcy Code and (y) may be amended or eliminated in accordance with applicable law as from time to time in effect.  For the purposes of this Section 4 of this Article IV, any class or series of equity securities that has only such voting rights as are mandated by the DGCL shall be deemed to be nonvoting for purposes of the restrictions of this Section 4 of this Article IV.

### ARTICLE V
### DIRECTORS

Section 1.     Director Powers.     The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors.  In addition to the powers and authority expressly conferred upon them by statute or by this Amended Restated Certificate of Incorporation or the Bylaws of the Corporation (as may be amended or restated from time to time, the "***Bylaws***"), the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

Section 2.     Number of Directors.     The initial number of directors shall be seven (7). The number of directors shall be fixed from time to time by the affirmative vote of a majority of the Whole Board (as defined below).

Section 3.     Elections.     Unless and except to the extent that the Bylaws shall so

3

require, elections of directors need not be by written ballot.¶

> **Section 4.    Classes of Directors and Term of Office¶.  The Board of Directors shall be divided into three classes, designated Class I, Class II and Class III, and the term of office of directors of one class shall expire at each annual meeting of stockholders of the Corporation, and in all cases as to each director until his or her successor shall be duly elected and qualified or until his or her earlier resignation, removal from office, death or incapacity.  All members of the Board of Directors then in office shall be assigned to a class, and the director(s) assigned to Class I shall hold office for a term expiring at the first regularly scheduled annual meeting of stockholders of the Corporation following the effectiveness of this provision, the director(s) assigned to Class II shall hold office for a term expiring at the second regularly scheduled annual meeting of stockholders of the Corporation following the effectiveness of this provision, and the director(s) assigned to Class III shall hold office for a term expiring at the third regularly scheduled annual meeting of stockholders of the Corporation following the effectiveness of this provision.  At each succeeding annual meeting of stockholders of the Corporation, a number of directors equal to the number of directors of the class whose term expires at the time of such meeting (or, if less, the number of directors properly nominated and qualified for election) shall be elected to hold office until the third succeeding annual meeting of stockholders of the Corporation after their election.**

## ARTICLE VI
## AMENDMENTS TO BYLAWS

The Board of Directors shall have the power to adopt, amend or repeal the Bylaws.  Any adoption, amendment or repeal of the Bylaws by the Board of Directors shall require the approval of a majority of the Whole Board.  For purposes of this Amended and Restated Certificate of Incorporation, the term "***Whole Board***" shall mean the total number of authorized directors whether or not there exist any vacancies in previously authorized directorships.

## ARTICLE VII
## DIRECTOR LIABILITY

To the fullest extent permitted by the DGCL, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director (it being understood that, without limiting the foregoing, if in the future the DGCL is amended or modified (including with respect to Section 102(b)(7) thereof) to permit the further limitation or elimination of the personal liability of a director of the Corporation to a greater extent than contemplated above, then the provisions of this Article VII shall be deemed to provide for the elimination of the personal liability of the directors of the Corporation to such greater extent).  This Article VII shall not eliminate or limit the liability of a director for any act or omission occurring prior to the date when this Article VII becomes effective.  Any repeal or amendment or modification of this Article VII, or the adoption of any provision of this Amended and Restated Certificate of Incorporation inconsistent with this Article VII, will, to the extent permitted by applicable law, be prospective only (except to the extent such amendment or change in applicable law permits the Corporation to provide a broader

4

limitation on a retroactive basis than permitted prior thereto), and will not adversely affect any limitation on the personal liability of any director of the Corporation at the time of such repeal or amendment or modification or adoption of such inconsistent provision.

## ARTICLE VIII
## INDEMNIFICATION AND INSURANCE

Section 1.    <u>Right to Indemnification</u>.  Each person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, investigative or otherwise (hereinafter referred to as a "***proceeding***"), by reason of the fact that such person, or a person of whom such person is the legal representative, is or was or has agreed to become a director or officer of the Corporation, or while a director or officer of the Corporation is or was serving or has agreed to serve at the request of the Corporation in any capacity, including as a director, officer, employee, fiduciary or agent, of another corporation or of a partnership, joint venture, trust or other enterprise, including, without limitation, service with respect to employee benefit plans maintained or sponsored by the Corporation or any of its subsidiaries (an "***Indemnitee***"), whether the basis of such proceeding is alleged action in an official capacity as a director, officer, employee, fiduciary or agent or in any other capacity while serving as a director, officer, employee, fiduciary or agent, shall be indemnified and held harmless by the Corporation to the fullest extent which it is empowered to do so by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, to the fullest extent permitted by applicable law, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than said law permitted the Corporation to provide prior to such amendment) against all cost, expense, liability and loss (including, without limitation, attorneys' fees, judgments, fines, ERISA excise taxes or penalties and amounts paid or to be paid in settlement) actually and reasonably incurred by such Indemnitee in connection with a proceeding if such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe that such person's conduct was unlawful.  The termination of any claim, action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that such person did not act in good faith and in a manner which such person reasonably believed to be in or not opposed to the best interests of the Corporation, and with respect to any criminal action or proceeding, had reasonable cause to believe that such person's conduct was unlawful. Such indemnification shall continue as to a person who has ceased to serve in the capacity which initially entitled such person to indemnity hereunder, and such indemnification shall inure to the benefit of such person's heirs, executors and administrators.  Notwithstanding the foregoing, except as provided in <u>Section 3</u> of this <u>Article VIII</u> with respect to proceedings to enforce rights to indemnification, the Corporation shall indemnify any Indemnitee seeking indemnification in connection with a proceeding initiated by such person only if such proceeding (or part thereof) was authorized by the Board of Directors.

Section 2.    <u>Advancement of Expenses</u>.  To the fullest extent to which it is permitted to do so by the DGCL or other applicable law, the Corporation shall, in advance of the final disposition of the matter, pay the expenses and costs (including attorneys' fees) actually and reasonably incurred by any Indemnitee in defending or otherwise participating in any proceeding

5

and any appeal therefrom for which such person may be entitled to such indemnification under this Article VIII or otherwise; provided, however, if required by the DGCL, such payment of expenses and costs in advance of the final disposition of the proceeding shall be made only upon receipt by the Corporation of an undertaking by or on behalf of such Indemnitee to repay all amounts advanced if it should be ultimately determined by final judicial decision from which there is no further right to appeal that such Indemnitee is not entitled to be indemnified for such expenses under this Article VIII or otherwise. Expenses incurred by other employees, fiduciaries and agents who are considered Indemnitees hereunder may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

Section 3.    Procedures for Indemnification of Directors and Officers.    Any indemnification or advancement of expenses under this Article VIII shall be made promptly, and in any event within thirty (30) days, upon the written request of the Indemnitee, except in the case of a claim for an advancement of expenses, in which case the applicable period shall be twenty (20) days. If a determination by the Corporation that the Indemnitee is entitled to indemnification pursuant to this Article VIII is required, and the Corporation fails to respond within sixty (60) days to a written request for indemnity, the Corporation shall be deemed to have approved the request. If the Corporation denies a written request for indemnification or advancement of expenses, in whole or in part, or if payment in full pursuant to such request is not made within thirty (30) days (or twenty (20) days in the case of a claim for advancement of expenses), the right to indemnification or advancement of expenses as granted by this Article VIII shall be enforceable by the Indemnitee in any court of competent jurisdiction. Such Indemnitee's costs and expenses incurred in connection with successfully establishing the right to indemnification, in whole or in part, in any such action or in a suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, shall also be indemnified by the Corporation. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any, has been tendered to the Corporation) that the Indemnitee has not met the standards of conduct which make it permissible under the DGCL for the Corporation to indemnify the Indemnitee for the amount claimed, but the burden of such defense shall be on the Corporation. Neither the failure of the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) to have made a determination prior to the commencement of such action that indemnification of the Indemnitee is proper in the circumstances because he or she has met the applicable standard of conduct set forth in the DGCL nor an actual determination by the Corporation (including its Board of Directors, independent legal counsel, or its stockholders) that the Indemnitee has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct. In any suit brought by the Indemnitee to enforce a right to indemnification or to an advancement of expenses hereunder, or brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnitee is not entitled to be indemnified, or to such advancement of expenses, under this Article VIII or otherwise, shall be on the Corporation.

Section 4.    Requested Services.    Without limiting the meaning of the phrase "serving at the request of the Corporation" as used herein, any person serving as a director, officer or equivalent executive of (a) another corporation of which a majority of the shares entitled to vote in the election of its directors is owned, directly or indirectly, by the Corporation, or (b) any

employee benefit plan maintained or sponsored by the Corporation or any corporation referred to in clause (a), shall be deemed to be doing so at the request of the Corporation for purposes of Section 1 of this Article VIII.

Section 5.    Contract Rights.  The provisions of this Article VIII shall be deemed to be a contract right between the Corporation and each Indemnitee and such rights shall continue as to an Indemnitee who has ceased to be a director, officer, employee, fiduciary or agent, or if the relevant provisions of the DGCL or other applicable law cease to be in effect. Such contract right shall vest for each Indemnitee who is a director, officer, employee, fiduciary or agent at the time such person is elected or appointed to such position, and no repeal or modification of this Article VIII or any such law shall affect any such vested rights or obligations then existing with respect to any state of facts or proceeding arising after such election or appointment and prior to such repeal or modification.

Section 6.    Insurance.  The Corporation may purchase and maintain insurance on its own behalf and on behalf of any person who is or was a director, officer, employee, fiduciary or agent of the Corporation or was serving at the request of the Corporation as a director, officer, employee, fiduciary or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the DGCL or this Article VIII.

Section 7.    Employees and Agents.  Except as otherwise provided in the Plan, Persons who are not covered by the foregoing provisions of this Article VIII and who are or were employees, fiduciaries or agents of the Corporation, or who are or were serving at the request of the Corporation as employees, fiduciaries or agents of another corporation, partnership, joint venture, trust or other enterprise, may be indemnified to the extent authorized at any time or from time to time by the Board of Directors to the fullest extent of this Article VIII.

Section 8.    Merger or Consolidation.  For purposes of this Article VIII, references to "the Corporation" shall include, in addition to the resulting corporation, any constituent corporation (including, without limitation, any constituent of a constituent) absorbed in a consolidation or merged in a merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director or officer of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee, fiduciary or agent of another corporation or of a partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article VIII with respect to the resulting or surviving corporation as he or she would have with respect to such constituent corporation if its separate existence had continued.

Section 9.    Non-Exclusivity of Rights.    The rights to indemnification and the advancement of expenses and costs conferred under this Article VIII shall not be exclusive of any other rights to which those seeking indemnification or advancement of expenses and costs may be entitled under any applicable law, provision of this Amended and Restated Certificate of Incorporation, by-law, agreement, vote of stockholders of the Corporation or disinterested

7

directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office.  The Corporation is specifically authorized to enter into individual contracts with any or all of its directors or officers respecting indemnification and advances, to the fullest extent not prohibited by the DGCL or by any other applicable law.

Section 10.    <u>Amendments</u>.  No amendment, repeal or modification of, and no adoption of any provision inconsistent with, any provision of this <u>Article VIII</u> shall adversely affect any right or protection of a director or officer of the Corporation existing by virtue of this <u>Article VIII</u> at the time of such amendment, repeal, modification or adoption.

Section 11.    <u>Jointly Indemnifiable Claims</u>.  Given that certain jointly indemnifiable claims (as defined below) may arise due to the service of the Indemnitee as a director and/or officer of the Corporation at the request of the indemnitee-related entities (as defined below), the Corporation shall be fully and primarily responsible for the payment to the Indemnitee in respect of indemnification or advancement of expenses in connection with any such jointly indemnifiable claims, pursuant to and in accordance with the terms of this <u>Article VIII</u>, irrespective of any right of recovery the Indemnitee may have from the indemnitee-related entities.  Under no circumstance shall the Corporation be entitled to any right of subrogation against or contribution by the indemnitee-related entities and no right of advancement, indemnification or recovery the Indemnitee may have from the indemnitee-related entities shall reduce or otherwise alter the rights of the Indemnitee or the obligations of the Corporation under this <u>Article VIII</u>. In the event that any of the indemnitee-related entities shall make any payment to the Indemnitee in respect of indemnification or advancement of expenses with respect to any jointly indemnifiable claim, the indemnitee-related entity making such payment shall be subrogated to the extent of such payment to all of the rights of recovery of the Indemnitee against the Corporation, and the Indemnitee shall execute all documents and instruments reasonably required and shall do all things that may be reasonably necessary to secure such rights, including the execution of such documents and instruments as may be necessary to enable the indemnitee-related entities effectively to bring suit to enforce such rights.   Each of the indemnitee-related entities shall be third-party beneficiaries with respect to this <u>Section 11</u> of this <u>Article VIII</u> and entitled to enforce this <u>Section 11</u> of this <u>Article VIII</u>.

(a)    The term "***indemnitee-related entities***" means any corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise (other than the Corporation or any other corporation, limited liability company, partnership, joint venture, trust, employee benefit plan or other enterprise for which the Indemnitee has agreed, on behalf of the Corporation or at the Corporation's request, to serve as a director, officer, employee or agent and which service is covered by the indemnity described herein) from whom an Indemnitee may be entitled to indemnification or advancement of expenses with respect to which, in whole or in part, the Corporation may also have an indemnification or advancement obligation.

(b)    The term "***jointly indemnifiable claims***" shall be broadly construed and shall include, without limitation, any action, suit or proceeding for which the Indemnitee shall be entitled to indemnification or advancement of expenses from both the indemnitee-related entities and the Corporation pursuant to applicable law, any agreement, certificate of incorporation, bylaws, partnership agreement, operating agreement, certificate of formation, certificate of limited partnership or comparable organizational documents of the Corporation or the

8

indemnitee-related entities, as applicable.

### ARTICLE IX
### SECTION 203

The Corporation elects not to be governed by Section 203 of the DGCL.

### ARTICLE X
### AMENDMENTS

In furtherance and not in limitation of the powers conferred by the laws of the State of Delaware as they presently exist or may hereafter be amended, subject to any limitations contained elsewhere in this Amended and Restated Certificate of Incorporation, the Corporation may from time to time adopt, amend or repeal any provisions of this Amended and Restated Certificate of Incorporation.

### ARTICLE XI
### SEVERABILITY

If any provision or provisions of this Amended and Restated Certificate of Incorporation shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by applicable law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Amended and Restated Certificate of Incorporation (including, without limitation, each portion of any sentence of this Amended and Restated Certificate of Incorporation containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby.

### ARTICLE XII
### FORUM

Unless the Corporation consents in writing to the selection of an alternative forum, to the fullest extent permitted by applicable law, the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the DGCL, or (iv) any action asserting a claim governed by the internal affairs doctrine shall be the Court of Chancery of the State of Delaware, (or, if the Court of Chancery lacks subject matter jurisdiction, another state or federal court located within the state of Delaware).  Any person or entity purchasing or otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article XII.

\* \* \* \* \* \* \* \*

9

**IN WITNESS WHEREOF**, the undersigned has executed this Amended and Restated Certificate of Incorporation this ____ day of [●], 2017.

**GIRAFFE NEW HOLDING CO., INC.**

By: _____

Name:

Title:

## **EXHIBIT A-2**

**Amended and Restated Bylaws of [Giraffe New Holding Co., Inc.]**

**Milbank Draft
8/31/17**

**AMENDED AND RESTATED BYLAWS
OF
GIRAFFE NEW HOLDING CO., INC.
(a Delaware corporation, hereinafter called the "*Corporation*")**

**Effective as of [●], 2017**

## ARTICLE I
## OFFICES AND RECORDS

**Section 1.1** **Registered Office.** The registered office of the Corporation, and the registered agent of the Corporation at such address, shall initially be as fixed in the Corporation's amended and restated certificate of incorporation (as may be further amended and/or restated from time to time, the "***Certificate of Incorporation***"). The registered office or registered agent of the Corporation may thereafter be changed from time to time by action of the board of directors of the Corporation (the "***Board of Directors***").

**Section 1.2** **Other Offices.** The Corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine or the business of the Corporation may require.

**Section 1.3** **Books and Records.**

(a) The books and records of the Corporation may be kept outside the State of Delaware at such place or places as may from time to time be designated by the Board of Directors.

(b) The Corporation shall, either at its principal executive office or at such place or places as designated by the Board of Directors, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each such stockholder, a copy of these bylaws, as may be amended to date, minute books, accounting books and other records.

(c) Any such records maintained by the Corporation may be kept on, or by means of, or be in the form of, any information storage device or method, provided that the records so kept can be converted into clearly legible paper form within a reasonable time. When records are kept in such manner, a clearly legible paper form produced from or by means of the information storage device or method shall be admissible in evidence, and accepted for all other purposes, to the same extent as an original paper form accurately portrays the record. The Corporation shall so convert any records so kept upon the request of any person or entity entitled to inspect such records pursuant to the provisions of the Certificate of Incorporation, these bylaws or applicable law.

## ARTICLE II
## STOCKHOLDERS

**Section 2.1    Place of Meetings.**  Meetings of stockholders of the Corporation shall be held at any place, if any, either within or without the State of Delaware, as may be designated from time to time by the Board of Directors.  The Board of Directors may, in its sole discretion, determine that a meeting of stockholders of the Corporation shall not be held at any place, but may instead be held solely by means of remote communication.  In the absence of notice to the contrary, meetings of the stockholders of the Corporation shall be held at the principal executive office of the Corporation.

**Section 2.2    Annual Meeting.**    The annual meeting of the stockholders of the Corporation shall be held on such date and at such place, if any, and/or by the means of remote communication, and time as may be fixed by resolution of the Board of Directors from time to time.  At the annual meeting of the stockholders of the Corporation, directors shall be elected and any other business may be transacted which is properly brought before the annual meeting in accordance with the procedures set forth in Section 2.14 of these bylaws.  Failure to hold any annual meeting as aforesaid shall not constitute, be deemed to be or otherwise effect a forfeiture or dissolution of the Corporation nor shall such failure affect otherwise valid corporate acts.

**Section 2.3    Special Meetings.**  Except as otherwise required by applicable law or provided in the instrument of designation of any series of preferred stock of the Corporation, special meetings of stockholders of the Corporation may be called at any time and from time to time only upon the written request (stating the purpose or purposes of the meeting) of (a) any two or more members of the Board of Directors, (b) [the Chairman of the Board of Directors], or (c) the holders of a majority of the total voting power of all the shares of capital stock of the Corporation entitled to vote generally in the election of directors.  Special meetings of the stockholders of the Corporation may not be called by any person, group or entity other than those specifically enumerated in this Section 2.3.  The Board of Directors or the Chairman of the Board of Directors shall determine the date, time, and place, if any, and/or means of remote communication, of any special meeting, which shall be stated in a notice of meeting delivered by the Board of Directors.  Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders of the Corporation before any meeting of the stockholders of the Corporation, or any class or series of thereof, shall be given in the manner provided in these bylaws.  No business may be transacted at any special meeting of the stockholders of the Corporation other than the business specified in the notice of such meeting.

**Section 2.4    Chairman of the Meeting; Conduct of Meetings; Inspection of Elections.**

(a)    Meetings of stockholders of the Corporation shall be presided over by the chairman of the meeting, who shall be the Chairman of the Board of Directors or, in the absence thereof, such person as the Chairman of the Board of Directors shall appoint, or, in the absence thereof or in the event that the Chairman of the Board of Directors shall fail to make such appointment, any officer of the Corporation appointed by the Board of Directors.

(b)    The secretary of any meeting of the stockholders of the Corporation shall be the Secretary or Assistant Secretary, or in the absence thereof, such person as the chairman of the meeting appoints.  The secretary of the meeting shall keep the minutes thereof.

(c)    The Board of Directors shall be entitled to make such rules or regulations for the conduct of meetings of stockholders of the Corporation as it shall deem necessary, appropriate or convenient from time to time.  Subject to such rules and regulations, if any, the chairman of the meeting shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures and to do all acts as, in the judgment of such chairman, are necessary, appropriate or convenient (and not inconsistent with the Certificate of Incorporation or these bylaws) for the proper conduct of the meeting, including, without limitation, establishing an agenda of business of the meeting, recognizing stockholders entitled to speak, calling for the necessary reports, stating questions and putting them to a vote, calling for nominations, announcing the results of voting, establishing rules or regulations to maintain order, imposing restrictions on entry to the meeting after the time fixed for commencement thereof and the fixing of the date and time of the opening and closing of the polls for each matter upon which the stockholders of the Corporation will vote at a meeting (and shall announce such at the meeting).

(d)    If required by applicable law, the Board of Directors shall appoint one or more inspectors, which inspector or inspectors may include individuals who serve the Corporation in other capacities, including, without limitation, as officers, employees, agents or representatives, to act at a meeting of stockholders of the Corporation and make a written report thereof.  One or more persons may be designated as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate has been appointed to act or is able to act at a meeting of stockholders of the Corporation, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall have such other duties as may be prescribed by applicable law.

**Section 2.5    Notice.**

(a)    Whenever stockholders of the Corporation are required or permitted to take any action at a meeting (whether special or annual), written notice (unless oral notice is reasonable under the circumstances) stating the place (if any), date, and time of the meeting, the means of remote communication (if any) by which such stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders of the Corporation entitled to vote at the meeting (if such date is different from the record date for stockholders of the Corporation entitled to notice of the meeting) and, in the case of special meetings, the purpose or purposes of such meeting, shall be given to each stockholder of the Corporation entitled to vote at such meeting not fewer than ten (10) nor more than sixty (60) days before the date of the meeting except as otherwise required by applicable law, the Certificate of Incorporation or these bylaws.  In the case of an annual meeting, the notice need not state the purpose or purposes of the meeting unless the Certificate of Incorporation or the General Corporation Law of the State of Delaware (as the same exists or may hereafter be

- 3 -

amended from time to time, the "**DGCL**") requires the purpose or purposes to be stated in the notice of the meeting.

(b)    All such notices shall be delivered in writing (unless oral notice is reasonable under the circumstances) or by a form of electronic transmission if receipt thereof has been consented to by the stockholder of the Corporation to whom the notice is given.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to such stockholder at such stockholder's address as it appears on the records of the Corporation.  If given by facsimile telecommunication, such notice shall be deemed to be delivered when directed to a number at which such stockholder has consented to receive notice by facsimile.  Subject to the limitations of <u>Section 2.6</u> of these bylaws, if given by electronic transmission, such notice shall be deemed to be delivered: (i) by electronic mail, when directed to an electronic mail address at which such stockholder has consented to receive notice; (ii) if by a posting on an electronic network together with separate written notice to such stockholder of such specific posting delivered by electronic mail or by United States mail, postage prepaid, addressed to such stockholder at such stockholder's address as it appears on the records of the Corporation, upon the later of (x) such posting and (y) the giving of such separate notice; and (iii) if by any other form of electronic transmission, when directed to such stockholder.  An affidavit of the Secretary or an Assistant Secretary, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

(c)    Whenever notice is required to be given under any provision of the DGCL, the Certificate of Incorporation or these bylaws, a written waiver thereof, signed by the stockholder of the Corporation entitled to notice, or a written waiver by electronic transmission by the person or entity entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Neither the business to be transacted at, nor the purpose of, any meeting of the stockholders of the Corporation need be specified in any waiver of notice of such meeting.

(d)    Attendance of a stockholder of the Corporation at a meeting of the stockholders of the Corporation shall constitute a waiver of notice of such meeting, except when such stockholder attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

(e)    Whenever notice is required to be given under the DGCL, the Certificate of Incorporation or these bylaws to any stockholder of the Corporation with whom communication is unlawful, the giving of such notice to such stockholder shall not be required, and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such stockholder.  Any action or meeting which shall be taken or held without notice to any such stockholder with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.

**Section 2.6    <u>Notice by Electronic Delivery</u>.**  Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the DGCL, the Certificate of Incorporation or these bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the DGCL, the Certificate of

Incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder of the Corporation to whom the notice is given.  Any such consent shall be revocable by such stockholder by written notice to the Secretary.  Any such consent shall be deemed revoked if: (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices of meetings or of other business given by the Corporation in accordance with such consent; and (ii) such inability becomes known to the Secretary or an Assistant Secretary or to the transfer agent or other person responsible for the giving of notice.  However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.  For purposes of these bylaws, except as otherwise limited by applicable law, the term "*electronic transmission*" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 2.7    Stockholders List.**  The officer having charge of the stock ledger of the Corporation shall make, at least ten (10) days before every meeting of the stockholders of the Corporation, a complete list of the stockholders of the Corporation entitled to vote at such meeting (provided, however, if the record date for determining the stockholders of the Corporation entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders of the Corporation entitled to vote as of the tenth (10th) day before the meeting date), arranged in alphabetical order, showing the address of (and any form of electronic transmission consented to by) each such stockholder and the number of shares registered in the name of each such stockholder.  Such list shall be open to the examination of any stockholder of the Corporation for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network; provided that the information required to gain access to such list is provided with the notice of the meeting; and/or (ii) during ordinary business hours at the principal place of business of the Corporation.  In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation.  If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder of the Corporation who is present.  If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder of the Corporation during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting.  Refusal or failure to prepare or make available the stockholder list shall not affect the validity of any action taken at a meeting of stockholders of the Corporation.

**Section 2.8    Quorum.**  Except as otherwise provided by applicable law or by the Certificate of Incorporation, the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders of the Corporation.  If a quorum is not present, the chairman of the meeting or the holders of a majority in voting power of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another place, if any, date and time.  When a quorum is once present to

commence a meeting of the stockholders of the Corporation, it is not broken by the subsequent withdrawal of any stockholders of the Corporation or their respective proxies.

### Section 2.9  Adjournment and Postponement of Meetings.

(a)    Any meeting of the stockholders of the Corporation, whether or not a quorum is present, may be adjourned to be reconvened at a specific date, time, place (if any) and/or by means of remote communication (if any) by the holders of a majority in voting power of the shares of capital stock present in person or represented by proxy at the meeting and entitled to vote at the meeting or, unless contrary to any provision of the Certificate of Incorporation, these bylaws or applicable law, the Chairman of the Board of Directors or the affirmative vote of a majority of the members of the Board of Directors.  When a meeting of the stockholders of the Corporation is adjourned to another date, time, place (if any), and/or by means of remote communication (if any), notice need not be given of the adjourned meeting if the date, time and place (if any) thereof, and/or the means of remote communication (if any) by which such stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting, are announced at the meeting at which the adjournment is taken; provided, however, that if the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for determination of stockholders of the Corporation entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix as the record date for determining such stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders of the Corporation entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record as of the record date so fixed for notice of such adjourned meeting.

(b)    Any previously scheduled meeting of the stockholders of the Corporation may be postponed, and (unless contrary to applicable law or the Certificate of Incorporation) any special meeting of the stockholders of the Corporation may be cancelled, by resolution of the Board of Directors upon notice given to such stockholders prior to the date previously scheduled for such meeting of stockholders.

### Section 2.10  Vote Required.  When a quorum is present, the affirmative vote of the majority in voting power of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders of the Corporation, unless the question is one upon which, by express provisions of applicable law, the Certificate of Incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or pursuant to any regulation applicable to the Corporation or its securities, or the instrument of designation of any series of preferred stock of the Corporation, a different or additional vote is required or provided for, in which case such express provision shall govern and control the decision of such question.  Where a separate vote by class or series is required or provided for, when a quorum is present, the affirmative vote of a majority in voting power of the shares of capital stock of the Corporation of such class or series present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of such class or series of stockholders, unless the question is one upon which, by express provisions of applicable law, the Certificate of Incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or pursuant to any

- 6 -

regulation applicable to the Corporation or its securities, or the designation of any series of preferred stock of the Corporation, a different vote is required or provided for, in which case such express provision shall govern and control the decision of such question.

**Section 2.11   Voting Rights.**   Except as otherwise provided by applicable law, each stockholder of the Corporation shall be entitled to that number of votes for each share of capital stock of the Corporation held by such stockholder as set forth in the Certificate of Incorporation or, in the case of preferred stock of the Corporation, in the instrument of designation thereof.

**Section 2.12   Proxies.**   Each stockholder of the Corporation entitled to vote at a meeting of stockholders of the Corporation may authorize another person or entity to act for such stockholder by proxy in such manner as prescribed under the DGCL, but no such proxy shall be voted or acted upon after three (3) years from its date unless such proxy expressly provides for a longer period.   At each meeting of the stockholders of the Corporation, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the Secretary or a person designated by the Secretary, and no shares may be represented or voted under a proxy that has been found (in the reasonable determination of the Secretary or such designee) to be invalid or irregular.   Reference by the Secretary in the minutes of the meeting to the regularity of a proxy shall be received as *prima facie* evidence of the facts stated for the purpose of establishing the presence of a quorum at such meeting and for all other purposes.   The revocability of a proxy that states on its face that it is irrevocable shall be governed by the applicable provisions of the DGCL and, without limiting the foregoing, a duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power.   A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.

**Section 2.13   Record Date.**

(a)     In order that the Corporation may determine the stockholders of the Corporation entitled to notice of any meeting of such stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by applicable law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting.   If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders of the Corporation entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.   If no record date is fixed by the Board of Directors, the record date for determining stockholders of the Corporation entitled to notice of or to vote at a meeting of such stockholders shall be at the close of business on the day immediately preceding the day on which notice is given, or, if notice is waived, at the close of business on the day immediately preceding the day on which the meeting is held.   A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders of the Corporation shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of such stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for such stockholders entitled to notice of such

adjourned meeting the same or an earlier date as that fixed for determination of stockholders of the Corporation entitled to vote in accordance herewith at the adjourned meeting.

(b)    In order that the Corporation may determine the stockholders of the Corporation entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not (i) precede the date upon which the resolution fixing the record date is adopted, or (ii) be more than sixty (60) days prior to such action.  If no such record date is fixed, the record date for determining stockholders of the Corporation for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c)    Unless such action in writing without a meeting is otherwise restricted by the Certificate of Incorporation, in order that the Corporation may determine the stockholders of the Corporation entitled to express consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  Unless such action in writing without a meeting is otherwise restricted by the Certificate of Incorporation, if no record date for determining stockholders of the Corporation entitled to express consent to corporate action in writing without a meeting is fixed by the Board of Directors, (i) when no prior action of the Board of Directors is required by applicable law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law, and (ii) if prior action by the Board of Directors is required by applicable law, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

**Section 2.14    Advance Notice of Stockholder Business.**

(a)    Only such business shall be conducted before a meeting of the stockholders of the Corporation as shall have been properly brought before such meeting.  To be properly brought before an annual or special meeting of the stockholders of the Corporation, from and after the date Common Stock (as defined in the Certificate of Incorporation) is listed, whether in connection with an initial public offering of the Common Stock or otherwise, on a U.S. national securities exchange registered with the Securities and Exchange Commission and any governmental body or agency succeeding to the functions thereof (a "***Public Listing***"), business must be: (i) with respect to any annual meeting, (A) specified in the notice of meeting (or any supplement or amendment thereto) given by or at the direction of the Board of Directors or a duly authorized committee of the Board of Directors; (B) otherwise properly brought before the meeting by or at the direction of the Board of Directors or a duly authorized committee of the Board of Directors; or (C) otherwise properly brought before the meeting by any stockholder of the Corporation (1) who is a stockholder of record on the date of the giving of the notice provided for in this <u>Section 2.14</u> and on the record date for the determination of stockholders of the Corporation entitled to vote at such annual meeting and (2) who complies with the notice

procedures set forth in this Section 2.14; and (ii) with respect to any special meeting, specified in the notice of meeting (or any supplement or amendment thereto) given to the stockholders of the Corporation by the Board of Directors pursuant to and in accordance with Section 2.3. For the avoidance of doubt, the provisions in this Section 2.14 shall not apply prior to completion of a Public Listing.

(b)     For such business to be considered properly brought before the meeting by a stockholder of the Corporation, such stockholder must, in addition to any other applicable requirements, have given timely notice thereof in proper written form to the Secretary. To be timely with respect to any annual meeting, such stockholder's notice to the Secretary must be delivered to or mailed and received by the Secretary at the principal executive office of the Corporation no fewer than ninety (90) and no more than one hundred twenty (120) days prior to the first (1st) anniversary of the immediately preceding annual meeting of the stockholders of the Corporation; provided, however, that in the event that no annual meeting was held in the previous year or the annual meeting is called for a date that is not within thirty (30) days before or after such anniversary date, notice by such stockholder to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which notice of the date of the annual meeting was mailed. To be timely with respect to any special meeting, such stockholder's notice to the Secretary must be delivered or mailed and received by the Secretary at the principal executive office of the Corporation not less than sixty (60) days prior to the date of such meeting; provided, however, that in the event that less than seventy (70) days' notice of the date of the meeting is given to stockholders of the Corporation, to be timely such stockholder's notice must be delivered or mailed and received by the Secretary at the principal executive office of the Corporation not later than the close of business on the tenth (10th) day following the earlier of the day on which such notice is mailed by the Corporation. In no event shall the public announcement of an adjournment or postponement of an announced meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as provided in this Section 2.14.

(c)     To be in proper written form, a stockholder's notice to the Secretary must set forth as to each matter such stockholder proposes to bring before the annual meeting: (i) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting; (ii) as to the stockholder of the Corporation giving the notice and the beneficial owner, if any, on whose behalf the proposal is made (A) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner, (B) the class or series and number of shares of capital stock of the Corporation which are directly or indirectly (including through any derivative arrangement) owned (1) beneficially and (2) of record by such stockholder and by such beneficial owner, (C) a description of all arrangements or understandings between such stockholder or such beneficial owner and any other person or entity (including, without limitation, their names) in connection with the ownership of the capital stock of the Corporation and the proposal of such business by such stockholder and such beneficial owner, and any material interest (financial or otherwise) of such stockholder or such beneficial owner in such business, (D) whether either such stockholder or beneficial owner intends to deliver a form of proxy to holders of at least the percentage of the Corporation's voting shares required under applicable law to approve the proposal and (E) if the Corporation is then subject to Section 14(a) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), any other information relating to such stockholder and beneficial owner,

if any, required to be disclosed in a proxy statement or other filing required to be made in connection with a solicitation of proxies for the proposal pursuant to and in accordance with Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder; and (iii) a representation that such stockholder is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to introduce the business specified in the notice. As used herein, shares "***beneficially owned***" by a person (and phrases of similar import) shall mean all shares which such person is deemed to beneficially own pursuant to Rules 13d-3 and 13d-5 under the Exchange Act, including, without limitation, shares which are beneficially owned, directly or indirectly, by any other person with which such person has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of the capital stock of the Corporation.

(d)    The chairman of a meeting of the stockholders of the Corporation shall determine and declare at such meeting whether the stockholder proposal was made in accordance with the terms of this Section 2.14. If the chairman of the meeting determines that such proposal was not properly brought before the meeting in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the proposal was not properly brought before the meeting and the business of such proposal shall not be transacted.

(e)    This provision shall not prevent the consideration and approval or disapproval at any annual or special meeting of stockholders of the Corporation of reports of officers, directors and committees of the Board of Directors, but in connection with such reports, no new business shall be acted upon at such meeting unless stated, filed and received as herein provided.

(f)    In addition, notwithstanding anything in this Section 2.14 to the contrary, a stockholder of the Corporation intending to nominate one or more persons for election as a director at an annual or special meeting of stockholders of the Corporation must comply with Section 2.15 of these bylaws for such nomination to be properly brought before such meeting.

(g)    For purposes of this Section 2.14, any adjournment(s) or postponement(s) of the original meeting whereby the meeting will reconvene within ninety (90) days from the original date shall be deemed for purposes of notice to be a continuation of the original meeting and no business may be brought before any such reconvened meeting unless pursuant to a notice of such business which was timely for the meeting and properly presented as determined as of the date originally scheduled.

### Section 2.15    Advance Notice of Director Nominations.

(a)    Unless otherwise required by applicable law or the Certificate of Incorporation, from and after the date on which the Corporation completes a Public Listing, only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided in the instrument of designation of any series of preferred stock of the Corporation with respect to the right of holders of preferred stock of the Corporation to nominate and elect a specified number of directors of the Corporation, who shall be nominated as provided therein. For the avoidance of doubt, the provisions in this Section 2.15 shall not apply prior to completion of a Public Listing.

(b)    Nominations of persons for election to the Board of Directors shall be made only at an annual or special meeting of stockholders of the Corporation called for the purpose of electing directors and must be (i) specified in the notice of meeting (or any supplement or amendment thereto) and (ii) made by (A) the Board of Directors or a duly authorized committee of the Board of Directors (or at the direction thereof) or (B) made by any stockholder of the Corporation (1) who is a stockholder of record on the date of the giving of the notice provided for in this Section 2.15 and on the record date for the determination of stockholders entitled to vote at such meeting and (2) who complies with the notice procedures set forth in this Section 2.15.

(c)    In addition to any other applicable requirements, for a nomination to be made by a stockholder of the Corporation, such stockholder must have given timely notice thereof in proper written form to the Secretary.  To be timely, such stockholder's notice to the Secretary must be delivered to or mailed and received at the principal executive office of the Corporation: (i) in the case of an annual meeting of the stockholders of the Corporation, no fewer than ninety (90) nor more than one hundred twenty (120) days prior to the first (1st) anniversary of the immediately preceding annual meeting; provided, however, that in the event that no annual meeting was held in the previous year or the annual meeting is called for a date that is not within thirty (30) days before or after such anniversary date, notice by such stockholder to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which notice of the date of the annual meeting was mailed, and (ii) in the case of a special meeting of stockholders of the Corporation called for the purpose of electing directors, not less than sixty (60) days prior to the meeting; provided, however, that in the event that less than seventy (70) days' notice of the date of the meeting is given or made to stockholders of the Corporation, notice by such stockholder to be timely must be so received not later than the close of business on the tenth (10th) day following the earlier of the day on which such notice was mailed.  Notwithstanding anything to the contrary in the immediately preceding sentence, in the event that the number of directors to be elected to the Board of Directors is increased, a stockholder's notice required by this Section 2.15 shall also be considered timely, but only with respect to nominees for any new positions created by such increase and only if otherwise timely notice of nomination for all other directorships was delivered by such stockholder in accordance with the requirements of the immediately preceding sentence, if it shall be delivered to the Secretary at the principal executive office of the Corporation not later than the close of business on the tenth (10th) day following the day on which notice to the stockholders of the Corporation was given by the Corporation naming all of the nominees for director or specifying the size of the increase in the number of directors to serve on the Board of Directors, even if such tenth (10th) day shall be later than the date for which a nomination would otherwise have been required to be delivered to be timely.  In no event shall the public announcement of an adjournment or postponement of an announced meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as provided in this Section 2.15.

(d)    To be in proper written form, a stockholder's notice to the Secretary pursuant to this Section 2.15 must set forth (i) as to each person whom the stockholder of the Corporation proposes to nominate for election as a director, (A) the name, age, business address, and residence address of such person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation which are directly or indirectly (including through any derivative arrangement) owned beneficially or of record by

the person, and (D) any other information relating to the person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with a solicitation of proxies for an election of directors pursuant to the Exchange Act and the rules and regulations promulgated thereunder if the Corporation were a reporting company under the Exchange Act, and (ii) as to the stockholder of the Corporation giving the notice and the beneficial owner, if any, on whose behalf the director nomination is made (A) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner; (B) the class or series and number of shares of capital stock of the Corporation which are owned (1) beneficially and (2) of record by such stockholder and by such beneficial owner, (C) a description of all arrangements or understandings between such stockholder or such beneficial owner and any other person or entity (including, without limitation, their names) in connection with the ownership of the capital stock of the Corporation and the nomination of such nominee(s), and any material interest of such stockholder or such beneficial owner in such nomination(s), (D) whether either such stockholder or beneficial owner intends to deliver a form of proxy to holders of the Corporation's voting shares to elect such nominee or nominees, (E) a representation that the stockholder of the Corporation giving the notice is a holder of record of stock of the Corporation entitled to vote at such meeting and that such stockholder intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (F) if the Corporation is then subject to Section 14(a) of the Exchange Act, any other information relating to such stockholder and beneficial owner, if any, required to be disclosed in a proxy statement or other filing required to be made in connection with a solicitation of proxies for an election of directors pursuant to the Exchange Act and the rules and regulations promulgated thereunder.  Such notice must be accompanied by a written consent of each proposed nominee to be named as a nominee and to serve as a director if elected.  The Corporation may require any nominee to furnish such other information (which may include meeting to discuss the information) as may reasonably be required by the Corporation to determine the eligibility of such nominee to serve as a director of the Corporation.

(e)     If the chairman of a meeting of the stockholders of the Corporation determines that a nomination was not made in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

(f)     Nothing in this Section 2.15 shall be deemed to affect any rights of the holders of any series of preferred stock of the Corporation to elect directors pursuant to any applicable provisions of the Certificate of Incorporation.

**Section 2.16   Action Without a Meeting.**  Until the date on which the Corporation completes a Public Listing, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders of the Corporation are recorded.  Following the date on

which the Corporation completes a Public Listing, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all the holders of outstanding stock of the Corporation entitled to vote thereon.

## ARTICLE III
## DIRECTORS

**Section 3.1**     **General Powers**.   All corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, the Board of Directors.   In addition to the powers and authority expressly conferred upon it by these bylaws, the Board of Directors shall exercise all such powers of the Corporation and do all such lawful acts and things as are not by applicable law or any other legal agreement among stockholders of the Corporation, by the Certificate of Incorporation, or by these bylaws directed or required to be exercised or done by the stockholders of the Corporation.

**Section 3.2**     **Number and Election.**

(a)     The total number of directors constituting the entire Board of Directors shall be not less than three (3) nor more than fifteen (15).   Subject to the limits specified in the immediately preceding sentence, the exact number of directors shall be determined from time to time by the Board of Directors; provided, however, that in no case will a decrease in the number of authorized directors constituting the Whole Board (as defined below) have the effect of removing or shortening the term of any incumbent director.

(b)     Except as provided in Section 3.6 of these bylaws and the Stockholders Agreement of the Corporation, dated as of [●], 2017 (as amended, modified or supplemented from time to time, the "***Stockholders Agreement***"), a plurality of the votes cast at any annual meeting of stockholders of the Corporation or any special meeting of the stockholders of the Corporation properly called for the purpose of electing directors shall elect directors of the Corporation.   Except as otherwise set forth in the instrument of designation of any class or series of preferred stock of the Corporation, no stockholder of the Corporation shall be entitled to cumulate votes on behalf of any candidate at any election of directors of the Corporation.

(c)     All elections of directors of the Corporation shall be by written ballot, unless otherwise provided in the Certificate of Incorporation or authorized by the Board of Directors from time to time.   If authorized by the Board of Directors, such requirement of a written ballot shall be satisfied by a ballot submitted by electronic transmission; provided, however, that any such electronic transmission must be either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized.

**Section 3.3**     **Classes of Directors and Term of Office.**   The Board of Directors shall be divided into three classes, designated Class I, Class II and Class III, and the term of office of directors of one class shall expire at each annual meeting of stockholders of the Corporation, and in all cases as to each director until his or her successor shall be duly elected and qualified or until his or her earlier resignation, removal from office, death or incapacity.   Upon the

effectiveness of these bylaws (the "**_Effective Time_**"), the Board of Directors, in accordance with the Stockholders Agreement, shall assign all members of the Board of Directors then in office to a class, and the director(s) assigned to Class I shall hold office for a term expiring at the first regularly scheduled annual meeting of stockholders of the Corporation following the Effective Time, the director(s) assigned to Class II shall hold office for a term expiring at the second regularly scheduled annual meeting of stockholders of the Corporation following the Effective Time, and the director(s) assigned to Class III shall hold office for a term expiring at the third regularly scheduled annual meeting of stockholders of the Corporation following the Effective Time.  At each succeeding annual meeting of stockholders of the Corporation, a number of directors equal to the number of directors of the class whose term expires at the time of such meeting (or, if less, the number of directors properly nominated and qualified for election) shall be elected to hold office until the third succeeding annual meeting of stockholders of the Corporation after their election.

**Section 3.4    Removal.**  Except as provided in the Stockholders Agreement and subject to the rights, if any, of the holders of shares of any class or series of preferred stock of the Corporation then outstanding to remove directors as set forth in the instrument of designation of such preferred stock applicable thereto, any director or the entire Board of Directors may be removed from office, with or without cause, upon the affirmative vote of the holders of a majority of the total voting power of all the shares of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

**Section 3.5    Resignation.**  Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation.  Any resignation shall take effect at the time specified therein or, if the time when it shall become effective is not specified therein, immediately upon receipt.  Unless otherwise specified therein, the acceptance of any such resignation shall not be necessary to make it effective.

**Section 3.6    Vacancies and Newly Created Directorships.**  Except as provided in the Stockholders Agreement and subject to the rights, if any, of the holders of shares of any class or series of preferred stock of the Corporation then outstanding to designate a director to fill a vacancy as set forth in the instrument of designation of such preferred stock applicable thereto, any vacancy on the Board of Directors resulting from any death, resignation, retirement, disqualification, removal from office, or newly created directorship resulting from any increase in the authorized number of directors or otherwise shall be filled only by the Board of Directors, acting by a majority of the remaining directors then in office, even if less than a quorum, or by a sole remaining director and not by the stockholders.  Except as provided in the Stockholders Agreement, a director elected to fill a vacancy shall hold office for a term expiring at the annual meeting of stockholders at which the term of office of the class to which such director has been appointed expires and until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal.  If there are no directors in office, then an election of directors shall be held in the manner provided by applicable law.

**Section 3.7    [Chairman of the Board of Directors.**  The Chairman of the Board of Directors shall be chosen from among the directors by a majority vote of the Whole Board (as defined below).  Any director elected as Chairman in accordance with this Section 3.7 shall hold such office until such director's earlier death, resignation, retirement, disqualification or removal

from office or the election of any successor by the Board of Directors from time to time. The Chairman of the Board of Directors shall preside at all meetings of the stockholders of the Corporation and shall have such other powers and perform such other duties (including, without limitation, as applicable, as an officer of the Corporation) as may be prescribed by the Board of Directors or provided in these bylaws.]

Section 3.8    **Meetings.**    Meetings of the Board of Directors may be held at such dates, times and places (if any) and/or by means of remote communication (if any) as shall be determined from time to time by the Board of Directors or as may be specified in a notice regarding a meeting of the Board of Directors. Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors, the Chief Executive Officer or President of the Corporation, or not less than a majority of the members of the Board of Directors and shall be called by the President or the Secretary if directed by the Chairman of the Board of Directors, the Chief Executive Officer or President of the Corporation or not less than a majority of the members of the Board of Directors.

Section 3.9    **Conduct of Meetings.**

(a)    Meetings of the Board of Directors shall be presided over by the chairman of the meeting, who shall be the Chairman of the Board of Directors or, in the discretion of the Board of Directors, such director as a majority of the directors present at such meeting shall appoint.

(b)    The Board of Directors shall be entitled to make such rules or regulations for the conduct of meetings of the Board of Directors as it shall deem necessary, appropriate or convenient.

Section 3.10    **Notice.**

(a)    Unless the Certificate of Incorporation provides otherwise, (i) regular meetings of the Board of Directors may be held without notice of the date, time, place or purpose of the meeting at any date, time and place (if any) and/or means of remote communication (if any), as shall from time to time be determined by the Board of Directors, and (ii) unless waived by each of the directors entitled to notice thereof, special meetings of the Board of Directors shall be preceded by at least twenty-four (24) hours' notice of the date, time and place (if any) and/or means of remote communication (if any). Any notice of a special or regular meeting of the Board of Directors shall be given to each director orally (either in person or by telephone), in writing (either by hand delivery, mail, courier or facsimile), or by electronic or other means of remote communication, in each case, directed to each director at that director's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the Corporation's records. Any oral notice may be communicated either to the director or to a person at the office of the director who the person giving notice has reason to believe will promptly communicate such notice to the director. If the notice is: (i) delivered personally by hand, by courier, or orally by telephone or otherwise, (ii) sent by facsimile or (iii) sent by electronic mail, it shall be delivered or sent at least twenty-four (24) hours before the time of the holding of the meeting. If the notice is sent by United States mail or courier service, it shall be

deposited in the United States mail or with the courier at least three (3) business days before the time of the holding of the meeting.

(b)    Whenever notice is required to be given under any provisions of the DGCL, the Certificate of Incorporation or these bylaws, a written waiver thereof, signed by the director entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice. Neither the business to be transacted at, nor the purpose of, any meeting of the Board of Directors or committee thereof need be specified in any waiver of notice of such meeting.

(c)    Attendance of a director at a meeting of the Board of Directors shall constitute a waiver of notice of such meeting, except when the director attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened. Such director shall be conclusively presumed to have assented to any action taken at any such meeting unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary immediately after the adjournment of the meeting. Such right to dissent shall not apply to any member who voted in favor of such action. Participation by means of remote communication, including, without limitation, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can adequately communicate with each other, shall constitute attendance in person at the meeting.

**Section 3.11    Quorum and Adjournment.**    Subject to Section 3.6, a majority of the Whole Board (as defined below) shall constitute a quorum for the transaction of business at all meetings of the Board of Directors, except as otherwise provided by applicable law or by the Certificate of Incorporation or these bylaws. If a quorum is not present, the Chairman of the Board of Directors or a majority of the directors present at the meeting may adjourn the meeting without further notice to another date, time and place (if any) and/or means of remote communications (if any). When a quorum is once present to commence a meeting of the Board of Directors, it is not broken by the subsequent withdrawal of any directors. At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called. As used in these bylaws, the term "*Whole Board*" shall mean the total number of authorized directors whether or not there exists any vacancies in previously authorized directorships.

**Section 3.12    Vote Required.**    Subject to the Certificate of Incorporation, the Stockholders Agreement, these bylaws, the DGCL and the rights, if any, of those directors who may be elected by the holders of any class or series of preferred stock of the Corporation as set forth in the instrument of designation of such preferred stock, the act by affirmative vote of a majority of the directors present at a meeting of the Board of Directors at which there is a quorum shall be an act of the Board of Directors.

**Section 3.13    Minutes.**    The Secretary shall act as secretary of all meetings of the Board of Directors but in the absence of the secretary, the Chairman of the Board of Directors may appoint any other person present to act as secretary of the meeting. The secretary of the meeting

- 16 -

shall keep the minutes thereof.  Minutes of any regular or special meeting of the Board of Directors shall be prepared and distributed to each director.

**Section 3.14  Board Action by Written Consent Without a Meeting.**  Unless otherwise restricted by the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if all members of the Board of Directors, or such committee, consent thereto in writing or by electronic transmission, and the writing(s) or electronic transmission(s) reasonably describe the action taken and are filed with the minutes of proceedings of the Board of Directors.

**Section 3.15  Committees.**

(a)  The Board of Directors may by resolution create one or more committees (and thereafter, by resolution, dissolve any such committee).  Each such committee shall consist of one or more of the directors of the Corporation who serve at the pleasure of the Board of Directors.  Committee members may be removed, with or without cause, at any time by resolution of the Board of Directors and may resign from a committee at any time upon written notice to the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee to replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

(b)  Any such committee, to the extent provided in these bylaws or in a resolution of the Board of Directors establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it, to the extent permitted under applicable law.  Any duly authorized action and otherwise proper action of a committee of the Board of Directors shall be deemed an action of the Board of Directors for purposes of these bylaws unless the context of these bylaws shall expressly state otherwise.

(c)  Each committee of the Board of Directors shall keep minutes of its meetings and shall report its proceedings to the Board of Directors when requested or required by the Board of Directors.

(d)  Meetings and actions of committees of the Board of Directors shall be governed by, and held and taken in accordance with, the provisions of Section 3.8, Section 3.9, Section 3.10, Section 3.11, Section 3.12 and Section 3.14 of these bylaws, with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board of Directors and its directors and, if there shall be a chairman of the committee, the Chairman of the Board of Directors for the chairman of the committee; provided, however, that: (i) the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee; (ii) special meetings of committees may also be called by resolution of the Board of Directors; and (iii) notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all

meetings of the committee.  The Board of Directors may adopt other rules for the government of any committee not inconsistent with the provisions of these bylaws.  Each committee of the Board of Directors may fix its own other rules of procedure not inconsistent with the provisions of these bylaws or the rules of such committee adopted by the Board of Directors and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board of Directors designating such committee or as provided in these bylaws.

**Section 3.16**   **Compensation.**   The Board of Directors, irrespective of any personal interest of any of its members, may establish reasonable compensation of all directors for services to the Corporation as directors, officers, or otherwise, or may delegate such authority to an appropriate committee.   Such compensation may be comprised of cash, property, stock, options to acquire stock, or such other assets, benefits or consideration as such directors shall deem, in the exercise of their sole discretion, to be reasonable and appropriate under the circumstances.   The Board of Directors also shall have authority to provide for or delegate an authority to an appropriate committee to provide for reasonable pensions, disability or death benefits, and other benefits or payments, to directors, officers, and employees and to their families, dependents, estates, or beneficiaries on account of prior services rendered to the Corporation by such directors, officers, and employees.

**Section 3.17**   **Corporate Governance.**   Without otherwise limiting the powers of the Board of Directors set forth in this Article III, if shares of capital stock of the Corporation are listed for trading on either the Nasdaq Stock Market ("***NASDAQ***") or the New York Stock Exchange ("***NYSE***"), the Corporation shall comply with the corporate governance rules and requirements of the NASDAQ or the NYSE, as applicable.

### OFFICERS

**Section 4.1**   **Officers.**   The officers of the Corporation shall be [a Chief Executive Officer, a Chief Financial Officer, one or more Presidents (at the discretion of the Board of Directors), a Treasurer, and a Secretary].   The Corporation may also have, at the discretion of the Board of Directors, one or more Vice Presidents, one or more Assistant Treasurers, one or more Assistant Secretaries, a Controller, and any such other officers as may be appointed from time to time in accordance with the provisions of these bylaws.   In addition, the Chairman of the Board of Directors shall exercise powers and perform such other duties as an officer of the Corporation as may be prescribed by the Board of Directors.   Any number of offices may be held by the same person.   In its discretion, the Board of Directors may choose not to fill any office for any period as it may deem advisable, except as required by applicable law.   The officers of the Corporation need not be stockholders of the Corporation nor, other than the Chairman of the Board of Directors, directors of the Corporation.

**Section 4.2**   **Election of Officers.**   The Board of Directors shall elect the officers of the Corporation, except such officers as may be elected in accordance with the provisions of Section 4.3 of these bylaws, and subject to the rights, if any, of an officer under any employment contract.   Each officer shall hold office until his or her successor is elected and qualified or until his or her earlier death, resignation or removal.   A failure to elect officers shall not dissolve or otherwise affect the Corporation.   Vacancies may be filled or new offices created and filled by the Board of Directors.

- 18 -

**Section 4.3**    **Appointment of Subordinate Officers.**    The Board of Directors may appoint, or empower the Chief Executive Officer and/or one or more Presidents of the Corporation to appoint, such other officers and agents as the business of the Corporation may require.  Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board of Directors may from time to time determine.

**Section 4.4**    **Removal and Resignation.**

(a)    Notwithstanding the provisions of any employment agreement, any officer of the Corporation may be removed at any time (i) by the majority vote of the Whole Board, with or without cause, and (ii) by any other officer of the Corporation upon whom the Board of Directors has expressly conferred the authority to remove another officer, in such case on the terms and subject to the conditions upon which such authority was conferred upon such officer.  No elected officer shall have any contractual rights against the Corporation for compensation by virtue of such election beyond the date of the election of his successor, his death, his resignation or his removal from office, whichever event shall first occur, except as otherwise provided in an employment contract or under an employee deferred compensation plan or as otherwise required by applicable law.

(b)    Any officer may resign at any time by giving written or electronic notice to the Corporation.  Any resignation shall take effect at the time specified therein or, if the time when it shall become effective is not specified therein, immediately upon receipt.  Unless otherwise specified therein, the acceptance of any such resignation shall not be necessary to make it effective.

**Section 4.5**    **Vacancies.**    Any vacancy occurring in any office because of death, resignation, retirement, disqualification, removal from office or otherwise may be filled as provided in Section 4.2 and/or Section 4.3 of these bylaws.

**Section 4.6**    **Chief Executive Officer.**  Subject to the powers of the Board of Directors, the Chief Executive Officer shall be responsible for the general management of the business, affairs and property of the Corporation and control over its officers, agents and employees, and shall see that all orders and resolutions of the Board of Directors are carried into effect.  The Chief Executive Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or these bylaws.

**Section 4.7**    **Chief Financial Officer.**  Subject to the powers of the Board of Directors, the Chief Financial Officer shall have the responsibility for the financial affairs of the Corporation and shall exercise supervisory responsibility for the performance of the duties of the Treasurer and the Controller, if any, of the Corporation. If there is no Controller, the Chief Financial Officer shall keep full and accurate account of receipts and disbursements in the books of the Corporation and render to the Board of Directors, the Chairman of the Board, or the President, whenever requested, an account of all his transactions as Chief Financial Officer and of the financial condition of the Corporation.  The Chief Financial Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors or these bylaws.

Section 4.8    **President.**  The President(s) of the Corporation, subject to the powers of the Board of Directors and the Chief Executive Officer, shall act in general executive capacity, subject to the supervision and control of the Board of Directors.  The President(s) shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer or these bylaws.

Section 4.9    **Vice President.**  The Vice President(s) shall have such powers and perform such duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the President(s) or these bylaws.

Section 4.10    **Treasurer.**  The Treasurer shall: (i) have the custody of the corporate funds and securities; (ii) keep full and accurate accounts of receipts and disbursements of the Corporation in books belonging to the Corporation; (iii) cause all monies and other valuable effects of the Corporation to be deposited in the name and to the credit of the Corporation in such banks as may be authorized by the Board of Directors; and (iv) cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements.  The Treasurer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the Chief Financial Officer or these bylaws.

Section 4.11    **Secretary.**  The Secretary shall attend all meetings of the Board of Directors and of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose.  The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors and, when appropriate, shall cause the corporate seal to be affixed to any instruments executed on behalf of the Corporation.  The Secretary shall also perform all duties incident to the office of Secretary and such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the President(s) or these bylaws.

Section 4.12    **Assistant Treasurers.**  The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors, shall, in the absence or disability of the Treasurer, perform the duties and functions, exercise the powers and be subject to all of the restrictions of the Treasurer.  The Assistant Treasurer(s) shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Financial Officer, the Treasurer or these bylaws.

Section 4.13    **Assistant Secretaries.**  The Assistant Secretary, or if there shall be more than one, the Assistant Secretaries in the order determined by the Board of Directors, shall, in the absence or disability of the Secretary, perform the duties and functions, exercise the powers and be subject to all of the restrictions of the Secretary.  The Assistant Secretary(ies) shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the Secretary or these bylaws.

Section 4.14    **Controller.**  The Controller, if any, shall keep full and accurate account of receipts and disbursements in the books of the Corporation and render to the Board of Directors, the Chairman of the Board, the President or Chief Financial Officer, whenever requested, an account of all his transactions as Controller and of the financial condition of the Corporation.

The Controller shall also perform all duties incident to the office of Controller and such other duties as may be assigned to him by the Board of Directors, the Chairman of the Board, the Chief Financial Officer or these bylaws.

**Section 4.15    Delegation of Duties.**  In the absence, disability or refusal of any officer of the Corporation to exercise and perform his or her duties, the Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

## ARTICLE V
## STOCK

**Section 5.1    Stock Certificates.**  The shares of capital stock of the Corporation shall be represented by certificates; provided, however, that the Board of Directors may provide by resolution that shares of some or all of any or all classes or series of stock of the Corporation shall be uncertificated and shall not be represented by certificates.  Any such resolution by the Board of Directors shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.  Certificates representing shares of capital stock of the Corporation shall be issued in such form as may be approved by the Board of Directors and shall be signed by two authorized officers of the Corporation.  The name of the person or entity to whom the shares are issued, with the number of shares and date of issue, shall be entered on the books of the Corporation.

**Section 5.2    Electronic Signatures.**  Any and all of the signatures on a certificate representing shares of capital stock of the Corporation may be electronic.  In case any officer, transfer agent or registrar who has signed or whose electronic signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

**Section 5.3    Special Designations of Shares.**  If the Corporation is authorized to issue more than one class of stock or more than one series of any class, (a) to the extent the shares are represented by certificates, the powers, designations, preferences, and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock; provided, however, that, except as otherwise required by applicable law (including, without limitation, Section 202 of the DGCL), in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences, and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights; and (b) to the extent the shares are uncertificated, within a reasonable time after the issuance or transfer of uncertificated shares, the Corporation shall send or cause to be sent to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to applicable provisions in the DGCL or a statement that the Corporation

will furnish without charge to each stockholder who so requests the powers, designations, preferences, and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

**Section 5.4   Transfers of Stock.**

(a)   Shares of capital stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney or legal representative duly authorized in writing and, if the shares are represented by certificates, upon surrender to the Corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  For shares of the Corporation's capital stock represented by certificates, it shall be the duty of the Corporation to issue a new certificate to the person or entity entitled thereto, cancel the old certificate or certificates and record the transaction on its books.  No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

(b)   The Board of Directors shall have the power and authority to make such other rules and regulations as it may deem necessary or proper concerning the issue, transfer and registration of certificates for shares of capital stock of the Corporation.

(c)   The Board of Directors shall have the authority to appoint one or more banks or trust companies organized under the laws of the United States or any state thereof to act as its transfer agent or agents or registrar or registrars, or both, in connection with the transfer or registration of any class or series of securities of the Corporation, and may require stock certificates to be countersigned or registered by one or more of such transfer agents and/or registrars.

(d)   The Corporation shall have the authority to enter into and perform any agreement with any number of stockholders of the Corporation of any one or more classes or series of capital stock of the Corporation to restrict the transfer of shares of capital stock of the Corporation of any one or more classes or series owned by such stockholders in any manner permitted by the DGCL.

**Section 5.5   Lost, Stolen or Destroyed Certificates.**  The Board of Directors may direct a new certificate or certificates representing one or more shares of capital stock of the Corporation or uncertificated shares to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person or entity claiming the certificate of stock to be lost, stolen or destroyed or may otherwise require production of such evidence of such loss, theft or destruction as the Board of Directors may in its discretion require.  Without limiting the generality of the foregoing, when authorizing such issue of a new certificate or certificates or such uncertificated shares, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or such owner's duly authorized attorney or legal representative, to give the

Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

**Section 5.6      Dividend Record Date.**  In order that the Corporation may determine the stockholders of the Corporation entitled to receive payment of any dividend or other distribution or allotment of any rights, or the stockholders entitled to exercise any rights of change, conversion or exchange of stock, or for the purposes of any other lawful action, the Board of Directors may fix a record date, which record date shall be determined in the manner set forth in Section 2.13 of these bylaws.

**Section 5.7      Registered Stockholders.**  The Corporation shall be entitled to recognize the exclusive right of a person or entity registered on its books as the owner of shares of capital stock of the Corporation to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner of such shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person or entity, whether or not it shall have express or other notice thereof, except as otherwise required by applicable law.

**ARTICLE VI**
**INDEMNIFICATION**

The Corporation shall indemnify any Indemnitee (as defined in the Certificate of Incorporation) as set forth in the Certificate of Incorporation.

**ARTICLE VII**
**GENERAL PROVISIONS**

**Section 7.1      Reliance on Books and Records.**  Each director of the Corporation, each member of any committee of the Board of Directors and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or documents presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person or entity as to matters which such director or committee member reasonably believes are within such other person's or entity's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

**Section 7.2      Dividends.**  Dividends upon the capital stock of the Corporation, subject to the requirements of the DGCL and the provisions of the Certificate of Incorporation, may be declared by the Board of Directors from time to time at any regular or special meeting of the Board of Directors and may be paid in cash, in property or in shares of the capital stock, or in any combination thereof.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for purchasing any of the shares of capital stock, warrants, rights, options, bonds, debentures, notes, scrip or other securities or evidences of indebtedness of the

Corporation, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for any other proper purpose.  The Board of Directors may modify or abolish any such reserve in the manner in which it was created.

**Section 7.3** **Corporate Funds; Checks, Drafts or Orders; Deposits.**  The funds of the Corporation shall be kept in such depositories as shall from time to time be prescribed by the Board of Directors.  All checks, drafts or other orders for the payment of money by or to the Corporation and all notes and other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer, officers, agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors from time to time.  All funds of the Corporation shall be deposited to the credit of the Corporation under such conditions and in such banks, trust companies or other depositories as the Board of Directors may designate or as may be designated by an officer or officers or agent or agents of the Corporation to whom such power may, from time to time, be determined by the Board of Directors.

**Section 7.4** **Execution of Contracts and Other Instruments.**  The Board of Directors, except as otherwise required by applicable law, may authorize from time to time any officer or agent of the Corporation to enter into any contract or to execute and deliver any other instrument in the name of and on behalf of the Corporation.  Such authority may be general or confined to specific instances.  No officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for damages, whether monetary or otherwise, for any purpose or for any amount except as specifically authorized in these bylaws or by the Board of Directors or an officer or committee with the power to grant such authority.

**Section 7.5** **Signatures.**  In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these bylaws, facsimile or electronic signatures of any director or officer of the Corporation may be used whenever the signature of a director or officer of the Corporation shall be required, except as otherwise required by applicable law or as directed by the Board of Directors from time to time.

**Section 7.6** **Fiscal Year.**  The fiscal year of the Corporation shall be fixed, and once fixed, may thereafter be changed from time to time, by the Board of Directors.

**Section 7.7** **Corporate Seal.**  The Board of Directors may provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the Corporation, the year of its incorporation and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

**Section 7.8** **Voting Securities Owned By the Corporation.**  Powers of attorney, proxies, waivers of notice of meeting, consents, and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chief Executive Officer, the President, Treasurer or Secretary, any Vice President, Assistant Treasurer or Assistant Secretary, or any other officer of the Corporation authorized to do so by the Board of Directors.  Any such officer may, in the name of and on behalf of the Corporation,

take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation or other entity in which the Corporation may own securities, and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have possessed and exercised if present.

**Section 7.9    Section Headings.**  Section headings in these bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

**Section 7.10    Inconsistent Provisions.**  In the event that any provision of these bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL, or any other applicable law, the provision of these bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

## ARTICLE VIII
## AMENDMENTS

**Section 8.1    Amendments.**    Subject to the power of the stockholders of the Corporation to adopt, amend or repeal any of these bylaws, these bylaws may be amended, modified or repealed, and new bylaws may be adopted at any time by the affirmative vote of a majority of the Whole Board.  Notwithstanding any other provision of these bylaws or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any series of preferred stock of the Corporation required by applicable law, by the Certificate of Incorporation or by any instrument designating any class or series of preferred stock of the Corporation, the affirmative vote of the holders of a majority of the total voting power of the shares of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders of the Corporation to alter, amend or repeal, or adopt any provision inconsistent with, the provisions of these bylaws.

*    *    *    *

## **EXHIBIT A-2 (a)**

**Comparison of Amended and Restated Bylaws of [Giraffe New Holding Co., Inc.]**

**Milbank Draft**
**8/~~17~~31/17**

## AMENDED AND RESTATED BYLAWS
### OF
### [GIRAFFE NEW HOLDING CO., INC.]
**(a Delaware corporation, hereinafter called the "*Corporation*")**

**Effective as of [●], 2017**

## ARTICLE I
## OFFICES AND RECORDS

**Section 1.1    Registered Office.**    The registered office of the Corporation, and the registered agent of the Corporation at such address, shall initially be as fixed in the Corporation's amended and restated certificate of incorporation (as may be further amended and/or restated from time to time, the "***Certificate of Incorporation***").    The registered office or registered agent of the Corporation may thereafter be changed from time to time by action of the board of directors of the Corporation (the "***Board of Directors***").

**Section 1.2    Other Offices.**    The Corporation may also have offices at such other places, both within and without the State of Delaware, as the Board of Directors may from time to time determine or the business of the Corporation may require.

**Section 1.3    Books and Records.**

(a)    The books and records of the Corporation may be kept outside the State of Delaware at such place or places as may from time to time be designated by the Board of Directors.

(b)    The Corporation shall, either at its principal executive office or at such place or places as designated by the Board of Directors, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each such stockholder, a copy of these bylaws, as may be amended to date, minute books, accounting books and other records.

(c)    Any such records maintained by the Corporation may be kept on, or by means of, or be in the form of, any information storage device or method, underlined provided that the records so kept can be converted into clearly legible paper form within a reasonable time.    When records are kept in such manner, a clearly legible paper form produced from or by means of the information storage device or method shall be admissible in evidence, and accepted for all other purposes, to the same extent as an original paper form accurately portrays the record.    The Corporation shall so convert any records so kept upon the request of any person or entity entitled to inspect such records pursuant to the provisions of the Certificate of Incorporation, these bylaws or applicable law.

# ARTICLE II
## STOCKHOLDERS

**Section 2.1    Place of Meetings.**  Meetings of stockholders of the Corporation shall be held at any place, if any, either within or without the State of Delaware, as may be designated from time to time by the Board of Directors.  The Board of Directors may, in its sole discretion, determine that a meeting of stockholders of the Corporation shall not be held at any place, but may instead be held solely by means of remote communication.  In the absence of notice to the contrary, meetings of the stockholders of the Corporation shall be held at the principal executive office of the Corporation.

**Section 2.2    Annual Meeting.**   The annual meeting of the stockholders of the Corporation shall be held on such date and at such place, if any, and/or by the means of remote communication, and time as may be fixed by resolution of the Board of Directors from time to time.  At the annual meeting of the stockholders of the Corporation, directors shall be elected and any other business may be transacted which is properly brought before the annual meeting in accordance with the procedures set forth in Section 2.14 of these bylaws.  Failure to hold any annual meeting as aforesaid shall not constitute, be deemed to be or otherwise effect a forfeiture or dissolution of the Corporation nor shall such failure affect otherwise valid corporate acts.

**Section 2.3    Special Meetings.**  Except as otherwise required by applicable law or provided in the instrument of designation of any series of preferred stock of the Corporation, special meetings of stockholders of the Corporation may be called at any time and from time to time only upon the written request (stating the purpose or purposes of the meeting) of (a) **any two or more members of** the Board of Directors, (b) [the Chairman of the Board of Directors], or (c) the holders of a majority of the total voting power of all the shares of capital stock of the Corporation entitled to vote generally in the election of directors.  Special meetings of the stockholders of the Corporation may not be called by any person, group or entity other than those specifically enumerated in this Section 2.3.  The Board of Directors or the Chairman of the Board of Directors shall determine the date, time, and place, if any, and/or means of remote communication, of any special meeting, which shall be stated in a notice of meeting delivered by the Board of Directors.  Advance notice of stockholder nominations for the election of directors and of business to be brought by stockholders of the Corporation before any meeting of the stockholders of the Corporation, or any class or series of thereof, shall be given in the manner provided in these bylaws.   No business may be transacted at any special meeting of the stockholders of the Corporation other than the business specified in the notice of such meeting.

**Section 2.4    Chairman of the Meeting; Conduct of Meetings; Inspection of Elections.**

(a)    Meetings of stockholders of the Corporation shall be presided over by the chairman of the meeting, who shall be the Chairman of the Board of Directors or, in the absence thereof, such person as the Chairman of the Board of Directors shall appoint, or, in the absence thereof or in the event that the Chairman of the Board of Directors shall fail to make such appointment, any officer of the Corporation appointed by the Board of Directors.

(b)    The secretary of any meeting of the stockholders of the Corporation shall be the Secretary or Assistant Secretary, or in the absence thereof, such person as the chairman of the meeting appoints.  The secretary of the meeting shall keep the minutes thereof.

(c)    The Board of Directors shall be entitled to make such rules or regulations for the conduct of meetings of stockholders of the Corporation as it shall deem necessary, appropriate or convenient from time to time.  Subject to such rules and regulations, if any, the chairman of the meeting shall have the right and authority to convene and (for any or no reason) to recess and/or adjourn the meeting, to prescribe such rules, regulations and procedures and to do all acts as, in the judgment of such chairman, are necessary, appropriate or convenient (and not inconsistent with the Certificate of Incorporation or these bylaws) for the proper conduct of the meeting, including, without limitation, establishing an agenda of business of the meeting, recognizing stockholders entitled to speak, calling for the necessary reports, stating questions and putting them to a vote, calling for nominations, announcing the results of voting, establishing rules or regulations to maintain order, imposing restrictions on entry to the meeting after the time fixed for commencement thereof and the fixing of the date and time of the opening and closing of the polls for each matter upon which the stockholders of the Corporation will vote at a meeting (and shall announce such at the meeting).

(d)    If required by applicable law, the Board of Directors shall appoint one or more inspectors, which inspector or inspectors may include individuals who serve the Corporation in other capacities, including, without limitation, as officers, employees, agents or representatives, to act at a meeting of stockholders of the Corporation and make a written report thereof.  One or more persons may be designated as alternate inspectors to replace any inspector who fails to act.  If no inspector or alternate has been appointed to act or is able to act at a meeting of stockholders of the Corporation, the chairman of the meeting shall appoint one or more inspectors to act at the meeting.  Each inspector, before discharging his or her duties, shall take an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability.  The inspectors shall have such other duties as may be prescribed by applicable law.

**Section 2.5    Notice.**

(a)    Whenever stockholders of the Corporation are required or permitted to take any action at a meeting (whether special or annual), written notice (unless oral notice is reasonable under the circumstances) stating the place (if any), date, and time of the meeting, the means of remote communication (if any) by which such stockholders and proxy holders may be deemed to be present in person and vote at such meeting, the record date for determining the stockholders of the Corporation entitled to vote at the meeting (if such date is different from the record date for stockholders of the Corporation entitled to notice of the meeting) and, in the case of special meetings, the purpose or purposes of such meeting, shall be given to each stockholder of the Corporation entitled to vote at such meeting not fewer than ten (10) nor more than sixty (60) days before the date of the meeting except as otherwise required by applicable law, the Certificate of Incorporation or these bylaws.  In the case of an annual meeting, the notice need not state the purpose or purposes of the meeting unless the Certificate of Incorporation or the General Corporation Law of the State of Delaware (as the same exists or may hereafter be

- 3 -

amended from time to time, the "***DGCL***") requires the purpose or purposes to be stated in the notice of the meeting.

(b)    All such notices shall be delivered in writing (unless oral notice is reasonable under the circumstances) or by a form of electronic transmission if receipt thereof has been consented to by the stockholder of the Corporation to whom the notice is given.  If mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to such stockholder at such stockholder's address as it appears on the records of the Corporation.  If given by facsimile telecommunication, such notice shall be deemed to be delivered when directed to a number at which such stockholder has consented to receive notice by facsimile.  Subject to the limitations of Section 2.6 of these bylaws, if given by electronic transmission, such notice shall be deemed to be delivered: (i) by electronic mail, when directed to an electronic mail address at which such stockholder has consented to receive notice; (ii) if by a posting on an electronic network together with separate written notice to such stockholder of such specific posting delivered by electronic mail or by United States mail, postage prepaid, addressed to such stockholder at such stockholder's address as it appears on the records of the Corporation, upon the later of (x) such posting and (y) the giving of such separate notice; and (iii) if by any other form of electronic transmission, when directed to such stockholder.  An affidavit of the Secretary or an Assistant Secretary, the transfer agent of the Corporation or any other agent of the Corporation that the notice has been given shall, in the absence of fraud, be *prima facie* evidence of the facts stated therein.

(c)    Whenever notice is required to be given under any provision of the DGCL, the Certificate of Incorporation or these bylaws, a written waiver thereof, signed by the stockholder of the Corporation entitled to notice, or a written waiver by electronic transmission by the person or entity entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Neither the business to be transacted at, nor the purpose of, any meeting of the stockholders of the Corporation need be specified in any waiver of notice of such meeting.

(d)    Attendance of a stockholder of the Corporation at a meeting of the stockholders of the Corporation shall constitute a waiver of notice of such meeting, except when such stockholder attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.

(e)    Whenever notice is required to be given under the DGCL, the Certificate of Incorporation or these bylaws to any stockholder of the Corporation with whom communication is unlawful, the giving of such notice to such stockholder shall not be required, and there shall be no duty to apply to any governmental authority or agency for a license or permit to give such notice to such stockholder.  Any action or meeting which shall be taken or held without notice to any such stockholder with whom communication is unlawful shall have the same force and effect as if such notice had been duly given.

**Section 2.6    Notice by Electronic Delivery.**  Without limiting the manner by which notice otherwise may be given effectively to stockholders of the Corporation pursuant to the DGCL, the Certificate of Incorporation or these bylaws, any notice to stockholders of the Corporation given by the Corporation under any provision of the DGCL, the Certificate of

- 4 -

Incorporation or these bylaws shall be effective if given by a form of electronic transmission consented to by the stockholder of the Corporation to whom the notice is given. Any such consent shall be revocable by such stockholder by written notice to the Secretary. Any such consent shall be deemed revoked if: (i) the Corporation is unable to deliver by electronic transmission two (2) consecutive notices of meetings or of other business given by the Corporation in accordance with such consent; and (ii) such inability becomes known to the Secretary or an Assistant Secretary or to the transfer agent or other person responsible for the giving of notice. However, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action. For purposes of these bylaws, except as otherwise limited by applicable law, the term "*electronic transmission*" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved, and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

**Section 2.7    Stockholders List.** The officer having charge of the stock ledger of the Corporation shall make, at least ten (10) days before every meeting of the stockholders of the Corporation, a complete list of the stockholders of the Corporation entitled to vote at such meeting (provided, however, if the record date for determining the stockholders of the Corporation entitled to vote is less than ten (10) days before the date of the meeting, the list shall reflect the stockholders of the Corporation entitled to vote as of the tenth (10th) day before the meeting date), arranged in alphabetical order, showing the address of (and any form of electronic transmission consented to by) each such stockholder and the number of shares registered in the name of each such stockholder. Such list shall be open to the examination of any stockholder of the Corporation for any purpose germane to the meeting for a period of at least ten (10) days prior to the meeting: (i) on a reasonably accessible electronic network; provided that the information required to gain access to such list is provided with the notice of the meeting; and/or (ii) during ordinary business hours at the principal place of business of the Corporation. In the event that the Corporation determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the time and place of the meeting during the whole time thereof and may be examined by any stockholder of the Corporation who is present. If the meeting is to be held solely by means of remote communication, then the list shall also be open to the examination of any stockholder of the Corporation during the whole time of the meeting on a reasonably accessible electronic network, and the information required to access such list shall be provided with the notice of the meeting. Refusal or failure to prepare or make available the stockholder list shall not affect the validity of any action taken at a meeting of stockholders of the Corporation.

**Section 2.8    Quorum.** Except as otherwise provided by applicable law or by the Certificate of Incorporation, the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation entitled to vote thereat, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the stockholders of the Corporation. If a quorum is not present, the chairman of the meeting or the holders of a majority in voting power of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another place, if any, date and time. When a quorum is once present to commence

a meeting of the stockholders of the Corporation, it is not broken by the subsequent withdrawal of any stockholders of the Corporation or their respective proxies.

**Section 2.9    Adjournment and Postponement of Meetings.**

(a)    Any meeting of the stockholders of the Corporation, whether or not a quorum is present, may be adjourned to be reconvened at a specific date, time, place (if any) and/or by means of remote communication (if any) by the holders of a majority in voting power of the shares of capital stock present in person or represented by proxy at the meeting and entitled to vote at the meeting or, unless contrary to any provision of the Certificate of Incorporation, these bylaws or applicable law, the Chairman of the Board of Directors or the affirmative vote of a majority of the members of the Board of Directors.  When a meeting of the stockholders of the Corporation is adjourned to another date, time, place (if any), and/or by means of remote communication (if any), notice need not be given of the adjourned meeting if the date, time and place (if any) thereof, and/or the means of remote communication (if any) by which such stockholders and proxy holders may be deemed to be present in person and vote at such adjourned meeting, are announced at the meeting at which the adjournment is taken; provided, however, that if the adjournment is for more than thirty (30) days, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.  If after the adjournment a new record date for determination of stockholders of the Corporation entitled to vote is fixed for the adjourned meeting, the Board of Directors shall fix as the record date for determining such stockholders entitled to notice of such adjourned meeting the same or an earlier date as that fixed for determination of stockholders of the Corporation entitled to vote at the adjourned meeting, and shall give notice of the adjourned meeting to each stockholder of record as of the record date so fixed for notice of such adjourned meeting.

(b)    Any previously scheduled meeting of the stockholders of the Corporation may be postponed, and (unless contrary to applicable law or the Certificate of Incorporation) any special meeting of the stockholders of the Corporation may be cancelled, by resolution of the Board of Directors upon notice given to such stockholders prior to the date previously scheduled for such meeting of stockholders.

**Section 2.10    Vote Required.**  When a quorum is present, the affirmative vote of the majority in voting power of the shares of capital stock of the Corporation present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of the stockholders of the Corporation, unless the question is one upon which, by express provisions of applicable law, the Certificate of Incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or pursuant to any regulation applicable to the Corporation or its securities, or the instrument of designation of any series of preferred stock of the Corporation, a different or additional vote is required or provided for, in which case such express provision shall govern and control the decision of such question.  Where a separate vote by class or series is required or provided for, when a quorum is present, the affirmative vote of a majority in voting power of the shares of capital stock of the Corporation of such class or series present in person or represented by proxy at the meeting and entitled to vote on the subject matter shall be the act of such class or series of stockholders, unless the question is one upon which, by express provisions of applicable law, the Certificate of Incorporation, these bylaws, the rules or regulations of any stock exchange applicable to the Corporation, or pursuant to any regulation

- 6 -

applicable to the Corporation or its securities, or the designation of any series of preferred stock of the Corporation, a different vote is required or provided for, in which case such express provision shall govern and control the decision of such question.

Section 2.11    **Voting Rights.**    Except as otherwise provided by applicable law, each stockholder of the Corporation shall be entitled to that number of votes for each share of capital stock of the Corporation held by such stockholder as set forth in the Certificate of Incorporation or, in the case of preferred stock of the Corporation, in the instrument of designation thereof.

Section 2.12    **Proxies.**    Each stockholder of the Corporation entitled to vote at a meeting of stockholders of the Corporation may authorize another person or entity to act for such stockholder by proxy in such manner as prescribed under the DGCL, but no such proxy shall be voted or acted upon after three (3) years from its date unless such proxy expressly provides for a longer period.    At each meeting of the stockholders of the Corporation, and before any voting commences, all proxies filed at or before the meeting shall be submitted to and examined by the Secretary or a person designated by the Secretary, and no shares may be represented or voted under a proxy that has been found (in the reasonable determination of the Secretary or such designee) to be invalid or irregular.  Reference by the Secretary in the minutes of the meeting to the regularity of a proxy shall be received as *prima facie* evidence of the facts stated for the purpose of establishing the presence of a quorum at such meeting and for all other purposes.  The revocability of a proxy that states on its face that it is irrevocable shall be governed by the applicable provisions of the DGCL and, without limiting the foregoing, a duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only so long as, it is coupled with an interest sufficient in law to support an irrevocable power.  A proxy may be made irrevocable regardless of whether the interest with which it is coupled is an interest in the stock itself or an interest in the corporation generally.

Section 2.13    **Record Date.**

(a)    In order that the Corporation may determine the stockholders of the Corporation entitled to notice of any meeting of such stockholders or any adjournment thereof, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall, unless otherwise required by applicable law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting.  If the Board of Directors so fixes a date, such date shall also be the record date for determining the stockholders of the Corporation entitled to vote at such meeting unless the Board of Directors determines, at the time it fixes such record date, that a later date on or before the date of the meeting shall be the date for making such determination.  If no record date is fixed by the Board of Directors, the record date for determining stockholders of the Corporation entitled to notice of or to vote at a meeting of such stockholders shall be at the close of business on the day immediately preceding the day on which notice is given, or, if notice is waived, at the close of business on the day immediately preceding the day on which the meeting is held.  A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders of the Corporation shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for determination of such stockholders entitled to vote at the adjourned meeting, and in such case shall also fix as the record date for such stockholders entitled to notice of such adjourned

meeting the same or an earlier date as that fixed for determination of stockholders of the Corporation entitled to vote in accordance herewith at the adjourned meeting.

(b)　　In order that the Corporation may determine the stockholders of the Corporation entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not (i) precede the date upon which the resolution fixing the record date is adopted, or (ii) be more than sixty (60) days prior to such action.  If no such record date is fixed, the record date for determining stockholders of the Corporation for any such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

(c)　　Unless such action in writing without a meeting is otherwise restricted by the Certificate of Incorporation, in order that the Corporation may determine the stockholders of the Corporation entitled to express consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors.  Unless such action in writing without a meeting is otherwise restricted by the Certificate of Incorporation, if no record date for determining stockholders of the Corporation entitled to express consent to corporate action in writing without a meeting is fixed by the Board of Directors, (i) when no prior action of the Board of Directors is required by applicable law, the record date for such purpose shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation in accordance with applicable law, and (ii) if prior action by the Board of Directors is required by applicable law, the record date for such purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution taking such prior action.

### Section 2.14　Advance Notice of Stockholder Business.

(a)　　Only such business shall be conducted before a meeting of the stockholders of the Corporation as shall have been properly brought before such meeting.  To be properly brought before an annual or special meeting of the stockholders of the Corporation, from and after the date Common Stock (as defined in the Certificate of Incorporation) is listed, whether in connection with an initial public offering of the Common Stock or otherwise, on a U.S. national securities exchange registered with the Securities and Exchange Commission and any governmental body or agency succeeding to the functions thereof (a "*Public Listing*"), business must be: (i) with respect to any annual meeting, (A) specified in the notice of meeting (or any supplement or amendment thereto) given by or at the direction of the Board of Directors or a duly authorized committee of the Board of Directors; (B) otherwise properly brought before the meeting by or at the direction of the Board of Directors or a duly authorized committee of the Board of Directors; or (C) otherwise properly brought before the meeting by any stockholder of the Corporation (1) who is a stockholder of record on the date of the giving of the notice provided for in this <u>Section 2.14</u> and on the record date for the determination of stockholders of the Corporation entitled to vote at such annual meeting and (2) who complies with the notice

procedures set forth in this Section 2.14; and (ii) with respect to any special meeting, specified in the notice of meeting (or any supplement or amendment thereto) given to the stockholders of the Corporation by the Board of Directors pursuant to and in accordance with Section 2.3.  For the avoidance of doubt, the provisions in this Section 2.14 shall not apply prior to completion of a Public Listing.

(b)    For such business to be considered properly brought before the meeting by a stockholder of the Corporation, such stockholder must, in addition to any other applicable requirements, have given timely notice thereof in proper written form to the Secretary.  To be timely with respect to any annual meeting, such stockholder's notice to the Secretary must be delivered to or mailed and received by the Secretary at the principal executive office of the Corporation no fewer than ninety (90) and no more than one hundred twenty (120) days prior to the first (1st) anniversary of the immediately preceding annual meeting of the stockholders of the Corporation; provided, however, that in the event that no annual meeting was held in the previous year or the annual meeting is called for a date that is not within thirty (30) days before or after such anniversary date, notice by such stockholder to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which notice of the date of the annual meeting was mailed.  To be timely with respect to any special meeting, such stockholder's notice to the Secretary must be delivered or mailed and received by the Secretary at the principal executive office of the Corporation not less than sixty (60) days prior to the date of such meeting; provided, however, that in the event that less than seventy (70) days' notice of the date of the meeting is given to stockholders of the Corporation, to be timely such stockholder's notice must be delivered or mailed and received by the Secretary at the principal executive office of the Corporation not later than the close of business on the tenth (10th) day following the earlier of the day on which such notice is mailed by the Corporation.  In no event shall the public announcement of an adjournment or postponement of an announced meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as provided in this Section 2.14.

(c)    To be in proper written form, a stockholder's notice to the Secretary must set forth as to each matter such stockholder proposes to bring before the annual meeting: (i) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting; (ii) as to the stockholder of the Corporation giving the notice and the beneficial owner, if any, on whose behalf the proposal is made (A) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner, (B) the class or series and number of shares of capital stock of the Corporation which are directly or indirectly (including through any derivative arrangement) owned (1) beneficially and (2) of record by such stockholder and by such beneficial owner, (C) a description of all arrangements or understandings between such stockholder or such beneficial owner and any other person or entity (including, without limitation, their names) in connection with the ownership of the capital stock of the Corporation and the proposal of such business by such stockholder and such beneficial owner, and any material interest (financial or otherwise) of such stockholder or such beneficial owner in such business, (D) whether either such stockholder or beneficial owner intends to deliver a form of proxy to holders of at least the percentage of the Corporation's voting shares required under applicable law to approve the proposal and (E) if the Corporation is then subject to Section 14(a) of the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), any other information relating to such stockholder and beneficial owner,

- 9 -

if any, required to be disclosed in a proxy statement or other filing required to be made in connection with a solicitation of proxies for the proposal pursuant to and in accordance with Section 14(a) of the Exchange Act and the rules and regulations promulgated thereunder; and (iii) a representation that such stockholder is a holder of record of stock of the Corporation entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to introduce the business specified in the notice.  As used herein, shares "***beneficially owned***" by a person (and phrases of similar import) shall mean all shares which such person is deemed to beneficially own pursuant to Rules 13d-3 and 13d-5 under the Exchange Act, including, without limitation, shares which are beneficially owned, directly or indirectly, by any other person with which such person has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting or disposing of any shares of the capital stock of the Corporation.

(d)     The chairman of a meeting of the stockholders of the Corporation shall determine and declare at such meeting whether the stockholder proposal was made in accordance with the terms of this Section 2.14.  If the chairman of the meeting determines that such proposal was not properly brought before the meeting in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the proposal was not properly brought before the meeting and the business of such proposal shall not be transacted.

(e)     This provision shall not prevent the consideration and approval or disapproval at any annual or special meeting of stockholders of the Corporation of reports of officers, directors and committees of the Board of Directors, but in connection with such reports, no new business shall be acted upon at such meeting unless stated, filed and received as herein provided.

(f)     In addition, notwithstanding anything in this Section 2.14 to the contrary, a stockholder of the Corporation intending to nominate one or more persons for election as a director at an annual or special meeting of stockholders of the Corporation must comply with Section 2.15 of these bylaws for such nomination to be properly brought before such meeting.

(g)     For purposes of this Section 2.14, any adjournment(s) or postponement(s) of the original meeting whereby the meeting will reconvene within ninety (90) days from the original date shall be deemed for purposes of notice to be a continuation of the original meeting and no business may be brought before any such reconvened meeting unless pursuant to a notice of such business which was timely for the meeting and properly presented as determined as of the date originally scheduled.

**Section 2.15    Advance Notice of Director Nominations.**

(a)     Unless otherwise required by applicable law or the Certificate of Incorporation, from and after the date on which the Corporation completes a Public Listing, only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Corporation, except as may be otherwise provided in the instrument of designation of any series of preferred stock of the Corporation with respect to the right of holders of preferred stock of the Corporation to nominate and elect a specified number of directors of the Corporation, who shall be nominated as provided therein.  For the avoidance of doubt, the provisions in this Section 2.15 shall not apply prior to completion of a Public Listing.

(b)      Nominations of persons for election to the Board of Directors shall be made only at an annual or special meeting of stockholders of the Corporation called for the purpose of electing directors and must be (i) specified in the notice of meeting (or any supplement or amendment thereto) and (ii) made by (A) the Board of Directors or a duly authorized committee of the Board of Directors (or at the direction thereof) or (B) made by any stockholder of the Corporation (1) who is a stockholder of record on the date of the giving of the notice provided for in this Section 2.15 and on the record date for the determination of stockholders entitled to vote at such meeting and (2) who complies with the notice procedures set forth in this Section 2.15.

(c)      In addition to any other applicable requirements, for a nomination to be made by a stockholder of the Corporation, such stockholder must have given timely notice thereof in proper written form to the Secretary.  To be timely, such stockholder's notice to the Secretary must be delivered to or mailed and received at the principal executive office of the Corporation: (i) in the case of an annual meeting of the stockholders of the Corporation, no fewer than ninety (90) nor more than one hundred twenty (120) days prior to the first (1st) anniversary of the immediately preceding annual meeting; provided, however, that in the event that no annual meeting was held in the previous year or the annual meeting is called for a date that is not within thirty (30) days before or after such anniversary date, notice by such stockholder to be timely must be so received not later than the close of business on the tenth (10th) day following the day on which notice of the date of the annual meeting was mailed, and (ii) in the case of a special meeting of stockholders of the Corporation called for the purpose of electing directors, not less than sixty (60) days prior to the meeting; provided, however, that in the event that less than seventy (70) days' notice of the date of the meeting is given or made to stockholders of the Corporation, notice by such stockholder to be timely must be so received not later than the close of business on the tenth (10th) day following the earlier of the day on which such notice was mailed.  Notwithstanding anything to the contrary in the immediately preceding sentence, in the event that the number of directors to be elected to the Board of Directors is increased, a stockholder's notice required by this Section 2.15 shall also be considered timely, but only with respect to nominees for any new positions created by such increase and only if otherwise timely notice of nomination for all other directorships was delivered by such stockholder in accordance with the requirements of the immediately preceding sentence, if it shall be delivered to the Secretary at the principal executive office of the Corporation not later than the close of business on the tenth (10th) day following the day on which notice to the stockholders of the Corporation was given by the Corporation naming all of the nominees for director or specifying the size of the increase in the number of directors to serve on the Board of Directors, even if such tenth (10th) day shall be later than the date for which a nomination would otherwise have been required to be delivered to be timely.  In no event shall the public announcement of an adjournment or postponement of an announced meeting commence a new time period (or extend any time period) for the giving of a stockholder's notice as provided in this Section 2.15.

(d)      To be in proper written form, a stockholder's notice to the Secretary pursuant to this Section 2.15 must set forth (i) as to each person whom the stockholder of the Corporation proposes to nominate for election as a director, (A) the name, age, business address, and residence address of such person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares of capital stock of the Corporation which are directly or indirectly (including through any derivative arrangement) owned beneficially or of record by

the person, and (D) any other information relating to the person that would be required to be disclosed in a proxy statement or other filing required to be made in connection with a solicitation of proxies for an election of directors pursuant to the Exchange Act and the rules and regulations promulgated thereunder if the Corporation were a reporting company under the Exchange Act, and (ii) as to the stockholder of the Corporation giving the notice and the beneficial owner, if any, on whose behalf the director nomination is made (A) the name and address of such stockholder, as they appear on the Corporation's books, and of such beneficial owner; (B) the class or series and number of shares of capital stock of the Corporation which are owned (1) beneficially and (2) of record by such stockholder and by such beneficial owner, (C) a description of all arrangements or understandings between such stockholder or such beneficial owner and any other person or entity (including, without limitation, their names) in connection with the ownership of the capital stock of the Corporation and the nomination of such nominee(s), and any material interest of such stockholder or such beneficial owner in such nomination(s), (D) whether either such stockholder or beneficial owner intends to deliver a form of proxy to holders of the Corporation's voting shares to elect such nominee or nominees, (E) a representation that the stockholder of the Corporation giving the notice is a holder of record of stock of the Corporation entitled to vote at such meeting and that such stockholder intends to appear in person or by proxy at the meeting to nominate the persons named in its notice and (F) if the Corporation is then subject to Section 14(a) of the Exchange Act, any other information relating to such stockholder and beneficial owner, if any, required to be disclosed in a proxy statement or other filing required to be made in connection with a solicitation of proxies for an election of directors pursuant to the Exchange Act and the rules and regulations promulgated thereunder.  Such notice must be accompanied by a written consent of each proposed nominee to be named as a nominee and to serve as a director if elected.  The Corporation may require any nominee to furnish such other information (which may include meeting to discuss the information) as may reasonably be required by the Corporation to determine the eligibility of such nominee to serve as a director of the Corporation.

(e)    If the chairman of a meeting of the stockholders of the Corporation determines that a nomination was not made in accordance with the foregoing procedures, the chairman of the meeting shall declare to the meeting that the nomination was defective and such defective nomination shall be disregarded.

(f)    Nothing in this <u>Section 2.15</u> shall be deemed to affect any rights of the holders of any series of preferred stock of the Corporation to elect directors pursuant to any applicable provisions of the Certificate of Incorporation.

**Section 2.16  <u>Action Without a Meeting</u>.**  Until the date on which the Corporation completes a Public Listing, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock of the Corporation having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted and shall be delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or to an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders of the Corporation are recorded.  Following the date on

which the Corporation completes a Public Listing, any action required or permitted to be taken at any annual or special meeting of stockholders of the Corporation may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all the holders of outstanding stock of the Corporation entitled to vote thereon.

## ARTICLE III
## DIRECTORS

**Section 3.1**     **General Powers.**  All corporate powers shall be exercised by or under the authority of, and the business and affairs of the Corporation shall be managed under the direction of, the Board of Directors.  In addition to the powers and authority expressly conferred upon it by these bylaws, the Board of Directors shall exercise all such powers of the Corporation and do all such lawful acts and things as are not by applicable law or any other legal agreement among stockholders of the Corporation, by the Certificate of Incorporation, or by these bylaws directed or required to be exercised or done by the stockholders of the Corporation.

**Section 3.2**     **Number and Election.**

(a)     The total number of directors constituting the entire Board of Directors shall be not less than three (3) nor more than fifteen (15).  Subject to the limits specified in the immediately preceding sentence, the exact number of directors shall be determined from time to time by the Board of Directors; provided, however, that in no case will a decrease in the number of authorized directors constituting the Whole Board (as defined below) have the effect of removing or shortening the term of any incumbent director.

(b)     Except as provided in Section 3.6 of these bylaws and the Stockholders Agreement of the Corporation, dated as of [●], 2017 (as amended, modified or supplemented from time to time, the "***Stockholders Agreement***"), a plurality of the votes cast at any annual meeting of stockholders of the Corporation or any special meeting of the stockholders of the Corporation properly called for the purpose of electing directors shall elect directors of the Corporation.  Except as otherwise set forth in the instrument of designation of any class or series of preferred stock of the Corporation, no stockholder of the Corporation shall be entitled to cumulate votes on behalf of any candidate at any election of directors of the Corporation.

(c)     All elections of directors of the Corporation shall be by written ballot, unless otherwise provided in the Certificate of Incorporation or authorized by the Board of Directors from time to time.  If authorized by the Board of Directors, such requirement of a written ballot shall be satisfied by a ballot submitted by electronic transmission; provided, however, that any such electronic transmission must be either set forth or be submitted with information from which it can be determined that the electronic transmission was authorized.

**Section 3.3**     **Classes of Directors and Term of Office.**  The Board of Directors shall be divided into three classes, designated Class I, Class II and Class III, and the term of office of directors of one class shall expire at each annual meeting of stockholders of the Corporation, and in all cases as to each director until his or her successor shall be duly elected and qualified or until his or her earlier resignation, removal from office, death or incapacity.  Upon the

effectiveness of these bylaws (the "*Effective Time*"), the Board of Directors, in accordance with the Stockholders Agreement, shall assign all members of the Board of Directors then in office to a class, and the director(s) assigned to Class I shall hold office for a term expiring at the first regularly scheduled annual meeting of stockholders of the Corporation following the Effective Time, the director(s) assigned to Class II shall hold office for a term expiring at the second regularly scheduled annual meeting of stockholders of the Corporation following the Effective Time, and the director(s) assigned to Class III shall hold office for a term expiring at the third regularly scheduled annual meeting of stockholders of the Corporation following the Effective Time.  At each succeeding annual meeting of stockholders of the Corporation, a number of directors equal to the number of directors of the class whose term expires at the time of such meeting (or, if less, the number of directors properly nominated and qualified for election) shall be elected to hold office until the third succeeding annual meeting of stockholders of the Corporation after their election.

Section 3.4   **Removal.**  Except as provided in the Stockholders Agreement and subject to the rights, if any, of the holders of shares of any class or series of preferred stock of the Corporation then outstanding to remove directors as set forth in the instrument of designation of such preferred stock applicable thereto, any director or the entire Board of Directors may be removed from office, with or without cause, upon the affirmative vote of the holders of a majority of the total voting power of all the shares of the Corporation entitled to vote generally in the election of directors, voting together as a single class.

Section 3.5   **Resignation.**  Any director may resign at any time upon notice given in writing or by electronic transmission to the Corporation.  Any resignation shall take effect at the time specified therein or, if the time when it shall become effective is not specified therein, immediately upon receipt.  Unless otherwise specified therein, the acceptance of any such resignation shall not be necessary to make it effective.

Section 3.6   **Vacancies and Newly Created Directorships.**  Except as provided in the Stockholders Agreement and subject to the rights, if any, of the holders of shares of any class or series of preferred stock of the Corporation then outstanding to designate a director to fill a vacancy as set forth in the instrument of designation of such preferred stock applicable thereto, any vacancy on the Board of Directors resulting from any death, resignation, retirement, disqualification, removal from office, or newly created directorship resulting from any increase in the authorized number of directors or otherwise shall be filled only by the Board of Directors, acting by a majority of the remaining directors then in office, even if less than a quorum, or by a sole remaining director and not by the stockholders.  Except as provided in the Stockholders Agreement, a director elected to fill a vacancy shall hold office for a term expiring at the annual meeting of stockholders at which the term of office of the class to which such director has been appointed expires and until such director's successor shall have been duly elected and qualified or until such director's earlier death, resignation or removal.  If there are no directors in office, then an election of directors shall be held in the manner provided by applicable law.

Section 3.7   [**Chairman of the Board of Directors.**  The Chairman of the Board of Directors shall be chosen from among the directors by a majority vote of the Whole Board (as defined below).  Any director elected as Chairman in accordance with this Section 3.7 shall hold such office until such director's earlier death, resignation, retirement, disqualification or removal

from office or the election of any successor by the Board of Directors from time to time.  The Chairman of the Board of Directors shall preside at all meetings of the stockholders of the Corporation and shall have such other powers and perform such other duties (including, without limitation, as applicable, as an officer of the Corporation) as may be prescribed by the Board of Directors or provided in these bylaws.]

Section 3.8    **Meetings.**  Meetings of the Board of Directors may be held at such dates, times and places (if any) and/or by means of remote communication (if any) as shall be determined from time to time by the Board of Directors or as may be specified in a notice regarding a meeting of the Board of Directors.  Special meetings of the Board of Directors may be called by the Chairman of the Board of Directors, the Chief Executive Officer or President of the Corporation, or not less than a majority of the members of the Board of Directors and shall be called by the President or the Secretary if directed by the Chairman of the Board of Directors, the Chief Executive Officer or President of the Corporation or not less than a majority of the members of the Board of Directors.

### Section 3.9    Conduct of Meetings.

(a)    Meetings of the Board of Directors shall be presided over by the chairman of the meeting, who shall be the Chairman of the Board of Directors or, in the discretion of the Board of Directors, such director as a majority of the directors present at such meeting shall appoint.

(b)    The Board of Directors shall be entitled to make such rules or regulations for the conduct of meetings of the Board of Directors as it shall deem necessary, appropriate or convenient.

### Section 3.10   Notice.

(a)    Unless the Certificate of Incorporation provides otherwise, (i) regular meetings of the Board of Directors may be held without notice of the date, time, place or purpose of the meeting at any date, time and place (if any) and/or means of remote communication (if any), as shall from time to time be determined by the Board of Directors, and (ii) unless waived by each of the directors entitled to notice thereof, special meetings of the Board of Directors shall be preceded by at least twenty-four (24) hours' notice of the date, time and place (if any) and/or means of remote communication (if any).  Any notice of a special or regular meeting of the Board of Directors shall be given to each director orally (either in person or by telephone), in writing (either by hand delivery, mail, courier or facsimile), or by electronic or other means of remote communication, in each case, directed to each director at that director's address, telephone number, facsimile number or electronic mail address, as the case may be, as shown on the Corporation's records.  Any oral notice may be communicated either to the director or to a person at the office of the director who the person giving notice has reason to believe will promptly communicate such notice to the director.  If the notice is: (i) delivered personally by hand, by courier, or orally by telephone or otherwise, (ii) sent by facsimile or (iii) sent by electronic mail, it shall be delivered or sent at least twenty-four (24) hours before the time of the holding of the meeting.  If the notice is sent by United States mail or courier service, it shall be

deposited in the United States mail or with the courier at least three (3) business days before the time of the holding of the meeting.

(b)     Whenever notice is required to be given under any provisions of the DGCL, the Certificate of Incorporation or these bylaws, a written waiver thereof, signed by the director entitled to notice, or a waiver by electronic transmission by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to notice.  Neither the business to be transacted at, nor the purpose of, any meeting of the Board of Directors or committee thereof need be specified in any waiver of notice of such meeting.

(c)     Attendance of a director at a meeting of the Board of Directors shall constitute a waiver of notice of such meeting, except when the director attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Such director shall be conclusively presumed to have assented to any action taken at any such meeting unless his or her dissent shall be entered in the minutes of the meeting or unless his or her written dissent to such action shall be filed with the person acting as the secretary of the meeting before the adjournment thereof or shall be forwarded by registered mail to the Secretary immediately after the adjournment of the meeting.  Such right to dissent shall not apply to any member who voted in favor of such action.  Participation by means of remote communication, including, without limitation, by means of conference telephone or other communications equipment by means of which all persons participating in the meeting can adequately communicate with each other, shall constitute attendance in person at the meeting.

**Section 3.11   Quorum and Adjournment.**  Subject to Section 3.6, a majority of the Whole Board (as defined below) shall constitute a quorum for the transaction of business at all meetings of the Board of Directors, except as otherwise provided by applicable law or by the Certificate of Incorporation or these bylaws.  If a quorum is not present, the Chairman of the Board of Directors or a majority of the directors present at the meeting may adjourn the meeting without further notice to another date, time and place (if any) and/or means of remote communications (if any).  When a quorum is once present to commence a meeting of the Board of Directors, it is not broken by the subsequent withdrawal of any directors.  At any adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called.  As used in these bylaws, the term "***Whole Board***" shall mean the total number of authorized directors whether or not there exists any vacancies in previously authorized directorships.

**Section 3.12   Vote Required.**   Subject to the Certificate of Incorporation, the Stockholders Agreement, these bylaws, the DGCL and the rights, if any, of those directors who may be elected by the holders of any class or series of preferred stock of the Corporation as set forth in the instrument of designation of such preferred stock, the act by affirmative vote of a majority of the directors present at a meeting of the Board of Directors at which there is a quorum shall be an act of the Board of Directors.

**Section 3.13   Minutes.**  The Secretary shall act as secretary of all meetings of the Board of Directors but in the absence of the secretary, the Chairman of the Board of Directors may appoint any other person present to act as secretary of the meeting.  The secretary of the meeting

shall keep the minutes thereof.  Minutes of any regular or special meeting of the Board of Directors shall be prepared and distributed to each director.

**Section 3.14  Board Action by Written Consent Without a Meeting.**  Unless otherwise restricted by the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or any committee thereof, may be taken without a meeting if all members of the Board of Directors, or such committee, consent thereto in writing or by electronic transmission, and the writing(s) or electronic transmission(s) reasonably describe the action taken and are filed with the minutes of proceedings of the Board of Directors.

**Section 3.15  Committees.**

(a)   The Board of Directors may by resolution create one or more committees (and thereafter, by resolution, dissolve any such committee).  Each such committee shall consist of one or more of the directors of the Corporation who serve at the pleasure of the Board of Directors.  Committee members may be removed, with or without cause, at any time by resolution of the Board of Directors and may resign from a committee at any time upon written notice to the Corporation.  The Board of Directors may designate one or more directors as alternate members of any committee to replace any absent or disqualified member at any meeting of the committee.  In the absence or disqualification of a member of a committee, the member or members present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member.

(b)   Any such committee, to the extent provided in these bylaws or in a resolution of the Board of Directors establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it, to the extent permitted under applicable law.  Any duly authorized action and otherwise proper action of a committee of the Board of Directors shall be deemed an action of the Board of Directors for purposes of these bylaws unless the context of these bylaws shall expressly state otherwise.

(c)   Each committee of the Board of Directors shall keep minutes of its meetings and shall report its proceedings to the Board of Directors when requested or required by the Board of Directors.

(d)   Meetings and actions of committees of the Board of Directors shall be governed by, and held and taken in accordance with, the provisions of Section 3.8, Section 3.9, Section 3.10, Section 3.11, Section 3.12 and Section 3.14 of these bylaws, with such changes in the context of those bylaws as are necessary to substitute the committee and its members for the Board of Directors and its directors, and, if there shall be a chairman of the committee, the Chairman of the Board of Directors for the chairman of the committee; provided, however, that: (i) the time of regular meetings of committees may be determined either by resolution of the Board of Directors or by resolution of the committee; (ii) special meetings of committees may also be called by resolution of the Board of Directors; and (iii) notice of special meetings of committees shall also be given to all alternate members, who shall have the right to attend all

- 17 -

meetings of the committee.  The Board of Directors may adopt other rules for the government of any committee not inconsistent with the provisions of these bylaws.  Each committee of the Board of Directors may fix its own other rules of procedure not inconsistent with the provisions of these bylaws or the rules of such committee adopted by the Board of Directors and shall hold its meetings as provided by such rules, except as may otherwise be provided by a resolution of the Board of Directors designating such committee or as provided in these bylaws.

**Section 3.16  Compensation.**  The Board of Directors, irrespective of any personal interest of any of its members, may establish reasonable compensation of all directors for services to the Corporation as directors, officers, or otherwise, or may delegate such authority to an appropriate committee.  Such compensation may be comprised of cash, property, stock, options to acquire stock, or such other assets, benefits or consideration as such directors shall deem, in the exercise of their sole discretion, to be reasonable and appropriate under the circumstances.  The Board of Directors also shall have authority to provide for or delegate an authority to an appropriate committee to provide for reasonable pensions, disability or death benefits, and other benefits or payments, to directors, officers, and employees and to their families, dependents, estates, or beneficiaries on account of prior services rendered to the Corporation by such directors, officers, and employees.

**Section 3.17  Corporate Governance.**  Without otherwise limiting the powers of the Board of Directors set forth in this Article III, if shares of capital stock of the Corporation are listed for trading on either the Nasdaq Stock Market ("*NASDAQ*") or the New York Stock Exchange ("*NYSE*"), the Corporation shall comply with the corporate governance rules and requirements of the NASDAQ or the NYSE, as applicable. **OFFICERS**

**Section 3.18  Officers.**  The officers of the Corporation shall be [a Chief Executive Officer, a Chief Financial Officer, one or more Presidents (at the discretion of the Board of Directors), a Treasurer, and a Secretary].  The Corporation may also have, at the discretion of the Board of Directors, one or more Vice Presidents, one or more Assistant Treasurers, one or more Assistant Secretaries, a Controller, and any such other officers as may be appointed from time to time in accordance with the provisions of these bylaws.  In addition, the Chairman of the Board of Directors shall exercise powers and perform such other duties as an officer of the Corporation as may be prescribed by the Board of Directors.  Any number of offices may be held by the same person.  In its discretion, the Board of Directors may choose not to fill any office for any period as it may deem advisable, except as required by applicable law.  The officers of the Corporation need not be stockholders of the Corporation nor, other than the Chairman of the Board of Directors, directors of the Corporation.

**Section 3.19  Election of Officers.**  The Board of Directors shall elect the officers of the Corporation, except such officers as may be elected in accordance with the provisions of Section 4.3 of these bylaws, and subject to the rights, if any, of an officer under any employment contract.  Each officer shall hold office until his or her successor is elected and qualified or until his or her earlier death, resignation or removal.  A failure to elect officers shall not dissolve or otherwise affect the Corporation.  Vacancies may be filled or new offices created and filled by the Board of Directors.

**Section 3.20**   **Appointment of Subordinate Officers.**   The Board of Directors may appoint, or empower the Chief Executive Officer and/or one or more Presidents of the Corporation to appoint, such other officers and agents as the business of the Corporation may require.   Each of such officers and agents shall hold office for such period, have such authority, and perform such duties as are provided in these bylaws or as the Board of Directors may from time to time determine.

**Section 3.21**   **Removal and Resignation.**

(a)     Notwithstanding the provisions of any employment agreement, any officer of the Corporation may be removed at any time (i) by the majority vote of the Whole Board, with or without cause, and (ii) by any other officer of the Corporation upon whom the Board of Directors has expressly conferred the authority to remove another officer, in such case on the terms and subject to the conditions upon which such authority was conferred upon such officer. No elected officer shall have any contractual rights against the Corporation for compensation by virtue of such election beyond the date of the election of his successor, his death, his resignation or his removal from office, whichever event shall first occur, except as otherwise provided in an employment contract or under an employee deferred compensation plan or as otherwise required by applicable law.

(b)     Any officer may resign at any time by giving written or electronic notice to the Corporation.   Any resignation shall take effect at the time specified therein or, if the time when it shall become effective is not specified therein, immediately upon receipt.   Unless otherwise specified therein, the acceptance of any such resignation shall not be necessary to make it effective.

**Section 3.22**   **Vacancies.**   Any vacancy occurring in any office because of death, resignation, retirement, disqualification, removal from office or otherwise may be filled as provided in Section 4.2 and/or Section 4.3 of these bylaws.

**Section 3.23**   **Chief Executive Officer.**   Subject to the powers of the Board of Directors, the Chief Executive Officer shall be responsible for the general management of the business, affairs and property of the Corporation and control over its officers, agents and employees, and shall see that all orders and resolutions of the Board of Directors are carried into effect.   The Chief Executive Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or these bylaws.

**Section 3.24**   **Chief Financial Officer.**   Subject to the powers of the Board of Directors, the Chief Financial Officer shall have the responsibility for the financial affairs of the Corporation and shall exercise supervisory responsibility for the performance of the duties of the Treasurer and the Controller, if any, of the Corporation. If there is no Controller, the Chief Financial Officer shall keep full and accurate account of receipts and disbursements in the books of the Corporation and render to the Board of Directors, the Chairman of the Board, or the President, whenever requested, an account of all his transactions as Chief Financial Officer and of the financial condition of the Corporation.   The Chief Financial Officer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors or these bylaws.

**Section 3.25    President.**  The President(s) of the Corporation, subject to the powers of the Board of Directors and the Chief Executive Officer, shall act in general executive capacity, subject to the supervision and control of the Board of Directors.  The President(s) shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer or these bylaws.

**Section 3.26    Vice President.**  The Vice President(s) shall have such powers and perform such duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the President(s) or these bylaws.

**Section 3.27    Treasurer.**  The Treasurer shall: (i) have the custody of the corporate funds and securities; (ii) keep full and accurate accounts of receipts and disbursements of the Corporation in books belonging to the Corporation; (iii) cause all monies and other valuable effects of the Corporation to be deposited in the name and to the credit of the Corporation in such banks as may be authorized by the Board of Directors; and (iv) cause the funds of the Corporation to be disbursed when such disbursements have been duly authorized, taking proper vouchers for such disbursements.  The Treasurer shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the Chief Financial Officer or these bylaws.

**Section 3.28    Secretary.**  The Secretary shall attend all meetings of the Board of Directors and of the stockholders and record all votes and the minutes of all proceedings in a book to be kept for that purpose.  The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors and, when appropriate, shall cause the corporate seal to be affixed to any instruments executed on behalf of the Corporation.  The Secretary shall also perform all duties incident to the office of Secretary and such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the President(s) or these bylaws.

**Section 3.29    Assistant Treasurers.**  The Assistant Treasurer, or if there shall be more than one, the Assistant Treasurers in the order determined by the Board of Directors, shall, in the absence or disability of the Treasurer, perform the duties and functions, exercise the powers and be subject to all of the restrictions of the Treasurer.  The Assistant Treasurer(s) shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Financial Officer, the Treasurer or these bylaws.

**Section 3.30    Assistant Secretaries.**  The Assistant Secretary, or if there shall be more than one, the Assistant Secretaries in the order determined by the Board of Directors, shall, in the absence or disability of the Secretary, perform the duties and functions, exercise the powers and be subject to all of the restrictions of the Secretary.  The Assistant Secretary(ies) shall have such other powers and perform such other duties as may be prescribed by the Board of Directors, the Chairman of the Board of Directors, the Chief Executive Officer, the Secretary or these bylaws.

**Section 3.31    Controller.**  The Controller, if any, shall keep full and accurate account of receipts and disbursements in the books of the Corporation and render to the Board of Directors, the Chairman of the Board, the President or Chief Financial Officer, whenever requested, an account of all his transactions as Controller and of the financial condition of the Corporation.

The Controller shall also perform all duties incident to the office of Controller and such other duties as may be assigned to him by the Board of Directors, the Chairman of the Board, the Chief Financial Officer or these bylaws.

**Section 3.32   Delegation of Duties.**  In the absence, disability or refusal of any officer of the Corporation to exercise and perform his or her duties, the Board of Directors may by resolution delegate the powers and duties of such officer to any other officer or to any director, or to any other person whom it may select.

**ARTICLE IV**
**STOCK**

**Section 4.1   Stock Certificates.**  The shares of capital stock of the Corporation shall be represented by certificates; provided, however, that the Board of Directors may provide by resolution that shares of some or all of any or all classes or series of stock of the Corporation shall be uncertificated and shall not be represented by certificates.  Any such resolution by the Board of Directors shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation.  Certificates representing shares of capital stock of the Corporation shall be issued in such form as may be approved by the Board of Directors and shall be signed by two authorized officers of the Corporation.  The name of the person or entity to whom the shares are issued, with the number of shares and date of issue, shall be entered on the books of the Corporation.

**Section 4.2   Electronic Signatures.**  Any and all of the signatures on a certificate representing shares of capital stock of the Corporation may be electronic.  In case any officer, transfer agent or registrar who has signed or whose electronic signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

**Section 4.3   Special Designations of Shares.**  If the Corporation is authorized to issue more than one class of stock or more than one series of any class, (a) to the extent the shares are represented by certificates, the powers, designations, preferences, and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights shall be set forth in full or summarized on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock; provided, however, that, except as otherwise required by applicable law (including, without limitation, Section 202 of the DGCL), in lieu of the foregoing requirements, there may be set forth on the face or back of the certificate that the Corporation shall issue to represent such class or series of stock a statement that the Corporation will furnish without charge to each stockholder who so requests the powers, designations, preferences, and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights; and (b) to the extent the shares are uncertificated, within a reasonable time after the issuance or transfer of uncertificated shares, the Corporation shall send or cause to be sent to the registered owner thereof a written notice containing the information required to be set forth or stated on certificates pursuant to applicable provisions in the DGCL or a statement that the Corporation

will furnish without charge to each stockholder who so requests the powers, designations, preferences, and relative, participating, optional or other special rights of each class of stock or series thereof and the qualifications, limitations or restrictions of such preferences and/or rights.

**Section 4.4**   **Transfers of Stock.**

(a)   Shares of capital stock of the Corporation shall only be transferred on the books of the Corporation by the holder of record thereof or by such holder's attorney or legal representative duly authorized in writing and, if the shares are represented by certificates, upon surrender to the Corporation of the certificate or certificates for such shares endorsed by the appropriate person or persons, with such evidence of the authenticity of such endorsement, transfer, authorization and other matters as the Corporation may reasonably require, and accompanied by all necessary stock transfer stamps.  For shares of the Corporation's capital stock represented by certificates, it shall be the duty of the Corporation to issue a new certificate to the person or entity entitled thereto, cancel the old certificate or certificates and record the transaction on its books.  No transfer of stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred.

(b)   The Board of Directors shall have the power and authority to make such other rules and regulations as it may deem necessary or proper concerning the issue, transfer and registration of certificates for shares of capital stock of the Corporation.

(c)   The Board of Directors shall have the authority to appoint one or more banks or trust companies organized under the laws of the United States or any state thereof to act as its transfer agent or agents or registrar or registrars, or both, in connection with the transfer or registration of any class or series of securities of the Corporation, and may require stock certificates to be countersigned or registered by one or more of such transfer agents and/or registrars.

(d)   The Corporation shall have the authority to enter into and perform any agreement with any number of stockholders of the Corporation of any one or more classes or series of capital stock of the Corporation to restrict the transfer of shares of capital stock of the Corporation of any one or more classes or series owned by such stockholders in any manner permitted by the DGCL.

**Section 4.5**   **Lost, Stolen or Destroyed Certificates.**   The Board of Directors may direct a new certificate or certificates representing one or more shares of capital stock of the Corporation or uncertificated shares to be issued in place of any certificate or certificates previously issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person or entity claiming the certificate of stock to be lost, stolen or destroyed or may otherwise require production of such evidence of such loss, theft or destruction as the Board of Directors may in its discretion require.  Without limiting the generality of the foregoing, when authorizing such issue of a new certificate or certificates or such uncertificated shares, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate or certificates, or such owner's duly authorized attorney or legal representative, to give the

- 22 -

Corporation a bond sufficient to indemnify the Corporation against any claim that may be made against the Corporation on account of the loss, theft or destruction of any such certificate or the issuance of such new certificate.

 **Section 4.6** **Dividend Record Date.** In order that the Corporation may determine the stockholders of the Corporation entitled to receive payment of any dividend or other distribution or allotment of any rights, or the stockholders entitled to exercise any rights of change, conversion or exchange of stock, or for the purposes of any other lawful action, the Board of Directors may fix a record date, which record date shall be determined in the manner set forth in Section 2.13 of these bylaws.

 **Section 4.7** **Registered Stockholders.** The Corporation shall be entitled to recognize the exclusive right of a person or entity registered on its books as the owner of shares of capital stock of the Corporation to receive dividends, to vote, to receive notifications and otherwise to exercise all the rights and powers of an owner of such shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person or entity, whether or not it shall have express or other notice thereof, except as otherwise required by applicable law.

**ARTICLE V**
**INDEMNIFICATION**

 The Corporation shall indemnify any Indemnitee (as defined in the Certificate of Incorporation) as set forth in the Certificate of Incorporation.

**ARTICLE VII**
**GENERAL PROVISIONS**

 **Section 7.1** **Reliance on Books and Records.** Each director of the Corporation, each member of any committee of the Board of Directors and each officer of the Corporation shall, in the performance of his or her duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation and upon such information, opinions, reports or documents presented to the Corporation by any of its officers or employees, or committees of the Board of Directors so designated, or by any other person or entity as to matters which such director or committee member reasonably believes are within such other person's or entity's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

 **Section 7.2** **Dividends.** Dividends upon the capital stock of the Corporation, subject to the requirements of the DGCL and the provisions of the Certificate of Incorporation, may be declared by the Board of Directors from time to time at any regular or special meeting of the Board of Directors and may be paid in cash, in property or in shares of the capital stock, or in any combination thereof.  Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Board of Directors from time to time, in its absolute discretion, deems proper as a reserve or reserves to meet contingencies, or for purchasing any of the shares of capital stock, warrants, rights, options, bonds, debentures, notes, scrip or other securities or evidences of indebtedness of the Corporation, or for equalizing

dividends, or for repairing or maintaining any property of the Corporation, or for any other proper purpose.  The Board of Directors may modify or abolish any such reserve in the manner in which it was created.

**Section 7.3**    **Corporate Funds; Checks, Drafts or Orders; Deposits.**  The funds of the Corporation shall be kept in such depositories as shall from time to time be prescribed by the Board of Directors.  All checks, drafts or other orders for the payment of money by or to the Corporation and all notes and other evidences of indebtedness issued in the name of the Corporation shall be signed by such officer, officers, agent or agents of the Corporation, and in such manner, as shall be determined by resolution of the Board of Directors from time to time.  All funds of the Corporation shall be deposited to the credit of the Corporation under such conditions and in such banks, trust companies or other depositories as the Board of Directors may designate or as may be designated by an officer or officers or agent or agents of the Corporation to whom such power may, from time to time, be determined by the Board of Directors.

**Section 7.4**    **Execution of Contracts and Other Instruments.**  The Board of Directors, except as otherwise required by applicable law, may authorize from time to time any officer or agent of the Corporation to enter into any contract or to execute and deliver any other instrument in the name of and on behalf of the Corporation.  Such authority may be general or confined to specific instances.  No officer, agent or employee shall have any power or authority to bind the Corporation by any contract or engagement or to pledge its credit or to render it liable for damages, whether monetary or otherwise, for any purpose or for any amount except as specifically authorized in these bylaws or by the Board of Directors or an officer or committee with the power to grant such authority.

**Section 7.5**    **Signatures.**  In addition to the provisions for use of facsimile signatures elsewhere specifically authorized in these bylaws, facsimile or electronic signatures of any director or officer of the Corporation may be used whenever the signature of a director or officer of the Corporation shall be required, except as otherwise required by applicable law or as directed by the Board of Directors from time to time.

**Section 7.6**    **Fiscal Year.**  The fiscal year of the Corporation shall be fixed, and once fixed, may thereafter be changed from time to time, by the Board of Directors.

**Section 7.7**    **Corporate Seal.**  The Board of Directors may provide a corporate seal which shall be in the form of a circle and shall have inscribed thereon the name of the Corporation, the year of its incorporation and the words "Corporate Seal, Delaware".  The seal may be used by causing it or a facsimile thereof to be impressed or affixed or reproduced or otherwise.

**Section 7.8**    **Voting Securities Owned By the Corporation.**  Powers of attorney, proxies, waivers of notice of meeting, consents, and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the Chief Executive Officer, the President, Treasurer or Secretary, any Vice President, Assistant Treasurer or Assistant Secretary, or any other officer of the Corporation authorized to do so by the Board of Directors.  Any such officer may, in the name of and on behalf of the Corporation,

- 24 -

take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any corporation or other entity in which the Corporation may own securities, and at any such meeting shall possess and may exercise any and all rights and power incident to the ownership of such securities and which, as the owner thereof, the Corporation might have possessed and exercised if present.

Section 7.9 **Section Headings.** Section headings in these bylaws are for convenience of reference only and shall not be given any substantive effect in limiting or otherwise construing any provision herein.

Section 7.10 **Inconsistent Provisions.** In the event that any provision of these bylaws is or becomes inconsistent with any provision of the Certificate of Incorporation, the DGCL, or any other applicable law, the provision of these bylaws shall not be given any effect to the extent of such inconsistency but shall otherwise be given full force and effect.

# ARTICLE VIII
# AMENDMENTS

Section 8.1 **Amendments.** Subject to the power of the stockholders of the Corporation to adopt, amend or repeal any of these bylaws, these bylaws may be amended, modified or repealed, and new bylaws may be adopted at any time by the affirmative vote of a majority of the Whole Board. Notwithstanding any other provision of these bylaws or any provision of law which might otherwise permit a lesser vote or no vote, but in addition to any affirmative vote of the holders of any series of preferred stock of the Corporation required by applicable law, by the Certificate of Incorporation or by any instrument designating any class or series of preferred stock of the Corporation, the affirmative vote of the holders of a majority of the total voting power of the shares of the Corporation entitled to vote generally in the election of directors, voting together as a single class, shall be required for the stockholders of the Corporation to alter, amend or repeal, or adopt any provision inconsistent with, the provisions of these bylaws.

*   *   *   *

## EXHIBIT A-7

**Amended and Restated Articles of Incorporation of Gymboree Manufacturing, Inc.**

AMENDED AND RESTATED ARTICLES OF INCORPORATION
OF
GYMBOREE MANUFACTURING, INC.

The undersigned hereby certify that:

1.      They are the [President] and the [Secretary], respectively, of Gymboree Manufacturing, Inc., a California corporation (the "Corporation").

2.      The Articles of Incorporation of the Corporation are amended and restated to read in its entirety as set forth on Exhibit A attached hereto and incorporated by reference as if fully set forth herein.

3.      The amendment and restatement of the Articles of Incorporation of the Corporation has been duly approved by the board of directors of the Corporation.

4.      The amendment and restatement of the Restated Articles of Incorporation of the Corporation has been duly approved by the required vote of the sole shareholder in accordance with Section 902 of the General Corporation Law of the State of California.  The total number of outstanding shares of Corporation is one hundred (100) shares.  All one hundred (100) shares voted in favor of the amendment and restatement of the Articles of Incorporation of the Corporation.   The number of shares voting in favor exceeded the vote required and the percentage vote required was more than 50%.

We further declare under the penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct to the best of my own knowledge.

Date: _____, 2017

_____
[_____]
[President]


_____
[_____]
[Secretary]

Exhibit A

AMENDED AND RESTATED ARTICLES OF INCORPORATION

OF

GYMBOREE MANUFACTURING, INC.

## ARTICLE I

The name of the Corporation is Gymboree Manufacturing, Inc.

## ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

## ARTICLE III

1.    Authorized Capital Stock.

The total number of shares of capital stock which the Corporation has authority to issue is One Thousand (1,000) shares of Common Stock.

2.    Nonvoting Stock.

To the extent prohibited by Section 1123 of the United States Bankruptcy Code, the Corporation shall not issue any class or series of nonvoting equity securities; provided, however, that the foregoing (x) will have no force and effect beyond that required under Section 1123 of the United States Bankruptcy Code and (y) may be amended or eliminated in accordance with applicable law as from time to time in effect.  For the purposes of this Section 2 of this Article III, any class or series of equity securities that has only such voting rights as are mandated under California law shall be deemed to be nonvoting for purposes of the restrictions of this Section 2 of this Article III.

## ARTICLE IV

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law. Unless applicable law otherwise requires, any amendment, repeal or modification of this Article IV shall not adversely affect any right of any director under this Article IV that existed at or prior to the time of such amendment, repeal or modification.

## <u>ARTICLE V</u>

To the maximum extent permitted from time to time under the law of the State of California, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or shareholders, other than those officers, directors or shareholders who are employees of the Corporation. No amendment or repeal of this Article V shall apply to or have any effect on the liability or alleged liability of any officer, director or shareholder of the Corporation for or with respect to any opportunities of which such officer, director, or shareholder becomes aware prior to such amendment or repeal.

## <u>ARTICLE VI</u>

The corporation is authorized to provide, only with respect to actions other than those on behalf of the Corporation or by its shareholders, indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code. Unless applicable law otherwise requires, any amendment, repeal or modification of any provision of this Article VI shall not adversely affect any contract or other right to indemnification of an agent of the Corporation that existed at or prior to the time of such amendment, repeal or modification.

## **EXHIBIT A-8**

**Amended and Restated Articles of Incorporation of Gymboree Operations, Inc.**

AMENDED AND RESTATED ARTICLES OF INCORPORATION
OF
GYMBOREE OPERATIONS, INC.

The undersigned hereby certify that:

1.      They are the [President] and the [Secretary], respectively, of Gymboree Operations, Inc., a
California corporation (the "Corporation").

2.      The Articles of Incorporation of the Corporation are amended and restated to read in its entirety as set forth on Exhibit A attached hereto and incorporated by reference as if fully set forth herein.

3.      The amendment and restatement of the Articles of Incorporation of the Corporation has been duly approved by the board of directors of the Corporation.

4.      The amendment and restatement of the Restated Articles of Incorporation of the Corporation has been duly approved by the required vote of the sole shareholder in accordance with Section 902 of the General Corporation Law of the State of California.  The total number of outstanding shares of Corporation is one hundred (100) shares.  All one hundred (100) shares voted in favor of the amendment and restatement of the Articles of Incorporation of the Corporation.  The number of shares voting in favor exceeded the vote required and the percentage vote required was more than 50%.

We further declare under the penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct to the best of my own knowledge.

Date: _____, 2017

_____
[_____]
[President]


_____
[_____]
[Secretary]

<u>Exhibit A</u>

AMENDED AND RESTATED ARTICLES OF INCORPORATION

OF

GYMBOREE OPERATIONS, INC.

## ARTICLE I

The name of the Corporation is Gymboree Operations, Inc.

## ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

## ARTICLE III

1.    <u>Authorized Capital Stock</u>.

The total number of shares of capital stock which the Corporation has authority to issue is One Thousand (1,000) shares of Common Stock.

2.    <u>Nonvoting Stock</u>.

To the extent prohibited by Section 1123 of the United States Bankruptcy Code, the Corporation shall not issue any class or series of nonvoting equity securities; <u>provided</u>, <u>however</u>, that the foregoing (x) will have no force and effect beyond that required under Section 1123 of the United States Bankruptcy Code and (y) may be amended or eliminated in accordance with applicable law as from time to time in effect. For the purposes of this Section 2 of this Article III, any class or series of equity securities that has only such voting rights as are mandated under California law shall be deemed to be nonvoting for purposes of the restrictions of this Section 2 of this Article III.

## ARTICLE IV

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law. Unless applicable law otherwise requires, any amendment, repeal or modification of this Article IV shall not adversely affect any right of any director under this Article IV that existed at or prior to the time of such amendment, repeal or modification.

## ARTICLE V

To the maximum extent permitted from time to time under the law of the State of California, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or shareholders, other than those officers, directors or shareholders who are employees of the Corporation. No amendment or repeal of this Article V shall apply to or have any effect on the liability or alleged liability of any officer, director or shareholder of the Corporation for or with respect to any opportunities of which such officer, director, or shareholder becomes aware prior to such amendment or repeal.

## ARTICLE VI

The corporation is authorized to provide, only with respect to actions other than those on behalf of the Corporation or by its shareholders, indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code. Unless applicable law otherwise requires, any amendment, repeal or modification of any provision of this Article VI shall not adversely affect any contract or other right to indemnification of an agent of the Corporation that existed at or prior to the time of such amendment, repeal or modification.

## **EXHIBIT A-9**

**Amended and Restated Articles of Incorporation of Gym-Mark, Inc.**

## AMENDED AND RESTATED ARTICLES OF INCORPORATION
## OF
## GYM-MARK, INC.

The undersigned hereby certify that:

1.      They are the [President] and the [Secretary], respectively, of Gym-Mark, Inc., a California corporation (the "Corporation").

2.      The Articles of Incorporation of the Corporation are amended and restated to read in its entirety as set forth on Exhibit A attached hereto and incorporated by reference as if fully set forth herein.

3.      The amendment and restatement of the Articles of Incorporation of the Corporation has been duly approved by the board of directors of the Corporation.

4.      The amendment and restatement of the Restated Articles of Incorporation of the Corporation has been duly approved by the required vote of the sole shareholder in accordance with Section 902 of the General Corporation Law of the State of California.  The total number of outstanding shares of Corporation is one hundred (100) shares.  All one hundred (100) shares voted in favor of the amendment and restatement of the Articles of Incorporation of the Corporation.  The number of shares voting in favor exceeded the vote required and the percentage vote required was more than 50%.

We further declare under the penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct to the best of my own knowledge.

Date: _____, 2017

 

_____

[_____]

[President]

 

_____

[_____]

[Secretary]

<u>Exhibit A</u>

AMENDED AND RESTATED ARTICLES OF INCORPORATION

OF

GYM-MARK, INC.

## **ARTICLE I**

The name of the Corporation is Gym-Mark, Inc.

## **ARTICLE II**

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

## **ARTICLE III**

1.    <u>Authorized Capital Stock</u>.

The total number of shares of capital stock which the Corporation has authority to issue is One Thousand (1,000) shares of Common Stock.

2.    <u>Nonvoting Stock</u>.

To the extent prohibited by Section 1123 of the United States Bankruptcy Code, the Corporation shall not issue any class or series of nonvoting equity securities; <u>provided</u>, <u>however</u>, that the foregoing (x) will have no force and effect beyond that required under Section 1123 of the United States Bankruptcy Code and (y) may be amended or eliminated in accordance with applicable law as from time to time in effect.  For the purposes of this Section 2 of this Article III, any class or series of equity securities that has only such voting rights as are mandated under California law shall be deemed to be nonvoting for purposes of the restrictions of this Section 2 of this Article III.

## **ARTICLE IV**

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law. Unless applicable law otherwise requires, any amendment, repeal or modification of this Article IV shall not adversely affect any right of any director under this Article IV that existed at or prior to the time of such amendment, repeal or modification.

## ARTICLE V

To the maximum extent permitted from time to time under the law of the State of California, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or shareholders, other than those officers, directors or shareholders who are employees of the Corporation. No amendment or repeal of this Article V shall apply to or have any effect on the liability or alleged liability of any officer, director or shareholder of the Corporation for or with respect to any opportunities of which such officer, director, or shareholder becomes aware prior to such amendment or repeal.

## ARTICLE VI

The corporation is authorized to provide, only with respect to actions other than those on behalf of the Corporation or by its shareholders, indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code. Unless applicable law otherwise requires, any amendment, repeal or modification of any provision of this Article VI shall not adversely affect any contract or other right to indemnification of an agent of the Corporation that existed at or prior to the time of such amendment, repeal or modification.

# EXHIBIT A-10

**Amended and Restated Articles of Incorporation of S.C.C. Wholesale, Inc.**

AMENDED AND RESTATED ARTICLES OF INCORPORATION
OF
S.C.C. WHOLESALE, INC.


The undersigned hereby certify that:


1.      They are the [President] and the [Secretary], respectively, of S.C.C. Wholesale, Inc., a California corporation (the "Corporation").

2.      The Articles of Incorporation of the Corporation are amended and restated to read in its entirety as set forth on Exhibit A attached hereto and incorporated by reference as if fully set forth herein.

3.      The amendment and restatement of the Articles of Incorporation of the Corporation has been duly approved by the board of directors of the Corporation.

4.      The amendment and restatement of the Restated Articles of Incorporation of the Corporation has been duly approved by the required vote of the sole shareholder in accordance with Section 902 of the General Corporation Law of the State of California.  The total number of outstanding shares of the Corporation is one (1) share.  The one (1) share voted in favor of the amendment and restatement of the Articles of Incorporation of the Corporation.  The number of shares voting in favor exceeded the vote required and the percentage vote required was more than 50%.

We further declare under the penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct to the best of my own knowledge.

Date: _____, 2017

_____
[_____]
[President]

_____
[_____]
[Secretary]

<u>Exhibit A</u>

AMENDED AND RESTATED ARTICLES OF INCORPORATION

OF

S.C.C. WHOLESALE, INC.

## ARTICLE I

The name of the Corporation is S.C.C. Wholesale, Inc.

## ARTICLE II

The purpose of the Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

## ARTICLE III

1.    <u>Authorized Capital Stock</u>.

The total number of shares of capital stock which the Corporation has authority to issue is One Thousand (1,000) shares of Common Stock.

2.    <u>Nonvoting Stock</u>.

To the extent prohibited by Section 1123 of the United States Bankruptcy Code, the Corporation shall not issue any class or series of nonvoting equity securities; <u>provided</u>, <u>however</u>, that the foregoing (x) will have no force and effect beyond that required under Section 1123 of the United States Bankruptcy Code and (y) may be amended or eliminated in accordance with applicable law as from time to time in effect.  For the purposes of this Section 2 of this Article III, any class or series of equity securities that has only such voting rights as are mandated under California law shall be deemed to be nonvoting for purposes of the restrictions of this Section 2 of this Article III.

## ARTICLE IV

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law. Unless applicable law otherwise requires, any amendment, repeal or modification of this Article IV shall not adversely affect any right of any director under this Article IV that existed at or prior to the time of such amendment, repeal or modification.

## ARTICLE V

To the maximum extent permitted from time to time under the law of the State of California, the Corporation renounces any interest or expectancy of the Corporation in, or in being offered an opportunity to participate in, business opportunities that are from time to time presented to its officers, directors or shareholders, other than those officers, directors or shareholders who are employees of the Corporation. No amendment or repeal of this Article V shall apply to or have any effect on the liability or alleged liability of any officer, director or shareholder of the Corporation for or with respect to any opportunities of which such officer, director, or shareholder becomes aware prior to such amendment or repeal.

## ARTICLE VI

The corporation is authorized to provide, only with respect to actions other than those on behalf of the Corporation or by its shareholders, indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaw provisions, agreements with agents, vote of shareholders or disinterested directors or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code. Unless applicable law otherwise requires, any amendment, repeal or modification of any provision of this Article VI shall not adversely affect any contract or other right to indemnification of an agent of the Corporation that existed at or prior to the time of such amendment, repeal or modification.

## EXHIBIT A-11

**Articles of Organization—Conversion of Gymboree Retail Stores LLC**



# State of California
## Secretary of State

## Limited Liability Company
## Articles of Organization - Conversion

| **IMPORTANT — Read all instructions before completing this form.** | This Space For Filing Use Only |
|---|---|

### Converted Entity Information

1. Name of Limited Liability Company  (The name must include the words Limited Liability Company or the abbreviations LLC or L.L.C.  The words Limited and Company may be abbreviated to Ltd. and Co., respectively.)

2. The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

3. The limited liability company will be managed by (check only one):

☐ One Manager          ☐ More Than One Manager          ☐ All Limited Liability Company Member(s)

4. Initial Street Address of Limited Liability Company's Designated Office in CA | City | State **CA** | Zip Code

5. Initial Mailing Address of Limited Liability Company, if different from Item 4 | City | State | Zip Code

6. Initial Agent for Service of Process:  Item 6a: List the name of an individual or a corporation registered in CA under California Corporations Code section 1505 that agrees to be your agent for service of process.  You may **not** list the converted entity as the agent.  Item 6b: If the agent is an individual, list the agent's CA business or residential street address. Item 6c: If the agent is an individual **and** the converting entity is a CA corporation, limited partnership or general partnership, list the agent's mailing address.  **Do not** list an address if the agent is a CA registered corporate agent as the address for service of process is already on file.

   a. Name of Agent For Service of Process

   b. **If an individual,** Street Address of Agent for Service of Process - *Do not list a P.O. Box* | City | State **CA** | Zip Code

   c. **If an individual,** Mailing Address of Agent for Service of Process | City | State | Zip Code

### Converting Entity Information

7. Name of Converting Entity

8. Form of Entity | 9.  Jurisdiction | 10. CA Secretary of State File Number, if any

11. The principal terms of the plan of conversion were approved by a vote of the number of interests or shares of each class that equaled or exceeded the vote required.  If a vote was required, the following was required <u>for each class</u>:

   <u>The class and number of outstanding interests entitled to vote.</u>     **AND**     <u>The percentage vote required of each class.</u>

### Additional Information

12. Additional information set forth on the attached pages, if any, is incorporated herein by this reference and made part of this certificate.

13. I certify under penalty of perjury that the contents of this document are true.  I declare I am the person who executed this instrument, which execution is my act and deed.

_____
Signature of Authorized Person

_____
Type or Print Name and Title of Authorized Person

_____
Signature of Authorized Person

_____
Type or Print Name and Title of Authorized Person

LLC-1A  (REV  01/2016)                                                APPROVED BY SECRETARY OF STATE

## **EXHIBIT B**

**Exit Financing Term Sheets**

EXIT FINANCING

# Summary of Proposed Exit Financing

|  | ABL Revolver | Term Loan |
|---|---|---|
| **Lenders** | • BAML (Agent) / Citizens in clubbed deal<br>  – Commitments: BAML ($125m) / Citizens ($75m) | • Goldman Sachs |
| **Facility Size / Structure** | • $200m ABL Revolver Facility<br>  – $75m LC Sublimit<br>  – $20m Swingline | • $85m Term Loan |
| **Security** | • First lien: Working capital (*i.e.,* ABL Priority Collateral)<br>• Second lien: IP & other assets (*i.e.,* Term Priority Collateral) | • First lien: IP & other assets (*i.e.,* Term Priority Collateral)<br>• Second lien: Working capital (*i.e.,* ABL Priority Collateral) |
| **Uncommitted Incremental** | • $75m | • $40m as long as Consolidated Secured Leverage Ratio ("CSLR") at close less 0.50x |
| **Maturity / Amortization** | • 5 Years | • 5 years<br>• 1% amortization per year, paid quarterly beginning first full quarter post close |
| **Mandatory Prepayment** | • Usual and customary | • 50% ECF, stepping down to 25% & 0% if CSLR is less than 1.0x and 0.5x, respectively<br>  – First sweep after FY 2018<br>• Sale proceeds subject to $5m annual cap on reinvestment |
| **Call Protection** | • None | • NC1[1] / 102[1] / 101 |
| **Interest Rate** | • Drawn: 1.25 – 1.75% (based on Average Excess Availability)<br>• Undrawn: 0.25% | • L (100) + 875 bps |
| **ABL Borrowing Base** | • Credit Card A/R – 90%<br>• Trade A/R – 85%<br>• Inventory – 90%<br>  – Seasonal increase to 92.5% from January 31 – May 31 of each year<br>• Reserves imposed by Agent in its permitted discretion | • Not subject to borrowing base |

EXIT FINANCING

# Summary of Proposed Exit Financing (cont'd)

| | ABL Revolver | Term Loan |
|---|---|---|
| **Financial Covenants** | • Minimum excess availability of the greater of 10% of Loan Cap and $17.5m and if CSLR > 2.0x, Minimum excess availability cannot be less than 20% of Loan Cap for three or more consecutive business days | • Minimum excess revolver availability of 10%<br>  – 20% if CSLR > 2.0x<br>• CSLR tested quarterly on LTM basis<br>  – Jul'18: 4.0x<br>  – Oct'18 - Jan'19: 3.25x<br>  – Apr'19 – Jul'19: 2.75x<br>  – Thereafter: 2.00x<br>  – Implies 40-50%+ cushion to the business plan |
| **Reporting / Monitoring** | • Annual audited financial statements within 120 days after FYE'17 (90 days in subsequent years)<br>• Quarterly financial statements within 60 days after Q3'17 (45 days thereafter) and monthly within 55 days for the first 3 fiscal months post-close (35 days thereafter)<br>• Consolidated monthly budget for following fiscal year, including availability/liquidity forecast, within 60 days after FYE<br>• Monthly borrowing base certificates, springing to weekly if excess availability < max of (i) 12.5% of Loan Cap and (ii) $20m for five consecutive business days<br>• Annual field exams and appraisals, springing to two per year if excess availability < max of (i) 20% of Loan Cap and (ii) $35m for five consecutive business days, and unlimited if an Event of Default is continuing | • Annual audited financial statements within 120 days after FYE'17 (90 days in subsequent years)<br>• Quarterly financial statements within 60 days after Q3'17 (45 days thereafter) and monthly within 55 days for the first 3 fiscal months post-close<br>• Consolidated quarterly budget for following fiscal year, including availability/liquidity forecast, within 60 days after FYE<br>• Ability to perform one inventory appraisal and field exam annually to the extent not conducted pursuant to the revolving credit facility |
| **Cash Dominion** | • If (1) excess availability < max of (i) 12.5% of Loan Cap and (ii) $20m for five consecutive business days or (2) an Event of Default has occurred and is continuing | • N/A |
| **Other Material Covenants (e.g., Investments, Acquisitions, RPs, Dividends)** | • <u>Post 4/30/2018</u>, payment condition of either (i) both (x) Excess Avail > max of (a) 15% of Line Cap or (b) $22.5m; and (y) FCCR greater than 1.0x;<br>**OR**  (ii) Excess Avail > max of (a) 20% of Line Cap or (b) $30m<br>  – Immediately following and pro forma for next 6 months<br>• ECF prepayments required by Term Loan facility to be permitted so long as projected Excess Availability > $50m plus unrestricted cash for next six months on pro forma basis | • Limitation on indebtedness, liens, guarantees, negative pledges, investments, subsidiary distributions, restricted payments, dispositions, acquisitions fundamental changes and other customary negative covenants, subject to:<br>  – $5m general basket for permitted indebtedness<br>  – $5m general basket for permitted liens<br>  – $5m general basket for permitted investments<br>  – Ratio basket for junior or unsecured indebtedness up to 2.0x leverage subject to intercreditor agreement<br>  – "Available Amount" post Feb'19 based upon retained excess cash flow and CSLR < 1.5x (can be utilized after second anniversary)<br>  – Permitted store closures (excl ongoing clearance / closing store process ) < 10% of Consolidated EBITDA |
| **Closing Conditions / Other** | • Excess availability at close > $65m<br>• Other customary closing conditions | • Business plan to include at least $16.5m of annual rent savings<br>• Minimum excess availability at close TBD<br>• Other customary closing conditions |

Note:    Loan Cap defined as the lesser of the borrowing base or the total commitments.

## <u>EXHIBIT E</u>

**List of Retained Causes of Action**

**Retained Causes of Action**

Article IV, Section M of the Plan provides as follows:[1]

> In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, Article IV, and Article I.A, hereof, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in the Reorganized Debtors' sole discretion. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.
>
> In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Notwithstanding and without limiting the generality of Article IV.M of the Plan, the following **Exhibit E(i)** through **Exhibit E(vii)** (each of which is attached hereto) include specific types of Causes of Actions expressly preserved by the Debtors and the Reorganized Debtors. For the avoidance of doubt, the specific types of Causes of Action listed in the following exhibits

---

[1]    Capitalized terms used but undefined herein shall have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation and Its Debtor Affiliates* [Docket No. 447] (as amended from time to time, the "Plan").

are indicative, but are in no way exclusive, of the causes of action retained in connection with the Plan.

The Debtors reserve all rights to amend, revise, or supplement this **<u>Exhibit E</u>** to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Bankruptcy Court; *provided* that any such amendment, revision, or supplement shall be subject to the consent of the Required Consenting Creditors.

## **EXHIBIT  E(ii)**

**Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or other type of deposit or collateral is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Exhibit E(ii)** attached hereto.

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| ADOBE SYSTEMS INCORPORATED | 75 REMITTANCE DRIVE SUITE 1025 CHICAGO, IL 60675-1025 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #381 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #419 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #499 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #5068 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #5093 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #594 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #607 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #6086 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #6087 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #6242 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| AMEREN MISSOURI - #6275 | P.O. BOX 66301<br>ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #69 | P.O. BOX 66301<br>ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #925 | P.O. BOX 66301<br>ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMERICAN EXPRESS | ATT JUNE CONRAD<br>50-B PENINSULA CENTER BLVD., PMB 35<br>ROLLING HILLS, CA 90274 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| APPLIED COMPUTER SOLUTIONS | PO BOX 101721<br>PASADENA, CA 91189-1721 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| APTOS | PO BOX 417411<br>BOSTON, MA 02241-7411 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| APTOS CANADA INC. | C/O T60167U<br>PO BOX 66512<br>CHICAGO, IL 60666-0512 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AT&T - STORE #912 | PO BOX 5082<br>CAROL STREAM, IL 60197-5082 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AT&T MOBILITY | 1355 W. UNIVERSITY<br>MESA, AZ 85201 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AUTOMIC SOFTWARE INC | P.O. BOX 202587<br>DALLAS, TX 75320 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AZUL SYSTEMS, INC. | 1600 PLYMOUTH STREET<br>MOUNTAIN VIEW, CA 94043 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| BARE ESCENTUALS BEAUTY INC. | 900 THIRD AVENUE, 28TH FLOOR NEW YORK, NY 10022 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| BMC SOFTWARE INC. | PO BOX 301165 DALLAS, TX 75303-1165 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| BRAINTREE ELECTRIC LIGHT DEPT. - #6118 | 150 POTTER RD. BRAINTREE, MA 02184 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| BUSINESS LICENSES LLC | 21 ROBERT PITT DR SUITE 310 MONSEY, NY 10952 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CARBON BLACK | DEPT. 3508 PO BOX 123508 DALLAS, TX 75312-3508 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CDW DIRECT, LLC | PO BOX 75723 CHICAGO, IL 60675-5723 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CITY OF SUGARLAND - #6341 | BILL PAYMENT CENTER 2700 TOWN CENTER BLVD. N SUGAR LAND, TX 77479 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CITY WATER & LIGHT - STORE #6240 | PO BOX 1289 JONESBORO, AR 72403-1289 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CLOUD ANALYTICS , LLC | 2 PETERS CANYON, STE #200, IRVINE, CA 92606 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CONVENTUS CORPORATION | 516 N. OGDEN AVE STE 115 CHICAGO, IL 60642 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CORPTAX, LLC | PO BOX 35158 NEWARK, NJ 07193-5158 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| CYCLOTRON INC. | 355 1ST STREET<br>S1008<br>SAN FRANCISCO, CA 94105 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DATA-MAIL, INC. | 240 HARTFORD AVENUE<br>NEWINGTON, CT 06111 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DEMANDWARE, INC. | 5 WALL STREET<br>BURLINGTON, MA 01803 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #1758 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #1773 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #2806 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #5014 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #5028 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #511 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #5138 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #6073 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| DOMINION VIRGINIA POWER - #6106 | PO BOX 26543 RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #6322 | PO BOX 26543 RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - 564 | PO BOX 26543 RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DYNATRACE LLC | PO BOX 74008118 CHICAGO, IL 60674-8118 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| E&Y | DEPT. 6793 LOS ANGELES, CA 90084-6793 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| EGAIN COMMUNICATIONS CORP | DEPT CH 17070 PALATINE, IL 60055-7070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| EMAGINED SECURITY, INC | 2816 SAN SIMEON WY SAN CARLOS, CA 94070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| ENERGY WORKS LANCASTER - STORE #199 - PARK CITY, PA | P.O. BOX 37290 BALTIMORE, MD 21297-3290 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| ENTIT SOFTWARE LLC | PO BOX 936224 ATLANTA, GA 31193-6224 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| EUROSORT, INC. | 55 NEW PLANT COURT OWINGS MILLS, MD 21117 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| EXPERIAN MARKETING SOLUTIONS INC | PO BOX 881971 LOS ANGELES, CA 90088-1971 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| FLORIDA POWER & LIGHT - STORE #2840 | P.O. BOX 821407 S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT - STORE 916 | P.O. BOX 821407 S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 1770 | P.O. BOX 821407 S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 2141 | P.O. BOX 821407 S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 5142 | P.O. BOX 821407 S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 5171 | P.O. BOX 821407 S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FORESEE | DEPT CH 19245 PALATINE, IL 60055-9245 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| GALLAGHER BASSETT SERVICES | 15763 COLLECTIONS CENTER DR CHICAGO, IL 60693 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| GEORGIA POWER - #5164 | 96 ANNEX ATLANTA, GA 30396-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| HILCO | 25285 NETWORK PLACE CHICAGO, IL 60673-1252 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| HINGHAM MUNICIPAL LIGHTING PLANT - STORE #616 | 308 CUSHING STREET HINGHAM, MA 02043-3709 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| HOEFLER & CO. | 611 BROADWAY<br>ROOM 725<br>NEW YORK, NY 10012-2608 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| IBM CORPORATION | P.O. BOX 61000, DEPT. 1896<br>SAN FRANCISCO, CA 94161-1896 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| IMPERVA | 3400 BRIDGE PKWY<br>STE 200<br>REDWOOD SHORES, CA 94065 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| INCOMM | 250 WILLIAMS ST NW<br>ATLANTA, GA 30303 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| JAPS-OLSON COMPANY | 7500 EXCELSIOR BLVD<br>ST. LOUIS PARK, MN 55426 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| JDA - SW LICENSE | WORLD HEADQUARTERS<br>14400 NORTH 87TH STREET<br>SCOTTSDALE, AZ 85260-3649 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| JDA SOFTWARE INC | WORLD HEADQUARTERS<br>14400 NORTH 87TH STREET<br>SCOTTSDALE, AZ 85260-3649 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| KEWILL INC | PO BOX 842467<br>BOSTON, MA 02284-2467 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| KOVARUS, INC | PO BOX 396039<br>SAN FRANCISCO, CA 94139-6039 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| KPMG | 1 STOKES PLACE<br>ST. STEPHEN'S GREEN<br>DUBLIN,  2 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| LAUREL WELLS INC | 14 SOUTH STREET<br>CENTER MORICHES, NY 11934 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| LI & FUNG | LIFUNG TOWER<br>888 CHEUNG SHA WAN ROAD<br>KOWLOON, HONG KONG | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| MICRO STRATEGY SERVICES CORP. | P.O. BOX 409671<br>ATLANTA, GA 30384-9671 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| MOMENTIS SYSTEMS | 75 QUEEN ST, SUITE 2300<br>MONTREAL,  H3C2N6 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| NCR CORPORATION | PO BOX 71540<br>SAN JUAN,  00936-8640 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| NICOR GAS - STORE #2844 | BILL PAYMENT CENTER<br>PO BOX 1630<br>AURORA, IL 60507-1630 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| OPTIV SECURITY INC. | PO BOX 28216 NETWORK PLACE<br>CHICAGO, IL 60673-1282 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| ORACLE AMERICA, INC | BEA SYSTEMS, INC<br>7074 COLLECTION CENTER DRIVE<br>CHICAGO, IL 60693 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| PALMETTO UTILITIES INC. - STORE 6164 | 1713 SUITE A WOODCREEK FARMS ROAD<br>ELGIN, S. CAROLINA 29045-8755 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| PERFORCE SOFTWARE | FILE NO. 73862<br>P.O. BOX 60000<br>SAN FRANCISCO, CA 94160-3862 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| PG&E - #5951-DIXON | 275 INDUSTRIAL RD<br>SAN CARLOS, CA 94070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| PG&E - VARIOUS STORES | 275 INDUSTRIAL RD<br>SAN CARLOS, CA 94070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| RESOLVE | 2302 MARTIN STREET<br>SUITE 225<br>IRVINE, CA 92612 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SALESFORCE.COM | PO BOX 203141<br>DALLAS, TX 75320-3141 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SALESFORCE.COM INC | PO BOX 203141<br>DALLAS, TX 75320-3141 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SAP AMERICA, INC | 3999 WEST CHESTER PIKE<br>NEWTON SQUARE, PA 19073 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SDI INDUSTRIES INC | 13000 PIERCE ST.<br>PACOIMA, CA 91331 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SERVICENOW INC | 4810 EASTGATE MALL<br>SAN DIEGO, CA 92121 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SHI INTERNATIONAL CORP | P.O. BOX 952121<br>DALLAS, TX 75395-2121 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SIRIUS COMPUTER SOLUTIONS | P.O. BOX 224968<br>DALLAS, TX 75222-4968 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SOFTWAREONE | 20875 CROSSROADS CIRCLE<br>SUITE 1<br>WAUKESHA, WI 53186 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SOUTHERN CALIFORNIA EDISON - VARIOUS STORES IN SO CAL | P.O. BOX 600<br>ROSEMEAD, CA 91771-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SOVOS COMPLIANCE (PREVIOUSLY TAXWARE) | PO BOX 347977<br>PITTSBURGH, MA 15251-4977 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| SPLASH BI | 3079 PEACHTREE INDUSTRIAL BLVD DULUTH, GA 30079 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| TAX CREDIT COMPANY | 6255 SUNSET BLVD SUITE 2200 LOS ANGELES, CA 90028 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| THE SEGERDAHL CORPORATION | 9279 PAYSPHERE CIRCLE CHICAGO, IL 60674 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| THOMSON REUTER ( TAX & ACCOUNTING) INC | P.O. BOX 6016 CAROL STREAM, IL 60197-6016 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| TRINTECH | 15851 DALLAS PARKWAY SUITE 900 ADDISION, TX 75001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| TRIPWIRE, INC | 75 REMITTANCE DR SUITE 3017 CHICAGO, IL 60675-3017 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| VERACODE INC | DEPT CH 16573 PALATINE, IL 60055-6573 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| VERIFONE INC | LOCKBOX #774060 4060 SOLUTIONS CENTER CHICAGO, IL 60677 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| VERISK CRIME ANALYTICS (ASPECT) | PO BOX 27508 NEW YORK, NY 10087-7508 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| WORKING MACHINES CORPORATION | 2170 DWIGHT WAY BERKELEY, CA 94704 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| ZENSAR TECHNOLOGIES | 1415 W 22ND STREET SUITE #925 OAK BROOK, IL 60523 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## EXHIBIT E (a)

**Comparison of List of Retained Causes of Action**

## **EXHIBIT  E(ii)**

**Claims Related to Deposits, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan, the Debtors expressly reserve all Causes of Action based in whole or in part upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit or collateral, regardless of whether such posting of security deposit, adequate assurance payment, or other type of deposit or collateral is specifically identified herein.  Without limiting the generality of the foregoing, the Debtors expressly reserve all Causes of Action against the Entities identified in **Exhibit E(ii)** attached hereto.

2

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| ADOBE SYSTEMS INCORPORATED | 75 REMITTANCE DRIVE SUITE 1025 CHICAGO, IL 60675-1025 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #381 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #419 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #499 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #5068 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #5093 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #594 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #607 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #6086 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #6087 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #6242 | P.O. BOX 66301 ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| AMEREN MISSOURI - #6275 | P.O. BOX 66301<br>ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #69 | P.O. BOX 66301<br>ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMEREN MISSOURI - #925 | P.O. BOX 66301<br>ST. LOUIS, MO 63166-6301 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AMERICAN EXPRESS | ATT JUNE CONRAD<br>50-B PENINSULA CENTER BLVD., PMB 35<br>ROLLING HILLS, CA 90274 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| APPLIED COMPUTER SOLUTIONS | PO BOX 101721<br>PASADENA, CA 91189-1721 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| APTOS | PO BOX 417411<br>BOSTON, MA 02241-7411 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| APTOS CANADA INC. | C/O T60167U<br>PO BOX 66512<br>CHICAGO, IL 60666-0512 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AT&T - STORE #912 | PO BOX 5082<br>CAROL STREAM, IL 60197-5082 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AT&T MOBILITY | 1355 W. UNIVERSITY<br>MESA, AZ 85201 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AUTOMIC SOFTWARE INC | P.O. BOX 202587<br>DALLAS, TX 75320 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| AZUL SYSTEMS, INC. | 1600 PLYMOUTH STREET<br>MOUNTAIN VIEW, CA 94043 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| BANK OF AMERICA | RUSSELL COURT ST STEPHENS GREEN DUBLIN 2,  12345 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| BARE ESCENTUALS BEAUTY INC. | 900 THIRD AVENUE, 28TH FLOOR NEW YORK, NY 10022 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| BMC SOFTWARE INC. | PO BOX 301165 DALLAS, TX 75303-1165 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| BRAINTREE ELECTRIC LIGHT DEPT. - #6118 | 150 POTTER RD. BRAINTREE, MA 02184 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| BUSINESS LICENSES LLC | 21 ROBERT PITT DR SUITE 310 MONSEY, NY 10952 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CARBON BLACK | DEPT. 3508 PO BOX 123508 DALLAS, TX 75312-3508 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CDW DIRECT, LLC | PO BOX 75723 CHICAGO, IL 60675-5723 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CITY OF SUGARLAND - #6341 | BILL PAYMENT CENTER 2700 TOWN CENTER BLVD. N SUGAR LAND, TX 77479 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CITY WATER & LIGHT - STORE #6240 | PO BOX 1289 JONESBORO, AR 72403-1289 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CLOUD ANALYTICS , LLC | 2 PETERS CANYON, STE #200, IRVINE, CA 92606 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CONVENTUS CORPORATION | 516 N. OGDEN AVE STE 115 CHICAGO, IL 60642 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| CORPTAX, LLC | PO BOX 35158<br>NEWARK, NJ 07193-5158 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| CYCLOTRON INC. | 355 1ST STREET<br>S1008<br>SAN FRANCISCO, CA 94105 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DATA-MAIL, INC. | 240 HARTFORD AVENUE<br>NEWINGTON, CT 06111 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DEMANDWARE, INC. | 5 WALL STREET<br>BURLINGTON, MA 01803 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #1758 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #1773 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #2806 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #5014 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #5028 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #511 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #5138 | PO BOX 26543<br>RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| DOMINION VIRGINIA POWER - #6073 | PO BOX 26543 RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #6106 | PO BOX 26543 RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - #6322 | PO BOX 26543 RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DOMINION VIRGINIA POWER - 564 | PO BOX 26543 RICHMOND, VA 23290-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| DYNATRACE LLC | PO BOX 74008118 CHICAGO, IL 60674-8118 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| E&Y | DEPT. 6793 LOS ANGELES, CA 90084-6793 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| EGAIN COMMUNICATIONS CORP | DEPT CH 17070 PALATINE, IL 60055-7070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| EMAGINED SECURITY, INC | 2816 SAN SIMEON WY SAN CARLOS, CA 94070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| ENERGY WORKS LANCASTER - STORE #199 - PARK CITY, PA | P.O. BOX 37290 BALTIMORE, MD 21297-3290 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| ENTIT SOFTWARE LLC | PO BOX 936224 ATLANTA, GA 31193-6224 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| EUROSORT, INC. | 55 NEW PLANT COURT OWINGS MILLS, MD 21117 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| EXPERIAN MARKETING SOLUTIONS INC | PO BOX 881971<br>LOS ANGELES, CA 90088-1971 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT - STORE #2840 | P.O. BOX 821407<br>S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT - STORE 916 | P.O. BOX 821407<br>S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 1770 | P.O. BOX 821407<br>S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 2141 | P.O. BOX 821407<br>S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 5142 | P.O. BOX 821407<br>S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FLORIDA POWER & LIGHT- STORE 5171 | P.O. BOX 821407<br>S FLORIDA, FL 33082-1407 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| FORESEE | DEPT CH 19245<br>PALATINE, IL 60055-9245 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| GALLAGHER BASSETT SERVICES | 15763 COLLECTIONS CENTER DR<br>CHICAGO, IL 60693 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| GEORGIA POWER - #5164 | 96 ANNEX<br>ATLANTA, GA 30396-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| HILCO | 25285 NETWORK PLACE<br>CHICAGO, IL 60673-1252 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| HINGHAM MUNICIPAL LIGHTING PLANT - STORE #616 | 308 CUSHING STREET<br>HINGHAM, MA 02043-3709 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| HOEFLER & CO. | 611 BROADWAY<br>ROOM 725<br>NEW YORK, NY 10012-2608 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| IBM CORPORATION | P.O. BOX 61000, DEPT. 1896<br>SAN FRANCISCO, CA 94161-1896 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| IMPERVA | 3400 BRIDGE PKWY<br>STE 200<br>REDWOOD SHORES, CA 94065 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| INCOMM | 250 WILLIAMS ST NW<br>ATLANTA, GA 30303 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| JAPS-OLSON COMPANY | 7500 EXCELSIOR BLVD<br>ST. LOUIS PARK, MN 55426 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| JDA - SW LICENSE | WORLD HEADQUARTERS<br>14400 NORTH 87TH STREET<br>SCOTTSDALE, AZ 85260-3649 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| JDA SOFTWARE INC | WORLD HEADQUARTERS<br>14400 NORTH 87TH STREET<br>SCOTTSDALE, AZ 85260-3649 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| KEWILL INC | PO BOX 842467<br>BOSTON, MA 02284-2467 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| KOVARUS, INC | PO BOX 396039<br>SAN FRANCISCO, CA 94139-6039 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| KPMG | 1 STOKES PLACE<br>ST. STEPHEN'S GREEN<br>DUBLIN,  2 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
### Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| LAUREL WELLS INC | 14 SOUTH STREET<br>CENTER MORICHES, NY 11934 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| LI & FUNG | LIFUNG TOWER<br>888 CHEUNG SHA WAN ROAD<br>KOWLOON, HONG KONG | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| MICRO STRATEGY SERVICES CORP. | P.O. BOX 409671<br>ATLANTA, GA 30384-9671 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| MOMENTIS SYSTEMS | 75 QUEEN ST, SUITE 2300<br>MONTREAL,  H3C2N6 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| NCR CORPORATION | PO BOX 71540<br>SAN JUAN,  00936-8640 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| NICOR GAS - STORE #2844 | BILL PAYMENT CENTER<br>PO BOX 1630<br>AURORA, IL 60507-1630 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| OPTIV SECURITY INC. | PO BOX 28216 NETWORK PLACE<br>CHICAGO, IL 60673-1282 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| ORACLE AMERICA, INC | BEA SYSTEMS, INC<br>7074 COLLECTION CENTER DRIVE<br>CHICAGO, IL 60693 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| PALMETTO UTILITIES INC. - STORE 6164 | 1713 SUITE A WOODCREEK FARMS ROAD<br>ELGIN, S. CAROLINA 29045-8755 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| PERFORCE SOFTWARE | FILE NO. 73862<br>P.O. BOX 60000<br>SAN FRANCISCO, CA 94160-3862 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| PG&E - #5951-DIXON | 275 INDUSTRIAL RD<br>SAN CARLOS, CA 94070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

**The Gymboree Corporation, et al.,**
**Retained Causes of Action**
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| PG&E - VARIOUS STORES | 275 INDUSTRIAL RD<br>SAN CARLOS, CA 94070 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| RESOLVE | 2302 MARTIN STREET<br>SUITE 225<br>IRVINE, CA 92612 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SALESFORCE.COM | PO BOX 203141<br>DALLAS, TX 75320-3141 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SALESFORCE.COM INC | PO BOX 203141<br>DALLAS, TX 75320-3141 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SAP AMERICA, INC | 3999 WEST CHESTER PIKE<br>NEWTON SQUARE, PA 19073 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SDI INDUSTRIES INC | 13000 PIERCE ST.<br>PACOIMA, CA 91331 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SERVICENOW INC | 4810 EASTGATE MALL<br>SAN DIEGO, CA 92121 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SHI INTERNATIONAL CORP | P.O. BOX 952121<br>DALLAS, TX 75395-2121 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SIRIUS COMPUTER SOLUTIONS | P.O. BOX 224968<br>DALLAS, TX 75222-4968 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SOFTWAREONE | 20875 CROSSROADS CIRCLE<br>SUITE 1<br>WAUKESHA, WI 53186 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SOUTHERN CALIFORNIA EDISON - VARIOUS STORES IN SO CAL | P.O. BOX 600<br>ROSEMEAD, CA 91771-0001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action
Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|---|---|---|
| SOVOS COMPLIANCE (PREVIOUSLY TAXWARE) | PO BOX 347977 PITTSBURGH, MA 15251-4977 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| SPLASH BI | 3079 PEACHTREE INDUSTRIAL BLVD DULUTH, GA 30079 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| TAX CREDIT COMPANY | 6255 SUNSET BLVD SUITE 2200 LOS ANGELES, CA 90028 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| THE SEGERDAHL CORPORATION | 9279 PAYSPHERE CIRCLE CHICAGO, IL 60674 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| THOMSON REUTER ( TAX & ACCOUNTING) INC | P.O. BOX 6016 CAROL STREAM, IL 60197-6016 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| TRINTECH | 15851 DALLAS PARKWAY SUITE 900 ADDISION, TX 75001 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| TRIPWIRE, INC | 75 REMITTANCE DR SUITE 3017 CHICAGO, IL 60675-3017 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| VERACODE INC | DEPT CH 16573 PALATINE, IL 60055-6573 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| VERIFONE INC | LOCKBOX #774060 4060 SOLUTIONS CENTER CHICAGO, IL 60677 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| VERISK CRIME ANALYTICS (ASPECT) | PO BOX 27508 NEW YORK, NY 10087-7508 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |
| WORKING MACHINES CORPORATION | 2170 DWIGHT WAY BERKELEY, CA 94704 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

## The Gymboree Corporation, et al.,
## Retained Causes of Action

Exhibit E(ii) Schedule

| PARTY/CASE | ADDRESS | NATURE |
|------------|---------|--------|
| ZENSAR TECHNOLOGIES | 1415 W 22ND STREET<br>SUITE #925<br>OAK BROOK, IL 60523 | CLAIMS RELATED TO DEPOSITS, ADEQUATE ASSURANCE POSTINGS, AND OTHER COLLATERAL POSTINGS |

# EXHIBIT F

**New Stockholders' Agreement**

**Milbank Draft**
**8/31/17**

**STOCKHOLDERS AGREEMENT**

**BY AND AMONG**

**GIRAFFE NEW HOLDING CO., INC.**

**AND**

**THE STOCKHOLDERS (AS DEFINED HEREIN)**

**DATED AS OF [●], 2017**

# TABLE OF CONTENTS

**Page**

## ARTICLE I

## STOCKHOLDERS

Section 1.1    Stockholders ................................................................................................ 1

## ARTICLE II

## BOARD OF DIRECTORS; MANAGEMENT AND CONTROL OF BUSINESS

Section 2.1    Board of Directors ....................................................................................... 2
Section 2.2    Restrictions on Authority of the Board ....................................................... 4
Section 2.3    Directors' Non-exclusive Services .............................................................. 6
Section 2.4    Reimbursement of Expenses ....................................................................... 6

## ARTICLE III

## INFORMATION RIGHTS

Section 3.1    Information Rights of Stockholders; Records Required by the DGCL;
               Right of Inspection ..................................................................................... 6
Section 3.2    Information Rights of the Company ............................................................ 8

## ARTICLE IV

## PREEMPTIVE RIGHTS; REGISTRATION RIGHTS

Section 4.1    Preemptive Rights ....................................................................................... 9
Section 4.2    Registration Rights .................................................................................... 11

## ARTICLE V

## MISCELLANEOUS

Section 5.1    Complete Agreement .................................................................................. 11
Section 5.2    Certain Actions ......................................................................................... 11
Section 5.3    Governing Law .......................................................................................... 11
Section 5.4    No Assignment .......................................................................................... 11
Section 5.5    Binding Effect ........................................................................................... 12
Section 5.6    Severability ............................................................................................... 12
Section 5.7    No Partition ............................................................................................... 12
Section 5.8    Additional Documents and Acts ............................................................... 12
Section 5.9    No Employment Rights .............................................................................. 12
Section 5.10   Amendments; Termination of Equity Rights ............................................ 12

i

Case 17-32986-KLP    Doc 597    Filed 08/31/17    Entered 08/31/17 21:21:23    Desc Main
Document        Page 135 of 272

Section 5.11    No Waiver ........................................................................................................ 13
Section 5.12    Notices ............................................................................................................. 13
Section 5.13    Consent to Jurisdiction; WAIVER OF JURY TRIAL ........................................ 13
Section 5.14    No Third Party Beneficiary ............................................................................... 14
Section 5.15    Confidentiality ................................................................................................. 14
Section 5.16    Business Opportunities ..................................................................................... 15
Section 5.17    Cumulative Remedies; Specific Performance ..................................................... 16
Section 5.18    Exhibits and Schedules ..................................................................................... 16
Section 5.19    Interpretation .................................................................................................... 17
Section 5.20    Termination ....................................................................................................... 17

SCHEDULE I        COMPETITORS

EXHIBIT A         DEFINITIONS

EXHIBIT B         CONFIDENTIALITY AGREEMENT

## STOCKHOLDERS AGREEMENT

This Stockholders Agreement (as amended, modified or supplemented from time to time, this "*Agreement*") is made and entered into as of [●], 2017 (the "*Effective Date*") by and among Giraffe New Holding Co., Inc., a Delaware corporation (the "*Company*"), and the Stockholders (as defined herein).  Capitalized terms used, but not otherwise defined, herein have the meanings set forth in Exhibit A attached hereto and made a part hereof by reference.

## RECITALS

A.      The Company and certain other affiliated debtors (collectively, the "*Debtors*") filed a plan of reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, on June 16, 2017, which was confirmed by the United States Bankruptcy Court for the Eastern District of Virginia on [●], 2017 (including all exhibits, schedules and supplements thereto and as amended from time to time in accordance with the terms thereof, the "*Plan*").

B.      The Plan provides that the Company and the Stockholders will enter into a stockholders agreement to establish certain arrangements with respect to the Company Common Stock, and the Company and Stockholders are entering into this Agreement in furtherance of the aforesaid provisions of the Plan.

C.      As of the date hereof, the Stockholders hold in the aggregate all of the Outstanding Company Common Stock.

D.      The Plan provides that this Agreement shall be deemed to be valid, binding and enforceable in accordance with its terms, and each Stockholder shall be deemed to be bound hereby, in each case without the need for execution of this Agreement by any party hereto other than the Company.

E.      The parties hereto desire to enter into this Agreement to establish certain arrangements with respect to the Company Common Stock and other related corporate matters of the Company.

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Company and the Stockholders, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## STOCKHOLDERS

**Section 1.1**    **Stockholders**.  Except for the obligations contained in Section 5.15, a Person shall cease to be a Stockholder for all purposes upon the disposition of all of such Person's Company Common Stock.

## ARTICLE II

## BOARD OF DIRECTORS; MANAGEMENT AND CONTROL OF BUSINESS

Section 2.1    **Board of Directors**.

(a)    The Board, acting in accordance with the terms of this Agreement, shall have the right, power and authority to oversee the business and affairs of the Company and to do all things necessary or appropriate to manage the business and affairs of the Company, and the Board is hereby authorized to take any action of any kind and to do anything and everything the Board deems necessary or appropriate in accordance with the provisions of this Agreement, the Company's Charter Documents and applicable law.  At all times, the composition of any board of directors or equivalent of any Subsidiary of the Company shall be the same as that of the Board.

(b)    The Board shall be comprised of seven (7) Directors as follows:

(i)    the chief executive officer of the Company (the "***Executive Director***"), who shall initially be Daniel Griesemer;

(ii)    for so long as Brigade holds at least the Minimum Designating Ownership, one (1) Director designated by Brigade (the "***Brigade Director***"), who shall initially be Matt Perkal;

(iii)    for so long as Oppenheimer holds at least the Minimum Designating Ownership, one (1) Director designated by Oppenheimer (the "***Oppenheimer Director***"), who shall initially be Brian Hickey;

(iv)    for so long as Searchlight holds at least the Minimum Designating Ownership, one (1) Director designated by Searchlight (the "***Searchlight Director***" and together with the Brigade Director and the Oppenheimer Director, the "***Investor Directors***"), who shall initially be Eric Sondag; and

(v)    three (3) Directors elected by the Stockholders in accordance with Section 2.1(c)(iii) and the Company's Charter Documents (the "***At-Large Directors***"), who shall initially be Ron Beegle of Carriage House Capital Advisors, LLC, Shaz Kahng and [●].[1]

(c)    Commencing as of the Effective Date, the Board shall be divided, with respect to the time for which the Directors shall severally hold office, into three (3) classes as follows: (i) the Executive Director and the Oppenheimer Director (or any replacement thereof selected in accordance with Section 2.1(f) and the Company's Charter Documents) shall serve in Class I with an initial term expiring at the 2018 annual meeting of the Stockholders in accordance with the Company's Charter Documents (the "***Class I Directors***"), (ii) the Brigade Director and the Searchlight Director (or any replacement thereof selected in accordance with accordance with Section 2.1(f) and the Company's Charter Documents) shall serve in Class II with an initial term

---

[1] **Note to Draft**:  Remaining At-Large Director to be designated by the Required Consenting Creditors prior to emergence.

expiring at the 2019 annual meeting of the Stockholders in accordance with the Company's Charter Documents (the "**Class II Directors**"), and (iii) the At-Large Directors (or any replacement thereof selected in accordance <u>Section 2.1(f)</u> and the Company's Charter Documents) shall serve in Class III with an initial term expiring at the 2020 annual meeting of the Stockholders in accordance with the Company's Charter Documents (the "**Class III Directors**"). Commencing with the 2018 annual meeting of the Stockholders (in accordance with the Company's Charter Documents), each Director that is elected by the Stockholders shall be elected for a three (3)-year term.

(d)    The Company and the Stockholders shall take all Necessary Action to ensure that (i) subject to the applicable Board Designator holding at least the Minimum Designating Ownership, each Investor Director designated by the applicable Board Designator shall hold office until the earlier to occur of (x) such Investor Director's death, disability, or disqualification and (y) such Investor Director's retirement, resignation, replacement or removal from the Board in accordance with <u>Section 2.1(f)</u> and the Company's Charter Documents and (ii) each At-Large Director shall hold office until the annual meeting of the Stockholders to elect the Class III Directors in accordance with <u>Section 2.1(c)(iii)</u> and the Company's Charter Documents or such shorter period resulting from any such At-Large Director's (x) death, disability or disqualification or (y) retirement, resignation, replacement or removal.

(e)    If at any time (i) Brigade holds less than the Minimum Designating Ownership, (A) the Brigade Director shall serve as a Class II Director until the expiration of the then-current term of the Class II Directors or until such Director's earlier death, disability, disqualification, retirement, resignation or removal, (B) at the subsequent election of Class II Directors, a Director (who may be the Brigade Director) shall be elected by the Stockholders in accordance with the Company's Charter Documents to fill the seat of the Brigade Director (such Director who initially replaces the Brigade Director pursuant to this <u>Section 2.1(e)</u> or any such Class II Director thereafter, the "**Replacement Brigade Director**"), and (C) Brigade shall no longer be entitled to designate the Brigade Director, (ii) Oppenheimer holds less than the Minimum Designating Ownership, (A) the Oppenheimer Director shall serve as a Class I Director until the expiration of the then-current term of the Class I Directors or until such Director's earlier death, disability, disqualification, retirement, resignation or removal, (B) at the subsequent election of Class I Directors, a Director (who may be the Oppenheimer Director) shall be elected by the Stockholders in accordance with the Company's Charter Documents to fill the seat of the Oppenheimer Director (such Director who initially replaces the Oppenheimer Director pursuant to this <u>Section 2.1(e)</u> or any such Class I Director thereafter, the "**Replacement Oppenheimer Director**"), and (C) Oppenheimer shall no longer be entitled to designate the Oppenheimer Director, or (iii) Searchlight holds less than the Minimum Designating Ownership, (A) the Searchlight Director shall serve as a Class II Director until the expiration of the then-current term of the Class II Directors or until such Director's earlier death, disability, disqualification, retirement, resignation or removal, (B) at the subsequent election of Class II Directors, a Director (who may be the Searchlight Director) shall be elected by the Stockholders in accordance with the Company's Charter Documents to fill the seat of the Searchlight Director (such Director who initially replaces the Searchlight Director pursuant to this <u>Section 2.1(e)</u> or any such Class II Director thereafter, together with the Replacement Brigade Director and the Replacement Oppenheimer Director, the "**Replacement Directors**"), and (C) Searchlight shall no longer be entitled to designate the Searchlight Director.

(f)    Subject to the applicable Board Designator holding at least the Minimum Designating Ownership, (i) each Investor Director shall serve solely at the discretion of the Board Designator that designated such Investor Director and (ii) any Investor Director may be removed (which removal may occur at any time with or without cause) and replaced only by the Board Designator that designated such Director and any vacancy on the Board resulting from the death, disability, retirement, resignation, disqualification or removal of such Investor Director shall be filled only by such Board Designator, and the Company and the Stockholders shall take all Necessary Action as may be required to facilitate and implement the immediate appointment of such replacement Investor Director to the Board.  If the chief executive officer of the Company is removed or resigns or is otherwise replaced as an officer of the Company, such person shall automatically, and without any action by the Board or the Stockholders, cease to be the Executive Director, and the Company's successor chief executive officer appointed pursuant to the Company's Charter Documents shall automatically become the Executive Director pursuant to Section 2.1(b)(i) and the Company and the Stockholders shall take all Necessary Action to ensure that such successor chief executive officer is elected as the Executive Director at the subsequent election of Class I Directors.  The At-Large Directors and the Replacement Directors may be removed and replaced in accordance with the Company's Charter Documents, and any vacancy on the Board resulting from the death, disability, retirement, resignation, disqualification or removal of any such Director shall be filled by the affirmative vote of a majority the Directors then serving on the Board.

(g)    A Director may resign from the Board at any time upon delivery of written notice to the Board and the Stockholder(s) that designated or elected him or her, and any such vacancy shall be filled in accordance with Section 2.1(f).

(h)    The size and composition of the committees of the Board and the committees of the boards of directors or equivalent governing bodies of the Company's Subsidiaries shall be as determined by the Board from time to time; provided, that each Investor Director shall have the right to serve on any such committee of the Board (or any such committee of the boards of directors or equivalent governing bodies of the Company's Subsidiaries) so long as the applicable Board Designator owns at least the Minimum Designating Ownership.

### Section 2.2    Restrictions on Authority of the Board.

(a)    Notwithstanding anything to the contrary in this Agreement, none of the following actions may be taken by the Company, directly or indirectly (and the Company shall cause its Subsidiaries to refrain from taking such actions) without a Stockholder Approval:

(i)    any merger, consolidation, reorganization or equity recapitalization of the Company or its Subsidiaries (other than mergers or consolidations of a wholly owned Subsidiary of the Company with another wholly owned Subsidiary of the Company or with the Company);

(ii)    any sale, assignment or other transfer of all or substantially all of the assets or properties of the Company and its Subsidiaries (in each case, on a consolidated basis) other than (x) sales, assignments and transfers between a wholly owned Subsidiary of the Company and the Company or another wholly owned Subsidiary of the Company or (y) a pledge of assets of the Company and its Subsidiaries in accordance with the exit term loan facility

provided by the DIP Term Loan Lenders (as defined in the Plan) to be entered into by the Debtors or any of their successors on the terms set forth in the Exit Term Loan Facility Term Sheet attached as Annex IV to that certain Restructuring Support Agreement, dated June 11, 2017, by and among the Debtors, the Sponsor and the Consenting Creditors (each as defined in the Plan);

(iii)    any liquidation, dissolution or winding up, bankruptcy or consenting to the entry of a decree or order appointing a trustee, custodian, receiver, liquidator, assignee or similar official, in each case, of the Company or any material Subsidiary of the Company, or any action that would cause the foregoing;

(iv)    any amendment, modification or waiver of the Charter Documents of the Company or any of the Company's material Subsidiaries other than (A) to correct any typographical or similar ministerial error, (B) to delete or add any provision required to be so deleted or added by any applicable law, (C) to cure any ambiguity or to correct or supplement any provision which may be inconsistent with any provision herein, and (D) to make any immaterial amendment or modification that is deemed necessary or appropriate by the Board, in each case set forth in clauses (A) through (D) above, which does not adversely affect the rights or obligations of any Stockholder, in its capacity as a Stockholder; provided that any such amendment that reasonably would be expected to disproportionately and adversely affect any Stockholder, in its capacity as a Stockholder, as compared to the other Stockholders, shall also require the prior written consent of each Stockholder so affected;

(v)    engagement in any material new line of business substantially unrelated to (A) any business or activity of the Company or any of its Subsidiaries currently conducted as of the date hereof or (B) any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof, or is complementary, incidental, ancillary or related thereto;

(vi)    implementation of a new management Equity Incentive Plan or similar arrangement which could result, when combined with all other Equity Incentive Plans, in the aggregate issuance of more than five percent (5%) of the Outstanding Company Common Stock; or

(vii)    entry into any agreement, commitment or arrangement to effect, or requiring the Company or any of its Subsidiaries to effect, any of the foregoing.

(b)    Affiliate Transactions.  Excluding transactions in accordance with Section 4.1, including Section 4.1(e), the Company shall not, and shall cause each of its Subsidiaries not to, enter into, modify (including by waiver) or terminate any transaction or series of related transactions, or agreement, with any holder of Company Common Stock that (together with its Affiliates) holds at least five percent (5%) of the Outstanding Company Common Stock or with any Director or officer of the Company, or with any Affiliate of any of the foregoing (any such transaction or series of related transactions or agreements, an "**Affiliate Transaction**"), unless (i) a majority of the Directors then serving on the Board who are not party to, or affiliated with such holder, or Affiliate thereof, that is a party to, such Affiliate Transaction (such majority, a "**Majority of Disinterested Directors**") reasonably determines that such Affiliate Transaction is

- 5 -

on terms that are at least as favorable to the Company and its Subsidiaries as could reasonably be obtained from an independent third party, (ii) such Affiliate Transaction is approved by a Majority of Disinterested Directors, and (iii) if and to the extent that an Affiliate Transaction involves the aggregate payment to or by the Company and its Subsidiaries equal to or in excess of five million dollars ($5,000,000), in addition to meeting the requirements in clauses (i) and (ii), either (x) the Company has obtained an opinion from a nationally recognized accounting or investment banking firm (to be selected and paid by the Company) that is independent, with no direct or indirect financial interest in the Company or its Subsidiaries, or in the proposed Affiliate Transaction or any other party thereto, that the proposed Affiliate Transaction is fair to the Stockholders from a financial point of view or (y) Stockholder Approval is obtained with respect to such Affiliate Transaction (disregarding, for such purposes, any holder of Company Common Stock, or Affiliate thereof, that is a party to such Affiliate Transaction, and the shares of Company Common Stock held by such Persons).  Notwithstanding the foregoing or anything to the contrary in this Agreement, except as required by applicable law, the Company's performance of its obligations under the Backstop Commitment Agreement or in connection with the consummation of the Rights Offerings, in each case in accordance with the Plan, shall not require any further consent or approval of the Board or the Stockholders.

Section 2.3    **Directors' Non-exclusive Services**.    No Director shall be required to manage the Company as his or her sole and exclusive function and any Director or Stockholder may have other business interests and may engage in other activities in addition to those relating to the Company.

Section 2.4    **Reimbursement of Expenses**.    Each Director shall be entitled to reimbursement from the Company of all expenses reasonably incurred and paid by such Director in connection with such Director's services as a Director or otherwise incurred for the benefit of, or on behalf of, the Company.  The Board may establish, from time to time, policies relating to expense reimbursement (including the types of expenses, such as retained counsel or other advisors, that will be reimbursable), which policies shall treat and apply to each Director (other than any employee of the Company serving as a Director) equally.

# ARTICLE III

# INFORMATION RIGHTS

Section 3.1    **Information Rights of Stockholders; Records Required by the DGCL; Right of Inspection**.

(a)    At any time that the Company is not obligated to file reports under Section 13 or 15(d) of the Exchange Act and does not file reports required by Section 13 or 15(d) of the Exchange Act as a voluntary filer, each Stockholder, other than any Stockholder that is a Competitor, shall have the right to receive the following information (which right the Company may satisfy by providing access to each Stockholder to a confidential website such as Intralinks and timely posting such information on such website (which website shall have a system of email notification of new postings and may require confirmation by viewers of the site of the confidentiality obligations set forth in <u>Section 5.15</u>, a "*Secure Site*")), and each Stockholder may share and discuss such information (along with any other information provided to Stockholders

pursuant to this Agreement and otherwise made available to Stockholders via the Secure Site) with its Affiliates, directors, officers, partners, managers, stockholders, employees, investors and advisors as well as any bona fide prospective purchaser of Company Common Stock that (x) is not a Competitor and (y) has entered into, and delivered to the Company, a confidentiality agreement substantially in the form set forth on Exhibit B attached hereto, with such changes as may be approved by the Company in its reasonable discretion, regarding the treatment of such information (any such Person, a "**Permitted Person**") (and for the avoidance of doubt, at its election, the Company may share and discuss such information with any prospective purchaser of Company Common Stock):

(i)    within ninety (90) days of the end of each fiscal year, copies of all annual financial statements and similar information of the Company and its Subsidiaries as of the end of such fiscal year, which financial statements shall (v) include a comparison to the prior fiscal year results; (w) be prepared in accordance with GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act shall be required in connection with such financial statements); (x) be audited by a nationally recognized accounting firm approved by the Board and accompanied by a report and opinion thereon by such accounting firm prepared in accordance with generally accepted auditing standards that is not subject to any qualification as to the scope of such audit or with respect to accounting principles followed by the Company or any of its Subsidiaries not in accordance with GAAP; (y) be accompanied by a management discussion and analysis of financial condition and results of operations with respect to such financial statements (an "**MD&A**"); and (z) be certified by the chief financial officer of the Company; and

(ii)    for each of the first three (3) fiscal quarters of each fiscal year of the Company, copies of all unaudited quarterly financial statements and similar information of the Company and its Subsidiaries as of the end of such fiscal quarter, which financial statements shall (w) include year-to-date results and a comparison to the corresponding period in the prior fiscal year; (x) be prepared in accordance with GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act shall be required in connection with such financial statements); (y) be accompanied by an MD&A; and (z) be delivered no later than forty-five (45) days following the end of each such fiscal quarter.

(b)    During the term of the Company's existence there shall be maintained in the Company's principal office or at the office of the Company's agents and representatives all records required to be kept pursuant to the DGCL, including (whether or not so required) a current list of the names, addresses and shares of Company Common Stock held by each of the Stockholders (including the dates on which each of the Stockholders became a Stockholder), copies of federal, state and local information or income tax returns for each of the Company's tax years, copies of this Agreement and each of the Company's Charter Documents, including all amendments thereto and restatements thereof, and correct and complete books and records of account of the Company.  Prior to any termination of the Company's existence, the Company shall use all reasonable efforts to ensure that, for a period of six (6) years after any such termination, such information, to the extent still in existence and available, may be obtained by a Stockholder's request in writing to a legal advisor or agent of the Company to be designated

prior to any such termination, with the cost (as reasonably determined by such legal advisor or agent) of accessing and providing such information being borne by the requesting Stockholder.

(c)    The Company shall host, and each Stockholder, other than any Stockholder that is a Competitor, that (together with its Affiliates) holds at least one percent (1%) of the Outstanding Company Common Stock, shall have access to, quarterly conference calls with the Company's chief executive officer and chief financial officer to discuss the status of the Company and its business and the business of its Subsidiaries, which calls shall include a reasonable and customary question and answer session (each such call, a "*Quarterly Call*").  Quarterly Calls shall be hosted as promptly as reasonably practicable but in any event no later than five (5) Business Days after furnishing the annual and quarterly reports in accordance with <u>Section 3.1(a)</u>.  Other than any Stockholder that is a Competitor, each Stockholder shall have the right to receive from the Company, within ten (10) days after a Quarterly Call, an audio recording of such Quarterly Call and copies of all materials provided by the Company to the attendees thereof in connection with such Quarterly Call (which right the Company may satisfy by providing access to each Stockholder to a Secure Site), and each Stockholder may share and discuss such information with any Permitted Person (and for the avoidance of doubt, at its election, the Company may share and discuss such information with any prospective purchaser of Company Common Stock).

(d)    On written request stating the purpose, a Stockholder that (together with its Affiliates) holds at least one percent (1%) of the Outstanding Company Common Stock may make reasonable inquiries of management and examine, at any reasonable time during business hours, for any proper purpose reasonably related to such Stockholder's interest as a Stockholder of the Company, and at the Stockholder's expense, records of the Company and its Subsidiaries; <u>provided</u> that the Company may limit access to certain information if the Board reasonably deems such information to be competitively sensitive with respect to the Stockholder requesting such access or if granting such access could reasonably be expected in the loss or impairment of the Company to claim attorney client privilege, work product doctrine, or a similar protective privilege or doctrine with respect to the information, or to violate applicable law (<u>provided</u> that the Company shall use its reasonable best efforts to allow for such access in a way that would not have any of the foregoing effects).  Upon written request by any Stockholder made to the Company, the Company shall provide or make available to such Stockholder without charge true copies of this Agreement, the Company's Charter Documents, and all amendments thereto and restatements thereof, which documents may be provided to such Stockholder by posting them on a Secure Site or on EDGAR (as applicable).

**Section 3.2    <u>Information Rights of the Company</u>**.  The Company may from time to time, but a Stockholder may be compelled to answer no more frequently than once per calendar quarter (unless, with respect to clause (a) of this <u>Section 3.2</u>, required by applicable law), reasonably request of any or all Stockholders information (a) needed by the Company to comply with applicable law or any contract entered into by the Company or any of its Subsidiaries, including any financing arrangements, and/or (b) regarding such Stockholder's "accredited investor" status (within the meaning of Regulation D promulgated under the Securities Act).

## ARTICLE IV

## PREEMPTIVE RIGHTS; REGISTRATION RIGHTS

**Section 4.1** **Preemptive Rights**. Any issuance of New Securities by the Company or any of its Subsidiaries, other than an issuance of Exempt Securities, shall be subject to the following provisions:

(a) Right to Purchase New Securities. Except as otherwise provided in this Section 4.1 (including Section 4.1(e)), the Company hereby grants to each Stockholder that (i) at the time of the relevant issuance, sale or distribution is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act and (ii) together with its Affiliates, holds of record as of the Preemptive Offer Record Date (as defined below) at least one percent (1%) of the Outstanding Company Common Stock (each such Stockholder, a "**Qualified Stockholder**") the right to purchase its pro rata share (calculated for purposes of this Section 4.1 as the percentage of the Outstanding Company Common Stock so held by all Qualified Stockholders) of any and all issuances, sales or distributions of New Securities proposed to be made by the Company or any of its Subsidiaries as set forth herein.

(b) Issuance Notice. The Company shall give each Qualified Stockholder written notice of the Company's intention to issue or sell New Securities (as applicable, the "**Offered Securities**") (which notice may be provided by posting the requisite information on a Secure Site and notifying (or causing notification to be delivered to) each such Qualified Stockholder of such posting in writing in accordance with Section 5.12) (the "**Issuance Notice**"), describing the type and terms of the Offered Securities, the price at which such Offered Securities will be issued or sold and the general terms upon which the Company proposes to issue or sell such Offered Securities, including the anticipated date of such issuance, sale or distribution, the general use of proceeds thereof, a description of both the business purpose of the offering of such Offered Securities and the dilutive effects, if any, of such offering, the record date for determining Qualified Stockholders, which, if not specified in the Issuance Notice, shall be the date of the Issuance Notice (the "**Preemptive Offer Record Date**"), and such Qualified Stockholder's pro rata share of such Offered Securities. Each Qualified Stockholder shall have ten (10) Business Days from the date the Issuance Notice is sent to deliver notice (the "**Response Notice**") of its intention to purchase all or any portion of its pro rata share of the Offered Securities and stating therein the quantity of Offered Securities it intends to purchase (each Qualified Stockholder who delivers a Response Notice hereunder is a "**Purchaser**" for purposes of this Section 4.1). Such Response Notice shall constitute the irrevocable agreement of such Purchaser to purchase the quantity of Offered Securities indicated in the Response Notice at the price and upon the terms stated in the Issuance Notice; provided, however, that if the Company is proposing to issue, sell or distribute securities for consideration other than all cash, and subject to the limitations on the rights set forth in this Section 4.1, the Company shall accept from such Purchaser either non-cash consideration that is reasonably comparable to the non-cash consideration proposed by the Company or the cash value of such non-cash consideration, in each case as determined in good faith by the Board. Any purchase of Offered Securities by a Purchaser pursuant to this Section 4.1 shall be consummated on or prior to the later of (x) the date on which all other Offered Securities described in the applicable Issuance Notice are issued, sold or distributed and (y) the second (2nd) Business Day following delivery of the Response Notice by such Purchaser.

(c)    <u>Reallotment Right</u>.  Each Purchaser shall have the further right to subscribe for all or any portion of the Offered Securities not subscribed for by Purchasers pursuant to <u>Section 4.1(b)</u> to which it may become entitled to purchase under this <u>Section 4.1(c)</u>.  The Response Notice may set forth an amount of additional Offered Securities ("***Reallotment Securities***") that such Purchaser would be willing to purchase in the event that there is any under-subscription for the entire amount of such Offered Securities.  In the event that there is such an under-subscription, the Company shall apportion the unsubscribed-for Offered Securities to those Purchasers whose Response Notices specified an amount of Reallotment Securities, which apportionment shall be made among such specifying Purchasers pro rata based upon the number of shares of Offered Securities initially subscribed for by each such specifying Purchaser relative to the number of shares of Offered Securities initially subscribed for by all such specifying Purchasers pursuant to <u>Section 4.1(b)</u>; <u>provided</u>, <u>however</u>, that in no event will any such specifying Purchaser be obligated to purchase any amount of Reallotment Securities that is greater than the amount of additional Offered Securities that such specifying Purchaser stated that it would be willing to purchase in the Response Notice of such specifying Purchaser.

(d)    <u>Sale to Other Persons</u>.  The Company shall have sixty (60) days from the date of the applicable Issuance Notice to consummate an issuance, sale or distribution of any Offered Securities which the Qualified Stockholders have not elected to purchase pursuant to <u>Section 4.1(b)</u> to other Persons at a price and on terms and conditions not less favorable to the Company than those contained in the Issuance Notice.  In the event that the sale of Offered Securities is not fully consummated within such sixty (60)-day period, then the Company shall be obligated once again to offer the purchase rights set forth in this <u>Section 4.1</u> before it may subsequently sell such Offered Securities (<u>provided</u> that such sixty (60)-day period shall automatically toll, but not for longer than one-hundred and eighty (180) days to the extent regulatory approval would be required for such Person to acquire such Offered Securities).

(e)    <u>Exempt Securities</u>.  Notwithstanding the foregoing provisions of this <u>Section 4.1</u>, Qualified Stockholders shall not have the right to participate in the issuance, sale or distribution of any New Securities which are otherwise authorized to be issued in accordance with this Agreement (i) if such New Securities were issued as consideration in any merger, consolidation or combination with or acquisition of securities or assets of another Person in exchange for New Securities, (ii) if made upon conversion or exercise of any rights, convertible securities, options or warrants to purchase Company Common Stock or other capital stock of the Company, (iii) if made by any Subsidiary of the Company to the Company or any of its direct or indirect wholly owned Subsidiaries, (iv) if made as securities which are the subject of a registration statement being filed under the Securities Act pursuant to a Qualified IPO, (v) if made to Directors, officers, employees or consultants as compensation pursuant to any Equity Incentive Plans or as compensation for services rendered or to be rendered to the Company or any of its Subsidiaries or otherwise due to his or her status as a service provider to the Company or any of its Subsidiaries, (vi) if such New Securities were issued in connection with the Backstop Commitment Agreement, or in connection with the consummation of the Rights Offerings in accordance with the Plan, (vii) if such New Securities were issued in connection with any joint venture, strategic alliance or partnership or similar transaction or arrangement (in each case as determined by the Board acting in good faith) or (viii) if such New Securities were issued pursuant to any pro rata stock split or stock dividend (the New Securities described in the foregoing clauses (i) through (viii), "***Exempt Securities***").

(f)      Accelerated Buyer Transactions.  Nothing in this Section 4.1 shall prevent the Company or its Subsidiaries from issuing or selling to any Person (the "*Accelerated Buyer*") any New Securities without first complying with the provisions of this Section 4.1; provided that in connection with such issuance or sale (i) the Company gives reasonably prompt notice to the Qualified Stockholders of such issuance (after such issuance has occurred), which notice shall describe in reasonable detail the New Securities purchased by the Accelerated Buyer and the purchase price thereof and (ii) the Accelerated Buyer and the Company enable the Qualified Stockholders to effectively exercise their respective rights under this Section 4.1 with respect to their purchase of their pro rata share of the New Securities issued to the Accelerated Buyer within fifteen (15) Business Days after receipt of the notice by the Qualified Stockholder of such issuance to the Accelerated Buyer on the terms specified in this Section 4.1. The Preemptive Offer Record Date for such issuance shall be the date such New Securities are issued to the Accelerated Buyer.

Section 4.2      **Registration Rights**.  The Stockholders shall have the registration rights set forth the Registration Rights Agreement.

## ARTICLE V

## MISCELLANEOUS

Section 5.1      **Complete Agreement**.    This Agreement, the Plan and the other agreements expressly referenced in this Agreement and the Plan constitute the complete and exclusive statement of agreement among the Stockholders with respect to the subject matter hereof.  This Agreement supersedes all prior written and oral statements by and among the Stockholders or any of them, and except as otherwise specifically contemplated by this Agreement, no representation, statement, or condition or warranty not contained in this Agreement will be binding on the Stockholders or the Company or have any force or effect whatsoever.

Section 5.2      **Certain Actions**.  The Company by its execution hereof acknowledges that it has actual notice of the terms of this Agreement, consents hereto and hereby covenants with each of the Stockholders that it will at all times during the term of this Agreement be governed by the terms and provisions hereof in carrying out its business and affairs and, accordingly, shall give or cause to be given such notices, execute or cause to be executed such documents and do or cause to be done all such acts, matters and things as may from time to time be necessary or required to carry out the terms and intent hereof.

Section 5.3      **Governing Law**.  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware, without reference to conflicts of law principles that would require the application of the laws of another jurisdiction.

Section 5.4      **No Assignment**.  No party hereto may assign any of its respective rights or delegate any of its respective obligations under this Agreement, and any attempted assignment or delegation in violation of the foregoing shall be null and void; provided, that Brigade, Oppenheimer and/or Searchlight may assign or delegate their respective rights and obligations

under this Agreement to their respective Affiliates and funds, clients and accounts managed by such Affiliates.

**Section 5.5**     **Binding Effect**.  Subject to the provisions of this Agreement relating to transferability or assignment, this Agreement will be binding upon and inure to the benefit of the Company and each of the Stockholders, and their respective heirs, devisees, spouses, distributees, representatives, successors and permitted assigns.  For the avoidance of doubt, no joinder to this Agreement shall be required in connection with any permitted Transfer or assignment.

**Section 5.6**     **Severability**.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future laws applicable to the Company effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

**Section 5.7**     **No Partition**.  The parties acknowledge that the assets and properties of the Company are not and will not be suitable for partition.  Thus, each Stockholder (on behalf of such Stockholder and their respective successors and assigns) hereby irrevocably waives any and all rights that such Stockholder may have to maintain any action for partition of such assets and properties, if any.

**Section 5.8**     **Additional Documents and Acts**.  Each party hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be reasonably necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

**Section 5.9**     **No Employment Rights**.  Nothing in this Agreement shall confer upon any Person any right to be employed or to continue employment by the Company or any of its Affiliates, or interfere in any manner with any right of the Company or any of its Affiliates to terminate such employment at any time.

**Section 5.10**     **Amendments; Termination of Equity Rights**.

(a)     All amendments to this Agreement will be in writing and subject to receipt of Stockholder Approval and approval by any other Stockholders whose approval is required pursuant to Section 5.10(b).

(b)     Any amendment or other modification that would adversely affect any Stockholder's rights set forth in Section 2.1, Section 2.3, Section 2.4 or Section 3.1 shall require the written consent of each such Stockholder adversely affected; provided, however, that any amendment to Section 3.1 that only provides for a reasonable extension of time for the delivery of the financial statements or the other information to be delivered pursuant thereto shall only require a Stockholder Approval.  If any amendment or other modification would adversely affect the rights and obligations of any Stockholder in a manner disproportionate relative to any other Stockholder or would subject a Stockholder to any obligation or liability not shared by each of

- 12 -

the other Stockholders, then such amendment or other modification shall not be effective without the written consent of such Stockholder.

**Section 5.11   No Waiver**.  No delay, failure or waiver by any party to exercise any right or remedy under this Agreement, and no partial or single exercise of any such right or remedy, will operate to limit, preclude, cancel, waive or otherwise affect such right or remedy, nor will any single or partial exercise of such right or remedy limit, preclude, impair or waive any further exercise of such right or remedy or the exercise of any other right or remedy.  No waiver of or consent to any departure from any provision of this Agreement shall be effective unless signed in writing by the party entitled to the benefit thereof, in which case such waiver shall bind the successors and permitted Transferees and assigns of such party.

**Section 5.12   Notices**.  Except as otherwise provided elsewhere in this Agreement regarding notices by electronic mail or other electronic means to Stockholders and the Board and regarding proxies, all notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be delivered (a) by personal delivery, (b) by a nationally recognized overnight courier service, (c) by electronic mail using equipment that provides written confirmation of delivery, or (d) by deposit in the U.S. Mail, postage prepaid, registered or certified mail, return receipt requested, to the Company at its principal executive office and to any Stockholder at the address then shown as the current address of such Stockholder specified on the Stockholder Registry.  Any such notice shall be deemed to have been given on the date so delivered, if delivered personally, by overnight courier service or by electronic mail; or if mailed, four (4) calendar days after mailing.  Any party may, at any time by giving five (5) calendar days' prior written notice to the Company, specify a different address (physical or electronic) or electronic mail address for notice purposes by sending notice thereof in the foregoing manner.  Any notice required to be given by the Company to Stockholders, including pursuant to Section 228(e) of the DGCL, may be given by posting to a Secure Site (with email notification of such posting to each Stockholder), and shall be deemed to be delivered on the date such posting is made.

**Section 5.13   Consent to Jurisdiction; WAIVER OF JURY TRIAL**.

(a)   Consent to Jurisdiction.  The Company and each Stockholder (i) irrevocably submit to the exclusive jurisdiction of any state court in the State of Delaware, and the United States District Court for the District of Delaware (and the appropriate appellate courts), for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agree to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in any state court in the State of Delaware.  Notwithstanding the foregoing, any party hereto may commence an action, suit or proceeding with any governmental body anywhere in the world for the sole purpose of seeking recognition and enforcement of a judgment of any court referred to in the first sentence of this Section 5.13(a).  The Company and each Stockholder further (x) agree that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth on the Stockholder Registry (or in the case of the Company, at the Company's principal office) shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this Section 5.13(a) and (y) irrevocably and unconditionally waive

any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (A) any state court in the State of Delaware, or (B) the United States District Court for the District of Delaware, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    WAIVER OF JURY TRIAL.  THE COMPANY AND EACH STOCKHOLDER HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR ANY SUCH STOCKHOLDER'S OWNERSHIP OF COMPANY COMMON STOCK.   THE COMPANY AND EACH STOCKHOLDER (I) CERTIFY THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE COMPANY OR ANY STOCKHOLDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE COMPANY OR SUCH STOCKHOLDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGE THAT THE COMPANY AND EACH STOCKHOLDER HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.13(B).

**Section 5.14    No Third Party Beneficiary**.  Except as expressly provided in Section 5.5, this Agreement is made solely and specifically among and for the benefit of the parties hereto (including each Stockholder), and their respective successors and permitted assigns, and no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

**Section 5.15    Confidentiality**.

(a)    The terms of this Agreement, the identity of any Person with whom the Company may be holding discussions with respect to any investment, acquisition, disposition or other transaction, any information disclosed to or received by any Stockholder pursuant to Section 3.1 or Exhibit B and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company or its Subsidiaries or the relative or absolute rights or interests of any of the Stockholders (collectively, the "***Confidential Information***") that has not been publicly disclosed by the Company is confidential and proprietary information of the Company, the disclosure of which may cause irreparable harm to the Company and the Stockholders.  Accordingly, each Stockholder represents that it has not and agrees that it will not and will direct its stockholders, partners, directors, officers, agents, representatives, attorneys, accountants, advisors, employees, and Affiliates (collectively, its "***Representatives***") not to, disclose to any Person any Confidential Information or confirm any statement made by third Persons regarding Confidential Information until the Company has publicly disclosed the Confidential Information; provided, however, that any Stockholder (or its Affiliates) may disclose such Confidential Information: (i) to the extent required by law (it being specifically understood and agreed that anything required to be set forth in a registration statement or any other document required to be filed pursuant to law will be deemed required by law, so long as the requirement to file such registration statement does not arise primarily in connection with a Transfer of securities of the Company), regulation, the listing standards of any national securities

- 14 -

exchange or required or requested by any governmental authority having applicable jurisdiction, (ii) to the extent that the Confidential Information is publicly known or subsequently becomes publicly known other than through a breach of this Section 5.15(a) by such Stockholder, (iii) to the extent that the Confidential Information is already in possession of, or is subsequently received by, a Stockholder from a third party not known by the Stockholder to be subject to an obligation of confidentiality owed to the Company, or (iv) to a prospective Transferee that (x) is not known by such Stockholder to be a Competitor and (y) has entered into reasonable confidentiality arrangements enforceable by the Company as described in Section 3.1(a), subject to the terms and conditions of such arrangements.  Notwithstanding the foregoing, each Stockholder may disclose Confidential Information to its Representatives (i) who such Stockholder determines in good faith need to know such information for the sole purpose of advising such Stockholder and (ii) who are informed by such Stockholder of the confidential nature of such information; provided that each Stockholder will be responsible for any violation of this Section 5.15 by any of its Representatives as if they were parties hereto.

(b)      If a Stockholder receives a request to disclose any Confidential Information under the terms of a valid and effective order issued by a court or governmental agency and the order was not sought by or on behalf of or consented to by such Stockholder, then such Stockholder may disclose the Confidential Information to the extent required if the Stockholder as promptly as practicable (i) notifies the Company of the existence, terms and circumstances of the order, (ii) consults in good faith with the Company on the advisability of taking legally available steps to resist or to narrow the order and cooperates with the reasonable requests of the Company, at the Company's sole cost and expense, in connection with the foregoing, and (iii) if disclosure of the Confidential Information is required, exercises its commercially reasonable efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded to the portion of the disclosed Confidential Information that the Company designates.  The cost (including attorneys' fees and expenses) of obtaining a protective order covering Confidential Information designated by the Company will be borne by the Company.

(c)      The covenants contained in this Section 5.15 will survive the Transfer of Company Common Stock of any Stockholder and the termination of this Agreement; provided, however, that this Section 5.15 will cease to be of any force and effect on the second (2nd) anniversary of the termination of this Agreement.

**Section 5.16  Business Opportunities**.  To the fullest extent permitted by Section 122(17) of the DGCL (or any successor provision) and except as may be otherwise expressly agreed in writing by the Company and any applicable Consenting Creditor (as defined in the Plan) (each, an "***Investor***" and together the "***Investors***"), the Company, on behalf of itself and its Subsidiaries, renounces and waives any interest or expectancy of the Company and its Subsidiaries in, or in being offered an opportunity to participate in, directly or indirectly, any potential transactions, matters or business opportunities (including, without limitation, any business activities or lines of business that are the same as or similar to those pursued by, or competitive with, the Company or any of its Subsidiaries or any dealings with customers or clients of the Company or any of its Subsidiaries) that are from time to time presented to any of the Investors or any of their respective Representatives even if the transaction, matter or opportunity is one that the Company or its Subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so and no such

person shall be liable to the Company or any of its Subsidiaries or its Affiliates for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such person pursues, acquires or participates in such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Company or its Subsidiaries.  Without limiting the foregoing renunciation, the Company acknowledges that certain Investors are in the business of making investments in, and have investments in, other businesses similar to and that may compete with the Company's businesses ("***Competing Businesses***"), and agrees that each such Investor shall have the right to make additional investments in or have relationships with other Competing Businesses independent of its investment in the Company. Any person purchasing or otherwise acquiring any interest in any shares of capital stock of the Company shall be deemed to have notice of and consented to the provisions of this <u>Section 5.16</u>.  Neither the alteration, amendment or repeal of this <u>Section 5.16</u>, nor the adoption of any provision of this Agreement inconsistent with this <u>Section 5.16</u>, nor, to the fullest extent permitted by the laws of the State of Delaware, any modification of law, shall eliminate or reduce the effect of this <u>Section 5.16</u> in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this <u>Section 5.16</u>, would accrue or arise, prior to such alteration, amendment, repeal, adoption or modification.  If any provision or provisions of this <u>Section 5.16</u> shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (a) the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this <u>Section 5.16</u> (including, without limitation, each portion of any paragraph of this <u>Section 5.16</u> containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (b) to the fullest extent possible, the provisions of this <u>Section 5.16</u> (including, without limitation, each such portion of any paragraph of this <u>Section 5.16</u> containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Company to protect its Representatives from personal liability in respect of their good faith service to or for the benefit of the Company to the fullest extent permitted by law.  This <u>Section 5.16</u> shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Company under this Agreement, the Charter Documents of the Company or applicable law.

**Section 5.17    <u>Cumulative Remedies; Specific Performance</u>**.

(a)      The rights and remedies of any party hereto as set forth in this Agreement are not exclusive and are in addition to any other rights and remedies now or hereafter provided by law or at equity.

(b)      The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that, in addition to any other rights and remedies at law or in equity existing in its favor, any non-breaching party hereto shall be entitled to seek specific performance and/or other injunctive relief from any court of law or equity of competent jurisdiction (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement.

**Section 5.18    <u>Exhibits and Schedules</u>**.  All Exhibits and Schedules attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.

**Section 5.19    Interpretation**. The titles and section headings set forth in this Agreement are for convenience only and shall not be considered as part of agreement of the parties hereto. When the context requires, the plural shall include the singular and the singular the plural, and any gender shall include all other genders or neuter. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation". No provision of this Agreement shall be interpreted or construed against any party because such party or its counsel was the drafter thereof. Any reference to the DGCL or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned. Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

**Section 5.20    Termination**. This Agreement will be automatically effective as of the Effective Date and will continue in effect thereafter until the earlier to occur of (a) its termination by the unanimous written consent of all Stockholders, (b) the dissolution, liquidation or winding up of the Company, (c) the occurrence of a Public Listing and (d) the date that is twenty (20) years after the date hereof. This Article V shall survive any termination of this Agreement.

**SCHEDULE I**

**COMPETITORS**

[*To be supplied.*]

# EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms will have the following meanings, and all section references shall be to sections in this Agreement unless otherwise provided:

"*Accelerated Buyer*" has the meaning set forth in <u>Section 4.1(e)</u>.

"*Affiliate(s)*" means with respect to any Person, (i) any other Person that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person (for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise); <u>provided</u>, <u>however</u>, that neither the Company nor any of its controlled Affiliates shall be deemed an Affiliate of any of the Stockholders (and vice versa), (ii) if such Person is an investment fund, an Affiliate shall include any other investment fund the primary investment advisor to which, or an Affiliate of such primary investment advisor, is the primary investment advisor to such Person and (iii) if such Person is a natural Person, any Family Member of such natural Person.

"*Affiliate Transaction*" has the meaning set forth in <u>Section 2.2(b)</u>.

"*Agreement*" has the meaning set forth in the preamble.

"*At-Large Directors*" has the meaning set forth in <u>Section 2.1(b)(vi)</u>.

"*Backstop Commitment Agreement*" has the meaning set forth in the Plan.

"*Board*" means the board of directors of the Company.

"*Board Designators*" means Brigade, Oppenheimer and Searchlight, collectively.

"*Brigade*" means Brigade Capital Management, LP, its Affiliates, and any fund, account or client managed or advised by any such Person from time to time.

"*Brigade Director*" has the meaning set forth in <u>Section 2.1(b)(ii)</u>.

"*Business Day*" means any day other than a Saturday, Sunday or date on which commercial banks in New York, New York are authorized by law to close for business.

"*Charter Documents*" means, with respect to the Company, the certificate of incorporation and bylaws of the Company, as the same may be amended, supplemented, modified or restated from time to time, and with respect to any other Person, the articles of incorporation, bylaws, certificate of incorporation, certificate of formation, operating agreement, partnership agreement or any other similar incorporating or formation documents of such Person, as the same may be amended, supplemented, modified or restated from time to time.

"***Class I Directors***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Class II Directors***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Class III Directors***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Company***" has the meaning set forth in the preamble.

"***Company Common Stock***" means the common stock, par value $0.01 per share, of the Company.

"***Competing Businesses***" has the meaning set forth in <u>Section 5.16</u>.

"***Competitor***" means any of the Persons set forth on <u>Schedule I</u> attached hereto and any of their controlled Affiliates, which schedule may be modified by the Board in good faith from time to time.

"***Confidential Information***" has the meaning set forth in <u>Section 5.15(a)</u>.

"***Debtors***" has the meaning set forth in the recitals.

"***Derivative Securities***" means direct or indirect options, rights, warrants or securities convertible into or exercisable or exchangeable for, any Company Common Stock or any other capital stock of the Company.

"***DGCL***" means the Delaware General Corporation Law, as the same may be amended from time to time.  All references herein to sections of the DGCL shall include any corresponding provisions of succeeding law.

"***Director***" means any member of the Board (other than any Person (if any) effecting observer rights on the Board).

"***EDGAR***" means the Electronic Data Gathering, Analysis and Retrieval System of the SEC.

"***Effective Date***" has the meaning set forth in the preamble.

"***Equity Incentive Plans***" means any equity incentive plans of the Company for Directors or officers or employees of the Company, including the Management Incentive Plan (as defined in the Plan).

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended from time to time.

"***Executive Director***" has the meaning set forth in <u>Section 2.1(b)(i)</u>.

"***Exempt Securities***" has the meaning set forth in <u>Section 4.1(d)</u>.

"***Family Member***" means, with respect to any natural Person, such Person's spouse and descendants (whether or not adopted) and any trust, family limited partnership or limited liability company that is and remains solely for the benefit of such Person's spouse and/or descendants.

"***GAAP***" means the generally accepted accounting principles as in effect from time to time in the U.S.

"***Investor Directors***" has the meaning set forth in Section 2.1(b)(iv).

"***Investor(s)***" has the meaning set forth in Section 5.16.

"***IPO***" means the first public offering of the Company pursuant to an effective Registration Statement under the Securities Act (other than on Forms S-4, S-8 or successors to such forms), covering the offer and sale of capital stock of the Company.

"***Issuance Notice***" has the meaning set forth in Section 4.1(b).

"***Majority of Disinterested Directors***" has the meaning set forth in Section 2.2(b).

"***MD&A***" has the meaning set forth in Section 3.1(a)(i).

"***Minimum Designating Ownership***" means seven and one-half percent (7.5%) of Outstanding Company Common Stock.

"***Necessary Action***" means, with respect to a specified result, all actions that are permitted by applicable law and reasonably necessary to cause such result, including (i) voting or providing a written consent or proxy with respect to Company Common Stock, (ii) causing the adoption of Stockholders' resolutions and amendments to the applicable Charter Documents, (iii) causing the Directors (to the extent such Directors were nominated or designated by the Person obligated to undertake the Necessary Action, and subject to any fiduciary duties that such Directors may have as directors of the Company) to act in a certain manner or causing them to be removed in the event they do not act in such a manner, (iv) executing agreements and instruments and (v) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result.

"***New Securities***" means Company Common Stock and other capital stock and rights, convertible securities, options or warrants to purchase Company Common Stock or other capital stock issued subsequent to the Effective Date, whether or not authorized as of the Effective Date.

"***Oppenheimer***" means OppenheimerFunds, Inc., its Affiliates, and any fund, account or client managed or advised by any such Person from time to time.

"***Oppenheimer Director***" has the meaning set forth in Section 2.1(b)(iii).

"***Outstanding Company Common Stock***" means, as of any given time, the then issued and outstanding Company Common Stock, excluding (unless calculated on a fully diluted basis)

any Derivative Securities and any unvested or restricted Company Common Stock issued pursuant to an Equity Incentive Plan.

"***Permitted Person***" has the meaning set forth in <u>Section 3.1(a)</u>.

"***Person***" means an individual, partnership, limited liability company, corporation, joint venture, trust, business trust, association, or similar entity, whether domestic or foreign, and the heirs, executors, legal representatives, successors and assigns of such entity where the context requires.

"***Plan***" has the meaning set forth in the recitals.

"***Preemptive Offer Record Date***" has the meaning set forth in <u>Section 4.1(b)</u>.

"***Public Listing***" means the listing of Company Common Stock on a U.S. national securities exchange registered with the SEC (whether in connection with an initial public offering of Company Common Stock or otherwise).

"***Purchaser***" has the meaning set forth in <u>Section 4.1(b)</u>.

"***Qualified IPO***" means a *bona fide*, marketed underwritten IPO after which closing such capital is quoted on the NASDAQ National Market or listed or quoted on the New York Stock Exchange or other national securities exchange acceptable to the Board and meeting one of the following two criteria: (i) the aggregate cash proceeds (net of underwriting discounts, commissions and offering expenses) of such offering to the Company exceed one hundred million dollars ($100,000,000), or (ii) at least twenty percent (20%) of the Outstanding Company Common Stock (calculated on a fully diluted basis, and for purposes of such calculation treating Company Common Stock issued in the IPO as Outstanding Company Common Stock) shall have been issued or sold to the public in connection with such IPO.

"***Qualified Stockholder***" has the meaning set forth in <u>Section 4.1(a)</u>.

"***Quarterly Call***" has the meaning set forth in <u>Section 3.1(c)</u>.

"***Reallotment Securities***" has the meaning set forth in <u>Section 4.1(c)</u>.

"***Registration Rights Agreement***" means that certain registration rights agreement, dated as of [●], 2017, by and among the Company and the investors party thereto.

"***Registration Statement***" means any registration statement of the Company under the Securities Act which permits the public offering of any of the Registrable Securities (as defined in the Registration Rights Agreement), including the prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"***Replacement Brigade Director***" has the meaning set forth in <u>Section 2.1(e)</u>.

"***Replacement Oppenheimer Director***" has the meaning set forth in Section 2.1(e).

"***Replacement Directors***" has the meaning set forth in Section 2.1(e).

"***Representatives***" has the meaning set forth in Section 5.15(a).

"***Response Notice***" has the meaning set forth in Section 4.1(b).

"***Rights Offerings***" has the meaning set forth in the Plan.

"***Searchlight***" means Searchlight Capital Partners, LP, its Affiliates, and any fund, account or client managed or advised by any such Person from time to time.

"***Searchlight Director***" has the meaning set forth in Section 2.1(b)(iv).

"***SEC***" means the Securities and Exchange Commission and any governmental body or agency succeeding to the functions thereof.

"***Secure Site***" has the meaning set forth in Section 3.1(a).

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Stockholder***" means each Person (other than the Company) who shall be a party to or bound by this Agreement, so long as such Person shall "beneficially own" (as such term is defined in Rule 13d-3 of the Exchange Act) any Company Common Stock.

"***Stockholder Approval***" means the affirmative vote or written consent of the holders of at least a majority of the shares of Outstanding Company Common Stock (subject to any adjustments or limitations on voting as set forth in the Company's Charter Documents).

"***Stockholder Registry***" means a register of the Company indicating: (i) with respect to each issuance of Company Common Stock or other capital stock of the Company, the date of such issuance, the number of shares issued and the Stockholder to whom such shares were issued and (ii) with respect to each transfer of Company Common Stock or other capital stock of the Company, the date of such Transfer, the number of shares Transferred and the identity of each of the transferor and the transferee(s) thereof.

"***Subsidiary***" means any Person the majority of the equity of which, directly, or indirectly through one or more other Persons, (a) the Company has the right to acquire or (b) is owned or controlled by the Company. As used in this definition, "control," including, its correlative meanings, "controlled by" and "under common control with," means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of equity, by contract or otherwise). For the avoidance of doubt, Subsidiary shall include any Person that is included in the Company's consolidated group for purposes of preparing the Company's consolidated financial statements in accordance with GAAP.

"***Transfer***" means the sale, sale of any option or contract to purchase, purchase of any option or contract to sell, grant of any option, right or warrant to purchase, assignment, loan,

offer, transfer, exchange or other disposition of any shares of Company Common Stock, whether or not for value, and whether voluntarily, by operation of law or otherwise, and includes foreclosure.

"*U.S.*" means the United States of America.

**EXHIBIT B**

**FORM OF
CONFIDENTIALITY AGREEMENT**

[●]
[●]
[●]

[INSERT DATE]

[INSERT NAME OF POTENTIAL TRANSFEREE]
[INSERT ADDRESS OF POTENTIAL TRANSFEREE]

Ladies and Gentlemen:

In connection with the consideration by [INSERT NAME OF POTENTIAL TRANSFEREE] ("***you***" or "***your***") of a potential investment in shares of the common stock, par value $0.01 per share, of Giraffe New Holding Co., Inc., a Delaware corporation (the "***Company***" and together with you, collectively, the "***Parties***" and each individually, a "***Party***"), or other securities of the Company (the "***Transaction***"), certain affiliates or stockholders of the Company, the Company or their respective representatives have furnished or may furnish you and your Representatives (as hereinafter defined) with non-public information regarding the Company, including, without limitation, information concerning the Company's financial and operational performance, properties, prospects, activities and plans. You recognize and acknowledge that such information furnished or to be furnished to you and/or your Representatives in the future (whether oral or written) is proprietary to the Company and may include trade secrets or other highly confidential non-public business information the disclosure of which could harm the Company. In consideration for, and as a condition of, such non-public information being furnished to you (and your agents, representatives, attorneys, accountants, advisors, directors, officers, employees and affiliates, collectively, your "***Representatives***"), you agree to treat any and all information concerning the Company or any of its subsidiaries that has been or is to be furnished to you or your Representatives (regardless of the manner in which it is furnished, including, without limitation, in written or electronic format or orally, gathered by visual inspection or otherwise) by or on behalf of the Company or any of its affiliates or stockholders, together with any documents you create that contain or are based upon any such information, in whole or in part (collectively, "***Company Information***"), in accordance with the provisions of this letter agreement (this "***Agreement***").

The term "Company Information" does not include information that you can demonstrate: (i) is obtained by you or your Representatives from a third party, who, after reasonable inquiry, is not known by you to be bound by any duty of confidentiality to or confidential agreement with the Company or any other Person (as defined below) with respect to Company Information or is otherwise prohibited from transmitting the information to you by a contractual, legal, fiduciary or other obligation to the Company or any other Person; (ii) is or becomes part of the public domain (other than through a breach of this Agreement by you or any

of your Representatives); (iii) is independently ascertained or developed by or for you or your Representatives or any third party without use of or reference to Company Information; or (iv) is approved for public release by written authorization of the Company. For purposes of this Agreement, the term "Person" shall be broadly interpreted to include, without limitation, any individual, partnership, limited liability company, corporation, joint venture, trust, business trust, association or similar entity, whether domestic or foreign, and the heirs, executors, legal representatives, successors and assigns of such entity where the context requires.

1.      You hereby agree that you and your Representatives will, except to the extent required by applicable law or legal process, (a) keep the Company Information strictly confidential, (b) not disclose any of the Company Information in any manner whatsoever without the prior written consent of the Company and (c) not use the Company Information for any purpose other than considering and negotiating the Transaction; provided, however, that you may disclose any of such information to your Representatives (i) who need to know such information for the sole purpose of advising you and (ii) who are informed by you of the confidential nature of such information; provided, further, that you will (x) be responsible for any violation of this Agreement by any of your Representatives as if they were parties hereto and (y) provide the Company with the names of any your Representatives that receives Company Information. You agree to promptly notify the Company in writing of any unauthorized use or disclosure of the Company Information and such notice shall include a detailed description of the circumstances of the disclosure and the Persons involved.

2.      In the event that you or any of your Representatives are required by applicable law or legal process to disclose any of the Company Information, you will promptly notify (except where such notice would be legally prohibited) the Company in writing so that the Company may seek a protective order or other appropriate remedy and (except to the extent legally prohibited) will reasonably cooperate with the Company (at the Company's expense) to limit the disclosure to the greatest extent possible consistent with such applicable law or legal process, including, without limitation, in appropriate circumstances, seeking reliable assurances that confidential or "attorneys eyes only" treatment shall be accorded the Company Information. Any such Company Information that is (x) not required to be disclosed or (y) accorded confidential treatment shall continue to be Company Information to which this Agreement shall continue to apply. You acknowledge and agree that, for purposes of this Agreement, there shall be no "applicable law" requiring you to disclose any Company Information solely by virtue of the fact that, absent such disclosure, you would be prohibited from purchasing, selling, or engaging in derivative transactions with respect to, any securities of the Company or otherwise proposing or making an offer to do any of the foregoing.

3.      All Company Information shall remain the property of the Company. Neither you nor any of your Representatives shall by virtue of disclosure to you or any of your Representatives, or your or any of your Representative's use, of any Company Information acquire any rights with respect thereto, all of which rights (including, without limitation, all intellectual property rights) shall remain exclusively with the Company.

4.      If you determine that you do not wish to proceed with a Transaction, you will promptly advise the Company of that decision. As soon as possible upon the Company's written request, you and your Representatives shall destroy (or at the Company's option (in its sole

discretion) return to the Company) all Company Information that has been disclosed to you or any of your Representatives, except for any such Company Information stored on electronic backup media to the extent that such information cannot be expunged without unreasonable effort. Upon returning or destroying such Company Information, you shall provide written notice to the Company certifying compliance with the foregoing sentence. Notwithstanding the provisions of this paragraph, you acknowledge and agree that this Agreement will continue to apply to any returned, held, retained or destroyed Company Information on the terms set forth herein.

5.      You acknowledge and agree that all Company Information is furnished on an "AS IS" basis, without warranty of any kind. THE COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE COMPANY INFORMATION, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

6.      You acknowledge that an award of money damages would be inadequate for any breach of this Agreement by you or any of your Representatives and would cause the Company irreparable harm. Therefore, you hereby agree that, in the event of any breach or threatened breach of this Agreement by you or any of your Representatives, the Company will be entitled to seek equitable relief, including, without limitation, injunctive relief and specific performance, as remedies for any such breach or threatened breach without the requirement of posting a bond or other security. Such remedies will not be the exclusive remedies for any breach of this Agreement, but will be in addition to all other remedies available at law or in equity to the Company.

7.      This Agreement or any provision hereof may not be amended, modified or waived by course of dealing, usage in trade, conduct or any exchanges of communication, including, without limitation, e-mail or any other electronic or digital means, other than by amendment, in writing duly executed with the handwritten signatures of an authorized signatory of each of the Parties. The rights and remedies of the Parties are cumulative, and not alternative. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

8.      This Agreement constitutes the complete agreement between the Parties concerning the subject matter hereof and supersedes and cancels any and all prior communications and agreements between the Parties with respect thereto. This Agreement

relates only to the subject matter hereof and shall not be construed as an agreement to agree to enter into the Transaction or any transaction by either Party. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect. If any of the covenants or provisions of this Agreement are determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Parties contemplate that the court making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this Agreement.

9.      Neither Party may assign any rights or delegate any duties under this Agreement without the prior written consent of the other Party, which consent shall be at the other Party's sole discretion. Any such attempted assignment or delegation without the other Party's prior written consent will be null and void ab initio. This Agreement will be binding upon the Parties and their respective authorized successors and assigns.

10.     You acknowledge and agree that no contract or agreement providing for any Transaction shall be deemed to exist between you and the Company or any of its affiliates or stockholders unless and until a final definitive agreement has been executed and delivered, and each Party hereby waives, in advance, any claims (including, without limitation, breach of contract) in connection with any Transaction unless and until a final definitive agreement has been executed and delivered with respect thereto. The Parties also agree that unless and until a final definitive agreement regarding a Transaction has been executed and delivered, neither Party will be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this Agreement, except for the matters specifically agreed to herein. You acknowledge and agree that the Company and its affiliates and stockholders reserve the right, in their sole discretion, to reject any and all proposals made by you or any of your Representatives with regard to the Transaction, and to terminate discussions and negotiations with you at any time.

11.     This Agreement shall be deemed to have been made and executed in the State of Delaware, and any dispute arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. You and the Company (i) irrevocably submit to the exclusive jurisdiction of any state court in the State of Delaware and the United States District Court for the District of Delaware (and the appropriate appellate courts) for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agree to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in any state court in the State of Delaware.

12.     EACH OF THE COMPANY AND YOU HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT OR YOU MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT.

13.     Any notice hereunder shall be made in writing by overnight courier, personal delivery or email (if telephonically confirmed), in each case to:

*If to the Company*:

[●]
[●]
[●]
Attention: [●]


*If to you*:

[INSERT ADDRESS OF POTENTIAL TRANSFEREE]

Attention: _____
Telephone: _____
Email: _____

14.     This Agreement shall expire on the earlier of (i) the date of the last to occur of (x) a definitive agreement relating to the Transaction is entered into by you and either the Company or any of its affiliates or stockholders and (y) you have become a party to the Stockholders Agreement, dated as of [●], as amended from time to time, by and among the Company and the stockholders of the Company and (ii) the twenty-four (24) month anniversary of the date hereof.

15.     This Agreement may be executed in two (2) or more counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute this Agreement when a duly authorized representative of each Party has signed a counterpart. The Parties may sign and deliver this Agreement by electronic (that is, .PDF) transmission.  Each Party agrees that the delivery of this Agreement by electronic transmission will have the same force and effect as delivery of original signatures.

Please confirm your agreement with the foregoing by signing and returning one copy of this Agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

**GIRAFFE NEW HOLDING CO., INC.**

By: _____
    Name:
    Title:

Accepted and agreed as of the date first written above:

**[INSERT NAME OF POTENTIAL TRANSFEREE]**

By: _____
    Name:
    Title:

# EXHIBIT F (a)

**Comparison of New Stockholders' Agreement**

**Milbank Draft**
**8/~~17~~31/17**

**STOCKHOLDERS AGREEMENT**

**BY AND AMONG**

**[GIRAFFE NEW HOLDING CO., INC.]**

**AND**

**THE STOCKHOLDERS (AS DEFINED HEREIN)**

**DATED AS OF [●], 2017**

## TABLE OF CONTENTS

**Page**

### ARTICLE I

### STOCKHOLDERS

Section 1.1    Stockholders ........................................................................ 1

### ARTICLE II

### BOARD OF DIRECTORS; MANAGEMENT AND CONTROL OF BUSINESS

Section 2.1    Board of Directors ............................................................... 2
Section 2.2    Restrictions on Authority of the Board ............................... 4
Section 2.3    Directors' Non-exclusive Services ...................................... 6
Section 2.4    Reimbursement of Expenses ................................................ 6

### ARTICLE III

### INFORMATION RIGHTS

Section 3.1    Information Rights of Stockholders; Records Required by the DGCL;
              Right of Inspection .............................................................. 6
Section 3.2    Information Rights of the Company ..................................... 8

### ARTICLE IV

### PREEMPTIVE RIGHTS; REGISTRATION RIGHTS

Section 4.1    Preemptive Rights ............................................................... ~~8~~9
Section 4.2    Registration Rights ............................................................. ~~10~~11

### ARTICLE V

### MISCELLANEOUS

Section 5.1    Complete Agreement ........................................................... 11
Section 5.2    Certain Actions .................................................................... 11
Section 5.3    Governing Law ..................................................................... 11
Section 5.4    No Assignment ..................................................................... 11
Section 5.5    Binding Effect ...................................................................... ~~11~~12
Section 5.6    Severability ........................................................................... ~~11~~12
Section 5.7    No Partition ........................................................................... ~~11~~12
Section 5.8    Additional Documents and Acts .......................................... 12
Section 5.9    No Employment Rights ........................................................ 12
Section 5.10   Amendments; Termination of Equity Rights ...................... 12

i

Section 5.11   No Waiver                                                              ~~12~~**13**
Section 5.12   Notices                                                                ~~12~~**13**
Section 5.13   Consent to Jurisdiction; WAIVER OF JURY TRIAL                          13
Section 5.14   No Third Party Beneficiary                                             14
Section 5.15   Confidentiality                                                        14
Section 5.16   Business Opportunities                                                 15
Section 5.17   Cumulative Remedies; Specific Performance                              16
Section 5.18   Exhibits and Schedules                                                 16
Section 5.19   Interpretation                                                         ~~16~~**17**
Section 5.20   Termination                                                            ~~16~~**17**

SCHEDULE I        COMPETITORS

EXHIBIT A         DEFINITIONS

EXHIBIT B         CONFIDENTIALITY AGREEMENT

## STOCKHOLDERS AGREEMENT

This Stockholders Agreement (as amended, modified or supplemented from time to time, this "***Agreement***") is made and entered into as of [●], 2017 (the "***Effective Date***") by and among [Giraffe New Holding Co., Inc.], a Delaware corporation (the "***Company***"), and the Stockholders (as defined herein).  Capitalized terms used, but not otherwise defined, herein have the meanings set forth in <u>Exhibit A</u> attached hereto and made a part hereof by reference.

## RECITALS

A.    The Company and certain other affiliated debtors (collectively, the "***Debtors***") filed a plan of reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, on June 16, 2017, which was confirmed by the United States Bankruptcy Court for the Eastern District of Virginia on [●], 2017 (including all exhibits, schedules and supplements thereto and as amended from time to time in accordance with the terms thereof, the "***Plan***").

B.    The Plan provides that the Company and the Stockholders will enter into a stockholders agreement to establish certain arrangements with respect to the Company Common Stock, and the Company and Stockholders are entering into this Agreement in furtherance of the aforesaid provisions of the Plan.

C.    As of the date hereof, the Stockholders hold in the aggregate all of the Outstanding Company Common Stock.

D.    The Plan provides that this Agreement shall be deemed to be valid, binding and enforceable in accordance with its terms, and each Stockholder shall be deemed to be bound hereby, in each case without the need for execution of this Agreement by any party hereto other than the Company.

E.    The parties hereto desire to enter into this Agreement to establish certain arrangements with respect to the Company Common Stock and other related corporate matters of the Company.

**NOW**, **THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the Company and the Stockholders, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## STOCKHOLDERS

**Section 1.1    Stockholders**.  Except for the obligations contained in <u>Section 5.15</u>, a Person shall cease to be a Stockholder for all purposes upon the disposition of all of such Person's Company Common Stock.

## ARTICLE II

## BOARD OF DIRECTORS; MANAGEMENT AND CONTROL OF BUSINESS

**Section 2.1**     **Board of Directors**.

(a)     The Board, acting in accordance with the terms of this Agreement, shall have the right, power and authority to oversee the business and affairs of the Company and to do all things necessary or appropriate to manage the business and affairs of the Company, and the Board is hereby authorized to take any action of any kind and to do anything and everything the Board deems necessary or appropriate in accordance with the provisions of this Agreement, the Company's Charter Documents and applicable law.  At all times, the composition of any board of directors or equivalent of any Subsidiary of the Company shall be the same as that of the Board.

(b)     The Board shall be comprised of seven (7) Directors as follows:

(i)     the chief executive officer of the Company (the "***Executive Director***"), who shall initially be [●]**Daniel Griesemer**;

(ii)     for so long as Brigade ~~Capital Management and its Affiliates ("*Brigade*") collectively hold~~**holds** at least the Minimum Designating Ownership, one (1) Director designated by Brigade (the "***Brigade Director***"), who shall initially be [●]**Matt Perkal**;

(iii)     for so long as ~~OppenheimerFunds, Inc. and its Affiliates ("Oppenheimer") collectively hold~~ **holds** at least the Minimum Designating Ownership, one (1) Director designated by Oppenheimer (the "***Oppenheimer Director***"), who shall initially be [●]**Brian Hickey**;

(iv)     for so long as Searchlight ~~Capital Partners, L.P. and its Affiliates ("*Searchlight*" and together with Brigade and Oppenheimer, the "*Board Designators*") collectively hold~~**holds** at least the Minimum Designating Ownership, one (1) Director designated by Searchlight (the "***Searchlight Director***" and together with the Brigade Director and the Oppenheimer Director, the "***Investor Directors***"), who shall initially be [●]**Eric Sondag**; and

(v)     three (3) Directors elected by the Stockholders in accordance with Section 2.1(c)(iii) and the Company's Charter Documents (the "***At-Large Directors***"), who shall initially be Ron Beegle of Carriage House Capital Advisors, LLC, [●]**Shaz Kahng** and [●].[1]

(c)     Commencing as of the Effective Date, the Board shall be divided, with respect to the time for which the Directors shall severally hold office, into three (3) classes as follows: (i) the Executive Director and the [●]**Oppenheimer** Director (or any replacement thereof selected in accordance with Section 2.1(f) and the Company's Charter Documents) shall serve in Class I with an initial term expiring at the 2018 annual meeting of the Stockholders in accordance with the Company's Charter Documents (the "***Class I Directors***"), (ii) the [●]**Brigade** Director and

---

[1] **Note to Draft**:  Remaining At-Large Director~~s~~ to be designated by the Required Consenting Creditors prior to emergence.

- 2 -

the [●]Searchlight Director (or any replacement thereof selected in accordance with accordance with Section 2.1(f) and the Company's Charter Documents) shall serve in Class II with an initial term expiring at the 2019 annual meeting of the Stockholders in accordance with the Company's Charter Documents (the "**Class II Directors**"), and (iii) the At-Large Directors (or any replacement thereof selected in accordance Section 2.1(f) and the Company's Charter Documents) shall serve in Class III with an initial term expiring at the 2020 annual meeting of the Stockholders in accordance with the Company's Charter Documents (the "**Class III Directors**"). Commencing with the 2018 annual meeting of the Stockholders (in accordance with the Company's Charter Documents), each Director that is elected by the Stockholders shall be elected for a three (3)-year term.

(d)      The Company and the Stockholders shall take all Necessary Action to ensure that (i) subject to the applicable Board Designator holding at least the Minimum Designating Ownership, each Investor Director designated by the applicable Board Designator shall hold office until the earlier to occur of (x) such Investor Director's death, disability, or disqualification and (y) such Investor Director's retirement, resignation, replacement or removal from the Board in accordance with Section 2.1(f) and the Company's Charter Documents and (ii) each At-Large Director shall hold office until the annual meeting of the Stockholders to elect the Class III Directors in accordance with Section 2.1(c)(iii) and the Company's Charter Documents or such shorter period resulting from any such At-Large Director's (x) death, disability or disqualification or (y) retirement, resignation, replacement or removal.

(e)      If at any time (i) Brigade holds less than the Minimum Designating Ownership, (A) the representative designated by Brigade **Director** shall serve as the Brigade**a Class II** Director until the expiration of the then-current term of the Class [●]**II** Directors or until such Director's earlier death, disability, disqualification, retirement, resignation or removal, (B) at the subsequent election of Class [●]**II** Directors, **a Director (who may be** the Brigade Director**)** shall be elected by the Stockholders in accordance with the Company's Charter Documents **to fill the seat of the Brigade Director** (such Director who initially replaces the Brigade Director pursuant to this Section 2.1(e) or any Brigade**such Class II** Director thereafter, the "**Replacement Brigade Director**"), and (C) Brigade shall no longer be entitled to designate the Brigade Director, (ii) Oppenheimer holds less than the Minimum Designating Ownership, (A) the representative designated by Oppenheimer **Director** shall serve as the Oppenheimer**a Class I** Director until the expiration of the then-current term of the Class [●]**I** Directors or until such Director's earlier death, disability, disqualification, retirement, resignation or removal, (B) at the subsequent election of Class [●]**I** Directors, **a Director (who may be** the Oppenheimer Director**)** shall be elected by the Stockholders in accordance with the Company's Charter Documents **to fill the seat of the Oppenheimer Director** (such Director who initially replaces the Oppenheimer Director pursuant to this Section 2.1(e) or any Oppenheimer**such Class I** Director thereafter, the "**Replacement Oppenheimer Director**"), and (C) Oppenheimer shall no longer be entitled to designate the Oppenheimer Director, or (iii) Searchlight holds less than the Minimum Designating Ownership, (A) the representative designated by Searchlight **Director** shall serve as the Searchlight**a Class II** Director until the expiration of the then-current term of the Class [●]**II** Directors or until such Director's earlier death, disability, disqualification, retirement, resignation or removal, (B) at the subsequent election of Class [●]**II** Directors, **a Director (who may be** the Searchlight Director**)** shall be elected by the Stockholders in accordance with the Company's

Charter Documents **to fill the seat of the Searchlight Director** (such Director who initially replaces the Searchlight Director pursuant to this Section 2.1(e) or any ~~Searchlight~~**such Class II** Director thereafter, together with the Replacement Brigade Director and the Replacement Oppenheimer Director, the "***Replacement Directors***"), and (C) Searchlight shall no longer be entitled to designate the Searchlight Director.

(f)     Subject to the applicable Board Designator holding at least the Minimum Designating Ownership, (i) each Investor Director shall serve solely at the discretion of the Board Designator that designated such Investor Director and (ii) any Investor Director may be removed (which removal may occur at any time with or without cause) and replaced only by the Board Designator that designated such Director and any vacancy on the Board resulting from the death, disability, retirement, resignation, disqualification or removal of such Investor Director shall be filled only by such Board Designator, and the Company and the Stockholders shall take all Necessary Action as may be required to facilitate and implement the immediate appointment of such replacement Investor Director to the Board.  If the chief executive officer of the Company is removed or resigns or is otherwise replaced as an officer of the Company, such person shall automatically, and without any action by the Board or the Stockholders, cease to be the Executive Director, and the Company's successor chief executive officer appointed pursuant to the Company's Charter Documents shall automatically become the Executive Director pursuant to Section 2.1(b)(i) and the Company and the Stockholders shall take all Necessary Action to ensure that such successor chief executive officer is elected as the Executive Director at the subsequent election of Class I Directors.  The At-Large Directors and the Replacement Directors may be removed and replaced in accordance with the Company's Charter Documents, and any vacancy on the Board resulting from the death, disability, retirement, resignation, disqualification or removal of any such Director shall be filled by the affirmative vote of a majority the Directors then serving on the Board.

(g)     A Director may resign from the Board at any time upon delivery of written notice to the Board and the Stockholder(s) that designated or elected him or her, and any such vacancy shall be filled in accordance with Section 2.1(f).¶

**(h)     The size and composition of the committees of the Board and the committees of the boards of directors or equivalent governing bodies of the Company's Subsidiaries shall be as determined by the Board from time to time; provided, that each Investor Director shall have the right to serve on any such committee of the Board (or any such committee of the boards of directors or equivalent governing bodies of the Company's Subsidiaries) so long as the applicable Board Designator owns at least the Minimum Designating Ownership.**

**Section 2.2    Restrictions on Authority of the Board**.

(a)     Notwithstanding anything to the contrary in this Agreement, none of the following actions may be taken by the Company, directly or indirectly (and the Company shall cause its Subsidiaries to refrain from taking such actions) without a Stockholder Approval:

(i)      any merger, consolidation, reorganization or equity recapitalization of the Company or its Subsidiaries (other than mergers or consolidations of a wholly owned Subsidiary of the Company with another wholly owned Subsidiary of the Company or with the Company);

(ii)      any sale, assignment or other transfer of all or substantially all of the assets or properties of the Company and its Subsidiaries (in each case, on a consolidated basis) other than (x) sales, assignments and transfers between a wholly owned Subsidiary of the Company and the Company or another wholly owned Subsidiary of the Company or (y) a pledge of assets of the Company and its Subsidiaries in accordance with the exit term loan facility provided by the DIP Term Loan Lenders (as defined in the Plan) to be entered into by the Debtors or any of their successors on the terms set forth in the Exit Term Loan Facility Term Sheet attached as Annex IV to that certain Restructuring Support Agreement, dated June 11, 2017, by and among the Debtors, the Sponsor and the Consenting Creditors (each as defined in the Plan);

(iii)      any liquidation, dissolution or winding up, bankruptcy or consenting to the entry of a decree or order appointing a trustee, custodian, receiver, liquidator, assignee or similar official, in each case, of the Company or any material Subsidiary of the Company, or any action that would cause the foregoing;

(iv)      any amendment, modification or waiver of the Charter Documents of the Company or any of the Company's material Subsidiaries other than (A) to correct any typographical or similar ministerial error, (B) to delete or add any provision required to be so deleted or added by any applicable law, (C) to cure any ambiguity or to correct or supplement any provision which may be inconsistent with any provision herein, and (D) to make any immaterial amendment or modification that is deemed necessary or appropriate by the Board, in each case set forth in clauses (A) through (D) above, which does not adversely affect the rights or obligations of any Stockholder, in its capacity as a Stockholder; provided that any such amendment that reasonably would be expected to disproportionately and adversely affect any Stockholder, in its capacity as a Stockholder, as compared to the other Stockholders, shall also require the prior written consent of each Stockholder so affected;¶

~~(v)      [on or prior to [●],] any initial public offering of Company Common Stock or other class of equity securities of the Company or the entry into any other transaction or permitting the occurrence of any other event (including any Transfer) that would result in or require the Company becoming subject to Section 13 of the Exchange Act in connection with the Company Common Stock or any other class of equity securities of the Company [(it being understood that, following [●], the actions set forth in this clause (v) shall not require Stockholder Approval pursuant to this Section 2.2(a))]; provided that this Section 2.2(a)(v) shall not apply to actions required of the Company pursuant to the Registration Rights Agreement;~~

**(v)**    ~~(vi)~~ engagement in any material new line of business substantially unrelated to **(A)** any business or activity of the Company or any of its Subsidiaries currently conducted as of the date hereof~~,~~ or **(B)** any business or activity that is reasonably similar thereto or a reasonable extension, development or expansion thereof, or is complementary, incidental, ancillary or related thereto;

(vi) (vii) implementation of a new management Equity Incentive Plan or similar arrangement which could result, when combined with all other Equity Incentive Plans, in the aggregate issuance of more than [●]five percent ([●]5%) of the Outstanding Company Common Stock; or

(vii) (viii) entry into any agreement, commitment or arrangement to effect, or requiring the Company or any of its Subsidiaries to effect, any of the foregoing.

(b) Affiliate Transactions. Excluding transactions in accordance with Section 4.1, including Section 4.1(e), the Company shall not, and shall cause each of its Subsidiaries not to, enter into, modify (including by waiver) or terminate any transaction or series of related transactions, or agreement, with any holder of Company Common Stock that (together with its Affiliates) holds at least [●]five percent ([●]5%) of the Outstanding Company Common Stock or with any Director or officer of the Company, or with any Affiliate of any of the foregoing (any such transaction or series of related transactions or agreements, an "*Affiliate Transaction*"), unless (i) a majority of the Directors then serving on the Board who are not party to, or affiliated with such holder, or Affiliate thereof, that is a party to, such Affiliate Transaction (such majority, a "*Majority of Disinterested Directors*") reasonably determines that such Affiliate Transaction is on terms that are at least as favorable to the Company and its Subsidiaries as could reasonably be obtained from an independent third party, (ii) such Affiliate Transaction is approved by a Majority of Disinterested Directors, and (iii) if and to the extent that an Affiliate Transaction involves the aggregate payment to or by the Company and its Subsidiaries equal to or in excess of [five million] dollars ($[5,000,000]), in addition to meeting the requirements in clauses (i) and (ii), either (x) the Company has obtained an opinion from a nationally recognized accounting or investment banking firm (to be selected and paid by the Company) that is independent, with no direct or indirect financial interest in the Company or its Subsidiaries, or in the proposed Affiliate Transaction or any other party thereto, that the proposed Affiliate Transaction is fair to the Stockholders from a financial point of view or (y) Stockholder Approval is obtained with respect to such Affiliate Transaction (disregarding, for such purposes, any holder of Company Common Stock, or Affiliate thereof, that is a party to such Affiliate Transaction, and the shares of Company Common Stock held by such Persons). Notwithstanding the foregoing or anything to the contrary in this Agreement, except as required by applicable law, the Company's performance of its obligations under the Backstop Commitment Agreement or in connection with the consummation of the Rights Offerings, in each case in accordance with the Plan, shall not require any further consent or approval of the Board or the Stockholders.

Section 2.3 **Directors' Non-exclusive Services**. No Director shall be required to manage the Company as his or her sole and exclusive function and any Director or Stockholder may have other business interests and may engage in other activities in addition to those relating to the Company.

Section 2.4 **Reimbursement of Expenses**. Each Director shall be entitled to reimbursement from the Company of all expenses reasonably incurred and paid by such Director in connection with such Director's services as a Director or otherwise incurred for the benefit of, or on behalf of, the Company. The Board may establish, from time to time, policies relating to expense reimbursement (including the types of expenses, such as retained counsel or other

advisors, that will be reimbursable), which policies shall treat and apply to each Director (other than any employee of the Company serving as a Director) equally.

## ARTICLE III

## INFORMATION RIGHTS

**Section 3.1    Information Rights of Stockholders; Records Required by the DGCL; Right of Inspection**.

(a)    ~~Each~~**At any time that the Company is not obligated to file reports under Section 13 or 15(d) of the Exchange Act and does not file reports required by Section 13 or 15(d) of the Exchange Act as a voluntary filer, each** Stockholder, other than any Stockholder that is a Competitor, shall have the right to receive the following information (which right the Company may satisfy by providing access to each Stockholder to a confidential website such as Intralinks and timely posting such information on such website (which website shall have a system of email notification of new postings and may require confirmation by viewers of the site of the confidentiality obligations set forth in Section 5.15, a "*Secure Site*")), and each Stockholder may share and discuss such information (along with any other information provided to Stockholders pursuant to this Agreement and otherwise made available to Stockholders via the Secure Site) with its Affiliates, directors, officers, partners, managers, stockholders, employees, investors and advisors as well as any bona fide prospective purchaser of Company Common Stock that (x) is not a Competitor and (y) has entered into, and delivered to the Company, a confidentiality agreement substantially in the form set forth on Exhibit B attached hereto**, with such changes as may be approved by the Company in its reasonable discretion,** regarding the treatment of such information **(any such Person, a "*Permitted Person*")** (and for the avoidance of doubt, at its election, the Company may share and discuss such information with any prospective purchaser of Company Common Stock):

(i)    within [ninety (90)] days of the end of each fiscal year, copies of all annual financial statements and similar information of the Company and its Subsidiaries as of the end of such fiscal year, which financial statements shall (~~w~~**v**) include a comparison to the prior fiscal year results; (~~x~~**w**) be prepared in accordance with GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act shall be required in connection with such financial statements); (~~y~~**x**) be audited by a nationally recognized accounting firm approved by the Board and accompanied by a report and opinion thereon by such accounting firm prepared in accordance with generally accepted auditing standards that is not subject to any qualification as to the scope of such audit or with respect to accounting principles followed by the Company or any of its Subsidiaries not in accordance with GAAP; **(y) be accompanied by a management discussion and analysis of financial condition and results of operations with respect to such financial statements (an "*MD&A*");** and (z) be certified by the chief financial officer of the Company; and

(ii)    for each of the first three (3) fiscal quarters of each fiscal year of the Company, copies of all unaudited quarterly financial statements and similar information of the Company and its Subsidiaries as of the end of such fiscal quarter, which financial statements shall (~~x~~**w**) include year-to-date results and a comparison to the corresponding period in the prior

- 7 -

fiscal year; (~~yx~~) be prepared in accordance with GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act shall be required in connection with such financial statements); **(y) be accompanied by an MD&A;** and (z) be delivered no later than [forty-five (45)] days following the end of each such fiscal quarter.

(b)      During the term of the Company's existence there shall be maintained in the Company's principal office or at the office of the Company's agents and representatives all records required to be kept pursuant to the DGCL, including (whether or not so required) a current list of the names, addresses and shares of Company Common Stock held by each of the Stockholders (including the dates on which each of the Stockholders became a Stockholder), copies of federal, state and local information or income tax returns for each of the Company's tax years, copies of this Agreement and each of the Company's Charter Documents, including all amendments thereto and restatements thereof, and correct and complete books and records of account of the Company.  Prior to any termination of the Company's existence, the Company shall use all reasonable efforts to ensure that, for a period of six (6) years after any such termination, such information, to the extent still in existence and available, may be obtained by a Stockholder's request in writing to a legal advisor or agent of the Company to be designated prior to any such termination, with the cost (as reasonably determined by such legal advisor or agent) of accessing and providing such information being borne by the requesting Stockholder.¶

**(c)      The Company shall host, and each Stockholder, other than any Stockholder that is a Competitor, that (together with its Affiliates) holds at least one percent (1%) of the Outstanding Company Common Stock, shall have access to, quarterly conference calls with the Company's chief executive officer and chief financial officer to discuss the status of the Company and its business and the business of its Subsidiaries, which calls shall include a reasonable and customary question and answer session (each such call, a "*Quarterly Call*").  Quarterly Calls shall be hosted as promptly as reasonably practicable but in any event no later than five (5) Business Days after furnishing the annual and quarterly reports in accordance with Section 3.1(a).  Other than any Stockholder that is a Competitor, each Stockholder shall have the right to receive from the Company, within ten (10) days after a Quarterly Call, an audio recording of such Quarterly Call and copies of all materials provided by the Company to the attendees thereof in connection with such Quarterly Call (which right the Company may satisfy by providing access to each Stockholder to a Secure Site), and each Stockholder may share and discuss such information with any Permitted Person (and for the avoidance of doubt, at its election, the Company may share and discuss such information with any prospective purchaser of Company Common Stock).**

**(d)**      ~~(c)~~ On written request stating the purpose, a Stockholder that (together with its Affiliates) holds at least [•]**one** percent ([•]**1**%) of the Outstanding Company Common Stock may make reasonable inquiries of management and examine, at any reasonable time during business hours, for any proper purpose reasonably related to such Stockholder's interest as a Stockholder of the Company, and at the Stockholder's expense, records of the Company and its Subsidiaries; underlined_provided that the Company may limit access to certain information if the Board reasonably deems such information to be competitively sensitive with respect to the Stockholder requesting such access or if granting such access could reasonably be expected in the loss or impairment of the Company to claim attorney client privilege, work product doctrine, or a similar

protective privilege or doctrine with respect to the information, or to violate applicable law (provided that the Company shall use its reasonable best efforts to allow for such access in a way that would not have any of the foregoing effects).  Upon written request by any Stockholder made to the Company, the Company shall provide or make available to such Stockholder without charge true copies of this Agreement, the Company's Charter Documents, and all amendments thereto and restatements thereof, which documents may be provided to such Stockholder by posting them on a Secure Site **or on EDGAR (as applicable)**.

Section 3.2    **Information Rights of the Company**.  The Company may from time to time, but a Stockholder may be compelled to answer no more frequently than once per calendar quarter (unless, with respect to clause (a) of this Section 3.2, required by applicable law), reasonably request of any or all Stockholders information (a) needed by the Company to comply with applicable law or any contract entered into by the Company or any of its Subsidiaries, including any financing arrangements, and/or (b) regarding such Stockholder's "accredited investor" status (within the meaning of Regulation D promulgated under the Securities Act).

# ARTICLE IV

# PREEMPTIVE RIGHTS; REGISTRATION RIGHTS

Section 4.1    **Preemptive Rights**.  Any issuance of New Securities by the Company or any of its Subsidiaries, other than an issuance of Exempt Securities, shall be subject to the following provisions:

(a)    Right to Purchase New Securities.  Except as otherwise provided in this Section 4.1 (including Section 4.1(e)), the Company hereby grants to each Stockholder that (i) at the time of the relevant issuance, sale or distribution is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act and (ii) together with its Affiliates, holds of record as of the Preemptive Offer Record Date (as defined below) at least ~~[•]~~**one** percent (~~[•]~~**1**%) of the Outstanding Company Common Stock (each such Stockholder, a "**Qualified Stockholder**") the right to purchase its pro rata share **(calculated for** *purposes of this Section* **4.1 as the percentage of the Outstanding Company Common Stock so held by all Qualified Stockholders)** of any and all issuances, sales or distributions of New Securities proposed to be made by the Company or any of its Subsidiaries as set forth herein.

(b)    Issuance Notice.  The Company shall give each Qualified Stockholder written notice of the Company's intention to issue or sell New Securities (as applicable, the "**Offered Securities**") (which notice may be provided by posting the requisite information on a Secure Site and notifying (or causing notification to be delivered to) each such Qualified Stockholder of such posting in writing in accordance with Section 5.12) (the "**Issuance Notice**"), describing the type and terms of the Offered Securities, the price at which such Offered Securities will be issued or sold and the general terms upon which the Company proposes to issue or sell such Offered Securities, including the anticipated date of such issuance, sale or distribution, the general use of proceeds thereof, a description of both the business purpose of the offering of such Offered Securities and the dilutive effects, if any, of such offering, the record date for determining Qualified Stockholders, which, if not specified in the Issuance Notice, shall be the date of the Issuance Notice (the "**Preemptive Offer Record Date**"), and such Qualified Stockholder's pro

- 9 -

rata share of such Offered Securities.  Each Qualified Stockholder shall have ten (10) Business Days from the date the Issuance Notice is sent to deliver notice (the "***Response Notice***") of its intention to purchase all or any portion of its pro rata share of the Offered Securities~~, based on the ratio of the shares of Company Common Stock held by such Qualified Stockholder on the Preemptive Offer Record Date to the number of shares of Company Common Stock held by all of the holders of Company Common Stock on the Preemptive Offer Record Date,~~ and stating therein the quantity of Offered Securities it intends to purchase (each Qualified Stockholder who delivers a Response Notice hereunder is a "***Purchaser***" for purposes of this <u>Section 4.1</u>).  Such Response Notice shall constitute the irrevocable agreement of such Purchaser to purchase the quantity of Offered Securities indicated in the Response Notice at the price and upon the terms stated in the Issuance Notice; <u>provided</u>, <u>however</u>, that if the Company is proposing to issue, sell or distribute securities for consideration other than all cash, and subject to the limitations on the rights set forth in this <u>Section 4.1</u>, the Company shall accept from such Purchaser either non-cash consideration that is reasonably comparable to the non-cash consideration proposed by the Company or the cash value of such non-cash consideration, in each case as determined in good faith by the Board.  Any purchase of Offered Securities by a Purchaser pursuant to this <u>Section 4.1</u> shall be consummated on or prior to the later of (x) the date on which all other Offered Securities described in the applicable Issuance Notice are issued, sold or distributed and (y) the second (2nd) Business Day following delivery of the Response Notice by such Purchaser.

(c)    <u>Reallotment Right</u>.  Each Purchaser shall have the further right to subscribe for all or any portion of the Offered Securities not subscribed for by Purchasers pursuant to <u>Section 4.1(b)</u> to which it may become entitled to purchase under this <u>Section 4.1(c)</u>.  The Response Notice may set forth an amount of additional Offered Securities ("***Reallotment Securities***") that such Purchaser would be willing to purchase in the event that there is any under-subscription for the entire amount of such Offered Securities.    In the event that there is such an under-subscription, the Company shall apportion the unsubscribed-for Offered Securities to those Purchasers whose Response Notices specified an amount of Reallotment Securities, which apportionment shall be made among such specifying Purchasers pro rata based upon the number of shares of Offered Securities initially subscribed for by each such specifying Purchaser relative to the number of shares of Offered Securities initially subscribed for by all such specifying Purchasers pursuant to <u>Section 4.1(b)</u>; <u>provided</u>, <u>however</u>, that in no event will any such specifying Purchaser be obligated to purchase any amount of Reallotment Securities that is greater than the amount of additional Offered Securities that such specifying Purchaser stated that it would be willing to purchase in the Response Notice of such specifying Purchaser.

(d)    <u>Sale to Other Persons</u>.  The Company shall have sixty (60) days from the date of the applicable Issuance Notice to consummate an issuance, sale or distribution of any Offered Securities which the Qualified Stockholders have not elected to purchase pursuant to <u>Section 4.1(b)</u> to other Persons at a price and on terms and conditions not less favorable to the Company than those contained in the Issuance Notice.  In the event that the sale of Offered Securities is not fully consummated within such sixty (60)-day period, then the Company shall be obligated once again to offer the purchase rights set forth in this <u>Section 4.1</u> before it may subsequently sell such Offered Securities (<u>provided</u> that such sixty (60)-day period shall automatically toll, but not for longer than one-hundred and eighty (180) days to the extent regulatory approval would be required for such Person to acquire such Offered Securities).

- 10 -

(e)    Exempt Securities.  Notwithstanding the foregoing provisions of this Section 4.1, Qualified Stockholders shall not have the right to participate in the issuance, sale or distribution of any New Securities which are otherwise authorized to be issued in accordance with this Agreement (i) if such New Securities were issued as consideration in any merger, consolidation or combination with or acquisition of securities or assets of another Person in exchange for New Securities, (ii) if made upon conversion or exercise of any rights, convertible securities, options or warrants to purchase Company Common Stock or other capital stock of the Company, (iii) if made by any Subsidiary of the Company to the Company or any of its direct or indirect wholly owned Subsidiaries, (iv) if made as securities which are the subject of a registration statement being filed under the Securities Act pursuant to a Qualified IPO, (v) if made to Directors, officers, employees or consultants as compensation pursuant to any Equity Incentive Plans or as compensation for services rendered or to be rendered to the Company or any of its Subsidiaries or otherwise due to his or her status as a service provider to the Company or any of its Subsidiaries, (vi) if such New Securities were issued in connection with the Backstop Commitment Agreement, or in connection with the consummation of the Rights Offerings in accordance with the Plan, (vii) if such New Securities were issued in connection with any joint venture, strategic alliance or partnership or similar transaction or arrangement (in each case as determined by the Board acting in good faith) or (viii) if such New Securities were issued pursuant to any pro rata stock split or stock dividend (the New Securities described in the foregoing clauses (i) through (viii), "***Exempt Securities***").

(f)    Accelerated Buyer Transactions.  Nothing in this Section 4.1 shall prevent the Company or its Subsidiaries from issuing or selling to any Person (the "***Accelerated Buyer***") any New Securities without first complying with the provisions of this Section 4.1; provided that in connection with such issuance or sale (i) the Company gives reasonably prompt notice to the Qualified Stockholders of such issuance (after such issuance has occurred), which notice shall describe in reasonable detail the New Securities purchased by the Accelerated Buyer and the purchase price thereof and (ii) the Accelerated Buyer and the Company enable the Qualified Stockholders to effectively exercise their respective rights under this Section 4.1 with respect to their purchase of their pro rata share of the New Securities issued to the Accelerated Buyer within fifteen (15) Business Days after receipt of the notice by the Qualified Stockholder of such issuance to the Accelerated Buyer on the terms specified in this Section 4.1. The Preemptive Offer Record Date for such issuance shall be the date such New Securities are issued to the Accelerated Buyer.

**Section 4.2    Registration Rights**.  The Stockholders shall have the registration rights set forth the Registration Rights Agreement.

## ARTICLE V

## MISCELLANEOUS

**Section 5.1    Complete Agreement**.    This Agreement, the Plan and the other agreements expressly referenced in this Agreement and the Plan constitute the complete and exclusive statement of agreement among the Stockholders with respect to the subject matter hereof.  This Agreement supersedes all prior written and oral statements by and among the Stockholders or any of them, and except as otherwise specifically contemplated by this

Agreement, no representation, statement, or condition or warranty not contained in this Agreement will be binding on the Stockholders or the Company or have any force or effect whatsoever.

**Section 5.2    Certain Actions**.  The Company by its execution hereof acknowledges that it has actual notice of the terms of this Agreement, consents hereto and hereby covenants with each of the Stockholders that it will at all times during the term of this Agreement be governed by the terms and provisions hereof in carrying out its business and affairs and, accordingly, shall give or cause to be given such notices, execute or cause to be executed such documents and do or cause to be done all such acts, matters and things as may from time to time be necessary or required to carry out the terms and intent hereof.

**Section 5.3    Governing Law**.  This Agreement and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Delaware, without reference to conflicts of law principles that would require the application of the laws of another jurisdiction.

**Section 5.4    No Assignment**.  No party hereto may assign any of its respective rights or delegate any of its respective obligations under this Agreement, and any attempted assignment or delegation in violation of the foregoing shall be null and void**; provided, that Brigade, Oppenheimer and/or Searchlight may assign or delegate their respective rights and obligations under this Agreement to their respective Affiliates and funds, clients and accounts managed by such Affiliates**.

**Section 5.5    Binding Effect**.  Subject to the provisions of this Agreement relating to transferability or assignment, this Agreement will be binding upon and inure to the benefit of the Company and each of the Stockholders, and their respective heirs, devisees, spouses, distributees, representatives, successors and permitted assigns.  **For the avoidance of doubt, no joinder to this Agreement shall be required in connection with any permitted Transfer or assignment.**

**Section 5.6    Severability**.  If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future laws applicable to the Company effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement.

**Section 5.7    No Partition**.  The parties acknowledge that the assets and properties of the Company are not and will not be suitable for partition.  Thus, each Stockholder (on behalf of such Stockholder and their respective successors and assigns) hereby irrevocably waives any and all rights that such Stockholder may have to maintain any action for partition of such assets and properties, if any.

**Section 5.8    Additional Documents and Acts**.  Each party hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as

may be reasonably necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

Section 5.9    **No Employment Rights**.  Nothing in this Agreement shall confer upon any Person any right to be employed or to continue employment by the Company or any of its Affiliates, or interfere in any manner with any right of the Company or any of its Affiliates to terminate such employment at any time.

Section 5.10    **Amendments; Termination of Equity Rights**.

(a)    All amendments to this Agreement will be in writing and subject to receipt of Stockholder Approval and approval by any other Stockholders whose approval is required pursuant to Section 5.10(b).

(b)    Any amendment or other modification that would adversely affect any Stockholder's rights set forth in Section 2.1**2.1, Section 2.3, Section 2.4** or Section 3.1 shall require the written consent of each such Stockholder adversely affected; provided, however, that any amendment to Section 3.1 that only provides for a reasonable extension of time for the delivery of the financial statements or the other information to be delivered pursuant thereto shall only require a Stockholder Approval.  If any amendment or other modification would adversely affect the rights and obligations of any Stockholder in a manner disproportionate relative to any other Stockholder or would subject a Stockholder to any obligation or liability not shared by each of the other Stockholders, then such amendment or other modification shall not be effective without the written consent of such Stockholder.

Section 5.11    **No Waiver**.  No delay, failure or waiver by any party to exercise any right or remedy under this Agreement, and no partial or single exercise of any such right or remedy, will operate to limit, preclude, cancel, waive or otherwise affect such right or remedy, nor will any single or partial exercise of such right or remedy limit, preclude, impair or waive any further exercise of such right or remedy or the exercise of any other right or remedy.  **No waiver of or consent to any departure from any provision of this Agreement shall be effective unless signed in writing by the party entitled to the benefit thereof, in which case such waiver shall bind the successors and permitted Transferees and assigns of such party.**

Section 5.12    **Notices**.  Except as otherwise provided elsewhere in this Agreement regarding notices by electronic mail or other electronic means to Stockholders and the Board and regarding proxies, all notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall be delivered (a) by personal delivery, (b) by a nationally recognized overnight courier service, (c) by telefacsimile or electronic mail, using equipment that provides written confirmation of delivery, or (d) by deposit in the U.S. Mail, postage prepaid, registered or certified mail, return receipt requested, to the Company at its principal executive office and to any Stockholder at the address then shown as the current address of such Stockholder specified on the Stockholder Registry.  Any such notice shall be deemed to have been given on the date so delivered, if delivered personally, by overnight courier service or by electronic mail; or if by telefacsimile, on the first (1st) calendar day following the transmission of such facsimile; or if mailed, four (4) calendar days after mailing.  Any party may, at any time by giving five (5) calendar days' prior written notice to the Company, specify a

different address (physical or electronic) ~~or telefacsimile number~~ or electronic mail address for notice purposes by sending notice thereof in the foregoing manner. Any notice required to be given by the Company to Stockholders, including pursuant to Section 228(e) of the DGCL, may be given by posting to a Secure Site (with email notification of such posting to each Stockholder), and shall be deemed to be delivered on the date such posting is made.

**Section 5.13    Consent to Jurisdiction; WAIVER OF JURY TRIAL**.

(a)    <u>Consent to Jurisdiction</u>.    The Company and each Stockholder (i) irrevocably submit to the exclusive jurisdiction of any state court in the State of Delaware, and the United States District Court for the District of Delaware (and the appropriate appellate courts), for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agree to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in any state court in the State of Delaware. Notwithstanding the foregoing, any party hereto may commence an action, suit or proceeding with any governmental body anywhere in the world for the sole purpose of seeking recognition and enforcement of a judgment of any court referred to in the first sentence of this <u>Section 5.13(a)</u>. The Company and each Stockholder further (x) agree that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth on the Stockholder Registry (or in the case of the Company, at the Company's principal office) shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this <u>Section 5.13(a)</u> and (y) irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (A) any state court in the State of Delaware, or (B) the United States District Court for the District of Delaware, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(b)    <u>WAIVER OF JURY TRIAL</u>.    THE COMPANY AND EACH STOCKHOLDER HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT OR ANY SUCH STOCKHOLDER'S OWNERSHIP OF COMPANY COMMON STOCK. THE COMPANY AND EACH STOCKHOLDER (I) CERTIFY THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE COMPANY OR ANY STOCKHOLDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE COMPANY OR SUCH STOCKHOLDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGE THAT THE COMPANY AND EACH STOCKHOLDER HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 5.13(B)</u>.

**Section 5.14   No Third Party Beneficiary**.    Except as expressly provided in <u>Section 5.5</u>, this Agreement is made solely and specifically among and for the benefit of the parties hereto (including each Stockholder), and their respective successors and permitted assigns, and

no other Person will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

**Section 5.15   Confidentiality**.

(a)      The terms of this Agreement, the identity of any Person with whom the Company may be holding discussions with respect to any investment, acquisition, disposition or other transaction, any information disclosed to or received by any Stockholder pursuant to Section 3.1 or Exhibit B and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company or its Subsidiaries or the relative or absolute rights or interests of any of the Stockholders (collectively, the "***Confidential Information***") that has not been publicly disclosed by the Company is confidential and proprietary information of the Company, the disclosure of which may cause irreparable harm to the Company and the Stockholders. Accordingly, each Stockholder represents that it has not and agrees that it will not and will direct its stockholders, partners, directors, officers, agents, representatives, attorneys, accountants, advisors, employees, and Affiliates (collectively, its "***Representatives***") not to, disclose to any Person any Confidential Information or confirm any statement made by third Persons regarding Confidential Information until the Company has publicly disclosed the Confidential Information; provided, however, that any Stockholder (or its Affiliates) may disclose such Confidential Information: (i) to the extent required by law (it being specifically understood and agreed that anything required to be set forth in a registration statement or any other document required to be filed pursuant to law will be deemed required by law, so long as the requirement to file such registration statement does not arise primarily in connection with a Transfer of securities of the Company), regulation, the listing standards of any national securities exchange or required or requested by any governmental authority having applicable jurisdiction, (ii) to the extent that the Confidential Information is publicly known or subsequently becomes publicly known other than through a breach of this Section 5.15(a) by such Stockholder, (iii) to the extent that the Confidential Information is already in possession of, or is subsequently received by, a Stockholder from a third party not known by the Stockholder to be subject to an obligation of confidentiality owed to the Company, or (iv) to a prospective Transferee that (x) is not known by such Stockholder to be a Competitor and (y) has entered into reasonable confidentiality arrangements enforceable by the Company as described in Section 3.1(a), subject to the terms and conditions of such arrangements. Notwithstanding the foregoing, each Stockholder may disclose Confidential Information to its Representatives (i) who such Stockholder determines in good faith need to know such information for the sole purpose of advising such Stockholder and (ii) who are informed by such Stockholder of the confidential nature of such information; provided that each Stockholder will be responsible for any violation of this Section 5.15 by any of its Representatives as if they were parties hereto.

(b)      ~~Each Stockholder hereby consents in advance to any motion for any protective order brought by the Company or any other Stockholder represented as being intended by the movant to implement the *purposes of this Section* 5.15; provided~~ that, ~~if~~**If** a Stockholder receives a request to disclose any Confidential Information under the terms of a valid and effective order issued by a court or governmental agency and the order was not sought by or on behalf of or consented to by such Stockholder, then such Stockholder may disclose the Confidential Information to the extent required if the Stockholder as promptly as practicable (i) notifies the Company of the existence, terms and circumstances of the order, (ii) consults in good faith with

the Company on the advisability of taking legally available steps to resist or to narrow the order and cooperates with the reasonable requests of the Company, at the Company's sole cost and expense, in connection with the foregoing, and (iii) if disclosure of the Confidential Information is required, exercises its commercially reasonable efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded to the portion of the disclosed Confidential Information that the Company designates.  The cost (including attorneys' fees and expenses) of obtaining a protective order covering Confidential Information designated by the Company will be borne by the Company.

(c)    The covenants contained in this Section 5.15 will survive the Transfer of Company Common Stock of any Stockholder and the termination of this Agreement; provided, however, that this Section 5.15 will cease to be of any force and effect on the second (2nd) anniversary of the termination of this Agreement.

**Section 5.16  Business Opportunities**.  To the fullest extent permitted by Section 122(17) of the DGCL (or any successor provision) and except as may be otherwise expressly agreed in writing by the Company and any applicable Consenting Creditor (as defined in the Plan) (each, an "*Investor*" and together the "*Investors*"), the Company, on behalf of itself and its Subsidiaries, renounces and waives any interest or expectancy of the Company and its Subsidiaries in, or in being offered an opportunity to participate in, directly or indirectly, any potential transactions, matters or business opportunities (including, without limitation, any business activities or lines of business that are the same as or similar to those pursued by, or competitive with, the Company or any of its Subsidiaries or any dealings with customers or clients of the Company or any of its Subsidiaries) that are from time to time presented to any of the Investors or any of their respective Representatives even if the transaction, matter or opportunity is one that the Company or its Subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so and no such person shall be liable to the Company or any of its Subsidiaries or its Affiliates for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such person pursues, acquires or participates in such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Company or its Subsidiaries.  Without limiting the foregoing renunciation, the Company acknowledges that certain Investors are in the business of making investments in, and have investments in, other businesses similar to and that may compete with the Company's businesses ("*Competing Businesses*"), and agrees that each such Investor shall have the right to make additional investments in or have relationships with other Competing Businesses independent of its investment in the Company. Any person purchasing or otherwise acquiring any interest in any shares of capital stock of the Company shall be deemed to have notice of and consented to the provisions of this Section 5.16.  Neither the alteration, amendment or repeal of this Section 5.16, nor the adoption of any provision of this Agreement inconsistent with this Section 5.16, nor, to the fullest extent permitted by the laws of the State of Delaware, any modification of law, shall eliminate or reduce the effect of this Section 5.16 in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this Section 5.16, would accrue or arise, prior to such alteration, amendment, repeal, adoption or modification.  If any provision or provisions of this Section 5.16 shall be held to be invalid, illegal or unenforceable as applied to any circumstance for any reason whatsoever: (a) the validity, legality and enforceability of such provisions in any other circumstance and of

the remaining provisions of this Section 5.16 (including, without limitation, each portion of any paragraph of this Section 5.16 containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and (b) to the fullest extent possible, the provisions of this Section 5.16 (including, without limitation, each such portion of any paragraph of this Section 5.16 containing any such provision held to be invalid, illegal or unenforceable) shall be construed so as to permit the Company to protect its Representatives from personal liability in respect of their good faith service to or for the benefit of the Company to the fullest extent permitted by law.  This Section 5.16 shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Company under this Agreement, the Charter Documents of the Company or applicable law.

**Section 5.17  Cumulative Remedies; Specific Performance**.

(a)     The rights and remedies of any party hereto as set forth in this Agreement are not exclusive and are in addition to any other rights and remedies now or hereafter provided by law or at equity.

(b)     The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that, in addition to any other rights and remedies at law or in equity existing in its favor, any non-breaching party hereto shall be entitled to seek specific performance and/or other injunctive relief from any court of law or equity of competent jurisdiction (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement.

**Section 5.18  Exhibits and Schedules**.  All Exhibits and Schedules attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.

**Section 5.19  Interpretation**.  The titles and section headings set forth in this Agreement are for convenience only and shall not be considered as part of agreement of the parties hereto.  When the context requires, the plural shall include the singular and the singular the plural, and any gender shall include all other genders or neuter.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  No provision of this Agreement shall be interpreted or construed against any party because such party or its counsel was the drafter thereof.  Any reference to the DGCL or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.  Numbered or lettered articles, sections, and subsections herein contained refer to articles, sections, and subsections of this Agreement unless otherwise expressly stated.

**Section 5.20  Termination**.  This Agreement will be automatically effective as of the Effective Date and will continue in effect thereafter until the earlier to occur of (a) its termination by the unanimous written consent of all Stockholders, (b) the dissolution, liquidation or winding up of the Company and, (c) the occurrence of a Public Listing **and (d) the date that is twenty (20) years after the date hereof**.  This Article V shall survive any termination of this Agreement.

**SCHEDULE I**

**COMPETITORS**

[*To be supplied.*]

# EXHIBIT A

## DEFINITIONS

As used in this Agreement, the following terms will have the following meanings, and all section references shall be to sections in this Agreement unless otherwise provided:

"***Accelerated Buyer***" has the meaning set forth in Section 4.1(e).

"***Affiliate(s)***" means with respect to any Person, (i) any other Person that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with, such Person (for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise); provided, however, that neither the Company nor any of its controlled Affiliates shall be deemed an Affiliate of any of the Stockholders (and vice versa), (ii) if such Person is an investment fund, an Affiliate shall include any other investment fund the primary investment advisor to which, or an Affiliate of such primary investment advisor, is the primary investment advisor to such Person and (iii) if such Person is a natural Person, any Family Member of such natural Person.

"***Affiliate Transaction***" has the meaning set forth in Section 2.2(b).

"***Agreement***" has the meaning set forth in the preamble.

"***At-Large Directors***" has the meaning set forth in Section 2.1(b)(vi).

"***Backstop Commitment Agreement***" has the meaning set forth in the Plan.

"***Board***" means the board of directors of the Company.

"***Board Designators***" ~~has the meaning set forth in Section 2.1(b)(iv)~~**means Brigade, Oppenheimer and Searchlight, collectively**.

"***Brigade***" ~~has the meaning set forth in Section 2.1(b)(ii)~~**means Brigade Capital Management, LP, its Affiliates, and any fund, account or client managed or advised by any such Person from time to time.**

"***Brigade Director***" has the meaning set forth in Section 2.1(b)(ii).

"***Business Day***" means any day other than a Saturday, Sunday or date on which commercial banks in New York, New York are authorized by law to close for business.

"***Charter Documents***" means, with respect to the Company, the certificate of incorporation and bylaws of the Company, as the same may be amended, supplemented, modified or restated from time to time, and with respect to any other Person, the articles of incorporation, bylaws, certificate of incorporation, certificate of formation, operating agreement,

partnership agreement or any other similar incorporating or formation documents of such Person, as the same may be amended, supplemented, modified or restated from time to time.

"*Class I Directors*" has the meaning set forth in Section 2.1(c).

"*Class II Directors*" has the meaning set forth in Section 2.1(c).

"*Class III Directors*" has the meaning set forth in Section 2.1(c).

"*Company*" has the meaning set forth in the preamble.

"*Company Common Stock*" means the common stock, par value $[0.01] per share, of the Company.

"*Competing Businesses*" has the meaning set forth in Section 5.16.

"*Competitor*" means any of the Persons set forth on Schedule I attached hereto and any of their controlled Affiliates, which schedule may be modified by the Board in good faith from time to time.

"*Confidential Information*" has the meaning set forth in Section 5.15(a).

"*Debtors*" has the meaning set forth in the recitals.

"*Derivative Securities*" means direct or indirect options, rights, warrants or securities convertible into or exercisable or exchangeable for, any Company Common Stock or any other capital stock of the Company.

"*DGCL*" means the Delaware General Corporation Law, as the same may be amended from time to time.  All references herein to sections of the DGCL shall include any corresponding provisions of succeeding law.

"*Director*" means any member of the Board (other than any Person (if any) effecting observer rights on the Board).¶

"*EDGAR*" means the Electronic Data Gathering, Analysis and Retrieval System of the SEC.

"*Effective Date*" has the meaning set forth in the preamble.

"*Equity Incentive Plans*" means any equity incentive plans of the Company for Directors or officers or employees of the Company, including the Management Incentive Plan (as defined in the Plan).

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended from time to time.

"*Executive Director*" has the meaning set forth in Section 2.1(b)(i).

"*Exempt Securities*" has the meaning set forth in Section 4.1(d).

"*Family Member*" means, with respect to any natural Person, such Person's spouse and descendants (whether or not adopted) and any trust, family limited partnership or limited liability company that is and remains solely for the benefit of such Person's spouse and/or descendants.

"*GAAP*" means the generally accepted accounting principles as in effect from time to time in the U.S.

"*Investor Directors*" has the meaning set forth in Section 2.1(b)(iv).

"*Investor(s)*" has the meaning set forth in Section 5.16.

"*IPO*" means the first public offering of the Company pursuant to an effective Registration Statement under the Securities Act (other than on Forms S-4, S-8 or successors to such forms), covering the offer and sale of capital stock of the Company.

"*Issuance Notice*" has the meaning set forth in Section 4.1(b).

"*Majority of Disinterested Directors*" has the meaning set forth in Section 2.2(b).¶

"*MD&A*" has the meaning set forth in Section 3.1(a)(i).

[*"*Minimum Designating Ownership*"* means ~~(i) with respect to Brigade, [●] percent ([●]%) of Outstanding Company Common Stock, (ii) with respect to Oppenheimer, [●] percent ([●]%) of Outstanding Company Common Stock and (iii) with respect to Searchlight, [●] percent ([●]~~seven and one-half percent (7.5%) of Outstanding Company Common Stock.]

"*Necessary Action*" means, with respect to a specified result, all actions that are permitted by applicable law and reasonably necessary to cause such result, including (i) voting or providing a written consent or proxy with respect to Company Common Stock, (ii) causing the adoption of Stockholders' resolutions and amendments to the applicable Charter Documents, (iii) causing the Directors (to the extent such Directors were nominated or designated by the Person obligated to undertake the Necessary Action, and subject to any fiduciary duties that such Directors may have as directors of the Company) to act in a certain manner or causing them to be removed in the event they do not act in such a manner, (iv) executing agreements and instruments and (v) making, or causing to be made, with governmental, administrative or regulatory authorities, all filings, registrations or similar actions that are required to achieve such result.

"*New Securities*" means Company Common Stock and other capital stock and rights, convertible securities, options or warrants to purchase Company Common Stock or other capital stock issued subsequent to the Effective Date, whether or not authorized as of the Effective Date.

"*Oppenheimer*" ~~has the meaning set forth in Section 2.1(b)(iii)~~means OppenheimerFunds, Inc., its Affiliates, and any fund, account or client managed or advised by any such Person from time to time.

"***Oppenheimer Director***" has the meaning set forth in Section 2.1(b)(iii).

"***Outstanding Company Common Stock***" means, as of any given time, the then issued and outstanding Company Common Stock, excluding (unless calculated on a fully diluted basis) any Derivative Securities and any unvested or restricted Company Common Stock issued pursuant to an Equity Incentive Plan.¶

"***Permitted Person***" has the meaning set forth in Section 3.1(a).

"***Person***" means an individual, partnership, limited liability company, corporation, joint venture, trust, business trust, association, or similar entity, whether domestic or foreign, and the heirs, executors, legal representatives, successors and assigns of such entity where the context requires.

"***Plan***" has the meaning set forth in the recitals.

"***Preemptive Offer Record Date***" has the meaning set forth in Section 4.1(b).

"***Public Listing***" means the listing of Company Common Stock on a U.S. national securities exchange registered with the SEC (whether in connection with an initial public offering of Company Common Stock or otherwise).

"***Purchaser***" has the meaning set forth in Section 4.1(b).

"***Qualified IPO***" means a *bona fide*, marketed underwritten IPO after which closing such capital is quoted on the NASDAQ National Market or listed or quoted on the New York Stock Exchange or other national securities exchange acceptable to the Board and meeting one of the following two criteria: (i) the aggregate cash proceeds (net of underwriting discounts, commissions and offering expenses) of such offering to the Company exceed [one hundred million] dollars ($[100,000,000]), or (ii) at least [twenty] percent ([20]%) of the Outstanding Company Common Stock (calculated on a fully diluted basis, and for purposes of such calculation treating Company Common Stock issued in the IPO as Outstanding Company Common Stock) shall have been issued or sold to the public in connection with such IPO.

"***Qualified Stockholder***" has the meaning set forth in Section 4.1(a).

"***Quarterly Call***" has the meaning set forth in Section 3.1(c).¶

"***Reallotment Securities***" has the meaning set forth in Section 4.1(c).

"***Registration Rights Agreement***" means that certain registration rights agreement, dated as of [●], 2017, by and among the Company and the investors party thereto.

"***Registration Statement***" means any registration statement of the Company under the Securities Act which permits the public offering of any of the Registrable Securities (as defined in the Registration Rights Agreement), including the prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material

incorporated by reference or deemed to be incorporated by reference in such registration statement.

"***Replacement Brigade Director***" has the meaning set forth in <u>Section 2.1(e)</u>.

"***Replacement Oppenheimer Director***" has the meaning set forth in <u>Section 2.1(e)</u>.

"***Replacement Directors***" has the meaning set forth in <u>Section 2.1(e)</u>.

"***Representatives***" has the meaning set forth in <u>Section 5.15(a)</u>.

"***Response Notice***" has the meaning set forth in <u>Section 4.1(b)</u>.

"***Rights Offerings***" has the meaning set forth in the Plan.

"***Searchlight***" has the meaning set forth in Section 2.1(b)(iv). ***Searchlight***" means Searchlight Capital Partners, LP, its Affiliates, and any fund, account or client managed or advised by any such Person from time to time.

"***Searchlight Director***" has the meaning set forth in <u>Section 2.1(b)(iv)</u>.

"***SEC***" means the Securities and Exchange Commission and any governmental body or agency succeeding to the functions thereof.

"***Secure Site***" has the meaning set forth in <u>Section 3.1(a)</u>.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Stockholder***" means each Person (other than the Company) who shall be a party to or bound by this Agreement, so long as such Person shall "beneficially own" (as such term is defined in Rule 13d-3 of the Exchange Act) any Company Common Stock.

"***Stockholder Approval***" means the affirmative vote or written consent of the holders of at least a majority of the shares of Outstanding Company Common Stock (subject to any adjustments or limitations on voting as set forth in the Company's Charter Documents).

"***Stockholder Registry***" means a register of the Company indicating: (i) with respect to each issuance of Company Common Stock or other capital stock of the Company, the date of such issuance, the number of shares issued and the Stockholder to whom such shares were issued and (ii) with respect to each transfer of Company Common Stock or other capital stock of the Company, the date of such Transfer, the number of shares Transferred and the identity of each of the transferor and the transferee(s) thereof.

"***Subsidiary***" means any Person the majority of the equity of which, directly, or indirectly through one or more other Persons, (a) the Company has the right to acquire or (b) is owned or controlled by the Company. As used in this definition, "control," including, its correlative meanings, "controlled by" and "under common control with," means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through

ownership of equity, by contract or otherwise). For the avoidance of doubt, Subsidiary shall include any Person that is included in the Company's consolidated group for purposes of preparing the Company's consolidated financial statements in accordance with GAAP.

"***Transfer***" means the sale, sale of any option or contract to purchase, purchase of any option or contract to sell, grant of any option, right or warrant to purchase, assignment, loan, offer, transfer, exchange or other disposition of any shares of Company Common Stock, whether or not for value, and whether voluntarily, by operation of law or otherwise, and includes foreclosure.

"***U.S.***" means the United States of America.

### EXHIBIT B

### FORM OF
### CONFIDENTIALITY AGREEMENT

[●]
[●]
[●]

[INSERT DATE]

[INSERT NAME OF POTENTIAL TRANSFEREE]
[INSERT ADDRESS OF POTENTIAL TRANSFEREE]

Ladies and Gentlemen:

In connection with the consideration by [INSERT NAME OF POTENTIAL TRANSFEREE] ("*you*" or "*your*") of a potential investment in shares of the common stock, par value $0.01 per share, of [Giraffe New Holding Co., Inc.], a Delaware corporation (the "*Company*" and together with you, collectively, the "*Parties*" and each individually, a "*Party*"), or other securities of the Company (the "*Transaction*"), certain affiliates or stockholders of the Company, the Company or their respective representatives have furnished or may furnish you and your Representatives (as hereinafter defined) with non-public information regarding the Company, including, without limitation, information concerning the Company's financial and operational performance, properties, prospects, activities and plans. You recognize and acknowledge that such information furnished or to be furnished to you and/or your Representatives in the future (whether oral or written) is proprietary to the Company and may include trade secrets or other highly confidential non-public business information the disclosure of which could harm the Company. In consideration for, and as a condition of, such non-public information being furnished to you (and your agents, representatives, attorneys, accountants, advisors, directors, officers, employees and affiliates, collectively, your "*Representatives*"), you agree to treat any and all information concerning the Company or any of its subsidiaries that has been or is to be furnished to you or your Representatives (regardless of the manner in which it is furnished, including, without limitation, in written or electronic format or orally, gathered by visual inspection or otherwise) by or on behalf of the Company or any of its affiliates or stockholders, together with any documents you create that contain or are based upon any such information, in whole or in part (collectively, "*Company Information*"), in accordance with the provisions of this letter agreement (this "*Agreement*").

The term "Company Information" does not include information that you can demonstrate: (i) is obtained by you or your Representatives from a third party, who, after reasonable inquiry, is not known by you to be bound by any duty of confidentiality to or confidential agreement with the Company or any other Person (as defined below) with respect to Company Information or is otherwise prohibited from transmitting the information to you by a contractual, legal, fiduciary or other obligation to the Company or any other Person; (ii) is or becomes part of the public domain (other than through a breach of this Agreement by you or any of your Representatives); (iii) is

independently ascertained or developed by or for you or your Representatives or any third party without use of or reference to Company Information; or (iv) is approved for public release by written authorization of the Company. For purposes of this Agreement, the term "Person" shall be broadly interpreted to include, without limitation, any individual, partnership, limited liability company, corporation, joint venture, trust, business trust, association or similar entity, whether domestic or foreign, and the heirs, executors, legal representatives, successors and assigns of such entity where the context requires.

1.    You hereby agree that you and your Representatives will, except to the extent required by applicable law or legal process, (a) keep the Company Information strictly confidential, (b) not disclose any of the Company Information in any manner whatsoever without the prior written consent of the Company and (c) not use the Company Information for any purpose other than considering and negotiating the Transaction; provided, however, that you may disclose any of such information to your Representatives (i) who need to know such information for the sole purpose of advising you and (ii) who are informed by you of the confidential nature of such information; provided, further, that you will (x) be responsible for any violation of this Agreement by any of your Representatives as if they were parties hereto and (y) provide the Company with the names of any your Representatives that receives Company Information. You agree to promptly notify the Company in writing of any unauthorized use or disclosure of the Company Information and such notice shall include a detailed description of the circumstances of the disclosure and the Persons involved.

2.    In the event that you or any of your Representatives are required by applicable law or legal process to disclose any of the Company Information, you will promptly notify (except where such notice would be legally prohibited) the Company in writing so that the Company may seek a protective order or other appropriate remedy and (except to the extent legally prohibited) will reasonably cooperate with the Company (at the Company's expense) to limit the disclosure to the greatest extent possible consistent with such applicable law or legal process, including, without limitation, in appropriate circumstances, seeking reliable assurances that confidential or "attorneys eyes only" treatment shall be accorded the Company Information. Any such Company Information that is (x) not required to be disclosed or (y) accorded confidential treatment shall continue to be Company Information to which this Agreement shall continue to apply. You acknowledge and agree that, for purposes of this Agreement, there shall be no "applicable law" requiring you to disclose any Company Information solely by virtue of the fact that, absent such disclosure, you would be prohibited from purchasing, selling, or engaging in derivative transactions with respect to, any securities of the Company or otherwise proposing or making an offer to do any of the foregoing.

3.    All Company Information shall remain the property of the Company. Neither you nor any of your Representatives shall by virtue of disclosure to you or any of your Representatives, or your or any of your Representative's use, of any Company Information acquire any rights with respect thereto, all of which rights (including, without limitation, all intellectual property rights) shall remain exclusively with the Company.

4.    If you determine that you do not wish to proceed with a Transaction, you will promptly advise the Company of that decision. As soon as possible upon the Company's written request, you and your Representatives shall destroy (or at the Company's option (in its sole

discretion) return to the Company) all Company Information that has been disclosed to you or any of your Representatives, except for any such Company Information stored on electronic backup media to the extent that such information cannot be expunged without unreasonable effort. Upon returning or destroying such Company Information, you shall provide written notice to the Company certifying compliance with the foregoing sentence. Notwithstanding the provisions of this paragraph, you acknowledge and agree that this Agreement will continue to apply to any returned, held, retained or destroyed Company Information on the terms set forth herein.

5.      You acknowledge and agree that all Company Information is furnished on an "AS IS" basis, without warranty of any kind. THE COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE COMPANY INFORMATION, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

6.      You acknowledge that an award of money damages would be inadequate for any breach of this Agreement by you or any of your Representatives and would cause the Company irreparable harm. Therefore, you hereby agree that, in the event of any breach or threatened breach of this Agreement by you or any of your Representatives, the Company will be entitled to seek equitable relief, including, without limitation, injunctive relief and specific performance, as remedies for any such breach or threatened breach without the requirement of posting a bond or other security. Such remedies will not be the exclusive remedies for any breach of this Agreement, but will be in addition to all other remedies available at law or in equity to the Company.

7.      This Agreement or any provision hereof may not be amended, modified or waived by course of dealing, usage in trade, conduct or any exchanges of communication, including, without limitation, e-mail or any other electronic or digital means, other than by amendment, in writing duly executed with the handwritten signatures of an authorized signatory of each of the Parties. The rights and remedies of the Parties are cumulative, and not alternative. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

8.      This Agreement constitutes the complete agreement between the Parties concerning the subject matter hereof and supersedes and cancels any and all prior communications and agreements between the Parties with respect thereto. This Agreement

relates only to the subject matter hereof and shall not be construed as an agreement to agree to enter into the Transaction or any transaction by either Party. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect. If any of the covenants or provisions of this Agreement are determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the Parties contemplate that the court making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this Agreement.

9.      Neither Party may assign any rights or delegate any duties under this Agreement without the prior written consent of the other Party, which consent shall be at the other Party's sole discretion. Any such attempted assignment or delegation without the other Party's prior written consent will be null and void ab initio. This Agreement will be binding upon the Parties and their respective authorized successors and assigns.

10.     You acknowledge and agree that no contract or agreement providing for any Transaction shall be deemed to exist between you and the Company or any of its affiliates or stockholders unless and until a final definitive agreement has been executed and delivered, and each Party hereby waives, in advance, any claims (including, without limitation, breach of contract) in connection with any Transaction unless and until a final definitive agreement has been executed and delivered with respect thereto. The Parties also agree that unless and until a final definitive agreement regarding a Transaction has been executed and delivered, neither Party will be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this Agreement, except for the matters specifically agreed to herein. You acknowledge and agree that the Company and its affiliates and stockholders reserve the right, in their sole discretion, to reject any and all proposals made by you or any of your Representatives with regard to the Transaction, and to terminate discussions and negotiations with you at any time.

11.     This Agreement shall be deemed to have been made and executed in the State of Delaware, and any dispute arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. You and the Company (i) irrevocably submit to the exclusive jurisdiction of any state court in the State of Delaware and the United States District Court for the District of Delaware (and the appropriate appellate courts) for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agree to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in any state court in the State of Delaware.

12.     EACH OF THE COMPANY AND YOU HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT OR YOU MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT.

13.     Any notice hereunder shall be made in writing by overnight courier, personal delivery, facsimile or email (if telephonically confirmed), in each case to:

*If to the Company*:

[●]
[●]
[●]
Attention: [●]¶
~~Facsimile: [●]~~

*If to you*:

[INSERT ADDRESS OF POTENTIAL TRANSFEREE]

Attention:        _____¶
~~Facsimile:~~      ~~_____~~
Telephone:        _____
Email:            _____

    14.    This Agreement shall expire on the earlier of (i) the date of the last to occur of (x) a definitive agreement relating to the Transaction is entered into by you and either the Company or any of its affiliates or stockholders and (y) you have become a party to the Stockholders Agreement, dated as of [●], as amended from time to time, by and among the Company and the stockholders of the Company and (ii) the twenty-four (24) month anniversary of the date hereof.

    15.    This Agreement may be executed in two (2) or more counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute this Agreement when a duly authorized representative of each Party has signed a counterpart. The Parties may sign and deliver this Agreement by ~~facsimile or~~ electronic (that is, .PDF) transmission.  Each Party agrees that the delivery of this Agreement by ~~facsimile or~~ electronic transmission will have the same force and effect as delivery of original signatures.

Please confirm your agreement with the foregoing by signing and returning one copy of this Agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

**GIRAFFE NEW HOLDING CO., INC.**

By: _____
    Name:
    Title:


Accepted and agreed as of the date first written above:

**[INSERT NAME OF POTENTIAL TRANSFEREE]**

By: _____
    Name:
    Title:


Exhibit B – Page  6

# **EXHIBIT G**

## **Registration Rights Agreement**

**DRAFT SUBJECT TO MATERIAL CHANGE**

**REGISTRATION RIGHTS AGREEMENT**

This Registration Rights Agreement (including all exhibits hereto and as may be amended, supplemented or amended and restated from time to time in accordance with the terms hereof, this "*Agreement*") is made and entered into as of [●], 2017, by and among The Gymboree Corporation, a Delaware corporation (the "*Company*"), and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto.

WHEREAS, the Company and certain affiliated debtors filed a plan of reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, on June 16, 2017, which was confirmed by the United States Bankruptcy Court for the Eastern District of Virginia on [●], 2017 (including all exhibits, schedules and supplements thereto and as amended from time to time, the "*Plan*"); and

WHEREAS, the Plan provides that the Company will enter into a registration rights agreement with each Holder (as defined below) and any Affiliates or Related Funds thereof that receive New Gymboree Common Shares; and

WHEREAS, the Company and the Holders are entering into this Agreement in furtherance of the aforesaid provisions of the Plan.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each of the Holders agree as follows:

1.    <u>Definitions</u>. Capitalized terms used and not otherwise defined herein that are defined in the Plan have the meanings given such terms in the Plan. As used in this Agreement, the following terms shall have the following meanings:

"*Advice*" has the meaning set forth in <u>Section 16(c)</u>.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Funds of such Person). For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the Recitals.

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act, as such definition may be amended from time to time.

"*beneficially own*" (and related terms such as "beneficial ownership" and "beneficial owner") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"*Board*" means the Board of Directors of the Company or any authorized committee thereof.

"*Bought Deal*" has the meaning set forth in Section 8(a).

"*Business Day*" means any day, other than a Saturday or Sunday or a day on which commercial banks in New York City are authorized or required by law to be closed.

"*Commission*" means the Securities and Exchange Commission.

"*Company*" has the meaning set forth in the Preamble and includes the Company's successors by merger, acquisition, reorganization or otherwise.

"*Counsel to the Holders*" means (i) with respect to any Demand Registration, the counsel selected by the Holders of a majority of the Registrable Securities initially requesting such Demand Registration and (ii) with respect to any Underwritten Takedown or Piggyback Offering, the counsel selected by the Majority Holders.

"*Demand Registration*" has the meaning set forth in Section 5(a).

"*Demand Registration Request*" has the meaning set forth in Section 5(a).

"*Effective Date*" means the date that a Registration Statement filed pursuant to this Agreement is first declared effective by the Commission.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Form S-1*" means Form S-1 under the Securities Act, or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

"*Form S-3*" means Form S-3 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-3.

"*Form S-4*" means Form S-4 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-4.

"*Form S-8*" means Form S-8 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-8.

"*FINRA*" has the meaning set forth in Section 10.

"*Grace Period*" has the meaning set forth in Section 7(a)(B).

"*Holder*" or "*Holders*" means any party to the Backstop Commitment Agreement that is also a party signatory to this Agreement, other than the Company, and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant to this Agreement. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"*Indemnified Party*" has the meaning set forth in <u>Section 12(c)</u>.

"*Indemnifying Party*" has the meaning set forth in <u>Section 12(c)</u>.

"*Initial Shelf Expiration Date*" has the meaning set forth in <u>Section 2(f)</u>.

"*Initial Shelf Participation Trigger Date*" has the meaning set forth in <u>Section 2(a)</u>.

"*Initial Shelf Registration Statement*" has the meaning set forth in <u>Section 2(a)</u>.

"*Lockup Period*" has the meaning set forth in <u>Section 11(a)</u>.

"*Losses*" has the meaning set forth in <u>Section 12(a)</u>.

"*Majority Holders*" means, with respect to any Underwritten Offering, the holders of a majority of the Registrable Securities to be included in such Underwritten Offering held by all Holders that have made the request requiring the Company to conduct such Underwritten Offering (but not including any Holders that have exercised "piggyback" rights hereunder to be included in such Underwritten Offering).

"*New Gymboree Common Shares*" means the common shares of the Company to be issued pursuant to the Plan.

"*Other Holder*" has the meaning set forth in <u>Section 8(b)</u>.

"*Person*" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"*Piggyback Notice*" has the meaning set forth in <u>Section 8(a)</u>.

"*Piggyback Offering*" has the meaning set forth in <u>Section 8(a)</u>.

"*Plan*" has the meaning set forth in the Recitals.

"*Plan Effective Date*" shall mean the date on which the Plan becomes effective.

"*Proceeding*" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a

prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means, collectively, (a) as of the Plan Effective Date, all New Gymboree Common Shares issued to any Holder or to any Affiliate or Related Fund of any Holder, either directly or pursuant to a joinder or assignment and any additional New Gymboree Common Shares acquired by any Holder, Affiliate or Related Fund of any Holder in open market or other purchases and issued or issuable to any Holder, Affiliate or Related Fund of any Holder, after the Plan Effective Date and (b) any additional New Gymboree Common Shares paid, issued or distributed in respect of any such securities by way of a stock dividend, stock split or distribution, or in connection with a combination of securities, and any security into which such New Gymboree Common Shares shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution or otherwise; *provided*, *however*, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (i) the date on which such securities are disposed of pursuant to an effective Registration Statement or (ii) the date on which such securities are disposed of pursuant to Rule 144 (or any similar provision then in effect) promulgated under the Securities Act; *provided further, however,* that Registrable Securities shall not otherwise cease to constitute Registrable Securities due solely to the fact that such securities may be sold without restriction by the Commission.

"*Registration Statement*" means any one or more registration statements of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement (including, without limitation, any Shelf Registration Statement), amendments and supplements to such registration statements, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such Registration Statements.

"*Related Fund*" means (i) any investment funds or other entities who are advised by the same investment advisor and (ii) any investment advisor with respect to an investment fund or entity it advises.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 144A*" means Rule 144A promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 158*" means Rule 158 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

4

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Stockholder Questionnaire*" means a questionnaire reasonably adopted by the Company from time to time.

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission in accordance with the Securities Act for the offer and sale of Registrable Securities by Holders on a continuous or delayed basis pursuant to Rule 415.

"*Significant Holder*" means any Holder who holds at least 5.0% of the New Gymboree Common Shares (or any securities convertible into or exchangeable or exercisable for such New Gymboree Common Shares).

"*Trading Day*" means a day during which trading in the New Gymboree Common Shares occurs in the Trading Market, or if the New Gymboree Common Shares are not listed on a Trading Market, a Business Day.

"*Trading Market*" means whichever of the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board, or OTC Markets Group marketplace on which the New Gymboree Common Shares are listed or quoted for trading on the date in question.

"*Transfer*" has the meaning set forth in <u>Section 14</u>.

"*Underwritten Offering*" means an offering of Registrable Securities under a Registration Statement in which the Registrable Securities are sold to an underwriter for reoffering to the public.

"*Underwritten Takedown*" has the meaning set forth in <u>Section 2(h)</u>.

2.      <u>Initial Shelf Registration</u>.

(a)      The Company shall prepare a Shelf Registration Statement (as may be amended from time to time, the "*Initial Shelf Registration Statement*"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall request inclusion therein of some or all of their Registrable Securities by written notice to the Company, *provided* that such notice may not be delivered earlier than [   ] days after the Plan Effective Date (the "Initial Shelf Participation Trigger Date"). The Company shall file the Initial Shelf Registration Statement with the Commission on or prior to the 60th day following

the Initial Shelf Participation Trigger Date; *provided, however*, that the Company shall not be required to file the Initial Shelf Registration Statement until 60 days after Holders constituting at least [  ] percent ([  ]%) of all Registrable Securities properly request the inclusion in the Initial Shelf Registration Statement of such Registrable Securities, and such Holders otherwise timely comply with the requirements of this Agreement with respect to the inclusion of such Registrable Securities in the Initial Shelf Registration Statement.

(b)    The Company shall include in the Initial Shelf Registration Statement all Registrable Securities whose inclusion has been timely requested as aforesaid; *provided, however*, that the Company shall not be required to include an amount of Registrable Securities in excess of the amount as may be permitted to be included in such Registration Statement under the rules and regulations of the Commission and the applicable interpretations thereof by the staff of the Commission.

(c)    Upon the request of any Holder whose Registrable Securities are not included in the Initial Shelf Registration Statement at the time of such request, the Company shall file a new Registration Statement to include the Registrable Securities of such Holder as well as all previously registered Registrable Securities under Section 2 (for the avoidance of doubt, any such request shall not constitute a Demand Registration Request (as defined below)).

(d)    Within seven (7) days after receiving a request pursuant to Section 2(c), the Company shall give written notice of such request to all other Holders of Registrable Securities and shall include in such New Registration Statement all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within twenty (20) days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)    The Initial Shelf Registration Statement shall be on Form S-1; *provided, however*, that, if the Company becomes eligible to register the Registrable Securities for resale by the Holders on Form S-3 (including without limitation a Form S-3 filed as an Automatic Shelf Registration Statement), the Company shall be entitled to amend the Initial Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial Shelf Registration Statement as initially filed.

(f)    The Company shall use its reasonable best efforts to cause the Initial Shelf Registration Statement to be declared effective by the Commission as promptly as practicable, and shall use its reasonable best efforts to keep such Initial Shelf Registration Statement continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (i) the date the Company (A) is eligible to register the Registrable Securities for resale by Holders on Form S-3 and (B) has filed such Registration Statement with the Commission and which is effective and (ii) the date that all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "*Initial Shelf Expiration Date*"). In the event of any stop order, injunction or other similar order or requirement of the Commission relating to

6

the Initial Shelf Registration Statement, if any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the period during which the Initial Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect.

(g)    If the Initial Shelf Registration Statement is on Form S-1, then for so long as any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law, any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) the Initial Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under Section 7 of this Agreement.

(h)    Upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering (each, an *"Underwritten Takedown"*), in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (i) the number of securities included in such "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate gross offering price (before deducting underwriting discounts and commission) of at least $75 million.

3.    Subsequent Shelf Registration Statements

(a)    After (i) the Effective Date of the Initial Shelf Registration Statement and prior to the Initial Shelf Expiration Date and (ii) for so long as any Registrable Securities remain outstanding, the Company shall use its best efforts to (A) ensure that it will be eligible to register the Registrable Securities on Form S-3 after the Initial Shelf Expiration Date, and (B) meet the requirements of General Instruction VII of Form S-1 after the Initial Shelf Expiration Date.

(b)    After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, the Company shall use its best efforts to (A) be eligible and/or to maintain its eligibility to register the Registrable Securities on Form S-3, and (B) meet the requirements of General Instruction VII of Form S-1.

(c)    After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, if there is not an effective Registration Statement which includes the Registrable Securities that are currently outstanding, the Company shall (i) if the Company is eligible to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-3 and use its reasonable best efforts to cause such Registration Statement to be declared effective or (ii) promptly file a Shelf Registration

Statement on Form S-1 and use its reasonable best efforts to cause such Registration Statement to be declared effective and for so long as any Registrable Securities covered by such Shelf Registration on Form S-1 remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law, any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (x) such Shelf Registration shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading, and (y) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under Section 7 of this Agreement.

4.      Quotation on OTC Market

(a)      Until and unless (x) the New Gymboree Common Shares are listed on a national securities exchange or (y) the New Gymboree Common Shares may be sold by any and all Holders without restriction by the Commission pursuant to a Registration Statement in an at-the-market offering, the Company shall use its reasonable best efforts to cause the New Gymboree Common Shares to be quoted on any of the OTCBB, OTCQX or OTCQB markets as promptly as practicable after the Plan Effective Date and shall thereafter use its reasonable best efforts to maintain such quotation.

5.      Demand Registration

(a)      At any time and from time to time beginning [   (   )] days after the Plan Effective Date, any Holder or group of Holders may request in writing ("*Demand Registration Request*") that the Company effect the registration of all or part of such Holder's or Holders' Registrable Securities with the Commission under and in accordance with the provisions of the Securities Act (a "*Demand Registration*").  The Company will file a Registration Statement covering such Holder's or Holders' Registrable Securities requested to be registered on or prior to (x) the 60th day following a Demand Registration Request (if no Initial Shelf Registration Statement has been filed and declared effective) or (y) the 30th day following a Demand Registration Request (if an Initial Shelf Registration Statement has been filed and declared effective), and shall use its reasonable best efforts to cause such Registration Statement to be declared effective, as promptly as practicable after receipt of such request; *provided*, *however*, that the Company will not be required to file a Registration Statement pursuant to this Section 5(a):

(A)      unless (i) the number of Registrable Securities requested to be registered on such Registration Statement equals at least (x) [   ] percent ([  ]%) of all Registrable Securities at such time (if no Initial Shelf Registration Statement has been filed and declared effective) or (y) twenty-five percent (25%) of all Registrable Securities at such time (if an Initial Shelf Registration Statement has been filed and declared effective) and (ii) the Registrable Securities requested to be sold by the Holders pursuant to such Registration Statement have an anticipated aggregate gross offering price (before deducting underwriting discounts and commission) of at least $50 million;

8

(B)    if the Registrable Securities requested to be registered are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offer and sale of the Registrable Securities requested to be registered;

(C)    if a registration statement filed by the Company shall have previously been initially declared effective by the Commission within the one hundred eighty (180) days preceding the date such Demand Registration Request is made; and

(D)    if the number of Demand Registration Requests previously made pursuant to this Section 5(a) shall exceed five (5); *provided, however*, that a Demand Registration Request shall not be considered made for purposes of this clause (D) unless the requested Registration Statement has been declared effective by the Commission for more than 75% of the full amount of Registrable Securities for which registration has been requested.

(b)    A Demand Registration Request shall specify (i) the then-current name and address of such Holder or Holders, (ii) the aggregate number of Registrable Securities requested to be registered, (iii) the total number of Registrable Securities then beneficially owned by such Holder or Holders, and (iv) the intended means of distribution.  If at the time the Demand Registration Request is made the Company appears, based on public information available to such Holder or Holders, eligible to use Form S-3 for the offer and sale of the Registrable Securities, the Holder or Holders making such request may request that the registration be in the form of a Shelf Registration Statement (for the avoidance of doubt, the Company shall not be under the obligation to file a Shelf Registration on Form S-3 if, upon the advice of its counsel, it is not eligible to make such a filing).

(c)    The Company may satisfy its obligations under Section 5(a) hereof by amending (to the extent permitted by applicable law) any registration statement previously filed by the Company under the Securities Act, so that such amended registration statement will permit the disposition (in accordance with the intended methods of disposition specified as aforesaid) of all of the Registrable Securities for which a Demand Registration Request has been properly made under Section 5(b) hereof. If the Company so amends a previously filed registration statement, it will be deemed to have effected a registration for purposes of Section 5(a) hereof; *provided, however*, that the Effective Date of the amended registration statement, as amended pursuant to this Section 5(c), shall be the "the first day of effectiveness" of such Registration Statement for purposes of determining the period during which the Registration Statement is required to be maintained effective in accordance with Section 5(e) hereof.

(d)    Within seven (7) days after receiving a Demand Registration Request, the Company shall give written notice of such request to all other Holders of Registrable Securities and shall, subject to the provisions of Section 6(c) in the case of an Underwritten Offering, include in such registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within twenty (20) days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

9

(e)    The Company will use its reasonable efforts to keep a Registration Statement that has become effective as contemplated by this Section 5 continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission:

(A)    in the case of a Registration Statement other than a Shelf Registration Statement, until all Registrable Securities registered thereunder have been sold pursuant to such Registration Statement, but in no event later than two hundred seventy (270) days from the Effective Date of such Registration Statement; and

(B)    in the case of a Shelf Registration Statement, until the earlier of: (x) three (3) years following the Effective Date of such Shelf Registration Statement; and (y) the date that all Registrable Securities covered by such Shelf Registration Statement shall cease to be Registrable Securities;

*provided, however*, that in the event of any stop order, injunction or other similar order or requirement of the Commission relating to any Shelf Registration Statement, if any Registrable Securities covered by such Shelf Registration Statement remain unsold, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect; *provided further, however*, that if any Shelf Registration Statement was initially declared effective on Form S-3 and, prior to the date determined pursuant to Section 5(e)(B), the Company becomes ineligible to use Form S-3, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which the Company did not have an effective Registration Statement covering unsold Registrable Securities initially registered on such Shelf Registration Statement.

(f)    The Holder or Holders making a Demand Registration Request may, at any time prior to the Effective Date of the Registration Statement relating to such registration, revoke their request for the Company to effect the registration of all or part of such Holder's or Holders' Registrable Securities by providing a written notice to the Company. If, pursuant to the preceding sentence, the entire Demand Registration Request is revoked, then, at the option of the Holder or Holders who revoke such request, either (i) such Holder or Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of doubt, shall not include overhead expenses and which requested registration shall not count as one of the permitted Demand Registration Requests hereunder or (ii) the requested registration that has been revoked will be deemed to have been effected for purposes of Section 5(a).

(g)    If a Registration Statement filed pursuant to this Section 5 is a Shelf Registration Statement, then upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering, in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (i) the number of securities included in such "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time or (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $75 million.

6.      Procedures for Underwritten Offerings.  The following procedures shall govern Underwritten Offerings pursuant to Section 2(h) or Section 5(g), whether in the case of an Underwritten Takedown or otherwise.

(a)      (i) The Majority Holders shall select one or more investment banking firm(s) of national standing to be the managing underwriter or underwriters for any Underwritten Offering pursuant to a Demand Registration Request or an Underwritten Takedown with the consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed and (ii) the Company shall select one or more investment banking firms of national standing to be the managing underwriter or underwriters for any other Underwritten Offering with the consent of the Majority Holders, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)      All Holders proposing to distribute their securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided, however*, that the underwriting agreement is in customary form and reasonably acceptable to the Majority Holders and *provided further, however*, that no Holder of Registrable Securities included in any Underwritten Offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (i) such Holder's ownership of its Registrable Securities to be sold or transferred, (ii) such Holder's power and authority to effect such transfer and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested).

(c)      If the managing underwriter or underwriters for an Underwritten Offering pursuant to a Demand Registration or an Underwritten Takedown advises the Holders that the total amount of Registrable Securities or other New Gymboree Common Shares permitted to be registered is such as to materially adversely affect the success of such Underwritten Offering, the number of Registrable Securities or other New Gymboree Common Shares to be registered on such Registration Statement will be reduced as follows: *first*, the Company shall reduce or eliminate the securities of the Company to be included by any Person other than a Holder or the Company; *second*, the Company shall reduce or eliminate any securities of the Company to be included by the Company; and *third*, the Company shall reduce the number of Registrable Securities to be included by Holders on a pro rata basis based on the total number of Registrable Securities requested by the Holders to be included in the Underwritten Offering.

(d)      Within three (3) days after receiving a request for an Underwritten Offering constituting a "takedown" from a Shelf Registration Statement, the Company shall give written notice of such request to all other Holders, and subject to the provisions of Section 6(c) hereof, include in such Underwritten Offering all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within seven (7) days after the Company's giving of such notice; *provided, however*, that such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be registered.

(e)      The Company will not be required to undertake an Underwritten Offering pursuant to Section 2(h) or Section 5(g):

11

(A)     If the Company has undertaken an Underwritten Offering, whether for its own account or pursuant to this Agreement, within the one hundred eighty (180) days preceding the date of the request to the Company for such Underwritten Offering; and

(B)     if the number of Underwritten Offerings previously made pursuant to Section 2(h) or Section 5(g) in the immediately preceding twelve (12)-month period shall exceed three (3); *provided* that an Underwritten Offering shall not be considered made for purposes of this clause (B) unless the offering has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested to be included.

7.      Grace Periods.

(a)     Notwithstanding anything to the contrary herein—

(A)     the Company shall be entitled to postpone the filing or effectiveness of, or, at any time after a Registration Statement has been declared effective by the Commission, suspend the use of, a Registration Statement (including the Prospectus included therein) if in the good faith judgment of the Board, such registration, offering or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any bona fide material financing of the Company or any material transaction under consideration by the Company or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner; *provided however*, that in the event such Registration Statement relates to a Demand Registration Request or an Underwritten Offering pursuant to Section 2(h) or Section 5(g), then the Holders initiating such Demand Registration Request or such Underwritten Offering shall be entitled to withdraw the Demand Registration Request or request for the Underwritten Offering and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 5(a)(D) or Section 6(e)(B) and the Company shall pay all registration expenses in connection with such registration; and

(B)     at any time after a Registration Statement has been declared effective by the Commission and there is no duty to disclose under applicable law, the Company may delay the disclosure of material non-public information concerning the Company if the disclosure of such information at the time would, in the good faith judgment of the Board, adversely affect the Company (the period of a postponement or suspension as described in clause (A) and/or a delay described in this clause (B), a "*Grace Period*").

(b)     The Company shall promptly (i) notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (*provided* that the Company shall not disclose the content of such material non-public information to any Holder, without the express consent of such Holder) or the need to file a post-effective amendment, as applicable, and the date on which such Grace Period will begin, (ii) use reasonable best efforts to terminate a Grace Period as promptly as practicable and (iii) notify the Holders in writing of the date on which the Grace Period ends.

(c)    The duration of any one Grace Period shall not exceed thirty (30) days, and the aggregate of all Grace Periods in total during any three hundred sixty-five (365) day period shall not exceed forty-five (45) days. For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in clause (i) of <u>Section 7(b)</u> and shall end on and include the later of the date the Holders receive the notice referred to in clause (iii) of <u>Section 7(b)</u> and the date referred to in such notice.  In the event the Company declares a Grace Period, the period during which the Company is required to maintain the effectiveness of an Initial Shelf Registration Statement or a Registration Statement filed pursuant to a Demand Registration Request shall be extended by the number of days during which such Grace Period is in effect.

8.    <u>Piggyback Registration</u>

(a)    If at any time, and from time to time, the Company proposes to—

(A)    file a registration statement under the Securities Act with respect to an underwritten offering of New Gymboree Common Shares of the Company or any securities convertible or exercisable into New Gymboree Common Shares (other than with respect to a registration statement (i) on Form S-8 or any successor form thereto, (ii) on Form S-4 or any successor form thereto or (iii) another form not available for registering the Registrable Securities for sale to the public), whether or not for its own account; or

(B)    conduct an underwritten offering constituting a "takedown" of a class of New Gymboree Common Shares or any securities convertible or exercisable into New Gymboree Common Shares registered under a shelf registration statement previously filed by the Company;

the Company shall give written notice (the "*Piggyback Notice*") of such proposed filing or underwritten offering to the Holders at least ten (10) Business Days before the anticipated filing date (*provided* that in the case of a "bought deal," "registered direct offering" or "overnight transaction" (a "*Bought Deal*"), such Piggyback Notice shall be given not less than two (2) Business Days prior to the expected date of commencement of marketing efforts.  Such notice shall include the number and class of securities proposed to be registered or offered, the proposed date of filing of such registration statement or the conduct of such underwritten offering, any proposed means of distribution of such securities, any proposed managing underwriter of such securities and a good faith estimate by the Company of the proposed maximum offering price of such securities as such price is proposed to appear on the front cover page of such registration statement (or, in the case of an Underwritten Offering, would appear on the front cover page of a registration statement), and shall offer the Holders the opportunity to register such amount of Registrable Securities as each Holder may request on the same terms and conditions as the registration of the Company's and/or the holders of other securities of the Company securities, as the case may be (a "*Piggyback Offering*").  Subject to <u>Section 8(b)</u>, the Company will include in each Piggyback Offering all Registrable Securities for which the Company has received written requests for inclusion within seven (7) Business Days after the date the Piggyback Notice is given (*provided* that in the case of a Bought Deal, such written requests for inclusion must be received within two (2) Business Days after the date the

Piggyback Notice is given); *provided*, *however*, that in the case of the filing of a registration statement, such Registrable Securities are not otherwise registered pursuant to an existing and effective Shelf Registration Statement under this Agreement, but in such case, the Company shall include such Registrable Securities in such underwritten offering if the Shelf Registration Statement may be utilized for the offering and sale of the Registrable Securities requested to be offered; *provided further, however*, that in the case of an underwritten offering in the form of a "takedown" under a shelf registration statement, such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be offered.

(b)    The Company will cause the managing underwriter or underwriters of the proposed offering to permit the Holders that have requested Registrable Securities to be included in the Piggyback Offering to include all such Registrable Securities on the same terms and conditions as any similar securities, if any, of the Company.   Notwithstanding the foregoing, if the managing underwriter or underwriters of such underwritten offering advises the Company and the selling Holders in writing that, in its view, the total amount of securities that the Company, such Holders and any other holders entitled to participate in such offering ("*Other Holders*") propose to include in such offering is such as to materially adversely affect the success of such underwritten offering, then:

(A)    if such Piggyback Offering is an underwritten primary offering by the Company for its own account, the Company will include in such Piggyback Offering:  (i) *first*, all securities to be offered by the Company; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders; and (iii) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by all Other Holders;

(B)    if such Piggyback Offering is an underwritten secondary offering for the account of Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request), the Company will include in such registration: (i) *first*, all securities of the Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request) requested to be included therein; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders entitled to participate therein, allocated pro rata among such Holders on the basis of the amount of securities requested to be included therein by each such Holder; (iii) *third*, up to the full amount of securities proposed to be included in the registration by the Company; and (iv) *fourth,* up to the full amount of securities requested to be included in such Piggyback Offering by the Other Holders entitled to participate therein, allocated pro rata among such Other Holders on the basis of the amount of securities requested to be included therein by each such Other Holder;

such that, in each case, the total amount of securities to be included in such Piggyback Offering is the full amount that, in the view of such managing underwriter, can be sold without materially adversely affecting the success of such Piggyback Offering.

(c)    If at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, the Company determines for any

reason not to register or delay the registration of the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation to register any Registrable Securities in connection with the abandoned or delayed Piggyback Offering, without prejudice.

(d)    Any Holder of Registrable Securities requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company of its intention to withdraw from that registration, at least three (3) Business Days prior to the anticipated Effective Date of the Registration Statement filed in connection with such Piggyback Offering, or in the case of a Piggyback Offering constituting a "takedown" off of a shelf registration statement, at least three (3) Business Days prior to the anticipated date of the filing by the Company under Rule 424 of a supplemental prospectus (which shall be the preliminary supplemental prospectus, if one is used in the "takedown") with respect to such offering; *provided*, *however*, that (i) the Holder's request be made in writing and (ii) the withdrawal will be irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

9.    <u>Registration Procedures</u>. If and when the Company is required to effect any registration under the Securities Act as provided in <u>Sections 2(a)</u>, <u>5(a)</u>, <u>6</u> or <u>8</u> of this Agreement, the Company shall use its reasonable best efforts to:

(a)    prepare and file with the Commission the requisite Registration Statement to effect such registration and thereafter use its reasonable best efforts to cause such Registration Statement to become and remain effective, subject to the limitations contained herein;

(b)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as all of such Registrable Securities have been disposed of in accordance with the method of disposition set forth in such Registration Statement, subject to the limitations contained herein;

(c)    (i) before filing a Registration Statement or Prospectus or any amendments or supplements thereto, at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference into such Registration Statement or Prospectus, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email), and afford Counsel to the Holders a reasonable opportunity to review and comment on such documents; and (ii) in connection with the preparation and filing of each such Registration Statement pursuant to this Agreement, (A) upon reasonable advance notice to the Company, give each of the foregoing such reasonable access to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence

15

investigation for purposes of the Securities Act and Exchange Act, and (B) upon reasonable advance notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and the Exchange Act;

(d)    notify each selling Holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed;

(e)    with respect to any offering of Registrable Securities, furnish to each selling Holder of Registrable Securities, and the managing underwriters for such Underwritten Offering, if any, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(f)    (i) register or qualify all Registrable Securities covered by such Registration Statement under such other securities or Blue Sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to enable such Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (f) be obligated to be so qualified, to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(g)    cause all Registrable Securities included in such Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or Counsel to the Holders of Registrable Securities included in such Registration Statement to enable such Holder or Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(h)     with respect to any Underwritten Offering, obtain and, if obtained, furnish to each Holder that is named as an underwriter in such Underwritten Offering and each other underwriter thereof, a signed

(A)     opinion of outside counsel for the Company (including a customary 10b-5 statement), dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such underwriters, if any, and

(B)     "comfort" letter, dated the date of the underwriting agreement and another dated the date of the closing under the underwriting agreement and addressed to the underwriters and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such Holder and such underwriters, if any,

in each case, covering substantially the same matters with respect to such Registration Statement (and the Prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(i)     notify each Holder of Registrable Securities included in such Registration Statement at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading and for which the Company chooses to suspend the use of the Registration Statement and Prospectus in accordance with the terms of this Agreement, and, at the written request of any such Holder, promptly prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such Prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(j)     notify the Holders of Registrable Securities included in such Registration Statement promptly of any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

(k)     advise the Holders of Registrable Securities included in such Registration Statement promptly after the Company receives notice or obtains knowledge of any order suspending the effectiveness of a registration statement relating to the Registrable Securities at the earliest practicable moment and promptly use its reasonable best efforts to obtain the withdrawal;

(l)     otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering of Registrable Securities, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar month after the Effective Date of such Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 and which requirement will be deemed satisfied if the Company timely files complete and accurate information on Form 10-Q and 10-K and Current Reports on Form 8-K under the Exchange Act and otherwise complies with Rule 158;

(m)     provide and cause to be maintained a transfer agent and registrar for the Registrable Securities included in a Registration Statement no later than the Effective Date thereof;

(n)     enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification; and provide reasonable cooperation, including causing at least one (1) executive officer and a senior financial officer to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested; *provided*, *however*, that the Company shall have no obligation to participate in more than three (3) "road shows" in any twelve (12)-month period and such participation shall not unreasonably interfere with the business operations of the Company;

(o)     if requested by the managing underwriter(s) or the Holders beneficially owning a majority of the Registrable Securities being sold in connection with an Underwritten Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such shares of Registrable Securities provided to the Company in writing by the managing underwriters and the Holders of a majority of the Registrable Securities being sold and that is required to be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation, information with respect to the number of Registrable Securities being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information;

(p)     cooperate with the Holders of Registrable Securities included in a Registration Statement and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such share amounts and registered in such names as the managing underwriters, or, if none, the Holders beneficially owning a majority of the Registrable Securities being offered for sale, may reasonably request at least three (3) Business Days prior to any sale of Registrable Securities to the underwriters;

(q)     cause all Registrable Securities included in a Registration Statement to be listed on a national securities exchange on which similar securities issued by the Company are then listed, if at all; and

(r)     otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, at least fifteen (15) Trading Days prior to the first anticipated filing date of a Registration Statement for any registration under this Agreement, the Company will notify each Holder of the information the Company requires from that Holder, including any update to or confirmation of the information contained in the Selling Stockholder Questionnaire, if any, which shall be completed and delivered to the Company promptly upon request and, in any event, within five (5) Trading Days prior to the applicable anticipated filing date. Each Holder further agrees that it shall not be entitled to be named as a selling security-holder in the Registration Statement or use the Prospectus for offers and resales of Registrable Securities at any time, unless such Holder has returned to the Company a completed and signed Selling Stockholder Questionnaire and a response to any requests for further information as described in the previous sentence and, if an Underwritten Offering, entered into an underwriting agreement with the underwriters in accordance with Section 6(b). If a Holder of Registrable Securities returns a Selling Stockholder Questionnaire or a request for further information, in either case, after its respective deadline, the Company shall be permitted to exclude such Holder from being a selling security holder in the Registration Statement or any pre-effective or post-effective amendment thereto. Each Holder acknowledges and agrees that the information in the Selling Stockholder Questionnaire or request for further information as described in this Section 9 will be used by the Company in the preparation of the Registration Statement and hereby consents to the inclusion of such information in the Registration Statement.

10.     Registration Expenses. All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement (excluding any underwriting discounts, fees or selling commissions or broker or similar commissions or fees (which shall be borne by participating Holders on a pro rata basis), or transfer taxes of any Holder) shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees and expenses (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the New Gymboree Common Shares are then listed for trading, if any, (B) with respect to compliance with applicable state securities or Blue Sky laws (including, without limitation, fees and disbursements of counsel for the Company, any Underwriters or

Holders in connection with Blue Sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the Holders) and (C) if not previously paid by the Company in connection with an issuer filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("*FINRA*") pursuant to FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) all expenses of any Persons in preparing or assisting in preparing, word processing, printing and distributing any Registration Statement, any Prospectus, any free writing prospectus and any amendments or supplements thereto, any underwriting agreements, securities sales agreements or other similar agreements and any other documents relating to the performance of and compliance with this Agreement (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) reasonable fees and disbursements of counsel for the Company, (v) the reasonable fees and expenses incurred in connection with any road show for Underwritten Offerings, (vi) Securities Act liability insurance, if the Company so desires such insurance, (vii) all rating agency fees, if any, and any fees associated with making the Registrable Securities eligible for trading through The Depository Trust Company, and (viii) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement.  In addition, the Company will pay the reasonable fees and disbursements of the Counsel to the Holders, including, for the avoidance of doubt, any expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or free writing prospectus hereunder or any Underwritten Offering.

11.     Lockups.

(a)     In connection with any Underwritten Takedown or underwritten registration pursuant to a Demand Registration Request or other underwritten public offering of equity securities by the Company, except with the written consent of the underwriters managing such offering, no Significant Holder shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the Company, during the seven (7) days prior to and the sixty (60)-day period beginning on the date of closing of such offering (the "*Lockup Period*"), except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Company and all of its and its subsidiaries' executive officers and directors; *provided* that nothing herein will prevent any such Significant Holder from making a distribution of Registrable Securities to any of its partners, members or stockholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section 11(a).  Each Significant Holder agrees to execute a lock-up agreement in favor of the Company's underwriters to such effect and, in any event, that the Company's underwriters in any relevant offering shall be third party beneficiaries of this Section 11(a).

20

(b)    In connection with any Underwritten Offering, the Company shall not effect any public sale or distribution of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the Majority Holders, during the Lockup Period, except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Majority Holders.  The Company agrees to execute a lock-up agreement in favor of the underwriters in any relevant offering to such effect and, in any event, that the underwriters in any relevant offering shall be third party beneficiaries of this Section 11(b).  Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to registrations on Form S-4 or Form S-8 or as part of any registration of securities of offering and sale to employees, directors or consultants of the company and its subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.

12.    Indemnification.

(a)    Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, investment manager, managers, stockholders, Affiliates and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, investment manager, managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and investigation and reasonable attorneys' fees) and expenses (collectively, "*Losses*"), to which any of them may become subject, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (ii) any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (A) such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto, or (B) in the case of an occurrence of an event of the type specified in Section 9(i), related to the use by a Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated and defined in Section 16(c) below, but only if and to the extent that following the receipt of the Advice, the misstatement or omission giving rise to such Loss would have been corrected. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Company may otherwise have.

21

(b)　　　Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its respective directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus, or any form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading (i) to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein or (ii) to the extent, but only to the extent, that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in a Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (iii) in the case of an occurrence of an event of the type specified in Section 9(i), to the extent, but only to the extent, related to the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 16(c), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Holder may otherwise have.

(c)　　　Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "*Indemnified Party*"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "*Indemnifying Party*") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with the defense thereof; *provided*, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any

such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided*, that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 12(c)) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided*, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder. The failure to deliver written notice to the Indemnifying Party within a reasonable time of the commencement of any such action shall not relieve such Indemnifying Party of any liability to the Indemnified Party under this Section 12, except to the extent that the Indemnifying Party is materially and adversely prejudiced in its ability to defend such action.

(d)    Contribution. If a claim for indemnification under Section 12(a) or (b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 12(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 12(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required

to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

13.    <u>Section 4(a)(7), Rule 144 and Rule 144A; Other Exemptions</u>.  With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 and Rule 144A and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company without registration, until such time as when no Registrable Securities remain outstanding, the Company covenants that it will (i) if it is subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder, or (ii) if it is not subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, make available information necessary to comply with Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A, if available with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time, or (y) any other rules or regulations now existing or hereafter adopted by the Commission.  Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

14.    <u>Transfer of Registration Rights</u>.  Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment, or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee; *provided*, that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee or assignee and identifying the Registrable Securities with respect to which such rights are being transferred or assigned and provide the amount of any other capital stock of the Company beneficially owned by such transferee or assignee; *provided further*, that (i) any rights assigned hereunder shall apply only in respect of the Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement.

15.    <u>Further Assurances</u>.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

16.    <u>Miscellaneous</u>.

(a)    <u>Remedies</u>. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(b)    <u>Compliance</u>. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to any Registration Statement and shall sell the Registrable Securities only in accordance with a method of distribution described in each Registration Statement.

(c)    <u>Discontinued Disposition</u>. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of a Grace Period or any event of the kind described in <u>Section 9(i)</u>, such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "*Advice*") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(d)    <u>Preservation of Rights</u>.  The Company shall not grant any registration rights to third parties which are more favorable than or inconsistent with the rights granted hereunder unless any such more favorable rights are concurrently added to the rights granted hereunder.

(e)    <u>No Inconsistent Agreements</u>. The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders in this Agreement.

(f)    <u>Amendments and Waivers</u>. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Company and Holders holding at least a majority of the then outstanding Registrable Securities; *provided*, *however*, that any party may give a waiver as to itself; *provided further, however*, that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; *provided further, however*, that the definition of "Holders" in <u>Section 1</u> and the provisions of <u>Section 2(c)</u> may not be amended, modified or supplemented, or waived unless in writing and signed by all the signatories to this Agreement; and *provided further*, that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least a majority of the then outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering.  Notwithstanding the foregoing, a waiver or consent to depart from the provisions

25

hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of a majority of the Registrable Securities to which such waiver or consent relates; *provided*, *however*, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.  No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.  The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(g)     Notices. Any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail, by private national courier service (return receipt requested, postage prepaid), by personal delivery, by electronic mail or by facsimile transmission.  Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, (iv) if sent by electronic mail, on the Business Day such electronic mail is transmitted, or (v) if sent by facsimile transmission, on the Business Day such facsimile is transmitted, in each case as follows:

(A)     If to the Company:

The Gymboree Corporation
500 Howard Street
San Francisco, California  94105
Attn:   Kimberly MacMillan
Facsimile:  (415) 278-7562
Email: kimberly_macmillan@gymboree.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn:  Steven Serajeddini
       Craig Garvey

Facsimile:  (312) 862-2200
E-mail: steven.serajeddini@kirkland.com
        craig.garvey@kirkland.com

(B)     If to the Holders (or to any of them), at their addresses as they appear in the records of the Company or the records of the transfer agent or registrar, if any, for the New Gymboree Common Shares.

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(h)     <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns (including any trustee in bankruptcy).  In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); *provided*, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Company, agreeing to be bound by its terms.  No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(i)     <u>Execution and Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(j)     <u>Delivery by Facsimile</u>.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument

27

was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(k)     Governing Law; Venue.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.  Each of the parties to this Agreement consents and agrees that any action to enforce this Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Agreement, shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City.  The parties hereto consent and agree to submit to the exclusive jurisdiction of such courts.  Each of the parties to this Agreement waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party and such party's property is immune from any legal process issued by such courts or (ii) any litigation or other proceeding commenced in such courts is brought in an inconvenient forum.  The parties hereby agree that mailing of process or other papers in connection with any such action or proceeding to an address provided in writing by the recipient of such mailing, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service in the manner herein provided.

(l)     Waiver of Jury Trial.  Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings.  Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 16(l) AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(m)     Severability.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

28

(n)        <u>Descriptive Headings; Interpretation; No Strict Construction</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa.  Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof.  The words "include", "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation".  The use of the words "or," "either" or "any" shall not be exclusive.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.   All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time.   All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(o)        <u>Entire Agreement</u>. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(p)        <u>Termination</u>. The obligations of the Company and of any Holder, other than those obligations contained in <u>Section 12</u> and this <u>Section 16</u>, shall terminate with respect to the Company and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**THE GYMBOREE CORPORATION**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the undersigned parties have executed this Registration Rights Agreement as of the date first written above.

<u>HOLDERS</u>:

**[Holder Name]**

By:_____
Name:
Title:

### EXHIBIT G (a)

**Comparison of Registration Rights Agreement**

DRAFT SUBJECT TO MATERIAL CHANGE

## REGISTRATION RIGHTS AGREEMENT

This Registration Rights Agreement (including all exhibits hereto and as may be amended, supplemented or amended and restated from time to time in accordance with the terms hereof, this "*Agreement*") is made and entered into as of [●], 2017, by and among The Gymboree Corporation, a Delaware corporation (the "*Company*"), and the other parties signatory hereto and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant hereto.

WHEREAS, the Company and certain affiliated debtors filed a plan of reorganization pursuant to Chapter 11 of the United States Bankruptcy Code, on June 16, 2017, which was confirmed by the United States Bankruptcy Court for the Eastern District of Virginia on [●], 2017 (including all exhibits, schedules and supplements thereto and as amended from time to time, the "*Plan*"); and

WHEREAS, the Plan provides that the Company will enter into a registration rights agreement with each Holder (as defined below) and any Affiliates or Related Funds thereof that receive New Gymboree Common Shares; and

WHEREAS, the Company and the Holders are entering into this Agreement in furtherance of the aforesaid provisions of the Plan.

NOW, THEREFORE, IN CONSIDERATION of the mutual covenants contained in this Agreement, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Company and each of the Holders agree as follows:

1.    <u>Definitions</u>. Capitalized terms used and not otherwise defined herein that are defined in the Plan have the meanings given such terms in the Plan. As used in this Agreement, the following terms shall have the following meanings:

"*Advice*" has the meaning set forth in <u>Section 16(c)</u>.

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Related Funds of such Person).  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"*Agreement*" has the meaning set forth in the Recitals.

"*Automatic Shelf Registration Statement*" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act, as such definition may be amended from time to time.

"*beneficially own*" (and related terms such as "beneficial ownership" and "beneficial owner") shall have the meaning given to such term in Rule 13d-3 under the Exchange Act, and any Person's beneficial ownership of securities shall be calculated in accordance with the provisions of such Rule.

"*Board*" means the Board of Directors of the Company or any authorized committee thereof.

"*Bought Deal*" has the meaning set forth in Section 8(a).

"*Business Day*" means any day, other than a Saturday or Sunday or a day on which commercial banks in New York City are authorized or required by law to be closed.

"*Commission*" means the Securities and Exchange Commission.

"*Company*" has the meaning set forth in the Preamble and includes the Company's successors by merger, acquisition, reorganization or otherwise.

"*Counsel to the Holders*" means (i) with respect to any Demand Registration, the counsel selected by the Holders of a majority of the Registrable Securities initially requesting such Demand Registration and (ii) with respect to any Underwritten Takedown or Piggyback Offering, the counsel selected by the Majority Holders.

"*Demand Registration*" has the meaning set forth in Section 5(a).

"*Demand Registration Request*" has the meaning set forth in Section 5(a).

"*Effective Date*" means the date that a Registration Statement filed pursuant to this Agreement is first declared effective by the Commission.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"*Form S-1*" means Form S-1 under the Securities Act, or any other form hereafter adopted by the Commission for the general registration of securities under the Securities Act.

"*Form S-3*" means Form S-3 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-3.

"*Form S-4*" means Form S-4 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-4.

"*Form S-8*" means Form S-8 under the Securities Act, or any other form hereafter adopted by the Commission having substantially the same usage as Form S-8.

"*FINRA*" has the meaning set forth in Section 10.

"*Grace Period*" has the meaning set forth in Section 7(a)(B).

"*Holder*" or "*Holders*" means any party to the Backstop Commitment Agreement that is also a party signatory to this Agreement, other than the Company, and any additional parties identified on the signature pages of any joinder agreement executed and delivered pursuant to this Agreement. A Person shall cease to be a Holder hereunder at such time as it ceases to hold any Registrable Securities.

"*Indemnified Party*" has the meaning set forth in Section 12(c).

"*Indemnifying Party*" has the meaning set forth in Section 12(c).

"*Initial Shelf Expiration Date*" has the meaning set forth in Section 2(f).

"*Initial Shelf Participation Trigger Date*" has the meaning set forth in Section 2(a).

"*Initial Shelf Registration Statement*" has the meaning set forth in Section 2(a).

"*Lockup Period*" has the meaning set forth in Section 11(a).

"*Losses*" has the meaning set forth in Section 12(a).

"*Majority Holders*" means, with respect to any Underwritten Offering, the holders of a majority of the Registrable Securities to be included in such Underwritten Offering held by all Holders that have made the request requiring the Company to conduct such Underwritten Offering (but not including any Holders that have exercised "piggyback" rights hereunder to be included in such Underwritten Offering).

"*New Gymboree Common Shares*" means the common shares of the Company to be issued pursuant to the Plan.

"*Other Holder*" has the meaning set forth in Section 8(b).

"*Person*" means an individual or corporation, partnership, trust, incorporated or unincorporated association, joint venture, limited liability company, joint stock company, government (or an agency or subdivision thereof) or other entity of any kind.

"*Piggyback Notice*" has the meaning set forth in Section 8(a).

"*Piggyback Offering*" has the meaning set forth in Section 8(a).

"*Plan*" has the meaning set forth in the Recitals.

"*Plan Effective Date*" shall mean the date on which the Plan becomes effective.

"*Proceeding*" means an action, claim, suit, investigation or proceeding (including, without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

"*Prospectus*" means the prospectus included in a Registration Statement (including, without limitation, a prospectus that includes any information previously omitted from a

prospectus filed as part of an effective registration statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of any portion of the Registrable Securities covered by a Registration Statement, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such Prospectus.

"*Registrable Securities*" means, collectively, (a) as of the Plan Effective Date, all New Gymboree Common Shares issued to any Holder or to any Affiliate or Related Fund of any Holder, either directly or pursuant to a joinder or assignment and any additional New Gymboree Common Shares acquired by any Holder, Affiliate or Related Fund of any Holder in open market or other purchases and issued or issuable to any Holder, Affiliate or Related Fund of any Holder, after the Plan Effective Date and (b) any additional New Gymboree Common Shares paid, issued or distributed in respect of any such securities by way of a stock dividend, stock split or distribution, or in connection with a combination of securities, and any security into which such New Gymboree Common Shares shall have been converted or exchanged in connection with a recapitalization, reorganization, reclassification, merger, consolidation, exchange, distribution or otherwise; *provided*, *however*, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (i) the date on which such securities are disposed of pursuant to an effective Registration Statement or (ii) the date on which such securities are disposed of pursuant to Rule 144 (or any similar provision then in effect) promulgated under the Securities Act; *provided further, however,* that Registrable Securities shall not otherwise cease to constitute Registrable Securities due solely to the fact that such securities may be sold without restriction by the Commission.

"*Registration Statement*" means any one or more registration statements of the Company filed under the Securities Act that covers the resale of any of the Registrable Securities pursuant to the provisions of this Agreement (including, without limitation, any Shelf Registration Statement), amendments and supplements to such registration statements, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such Registration Statements.

"*Related Fund*" means (i) any investment funds or other entities who are advised by the same investment advisor and (ii) any investment advisor with respect to an investment fund or entity it advises.

"*Rule 144*" means Rule 144 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 144A*" means Rule 144A promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 158*" means Rule 158 promulgated by the Commission pursuant to the Securities Act, as such Rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 415*" means Rule 415 promulgated by the Commission pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Rule 424*" means Rule 424 promulgated by the Commission pursuant to the Securities Act, as such rule may be amended from time to time, or any similar rule or regulation hereafter adopted by the Commission having substantially the same effect as such rule.

"*Securities Act*" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"*Selling Stockholder Questionnaire*" means a questionnaire reasonably adopted by the Company from time to time.

"*Shelf Registration Statement*" means a Registration Statement filed with the Commission in accordance with the Securities Act for the offer and sale of Registrable Securities by Holders on a continuous or delayed basis pursuant to Rule 415.

"*Significant Holder*" means any Holder who holds at least 5.0% of the New Gymboree Common Shares (or any securities convertible into or exchangeable or exercisable for such New Gymboree Common Shares).

"*Trading Day*" means a day during which trading in the New Gymboree Common Shares occurs in the Trading Market, or if the New Gymboree Common Shares are not listed on a Trading Market, a Business Day.

"*Trading Market*" means whichever of the New York Stock Exchange, the NYSE MKT, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, OTC Bulletin Board, or OTC Markets Group marketplace on which the New Gymboree Common Shares are listed or quoted for trading on the date in question.

"*Transfer*" has the meaning set forth in Section 14.

"*Underwritten Offering*" means an offering of Registrable Securities under a Registration Statement in which the Registrable Securities are sold to an underwriter for reoffering to the public.

"*Underwritten Takedown*" has the meaning set forth in Section 2(h).

2.      Initial Shelf Registration.

(a)      The Company shall prepare a Shelf Registration Statement (as may be amended from time to time, the "*Initial Shelf Registration Statement*"), and shall include in the Initial Shelf Registration Statement the Registrable Securities of each Holder who shall request inclusion therein of some or all of their Registrable Securities by ~~checking the appropriate box on the signature page of such Holder hereto or by~~ written notice to the Company~~ no later~~, *provided* that such notice may not be delivered earlier than ~~30~~[__] days after the Plan Effective Date~~.~~ (the "Initial Shelf Participation Trigger Date"). The Company shall file the Initial Shelf

5

Registration Statement with the Commission on or prior to the [60]¹th60th day following the Plan EffectiveInitial Shelf Participation Trigger Date; *provided, however*, that the Company shall not be required to file or cause to be declared effective the Initial Shelf Registration Statement unlessuntil 60 days after Holders constituting at least [  ] percent ([  ]%) of all Registrable Securities properly request the inclusion in the Initial Shelf Registration Statement of Registrable Securities constituting at least fifteen percent (15%) of allsuch Registrable Securities, and such Holders otherwise timely comply with the requirements of this Agreement with respect to the inclusion of such Registrable Securities in the Initial Shelf Registration Statement.

(b)    The Company shall include in the Initial Shelf Registration Statement all Registrable Securities whose inclusion has been timely requested as aforesaid; *provided, however*, that the Company shall not be required to include an amount of Registrable Securities in excess of the amount as may be permitted to be included in such Registration Statement under the rules and regulations of the Commission and the applicable interpretations thereof by the staff of the Commission.

(c)    [Upon the request of any Holder whose Registrable Securities are not included in the Initial Shelf Registration Statement at the time of such request, the Company shall amend the Initial Shelffile a new Registration Statement to include the Registrable Securities of such Holder; provided that the Company as well as all previously registered Registrable Securities under Section 2 (for the avoidance of doubt, any such request shall not be required to amend the Initial Shelfconstitute a Demand Registration Statement more than once every fiscal quarter of the Company.]Request (as defined below)).

(d)    Within seven (7) days after receiving a request pursuant to Section 2(c), the Company shall give written notice of such request to all other Holders of Registrable Securities and shall include in such amendmentNew Registration Statement all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within twenty (20) days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)    The Initial Shelf Registration Statement shall be on Form S-1; *provided, however*, that, if the Company becomes eligible to register the Registrable Securities for resale by the Holders on Form S-3 (including without limitation a Form S-3 filed as an Automatic Shelf Registration Statement), the Company shall be entitled to amend the Initial Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a Shelf Registration Statement on Form S-3 in substitution of the Initial Shelf Registration Statement as initially filed.

(f)    The Company shall use its reasonable best efforts to cause the Initial Shelf Registration Statement to be declared effective by the Commission as promptly as practicable, and shall use its reasonable best efforts to keep such Initial Shelf Registration Statement

---

¹    Subject to continuing discussion.

continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission, until the earlier of (i) the date the Company (A) is eligible to register the Registrable Securities for resale by Holders on Form S-3 and (B) has filed such Registration Statement with the Commission and which is effective and (ii) the date that all Registrable Securities covered by the Initial Shelf Registration Statement shall cease to be Registrable Securities (such earlier date, the "*Initial Shelf Expiration Date*"). In the event of any stop order, injunction or other similar order or requirement of the Commission relating to the Initial Shelf Registration Statement, if any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the period during which the Initial Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect.

(g)     If the Initial Shelf Registration Statement is on Form S-1, then for so long as any Registrable Securities covered by the Initial Shelf Registration Statement remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law, any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (i) the Initial Shelf Registration Statement shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and (ii) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under Section 7 of this Agreement.

(h)     Upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering (each, an "*Underwritten Takedown*"), in the manner and subject to the conditions described in Section 6 of this Agreement, *provided* that (i) the number of securities included in such "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time and (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate gross offering price (before deducting underwriting discounts and commission) of at least $75 million.

3.     Subsequent Shelf Registration Statements

(a)     After (i) the Effective Date of the Initial Shelf Registration Statement and prior to the Initial Shelf Expiration Date and (ii) for so long as any Registrable Securities remain outstanding, the Company shall use its best efforts to (A) ensure that it will be eligible to register the Registrable Securities on Form S-3 after the Initial Shelf Expiration Date, and (B) meet the requirements of General Instruction VII of Form S-1 after the Initial Shelf Expiration Date.

(b)     After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, the Company shall use its best efforts to (A) be eligible and/or to maintain its eligibility to register the Registrable Securities on Form S-3, and (B) meet the requirements of General Instruction VII of Form S-1.

7

(c)    After the Initial Shelf Expiration Date and for so long as any Registrable Securities remain outstanding, if there is not an effective Registration Statement which includes the Registrable Securities that are currently outstanding, the Company shall (i) if the Company is eligible to register the Registrable Securities on Form S-3, promptly file a Shelf Registration Statement on Form S-3 and use its reasonable best efforts to cause such Registration Statement to be declared effective or (ii) promptly file a Shelf Registration Statement on Form S-1 and use its reasonable best efforts to cause such Registration Statement to be declared effective and for so long as any Registrable Securities covered by such Shelf Registration on Form S-1 remain unsold, the Company will file any supplements to the Prospectus or post-effective amendments required to be filed by applicable law in order to incorporate into such Prospectus any Current Reports on Form 8-K necessary or required to be filed by applicable law, any Quarterly Reports on Form 10-Q or any Annual Reports on Form 10-K filed by the Company with the Commission, or any other information necessary so that (x) such Shelf Registration shall not include any untrue statement of material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein not misleading, and (y) the Company complies with its obligations under Item 512(a)(1) of Regulation S-K; *provided*, *however*, that these obligations remain subject to the Company's rights under <u>Section 7</u> of this Agreement.

4.    <u>Quotation on OTC Market</u>

(a)    Until and unless (x) the New Gymboree Common Shares are listed on a national securities exchange or (y) the New Gymboree Common Shares may be sold by any and all Holders without restriction by the Commission pursuant to a Registration Statement in an at-the-market offering, the Company shall use its reasonable best efforts to cause the New Gymboree Common Shares to be quoted on any of the OTCBB, OTCQX or OTCQB markets as promptly as practicable after the Plan Effective Date and shall thereafter use its reasonable best efforts to maintain such quotation.

5.    <u>Demand Registration</u>

(a)    At any time and from time to time beginning ~~one hundred eighty (180)~~[   (   )] days after the Plan Effective Date, any Holder or group of Holders may request in writing ("*Demand Registration Request*") that the Company effect the registration of all or part of such Holder's or Holders' Registrable Securities with the Commission under and in accordance with the provisions of the Securities Act (a "*Demand Registration*").  The Company will file a Registration Statement covering such Holder's or Holders' Registrable Securities requested to be registered~~,~~ on or prior to (x) the 60th day following a Demand Registration Request (if no Initial Shelf Registration Statement has been filed and declared effective) or (y) the 30th day following a Demand Registration Request (if an Initial Shelf Registration Statement has been filed and declared effective), and shall use its reasonable best efforts to cause such Registration Statement to be declared effective, as promptly as practicable after receipt of such request; *provided*, *however*, that the Company will not be required to file a Registration Statement pursuant to this <u>Section 5(a)</u>:

(A)    unless (i) the number of Registrable Securities requested to be registered on such Registration Statement equals at least (x) [   ] percent ([   ]%) of all Registrable

Securities at such time (if no Initial Shelf Registration Statement has been filed and declared effective) or (y) twenty-five percent (25%) of all Registrable Securities at such time or(if an Initial Shelf Registration Statement has been filed and declared effective) and (ii) the Registrable Securities requested to be sold by the Holders pursuant to such Registration Statement have an anticipated aggregate gross offering price (before deducting underwriting discounts and commission) of at least $2550 million;

(B)     if the Registrable Securities requested to be registered are already covered by an existing and effective Registration Statement and such Registration Statement may be utilized for the offer and sale of the Registrable Securities requested to be registered;

(C)     if a registration statement filed by the Company shall have previously been initially declared effective by the Commission within the one hundred eighty (180) days preceding the date such Demand Registration Request is made; and

(D)     if the number of Demand Registration Requests previously made pursuant to this Section 5(a) shall exceed five (5); *provided, however*, that a Demand Registration Request shall not be considered made for purposes of this clause (D) unless the requested Registration Statement has been declared effective by the Commission for more than 75% of the full amount of Registrable Securities for which registration has been requested.

(b)     A Demand Registration Request shall specify (i) the then-current name and address of such Holder or Holders, (ii) the aggregate number of Registrable Securities requested to be registered, (iii) the total number of Registrable Securities then beneficially owned by such Holder or Holders, and (iv) the intended means of distribution.  If at the time the Demand Registration Request is made the Company appears, based on public information available to such Holder or Holders, eligible to use Form S-3 for the offer and sale of the Registrable Securities, the Holder or Holders making such request may request that the registration be in the form of a Shelf Registration Statement (for the avoidance of doubt, the Company shall not be under the obligation to file a Shelf Registration on Form S-3 if, upon the advice of its counsel, it is not eligible to make such a filing).

(c)     The Company may satisfy its obligations under Section 5(a) hereof by amending (to the extent permitted by applicable law) any registration statement previously filed by the Company under the Securities Act, so that such amended registration statement will permit the disposition (in accordance with the intended methods of disposition specified as aforesaid) of all of the Registrable Securities for which a Demand Registration Request has been properly made under Section 5(b) hereof. If the Company so amends a previously filed registration statement, it will be deemed to have effected a registration for purposes of Section 5(a) hereof; *provided, however*, that the Effective Date of the amended registration statement, as amended pursuant to this Section 5(c), shall be the "the first day of effectiveness" of such Registration Statement for purposes of determining the period during which the Registration Statement is required to be maintained effective in accordance with Section 5(e) hereof.

(d)     Within seven (7) days after receiving a Demand Registration Request, the Company shall give written notice of such request to all other Holders of Registrable Securities

9

and shall, subject to the provisions of <u>Section 6(c)</u> in the case of an Underwritten Offering, include in such registration all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within twenty (20) days after the Company's giving of such notice, *provided* that such Registrable Securities are not already covered by an existing and effective Registration Statement that may be utilized for the offer and sale of the Registrable Securities requested to be registered in the manner so requested.

(e)    The Company will use its reasonable efforts to keep a Registration Statement that has become effective as contemplated by this <u>Section 5</u> continuously effective, and not subject to any stop order, injunction or other similar order or requirement of the Commission:

(A)    in the case of a Registration Statement other than a Shelf Registration Statement, until all Registrable Securities registered thereunder have been sold pursuant to such Registration Statement, but in no event later than two hundred seventy (270) days from the Effective Date of such Registration Statement; and

(B)    in the case of a Shelf Registration Statement, until the earlier of: (x) three (3) years following the Effective Date of such Shelf Registration Statement; and (y) the date that all Registrable Securities covered by such Shelf Registration Statement shall cease to be Registrable Securities;

*provided, however*, that in the event of any stop order, injunction or other similar order or requirement of the Commission relating to any Shelf Registration Statement, if any Registrable Securities covered by such Shelf Registration Statement remain unsold, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which such stop order, injunction or similar order or requirement is in effect; *provided further, however*, that if any Shelf Registration Statement was initially declared effective on Form S-3 and, prior to the date determined pursuant to <u>Section 5(e)(B)</u>, the Company becomes ineligible to use Form S-3, the period during which such Shelf Registration Statement shall be required to remain effective will be extended by the number of days during which the Company did not have an effective Registration Statement covering unsold Registrable Securities initially registered on such Shelf Registration Statement.

(f)    The Holder or Holders making a Demand Registration Request may, at any time prior to the Effective Date of the Registration Statement relating to such registration, revoke their request for the Company to effect the registration of all or part of such Holder's or Holders' Registrable Securities by providing a written notice to the Company. If, pursuant to the preceding sentence, the entire Demand Registration Request is revoked, then, at the option of the Holder or Holders who revoke such request, either (i) such Holder or Holders shall reimburse the Company for all of its reasonable and documented out-of-pocket expenses incurred in the preparation, filing and processing of the Registration Statement, which out-of-pocket expenses, for the avoidance of doubt, shall not include overhead expenses and which requested registration shall not count as one of the permitted Demand Registration Requests hereunder or (ii) the requested registration that has been revoked will be deemed to have been effected for purposes of <u>Section 5(a)</u>.

10

(g)    If a Registration Statement filed pursuant to this <u>Section 5</u> is a Shelf Registration Statement, then upon the demand of one or more Holders, the Company shall facilitate a "takedown" of Registrable Securities in the form of an Underwritten Offering, in the manner and subject to the conditions described in <u>Section 6</u> of this Agreement, *provided* that (i) the number of securities included in such "takedown" shall equal at least twenty-five percent (25%) of all Registrable Securities at such time or (ii) the Registrable Securities requested to be sold by the Holders in such "takedown" shall have an anticipated aggregate offering price (before deducting underwriting discounts and commission) of at least $75 million.

6.    <u>Procedures for Underwritten Offerings</u>.  The following procedures shall govern Underwritten Offerings pursuant to <u>Section 2(h)</u> or <u>Section 5(g)</u>, whether in the case of an Underwritten Takedown or otherwise.

(a)    (i) The Majority Holders shall select one or more investment banking firm(s) of national standing to be the managing underwriter or underwriters for any Underwritten Offering pursuant to a Demand Registration Request or an Underwritten Takedown with the consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed and (ii) the Company shall select one or more investment banking firms of national standing to be the managing underwriter or underwriters for any other Underwritten Offering with the consent of the Majority Holders, which consent shall not be unreasonably withheld, conditioned or delayed.

(b)    All Holders proposing to distribute their securities through an Underwritten Offering, as a condition for inclusion of their Registrable Securities therein, shall agree to enter into an underwriting agreement with the underwriters; *provided, however*, that the underwriting agreement is in customary form and reasonably acceptable to the Majority Holders and *provided further, however*, that no Holder of Registrable Securities included in any Underwritten Offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (i) such Holder's ownership of its Registrable Securities to be sold or transferred, (ii) such Holder's power and authority to effect such transfer and (iii) such matters pertaining to compliance with securities laws as may be reasonably requested).

(c)    If the managing underwriter or underwriters for an Underwritten Offering pursuant to a Demand Registration or an Underwritten Takedown advises the Holders that the total amount of Registrable Securities or other New Gymboree Common Shares permitted to be registered is such as to materially adversely affect the success of such Underwritten Offering, the number of Registrable Securities or other New Gymboree Common Shares to be registered on such Registration Statement will be reduced as follows: *first*, the Company shall reduce or eliminate the securities of the Company to be included by any Person other than a Holder or the Company; *second*, the Company shall reduce or eliminate any securities of the Company to be included by the Company; and *third*, the Company shall reduce the number of Registrable Securities to be included by Holders on a pro rata basis based on the total number of Registrable Securities requested by the Holders to be included in the Underwritten Offering.

(d)    Within three (3) days after receiving a request for an Underwritten Offering constituting a "takedown" from a Shelf Registration Statement, the Company shall give written notice of such request to all other Holders, and subject to the provisions of <u>Section 6(c)</u> hereof,

include in such Underwritten Offering all such Registrable Securities with respect to which the Company has received written requests for inclusion therein within seven (7) days after the Company's giving of such notice; *provided, however*, that such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be registered.

(e)    The Company will not be required to undertake an Underwritten Offering pursuant to Section 2(h) or Section 5(g):

(A)    If the Company has undertaken an Underwritten Offering, whether for its own account or pursuant to this Agreement, within the one hundred eighty (180) days preceding the date of the request to the Company for such Underwritten Offering; and

(B)    if the number of Underwritten Offerings previously made pursuant to Section 2(h) or Section 5(g) in the immediately preceding twelve (12)-month period shall exceed three (3); *provided* that an Underwritten Offering shall not be considered made for purposes of this clause (B) unless the offering has resulted in the disposition by the Holders of at least 75% of the amount of Registrable Securities requested to be included.

7.    Grace Periods.

(a)    Notwithstanding anything to the contrary herein—

(A)    the Company shall be entitled to postpone the filing or effectiveness of, or, at any time after a Registration Statement has been declared effective by the Commission, suspend the use of, a Registration Statement (including the Prospectus included therein) if in the good faith judgment of the Board, such registration, offering or use would reasonably be expected to materially affect in an adverse manner or materially interfere with any bona fide material financing of the Company or any material transaction under consideration by the Company or would require the disclosure of information that has not been, and is not otherwise required to be, disclosed to the public and the premature disclosure of which would materially affect the Company in an adverse manner; *provided however*, that in the event such Registration Statement relates to a Demand Registration Request or an Underwritten Offering pursuant to Section 2(h) or Section 5(g), then the Holders initiating such Demand Registration Request or such Underwritten Offering shall be entitled to withdraw the Demand Registration Request or request for the Underwritten Offering and, if such request is withdrawn, it shall not count against the limits imposed pursuant to Section 5(a)(D) or Section 6(e)(B) and the Company shall pay all registration expenses in connection with such registration; and

(B)    at any time after a Registration Statement has been declared effective by the Commission and there is no duty to disclose under applicable law, the Company may delay the disclosure of material non-public information concerning the Company if the disclosure of such information at the time would, in the good faith judgment of the Board, adversely affect the Company (the period of a postponement or suspension as described in clause (A) and/or a delay described in this clause (B), a "*Grace Period*").

(b)     The Company shall promptly (i) notify the Holders in writing of the existence of the event or material non-public information giving rise to a Grace Period (*provided* that the Company shall not disclose the content of such material non-public information to any Holder, without the express consent of such Holder) or the need to file a post-effective amendment, as applicable, and the date on which such Grace Period will begin, (ii) use reasonable best efforts to terminate a Grace Period as promptly as practicable and (iii) notify the Holders in writing of the date on which the Grace Period ends.

(c)     The duration of any one Grace Period shall not exceed thirty (30) days, and the aggregate of all Grace Periods in total during any three hundred sixty-five (365) day period shall not exceed forty-five (45) days. For purposes of determining the length of a Grace Period, the Grace Period shall be deemed to begin on and include the date the Holders receive the notice referred to in clause (i) of <u>Section 7(b)</u> and shall end on and include the later of the date the Holders receive the notice referred to in clause (iii) of <u>Section 7(b)</u> and the date referred to in such notice.  In the event the Company declares a Grace Period, the period during which the Company is required to maintain the effectiveness of an Initial Shelf Registration Statement or a Registration Statement filed pursuant to a Demand Registration Request shall be extended by the number of days during which such Grace Period is in effect.

8.     <u>Piggyback Registration</u>

(a)     If at any time, and from time to time, the Company proposes to—

(A)     file a registration statement under the Securities Act with respect to an underwritten offering of New Gymboree Common Shares of the Company or any securities convertible or exercisable into New Gymboree Common Shares (other than with respect to a registration statement (i) on Form S-8 or any successor form thereto, (ii) on Form S-4 or any successor form thereto or (iii) another form not available for registering the Registrable Securities for sale to the public), whether or not for its own account; or

(B)     conduct an underwritten offering constituting a "takedown" of a class of New Gymboree Common Shares or any securities convertible or exercisable into New Gymboree Common Shares registered under a shelf registration statement previously filed by the Company;

the Company shall give written notice (the "*Piggyback Notice*") of such proposed filing or underwritten offering to the Holders at least ten (10) Business Days before the anticipated filing date (*provided* that in the case of a "bought deal," "registered direct offering" or "overnight transaction" (a "*Bought Deal*"), such Piggyback Notice shall be given not less than two (2) Business Days prior to the expected date of commencement of marketing efforts.  Such notice shall include the number and class of securities proposed to be registered or offered, the proposed date of filing of such registration statement or the conduct of such underwritten offering, any proposed means of distribution of such securities, any proposed managing underwriter of such securities and a good faith estimate by the Company of the proposed maximum offering price of such securities as such price is proposed to appear on the front cover page of such registration statement (or, in the case of an Underwritten Offering, would appear on

13

the front cover page of a registration statement), and shall offer the Holders the opportunity to register such amount of Registrable Securities as each Holder may request on the same terms and conditions as the registration of the Company's and/or the holders of other securities of the Company securities, as the case may be (a "*Piggyback Offering*").  Subject to <u>Section 8(b)</u>, the Company will include in each Piggyback Offering all Registrable Securities for which the Company has received written requests for inclusion within seven (7) Business Days after the date the Piggyback Notice is given (*provided* that in the case of a Bought Deal, such written requests for inclusion must be received within two (2) Business Days after the date the Piggyback Notice is given); *provided*, *however*, that in the case of the filing of a registration statement, such Registrable Securities are not otherwise registered pursuant to an existing and effective Shelf Registration Statement under this Agreement, but in such case, the Company shall include such Registrable Securities in such underwritten offering if the Shelf Registration Statement may be utilized for the offering and sale of the Registrable Securities requested to be offered; *provided further, however*, that in the case of an underwritten offering in the form of a "takedown" under a shelf registration statement, such Registrable Securities are covered by an existing and effective Shelf Registration Statement that may be utilized for the offering and sale of the Registrable Securities requested to be offered.

(b)    The Company will cause the managing underwriter or underwriters of the proposed offering to permit the Holders that have requested Registrable Securities to be included in the Piggyback Offering to include all such Registrable Securities on the same terms and conditions as any similar securities, if any, of the Company.  Notwithstanding the foregoing, if the managing underwriter or underwriters of such underwritten offering advises the Company and the selling Holders in writing that, in its view, the total amount of securities that the Company, such Holders and any other holders entitled to participate in such offering ("*Other Holders*") propose to include in such offering is such as to materially adversely affect the success of such underwritten offering, then:

(A)    if such Piggyback Offering is an underwritten primary offering by the Company for its own account, the Company will include in such Piggyback Offering: (i) *first*, all securities to be offered by the Company; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders; and (iii) *third*, up to the full amount of securities requested to be included in such Piggyback Offering by all Other Holders;

(B)    if such Piggyback Offering is an underwritten secondary offering for the account of Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request), the Company will include in such registration: (i) *first*, all securities of the Other Holders exercising "demand" rights (including pursuant to a Demand Registration Request) requested to be included therein; (ii) *second*, up to the full amount of securities requested to be included in such Piggyback Offering by the Holders entitled to participate therein, allocated pro rata among such Holders on the basis of the amount of securities requested to be included therein by each such Holder; (iii) *third*, up to the full amount of securities proposed to be included in the registration by the Company; and (iv) *fourth,* up to the full amount of securities requested to be included in such Piggyback Offering by the Other Holders entitled to participate therein, allocated

pro rata among such Other Holders on the basis of the amount of securities requested to be included therein by each such Other Holder;

such that, in each case, the total amount of securities to be included in such Piggyback Offering is the full amount that, in the view of such managing underwriter, can be sold without materially adversely affecting the success of such Piggyback Offering.

(c)    If at any time after giving the Piggyback Notice and prior to the time sales of securities are confirmed pursuant to the Piggyback Offering, the Company determines for any reason not to register or delay the registration of the Piggyback Offering, the Company may, at its election, give notice of its determination to all Holders, and in the case of such a determination, will be relieved of its obligation to register any Registrable Securities in connection with the abandoned or delayed Piggyback Offering, without prejudice.

(d)    Any Holder of Registrable Securities requesting to be included in a Piggyback Offering may withdraw its request for inclusion by giving written notice to the Company of its intention to withdraw from that registration, at least three (3) Business Days prior to the anticipated Effective Date of the Registration Statement filed in connection with such Piggyback Offering, or in the case of a Piggyback Offering constituting a "takedown" off of a shelf registration statement, at least three (3) Business Days prior to the anticipated date of the filing by the Company under Rule 424 of a supplemental prospectus (which shall be the preliminary supplemental prospectus, if one is used in the "takedown") with respect to such offering; *provided*, *however*, that (i) the Holder's request be made in writing and (ii) the withdrawal will be irrevocable and, after making the withdrawal, a Holder will no longer have any right to include its Registrable Securities in that Piggyback Offering.

9.    <u>Registration Procedures</u>. If and when the Company is required to effect any registration under the Securities Act as provided in <u>Sections 2(a)</u>, <u>5(a)</u>, <u>6</u> or <u>8</u> of this Agreement, the Company shall use its reasonable best efforts to:

(a)    prepare and file with the Commission the requisite Registration Statement to effect such registration and thereafter use its reasonable best efforts to cause such Registration Statement to become and remain effective, subject to the limitations contained herein;

(b)    prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective and to comply with the provisions of the Securities Act and the Exchange Act with respect to the disposition of all Registrable Securities covered by such Registration Statement until such time as all of such Registrable Securities have been disposed of in accordance with the method of disposition set forth in such Registration Statement, subject to the limitations contained herein;

(c)    (i) before filing a Registration Statement or Prospectus or any amendments or supplements thereto, at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other

15

than documents that are incorporated by reference into such Registration Statement or Prospectus, proposed to be filed and such other documents reasonably requested by such Holders (which may be furnished by email), and afford Counsel to the Holders a reasonable opportunity to review and comment on such documents; and (ii) in connection with the preparation and filing of each such Registration Statement pursuant to this Agreement, (A) upon reasonable advance notice to the Company, give each of the foregoing such reasonable access to all financial and other records, corporate documents and properties of the Company as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and Exchange Act, and (B) upon reasonable advance notice to the Company and during normal business hours, provide such reasonable opportunities to discuss the business of the Company with its officers, directors, employees and the independent public accountants who have certified its financial statements as shall be necessary, in the reasonable opinion of Counsel to the Holders and such underwriters, to conduct a reasonable due diligence investigation for purposes of the Securities Act and the Exchange Act;

(d)     notify each selling Holder of Registrable Securities, promptly after the Company receives notice thereof, of the time when such Registration Statement has been declared effective or a supplement to any Prospectus forming a part of such Registration Statement has been filed;

(e)     with respect to any offering of Registrable Securities, furnish to each selling Holder of Registrable Securities, and the managing underwriters for such Underwritten Offering, if any, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "issuer free writing prospectus" as such term is defined under Rule 433 promulgated under the Securities Act), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(f)     (i) register or qualify all Registrable Securities covered by such Registration Statement under such other securities or Blue Sky laws of such states or other jurisdictions of the United States of America as the Holders covered by such Registration Statement shall reasonably request in writing, (ii) keep such registration or qualification in effect for so long as such Registration Statement remains in effect and (iii) take any other action that may be necessary or reasonably advisable to enable such Holders to consummate the disposition in such jurisdictions of the securities to be sold by such Holders, except that the Company shall not for any such purpose be required to qualify generally to do business as a foreign corporation in any jurisdiction wherein it would not but for the requirements of this subsection (f) be obligated to be so qualified,

16

to subject itself to taxation in such jurisdiction or to consent to general service of process in any such jurisdiction;

(g)    cause all Registrable Securities included in such Registration Statement to be registered with or approved by such other federal or state governmental agencies or authorities as necessary upon the opinion of counsel to the Company or Counsel to the Holders of Registrable Securities included in such Registration Statement to enable such Holder or Holders thereof to consummate the disposition of such Registrable Securities in accordance with their intended method of distribution thereof;

(h)    with respect to any Underwritten Offering, obtain and, if obtained, furnish to each Holder that is named as an underwriter in such Underwritten Offering and each other underwriter thereof, a signed

(A)    opinion of outside counsel for the Company (including a customary 10b-5 statement), dated the date of the closing under the underwriting agreement and addressed to the underwriters, reasonably satisfactory (based on the customary form and substance of opinions of issuers' counsel customarily given in such an offering) in form and substance to such underwriters, if any, and

(B)    "comfort" letter, dated the date of the underwriting agreement and another dated the date of the closing under the underwriting agreement and addressed to the underwriters and signed by the independent public accountants who have certified the Company's financial statements included or incorporated by reference in such registration statement, reasonably satisfactory (based on the customary form and substance of "cold comfort" letters of issuers' independent public accountant customarily given in such an offering) in form and substance to such Holder and such underwriters, if any,

in each case, covering substantially the same matters with respect to such Registration Statement (and the Prospectus included therein) and, in the case of the accountants' comfort letter, with respect to events subsequent to the date of such financial statements, as are customarily covered in opinions of issuer's counsel and in accountants' comfort letters delivered to underwriters in such types of offerings of securities;

(i)    notify each Holder of Registrable Securities included in such Registration Statement at any time when a Prospectus relating thereto is required to be delivered under the Securities Act, upon discovery that, or upon the happening of any event as a result of which, the Prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading and for which the Company chooses to suspend the use of the Registration Statement and Prospectus in accordance with the terms of this Agreement, and, at the written request of any such Holder, promptly prepare and furnish to it a reasonable number of copies of a supplement to or an amendment of such Prospectus as may be necessary so that, as thereafter delivered to the purchasers of such securities, such

17

Prospectus, as supplemented or amended, shall not include an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(j)    notify the Holders of Registrable Securities included in such Registration Statement promptly of any request by the Commission for the amending or supplementing of such Registration Statement or Prospectus or for additional information;

(k)    advise the Holders of Registrable Securities included in such Registration Statement promptly after the Company receives notice or obtains knowledge of any order suspending the effectiveness of a registration statement relating to the Registrable Securities at the earliest practicable moment and promptly use its reasonable best efforts to obtain the withdrawal;

(l)    otherwise comply with all applicable rules and regulations of the Commission and any other governmental agency or authority having jurisdiction over the offering of Registrable Securities, and make available to its stockholders, as soon as reasonably practicable, an earnings statement covering the period of at least twelve (12) months, but not more than eighteen (18) months, beginning with the first (1st) full calendar month after the Effective Date of such Registration Statement, which earnings statement shall satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 and which requirement will be deemed satisfied if the Company timely files complete and accurate information on Form 10-Q and 10-K and Current Reports on Form 8-K under the Exchange Act and otherwise complies with Rule 158;

(m)    provide and cause to be maintained a transfer agent and registrar for the Registrable Securities included in a Registration Statement no later than the Effective Date thereof;

(n)    enter into such agreements (including an underwriting agreement in customary form) and take such other actions as the Holders beneficially owning a majority of the Registrable Securities included in a Registration Statement or the underwriters, if any, shall reasonably request in order to expedite or facilitate the disposition of such Registrable Securities, including customary indemnification; and provide reasonable cooperation, including causing at least one (1) executive officer and a senior financial officer to attend and participate in "road shows" and other information meetings organized by the underwriters, if any, as reasonably requested; *provided*, *however*, that the Company shall have no obligation to participate in more than three (3) "road shows" in any twelve (12)-month period and such participation shall not unreasonably interfere with the business operations of the Company;

(o)    if requested by the managing underwriter(s) or the Holders beneficially owning a majority of the Registrable Securities being sold in connection with an Underwritten Offering, promptly incorporate in a prospectus supplement or post-effective amendment such information relating to the plan of distribution for such shares of Registrable Securities provided to the Company in writing by the managing underwriters

18

and the Holders of a majority of the Registrable Securities being sold and that is required to be included therein relating to the plan of distribution with respect to such Registrable Securities, including without limitation, information with respect to the number of Registrable Securities being sold to such underwriters, the purchase price being paid therefor by such underwriters and with respect to any other terms of the Underwritten Offering of the Registrable Securities to be sold in such offering, and make any required filings with respect to such information relating to the plan of distribution as soon as practicable after notified of the information;

(p)     cooperate with the Holders of Registrable Securities included in a Registration Statement and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates representing Registrable Securities to be sold and not bearing any restrictive legends, and enable such Registrable Securities to be in such share amounts and registered in such names as the managing underwriters, or, if none, the Holders beneficially owning a majority of the Registrable Securities being offered for sale, may reasonably request at least three (3) Business Days prior to any sale of Registrable Securities to the underwriters;

(q)     cause all Registrable Securities included in a Registration Statement to be listed on a national securities exchange on which similar securities issued by the Company are then listed, if at all; and

(r)     otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

In addition, at least fifteen (15) Trading Days prior to the first anticipated filing date of a Registration Statement for any registration under this Agreement, the Company will notify each Holder of the information the Company requires from that Holder, including any update to or confirmation of the information contained in the Selling Stockholder Questionnaire, if any, which shall be completed and delivered to the Company promptly upon request and, in any event, within five (5) Trading Days prior to the applicable anticipated filing date. Each Holder further agrees that it shall not be entitled to be named as a selling security-holder in the Registration Statement or use the Prospectus for offers and resales of Registrable Securities at any time, unless such Holder has returned to the Company a completed and signed Selling Stockholder Questionnaire and a response to any requests for further information as described in the previous sentence and, if an Underwritten Offering, entered into an underwriting agreement with the underwriters in accordance with Section 6(b). If a Holder of Registrable Securities returns a Selling Stockholder Questionnaire or a request for further information, in either case, after its respective deadline, the Company shall be permitted to exclude such Holder from being a selling security holder in the Registration Statement or any pre-effective or post-effective amendment thereto. Each Holder acknowledges and agrees that the information in the Selling Stockholder Questionnaire or request for further information as described in this Section 9 will be used by the Company in the preparation of the Registration Statement and hereby consents to the inclusion of such information in the Registration Statement.

10.     Registration Expenses. All fees and expenses incident to the Company's performance of or compliance with its obligations under this Agreement (excluding any

underwriting discounts, fees or selling commissions or broker or similar commissions or fees (which shall be borne by participating Holders on a pro rata basis), or transfer taxes of any Holder) shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees and expenses (including, without limitation, fees and expenses (A) with respect to filings required to be made with any Trading Market on which the New Gymboree Common Shares are then listed for trading, if any, (B) with respect to compliance with applicable state securities or Blue Sky laws (including, without limitation, fees and disbursements of counsel for the Company, any Underwriters or Holders in connection with Blue Sky qualifications or exemptions of the Registrable Securities and determination of the eligibility of the Registrable Securities for investment under the laws of such jurisdictions as requested by the Holders) and (C) if not previously paid by the Company in connection with an issuer filing, with respect to any filing that may be required to be made by any broker through which a Holder intends to make sales of Registrable Securities with the Financial Industry Regulatory Authority ("*FINRA*") pursuant to FINRA Rule 5110, so long as the broker is receiving no more than a customary brokerage commission in connection with such sale, (ii) all expenses of any Persons in preparing or assisting in preparing, word processing, printing and distributing any Registration Statement, any Prospectus, any free writing prospectus and any amendments or supplements thereto, any underwriting agreements, securities sales agreements or other similar agreements and any other documents relating to the performance of and compliance with this Agreement (including, without limitation, expenses of printing certificates for Registrable Securities and of printing prospectuses if the printing of prospectuses is reasonably requested by the Holders of a majority of the Registrable Securities included in the Registration Statement), (iii) messenger, telephone and delivery expenses, (iv) reasonable fees and disbursements of counsel for the Company, (v) the reasonable fees and expenses incurred in connection with any road show for Underwritten Offerings, (vi) Securities Act liability insurance, if the Company so desires such insurance, (vii) all rating agency fees, if any, and any fees associated with making the Registrable Securities eligible for trading through The Depository Trust Company, and (viii) fees and expenses of all other Persons retained by the Company in connection with the consummation of the transactions contemplated by this Agreement.  In addition, the Company will pay the reasonable fees and disbursements of the Counsel to the Holders, including, for the avoidance of doubt, any expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or free writing prospectus hereunder or any Underwritten Offering.

11.   <u>Lockups.</u>

(a)   [In connection with any Underwritten Takedown or underwritten registration pursuant to a Demand Registration Request or other underwritten public offering of equity securities by the Company, except with the written consent of the underwriters managing such offering, no <u>Significant</u> Holder who participates in such offering shall effect any public sale or distribution (including sales pursuant to Rule 144) of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the Company, during the seven (7) days prior to and the sixty ([(60]) -day period beginning on the date of closing of such offering (the "*Lockup Period*"), except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Company and all of its and its subsidiaries' executive officers and directors;

*provided* that nothing herein will prevent any such Significant Holder from making a distribution of Registrable Securities to any of its partners, members or stockholders thereof or a transfer of Registrable Securities to an Affiliate or Related Fund that is otherwise in compliance with the applicable securities laws, so long as such distributees or transferees, as applicable, agree to be bound by the restrictions set forth in this Section 11(a). Each Significant Holder agrees to execute a lock-up agreement in favor of the Company's underwriters to such effect and, in any event, that the Company's underwriters in any relevant offering shall be third party beneficiaries of this Section 11(a). The provisions of this Section 11(a) will no longer apply to a Holder once such Holder ceases to hold Registrable Securities.][2]

(b)    In connection with any Underwritten Offering, the Company shall not effect any public sale or distribution of equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, without prior written consent from the Majority Holders, during the Lockup Period, except as part of such offering, *provided*, that such Lockup Period restrictions are applicable on substantially similar terms to the Majority Holders.  The Company agrees to execute a lock-up agreement in favor of the underwriters in any relevant offering to such effect and, in any event, that the underwriters in any relevant offering shall be third party beneficiaries of this Section 11(b).  Notwithstanding the foregoing, the Company may effect a public sale or distribution of securities of the type described above and during the periods described above if such sale or distribution is made pursuant to registrations on Form S-4 or Form S-8 or as part of any registration of securities of offering and sale to employees, directors or consultants of the company and its subsidiaries pursuant to any employee stock plan or other employee benefit plan arrangement.

12.    Indemnification.

(a)    Indemnification by the Company. The Company shall, notwithstanding any termination of this Agreement, indemnify, defend and hold harmless each Holder, the officers, directors, agents, partners, members, investment manager, managers, stockholders, Affiliates and employees of each of them, each Person who controls any such Holder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, partners, members, investment manager, managers, stockholders, agents and employees of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable costs of preparation and investigation and reasonable attorneys' fees) and expenses (collectively, "*Losses*"), to which any of them may become subject, that arise out of or are based upon (i) any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus or (ii) any omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus or form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading, except to the extent, but only to the extent, that (A) such untrue statements, alleged untrue statements, omissions or alleged omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein, or to the extent that such information relates to such Holder or such

---

[2] TBD

Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in the Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto, or (B) in the case of an occurrence of an event of the type specified in Section 9(i), related to the use by a Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated and prior to the receipt by such Holder of the Advice contemplated and defined in Section 16(c) below, but only if and to the extent that following the receipt of the Advice, the misstatement or omission giving rise to such Loss would have been corrected. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Company may otherwise have.

(b)    Indemnification by Holders. Each Holder shall, severally and not jointly, indemnify and hold harmless the Company, its respective directors, officers, agents and employees, each Person who controls the Company (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, any Prospectus, or any form of prospectus, or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any Prospectus, or any form of prospectus or supplement thereto, in the light of the circumstances under which they were made) not misleading (i) to the extent, but only to the extent, that such untrue statements or omissions are based upon information regarding such Holder furnished in writing to the Company by such Holder expressly for use therein or (ii) to the extent, but only to the extent, that such information relates to such Holder or such Holder's proposed method of distribution of Registrable Securities and was provided by such Holder expressly for use in a Registration Statement, such Prospectus or such form of Prospectus or in any amendment or supplement thereto or (iii) in the case of an occurrence of an event of the type specified in Section 9(i), to the extent, but only to the extent, related to the use by such Holder of an outdated or defective Prospectus after the Company has notified such Holder in writing that the Prospectus is outdated or defective and prior to the receipt by such Holder of the Advice contemplated in Section 16(c), but only if and to the extent that following the receipt of the Advice the misstatement or omission giving rise to such Loss would have been corrected. In no event shall the liability of any selling Holder hereunder be greater in amount than the dollar amount of the net proceeds received by such Holder upon the sale of the Registrable Securities giving rise to such indemnification obligation.  Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of an Indemnified Party (as defined in Section 12(c)), shall survive the transfer of the Registrable Securities by the Holders, and shall be in addition to any liability which the Holder may otherwise have.

(c)    Conduct of Indemnification Proceedings. If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "*Indemnified Party*"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "*Indemnifying Party*") in writing, and the Indemnifying Party shall have the right to assume the

defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all reasonable fees and expenses incurred in connection with the defense thereof; *provided*, that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that such failure shall have materially and adversely prejudiced the Indemnifying Party.

An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (1) the Indemnifying Party has agreed in writing to pay such fees and expenses; (2) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding; or (3) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by counsel that in the reasonable judgment of such counsel a conflict of interest exists if the same counsel were to represent such Indemnified Party and the Indemnifying Party; *provided*, that the Indemnifying Party shall not be liable for the reasonable and documented fees and expenses of more than one separate firm of attorneys at any time for all Indemnified Parties. The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its written consent, which consent shall not be unreasonably withheld, delayed or conditioned. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

Subject to the terms of this Agreement, all reasonable and documented fees and expenses of the Indemnified Party (including reasonable and documented fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 12(c)) shall be paid to the Indemnified Party, as incurred, with reasonable promptness after receipt of written notice thereof to the Indemnifying Party; *provided*, that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is finally judicially determined to not be entitled to indemnification hereunder. The failure to deliver written notice to the Indemnifying Party within a reasonable time of the commencement of any such action shall not relieve such Indemnifying Party of any liability to the Indemnified Party under this Section 12, except to the extent that the Indemnifying Party is materially and adversely prejudiced in its ability to defend such action.

(d)    Contribution. If a claim for indemnification under Section 12(a) or (b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other

things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission.

The parties hereto agree that it would not be just and equitable if contribution pursuant to this Section 12(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 12(d), no Holder shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such Holder from the sale of the Registrable Securities subject to the Proceeding exceeds the amount of any damages that such Holder has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

13.    Section 4(a)(7), Rule 144 and Rule 144A; Other Exemptions.  With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 and Rule 144A and other rules and regulations of the Commission that may at any time permit a Holder of Registrable Securities to sell securities of the Company without registration, until such time as when no Registrable Securities remain outstanding, the Company covenants that it will (i) if it is subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, file in a timely manner all reports and other documents required, if any, to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted thereunder, or (ii) if it is not subject to the reporting requirement of Section 13 or 15(d) of the Exchange Act, make available information necessary to comply with Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A, if available with respect to resales of the Registrable Securities under the Securities Act, at all times, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by (x) Section 4(a)(7) of the Securities Act and Rule 144 and Rule 144A (if available with respect to resales of the Registrable Securities), as such rules may be amended from time to time, or (y) any other rules or regulations now existing or hereafter adopted by the Commission.  Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

14.    Transfer of Registration Rights.  Any Holder may freely assign its rights hereunder on a pro rata basis in connection with any sale, transfer, assignment, or other conveyance (any of the foregoing, a "*Transfer*") of Registrable Securities to any transferee or assignee; *provided*, that all of the following additional conditions are satisfied: (a) such Transfer is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement; and (c) the Company is given written notice by such Holder of such Transfer, stating the name and address of the transferee or assignee and identifying the Registrable Securities with respect to which such rights are being

24

transferred or assigned and provide the amount of any other capital stock of the Company beneficially owned by such transferee or assignee; *provided further*, that (i) any rights assigned hereunder shall apply only in respect of the Registrable Securities that are Transferred and not in respect of any other securities that the transferee or assignee may hold and (ii) any Registrable Securities that are Transferred may cease to constitute Registrable Securities following such Transfer in accordance with the terms of this Agreement.

15.    Further Assurances.  Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

16.    Miscellaneous.

(a)    Remedies. Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights granted by law.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or other security) for specific performance and for other injunctive relief in order to enforce or prevent violation of the provisions of this Agreement.

(b)    Compliance. Each Holder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it (unless an exemption therefrom is available) in connection with sales of Registrable Securities pursuant to any Registration Statement and shall sell the Registrable Securities only in accordance with a method of distribution described in each Registration Statement.

(c)    Discontinued Disposition. By its acquisition of Registrable Securities, each Holder agrees that, upon receipt of a notice from the Company of the occurrence of a Grace Period or any event of the kind described in Section 9(i), such Holder will forthwith discontinue disposition of such Registrable Securities under a Registration Statement until it is advised in writing (the "*Advice*") by the Company that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. The Company may provide appropriate stop orders to enforce the provisions of this paragraph.

(d)    Preservation of Rights.  The Company shall not grant any registration rights to third parties which are more favorable than or inconsistent with the rights granted hereunder unless any such more favorable rights are concurrently added to the rights granted hereunder.

(e)    No Inconsistent Agreements. The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders in this Agreement.

(f)    Amendments and Waivers. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, or waived unless the same shall be in writing and signed by the Company and Holders holding at least a majority of the then outstanding Registrable Securities; *provided*, *however*, that any party may give a

waiver as to itself; *provided further, however*, that no amendment, modification, supplement, or waiver that disproportionately and adversely affects, alters, or changes the interests of any Holder shall be effective against such Holder without the prior written consent of such Holder; *provided further, however*, that the definition of "Holders" in <u>Section 1</u> and the provisions of <u>Section 2(c)</u> may not be amended, modified or supplemented, or waived unless in writing and signed by all the signatories to this Agreement; and *provided further*, that the waiver of any provision with respect to any Registration Statement or offering may be given by Holders holding at least a majority of the then outstanding Registrable Securities entitled to participate in such offering or, if such offering shall have been commenced, having elected to participate in such offering.  Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of certain Holders and that does not directly or indirectly affect the rights of other Holders may be given by Holders of a majority of the Registrable Securities to which such waiver or consent relates; *provided, however*, that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the immediately preceding sentence.  No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof.  No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.  The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(g)     <u>Notices</u>. Any notice or other communication required or which may be given hereunder shall be in writing and shall be sent by certified or regular mail, by private national courier service (return receipt requested, postage prepaid), by personal delivery, by electronic mail or by facsimile transmission. Such notice or communication shall be deemed given (i) if mailed, two days after the date of mailing, (ii) if sent by national courier service, one Business Day after being sent, (iii) if delivered personally, when so delivered, (iv) if sent by electronic mail, on the Business Day such electronic mail is transmitted, or (v) if sent by facsimile transmission, on the Business Day such facsimile is transmitted, in each case as follows:

(A)     If to the Company:

The Gymboree Corporation
500 Howard Street
San Francisco, California  94105
Attn:   Kimberly MacMillan
Facsimile:  (415) 278-7562
Email: kimberly_macmillan@gymboree.com

with a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attn: Steven Serajeddini
    Craig Garvey

Facsimile: (312) 862-2200
E-mail: steven.serajeddini@kirkland.com
    craig.garvey@kirkland.com

(B)    If to the Holders (or to any of them), at their addresses as they appear in the records of the Company or the records of the transfer agent or registrar, if any, for the New Gymboree Common Shares.

If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(h)    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns (including any trustee in bankruptcy).  In addition, and whether or not any express assignment shall have been made, the provisions of this Agreement which are for the benefit of the Holders of Registrable Securities (or any portion thereof) as such shall be for the benefit of and enforceable by any subsequent holder of any Registrable Securities (or of such portion thereof); *provided*, that such subsequent holder of Registrable Securities shall be required to execute a joinder to this Agreement in form and substance reasonably satisfactory to the Company, agreeing to be bound by its terms.  No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(i)    Execution and Counterparts. This Agreement may be executed simultaneously in two or more counterparts, any one of which need not contain the signatures of more than one party, but all such counterparts taken together shall constitute one and the same Agreement.

(j)    Delivery by Facsimile.  This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument

27

was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(k)     <u>Governing Law; Venue</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.  Each of the parties to this Agreement consents and agrees that any action to enforce this Agreement or any dispute, whether such dispute arises in law or equity, arising out of or relating to this Agreement, shall be brought exclusively in the United States District Court for the Southern District of New York or any New York State Court sitting in New York City.  The parties hereto consent and agree to submit to the exclusive jurisdiction of such courts.  Each of the parties to this Agreement waives and agrees not to assert in any such dispute, to the fullest extent permitted by applicable law, any claim that (i) such party and such party's property is immune from any legal process issued by such courts or (ii) any litigation or other proceeding commenced in such courts is brought in an inconvenient forum.  The parties hereby agree that mailing of process or other papers in connection with any such action or proceeding to an address provided in writing by the recipient of such mailing, or in such other manner as may be permitted by law, shall be valid and sufficient service thereof and hereby waive any objections to service in the manner herein provided.

(l)     <u>Waiver of Jury Trial</u>.  Each of the parties to this Agreement hereby agrees to waive its respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this Agreement, including contract claims, tort claims and all other common law and statutory claims.  Each party hereto acknowledges that this waiver is a material inducement to enter into this Agreement, that each has already relied on this waiver in entering into this Agreement, and that each will continue to rely on this waiver in their related future dealings.  Each party hereto further warrants and represents that it has reviewed this waiver with its legal counsel and that it knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS <u>SECTION 16(l)</u> AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.  In the event of litigation, this Agreement may be filed as a written consent to a trial by the court.

(m)     <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or the effectiveness or validity of any provision in any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

28

(n)        <u>Descriptive Headings; Interpretation; No Strict Construction</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement.  Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa.  Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof.  The words "include", "includes" or "including" in this Agreement shall be deemed to be followed by "without limitation".  The use of the words "or," "either" or "any" shall not be exclusive.  The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.   All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time.   All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(o)        <u>Entire Agreement</u>. This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof.

(p)        <u>Termination</u>. The obligations of the Company and of any Holder, other than those obligations contained in <u>Section 12</u> and this <u>Section 16</u>, shall terminate with respect to the Company and such Holder as soon as such Holder no longer beneficially owns any Registrable Securities.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have executed this Registration Rights Agreement as of the date first written above.

**THE GYMBOREE CORPORATION**

By: _____
Name:
Title:

IN WITNESS WHEREOF, the undersigned parties have executed this Registration Rights Agreement as of the date first written above.


<u>HOLDERS</u>:


**[Holder Name]**


By:_____
Name:
Title:


☐ ~~By checking this box, the Holder signing above hereby requests the inclusion of all of its Registrable Securities in the Initial Shelf Registration Statement.~~


☐ ~~By checking this box, the Holder signing above hereby requests the inclusion of _____ of its Registrable Securities in the Initial Shelf Registration Statement, constituting less than all of its Registrable Securities.~~

# <u>EXHIBIT H</u>

**Members of the New Boards and Section 1129(a)(5) of the Bankruptcy Code Disclosures**

# EXHIBIT H

## MEMBERS OF THE NEW BOARDS AND
## SECTION 1129(A)(5) OF THE BANKRUPTCY CODE DISCLOSURES[1]

Pursuant to Article IV.J of the Plan and section 1129(a)(5) of the Bankruptcy Code, this revised Exhibit H to the Plan Supplement identifies certain members of the New Board of Reorganized Gymboree as of the Effective Date.[2]

**Mr. Daniel Griesemer**

Mr. Daniel Griesemer has been Chief Executive Officer and President at The Gymboree Corporation since May 22, 2017. Mr. Griesemer is an experienced retail executive with an established track record of building customer loyalty in an omni-channel environment. He has leadership in the specialty-store sector, combined with his operational and financial experience. Mr. Griesemer served as the Chief Executive Officer and President of Tilly's, Inc. from February 21, 2011 to October 7, 2015. Mr. Griesemer served as the President and Chief Executive Officer of Coldwater Creek Inc. from October 30, 2007 to September 2009. Mr. Griesemer was responsible for its sales, marketing and national retail store expansion plans, as well as all distribution center and customer contact center operations. His career spans 24 years in the retail apparel industry and joined Coldwater Creek in 2001. Mr. Griesemer served as Executive Vice President of Sales and Marketing at Coldwater Creek Inc. from January 2005 to March 2007, where he was responsible for all aspects of sales and marketing for its Catalog, Internet and Retail sales channels and from April 2004 to January 2005, he served as Executive Vice President of Retail. He served as Co-President and Chief Operating Officer of Coldwater Creek Inc. from March 28, 2007 to October 30, 2007 and its Senior Vice President of Retail from October 2001 to April 2004. Mr. Griesemer began his career with Macy's Stores. Mr. Griesemer adapted to the rapidly changing retail marketplace by increasing consumer engagement, elevating the customer experience and succeeding in the e-commerce and digital arena. Prior to joining Coldwater Creek, from 1989 to 2000, Mr. Griesemer held a number of progressively responsible positions with and ultimately served as Divisional Merchandise Manager for Gap Inc. and also served with GapKids and Gap Inc.'s International division. From 1983 to 1989, he served in a variety of positions at Federated Department Stores. He served as a Director of Coldwater Creek Inc. from October 30, 2007 to September 2009. He served as a Director of Tilly's, Inc. from February 21, 2011 to October 7, 2015. He holds a Bachelor of Science degree in Business Administration from the University of Dayton. Mr. Griesemer attended the executive education program at the University of Michigan Ross School of Business.

---

[1]   Capitalized terms used but undefined herein shall have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation and Its Debtor Affiliates* [Docket No. 447] (as amended from time to time, the "Plan").

[2]   One (1) additional member of the New Board of Reorganized Gymboree will be selected prior to the Effective Date pursuant to the Plan.

**Ms. Shaz Kahng**

Ms. Shaz Kahng currently advises private equity and venture capital firms in the areas of retail, footwear, and apparel and serves as a mentor to startups in both the R/GA Westfield Mall retail accelerator and the Lazaridis Program. Previously, Ms. Kahng was a board director and CMO for OMsignal, a leading smart apparel company. Prior to that, she was president of Lucy Activewear, a retailer with 65 stores and over 800 employees where she transformed the business. Ms. Kahng introduced numerous strategic, product, marketing, and retail innovations and along with her team made the company profitable for the first time in its 12-year history. She was one of the few female senior executives at Nike and helped build out Nike's global retail presence and launch Nike+, the chip in the running shoe that "talked" to the iPod nano. Ms. Kahng was the Global GM of Nike Cycling, growing revenues 300% and making it profitable for the first time. Her last role was as a global director and the number two person over the $1 billion Global Women's Training business. Before Nike, Ms. Kahng was Head of Brand Strategy for Wolff Olins, a brand strategy and design firm. Prior to that, Ms. Kahng was a managing director at Scient, an Internet business builder that built eLuxury and Sephora.com. Before that, she was a partner at Kurt Salmon Associates, a global consulting firm advising the world's leading retail and consumer goods brands. Ms. Kahng achieved record sales and earned multiple client awards for outstanding work for a client roster that included Proctor & Gamble, Tiffany & Co., Macy's, Levi Strauss, and The Limited. Ms. Kahng started her career as a research scientist for Kraft General Foods. She holds a B.S. in Food Science & Chemistry from Cornell University and an MBA in Finance & Marketing from the Wharton School of the University of Pennsylvania.

**Mr. Ron Beegle**

Mr. Ron Beegle is the founder and chief executive officer of Carriage House Capital Advisors, LLC ("Carriage House"). Launched in 2015, the Los Angeles based firm provides capital and advisory services to consumer brands and retail companies, as well as private equity firms that invest in those industry sectors. Mr. Beegle launched Carriage House prior to his retirement as co-founder and operating partner of Goode Partners, LLC, a New York based private equity firm that invests primarily in the consumer sector, specifically consumer brands, retail companies, and restaurants. Before co-founding Goode Partners, Mr. Beegle was the founder and chairman of Global Consumer Retail Investors, a consulting firm that worked exclusively for Credit Suisse Private Equity. Prior to becoming involved in private equity, Mr. Beegle worked for twenty years in the retail industry, including most recently at Gap Inc., where he served first as chief financial officer and then chief operating officer of Banana Republic, executive vice president and general manager of Gap Inc. Direct, and finally chief operating officer of the company's flagship Gap division. Mr. Beegle presently serves as a director of Aeropostale, Inc. and lead director of Harris Farms, Inc. He is the former non-executive chairman of the board of Luxury Optical Holdings, as well as a former board member of Neiman Marcus Group and Intermix, Inc. Additionally, Mr. Beegle was a founding director of the USA Swimming Foundation and is a former trustee of Allegheny College. Mr. Beegle is a graduate of Allegheny College and has an MBA from Stern School of Business at New York University.

**Mr. Matt Perkal**

Mr. Matt Perkal is a senior analyst at Brigade Capital Management, LP ("Brigade"), covering the gaming, retail, and restaurant sectors. Brigade is an SEC-registered investment advisor focusing on investing in the global high-yield market. It currently manages approximately $18.1 billion in assets specializing in the credit markets, and implements a fundamentally driven, "bottom-up" investment process which seeks to achieve long term growth of capital independent of the market environment. Prior to joining Brigade, Mr. Perkal worked at Deutsche Bank as an analyst in the Leveraged Finance Group. In that capacity, Mr. Perkal also spent time on the Leveraged Debt Capital Markets Desk, selling both bank and bond deals. Mr. Perkal received a BS in Economics with a concentration in Finance and Accounting from the Wharton School of the University of Pennsylvania.

**Mr. Brian Hickey**

Mr. Brian Hickey serves as a senior analyst on the Senior Corporate Loan team at OppenheimerFunds, Inc. ("Oppenheimer"), a global asset management firm with over $240 billion in assets under management. He currently has analytical responsibilities for the services and telecommunications industries. Mr. Hickey's past industry coverage includes the apparel, automotive, chemicals, financials, homebuilding, and paper and packaging industries. Prior to joining Oppenheimer in 2009, Mr. Hickey was a vice president at Barclays Capital/Lehman Brothers, where he focused on the analysis and valuation of distressed companies. Earlier in his career, Mr. Hickey served as a credit analyst at firms including Moody's, General Motors Asset Management, and Fidelity Investments. Mr. Hickey holds a B.A. in Government from Dartmouth College and an M.B.A. in Finance and Management from New York University. Mr. Hickey is a CFA charterholder.

**Mr. Eric Sondag**

Mr. Eric Sondag is a partner at Searchlight Capital Partners, LP ("Searchlight"), a private investment firm with operations across North America and Europe. Prior to joining Searchlight in 2011, Mr. Sondag worked at GTCR Golder Rauner in Chicago, where he worked primarily on investments in the media, information services, and consumer industries. He started his career in investment banking at Wasserstein Perella in Chicago in 1998. Mr. Sondag is currently Chairman of the Board at Cengage Learning, as well as a board member of TouchTunes and M&M Food Market. He is also a member of the Board of Advisors for Georgetown University's McDonough School of Business. Mr. Sondag received a BSc from Georgetown University and completed the Executive Management Program at INSEAD in Singapore.

On the Effective Date, the officers of the Reorganized Debtors (including the Chief Financial Officer and Chief Restructuring Officer) will be the persons currently serving in such positions. After the Effective Date, the Reorganized Debtors and the New Board shall have the right to (and may) appoint successors in accordance with the New Organizational Documents and applicable law.

## EXHIBIT H (a)

**Comparison of Members of the New Boards and Section 1129(a)(5) of the Bankruptcy Code Disclosures**

# EXHIBIT H

## MEMBERS OF THE NEW BOARDS and SectionAND SECTION 1129(aA)(5) OF THE BANKRUPTCY CODE DISCLOSURES[1]

of the Bankruptcy Code Disclosures

Pursuant to Article IV.J of the Plan and section 1129(a)(5) of the Bankruptcy Code, this revised Exhibit H to the Plan Supplement identifies certain members of the New Board of Reorganized Gymboree as of the Effective Date.[2]

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the New Boards and the officers of each of the Reorganized Debtors shall be appointed in accordance with the New Organizational Documents, other constituent documents of each Reorganized Debtor, and the Plan. The Reorganized Gymboree Board will be composed of seven members as of the Effective Date as follows: (a) Chief Executive Officer of the Reorganized Gymboree (who shall be the Chief Executive Officer of The Gymboree Corporation immediately prior to the occurrence of the Effective Date); (b) Ron Beegle of Carriage House Capital Advisors, LLC; (c) one member selected by Brigade Capital Management; (d) one member selected by Oppenheimer Funds, Inc.; (e) one member selected by Searchlight Capital Partners; and (f) two members selected by the Required Consenting Creditors. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose before Confirmation the identity, affiliations, and nature of any compensation of any Person proposed to serve on the New Boards or any Persons that will serve as an officer of the Reorganized Debtors. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized Gymboree and the Reorganized Debtors.

EXHIBIT H_48807624_1.DOCXMr. Daniel Griesemer

Mr. Daniel Griesemer has been Chief Executive Officer and President at The Gymboree Corporation since May 22, 2017. Mr. Griesemer is an experienced retail executive with an established track record of building customer loyalty in an omni-channel environment. He has leadership in the specialty-store sector, combined with his operational and financial experience. Mr. Griesemer served as the Chief Executive Officer and President of Tilly's, Inc. from February 21, 2011 to October 7, 2015. Mr. Griesemer served as the President and Chief Executive Officer

---

[1] Capitalized terms used but undefined herein shall have the meanings ascribed to them in the *First Amended Joint Chapter 11 Plan of Reorganization of the Gymboree Corporation and Its Debtor Affiliates* [Docket No. 447] (as amended from time to time, the "Plan").

[2] One (1) additional member of the New Board of Reorganized Gymboree will be selected prior to the Effective Date pursuant to the Plan.

of Coldwater Creek Inc. from October 30, 2007 to September 2009. Mr. Griesemer was responsible for its sales, marketing and national retail store expansion plans, as well as all distribution center and customer contact center operations. His career spans 24 years in the retail apparel industry and joined Coldwater Creek in 2001. Mr. Griesemer served as Executive Vice President of Sales and Marketing at Coldwater Creek Inc. from January 2005 to March 2007, where he was responsible for all aspects of sales and marketing for its Catalog, Internet and Retail sales channels and from April 2004 to January 2005, he served as Executive Vice President of Retail. He served as Co-President and Chief Operating Officer of Coldwater Creek Inc. from March 28, 2007 to October 30, 2007 and its Senior Vice President of Retail from October 2001 to April 2004. Mr. Griesemer began his career with Macy's Stores. Mr. Griesemer adapted to the rapidly changing retail marketplace by increasing consumer engagement, elevating the customer experience and succeeding in the e-commerce and digital arena. Prior to joining Coldwater Creek, from 1989 to 2000, Mr. Griesemer held a number of progressively responsible positions with and ultimately served as Divisional Merchandise Manager for Gap Inc. and also served with GapKids and Gap Inc.'s International division. From 1983 to 1989, he served in a variety of positions at Federated Department Stores. He served as a Director of Coldwater Creek Inc. from October 30, 2007 to September 2009. He served as a Director of Tilly's, Inc. from February 21, 2011 to October 7, 2015. He holds a Bachelor of Science degree in Business Administration from the University of Dayton. Mr. Griesemer attended the executive education program at the University of Michigan Ross School of Business.

**Ms. Shaz Kahng**

Ms. Shaz Kahng currently advises private equity and venture capital firms in the areas of retail, footwear, and apparel and serves as a mentor to startups in both the R/GA Westfield Mall retail accelerator and the Lazaridis Program. Previously, Ms. Kahng was a board director and CMO for OMsignal, a leading smart apparel company. Prior to that, she was president of Lucy Activewear, a retailer with 65 stores and over 800 employees where she transformed the business. Ms. Kahng introduced numerous strategic, product, marketing, and retail innovations and along with her team made the company profitable for the first time in its 12-year history. She was one of the few female senior executives at Nike and helped build out Nike's global retail presence and launch Nike+, the chip in the running shoe that "talked" to the iPod nano. Ms. Kahng was the Global GM of Nike Cycling, growing revenues 300% and making it profitable for the first time. Her last role was as a global director and the number two person over the $1 billion Global Women's Training business. Before Nike, Ms. Kahng was Head of Brand Strategy for Wolff Olins, a brand strategy and design firm. Prior to that, Ms. Kahng was a managing director at Scient, an Internet business builder that built eLuxury and Sephora.com. Before that, she was a partner at Kurt Salmon Associates, a global consulting firm advising the world's leading retail and consumer goods brands. Ms. Kahng achieved record sales and earned multiple client awards for outstanding work for a client roster that included Proctor & Gamble, Tiffany & Co., Macy's, Levi Strauss, and The Limited. Ms. Kahng started her career as a research scientist for Kraft General Foods. She holds a B.S. in Food Science & Chemistry from Cornell University and an MBA in Finance & Marketing from the Wharton School of the University of Pennsylvania.

**Mr. Ron Beegle**

Mr. Ron Beegle is the founder and chief executive officer of Carriage House Capital Advisors, LLC ("Carriage House"). Launched in 2015, the Los Angeles based firm provides capital and advisory services to consumer brands and retail companies, as well as private equity firms that invest in those industry sectors. Mr. Beegle launched Carriage House prior to his retirement as co-founder and operating partner of Goode Partners, LLC, a New York based private equity firm that invests primarily in the consumer sector, specifically consumer brands, retail companies, and restaurants. Before co-founding Goode Partners, Mr. Beegle was the founder and chairman of Global Consumer Retail Investors, a consulting firm that worked exclusively for Credit Suisse Private Equity. Prior to becoming involved in private equity, Mr. Beegle worked for twenty years in the retail industry, including most recently at Gap Inc., where he served first as chief financial officer and then chief operating officer of Banana Republic, executive vice president and general manager of Gap Inc. Direct, and finally chief operating officer of the company's flagship Gap division. Mr. Beegle presently serves as a director of Aeropostale, Inc. and lead director of Harris Farms, Inc. He is the former non-executive chairman of the board of Luxury Optical Holdings, as well as a former board member of Neiman Marcus Group and Intermix, Inc. Additionally, Mr. Beegle was a founding director of the USA Swimming Foundation and is a former trustee of Allegheny College. Mr. Beegle is a graduate of Allegheny College and has an MBA from Stern School of Business at New York University.

**Mr. Matt Perkal**

Mr. Matt Perkal is a senior analyst at Brigade Capital Management, LP ("Brigade"), covering the gaming, retail, and restaurant sectors. Brigade is an SEC-registered investment advisor focusing on investing in the global high-yield market. It currently manages approximately $18.1 billion in assets specializing in the credit markets, and implements a fundamentally driven, "bottom-up" investment process which seeks to achieve long term growth of capital independent of the market environment. Prior to joining Brigade, Mr. Perkal worked at Deutsche Bank as an analyst in the Leveraged Finance Group. In that capacity, Mr. Perkal also spent time on the Leveraged Debt Capital Markets Desk, selling both bank and bond deals. Mr. Perkal received a BS in Economics with a concentration in Finance and Accounting from the Wharton School of the University of Pennsylvania.

**Mr. Brian Hickey**

Mr. Brian Hickey serves as a senior analyst on the Senior Corporate Loan team at OppenheimerFunds, Inc. ("Oppenheimer"), a global asset management firm with over $240 billion in assets under management. He currently has analytical responsibilities for the services and telecommunications industries. Mr. Hickey's past industry coverage includes the apparel, automotive, chemicals, financials, homebuilding, and paper and packaging industries. Prior to joining Oppenheimer in 2009, Mr. Hickey was a vice president at Barclays Capital/Lehman Brothers, where he focused on the analysis and valuation of distressed companies. Earlier in his career, Mr. Hickey served as a credit analyst at firms including Moody's, General Motors Asset Management, and Fidelity Investments. Mr. Hickey holds a B.A. in Government from

Dartmouth College and an M.B.A. in Finance and Management from New York University.  Mr. Hickey is a CFA charterholder.

**Mr. Eric Sondag**

      Mr. Eric Sondag is a partner at Searchlight Capital Partners, LLC ("Searchlight"), a private investment firm with operations across North America and Europe.  Prior to joining Searchlight in 2011, Mr. Sondag worked at GTCR Golder Rauner in Chicago, where he worked primarily on investments in the media, information services, and consumer industries.  He started his career in investment banking at Wasserstein Perella in Chicago in 1998.  Mr. Sondag is currently Chairman of the Board at Cengage Learning, as well as a board member of TouchTunes and M&M Food Market.  He is also a member of the Board of Advisors for Georgetown University's McDonough School of Business.  Mr. Sondag received a BSc from Georgetown University and completed the Executive Management Program at INSEAD in Singapore.

      On the Effective Date, the officers of the Reorganized Debtors (including the Chief Financial Officer and Chief Restructuring Officer) will be the persons currently serving in such positions.  After the Effective Date, the Reorganized Debtors and the New Board shall have the right to (and may) appoint successors in accordance with the New Organizational Documents and applicable law.